UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| DENISE M. BARRY; JANE B. GREEN;  ) | CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J.) | |
| McDONOUGH; ELAINE MESITI; LILA ) | |
| BROWN; MARY M. KANE; and          ) | |
| JUDITH A. KELLEY, individually and on) | |
| behalf of all those similarly situated,     ) | |
|                                                            ) | |
|                            Plaintiffs,             ) | |
|                                                            ) | |
|               vs.                                      ) | |
|                                                            ) | |
| ROBERT J. MORAN; RONALD          ) | |
| KEATING; PAUL A. CHRISTIAN;       ) | |
| RODERICK FRASER, Jr.; WILLIAM    ) | |
| KESSLER; WILLIAM HITCHCOCK;     ) | |
| CITY OF BOSTON (FIRE                    ) | |
| DEPARTMENT), and JOHN and/or      ) | |
| JANE DOES 1-50,                              ) | |
|                                                            ) | |
|                            Defendants.            ) | |
| _____ ) | |

**THIRD AMENDED COMPLAINT FOR
INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES
ON BEHALF OF PLAINTIFFS INDIVIDUALLY,
AND ON BEHALF OF A CLASS OF PERSONS SIMILARLY SITUATED**

Plaintiffs Denise M. Barry, Jane B. Green, Elizabeth H. Golden, Patricia J. McDonough,

Elaine Mesiti, Lyla Brown, Mary M. Kane,  and Judith A. Kelley, individually and on behalf of all

those similarly situated [hereinafter collectively referred to as "Plaintiffs"], by and through their

undersigned counsel, hereby assert the following facts and claims against Defendants Robert J.

Moran, Ronald Keating, Paul A. Christian, William Kessler, William Hitchcock [collectively

referred to as the "Individual Defendants"] in their individual and official capacities, and against

Defendant City of Boston and its Fire Department [hereinafter "BFD"].

## I. INTRODUCTION

1)    This is a class action to redress the deprivation under color of statutes, ordinances,

regulations, customs, policies, practices, and/or usages of rights, privileges, and

immunities secured to Plaintiffs by the First, Fifth, Ninth, and Fourteenth Amendments to

the Constitution of the United States, Articles I, VI, XI, and XII, and Amendment XVI of

the Massachusetts Constitution, Declaration of Rights, and 42 U.S.C. §§ 1983 and 1988,

et seq., M.G.L. c. 12, §§ 11H, 11I, and 11J, M.G.L. c. 25, §17, and M.G.L. c. 149, §

185b, the City of Boston October 2000 Executive Order, and state common law, inter

alia.  Plaintiffs, on behalf of themselves and all others similarly situated, seek declaratory

and injunctive relief pursuant to M.G.L. c. 214, § 1, M.G.L. c. 231A, and 42 U.S.C. §§

1983, *inter alia*, and damages.  Plaintiffs allege further that Defendant BFD and its

supervisors negligently failed to train and supervise its employees, including but not

limited to Defendant Moran, thereby causing the violations of Plaintiffs' constitutional,

statutory, and other legal rights, and seek damages accordingly.

## PARTIES

1.    Plaintiff Denise M. Barry is an individual residing at 4 Essex Street, Charlestown, Suffolk

County, Massachusetts 02129.

2.    Plaintiff Jane B. Green is an individual residing at 60 LaGrange Street, West Roxbury,

Suffolk County, Massachusetts 02132.

3.    Plaintiff Patricia J. McDonough is an individual residing at 31 Woodcliff Road, Holbrook,

Norfolk County, Massachusetts 02343.

4.    Plaintiff Elizabeth H. Golden is an individual residing at 74 Tremont Street, Charlestown,

Suffolk County, Massachusetts 02129.

5.      Plaintiff Elaine Mesiti is an individual residing at 12 Waterman Road, Roslindale,  Suffolk

County, Massachusetts 02131.

6.      Plaintiff Lila Brown is an individual residing at 99 Lawrence Avenue, Dorchester,  Suffolk

County, Massachusetts 02121.

7.      Plaintiff Mary M. Kane is an individual residing at 619 East 5th  Street, South Boston,

Suffolk County, Massachusetts 02127.

8.      Plaintiff Judith A. Kelley is an individual residing at 290 Turner Road, Rockland,

Plymouth County, Massachusetts 02370.

9.      Defendant Robert Moran is employed as the Personnel Manager in the Boston Fire

Department.  Upon information and belief, Defendant Moran resides at 86 Minot Street,

Dorchester, Boston, Massachusetts 02122. Defendant Moran is sued in his official and

individual capacities.

10.     Defendant Joseph Finn was employed as the Deputy Fire Chief of Personnel Department

in the Boston Fire Department from 8 December 2001 to 2 July 2005.  Upon information

and belief, Defendant Finn resides at Quincy, Norfolk County, Massachusetts 02269.

Defendant Finn is sued in his official and individual capacities.

11.     Defendant Ronald Keating is employed as the Deputy Fire Chief of Personnel Department

in the Boston Fire Department since 15 June 2005.  Upon information and belief,

Defendant Keating resides at 8163 Bayside Road, Squantum, Norfolk County,

Massachusetts 02171. Defendant Keating is sued in his official and individual capacities.

12.     Defendant Paul A. Christian was, at relevant times herein, employed as the Fire

Commissioner for the City of Boston Fire Department, with his place of business located

3

at 115 Southhampton Street, Boston, Massachusetts, and who resides at 1682 Columbia Road, South Boston, Massachusetts 02127. Defendant Christian is sued in his official and individual capacities.

13. Defendant Roderick Fraser, Jr., is, at relevant times herein, employed as the Fire Commissioner for the City of Boston Fire Department, with his place of business located at 115 Southhampton Street, Boston, Massachusetts, and who resides at 2 Maple Leaf Drive, Hyde Park, Massachusetts 02136. Defendant Fraser is sued in his official and individual capacities.

14. Defendant William Kessler is employed by the City of Boston as the Director of Employment and Recruitment, with his place of business located at Boston City Hall, Room 612, Boston, Massachusetts 02201. Defendant Kessler is sued in his official and individual capacities.

15. Defendant William Hitchcock was employed, at relevant times herein, as the Director of Operations for the City of Boston Fire Department, and resides at 15 Hatch Avenue, Braintree, Massachusetts 02184. Defendant Hitchcock is sued in his official and individual capacities.

16. Defendant City of Boston, inclusive of its Fire Department ["BFD"], is an incorporated governmental municipality of the Commonwealth of Massachusetts, with the BFD's principal office located at 115 Southhampton Street, Boston, Suffolk County, Massachusetts.

17. Defendants John and/or Jane Does 1-50 [hereinafter "Doe Defendants"] are administrators, supervisors, and/or other employees and/or staff of the BFD and/or of related municipal entities, and/or government and/or non-government persons and/or

entities employed, hired, and/or otherwise engaged by the City of Boston, whose true names and capacities are as yet unknown to Plaintiffs and their counsel despite inquiry and due diligence, who acted and/or failed to act herein as more particularly alleged below. The Doe Defendants are sued herein in both their official and their individual capacities. The true names and capacities of the Doe Defendants will be substituted through a Motion to Amend the Complaint as they become known.

## JURISDICTION

18.  The original Complaint in ths matter was filed in the Superior Court of Commonwealth of Massachusetts which had jurisdiction over this action for damages and equitable relief pursuant to M.G.L. c. 212, § 4 and M.G.L. c. 214, §1, respectively,  *inter alia.*

19.  The civil rights claims asserted herein present questions of federal law thereby conferring jurisdiction upon this Court under 42 U.S.C. §§ 1983, inter alia.  Any and all state law claims contained herein form part of the same case or controversy and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## CLASS ACTION ALLEGATIONS

20.  Plaintiffs Barry, Green, McDonough, Golden, Mesiti, Brown, Kane, and Kelley bring this action in their own behalf and, pursuant to Rules 23(a) and 23(b)(1)(2) and (3) of the Federal Rules of Civil Procedure, in behalf of all others who were or are similarly situated.

21.  Plaintiffs Barry, Green, McDonough, Golden, Mesiti, Brown, Kane, and Kelley seek to represent that class of present and former administrative employees of the Boston Fire Department who have been and/or are being subjected to unlawful political affiliation discrimination, or retaliation based upon their objection to, or reporting of, said political affiliation discrimination, that has been practiced and/or is now being practiced within the

Boston Fire Department, as set forth below.

22.    Plaintiffs fairly and adequately will represent the interests of the class because Plaintiffs'
claims that Defendants' policies, practices, regulations, and/or actions deprive them of
constitutionally protected rights, inter alia, are typical of the claims of the class as a whole.

23.    Plaintiffs know of no conflicts of interest among members of the class and are represented
by an attorney with over 15 years of state and federal court litigation experience and who
has litigated several class actions in federal court and adequately will represent the
interests of the entire class.

24.    Plaintiffs allege that the prosecution of separate actions by individual members of the class
would create a risk of inconsistent or varying adjudications which would establish
incompatible standards of conduct for the party opposing the class.

25.    Plaintiffs allege further that adjudications with respect to individual class representatives
would, as a practical matter, be dispositive of the interests of certain other class members
who are not parties to this action, or substantially impair or impede the class members'
ability to protect their interests without class certification.

26.    Defendants have acted and/or refused to act on grounds generally applicable to the class
thereby making appropriate final injunctive, declaratory, and monetary relief with respect
to the class as a whole.

27.    Plaintiffs assert that there are questions of law and fact that predominate over any
questions affecting only individual members, and a class action is superior to individual
lawsuits or other methods of formal dispute resolution.

28.    To the best of Plaintiffs' knowledge and belief, there are approximately thirty-five to forty
potential class members.

## FACTS COMMON TO ALL COUNTS

29. On or about October 2000, City of Boston Mayor Thomas M. Menino issued an Executive Order which "ordered and directed" that "[a]ll departments within the City of Boston shall adhere to this policy" and setting forth the policy, *inter alia*, that "discrimination, retaliation and harassment are contrary to City policy and are also illegal. Such conduct is defined as follows: . . . Conduct that conditions a person's hiring, compensation, terms and conditions of employment or access to services provided by the City on that person's . . . political affiliation[.]"

30. Plaintiffs are informed and believe, and thereupon allege, that the October 2000 Executive Order was issued to address a historical pattern and practice of political affiliation discrimination, a.k.a. "patronage" or "cronyism", within Boston City departments, including but not limited to Defendant Boston Fire Department.

31. On or about July 2001, Defendant Moran was hired by the BFD. Plaintiffs are informed and believe, and thereupon allege, that Defendant Moran was not qualified, and certainly not as well qualified as other applicants as set forth below, or otherwise suited for the position of personnel manager, was suspended and/or terminated from his previous human resources position for cause, and obtained the position with the BFD primarily as a political favor.

32. Plaintiffs are informed and believe, and thereupon allege, that regular meetings were held between and among Defendants Moran, Hitchcock, and Christian, and Fraser as Christian's successor, in which meetings it was determined who would be hired or promoted such that the primary and/or substantial factor was not the person's qualifications, but was the applicant's political affiliation or other association with those

maintaining power and influence as to the BFD.

33.     Since Defendant Fraser was hired as Fire Commissioner, the pattern and practice of

political affiliation discrimination has continued, and Plaintiffs allege that Defendant Fraser

knew or should have known of such discrimination and acquiesced in such unlawful

34.     For more than the past five years, Plaintiffs have been passed over for, denied, or

otherwise dissuaded from applying for, promotions, step increases, and upgrades because

they are not politically affiliated or otherwise advantageously associated with those in

power in the Fire Department, or those in City Government who have influence in the Fire

Department, including but not limited to the following

a.     On 3 Aprll 2006, Jacqueline McGrath,  primarily and/or substantially because of

her political affiliations with one or more of the Defendants or their political

affiliations, was not qualified but placed in a position over a qualified

candidate/class member without the necessary political affiliations, as an R-9,

despite testing positive for drugs.  On 28 April 2006, McGrath's employment

terminated after she was found consistently sleeping at her desk.

b.     On or about 6 February 2006, Anthony Renzi, primarily and/or substantially

because of his political affiliations with one or more of the Defendants or their

political affiliations, was provided a position as Civil Service Linesman on a

Construction Crew, which position never was posted for any of the Plaintiffs or

Class Members to apply; Plaintiff Golden, among other Class Members, would

have applied for this position if it had been offered.  In addition to the procedurally

and substantively unlawful appointment, as an exclamation of his political

connections, Mr. Renzi was escorted personally into the office by Defendant

Moran upon his first day of work, which was special treatment from Defendant

Moran inconsistent with treatment afforded those with no political affiliation.

c.      On or about 22 April 2005, Priscilla Richardson, primarily and/or substantially

because of her political affiliations with one or more of the Defendants or their

political affiliations, was provided a position as an R-10 Principal Clerk, which

position never was posted for any of the Plaintiffs or Class Members to apply;

certain members of the Class would have applied for this position if it had been

offered.

d.      On or about 13 December 2004, Lois Hart, primarily and/or substantially because

of her political affiliations with one or more of the Defendants or their political

affiliations, was hired for the position of an R-14 Principal Clerk, thereby depriving

the position to Plaintiffs Barry and Brown, who had applied, and certain other

Class Members who had applied for the position, or who, such as certain Class

Members were dissuaded from applying because they were informed that a person

with favorable political connections already had been promised the position; More

specifically, the job was first posted months prior to Hart obtaining the position, at

which Barry and Brown applied, then it was posted again, at which only Brown

applied, then, after once again not properly considering Brown's application, the

BFD posted the job city-wide, and Lois Hart was installed as a political favor.

e.      Kerin Cunningham was hired on 25 August 2004 as an R-9 as a political favor and

immediately negotiated a Step 3 pay raise, where the class members need to start

at a Step 1 (Ian McKenzie negotiated a Step 7 upon hire).  Moreover, Cunningham

was promised by Moran and certain other persons with political influence that she

9

would get an R-14 position. On 30 June 2006, Cunningham successfully applied for a compensation grade appeal, with no further real increase in duties, and she was granted a 3-level upgrade (R-9 to R-12) in October with the direct help and intervention of Defendant Ronald Keating, retroactive to 30 June 2006. All Plaintiffs and class members all have been seeking upgrades for their position but have been denied such upgrades, or have been dissuaded from applying for such upgrades because it would be futile, because of their lack of proper political affiliations.

f.      On or about 11 August 2004, Ian McKenzie, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an MM-5 Case Manager/ Utilization Review, later changed and upgraded to MM-7 Director of Utilization Review prior to the hiring of McKenzie, thereby depriving the position to Plaintiffs Barry, Golden, McDonough, and Kelley, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying, such as Plaintiff Green, because they were informed that a person with favorable political connections already had been promised the position;


g.      On or about 20 January 2004, Erica Boylan, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position an R-12 Administrative Assistant, thereby depriving the position to one or more Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a

person with favorable political connections already had been promised the position;

h.      On or about 13 October 2003, Michelle Urso, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an R-15 Head Clerk, thereby depriving the position to Plaintiff Barry, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position;

i.      On or about 12 December 2002, Kerry Manning, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an R-15 Stationary Clerk, thereby depriving the position to Plaintiff Barry, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position;

j.      On or about 21 July 2001, Mary Kilgallen, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of a MM-8 Principal Administrative Clerk, thereby depriving the position to Plaintiffs McDonough, Kane, and Kelley, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position, such as Plaintiff Golden;

    i.    Furthermore, Mary Kilgallen was provided with another MM-8 position on or about August 2003, and her prior position, rather than being reposted, was abolished, thereby denying the opportunity for promotion to Plaintiffs Barry, Green, Kane, Brown, and Kelley who would have applied, and certain other Class Members who would have applied;

        (1)    The new position that eventually was provided to Kilgallen originally was posted as a MM-6, and Kilgallen, a MM-8, was the interviewer for the position along with Defendant Moran, to interview Plaintiffs Barry, McDonough, Kane, Brown, and Kelley. Then when the position was raised to a MM-8, only Plaintiff Golden was interviewed, the other Plaintiffs being told that their prior interviews [with Kilgallen] would suffice.

        (2)    Plaintiffs are informed and believe, and thereupon allege, that Kilgallen is further granted additional benefits, unavailable to Plaintiffs or the Class Members, in the form of paid time off and free tuition to attend higher education classes on Monday, Wednesdays, and Friday from 9 am to 12 pm, and is allowed to sign in, as though working in the building when she is not, from 8 to 5.

        (3)    Plaintiffs Barry, McDonough, Golden, Kane, Brown, and Kelley all protested the manner and substance of Kilgallen's appointment.

k.    On or about 21 July 2001, Defendant Robert Moran, primarily and/or substantially because of his political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of Executive Assistant Director of

Human Services MM-12, thereby depriving the position to Plaintiff Mesiti, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position;

l.      On or about 9 July 2001, Eileen Stille, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an R-10 [or 12] Head Clerk, thereby depriving the position to Plaintiffs Barry, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position;

m.      On or about 19 June 2001, Carol Petta, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an MM-8 Principal Administrative Assistant, thereby depriving the position to Plaintiff McDonough, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position; and

n.      On or about 18 September 2000, Mary Ann McHugo (nee Creedan), primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of a MM-8 Principal Administrative Assistant, thereby depriving the position to Plaintiffs McDonough, Golden and Kelley, who had applied, and certain other Class

13

Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position.

    i.    Plaintiffs are informed and believe, and thereupon allege, that Mary Ann McHugo receives additional benefits and privileges, unavailable to Plaintiffs or Class Members, in the form of free tuition to attend higher education.

35.    For each of the above positions denied to one of the Plaintiffs and/or Class Members as set forth above, *inter alia*, the position filled unlawfully by a political appointee then did not become available for another Plaintiff or Class Member, thus, perpetuating the discriminatory effect down the line to others of lesser or equal grades who would have qualified, applied, and been accepted for the denied Plaintiff's position had it become available.

36.    Defendants BFD, Moran, Christian, and Hitchcock, and certain of the Doe Defendants have established a pattern and practice of hiring and/or promoting, with little or no regard to actual or comparative qualifications, almost exclusively those persons who are politically affiliated, associated, or otherwise connected to those with power and influence over the BFD and those persons in charge, including but not limited to Defendants Moran, Christian, and Hitchcock.

37.    Defendants BFD, Moran, Christian, and Hitchcock, and certain of the Doe Defendants would, as part of their unlawful practice of political affiliation discrimination, tailor the position's requirements to the politically affiliated candidate such as to exclude the equally or more qualified Plaintiff or Class Member, by adding in, on an arbitrary and capricious manner, certain requirements that never were required for the same or similar positions,

and were not required for the substance of the position. In addition, Defendants would apply position requirements only to the non-politically affiliated Plaintiffs and/or Class Members of the BFD and not to the installed politically affiliated person.

38.    Defendants BFD, Moran, Christian, and Hitchcock, and certain of the Doe Defendants would, as part of their unlawful practice of political affiliation discrimination, deny or otherwise impede the provision of training to Plaintiffs, such as Plaintiffs Barry, Golden, and McDonough, and other class members so that they could not match the qualifications set forth in the job postings.

39.    Defendants BFD, Moran, Finn, Keating, Christian, Fraser, and Hitchcock, and certain of the Doe Defendants would, as part of their unlawful practice of political affiliation discrimination, would misrepresent or otherwise fabricate reasons for the denial of promotions to certain Plaintiffs and Class members, such as Defendant Moran representing to potential class member Joanne Callahan (a formal post office worker lifting large sacks of mail) that she was not hired for the job given to Kerry Manning (a former bakery worker lifting sacks of flour) because the BFD needed someone who occasionally could lift large containers of stationary, and Ms. Manning purportedly had the sole ability.

40.    Defendants knew of the unlawful political affiliation discrimination because of complaints reasonably timely submitted to Defendants in writing and orally, and Defendants failed and refused to correct said unlawful discrimination.

41.    Defendants Moran, Keating, Finn, Christian, Fraser, Hitchcock, and Kessler, and certain Doe Defendants acted, and otherwise purposely failed to act, in concert with each other to affect adversely the terms and conditions of Plaintiffs' respective employment as set forth herein.

42.    As set forth in more detail below, complaints were made to Defendant Kessler about the political affiliation and retaliatory conduct of Defendants Moran, Christian, and Hitchcock.

43.    Defendant Kessler never conducted a reasonable investigation, and never issued a written opinion regarding Plaintiffs' complaints, despite receiving a written request to conduct an investigation, and despite receiving complaints about Defendant Moran from other individuals, in addition to Plaintiffs, during the meeting on 7 September 2004, and otherwise.

44.    Instead, Plaintiffs are informed and believe, and thereupon allege, that Defendant Kessler's refusal and deliberate failure to consider and otherwise investigate the Plaintiff's allegations of wrongdoing by Moran and the BFD was motivated by Plaintiffs lack of political affiliation or other advantageous association with those having influence over the BFD.

45.    As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiffs have been deprived of wages and benefits, and continue to suffer such losses  in amounts to be shown at trial, which are the differences between each Plaintiff's then or present wages and the higher wages of the person installed into the position for which each Plaintiff was well qualified, or the difference between comparable step nnd grade increases, as provided, for example, to Kerin Cunningham.

**PLAINTIFF DENISE M. BARRY**

46.    On or about 21 August 1996, Plaintiff Barry commenced employment with the BFD in the Training Division as a Principal Clerk, with an R-8 civil service employment rating.

47.    On or about 3 July 1998 after a budget review, the BFD upgraded all R-8 positions. As a

       result, Plaintiff Barry and another employee were upgraded to Head Clerk (R-l1)

       positions. Then, on 1 September 1998, a Memorandum went out from AFSCME Council

       93 regarding the Joint Clerical Upgrade Committee Meeting such that whoever held a  R-

       11 Head Clerk position was upgraded to Head Clerk (R12) position, Step 1 (Plaintiff

       Barry is now at the current pay rate of a step 5, pursuant to regular Union step increases,

       at approximately $666.00 per week).  This has been the only time that Plaintiff Barry has

       been upgraded.

48.    On or about 14 July 2003, Plaintiff Barry asked Defendant Moran why she was not getting

       raises or upgrades, whereupon Defendant Moran told Plaintiff Barry that there was not

       enough money and that no one is getting a raise.  Coincidentally, despite the purported

       lack of money, Plaintiff Barry discovered that Defendant Moran was trying, at this time, to

       create an R-15 Administrative Assistant position for a Sheila Mancuso, who just recently

       was employed at the BFD on 12 October 2002 as a form of patronage and political favor.

49.    On or about 14 August 2003, Plaintiff Barry submitted a 12-page letter consisting of

       recommendations from various fire and civilian personnel from different offices that

       Plaintiff Barry had assisted during her BFD career.

50.    On or about 20 August 2003, Plaintiff Barry applied for an R-15 Administrative Assistant

       position in the BFD, for which she was well-qualified. Plaintiff Barry went on two

       interviews; first with Defendant Moran; and second with Chief Robert Calobrisi. On her

       way to the second interview, Plaintiff Barry was told by other employees not to waste her

       time because they - Defendant Moran and Defendant Christian - already had someone

       picked for the job from outside the department, and that she purportedly did not meet the

minimum entrance qualifications according to the job posting.   Plaintiff Barry is informed
and believes, and thereupon alleges that an outsider, Michelle Urso, who did not meet the
minimum qualifications but was politically affiliated and otherwise associated with those
with power and influence in the BFD, was hired for the position on or about 1 October
2003.

51.    On or about 28 August 2003, during a conversation with Defendant Moran, Plaintiff Barry
asked Defendant Moran if he had received a reply from City Hall about her pay raise.
Defendant's  response was, despite the recent hiring as set forth above,  "No, I didn't tell
you the City is out of money, there is a freeze on raises and hiring?"   "No,"Plaintiff said,
"you didn't tell me."

52.    For the past 2 years, Defendant Chief William F. Hitchcock and Chief David R. Granara
have requested step increases on several occasions for Plaintiff Barry, which repeatedly
were denied by Defendants Moran and Christian.

53.    For each position for which Plaintiff Barry applied, she was well qualified for the position,
more so than 90% of the persons who received the jobs.

54.    On or about 1 October 2003, a BFD nurse, knowing of Plaintiff's competence, asked
Plaintiff if she would be willing to assist in organizing the medical bills for payment in a
job classified as "Case Manager - Indemnification.".  Plaintiff agreed to help and
Defendant Moran agreed to appoint Plaintiff Barry as an Acting .position of MM-5.

55.    In order to prepare for her new responsibilities, Plaintiff requested of Defendant Moran if
she could attend Peoplesoft Training at City Hall because the software had been updated.
Defendant Moran's reply was "Yes, I will work on it immediately."

56.    On or about 1 October 2003, Plaintiff Barry asked Defendant Moran what Acting Position

grade and step that she was doing as a Case Manager. Defendant Moran responded that the position was an "MM-5, and that he would work out what step it was and respond to Plaintiff Barry at a later time.

57.    On or about 3 October 2003, after only one day at the new position, Plaintiff Barry sent $43,996.48 worth of payrun claims to City Hall to be processed; there was a significant backlog of such payrun claims when Plaintiff Barry entered the position.

58.    On or about 3 October 2003, Nurse Barbara Ryan sent an electronic mail message to Carol Connors and Plaintiff Barry, thanking them for their extra effort during the backlog process.

59.    On or about 6 October 2003, Department Nurse Barbara Ryan sent an electronic mail message to Chief Granara saying that she wanted to thank him for allowing Plaintiff Barry to assist in the claims payment process and that Plaintiff Barry is a pleasure to work with and performs her duties exceptionally well.

60.    Plaintiff Barry was doing both her regular position's responsibilities as well as the Case Manager's responsibilities during the time that she had the temporary upgrade.

61.    On or about 6 October 2003, Plaintiff Barry requested again of Defendant Moran about the step rate, because she was only receiving the pay for a step 1 while she should be receiving at least a Step 3 or 4.

62.    On or about 7 October 2003, Plaintiff Barry requested again of Defendant Moran if he had a chance to ask City Hall about the stcp rate; Defendant Moran responded that he would check into it.

63.    On or about 7 October 2003, Plaintiff Barry sent $25,753.28 worth of payrun claims to City Hall for processing in order to assist in clearing the Case Manager backlog.

64.    On or about 8 October 2003, Plaintiff Barry went to the Fire Marshall's Office of Maryanne McHugo in order to get trained in People Soft, but Ms. McHugo had informed Defendant Moran earlier that she could not train Plaintiff Barry, and Defendant Moran had failed to inform Plaintiff Barry about this situation, thereby causing unnecessary dissension among BFD employees, and embarrassing Plaintiff Barry.

65.    On or about 9 October 2003, Plaintiff Barry had a meeting with the Fire Department Human Resources Manager, Defendant Robert Moran.  This meeting was called because Plaintiff Barry wanted to inquire if she would be getting the Case Manager position and because Plaintiff Barry had complaints that she was not receiving promotions and pay increases when due.

66.    At the 9 October 2003 meeting, in response to Plaintiff Barry's request for the position and complaints, Defendant Moran said that Plaintiff Barry would not be getting the position, that City Hall had someone else in mind and said, rather blatantly, "Well, if you're not into politics little girl, then you're not into a position here."

67.    At the 9 October 2003 meeting, at which Plaintiff Jane Green was present as Plaintiff Barry's Union Shop Steward, Plaintiff Green promptly stood up upon Defendant Moran's statement above, and said to Defendant Moran "I can't believe you are saying this to her, not to mention in front of me."  Defendant Moran replied "that's the way it is around here."   Whereupon Plaintiff Barry said "so, I am going to be punished because I am not into politics?"  Defendant Moran shrugged his shoulders and said "that's politics for you."

68.    Later on 9 October 2003, Plaintiff Barry was informed that Defendant Moran was going to retaliate against Plaintiff Barry for her complaints and request for pay raises, such that

he never would approve any pay increases for Plaintiff Barry. That has been the case since that time, such that Plaintiff Barry has continued to be denied promotions and wage increases.

69. The person who received the Case Manager position was a former BFD employee who was politically affiliated with those with power and influence over the BFD, Ian McKenzie, who, Plaintiffs are informed and believe, did not even live within the City of Boston at the time he was hired, as is a requirement for such positions; Mr. McKenzie lived in Maryland at the time, while using a Boston property that he owned as his residence address for the purposes of applying for the position. Moreover, Mr. McKenzie received the position as an MM-8, Step 7, paying approximately $1,350.00 per week, rather than the MM-5, Step 1 pay at approximately $720.00 per week that Plaintiff Barry was receiving for doing the same job.

70. After Plaintiff Barry's above-mentioned meeting with Defendant Moran, Plaintiff Barry complained in writing and in a meeting to Defendant Kessler, the Director of Employment and Recruitment for the City of Boston, who told her that what Defendant Moran said was not unlawful discrimination and that he could not help Plaintiff Barry.

71. Plaintiff Barry had subsequent meetings with Defendant Kessler and at each meeting, Defendant Kessler refused to acknowledge that discrimination on the basis of political affiliation was unlawful and failed and otherwise refused do an independent investigation of Plaintiff Barry's allegations.

72. On or about 3 September 2004, Plaintiff Barry submitted to her supervisor Chief Granara a written complaint against Defendant Moran and the BFD's unlawful practices and policies that he was effectuating.

73.    Shortly about or after 3 September 2004, Chief Granara then informed Defendant
Hitchcock and then proceeded to inform the Fire Commissioner Defendant Christian of
Plaintiff's complaint against Defendant Moran and the alleged policies of discrimination.

74.    On or about 3 September 2004, Plaintiff Barry again submitted to, *inter alia*, Defendant
Kessler, formal complaints about Defendant Moran's actions against her, including her
lack of promotions and retaliation for her complaints, and as to Plaintiff Green for the
retaliation being perpetrated upon her as her witness.  The Mayor of the City of Boston
was notified also of Plaintiffs' complaints against Defendant Moran.  In response, on 21
October 2004, legal counsel for the City of Boston's Office of Labor Relations drafted a
letter warning Plaintiffs' counsel not to speak with any employees of the City of Boston
regarding this matter.

75.    On or about 7 September 2004, a meeting was held with Defendant Kessler to review the
complaints regarding Defendant Moran's, and others', discrimination, mistreatment, and
retaliation against Plaintiffs Barry and Green.

76.    More than six months elapsed and Plaintiffs are informed and believe, and thereupon
allege, that Defendant Kessler never conducted an investigation, and never issued a
written opinion regarding Plaintiff Barry and Green's complaints, despite receiving a
written request to conduct an investigation, and despite receiving complaints about
Defendant Moran from other individuals, in addition to Plaintiffs, during the meeting on 7
September 2004.

77.    Defendant Kessler, instead of investigating the significant complaints about Defendant
Moran's unlawful employment practices from Plaintiff Barry and others, placed an
unreasonable and unnecessary burden upon Plaintiff Barry to produce more

documentation, when, in fact, Defendant Kessler had more than enough information to commence and otherwise complete a good faith investigation.

78. On or about 15 October 2004, Plaintiff Barry was denied a step increase by Defendants.

79. On or about 20 October 2004, Chief Joseph Finn requested a step increase for Kathy Frechette for an R-17.  Kathy Frechette resides in South Boston and is politically affiliated with those presently having political influence over the Boston Fire Department.

80. On or about 9 December 2004, Plaintiff Barry had two hearings scheduled at Labor Relations before Analyst Alice Kessler, the wife of Defendant William Kessler,  that were held with regards to her complaints that she was being discriminated against.

81. Eight days after the hearings on 9 December 2004, Plaintiff Green was informed that the Commissioner wants her out of the building immediately for no apparent reason.

82. On or about this time in Mid-December 2004, Defendants Moran, Christian, and Hitchock, *inter alia*, had a meeting in which it was decided to retaliate against Plaintiff Barry through harassing her witness, and Union Shop Steward Plaintiff Green, by moving Plaintiff Green away from her files and making Plaintiff Green's terms and conditions of employment more onerous.  At this meeting, in response to concerns that their behavior was retaliatory, Defendant Hitchcock stated "F–k Jane Green."

83. Plaintiff Barry was offered only once an out-of-grade positions when such position were made available to less senior civil service and non-civil-service employees who were politically affiliated to influential persons, including but not limited to Defendants Christian and Moran, for which she would have been qualified.  On or about 15 November 2004, Plaintiff Barry reported and complained about this unlawful practice to Defendants, but her reports and complaint were ignored.

84.     On or about 4 April 2005, Plaintiff Barry arrived at work, after having taken the last few business days off because of the stress induced by Defendants' retaliatory conduct, and discovered that a surveillance camera installed to monitor the entrance has been re-trained, at the direction of the Fire Commissioner - Defendant Christian's office, to monitor her work station, instead of the entrance way.

85.     Since approximately January of 2006, Plaintiff Barry has been compelled to cover the responsibilities of a Fire Lieutenant (Thomas Dinan), who had been getting acting Captain's pay, who passed away, without Plaintiff Barry being offered an out-of grade promotion for doing the extra work.

86.     As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Barry has been deprived of approximately $90,000 in wages and benefits, and continues to suffer such losses at the rate of approximately $1,092 per week, which is the difference between her present wages and the wages of the person who was doing her present job responsibilities before her, for which Plaintiff Barry was well qualified.

87.     As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Barry has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF JANE B. GREEN**

88.     Plaintiff Green is employed by the Boston Fire Department as a civil service employee, and a member of, and shop steward in, SENA, Local 9158.

89.    Plaintiff Green's  responsibilities include reviewing fire reports of the on-scene firemen, providing documentation and confirmation to victims of fires so that the victims, many of whom are poor and destitute as a result of the fire, can receive recoveries from their insurance companies and aid from welfare agencies, including temporary housing and housing assistance payments.  The victims of house and car fires are directed to seek assistance through Plaintiff Green.

90.    On or about 9 October 2003, Plaintiff Green was present as the Union Shop Steward for Union Member Plaintiff Barry for a meeting between Plaintiff Barry and Boston Fire Department Human Resources Manager Defendant Robert Moran.  This meeting was called as a result of complaints by Plaintiff Barry that she was not receiving promotions and pay increases when due.  In response to Plaintiff Barry's complaints, Defendant Moran said, rather blatantly, "Well, if you're not into politics little girl, then you're not into a position here."  Plaintiff Green promptly stood up and said to Defendant Moran "I can't believe you are saying this to her, not to mention in front of me."  Mr. Moran replied "that's the way it is around here."   Whereupon Plaintiff Barry said "so, I am going to be punished because I am not into politics?"  Defendant Moran shrugged his shoulders and said "that's politics for you."

91.    On or about this time in Mid-December 2004, Defendants Moran, Finn, Christian, and Hitchock, *inter alia*, had one or more meetings in which it was decided to retaliate against Plaintiffs by moving Plaintiff Green away from her files and make Plaintiff Greens terms and conditions of employment more onerous.  At this meeting, in response to concerns that their behavior was retaliatory, Defendant Hitchcock stated "F–k Jane Green."

92.    On and before 27 December 2004, Plaintiff Green was based at 115 Southampton Street,

Boston, Massachusetts; all of the records that she needs are there, as well as the computer files vital to the efficient operation of her position.

93.    In addition, the Fire Investigation Unit, a necessary stop for the victims of car fires, is located just behind 115 Southhampton Street, on 920 Massachusetts Avenue.  Fortunately for the victims of house fires, there is ample free parking near 115 Southampton Street.

94.    On Thursday, 23 December 2004, Defendant Moran handed Plaintiff Green a paper stating "this is your official transfer paper," signed, Peter Liazza, Fire Marshal, Boston Fire Department.   Plaintiff Green is informed and believes and thereupon alleges that Liazza only signed the document under duress and at the insistence of Defendant Finn.  The transfer stated that management has decided that the Fire Reports section (Plaintiff Green's section) of the Fire Prevention Division will be relocated to 1010 Massachusetts Avenue, 4th floor, starting Monday, 27 December 2004.  The only explanation provided was that "this is not a transfer but a relocation."

95.    When Plaintiff Green was moved, she was told that the equipment and files needed for her position would be moved with her.  This did not happen for more than 8 months after she moved, forcing her to travel back and forth between buildings for almost the entire winter..

96.    The relocation is arbitrary, capricious, and malicious because Plaintiff Green's records remained located at 115 Southampton Street, requiring her to make two or three trips a week to look up information for customers.

97.    Plaintiff Green's move to 1010 Massachusetts Avenue also has an adverse impact upon the public.

98.    Plaintiff Green's move causes an unnecessary, malicious, arbitrary, and capricious burden

to the public to access the Fire Investigation Unit, there is no free parking (often a vital

consideration for the newly destitute); and Plaintiff Green was practically unreachable

because her old telephone number had been disconnected, without being re-established at

her new location until Tuesday, 8 March 2005. Plaintiff Green remained separated from

key files and records located at 115 Southhampton Street for more than eight months,

posing an undue and malicious burden upon the terms and conditions of her employment

because of her exercise of her First Amendment Rights to speak on behalf of Plaintiff

Barry.

99.     Up until 8 March 2005, Plaintiff Green's current location did not provide her with a

telephone such that she was cut off from answering vital customer and work-related

inquiries and helping customers in need of emergency services, such that she was forced to

locate an available desk, and stand over the person whose desk it is, to answer and return

calls at least 15 to 20 times a day for three months.

100.    The Boston Fire Department is in the business of not only putting out fires, but are to

provide fire victims with the essential services they need to help them.

101.    The emotional pain of people experiencing the devastating effects of fire is traumatic, and

then not to provide the emergency services they so desperately need creates further

trauma and burden. With the loss of a home, belongings and sometimes family members,

people are emotionally distraught and angry, and are in need of emergency services.

Plaintiff Green's present location prevents her from meeting the needs of the public

effectively.

102.    Plaintiff Green's responsibilities as Senior Administrative Assistant - Incident Reports

requires her to be in constant contact with people to provide information on fire or

incident reports, and to do research in order to get emergency services when needed either through Boston Housing, Salvation Army, Red Cross or insurance companies. This process further requires the public to come to 1010 Mass Ave., to pick up a fire report or information, where parking is a problem or paying a parking fee of five-dollars (which they often do not have); such problems did not exist at her former location.

103.    Because of information that Plaintiff Green has provided and offered to provide as a witness to the violations of law being perpetrated by Defendants, the actions of the Defendants are in violation of the terms and conditions of her employment and of law.

104.    The transfer or job relocation to 1010 Mass Ave., serves no other purpose than retaliation, discrimination, and harassment because of Plaintiff Green's exercise of her First Amendment Rights to freedom of speech in her union activity in an official capacity as shop steward, and in her role as a witness to and reporter of the violations of law perpetrated upon Plaintiff Barry.

105.    The transfer or job relocation has been difficult and frustrating for Plaintiff Green in trying to do Plaintiff Green's job for at least eight full months after her purported "transfer", and has caused, and continues to cause, severe emotional and physical distress and suffering, such that she has been compelled to seek medical treatment for the same.

106.    Plaintiff Green filed a grievance regarding her retaliatory, forced relocation, which was heard on 27 January 2005 by Labor Relations Analyst Alice Kessler.

107.    Labor Relations Analyst Alice Kessler is the wife of Defendant Kessler.

108.    By decision dated 1 March 2005, Labor Relations Analyst Kessler found that there was no violation of the collective bargaining agreement, and thereby denied Plaintiff Green's grievance.

109.  Plaintiffs are informed and believe, and thereupon allege, that such grievances that address the discrimination based upon political affiliation, and any related grievances, are arbitrarily, capriciously, and uniformly denied by the Office of Labor Relations, and specifically by Ms. Kessler.

110.  As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Green discovered from her physician on Saturday, 12 March 2005, that her blood pressure suddenly has become threateningly high, such that her physician has considered pulling Plaintiff Green from her position for health reasons.

111.  On 1 April 2004, Defendant Moran continued his retaliatory conduct against Plaintiffs by calling Plaintiff Green at her home and denying her bereavement leave for the death of her husband's brother the day before.   It has been the long standing practice in the BFD to grant five days of bereavement leave under such and similar circumstances.  Thus, Plaintiff Green has been forced to use her vacation pay instead of the bereavement leave ordinarily granted, and has suffered the loss of those vacation days in the amount of approximately $669.00, accordingly.

112.  As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Green has been deprived of approximately $45,000 in wages and benefits, and continues to suffer such losses at the rate of approximately $400 per week, which is the difference between her present wages and the wages of the person installed into the Case Manager position, for which Plaintiff Barry was well qualified.

113.  As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Green has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100.000.00.

114.   Defendants, in concert with each other, acted, and otherwise purposefully failed to act, to affect adversely the terms and conditions of Plaintiff Green's employment as set forth.

**PLAINTIFF PATRICA McDONOUGH**

115.   On or about 6 November 1974, Plaintiff McDonough commenced employment with the BFD in an administrative position.

116.   Plaintiff McDonough is now, and has been for approximately the last five years, at the current pay rate of an MM-6.

117.   For the positions to which she applied, Plaintiff McDonough often was told not to waste her time because they - Defendants Moran and Defendant Christian, among others in power - already had someone picked for the job from outside the department, and that she purportedly did not meet the minimum entrance qualifications according to the job posting.

118.   In or about September 2000, when Plaintiff McDonough applied for the position given to Mary Ann McHugo, Defendants decided to not even provide Plaintiff McDonough an interview for the posted position.

119.   For each position for which Plaintiff McDonough applied, she was well qualified for the position, more so than the politically affiliated persons who received the jobs.

120.   Plaintiff McDonough, timely after her denials of the above-mentioned positions, submitted written complaints and/or grievances to her supervisors and Defendants, including Defendant Kessler, describing and seeking a correction of the unlawful practices and policies that were being effectuated by the Defendants; Plaintiff McDonough continues to

assert her complaints in writing and orally..

121.    As a direct and proximate result of the discrimination and other violations of the law

perpetrated by Defendants, Plaintiff McDonough has been deprived of approximately

$70,000.00 in wages and benefits, and continues to suffer such losses at the rate of

approximately $251.22 per week.

122.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,

Plaintiff McDonough has suffered, and will continue to suffer, severe emotional distress in

amounts to be proven at trial, but no less than $100,000.00.


**PLAINTIFF ELIZABETH H. GOLDEN**

123.    On or about 15 July 1985, Plaintiff Golden commenced employment with the BFD in an

administrative position.

124.    Plaintiff Golden is now, and has been for approximately the last five years, at the current

pay rate of an MM-6.

125.    For the positions to which she applied, and for some that she did not, Plaintiff Golden

often was told, many times by Defendant Moran, not to waste her time because they -

Defendants Moran and Defendant Christian, among others in power -  already had

someone picked for the job from outside the department, and that she purportedly did not

meet the minimum entrance qualifications according to the job posting.

126.    For each position for which Plaintiff Golden applied, she was well qualified for the

position, more so than the politically affiliated persons who received the jobs.

127.    Plaintiff Golden submitted written complaints and grievances  to her supervisors and

Defendants, including Defendant Kessler, describing and seeking a correction of the

unlawful practices and policies that were being effectuated by the Defendants.

128.    On or about Spring 2005, Plaintiff Golden met, after submitting a written complaint and

demand for investigation, with Labor Relations with Defendant William Kessler,  that was

held to discuss her complaints that she was being discriminated against.

129.    Defendant Kessler promised to investigate Plaintiff's Golden's allegations but, Plaintiff

Golden is informed and believes and thereupon alleges, that Defendant Kessler did not

perform an investigation in good faith or otherwise, and simply informed Plaintiff Golden

that her complaint was not covered by the Collective Bargaining Agreement.  When asked

to point specifically to what provision[s] of the CBA did not no apply, Defendant Kessler

failed and refused to answer such of Plaintiff Golden's inquiried.

130.    As a direct and proximate result of the discrimination and other violations of the law

perpetrated by Defendants, Plaintiff Golden has been deprived of approximately

$68,000.00 in wages and benefits, and continues to suffer such losses at the rate of

approximately $220.00 per week.

131.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,

Plaintiff Golden has suffered, and will continue to suffer, severe emotional distress in

amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF ELAINE MESITI**

132.    On or about 11 July 1966, Plaintiff Mesitit commenced employment with the BFD in an

administrative position.

133.    Plaintiff Mesiti is now, and has been for approximately the last five years, at the current

pay rate of an MM-8.

134.    For the positions to which she applied, Plaintiff Mesiti often was told not to waste her

time because they - Defendants Moran and Defendant Christian, among others in power - already had someone picked for the job from outside the department, and that she purportedly did not meet the minimum entrance qualifications according to the job posting.  .

135.   For each position for which Plaintiff Mesiti applied, she was well qualified for the position, more so than the politically affiliated persons who received the jobs.

136.   As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Mesiti has been deprived of approximately $123,900.00 in wages and benefits through 2005, and continues to suffer such losses at the rate of approximately $390.00 per week.

137.   As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff McDonough has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF LILA BROWN**

138.   On or about 26 November 1997, Plaintiff Brown commenced employment with the BFD in an administrative position.

139.   Plaintiff Brown is now, and has been for approximately the last five years, at the current pay rate of an R-12.

140.   For the positions to which she applied, Lois Hart's R-14, Plaintiff Brown applied the first time that the position was offered interdepartmentally.   Plaintiff was interviewed, along with Plaintiff Green, but both were informed that the position was going to be reposted interdepartmentally.  The second time that it was posted, Plaintiff Brown was the only applicant, and, though qualified, still she did not get the position.  The position was posted

a third time, city wide, to which Plaintiff Brown applied again, interviewed again and once again was not picked. The third time around, Lois Hart, substantially on the basis of her political connections.

141.    Plaintiff Brown often was told not to waste her time because they - Defendants Moran and Defendant Christian, among others in power -  already had someone picked for the job from outside the department, and that she purportedly did not meet the minimum entrance qualifications according to the job posting.

142.    For each position for which Plaintiff Brown applied, she was well qualified for the position, more so than the politically affiliated persons who received the jobs.

143.    As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Brown has been deprived of approximately $4,000 in wages and benefits through 2005, and continues to suffer such losses at the rate of approximately $89.00 per week.

144.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Brown has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF MARY KANE**

145.    On or about 26 October 1987, Plaintiff Kane commenced employment with the BFD in an administrative position.

146.    Plaintiff Kane is now, and has been for approximately the last five years, at the current pay rate of an MM-8.

147.    For the positions to which she applied, Plaintiff Kane often was told not to waste her time because they - Defendants Moran and Defendant Christian, among others in power -

already had someone picked for the job from outside the department, and that she purportedly did not meet the minimum entrance qualifications according to the job posting.

148. For each position for which Plaintiff Kane applied, she was well qualified for the position, more so than the politically affiliated persons who received the jobs.

149. Plaintiff Kane complained orally and submitted written complaints and grievances to her supervisors and Defendants, including Defendant Kessler, describing and seeking a correction of the unlawful practices and policies that were being effectuated by the Defendants.

150. As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Kane has been deprived of approximately $ 78,000.00 in wages and benefits, and continues to suffer such losses at the rate of approximately $344.00 per week.

151. As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Kane has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

## PLAINTIFF JUDITH A. KELLEY

152. On or about 6 June 1980, Plaintiff Kelley commenced employment with the BFD as an R-2 Clerk Typist.

153. Plaintiff Kelley is now a senior administrative assistant, and has been for approximately the last thirteen years, at the current pay rate of a MM-5.

154. Plaintiff Kelley has continued to complain and object to the unlawful treatment as set forth herein.

155.  When Plaintiff went out on Workers Compensation in November 1999, she had the responsibility of manager of Fire Prevention at MM-5 level.  After she had been out on year, she discovered that her responsibilities were going to be given to Mary Ann McHugo at the MM-8 level, and Plaintiff Kelley applied for the position given to Mary Ann McHugo, but was told that she could only apply if she were able to come back immediately.

156.  Plaintiff Kelley, and the other Plaintiffs, constantly sought, inquired after, or applied for step and grade increases for her responsibilities, but was denied in an arbitrary and capricious manner when other politically affiliated persons received such step and grade increases undeservedly.

157.  For each position for which Plaintiff Kelley applied, she was well qualified for the position, more so than the politically affiliated persons who received the jobs.

158.  As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Kelley has been deprived of approximately $20,000.00 in wages and benefits, and continues to suffer such losses at the rate of approximately $60.00 per week.

159.  As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Kelley has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.


## CLAIMS

### First Cause of Action - Massachusetts Civil Rights Act M.G.L. c. 12, 11H and 11I

160.  Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

161.    Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

162.    Defendants Christian, Fraser, Finn, Hitchcock, Keating, Kessler, Moran, and certain Doe Defendants perpetrated, and continue to perpetrate a scheme of harassment and retaliation against Plaintiffs in order to deny Plaintiffs rights secured to them by the Constitution and laws of the Commonwealth of Massachusetts and of the United States.

163.    Defendants Christian, Fraser, Hitchcock, Kessler, Moran, Finn, Keating and certain Doe Defendants, in their individual capacities, interfered, or attempted to interfere, by threats, intimidation, and/or coercion, with Plaintiffs' exercise of their rights of freedom of speech and association, and to due process of law, *inter alia.*

164.    As a direct and proximate cause of these Defendants' violation of laws as set forth herein, Plaintiffs have suffered, and continue to suffer, adverse and hostile employment actions, and severe emotional distress, in amounts as set forth herein and to be proven at trial.


**Second Cause of Action - Whistleblower Protection Act - Violation of M.G.L. c 149, § 185**

165.    Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

166.    Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

167.    Plaintiffs have suffered retaliation in the form of adverse and hostile terms and conditions of employment  because of Plaintiffs' reports regarding the unlawful political affiliation discrimination and patronage practices being perpetrated by Defendant BFD (Defendants Christian, Fraser, Finn, Keating, Hitchcock, and Moran in their official capacities).

168.    As a direct and proximate result of said violations of public policy, Plaintiffs have suffered,

and will continue to suffer, adverse and hostile employment conditions and severe

emotional distress in amounts as set forth herein and to be shown at trial.

### Third Cause of Action - 42 U.S.C. § 1983

169.    Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

170.    Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all

those similarly situated.

171.    This claim for relief is brought against Defendants Moran, Christian, Fraser, Finn, Keating,

Kessler, and Hitchcock, and certain of the Doe Defendants, in their individual capacities

for monetary damages, against Defendant BFD for monetary damages because of the

pattern and practice of such unlawful conduct, and against all Defendants in their official

capacities, including the BFD, for declaratory and injunctive relief.

172.    Plaintiffs are informed and believe, and thereupon allege, that the individual Defendants

Moran, Christian, Fraser, Finn, Keating, Hitchcock, Kessler, and certain of the Doe

Defendants acted and/or purported to act herein under color of statutes, regulations,

customs, practices, and/or usages of the Municipality of the City of Boston and the

Commonwealth of Massachusetts.

173.    Plaintiffs are informed and believe, and thereupon allege, that by the aforementioned acts

and/or omissions of Defendants Moran, Hitchcock, Kessler, and Christian and certain of

the Doe Defendants, Plaintiffs have been unlawfully denied their First Amendment Rights

to Freedom of Speech and Association, due process of law, and their rights to be free

from unlawful discrimination, including discrimination on the basis of political affiliation

and patronage, whether created by federal, state, or local law, inter alia, in violation of

38

rights guaranteed to them by the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and the Constitution and laws of the Commonwealth of Massachusetts, including but not limited to M.G.L., c. 12, §§ 11H, 11I, and 11J, Articles I, VI, XI, XII, and Amendment XVI of the Massachusetts Constitution, the Massachusetts Declaration of Rights, M.G.L. c. 127, § 32, M.G.L., c. 149, § 185b; and the City of Boston October 2000 Executive Order, inter alia.

174.   Plaintiffs are informed and believe, and thereupon allege, that Defendants Moran, Christian, Fraser, Finn, Keating, Hitchcock, Kessler, and certain of the Doe Defendants, acted herein knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference for the rights and/or interests and/or well being of Plaintiffs, thereby directly and proximately causing injuries in amounts as set forth herein and to be proven at trial.

## Fourth Cause of Action - NEGLIGENT SUPERVISION

175.   Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

176.   Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

177.   This claim for relief is brought against Defendants Christian, Fraser, and Hitchcock in their individual an official capacities, and Defendant BFD.

178.   Plaintiffs are informed and believe, and thereupon allege, that Defendants Christian, Fraser, and the BFD, and certain of the Doe Defendants, and/or their predecessors and successors in their respective employment offices, failed and refused to properly train, supervise, and/or discipline Defendants Moran and Hitchcock, and certain other of the Doe Defendants, including but not limited to the supervisory staff of the BFD, thereby proximately causing the aforementioned injuries to Plaintiffs.

179.    Plaintiffs are informed and believe, and thereupon allege, that Defendants BFD and

Defendants Moran, Christian, Fraser, Kessler, Hitchcock, and certain of the Doe

Defendants acted herein with negligence and/or deliberate indifference to the rights,

interests, and well being of Plaintiffs, thereby directly and proximately causing injuries in

amounts as set forth herein and to be proven at trial.

180.    Plaintiffs have brought to the attention, in writing and otherwise the discriminatory

practices, retaliatory actions, and general negligence of the Defendants as set forth herein,

to their supervisors and the City of Boston, or have been informed, or otherwise have

experienced, that it would be futile to complain about such discriminatory practices.

## Sixth Cause of Action - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

181.    Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

182.    This cause of action is brought against Defendant Moran, Christian, Hitchcock, Kessler,

and certain of the Doe Defendants in their individual capacities only.

183.    Plaintiffs recognize that this Sixth Cause of Action for Intentional Infliction of Emotional

Distress was dismissed by order of this court as to Plaintiff Green and include the claim as

for Plaintiff Barry, and all others similarly situated, and merely preserve the issue for

possible appeal by Plaintiff Green, rather than to assert it anew.

184.    Defendants knew or should have known that their conduct would cause severe emotional

distress to Plaintiffs.

185.    Defendants' conduct was and continues to be outrageous and beyond the bounds of

decency.

186.    Plaintiffs are informed and believe, and thereupon allege, that Defendant Moran, Christian,

Hitchcock, Kessler, and certain of the Doe Defendants malevolently wrongfully and

intentionally caused emotional distress upon Plaintiffs.

187. Plaintiffs are informed and believe, and thereupon allege, that Defendant Moran, Christian,

Hitchcock, Kessler, and certain of the Doe Defendants acted herein knowingly,

intentionally, willfully, and deliberately without regard for Plaintiffs' rights, interests, or

well being, thereby directly and proximately causing injuries in amounts as set forth herein

and to be proven at trial.

### Seventh Cause of Action - NEGLIGENCE

188. Plaintiffs hereby incorporate all of the allegations contained in the preceding paragraphs.

189. Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all

those similarly situated.

190. This cause of action is brought against all Defendants.

191. Plaintiffs are informed and believe, and thereupon allege, that Defendants acted herein

negligently, including but not limited to Defendants' failure to appropriately train and/or

supervise Defendant Moran and other Fire Department employees in the appropriate

standards of conduct regarding the prohibitions of political affiliation discrimination and

retaliation for exercises of rights to freedom of speech constitutes negligence under state

tort law and M.G.L. c. 258, *inter alia,* thereby proximately and directly causing the

injuries of which Plaintiffs complain.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For a determination that the named Plaintiffs qualify as class representatives for

those persons similarly situated;

(B)    For a Declaration that the actions and/or omissions of Defendants in failing and

refusing to promote and/or upgrade Plaintiffs on the basis of their political affiliation, or lack thereof, *inter alia,* with the attendant deprivations, as set forth herein violate Plaintiffs' rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution; Articles 1, 10, 11, 12, and 16 of the Massachusetts Declaration of Rights; 42 U.S.C. §§ 1983; G.L. c. 127, § 32;  and state tort law; and for a further Declaration that the actions and/or omissions of Defendants in retaliating against Plaintiff Green because of her status as a witness to the aforesaid violations and for her support of Plaintiff Barry's report of violations of law violate Plaintiff Green's rights under the Fifth and Fourteenth Amendments to the United States Constitution, Articles 1, 10, 11,12, and 16 of the Massachusetts Declaration of Rights, 42 U.S.C. § 1983; M.G.L. c. 12, §§ 11H, 11I, and 11J; M.G.L. c. 127, § 32; and state tort law;

(C)     For and injunction preventing Defendants from interfering with the terms and conditions of Plaintiff Green's position's responsibilities such that she be relocated at 115 Southampton Road, Boston with all of the facilities necessary for her to fulfill her employment responsibilities without harassment or intimidation.

(D)     For general damages in the amount of no less than $2,000.000 against Defendant Moran, Christian, Kessler, Hitchcock, and certain of the Doe Defendants, in their individual capacities, according to the proof thereof at trial;

(E)     For special damages against Defendants Moran, Christian, Finn, Keating, Kessler, and Hitchcock, and certain of the Doe Defendants, in their individual capacities, according to the proof thereof at trial, in amount in excess of $600,000.00 for the class representatives and an additional amount of approximately $40 - 75,000 for each class member, plus medical expenses for Plaintiff Green, and other Class Members similarly situated;

(E)     For pre-judgment interest and triple damages pursuant to the Whistleblower

Protection Act, M.G.L., c. 149, § 185.

(F)    For punitive damages against Defendant BFD, and Defendants Moran, Christian, Kessler, and Hitchcock, and certain of the Doe Defendants, in their individual capacities, in an amount sufficient to deter such practices in the future, which amount is alleged to be $500,000;

(G)    For reimbursement of Plaintiffs' costs and expenses herein, including reasonable provision for their attorneys' fees and costs pursuant to 42 U.S.C. § 1988, M.G.L. c. 12, § 11H, 11I, and 11J, and the Massachusetts Declaration of Rights,  *inter alia*; and

(H)    For such further and additional relief as the Court deems appropriate and just.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

Respectfully submitted,
Plaintiffs Denise M. Barry and Jane B.Green
By their attorney,


_____ /s/ Thomas F.Feeney _____
Thomas F. Feeney, BBO # 645605
THOMAS F FEENEY, COUNSELLOR AT LAW
39 Sheafe Street, Suite 1
Chestnut Hill, Massachusetts  02467
Tel.: (617) 277-5750
DATED: 8 December 2006                Fax: (617) 277-5751



Certificate of Service
I, Thomas F. Feeney, hereby certify that the foregoing document was served upon counsel for the

named Defendants in this matter on the 8th day of December 2006 by Electronic Filing Notification and U.S. Mail, First Class Postage, Prepaid..

                                    _____/s/ Thomas F. Feeney_____