UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ELIZABETH H. GOLDEN; PATRICIA J. McDONOUGH; ELAINE MESITI; LILA BROWN; MARY M. KANE; and JUDITH A. KELLEY, individually and on behalf of all those similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ROBERT J. MORAN; RONALD KEATING; PAUL A. CHRISTIAN; RODERICK FRASER, Jr.; WILLIAM KESSLER; WILLIAM HITCHCOCK; CITY OF BOSTON (FIRE DEPARTMENT), and JOHN and/or JANE DOES 1-50, <br><br> Defendants. | CIVIL NO. 05-10528 RCL |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Plaintiffs DENISE M. BARRY; JANE B. GREEN; ELIZABETH H. GOLDEN;

PATRICIA J. McDONOUGH; ELAINE MESITI; LILA BROWN; MARY M. KANE; and

JUDITH A. KELLEY, individually and in behalf of all persons similarly situated [hereinafter

collectively referred to as "Plaintiffs"], by and through their undersigned attorneys, hereby move

for an order allowing this cause to be maintained as a class action.

This motion is made pursuant to Rules 7, 23(a), 23(b) (2), and 23(b)(3) of the Federal

Rules of Civil Procedure, and is based on the Memorandum in Support of Class Certification and

Declarations of Plaintiffs and their counsel and exhibits attached hereto, the records and files

herein, and the arguments of counsel at a hearing on the motion.  In support of their motion,

Plaintiffs assert that:

1.      The Plaintiff class is composed of all persons who have been and/or are being

subjected to unlawful political affiliation discrimination, or retaliation based upon their objection

to, or reporting of, said political affiliation discrimination, that has been practiced and/or is now being practiced within the Boston Fire Department.

2.       Within this class, Plaintiffs seek also to represent the following subclasses:

        A.      Plaintiffs seeking injunctive relief who have been discriminated against because of their lack of political affiliation.

        B.      Plaintiffs who may have monetary claims for injuries suffered due to Defendants' denial of advancement or pay increases while employed by the Boston Fire Department.

3.       The class is so numerous that joinder of all its members is impracticable.

4.       There are questions of law and/or fact common to the class.

5.       The claims of the named Plaintiffs are typical of the claims of the class.

6.       Plaintiffs fairly and adequately will represent the claims of the entire class.

7.       The Defendants have acted on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

WHEREFORE, Plaintiffs pray that this action be certified as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b) (3) of the Federal Rules of Civil Procedure.

Respectfully submitted,
Plaintiffs Denise M. Barry and Jane B.Green
By their attorney,

____/s/ _Thomas F. Feeney_____
Thomas F. Feeney, BBO # 645605
FEENEY & ASSOCIATES AT LAW
39 Sheafe Street, Suite 1
Chestnut Hill, Massachusetts  02467
Tel.: (617) 277-5750
Fax: (617) 277-5751

DATED: 3 August 2007

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ELIZABETH H. GOLDEN; PATRICIA J. McDONOUGH; ELAINE MESITI; LILA BROWN; MARY M. KANE; and JUDITH A. KELLEY, individually and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ROBERT J. MORAN; RONALD KEATING; PAUL A. CHRISTIAN; RODERICK FRASER, Jr.; WILLIAM KESSLER; WILLIAM HITCHCOCK; CITY OF BOSTON (FIRE DEPARTMENT), and JOHN and/or JANE DOES 1-50,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL NO. 05-10528 RCL |

**MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 2

II. THE PROPOSED CLASS .......................................................................... 5

III. RULE 23(a) REQUIREMENTS ARE SATISFIED ..................................... 5

     A.    The class is so numerous that joinder of all its members is impracticable ..... 6

     B.    There Are Questions of Law or Fact Common to the Class ......................... 7

     C.    The claims of representative parties are typical of claims or defenses of class .................................................................................................... 9

     D.    The Representative Parties Will Fairly and Adequately Protect the Interests of the Class ....................................................................................... 18

IV. REQUIREMENTS OF RULE 23(b) ARE SATISFIED ............................... 19

V. TIME SCOPE OF CLASS ALLEGATIONS ................................................ 21

CONCLUSION .............................................................................................. 21

# I. INTRODUCTION

"Well, if you are not into politics little girl, then you're not into a position here."

A statement made by Defendant Moran that succinctly characterizes the pattern and practice within the Boston Fire Department.[1]  This civil rights action is primarily seeking declaratory and injunctive relief - stop the practice, and create hiring procedures resistant to such political patronage.   In Chicago, there has been in place a consent decree on behalf of all present and future employees of the Chicago municipal employees addressing the identical manner of political patronage at issue here - not so much as between political parties, but as between those local neighborhood groups in power and those without such influence.[2]   See e.g.,  Shakman v.

---

[1]    Understandably, Defendant Moran at his deposition denied ever saying this, and even denied that such a meeting ever occurred, despite the presence of witnesses.  See Moran Deposition Transcript dated 9 July 2007 p. 65, ll. 11-14 submitted herewith as Exhibit Q. Defendant Moran also categorically denies that political patronage ever plays a role in appointments at the Boston Fire Department.  Common knowledge and specific revelations of other persons with knowledge, in addition to the Plaintiffs, indicate otherwise.  See Affidavits of Cathy Moore and Mike Mahoney submitted herewith respectively as Exhibits H and M, and generally Plaintiffs' Answers to Interrogatories submitted herewith.   Either Moran is woefully uninformed as a head of personnel, or he is purposefully misrepresenting the facts.

[2]    **Shakman Consent Decrees**
     On May 5, 1972, the City of Chicago entered into a Consent Judgment with the Shakman Plaintiffs prohibiting, "coerced political financial contributions by any governmental employee, contractor or supplier, to any individual or organization.  See Shakman Monitor's Report, submitted herewith as Exhibit R.   The 1972 Order also prohibits the City from:
     1.. conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor;
     2. knowingly causing or permitting any employee to do any partisan political work during the regular working hours of his or her governmental employment, or during time paid for by public funds.  See Id.
     In 1983, the City entered into a second consent judgment in the Shakman litigation extending the 1972 order to include a prohibition against hiring based on political factors.   The 1983 Consent Decree prohibits the City from: (1) conditioning, basing or knowingly prejudicing or affecting the hiring of any person as a Governmental Employee (other than for Exempt Positions), upon or because of any political reason or factor including, without limitation, any prospective employee's political affiliation, political support or activity, political financial contributions, or such prospective employee's political sponsorship or recommendation."  Id. at p. 6 (citing 1983 Consent Decree).  The 1983 Consent Decree also required the City to submit a

Democratic Organization of Cook County, 435 F. 2d. 267 (7th Cir. 1970).

On 14 March 2005, Plaintiffs filed in Suffolk Superior Court a Verified Complaint for Injunctive Relief, Declaratory Relief, and Damages against the City of Boston Fire Department, Robert J. Moran, Paul A. Christian, William Kessler, and William Hitchcock in their individual and official capacities. On 15 September 2006, Plaintiffs filed their Second Amended Complaint for Injunctive Relief, Declaratory Relief, and Damages. On 8 December 2006 Plaintiffs filed their Third Amended Complaint for Injunctive Relief, Declararory Relied, and Damages.

The Third Amended Complaint asserts claims for, *inter alia*, prospective injunctive and declaratory relief based upon the alleged deprivation under color of statutes, ordinances, regulations, customs, policies, practices, and/or usages of rights, privileges, and immunities secured to Plaintiffs by the First, Fifth, Ninth, and Fourteenth Amendments to the Constitution of the United States, Articles I, VI, XI, and XII, and Amendment XVI of the Massachusetts Constitution, Declaration of Rights, and 42 U.S.C. §§ 1983 and 1988, et seq., M.G.L. c. 12, §§ 11H, 11I, and 11J, M.G.L. c. 25, §17, and M.G.L. c. 149, § 185b, the City of Boston October 2000 Executive Order, and state common law, inter alia. Plaintiffs, on behalf of themselves and all others similarly situated, seek declaratory and injunctive relief pursuant to M.G.L. c. 214, § 1,

———————————————

Plan of Compliance outlining the steps the City would take in hiring and promoting employees to ensure compliance with the court orders. Id.

**Criminal Prosecutions**

The United States Attorney's Office for the Northern District of Illinois has aggressively prosecuted senior City of Chicago officials for willful violations of the 1972 and 1983 Shakman Consent Decrees. See Department of Justice Press Release submitted herewith as Exhibit S. On July 29, 2005, Donald Tomczak, former Deputy Commissioner of the City of Chicago Water Department, pleaded guilty to criminal charges regarding his role in the city's hiring and promotion practices. Tomczak's guilty plea included sworn admissions that he and others awarded jobs and promotions to individuals based on political considerations in direct violations of the Shakman Decrees. Id.

Additionally, in 2006, Robert Sorich, senior advisor to Mayor Richard Daley, was found guilty of repeated instances of manipulation of the interviewing, selection and hiring processes by the City of Chicago to ensure preferential hiring and promotions for pre-selected candidates, in direct violation of the Shakman Decrees. Id.

M.G.L. c. 231A, and 42 U.S.C. §§ 1983, *inter alia*, and damages.  Plaintiffs allege further that

Defendant BFD and its supervisors negligently failed to train and supervise its employees,

including but not limited to Defendant Moran, thereby causing the violations of Plaintiffs'

constitutional, statutory, and other legal rights, and seek damages accordingly.

The State will be liable under 42 U.S.C. § 1983 for discriminating against people based

on political affiliation.  Pendant state law claims related to intentional infliction of emotional

distress and negligent supervision will also bind the State and its employees, both in their official

and individual capacities.

The leading cases on political affiliation discrimination is Elrod v. Burnes, 427 U.S. 347

(1976).  In Elrod, petitioners were non-civil service employees who were fired or threatened

with dismissal solely because they were not affiliated with or sponsored by the political party

currently in power. The U.S. Supreme Court held that non-policy making employees may not be

dismissed based on their political affiliation alone.   Elrod v. Burnes, 427 U.S. 347, 373 (1976).

> Under that [patronage] practice, public employees hold their jobs on the condition
> that they provide, in some acceptable manner, support for the favored political party.
> The threat of dismissal for failure to provide that support unquestionably inhibits
> protected belief and association, and dismissal for failure to provide support only
> penalizes its exercise.  The belief and association which government may not ordain
> directly are achieved by indirection.  And regardless of how evenhandedly these
> restraints may operate in the long run, after political office has changed hands
> several times, protected interests are still infringed and thus the violation remains.

Elrod 427 U.S. at 359-360.  The Court went further and held the "[p]rotection of First

Amendment interests has not been limited to invalidation of conditions on government

employment requiring allegiance to a particular political party.  This Court's decisions have

prohibited conditions on public benefits, in the form of jobs or otherwise, which dampen the

exercise generally of First Amendment rights, however slight the inducement to the individual to

forsake those rights." Elrod 427 U.S. at n. 11.  "The denial of a public benefit may not be used

by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." Elrod, 427 U.S. at 361. "Rights are infringed both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason." Elrod, 427 U.S. at n.13.

The Court later clarified its ruling in Elrod, in the case of Branti v. Finkel, 445 U.S. 507 (1980), in which it distinguished between policymaking position (which are subject to such discrimination) and positions having no bearing on such concerns. See Fuentes v. Gaztambide, 807 F.2d 236, 239-241 (1st Cir. 1986) and cases cited therein; see also Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990)(public employee's right under the First Amendment to have promotion decision made without consideration of political affiliation or support); Hosford v. School Committee of Sandwich, 51 Mass. App. Ct. 728 (1996); Souther Worcester County Regional Vocational Sch. Dist. v. alobor Relations Comm'n, 386 Mass 414 (1982)(failure to re-appoint untenured teacher because of union activity). In the instant matter, none of the positions are policy making positions; they merely effectuate policies created and enforced by higher level positions. For example, the Commissioner of the Fire Department and his deputy would be policymaking positions. The Commissioner's secretary or minor departmental managers would not be such a position.

## II. STANDARDS FOR CLASS CERTIFICATION

"Class actions serve to afford remedies for injuries unremedied by the regulatory action of government, and they enhance the effectiveness of private attorney general litigation that otherwise might be brought only on an individual basis. Deposit Guar. Nat'l Bank v. Roper, 455 U.S. 326, 339 (1988) reh'g denied 446 U.S. 947. The objectives of a class action include:

    1.      Judicial economy and efficiency;

    2.      Protection of defendants from inconsistent obligations;

3.    Protection of the interests of absentees;

4.    Access to judicial relief for small claimants;

5.    Enhanced means for private attorney general suits to enforce laws and to

deter wrongdoing.

Newberg on Class Actions, (Shepard's/McGraw-Hill 3rd ed. 1992), § 1.06, p. 1-20

"A district court's ruling on the certification issue is often the most significant decision

rendered in these class-action proceedings."  Deposit Guar. Nat'l Bank v. Roper, supra; Manual

for Complex Litigation, Second § 30 (1985) ("Deciding whether to certify a class action and

defining its membership are rulings that often prove as important as those on substantive

issues.").  On behalf of themselves and a class similarly situated, Plaintiffs ask this Court to

determine that this action may proceed as a class action pursuant to Rules 23(a) and 23(b) (2) of

the Federal Rules of Civil Procedure ("F.R.Civ.P.").

> On a motion for class certification, "[a] district court must conduct a rigorous analysis of
> the prerequisites established by Rule 23." Smilow v. Southwestern Bell Mobile Sys., Inc.,
> 323 F.3d 32, 38 (1st Cir.2003) (citing General Telephone Co. v. Falcon, 457 U.S. 147,
> 161, ... (1982)). This analysis should not involve a "preliminary hearing into the merits,"
> Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, ... (1974), but rather an inquiry into
> "whether the requirements of Rule 23 are met," id. at 178, ... (quoting Miller v. Mackey
> International, Inc., 452 F.2d 424, 427 (5th Cir.1971)) (internal quotation marks omitted).
> The moving party bears the burden of establishing the elements necessary for class
> certification: the four requirements of Rule 23(a) and one of the several requirements of
> Rule 23(b). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14, ... (1997);
> Guckenberger v. Boston Univ., 957 F.Supp. 306, 325 (D.Mass.1997) (Saris, J.).
>
> Rule 23(a) imposes four "threshold requirements" applicable to all class actions:
>
> > (1) the class is so numerous that joinder of all members is impracticable, (2) there
> > are questions of law or fact common to the class, (3) the claims or defenses of the
> > representative parties are typical of the claims or defenses of the class, and (4) the
> > representative parties will fairly and adequately protect the interests of the class.
>
> Fed.R.Civ.P. 23(a); Amchem, 521 U.S. at 613, 117 S.Ct. 2231. In addition to the
> requirements of Rule 23(a), the moving party must establish the elements of Rule
> 23(b)(1), (2), or (3). Amchem, 521 U.S. at 614.

In Re Relafin Antitrust Litigation, 221 F.R.D. 260, 265-66 (D. Mass. 2004).  Thus, class

certification under Rule 23, F.R.Civ.P., requires the existence of all of the factors listed under

Rule 23(a) and that at least one of the alternative factors of Rule 23(b) is present also.  <u>See</u>

<u>McLaughlin v. Liberty Mut. Ins. Co.</u>, 224 F.R.D. 304, 307 (D.Mass. 2004).  <u>Blake v. Barnett</u>,

663 F.2d 906, 912 (9th Cir. 1981); <u>Peterson v. Oklahoma City Housing Auth.</u>, 545 F.2d 1270,

1273 (10th Cir. 1976). Plaintiffs meet the requirements of Rule 23(a) and (b).

### III.  THE PROPOSED CLASS

The Plaintiff class is composed of all persons who have been and/or may be subjected to

unlawful political affiliation discrimination, or retaliation based upon their objection to, or

reporting of, said political affiliation discrimination, that has been practiced and/or is now being

practiced within the Boston Fire Department.  The class includes those employees who have

applied for positions, promotions, pay upgrades, and/or step increases.  The class includes also

those individuals who were denied the opportunity to apply for a position that would have been

open had a more qualified, non-affiliated BFD applicant obtained a promotion given to a

(usually non-BFD) political appointee.

### A.    **The class is so numerous that joinder of all its members is impracticable**

Plaintiffs have identified **by name**, including themselves, up to 45 potential class

members.  At a single point in time, there are approximately 76 AFSCME and SENA civilan

employees  working at the fire department.  See Exhibits A and B, respectively, submitted

herewith.  As such, there may be 76 class members for the injunctive and declaratory relief

aspect of this case.  Over the course of 6 years, there would be many more such employees

would have claims for damages.   Most of the civilian employees of the Boston Fire Department,

a number well in excess of 50, are likely victims of the political affiliation, patronage, and

influence discrimination being practiced at the Boston Fire Department.  <u>See</u> e.g., Answers to

Defendants' Interrogatory No. 14 submitted by Plaintiffs Barry (identifying by name 38 potential

class members) and Golden (identifying by name 35 potential class members), submitted herewith as Exhibits C and D, respectively.  The testimony of Robert Moran, just as to the positions identified by the Plaintiffs that were allegedly the objects of political affiliation discrimination, indicated a potential class membership of upwards of 100 potential members, and that was for just one of the positions.  See e.g., Deposition Transcript of Robert Moran dated 13 June 2007, submitted as Exhibit E, p. 70, ll.4-22 (100 applicants, 20 interviewed); see also Moran Deposition dated 13 June 2007, pp. 86-87, ll. 17-24 and 1-5 (20 Applicants, 10 interviewed).

"Numerosity" is the first requirement for class certification under Rule 23(a) which is met when the joinder of all of its individual members is impracticable.  Rule 23(a) (1), F.R.Civ.P.  No set numerical formula exists for determining whether a class is numerous enough to meet the Rule 23(a) (1) numerosity requirement.  The critical inquiry for determining class status is not merely the numerical size of the class, but whether joinder of all class members would be impracticable.  Groups as small as thirteen have been certified as a class.  Dale Electronics, Inc. v. R.C.I. Electronics, Inc., 53 F.R.D. 531 (D.N.H. 1971); see also Cypress v. Newport News Gen'l. & Nonsectarian Hosp. Assn., 375 F.2d 648 (4th Cir. 1967) (class action by African-American physician for injunction against racially discriminatory policies of publicly supported hospital properly brought on behalf of all 18 African-American physicians practicing medicine in area); Manning v. Princeton Consumer Discount Co., 370 F.Supp. 320 (E.D.Pa. 1975) (fourteen member class).  In Massachusetts, an class size of 40 appears to hold presumptive legitimacy.  See McLaughlin v. Liberty Mutual Insurance Company, 224 F.R.D. 304 (2004)(Keeton, J.)(certifying 51 member class of former employees seeking overtime pay) citing In Re Relafin Antitrust Litigation, 218 F.R.D. 337, 342 (D.Mass. 2003)(Young, J.)(citing McAdams v. Massachusetts Mut. Life Ins. Co. 2002 WL 1067449 at *3 (D.Mass.

2002)(Friedman, J.).

The size of this class is likely to be at least 40, and most likely well in excess of that number, as the claims implicate all civilian employees of the Boston Fire Department.  See Dale Electronics, Inc. v. R.C.I. Electronics, Inc., supra (numerosity satisfied by 13 members of identifiable class); see also Cypress v. Newport News Gen'l. & Nonsectarian Hosp. Assn., 375 F.2d 648 (4th Cir. 1967) (eighteen member class); Manning v. Princeton Consumer Discount Co., 370 F.Supp. 320 (E.D.Pa. 1975) (fourteen member class).

In addition to the size of the class, the fear of retaliation for joining this suit is especially sharp given the claims asserted.  As recognized by Judge Keeton in McLaughlin, "Many courts have suggested that the employer-employee relationship is of such a nature that an employee 'may feel inhibited to sue making joinder unlikely.'" 224 F.R.D at 310 quoting Ladegaard v. Hard Rock Concrete Cutters, Inc., 2000 WL 1774091 at *4 (N.D.Ill. 2000), accord O'Brien v. Encotech Constgruction Services, Inc., 203 F.R.D. 346, 351 (N.D. Ill. 2001); Scott v. Aetna Services, Inc., 210 F.R.D. 251, 267 (D.Conn. 2002).   Plaintiff Jane Green already has felt the wrath of the Defendants' displeasure, as has Plaintiff Denise Barry.  See Answers to Interrogatories of Plaintiffs Barry and Green attached hereto as Exhibits C and F, respectively. In essence, one's career could well be over if those in power decide that a civilian employee sits on the wrong side of the fence.

Moreover because the discrimination continues, the membership of the instant class of Plaintiffs is constantly changing, as a result of all the individuals that apply for newly available positions, or a change in grade, or new individuals are interviewed.  Continual change of class membership is a legitimate reason for certifying a class.  United States v. Peters, 153 F.R.D. 615 (N.D.Ill. 1994) (habeas petitioners; Santiago v. City of Philadelphia, 72 F.R.D. 619, 624 (E.D.Pa. 1976); Ponce v. Housing Auth. of County of Tulane, 389 F.Supp. 635, 655 (E.D.Cal.

1975).

It is apparent, also, that without class certification, it would be extremely difficult or impossible to identify and locate all of the persons who have been, are, or may be discriminated against by the policies and practices of the Defendants.  Employment records are confidential. In this case, even though Plaintiffs have requested the employment records of the individuals who have applied for positions, the Defendants redacted all relevant information such as names of these individuals.  Difficulty in identifying and locating each affected person also is relevant in determining that joinder is impracticable.  Doe v. Charleston Area Medical Center, Inc., 529 F.2d 638, 645 (4th Cir. 1975).

Finally, individual class members may not have monetarily nominal individual incentive for pursuing the declaratory and injunctive relief requested, as their damages may be prospective (a position has not yet opened up for which they are qualified), thus making joinder impractical at this time.  Although each of the class members has as his or her long term interest in eliminating political discrimination for positions for which they may become eligible, not every one of the class members has yet incurred damages, or has incurred significant damages as a result of Defendants' unlawful practices.

Plaintiffs respectfully submit that the "numerosity" requirement of Rule 23(a)(1) is satisfied in this case because of the numerical size of the class (greater than 70); the fear of retaliation, the continuously changing membership of the class;; and the difficulty of identifying and locating every affected person, especially those who may have left the Commonwealth.

**B.     There Are Questions of Law or Fact Common to the Class**

"Commonality" is the second requirement for class certification under Rule 23(a), which is met when the joinder of all of its individual members is impracticable.  Rule 23(a) (2), F.R.Civ.P.  All potential class members have been employed by the Boston Fire Department.

All class members, during the course of their employment applied for a position, pay increase, and/or grade increase and the resulting employment decision was adverse to their interests because of their lack of political affiliation, sponsorship, or support. The politically motivated procedure and decision making related to individuals less qualified, constitutes a recurring and common practice applicable to all, even though certain factual situations may be case specific. See, e.g., Jensen v. Eveleth Taconite, 139 F.R.D. 657 (D.Minn. 1991).

In Jensen v. Eveleth Taconite,, the District of Minnesota certified a class that comprised women mining company employees who were subjected to a discriminatorily hostile work environment. The Minnesota District Court rejected the defendant's argument that the women's claims were inherently individual in nature. Id. "[E]specially where the subject-matter of the suit is common to all, there can be very little danger but that the interest of all will be properly protected and maintained." Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 363 (1921).

Numerous class actions have been certified in cases challenging practices of government agencies, even though the precise injury suffered by each class member was not identical. See e.g., Jordan v. County of Los Angeles, 669 F.2d 1311, 1319-20 (9th Cir. 1982) vacated on other grounds, 459 U.S. 810 (1982), amended 726 F.2d 1366 (9th Cir. 1984); Liberty Alliance of the Blind v. Cellophane, 568 F.2d 333, 347 (3rd Cir. 1977); Like v. Carter, 448 F.2d 798 (8th Cir. 1971), cert. denied, 405 U.S. 1045 (1972); Mayhaw v. Cohen, 604 F.Supp. 850 (C.D.Pa. 1984) (Money award not inconsistent with class certification requirement that there be common questions of law or fact; court may certify classification or injunction issue and treat damages as incidental); Rodriguez v. Swank, 318 F.Supp. 289, 294 (N.D.ILL. 1970), aff'd mem., 403 U.S. 901 (1971).

"Rule 23(a)(2) requires that questions of law or fact be shared by the prospective class, but does not require that every question be common." See McLaughlin v. Liberty Mut. Ins. Co.,

224 F.R.D. 304, 309 (D.Mass. 2004);  Kirby v. Cullinet Software, Inc., 116 F.R.D. 303, 306

(D.Mass.1987); see also Black v. Barrack, 524 F.2d 891, 904 (9th Cir. 1975), cert. denied, 429

U.S. 816 (1976)(Plaintiffs need present only single issue of law or fact common to all class

members).  Common issues of fact affect all potential members, and although some of the

individual facts concerning injuries to members of the Plaintiff class may vary, the facts of being

discriminated against based on political affiliation, and the issues of law raised in this action, are

common to all class members, and thus the "commonality" factor in Rule 23(a)(2) is present.

### C.    The claims of representative parties are typical of claims or defenses of class

Under Rule 23(a)(3), the named plaintiffs' claims must be typical of the claims of the

proposed class. "The central inquiry in determining whether a proposed class has 'typicality' is

whether" the class representatives' claims "have the same essential characteristics as the claims

of the other members of the class." See McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304,

310 (D.Mass. 2004) quoting Cheney v. Cyberguard Corp., 213 F.R.D. 484, 491 (S.D.Fla.2003)

(quoting In re Amerifirst Secs. Litig., 139 F.R.D. 423, 428 (S.D.Fla.1991)).  "Typicality,"

overlaps considerably with the other requirements of Rule 23(a), see Donaldson v. Pillsbury Co.,

554 F.2d 825, 829 (8th Cir. 1977), and is satisfied where there is no antagonism between the

claims of the named Plaintiffs and the claims of the class.  Fowler v. Birmingham News Co., 608

F.2d 1055, 1058 (5th Cir. 1979); Cunter v. Fried, 373 F.Supp. 4, 13 (S.D.N.Y. 1974).  The

"typicality" factor is present also where the named representatives' claims are similar enough to

the class claims to ensure that the named Plaintiffs will adequately represent them.  Cruz v.

Bowen, 672 F.Supp. 1300, 1305 (N.D.Cal. 1987) quoting General Telephone Co. of Southwest

v. Falcon, 457 U.S. 147, 157 n.13 (1982); Donaldson, 554 F.2d at 831; 7A C. Wright, A. Miller,

& Y. Kane, FEDERAL PRACTICE AND PROCEDURE, § 1764 (1986).  "The "plaintiffs need not

show substantial identity between their claims and those of absent class members, but need only

show that their claims arise from the same course of conduct that gave rise to the claims of the absent members." McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304, 310 (D.Mass. 2004) quoting Priest, 118 F.R.D. at 555 (internal quotation marks omitted); See Fraser v. Major League Soccer, L.L.C., 180 F.R.D. 178, 181, (D.Mass. 1998). "The claims of a class representative are "typical" when the representative's injuries arise from the same course of conduct as do the injuries that form the basis of the class claims."; See also Modell v. Eliot Sav. Bank, 139 F.R.D. 17, 22 (D.Mass.1991).

Plaintiffs in this action seek relief that is appropriate to the members of the proposed class. There is no information that the individual Plaintiffs' claims are antagonistic to the interests of other class members. If Plaintiffs prevail upon the merits, the interests of the class members in not being discriminated against will be advanced significantly.

With regard to the factual circumstances surrounding each Plaintiff's claims, each Plaintiff has reaffirmed and re-alleges the facts alleged in the Third Amended Complaint. See Answers to Interrogatories provided by Plaintiffs submitted herewith as Exhibits C, D, F, G, I, J, K, and L; see also Deposition of Plaintiffs Barry, McDonough, and Golden, submitted herewith as Exhibits N-P. Defendants Barry and Green verified the original complaint filed. As such, the facts for each plaintiff will not be recounted in full. Except for Plaintiff Green, the named Plaintiffs have each applied for a promotion, step increase, and/or pay upgrade and were denied based on their lack of political affiliation. Plaintiff Green's claim focuses on the retaliation that she suffered as a result of her.

After their application, the Plaintiffs received an adverse employment decision in the form of a denial of the promotion, pay increase, or step increase., because a less qualified individual with the correct political connections was hired or otherwise given pay increases. By way of example, the position involving Mary Ann McHugo's political affiliation appointment is

instructive.

In the depositions, corporate counsel sought to portray the political anointment process as merely rumour. In fact, it is common knowledge. The common knowledge as to McHugo's appointment is confirmed by the assertions made in the Affidavits of Catherine M. Moore and Maurice J. Mahoney. More specifically, Catherine M. Moore has asserted in her affidavit:

> Deputy Chief Joseph Fleming and District Chief Paul Burke called me into their office to tell me they needed an MM-8 to run Fire Prevention. At the time, I was the Shop Steward and Co Chapter Chair Person for the AFSCME Union. Chief Fleming told me how they were going to put up a posting for an MM-8, I said "that will be a good position for Patti McDonough to put in for, she took on those duties for a year and a half when you needed someone and she has many years of service", then Chief Fleming said "Patti's not getting the job" then he continued to tell me a woman named MaryAnn Creedon (now McHugo) from City Hall, who was a friend of Andy Warren's would be getting the job.

> When the position was finally posted, the job description was changed from the one that was shown to me in the office, prior to the posting, they added qualifications that would match MaryAnn's background.

> Patricia McDonough came back from a week's vacation to find out that the interviews were all completed, MaryAnn was already selected and Patti was told she did not get an interview because she did not meet the minimum qualifications.

See Affidavit of Catherine M. Moore, submitted herewith as Exhibit H.

Maurice J. Mahoney asserted in his affidavit:

> Sometime around late spring or early summer of the year 2000, while I was having a conversation with the Fire Marshal, Deputy Chief Joseph Fleming, he informed me that he went to Andy Warren and requested to have a job posted for a supervisor for the civilian employees in the Fire Prevention Division. Chief Fleming also stated to me, that as soon as he made the request, Andy Warren said he knew just the woman for the job, as she had to get out of the Auditors Office at City Hall.

> When the position for a Principal Administrative Assistant (MM8), in Fire Prevention was filled by MaryAnn Creedon (McHugo) it became evident to me that this was the woman that Andy Warren was talking about prior to the job being posted. She talked openly about being friends with Andy Warren.

14

<u>See</u> Affidavit of Maurice J. Mahoney, submitted herewith as Exhibit M. McHugo was overheard constantly bragging about her political connections, but categorically denied ever referring to such connections, perhaps in the belief that outright denial will delay judgment.

### D.    Fair and Adequate Protection of the Interests of the Class

"Adequate representation" is the fourth factor of Rule 23(a) that needs to be present for proper class certification. Fair and adequate representation is present where 1) the class representatives have common interests with the unnamed members of the class and 2) the representatives will be able to prosecute the class claims vigorously. <u>Harris v. Pan Am World Airways, Inc.,</u> 74 F.2d 1489 (9th Cir.), <u>vacated on other grounds</u>, 469 U.S. 1082 (1984); <u>Gonzales v. Cassidy</u>, 474 F.2d 67, 73 (6th Cir. 1973). Both of the above requirements are satisfied in the present case.

First, counsel for Plaintiffs previously have litigated individual suits and class actions concerning civil rights. <u>See</u> Affidavit of Counsel submitted herewith. Plaintiffs' counsel clearly are adequate advocates for Plaintiffs and their class, and will prosecute the claims vigorously. More importantly, Plaintiff's counsel will hire or associate with other counsel to prosecute this case effectively, as well. <u>Id.</u> Plaintiffs themselves are committed, both financially and psychologically, to prosecuting this case. <u>Id.</u>

Second, as in other class actions where plaintiffs sought agency compliance with regulatory, statutory, and constitutional mandates, the key interests of the Plaintiffs herein are co-extensive with the class members' interests. <u>See</u>, <u>e.g.</u>, <u>Perez-Funez v. District Director, INS.</u>, 611 F.Supp. 990, 997 (C.D.Cal. 1984); <u>Cornelius v. Mintner</u>, 395 F.Supp. 616 (C.D.Mass. 1974); <u>McLaughlin v. Wohlgemuth</u>, 398 F.Supp. 269 (E.D.PA. 1975).

As set forth above, all four factors contained in Rule 23(a) for class certification are present in the instant case. The final requirements for class certification are contained in Rule 23(b), F.R.Civ.P., and Plaintiffs submit that they meet these qualifications also.

## IV.  REQUIREMENTS OF RULE 23(b) ARE SATISFIED

Rule 23(b) (2), F.R.Civ.P., provides that an action may be maintained as a class action where the four prerequisites of Rule 23(a) are met and:

> [T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]

The rule does not require that every member of the class suffer identical injury, so long as the injury is based on generally applicable grounds, and the injury is threatened sufficiently to make declaratory and injunctive relief necessary and appropriate. Cornelius, 395 F.Supp at 623; Rentschler v. Carnahan, 160 F.R.D. 114, 117 (E.D.Mo. 1995) ("one purpose of Rule 23(b) (2) was to bring lawsuits vindicating civil rights, the rule 'must be read liberally in the context of civil rights actions.'"); see also Akau v. Olomana Corp., 65 Haw. 383, 392 (1982) (standards for specificity are lower for Rule 23(b) (2) than Rule 23(b) (3) actions). As the Ninth Circuit Court of Appeals held in Elliot v. Weinberger, 564 F.2d 1219, 1229-30 (9th Cir. 1977), aff'd sub nom., Cellophane v. Yamasaki, 442 U.S. 682 (1979):

> It would be a practical absurdity were the Secretary to provide the due process safeguards enunciated herein to the exclusion of all save the named plaintiffs. Multiplicity of actions based on the same constitutional claims advanced here would inevitably result. Obviating such unnecessary duplication is the very purpose for which Rule 23(b) (2) was designed. Maintenance of the instant case as a class action is not only proper, but it also will effectuate the interests of both judicial administration and of justice.

Rule 23(b)(3), F.R.Civ.P., provides that an action may be maintained as a class action if:

> [T]he court finds that the question of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or

16

defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undertaking of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In this case, Defendants' practices and procedures are generally applicable to all class members and, thus, challenging those practices and procedures is appropriate for class certification under Rule 23(b) (2), F.R.Civ.P.

Class certification is also appropriate under Rule 23(b)(3), F.R.Civ.P., because the questions of law and fact common to the members of the class predominate over the questions affecting any individual members of the class and a class action is the superior method for adjudicating this controversy.  (Under Rule 23(b)(3) it is more difficult to get a class certified because it is more difficult to get over the predominate question hurdle.  One question may predominate but if the court will have to hear each factual claim separately the court will usually not certify the class.) would have a right to bring suit under the doctrine of continuing tort, even though they initially were incarcerated prior to the two-year window.  See Reynolds Metals Co. v. Yturbide, 258 F.2d 321, 333 (9th Cir.), cert. denied 358 U.S. 840 (1958) ("[w]here the tort is continuing, the right of action is continuing.  The rule that the statute runs from the last date of the continuous negligent [act] is just and equitable.").

## V.  TIME SCOPE OF CLASS ALLEGATIONS

Actions brought pursuant to 42 U.S.C. § 1983 are governed by the state statutes of limitations for personal injury actions.  Wilson v. Garcia, 471 U.S. 261, 275 (1985); Fink v. Shedler, 192 F.3d 911, 914 (9th Cir. 1999), cert. denied, 2000 WL 307729 (May 15, 2000). Accordingly, BFD clerical employees employed at any time during the three years previous to the filing of the instant lawsuit are automatically potential class members.  In addition, because the Defendant's actions constitute a pattern and practice of political affiliation discrimination,

Defendant's will be liable beyond the three year statute of limitations based on the continuing

tort theory.  See e.g., Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472

(9th Cir. 1989).  Plaintiff's allege that this pattern and practice began in the year 2000 shortly

after the civil service exam procedure was abolished.

## VI.  CONCLUSION

Plaintiffs submit that this action presents all of the factors necessary for class

certification pursuant to Rule 23 of the Federal Rules of Civil Procedure, and respectfully urge

the Court to certify this lawsuit as a class action.

Respectfully submitted,
Plaintiffs Denise M. Barry and Jane B.Green
By their attorney,

_____/s/ Thomas F. Feeney_____
Thomas F. Feeney, BBO # 645605
FEENEY & ASSOCIATES AT LAW
39 Sheafe Street, Suite 1
Chestnut Hill, Massachusetts  02467
Tel.: (617) 277-5750
DATED: 3 August 2007          Fax: (617) 277-5751

Afscme Employees                                                    9/28/04

| AFSCME Empl | First Name | Middle | Last Name | Title | Grade | Longevity |
|---|---|---|---|---|---|---|
| 1 | | | | Asst.Prin. Acct | R14-9 | 9.2.87 |
| 2 | | | | L & C Wkr. | R11L##9 | 2.21.89 |
| 3 | | | | L & C Wkr. | R11L##6 | 12.11.00 |
| 4 | | | | Head Clerk | R12-6 | 3.5.98 |
| 5 | | | | Prin. Clerk | R9-6 | 12.18.00 |
| 6 | | | | Wk.Frm.MMPn | R13##9 | 2.16.94 |
| 7 | | | | Prin. Acct. | R16-6 | 12.10.86 |
| 8 | | | | Prin. Clerk | R9-6 | 8.5.98 |
| 9 | | | | Gen MM Frmn. | R16A##9 | 7.13.88 |
| 10 | | | | Head Clerk | R12-6 | 4.8.97 |
| 11 | | | | Head Clerk | R12-9 | 7.6.92 |
| 12 | | | | Head Clerk | R12-9 | 4.9.88 |
| 14 | | | | Adm. Asst. | R15-9 | 6.25.85 |
| 15 | | | | Storekeeper | R5-9 | 5.20.86 |
| 16 | | | | Adm. Asst. | R15-9 | 11.9.87 |
| 17 | | | | Sr. Legal Asst. | R15-7 | 8.31.94 |
| 18 | | | | Adm. Analyst | R14-5 | 3.27.97 |
| 19 | | | | Coll. Agent | R14-9 | 9.11.85 |
| 21 | | | | Wkg Frm L&C | R13##9 | 2.15.72 |
| 22 | | | | Chaplain | R12-9 | 1.20.75 |
| 23 | | | | Adm. Sec. | R14-9 | 4.4.87 |
| 24 | | | | Head Clerk | R12-9 | 7.15.96 |
| 25 | | | | Chaplain | R12-9 | 9.30.91 |
| 27 | | | | Prin. Strkpr | R14-2 | 12.30.02 |
| 28 | | | | L & C Wkr. | R11L##6 | 12.11.00 |
| 29 | | | | Adm. Sec. | R14-9 | 11.30.87 |
| 30 | | | | Gen. MM Frmn | R16A##9 | 6.5.85 |
| 31 | | | | Head Clerk | R12-3 | 1.8.01 |
| 32 | | | | Adm. Asst. | R15-9 | 2.19.86 |
| 33 | | | | Chaplain | R12-3 | 1.15.97 |
| 34 | | | | Asst. Prin. Acct | R14-9 | 10.30.95 |
| 37 | | | | Chief Tel. Oper | R10-5 | 12.4.99 |
| 38 | | | | Asst. Prin. Acct | R14-5 | 7.9.01 |
| 39 | | | | Sr. Sign P/L | R12L##9 | 9.22.84 |
| 40 | | | | Adm. Asst. | R15-1 | 10.13.03 |
| 41 | | | | Head Clerk | R12-1 | 1.25.00 |
| 42 | | | | Prin. Clerk | R9-1 | 8.25.04 |
| 43 | | | | Head Storekpr | R12-9 | |

SENA Positions

| First Name | Mid | Last Name | Title | Grade | Longevity |
|---|---|---|---|---|---|
| | | | Sr. Adm. Asst.(Fire) | MM6-9 | 4.6.89 |
| | | | Assoc. Insp. Engineer (Fire) | MM9-5 | 2.28.01 |
| | | | Sr. Adm. Asst. (Fire) | MM6-9 | 6.6.79 |
| | | | Data Proc. Sys. Analyst | MM6-9 | 6.11.86 |
| | | | Adm. Asst. (Fire) | MM4-9 | 12.27.78 |
| | | | Sr. Data Proc. Sys. Analyst | MM8-8 | 3.20.94 |
| | | | Sr. Adm. Asst. | MM5-9 | 2.26.75 |
| | | | Sr. Data Proc. Sys. Analyst | MM8-9 | 8.31.77 |
| | | | Sr. Adm. Asst. (Fire) | MM6-9 | 5.11.88 |
| | | | Fire Prev. Supv. (F.Prot.Eng.) | MM10-9 | 4.24.86 |
| | | | Sr. Adm. Asst. (Fire) | MM6-8 | 9.5.87 |
| | | | Sr. Adm. Asst. | MM5-9 | 5.21.76 |
| | | | Sr. Adm. Asst. (Fire) | MM6-9 | 2.14.85 |
| | | | Sr. Adm. Asst. | MM5-9 | 12.12.82 |
| | | | Sr. Data Proc. Sys. Analyst | MM9-9 | 9.8.82 |
| | | | Sr. Adm. Asst. (Fire) | MM6-9 | 3.11.79 |
| | | | Medical Examiner | MM9-9 | 12.1.94 |
| | | | Sr. Data Proc. Sys. Analyst | MM8-9 | 3.16.94 |
| | | | Nurse | MM6-5 | 10.30.04 |
| | | | Sr. Adm. Asst. | MM5-9 | 11.23.82 |
| | | | Sr. Data Proc. Sys. Analyst | MM8-9 | 8.30.95 |
| | | | Sr. Adm. Asst. | MM5-9 | 6.15.80 |
| | | | Prin. Adm. Asst. | MM8-8 | 10.15.94 |
| | | | Case Manager | MM8-8 | 4.10.03 |
| | | | Sr. Adm. Asst. (Fire) | MM6-9 | 5.24.71 |
| | | | Prin. Adm. Asst. | MM8-9 | 12.20.93 |
| | | | Prin. Adm. Asst. | MM8-9 | 7.11.66 |
| | | | Exec. Asst. (Director of H.R.) | MM12-9 | 7.21.01 |
| | | | Prin. Data Proc. Syst. Anal. | MM10-9 | 4.13.77 |
| | | | Prin. Adm. Asst. | MM8-9 | 6.19.01 |
| | | | Sr. Adm. Asst. | MM5-9 | 3.21.84 |
| | | | Sr. Adm. Asst. | MM5-9 | 10.19.87 |
| | | | Adm. Asst. (Fire) | MM4-7 | 11.27.96 |
| | | | Executive Asst. (Fire Dept.) | MM14-9 | 1.18.70 |

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

DENISE M. BARRY; JANE B. GREEN;  )   CIVIL NO. 05-10528 RCL
ELIZABETH H. GOLDEN; PATRICIA J. )
McDONOUGH; ELAINE MESITI; LILA )
BROWN; MARY M. KANE; and           )
JUDITH A. KELLEY, individually and on )
behalf of all those similarly situated,    )
                                                        )
                          Plaintiffs,           )
                                                        )
              vs.                                     )
                                                        )
ROBERT J. MORAN; RONALD        )
KEATING; PAUL A. CHRISTIAN;     )
RODERICK FRASER, Jr.; WILLIAM   )
KESSLER; WILLIAM HITCHCOCK;    )
CITY OF BOSTON (FIRE                   )
DEPARTMENT), and JOHN and/or     )
JANE DOES 1-50,                             )
                                                        )
                          Defendants.          )
_____ )

**PLAINTIFF DENISE M. BARRY'S ANSWERS TO
DEFENDANTS' INTERROGATORIES TO THE
PLAINTIFF, DENISE M. BARRY**

Plaintiff Denise M. Barry [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

        Answer:     Denise Marie Barry
                    4 Essex Street
                    Charlestown, MA 02129

                    Date of Birth: April 3, 1973

                    Position: Head Clerk R12, Step 9

2.      Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.


Answer:         Objection, overbroad.  Subject to and without waiver of said objection,

Defendant answers as follows:


St. Catherine's of Siena School                     1979-1987
9 Vine Street
Charlestown, MA 02129

Matignon High School                                1991
One Matignon Road
Cambridge, MA

Harborside Business Skills Training Program         1996
Harborside Drive, Logan Airport
East Boston, MA

Bunker Hill Community College                       2005
250 Rutherford Avenue
Charlestown, MA 02129

Quincy College                                      2005
34 Coddington Street
Quincy, MA


Boston Fire Department Headquarters, Boston, MA        **Sept. 2003 to Oct. 2003**

CASE MANAGER/UTILIZATION REVIEW ACTING MM-5:
I assured that medical providers including primary care physicians, hospitals and specialists
are providing high quality care to members.  I conferred with department physicians and
nurses to determine potential lengths of absence of members.  I developed treatment
pathway for injuries to insure that care is reasonable, necessary, and related to the injury.
I also conducted a weekly meeting with staff, submitted monthly reports detailing
indemnification costs and advising trends of injury, downloaded and submitted pay runs to
City hall to insure payment in a timely manner, and mailed, signed non-order workers
compensation expenditures piles, to auditing and budget located at City hall for review.

Boston Fire Department Headquarters, Boston, MA          **August, 1996 to present**
HEAD CLERK:
I assist the Deputy Fire Chief, District Fire Chief and Fire Captain with all incoming and
outgoing business correspondence.  I communicate with outside federal, state, and city
agencies on a daily basis.  I am responsible for all general office duties, faxing,
switchboard, xeroxing, etc.  I am responsible for submitting requisitions to purchasing for
items requested by the Training Division.  I am responsible for transcribing scheduled
monthly meetings into report form, designing spreadsheets ranging from special
equipment, fiscal budget, FFOP reports, etc., and I maintaining and updating Training
Division Annual Fiscal Year Budget.  I presently hold certificates in Advanced MS Word
(7.0), Excel (7.0), Access (7.0), and Intro. PowerPoint (7.0).

Warren Tavern/Tavern on the Water, Charlestown, MA          **May 1998 to June 1999**
WAITRESS/HOSTESS
I assisted customers, greeted and seat customers, handled cash and credit card
transactions, and was responsible for maintaining a clean work environment.

Fleet Bank, Malden, MA          **Feb. 1993 to March 1994**
COMPLIANCE CLERK
I was responsible for activating all new incoming accounts, reconciling accounts for final
month ending reports, and I maintained and updated accounts from spreadsheets.
*Controlled accounts for out-of-state clients
*Owner of IOLTA accounts, Reg. CC accounts and Political Campaign accounts

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:   See answer to Interrogatory No. 2, above.

| | | | |
|---|---|---|---|
| Principal Clerk | - | R8 | August 21, 1996 |
| Head Clerk | - | R11 (Budget) | July 3, 1998 |
| Head Clerk | - | R12 (Union) | Sept. 1, 1998 |

4.    For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:  Administrative Secretary         R-14         April 2000
I never got an interview or an explanation. I was denied a position because
I was not politically affiliated or otherwise supported or sponsored by
those with influence in the City of Boston or the Boston Fire Department.

Administrative Analyst           R-14         June 2000
I never got an interview or an explanation. I was denied a position because
I was not politically affiliated or otherwise supported or sponsored by
those with influence in the City of Boston or the Boston Fire Department.

Head Clerk and Secretary         R-13         May 2001
This was a temporary position for the duration of the vacancy. Eileen Stile
was appointed who was part of the same affiliation with Carol Petta and
Mary Kilgallen and their sponsors. I never got an interview or an
explanation. I was denied a position because I was not politically affiliated
or otherwise supported or sponsored by those with influence in the City of
Boston or the Boston Fire Department.

Administrative Assistant         R-15         August 2003
I never got an interview or an explanation. I was denied a position because
I was not politically affiliated or otherwise supported or sponsored by
those with influence in the City of Boston or the Boston Fire Department.
More over, I received a letter from Bob Moran. Michelle Urso from
Polaroid, and was sponsored by Joe "Do Do" Nee (and therefore by the
Mayor) was hired through her political affiliation with, and sponsorship
from, the current City of Boston Fire Department administrator and others.

Case Manager/Utilization Review      MM6          Dec. 2003
I never got an interview or an explanation. I was denied a position because
I was not politically affiliated or otherwise supported or sponsored by
those with influence in the City of Boston or the Boston Fire Department.
Moreover, I got an email from Bob Moran on April 7, 2004 stating, "the
position is still open, no decisions have been made". Ian MacKenzie was
politically affiliated with, supported by, and sponsored by the then current
City and BFD administration. In addition, he lived in Maryland at the time
of application and hiring, which is illegal.

Principal Accountant             R-16         June 2004
I received a letter from Bob Moran telling me that I did not get the
position.

Assistant Principal Accountant       R-14         July 2004
I received a letter from Bob Moran telling me that I did not get the position

Administrative Secretary         R-14         Sept. 2004
I received a letter from Bob Moran telling me that I did not get the
position. Lois Hart, a person politically affiliated with and/or supported or

sponsored by persons within the then current City and/or BFD administration, was hired. I was denied a position because I was not politically affiliated or otherwise supported or sponsored by those with influence in the City of Boston or the Boston Fire Department.

Temp. Senior Legal Assistant                    R-15            August 2006
I inquired about the position to Bob Moran but never received an answer. I never got an interview or an explanation. I was denied the position because I was not politically affiliated or otherwise supported or sponsored by those with influence in the City of Boston or the Boston Fire Department.

Senior Admin. Asst.                             MM5            August 2006
I received a letter from Bob Moran telling me that I did not get the position. I was denied a position because I was not politically affiliated or otherwise supported or sponsored by those with influence in the City of Boston or the Boston Fire Department.

Administrative Assistant              R-15 down from MM-6 August 2006
At first I received an offer for the position, but then they changed the job responsibilities, without an increase in pay, so the job I had applied for was constructively taken away, and so I did not accept the revised position.

5.      Please state each and every fact upon which you rely in your assertion that your claims

        against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

        civil action.

        Answer:         In addition to the facts as set forth in the Complaint, consider that the
                        Mayor issued Executive Order 2000 prohibiting political affiliation
                        discrimination for city jobs. Almost all of the persons who were hired
                        instead of me were less qualified but more affiliated with, supported by, or
                        sponsored by the then current City and Boston Fire Department
                        administrations. It was clear from my lack of active and/or obvious
                        support and affiliations with the political power holders that I was not
                        going to be given equal treatment.

6.      Please state every fact common to you and the other plaintiffs with respect to the claims

        asserted by you and the other plaintiffs against the named defendants in the

        above-referenced matter.

        Answer:         I was bypassed for promotion, pay upgrades (3 to 5), and step increases (at
                        least 5 times) based on my lack of political affiliation with the current
                        administration. Other class representatives experienced similarly adverse

employment decisions in their applications for promotions, pay upgrades, and step increase. I also was the object of retaliation by the Defendants because of my assertion of my rights to be free from political affiliation discrimination, as were others, e'g, Jane Green..

7.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

Answer:    In addition to the facts as alleged in the Complaint, which are hereby incorporated herein, in general, Robert Moran effectuated the political agenda of the policy makers with in the current City of Boston Fire Department administration.  More specifically, Moran's unlawful activities include, but are not limited to, the following:

October 9, 2003
9:30am, Jane Green, my shop steward, and I went to Bob Moran's office and asked if we could have a meeting to discuss what my chances are of receiving the position in which i had been acting in temporarily, when it is posted.  Moran told me "there are no guarantees".  I asked him about Mary Anne McHugo (a political appointee) refusing to train me for the position and Moran denied knowing anything about what took place at the Fire Marshall's Office with Chief Laizza.  I said to Moran "are you calling Chief Laizza a liar?"  "Do we have to call him and verify what took place?"

Moran completely ignored me and changed the subject.  Moran said "I don't know if I mentioned this to you but, we have nothing but problems in the Indemnification Office.  So people from City Hall are coming to revamp the entire office."  I said, "are you saying you want me to do all of this work, get you up to date and then someone from City Hall is going to replace me?" "Yes ," Moran said.  I said, that's not fair, we have no chance for promotions or advancements here. He said, "Well, if you're not into politics little girl then you are not into a position here."  Whereupon Jane Green stood up and said, "I can't believe you are saying this to her, not to mention in front of me."  Jane continued and asked for confirmation from Moran by asking: "Is that so Bob?"  Moran said, "that's the way it is around here, yes."  I said, "so I am going to be punished because I am not into politics."  Bob shrugged his shoulders and said "that's politics for you."  Then he said, "listen kiddo there are other job opportunities out there you know".  With that remark Jane Green and I walked out of his office.

October 9, 2003
I spoke with the Boston Fire Department Nurse Barbara Ryan about a conversation with Bob Moran about the Acting MM-5 I was performing. Barbara Ryan told Moran that she would give me $50.00 out of her own pocket, that's how desperate she was for help.  Barbara said, "Bob's

response was "that little girl is not going to hold me hostage, I'll just remember when promotions come around." Barbara said, "You're going to be spiteful towards her?" He said, "I'll just remember who gave me headaches".

October 10, 2003

I spoke with Chief Hitchcock and he asked me what happened between Bob Moran and myself. I told him what took place. Chief Hitchcock told me that Bob Moran went to him and told him he thinks Jane Green influenced me to stop the acting position. I told Chief Hitchcock, Jane Green had nothing to do with my decision. I stopped because Bob Moran told me that someone from City Hall was coming to take over the position and the reason I am not in the position flat out is I am not into politics. My reason for not acting was simple; I didn't think that it was fair to process six months of backlog, get the office up to date and then replace me with someone with City Hall patronage.

Bob Moran has engaged in almost every conceivable workplace harassment tactics, which have interfered with my work performance and has affected me physically, emotionally, financially, and psychologically by intimidation and retaliation tactics. He misuses his authority as the Human Resource Director, with the full approval and acquiescence of the BFD and City adminstration.

September 3, 2004

I submitted my formal written complaint against Robert Moran to my supervisor Chief Granara. Chief Granara informed Chief Hitchcock and then proceeded to inform the Fire Commissioner. On my way home I stopped into the post office where I certified all the carbon copy letters to the proper authorities.

September 7, 2004

Chief Laizza called me and told me that he thinks Bob Moran is retaliating against me already. I said, "what are you talking about?" He said, "Bob just called over here and asked all kinds of questions about Jane Green and Carol Connors' positions." I said, "well Bob did tell Chief Hitchcock that he thinks Jane Green is a bad influence on me and that he thinks she influences me with some decisions that I have made around here." I walked over to Jane Green personally and she was on the phone so I walked away. As soon as she was off of the phone, I went back over to her desk and told her what Chief Laizza just said to me about Bob Moran retaliation toward Jane and myself. Jane said, "how ironic that was just Chief Burke (per order of the Commissioner he said) on the phone asking me all kinds of questions regarding my position." They want to have a meeting regarding our positions.

8

For the record, I personally believe that Bob Moran is retaliating against Jane Green because she is against political affiliation discrimination as practiced by the then current administration and represented me well as Union Shop Steward for SENA when I was acting MM-5 not to mention she is a witness to statements that Bob Moran made to me in my formal written complaint against Bob Moran.

8.     Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

Answer:     Ronald Keating has perpetrated and perpetuated the pattern and practice of political affiliation discrimination, and harassment against me and other class members. For example, Keating obtained an upgrade for Karen Cunningham (a South Boston Group affiliated person) while he was the chief of personnel, and bragged about it to me and Kay McMillan because he knew that we had been trying to get the same upgrade. Keating also allowed Cunningham to change her job description without going through proper channels.

9.     Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

Answer:     Generally, Chief Finn sponsors or otherwise is a patron of political appointees in the BFD, and otherwise carries out the politically discriminatory policies and practices of the then current City and BFD administrations. In addition, Chief Finn's unlawful activities include, but are not limited to, the following:

October 20, 2004
Jane Green and I went to the post office so I could certify my letters to Bill Kessler & Winnie Yam. When Jane Green and I returned we went into the conference room where Kay was eating lunch. She looked up from reading the paper and said, "no more raise Denise". I said, "what does that mean?" She said "Chief Finn told Chief Shea to stop bothering Bob [Moran] about getting Kay a raise." So Jane stated, "that doesn't mean that you can't get a raise." Kay in a stern voice said Jane, Chief Finn had a meeting with Chief Shea and Bob Moran where again he told Bart (Chief Shea) to stop asking Bob Moran for a raise for Kay." Chief Finn said, "that it is a dead issue." Chief Finn said, "it took him 18 months to get Kathy Frechette an upgrade."

I spoke with Chief Shea after I said "so you were told not to ask Bob Moran anymore for a raise for Kay." He said "yes." When Bob Moran told me that Cityhall denied the raise I emailed Bob and asked him the

names of the people from Cityhall that denied the raise." Because of this email, Chief Finn told Chief Shea "stop listening to them (meaning me and Kay) they don't know what they are talking about". Chief Shea then stated "that Chief Finn read him the riot act to leave Bob alone." Chief Shea stated "that Bob denied ever going to Cityhall for a raise for Kay 2 years ago. Bob also denied stating "that he needed documentation and or Chief Shea himself to go down to Cityhall and present his case in order to get Kay an upgrade. Chief Shea stated to Bob "I have heard a lot of stories about you Bob, but I wanted to give you the benefit of doubt, but it is true you are a liar." Bob replied, "I am offended by that statement Bart." Chief Shea said he turned to Chief Finn and asked him if he was finished with him because he wanted away from Bob because he is unprofessional.

Later on that afternoon, Chief Finn approached Chief Shea and stated, "it is not about their qualifications, it's about politics & connections!" "Who do they know?" "Do they know anyone?"

<u>December 9, 2004</u>
I went to City Hall to have 2 grievances heard by Labor Relations. At this meeting was Jen Springer (AFSCME Council), Dan Moriarty - Union President, Robert Moran, Alice Kessler, and myself. During the meeting, we went over the first grievance, which was regarding Kerin Cunnunigham. I mentioned that she just started here in August and was able to negotiate her starting step when Mary Kilgallen and Bob Moran told me that you could not negotiate steps. Instead of coming in as an R9 step 1 she is at a step 3. Bob stated "nobody is going to come and work for $20,000". I said, "well we all had to". He stated, "that's not true." Alice Kessler seemed to agree with him where I disagree.

We proceeded on to the second grievance regarding Kathy Frechette upgrade from and R15 to an R17. Moran said, "we have been working on this upgrade for about 18 months". I said, "well so hasn't Chief Hitchcock and Chief Granara". I asked Moran to justify how Kathy was able to get her upgrade and I was denied. Moran simply had no answer. I asked Moran to state what documentation he presented on Kathy's behalf in comparison to me. Moran still did not have an answer. Alice Kessler asked Moran "who he asked about the upgrades?" Morn answered "Carol Connors, Tony Repucci and Richie Driscoll." Moran stated, "they didn't see any reason for my [Denise Barry's] position being upgraded and denied the request". Moran stated that they (budget) said it is an R12 position and that if I wanted an upgrade that I should have applied for the R14 over at 1010 Mass Ave.

I asked Moran "why should I have to move for an upgrade if Kathy doesn't have to?" I stated to Moran "is the reason just like Chief Finn stated to Chief Shea that it is not about your qualifications but about politics, I said just like you told me on Oct. 9, 2003 in your office Bob?" Moran wouldn't

answer me.  Moran stated "that he has tried to post positions in house to give people opportunities for promotions".  I said, 'well since you are on the subject, that R14 that was posted for 1010 Mass Ave., Lila Brown was the only one that applied for it.  You didn't even give her an interview before you posted it again, then you post it for a second time where again she is the only one that applied again without interviewing her you re-posted the position Citywide.  How would you call that 'opportunity'?"  Alice Kessler asked, "did you put in for that position?"  I said "no".  Mary Ann McHugo told me that Bob Moran called her and told her that if Kay MacMillan or I put it for the position to hire whichever one applied".  I stated, "this is what I am fighting against, people being hand picked for positions, it is not fair."  Also, I mentioned to Alice Kessler that I have applied for about 5-6 positions whereupon someone from the outside with political affiliations always is hired.  I mentioned that I always am bypassed for acting position when it becomes available.

I told Alice Kessler that Chief Hitchcock is the one that initiated me being upgraded about 2 years ago maybe even longer.  Chief Hitchcock called me on the phone and told me that he sat with Bob Moran and for me to go and sit with Bob.  Chief Granara did everything that Bob requested.  Bob said, "I just can't go down to City Hall and tell them to upgrade you, I need ammunition."  I said, "what kind of ammunition?"  He said "basically sell yourself on paper that you're worth an upgrade."  On August 11, 2003, Chief Granara handed a letter to Bob along with 12 other letters of recommendation the reasons why I should be upgraded".  Moran said, "this should be more than enough."

During the hearing Moran stated "that he never discussed getting me an upgrade with Chief Granara."  I said, "you're going to sit here and say that you never sat with Chief Granara about getting me an upgrade".  Moran stated "no".  I said, "then why would you email him that you 'presented Denis's case to City Hall' and denied the request if you didn't discuss this with him."  At that time, I put the email on the table that Bob Moran sent to Chief Granara.  Moran said, "oh", on October 15th I sat with Chief Granara and discussed your position where Chief Granara agreed that your position is not worth an upgrade."  I said "I thought that you never had a discussion this with Chief Granara, you just said it yourself."  Moran didn't reply.

Alice Kessler said, "may I have a copy of this email?"  I said "sure."  Alice Kessler said, "you have documentation too?"  I said, "not with me, it is at my desk and as soon as I get back to my desk I will forward it to your attention."  She said "great".

Later that afternoon, as soon as I got back from City Hall, Chief Finn came into the Training Division area.  Chief Shea, Kay, and I were in the conference room talking while they were eating lunch.  Chief Finn looked

11

into the room and said "Bart, when you have a chance I want to see you."
I got scared for him because of what I mentioned down at Labor Relations.
Chief Granara walked in I mentioned to him what had just happened and he
said that he would go to Chief Finn's office with Chief Shea. Chief
Granara came back to the office I said, "Chief Shea didn't get in trouble
because of me did he?" Chief Granara said "no". About 30 minutes later I
saw Chief Shea and looked up at him from my desk he made a gesture to
me (locking his lips) and shrugged his shoulders. I said, "I feel terrible, I
just don't want you getting in trouble because of me." He said, "Chief Finn
was nice about it and said that considering that he is a District Chief he
really shouldn't be getting involved in civilian issues. Chief Finn told Chief
Shea that he is not a team player and not trustworthy.

December 20, 2004
Monday, 3:30 Chief Finn walked them the back door of the Training
Division. No sooner did he walk out Jane Green's phone was ringing. It
was Bob Moran he said "that he wanted to see Jane Green down at his
office". Jane hung up and said, "Bob wants to see me will you watch my
phones?" When Jane came back to the office her face was so withdrawn I
asked "Jane if she was okay, because she looked like she was going to have
either a heart attack or a stroke". She said, "Bob just screamed and yelled
at me that I was to transfer to 1010 Mass Ave."

I stayed with her until it was time to leave but at 5:00 she opened the back
door located at the Training Division, she opened the back door where she
noticed Chief Laizza going to his car she said "Peter do you have a
minute?" He said, "no Jane, I got to go". Jane said, "no problem Chief,
thanks anyhow".

10.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:    Paul A. Christian implements and perpetuates a policy of political affiliation
discrimination, including having knowledge of and otherwise acquiescing in
all of the activities set forth in these answers. His activities include, but are
not limited to, the following unlawful activities:

December 21, 2004
Chief Laizza came into the Training Division's back door at around 9:00 as
always. He was over at Jane's desk and he apologized to her for what was
going on and stated, "I don't want to be in the middle of this Jane". She
said, "I understand Peter".

He walked over to my desk and said "Chief Hitchcock called him and

asked him why Jane Green wasn't over at 1010 Mass Ave this morning?"
Peter said, "her lawyer wants it in writing." Peter said Chief Hitchcock's
response was "fuck Jane Green and her lawyer."

Chief Laizza and Chief Granara went up to the Deputy's meeting. Peter
came back to me and said how crazy is this. At the end of the meeting
Chief Hitchcock stated, "there are rumors going around about Bob Moran,
so if anyone has any comments or complaints regarding Bob please feel
free to speak". Peter said, "no one said anything".

He said that Chief Hitchcock called him back later in the day and told him
that the Commissioner wanted to speak to him. Peter said, "that he turned
back in traffic". Peter said, "when I was entering the Commissioner's
office, Joe Finn was coming out". He went into the Commissioner's office,
the Commissioner, Chief Hitchcock, and Bob Moran were all sitting there.
They asked Peter if he told Jane to report to 1010 Mass. Ave., he said,
"Yes, I did." Chief Laizza stated "to all of them that not only does Jane's
Union want it in writing, but her lawyer too, before she moves." Peter
said, "that he let them know that this is pure retaliation and he will not be a
part of it." Peter said "the Commissioner said, "I want Jane Green out of
this building, no ifs, and, or buts about it". Peter said he stated to all of
them that he was not putting it in writing and if they want her moved that
they should write it themselves". Peter said he stated that this looks like
retaliation to me. The Commissioner responded "you're not a fucking
lawyer". Peter said he told the Commissioner "I didn't say that I was a
fucking lawyer, I am just telling you that I know the laws from working in
Personnel, and retaliation is serious".

Peter said that he mentioned when subpoenas go out that he is not going
under the bus." He said the Commissioner said, "what are you talking
about?" Peter said that he stated, "you're doing this because Denise has a
case against Bob and Jane is one of her witnesses". He said, the
Commissioner said, "what case are you talking about?" Peter said
"Denise's case!" He said the Commissioner looked around at Chief
Hitchcock and Bob Moran and they both stated that they didn't know
anything about a case." Peter said, "Denise, I know that they know, and
they are playing dumb, but I just wanted to get out of there." Peter said
"on his way out of the Commissioner's office Bob Moran said "hey Peter
what do you think? This is the start of getting rid of Jane Green". Peter
said that he was appalled that Moran would make a statement like that.

December 23, 2004
At around 12:30, Chief Laizza was sitting in Bob Moran's office. At
around 1:00 Bob came into the office and was looking around. I was
standing talking to someone. He said "Denise, Jane around?" I said "yes,
she is here, she was just at her desk." He waited over at her desk until she
returned. He had a piece of paper in his hand. Jane came up from the

garage area, Moran was standing at her desk and handed her the paper and said "your official transfer paper." Then he walked out the office.

3:30 I was talking to Chief Laizza wishing him a Merry Christmas. I said "Bob couldn't come down here quick enough after you left his office to give Jane the paper. Peter said, "yeah, Chief Finn called me to come over and sign something." Peter said, "Joe if it has anything to do with Jane I am not signing it." Peter said, Chief Finn said, "well then you are going to have to answer to the Commissioner then." Peter said, "Joe I am not getting into it".

Peter said, when he got to Bob's office Chief Finn and Bob Moran assured him that the law department helped them construct and write the letter. Peter said, when he read it he felt better because it was not derogatory." Peter said "If I get called as a witness I am going to make sure to state that I was ordered by Chief Finn and the Commissioner to sign the paper.

11.   Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:    Generally, William Kessler implements, enforces, and otherwise acquiesces in the political affiliation discrimination set forth in the Complaint and these answers. Kessler's involvement in said unlawful activities includes, but is not limited to, the following:

September 7, 2004
At around 11:00 am Bill Kessler from City Hall called to speak with Chief Granara. Later in the day Winnie Yam called from Human Resources located at City Hall to speak with me. She said, "I would like to sit and talk with you regarding some of the statements that you have written in your complaint." I responded "fine let me consult with my Union Shop Steward and I will get right back to you." So I called Winnie back and asked her if Thursday at 9:00 was convenient with her, she said, "that is perfect." So we are going to meet down City Hall in room 612 at 9:00.

September 9, 2004
Went to City Hall for a meeting with Bill Kessler, Winnie Yam, Cathy Moore, Jen Springer, Dan Moriarty and myself.

September 20, 2004
Bill Kessler from City Hall called requesting my paper regarding Bob Moran. I told him that I consulted with my attorney and was advised not to submit any of my paper work and that my attorney will be in touch with Mr. Kessler.

<u>December 9, 2004</u>
I went to City Hall to have two grievances heard by Labor Relations. At this meeting was Jen Springer (AFSCME Council), Dan Moriarty, Union President, Robert Moran, Alice Kessler, and myself. During the meeting, we went over the 1st grievance, which was regarding Kerin Cunnunigham. I mentioned that she just started here in August and was able to negotiate her starting step when Mary Kilgallen and Bob Moran told me that there is no negotiating steps. Instead of coming in as an R9 step 1 she is at a step 3. Bob stated "nobody is going to come and work for $20,000". I said, "well we all had to". He stated, "that's not true." Alice Kessler seemed to agree with him where I disagree.

12.     Please set forth in detail the factual basis for any and all claims that you have filed against the

City of Boston Fire Department.


        Answer:       See Answers to Interrogatories Nos. 4, 7, 8, 9, 10, and 11. As additional facts, Carol Petta is politically affiliated with, supported by, and otherwise sponsored by Mayor Menino, through her association with both the Mayor and his wife, Angela. For example, Carol Petta is the only person who is entitled to almost $20,000.00 per year in overtime pay (gets 15 minutes overtime in the morning to do part of Mary Kilgallen's job (because Kilgallen is incapable of doing it), and then is allowed to stay late at night on a regular basis to get overtime (in the same amount as her regular check) for her regular job, that was done without overtime prior to her taking the position). Other employees would prefer to work overtime, but are denied..

13.     Are you aware of other employees of the Boston Fire Department not already named in the

above-captioned matter that you claim or understand to be, in your opinion, subject to the

same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.


        Answer: Yes.

14.     If you answer to the preceding interrogatory is in the affirmative, please identify (a) the

number of those individuals; and/or (b) identify those individuals by name, residence address

and office within the Boston Fire Department. If you are unable to provide the name and

address of these individuals, please set forth the number of those individuals.

Answer:     <u>Former Employees who were subject to political affilation discrimination</u>

Jessica Ahearn
Rosemarie Clinton
Karen Denver
Mary Doherty
Jane Hickey
Marie Howard
Kathryn Kempton
Stephanie Long
Maria Lopez
Sheila Mancuso
Claire Miller
Robert Molloy
Steve Morash
Patricia Mulkern
Desiree Russo
Barbara Ryan
Gwendolyn Sheppard

<u>Present Employees who remain whe were victims of the administrtion'</u>
<u>political affiliation discrimination</u>
JoAnne (Donovan) Allain
Janice Boyle0
Crystal Bradeen
Irene Debbie Burke
Joanne Callahan
Linda Collins
Linda Cleary
Carol Connors
Katy Donovan
Patricia Fiasconaro
Karen Green
Coretta Henry-Gardiner
Paula Hamilton
Maria Hernandez
Maria Lopez
Katherine MacMillen
Angela Marshall
Cathy Moore
Marta Poupart
Barbara Powers
Luz Rivera
Jennifer Ryan

Majority of B.F.D. civilian employees

15.    If you believe the facts or nature of your claims against the Defendants is different in anyway

than the facts and nature of the claims of the other plaintiffs named in the above-captioned

matter, please set forth each and every fact which you believe distinguishes or differentiates

your claim or claims from the claims of the other plaintiffs.

Answer:    I have been subject to adverse employment decisions based on lack of political
support for and or affiliation with the City of Boston ans /or the Boston Fire
Department administration.  I have been subject also to adverse employment
decisions and harassment in retaliation for the assertion of my rights to be free
from political affiliation discrimination.  I am informed and believe that not all
of the class members have suffered retaliation as I have..

16.    How long do you believe you have been denied advancement in the Boston Fire Department

because, as you assert in Plaintiffs' Complaint, you were of the correct political affiliation,

including in your answer the date when you first believe you were denied advancement due

to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions such
as the denial of pay raises, upgrades, and denials of promotion, solely because
of my lack of political affiliation, sponsorship, support, and/or connection to
the then current City and BFD administration, I never have alleged that I have
suffered  because I was of the "correct political affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer: See Answers to Interrogatories, above.  Political affiliation is the sponsorship from,
support from, and/or close affiliation with a member of the then existing administration in
power and influence in the City of Boston Administration and Boston Fire Department
executive officers, including the group of individuals known as the "Hyde Park Group" and
"South Botson Group" who constantly vie for power against the Republicans, and within the
Democratic party.

18.     As set forth in the Plaintiffs' Complaint, to what organization, political group, place or person do you believe you must be affiliated in order to advance in the Boston Fire Department.

> Answer:     Mayor Thomas M. Menino
> "The Menino Administration,"
> "Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
> "South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.     Do you believe "political affiliation" discrimination within the Boston Fire Department extends beyond your department and, if so, state each and every fact upon which you rely in this assertion and describe the extent of the alleged discrimination.

> Answer:     Objection, overbroad, vague and ambiguous, subject to and without waiver of said objection, Plaintiff responds that political affiliation discrimination is widespread throughout the agencies controlled by the Menino administration. This is not part of the claims as set forth in the complaint, and therefore irrelevant to the Class Certification issues.

20.     For each promotion or transfer you requested or received within the Boston Fire Department, please state the following:

> a. the dates of each request for promotion or transfer;
>
> b. the position desired;
>
> c. the date you received a response to each request; and
>
> d. the reason you received for the denial of the request.

> Answer:     See Answer to Interrogatory No. 4.

21.     Please identify by name and address everyone known to you to have been subjected to the same conduct from the Defendant(s) as you allege in the Plaintiffs' Complaint.

> Answer:     See Answer to Interrogatory No. 14.

I, DENISE BARRY, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

Denise Barry

AS TO OBJECTIONS:

Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

DENISE M. BARRY; JANE B. GREEN; )    CIVIL NO. 05-10528 RCL
ELIZABETH H. GOLDEN; PATRICIA J. )
McDONOUGH; ELAINE MESITI; LILA )
BROWN; MARY M. KANE; and )
JUDITH A. KELLEY, individually and on )
behalf of all those similarly situated, )
                             )
                Plaintiffs, )
                             )
       vs. )
                             )
ROBERT J. MORAN; RONALD )
KEATING; PAUL A. CHRISTIAN; )
RODERICK FRASER, Jr.; WILLIAM )
KESSLER; WILLIAM HITCHCOCK; )
CITY OF BOSTON (FIRE )
DEPARTMENT), and JOHN and/or )
JANE DOES 1-50, )
                             )
               Defendants. )
_____ )

**PLAINTIFF ELIZABETH H GOLDEN'S ANSWERS TO
DEFENDANTS' INTERROGATORIES TO THE
PLAINTIFF, ELIZABETH H. GOLDEN**

      Plaintiff Elizabeth H. Golden [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

              Answer:       Elizabeth H. Golden
                            74 Tremont Street
                            Charlestown, Massachusetts 02129

                            Date of Birth: 15 November 1950

                            Position: Senior Administrative Assistant (Fire) MM6

2.      Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:        See Appendix A.

3.      Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:        See Appendices B and C.

4.      For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:        Lineman (multiple)
               Cablesplicer (multiple)
               Lineman/Cablesplicer (multiple)
               Radio Repairman (multiple)
               Batteryman/Battery Operator (multiple)
               Principal Administrative Assistant MM8 (multiple)
               Case Manager
               Leather and Canvas Worker
               Electrical Equipment Repairman
               Each clerical or administrative position which I have held were also applied
               for on multiple occasions.  See Appendix D for additional information.

5.      Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
               Interrogatory No. 5 specifically, and generally to all interrogatories herein.

3

I know that I, and many others, have been victims of Political Affiliation Discrimination in regard to promotional advancement within the Boston Fire Department.

I, and many others, was also denied pay upgrades because of the lack of political affiliation, patronage, and support.  People who have been advanced solely because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, and Mary Kilgallen.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims

       asserted by you and the other plaintiffs against the named defendants in the

       above-referenced matter.

       Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
                      Interrogatory No. 5 specifically, and generally to all interrogatories herein.
                      Other class representatives and potential class members applied also for the
                      jobs listed above, and for pay upgrades, and were denied fair consideration
                      because of political affiliation discrimination in regards to promotional
                      advancement within the Boston Fire Department.  Also, as a result ot
                      inserting political appointments at the highest levels, all persons below who
                      would have had a chance to move up into a position vacated by a person
                      who obtained the higher position were denied the opportunity to move up.

                      All job vacancies and newly created positions have not been filled following
                      any established procedures or policies within the Boston Fire Department.

7.    Please set forth in detail the factual basis for any and all claims that you have filed against

       the defendant, Robert J. Moran.

       Answer:        See Appendices C, D, E, F, H, and I.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

       the defendant, Ronald Keating.

       Answer:        Not applicable to me.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against

       the defendant, Joseph Finn.

       Answer:        See Appendix E.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:        See Appendices C, D, E, H, and I.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:        See Appendices E, F, H, and I.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against

the City of Boston Fire Department.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.
See also Appendices A through K, attached hereto.

The Boston Fire Department and representatives of the Fire Department
have appointed people solely or substantially because of their political
affiliation, patronage, or support.

13.    Are you aware of other employees of the Boston Fire Department not already named in

the above-captioned matter that you claim or understand to be, in your opinion, subject to

the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:        Yes.

14.    If you answer to the preceding interrogatory is in the affirmative, please identify (a) the

number of those individuals; and/or (b) identify those individuals by name, residence

address and office within the Boston Fire Department. If you are unable to provide the

name and address of these individuals, please set forth the number of those individuals.

Answer:        <u>Former Employees who were subject to political affiliation discrimination</u>
Jessica Ahearn
Herbert Ceruvales
Linda Cleary
Rosemarie Clinton
Karen Denver

Mary Doherty
Jane Hickey
Marie Howard
Stephanie Long
Maria Lopez
Robert Molloy
Steve Morash
Jeanne Pijanowske
Desiree Russo
Gwendolyn Sheppard

Present Employees who remain whe were victims of the administrations'
political affiliation discrimination
Janice Boyle0
Irene Debbie Burke
Joanne Callahan
William Chisolm
Carol Connors
Katy Donovan
Denise Evers
Patricia Fiasconaro
Sharon Green
Paula Hamilton
Maureen Hartnett
Maria Hernandez
Katherine MacMillen
Cathy Moore
Michael O'Reilly
Marta Poupart
Luz Rivera
Jennifer Ryan
Linda Short
Mary Ann Quilty

Majority of B.F.D. civilian employees because of non-advancement

15.    If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:        Each of Plaintiff's claims are similar in that we all were discriminated
               against in similar ways in our efforts to obtain promotions, pay upgrades,

6

and step increases.  Some Plaintiff were retaliated against because of their vocal opposition to this system.  That type of retaliation may have a part of why I did not receive fair consideration, but my claims are more directly political discrimination claims.  But the individual circumstances are not exactly the same.

16.    How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions such as the denial of pay raises, upgrades, and denials of promotion, solely because of my lack of political affiliation, sponsorship, support, and/or connection to the then current City and BFD administration, I never have alleged that I have suffered  because I was of the "correct political affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.   Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly vie for power against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

Political Affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit..  I was aware, as well as others were aware, of who was being appointed to a position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the year 2000.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

>Answer:    Former Mayor Raymond Flynn
>Mayor Thomas M. Menino
>"The Menino Administration,"
>"Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
>"South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

>Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver
>of said objection, Plaintiff responds that political affiliation discrimination is
>widespread throughout the agencies controlled by the Menino
>administration.  This is not part of the claims as set forth in the complaint,
>and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

>a. the dates of each request for promotion or transfer;

>b. the position desired;

>c. the date you received a response to each request; and

>d. the reason you received for the denial of the request.

>Answer:    See Answer to Interrogatory Nos. 3 and 4.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

>Answer:    See Answer to Interrogatory No. 14.  The addresses of the individuals

>identified are more readily available to the Defendants than the Plaintiff.

I, ELIZABETH H. GOLDEN, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

_____/s/_____
Elizabeth H. Golden

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

ORIGINAL

VOLUME: I
PAGES: 1 to 131
EXHIBITS: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 05-10528-RCL

DENISE M. BARRY; JANE B.              )
GREEN; ELIZABETH H. GOLDEN;           )
PATRICIA J. McDONOUGH;                )
ELAINE MESITI; LILA BROWN;            )
MARY M. KANE; and JUDITH              )
KELLY, individually and on            )
behalf of those similarly             )
situated,                             )
            Plaintiffs,               )
                                      )
v.                                    )
                                      )
ROBERT J. MORAN; RONALD               )
KEATING; PAUL CHRISTIAN;              )
RODERICK J. FRASER, JR.;              )
CITY OF BOSTON (Fire                  )
Department) and JOHN and/or           )
JANE DOES 1-50,                       )
            Defendants.               )

      DEPOSITION of ROBERT J. MORAN, a witness
called on behalf of the Plaintiffs, pursuant to
the applicable provisions of the Massachusetts
Rules of Civil Procedure, before
Myriam A. Maracas, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the City of

Boston Law Department, City Hall Plaza, Room

615, Boston, Massachusetts, on Wednesday, June

13, 2007, commencing at 2:05 p.m.

APPEARANCES:

        LAW OFFICE OF THOMAS F. FEENEY
                (by Thomas F. Feeney, Esq.)
                39 Sheafe Street, Suite One,
                Chestnut Hill, MA  02467, for
                the Plaintiffs.


        CITY OF BOSTON LAW DEPARTMENT
                (by Karen A. Glasgow, Esq.; and
                Scott C. Holmes, Esq.)
                City Hall Plaza, Room 615,
                Boston, MA  02201, for the
                Defendants.

```
 1                        I N D E X

 2

 3
      Testimony of:                    Direct

 4

 5

      Robert J. Moran

 6

         (by Mr. Feeney)                  5

 7

 8

 9

10
                     E X H I B I T S

11

12

13    No.              Description             Page

14

15
                     (None)

16

17

18

19

20

21

22

23

24
```

```
 1              P R O C E E D I N G S

 2              MR. FEENEY:  Okay.  We'll have the

 3       usual stipulations, read and sign, 30 days?

 4              MS. GLASGOW:  30 days.

 5              MR. FEENEY:  Waive the notary?

 6              MS. GLASGOW:  Yes.  We'll waive

 7       objections, except as to form.

 8              MR. FEENEY:  Then we're all set.

 9                   ROBERT J. MORAN

10          A witness called for examination by counsel

11       for the Plaintiffs, having been first duly

12       sworn, was examined and testified as follows:

13                   DIRECT EXAMINATION

14       BY MR. FEENEY:

15   Q.  Mr. Moran, can you state your name for the

16       record.

17   A.  Robert Moran.

18   Q.  Do you have a middle initial?

19   A.  J.

20   Q.  Have you had your deposition taken before?

21   A.  Yes, I have.

22   Q.  How many times?

23   A.  I would say close to five.

24   Q.  Okay.  In what kind of cases?
```

```
1    A.   In what kind of basis?

2    Q.   In what kind of cases?

3    A.   Arbitrations.

4    Q.   Were they five different cases?

5    A.   Explain that question, sir.

6    Q.   Were you a witness?

7    A.   Five.

8    Q.   Five different cases, or was it one case where

9         you had a deposition taken five times?

10   A.   No.  I would say it would be around three or

11        four cases.

12   Q.   And, if you can, were you a party to those cases

13        or a witness?

14   A.   I've never been a party to a case.

15   Q.   Okay.  Either as a Plaintiff or a Defendant?

16   A.   Correct.

17   Q.   So this is the first time that you've been sued?

18   A.   Yes.

19   Q.   Okay.  And are you aware of your status within

20        this case?  So you know that you're a Defendant?

21   A.   Yes.

22   Q.   You're being sued?

23   A.   (Witness shakes head)

24   Q.   I'm sorry.  Let me --
```

1              MS. GLASGOW:  You have to say yes.

2    Q.   I apologize.  I should have gone over the ground

3         rules.  We've been over this before.  Because we

4         have a court reporter, we need -- both you and I

5         actually have to enunciate yes or no.  We both

6         have to wait until we finish so she can get down

7         what we're all saying.  Let me turn this off.  I

8         apologize.  Before we speak, and this is more to

9         myself than to you, we tend to speak slowly and

10        clearly so that she can get down everything that

11        we say.  I speak a little bit too quickly

12        sometimes.  If there is anything you don't

13        understand, please let me know and I will

14        clarify it.

15   A.   Fine.

16   Q.   If you ever want to have a break, you may any

17        time.  Just let us know.  We'll go off the

18        record and let us know.

19   A.   Thank you.

20   Q.   Okay.  So you mentioned that you had your

21        deposition taken before.  Can you please

22        describe the cases that you were involved in?

23   A.   I don't remember.

24   Q.   At all?

1   A.   No.

2   Q.   Were they cases that were against the Boston

3        Fire Department?

4   A.   No.

5   Q.   These were civil cases?

6   A.   Cases that had to do with hotels many years ago.

7   Q.   So nothing recently?

8   A.   No, sir.

9   Q.   All right.  What have you done to prepare

10       yourself for this deposition?

11  A.   I've talked to the lawyers from the City Hall,

12       and I've looked at a couple of personnel files.

13  Q.   Which personnel files did you look at?

14  A.   Personnel files of most of the employees.

15  Q.   Most of the employees of the Boston Fire

16       Department?

17  A.   Yes.

18  Q.   How many employees are there?

19  A.   For civilians, there are 74.

20  Q.   So you looked at all of those?

21  A.   Most of them, yes.

22  Q.   Okay.  What's contained in a personnel file?

23  A.   In the personnel file is mostly hiring

24       paperwork, progression of promotion or movement

```
 1        up, any kind of disciplinary action, absentee
 2        records.
 3   Q.   Awards?
 4   A.   Awards, recognitions, yes.
 5   Q.   If an employee has submitted a resume for a
 6        position, would that also be in their personnel
 7        file?
 8   A.   Yes.  If the person was hired.
 9   Q.   What if they were not hired?
10   A.   Then they would not be in the personnel file.
11   Q.   Where would that record be kept?
12   A.   It would be kept in separate files.
13   Q.   Separate files based upon the position?
14   A.   Yes.  It would be in a file based on the posting
15        of a position.
16   Q.   Okay.  So aside from those two types of files, a
17        person's, an employee's personnel file, and the
18        file for a particular job posting, are there any
19        other files where the record of a particular
20        employee might be kept or found?
21   A.   Not to my knowledge.
22   Q.   Where do you live?
23   A.   Dorchester.
24   Q.   Any address?
```

```
 1    A.   86 Minot Street, M I N O T, Street, in

 2         Dorchester.

 3    Q.   And for how long have you lived there?

 4    A.   We moved there on May 30th of 1986.  We moved

 5         out in January 1991, came back in the summer of

 6         '95.

 7    Q.   So July of '95, August of '95?

 8    A.   I think it was July of '95.

 9    Q.   And where were you in the interim?

10    A.   Michigan and Upstate New York.

11    Q.   For how long were you in Michigan?

12    A.   I was in Michigan for 18 months.

13    Q.   Was that the first move, January of '91?  Was it

14         Michigan or --

15    A.   Michigan was the first move.

16    Q.   For about 18 months and from Michigan, you moved

17         to Upstate New York?

18    A.   Yes, sir.

19    Q.   Whereabouts is that?

20    A.   Lake George.

21    Q.   In Lake George?

22    A.   Yes, sir.

23    Q.   For how long?

24    A.   '92, '93, to '95.
```

```
 1    Q.   And why had you moved to Michigan?  What were

 2         you doing in Michigan?

 3    A.   Job promotion.

 4    Q.   Job promotion from what to what?

 5    A.   I was offered a regional job from Swissotel to

 6         Omni Hotels.

 7    Q.   I'll come back to that.

 8    A.   Sure.

 9    Q.   Are you married?

10    A.   Yes, sir.

11    Q.   And who's your spouse?

12    A.   Mary Moran.

13    Q.   And for how long have you been married?

14    A.   26 years.

15    Q.   Congratulations.

16    A.   Thank you.

17    Q.   And where does your wife work?

18    A.   She's a public schoolteacher.

19    Q.   Has she always been one?

20    A.   No.

21    Q.   And for how long has she been a public

22         schoolteacher?

23    A.   Nine years.

24    Q.   And before that, what was she?
```

```
 1   A.   She was a stay-at-home mom and she did various

 2        catering jobs, various gardening.  She was a

 3        gardener full time so she did various jobs.

 4   Q.   Has she ever worked for the City of Boston?

 5   A.   She's a teacher now for the City of Boston.

 6   Q.   Okay.  And where does she teach?

 7   A.   She teaches at the Roger Clapp Elementary School

 8        in Dorchester.

 9   Q.   Did she ever work anywhere else within the City

10        of Boston?

11   A.   No, sir.

12   Q.   Do you have any children?

13   A.   Yes, sir.

14   Q.   And how old are they?

15   A.   25, 23, and 18.

16   Q.   And the 25-year-old is who?

17   A.   Marguerite Deidra Moran.

18   Q.   Where does she work or go to school?

19   A.   She just finished college.

20   Q.   Is she working?

21   A.   At the moment, she's a waitress at Fenway

22        Ballpark.

23   Q.   And the 22-year-old?

24   A.   23.  She just graduated college.  And she's
```

```
 1        interviewing.

 2   Q.   And where is she interviewing?

 3   A.   She just interviewed at a hotel.

 4   Q.   And the 18-year-old is in high school or

 5        college?

 6   A.   She's going to college next year and she's going

 7        to Bridgewater to become a teacher like her

 8        mother.

 9   Q.   Congratulations again.

10   A.   Thank you.  I appreciate it.

11   Q.   All three of them are going to college.  Do you

12        have any siblings?

13   A.   Yes, I do.

14   Q.   Who are they?

15   A.   I have a brother.

16   Q.   What's his name?

17   A.   Michael Moran.

18   Q.   And where does he work?

19   A.   He lives -- he works on Long Island.

20   Q.   Works on --

21   A.   Long Island.

22   Q.   In New York?

23   A.   Yes.

24   Q.   Since when?
```

1   A.   All his life.

2   Q.   What does he do there?

3   A.   He's a CPA.  He's head of a bank.

4   Q.   Which bank is that?

5   A.   I have no idea.

6   Q.   Any other brothers or sisters?

7   A.   I have a sister.  She works as a sales

8        consultant.  She lives in Baldwin Harbor, New

9        York.

10  Q.   Anyone else?

11  A.   That's it.

12  Q.   Do you have any family members?  Are there

13       cousins, nieces or nephews who work for the City

14       of Boston?

15  A.   I don't, sir.

16  Q.   Any who work in the State of Massachusetts at

17       all?

18  A.   No, sir.

19  Q.   Do you have any relation to Michael Moran, the

20       councilman?

21  A.   No.

22  Q.   What is your educational background starting

23       with high school?

24  A.   High school, Chaminade High School in Long

```
 1        Island.  LaMoine College in Syracuse, New York.
 2   Q.   And when did you graduate there?
 3   A.   I graduated in 1975.
 4   Q.   With what degree?
 5   A.   B.S. in industrial relations.
 6   Q.   And then?
 7   A.   Then I received my Master's at Framingham
 8        University -- Framingham College in 2006.
 9   Q.   When did you start that Master's degree?
10   A.   It was a three-year program so 2003.
11   Q.   Did you go there full time?
12   A.   No.  I went nighttime.
13   Q.   So it's a three-year nighttime program?
14   A.   Yes.
15   Q.   Did you start it in the spring, summer, or fall
16        of 2003?
17   A.   Fall of 2003.
18   Q.   And you graduated in which -- after the spring,
19        summer, or fall of 2006?
20   A.   May of 2006.
21   Q.   And that was an MA in what?
22   A.   Master's of Arts in human resources.
23   Q.   Okay.  Any other training, certifications?
24   A.   I received from New England Resources
```

```
 1        Association a certified director of HR program.

 2        I've gone to training courses all my life to

 3        different colleges.  I personally have taught

 4        harassment courses and --

 5   Q.   The New England certificate, when did you

 6        receive that?

 7   A.   I would say that was the mid-'90s.

 8   Q.   So '95?

 9   A.   '95.  That would be good, yes, sir.

10   Q.   So you graduated from college in '95?

11   A.   Yes, sir.

12   Q.   And what was your work history thereafter?

13   A.   I worked for ARA from '76 to '79.

14   Q.   And what's ARA?

15   A.   I don't know.  It's Aramark now.  So it was

16        always -- it was just ARA so Aramark, whatever

17        those acronyms stand for.

18   Q.   What does ARA do?

19   A.   I did the food service for different colleges.

20   Q.   And after that?

21   A.   After that, 1979, I was hired by Hilton Hotel

22        and I worked at the Waldorf Astoria as a

23        trainee.

24   Q.   For how long?
```

1    A.    That was from '79 to 1980.

2    Q.    And then?

3    A.    I became a director of HR for Hilton from 1980

4          to 1986.

5    Q.    Is there more than one director of HR for

6          Hilton?

7    A.    For a hotel?

8    Q.    Yes.  Is it for one particular hotel?

9    A.    Yes.

10   Q.    So which hotel was that for?

11   A.    It was for the Middle Lance Hilton from --

12   Q.    In Jersey?

13   A.    In Jersey, yes, sir.

14   Q.    Where is that in Jersey?

15   A.    It's right in Secaucus.  So I was there, sir,

16         from 1980 to 1984.

17   Q.    You said '86 before.

18   A.    Yes.  I was promoted to the Washington Hilton

19         from '84 to '86.

20   Q.    I'm sorry.  To which one?

21   A.    Washington Hilton.

22   Q.    Washington?

23   A.    Hilton.

24   Q.    DC?

1   A.   Yes, sir.

2   Q.   And then?

3   A.   In 1986, I accepted a job here in Boston for the

4        Swissotel.

5   Q.   That's right downtown?

6   A.   It's now the Hyatt.

7   Q.   Basically, it's right down --

8   A.   Yes, sir, right at Downtown Crossing.

9   Q.   And what was your job there?

10  A.   I was director of HR.

11  Q.   For how long were you there?

12  A.   I was there from 1986 to 1991.

13  Q.   And after that?

14  A.   In '91, as I said before, sir, I went to Omni

15       Hotels as a regional.

16  Q.   Where is Omni Hotels?

17  A.   Omni Hotels was based in Hong Kong at that time.

18       The corporate office for Omni Hotels was up in

19       Hampton, New Hampshire.  I was based in Michigan

20       and Detroit, as I said, from '91 to 1993.

21  Q.   And your position there was?

22  A.   Regional.

23  Q.   Regional director of human resources?

24  A.   Yes.  That meant I had one hotel that was

```
 1        strictly under my command or then I would help

 2        other hotels in a satellite environment.

 3   Q.   Which hotel was that?

 4   A.   It was the Detroit Hotel.

 5   Q.   Which one?

 6   A.   Detroit.

 7   Q.   The Detroit Omni Hotel?

 8   A.   Yes.

 9   Q.   And there is only one?

10   A.   Yes, sir.

11   Q.   And after that?

12   A.   After that, I received another promotion to open

13        up a resort.  Not open up.  To work a resort

14        hotel, which was a little bit bigger in Lake

15        George.

16   Q.   Which one was that?

17   A.   The Sagamore Hotel.

18   Q.   Been there.

19   A.   Good hotel.

20   Q.   And you were there from when to when?  '93

21        until --

22   A.   '93 to '95.

23   Q.   And your position at Sagamore was?

24   A.   Still regional.
```

```
 1    Q.   So you were in charge of Sagamore and you
 2         consulted with other hotels in the area?
 3    A.   Correct.
 4    Q.   So how many other hotels would you consult?
 5    A.   It depends.  Anywhere from five to ten.
 6    Q.   After '95?
 7    A.   In '95, I moved back to the Omni Parker House.
 8    Q.   As?
 9    A.   As regional still.
10    Q.   So you were human resources director for Omni
11         Parker and then regional for how many other
12         hotels?
13    A.   At that time, I had Charlotte, Cincinnati,
14         Charleston, New York.  Did I say Cincinnati?
15    Q.   You did.
16    A.   That was it.
17    Q.   So three others?
18    A.   And the Durham in Washington, D.C.  I'm sorry.
19    Q.   That's from '95 until when?
20    A.   '95 until I went with Starwood Hotels in '97.
21    Q.   From '97 until when were you at the Starwood
22         Hotel?
23    A.   I was at the Starwood Hotel from '97 to '99.
24    Q.   And where are they located?
```

```
1   A.  Starwood Hotel is based in Westchester, New
2       York.  They are the Sheraton and Westin Hotels.
3   Q.  And where were you based?
4   A.  I was based at Sheraton, Boston.
5   Q.  Where is that located?
6   A.  The Sheraton Boston is on Dalton Street.
7   Q.  And then after '99?
8   A.  In '99, I went with Hilton Hotels to open up a
9       new hotel, so I went back to Hilton Hotels
10      afterwards and I opened up the new hotel at
11      Logan Airport.
12  Q.  When you say you opened it up, you were in
13      charge of human resources, hiring people?
14  A.  Yes.  Correct.
15  Q.  In '99 until when?
16  A.  To 2001.
17  Q.  And then?
18  A.  And then I went to the Boston Fire Department.
19  Q.  How did you discover the opening at the Boston
20      Fire Department?
21  A.  I saw it in the Boston Globe.
22  Q.  And why did you leave the Hilton at Logan?
23  A.  My children at that time had reached an age
24      where they didn't feel like moving anymore.
```

```
 1         Hilton Hotel wanted me to work in New York.  I

 2         didn't want to go back to New York.  And I

 3         wanted to stay in the Boston area.

 4    Q.   Did you apply for any other job besides the

 5         Boston Fire Department job?

 6    A.   At that time?

 7    Q.   At that time.

 8    A.   No.

 9    Q.   So you saw the ad in the Boston Globe?

10    A.   Yes.

11    Q.   For human resources director?

12    A.   Director of human resources for the Boston Fire

13         Department.

14    Q.   And you applied to the one position?

15    A.   Correct.

16    Q.   How soon after you applied did you get the

17         interview?

18    A.   It was around a three-month, four-month period.

19    Q.   So in that three- or four-month period, you

20         didn't apply anywhere else?

21    A.   No, sir.

22    Q.   Did you know anybody in the Boston Fire

23         Department?

24    A.   I did not.
```

1    Q.   Did you know anybody in the City of Boston who

2         worked in the Boston administration at that

3         time?

4    A.   Maureen Feeney.

5    Q.   So do you know Maureen Feeney?

6    A.   She's a neighbor in Dorchester.

7    Q.   What does she do?

8    A.   She's city counsel.

9    Q.   And who is she married to?

10   A.   I have no idea.

11   Q.   And how did you meet Maureen Feeney?

12   A.   I met Maureen Feeney, like I said, a neighbor.

13        I think I see her at mass.

14   Q.   Is that the first time you met her, at mass?

15   A.   Yes.

16   Q.   And Ms. Feeney is now a counsel member?

17   A.   Counselor.

18   Q.   Counselor?

19   A.   Yes.

20   Q.   For whom?

21   A.   City of Boston.

22   Q.   And how long has she been a counselor for the

23        City of Boston?

24   A.   I don't know.

```
 1    Q.   Since meeting Ms. Feeney at mass, what other

 2         contact did you have with her?

 3    A.   Her children and my children went to St.

 4         Brendon's School and I would say "hi" to her.

 5    Q.   When you applied for the Boston Fire Department

 6         position, did you inform her of the application?

 7    A.   I did not.

 8    Q.   Is Maureen Feeney the only person at the time

 9         that you applied in 2001, the only person who

10         worked for the City of Boston that you knew?

11    A.   Yes.

12    Q.   Did you know anybody who worked for the Boston

13         Fire Department?

14    A.   No, I did not.

15    Q.   Who interviewed you?

16    A.   It was a two-stage process.  I went into a room

17         and there was Chief McCurtin, who I believe at

18         that time was chief of operations.  Rosco

19         Morris, who was a former director of personnel

20         for the city.  And some other gentlemen who were

21         directives of HR in the city and they asked me

22         questions pertaining to HR.

23    Q.   You say that Rosco Morris --

24    A.   Yes, I believe.  It's been a while, sir.
```

```
 1    Q.   -- was a former director of personnel so where

 2         was he working at that time?

 3    A.   He was a consultant.

 4    Q.   Okay.  And you said it was a two-stage process?

 5    A.   Correct.

 6    Q.   So you went to the interview first?

 7    A.   I think several candidates went.  Several

 8         candidates went to that committee.  There is

 9         like a search committee.

10    Q.   Do you know who else was?

11    A.   I have no idea.  No, I don't.

12    Q.   And then the second stage?

13    A.   The second stage was a meeting with Dennis

14         Dimarzio, D I M A R Z I O, and Chief of Staff,

15         Paul Christian.

16    Q.   Had you ever met either Dennis Dimarzio or Paul

17         Christian and spoke to them before that time?

18    A.   No, I did not.

19    Q.   And what did they discuss with you?

20    A.   Both of them were -- they wanted to know if I

21         had any connections or any type of relations

22         with anybody that lived in the City of Boston;

23         and they brought up how my knowledge of the

24         O'Tool report so they wanted to know two things.
```

```
 1        Did I have any relationships with anybody in the
 2        City of Boston and my knowledge of the O'Tool
 3        report.
 4   Q.   What is the O'Tool report?
 5   A.   The O'Tool report was a report that was done on
 6        the prior Commissioner and staff of the City of
 7        Boston and they didn't come out too favorably.
 8   Q.   In what sense?
 9   A.   Old-fashioned.  Not equal treatment of
10        personnel.  There were issues regarding women in
11        the workplace, issues regarding diversity in the
12        workplace; and they wanted to make sure that I
13        was going to be a person that was attuned to
14        these types of issues and that I could come in
15        there and do whatever was necessary to kind of
16        clean up what had been going on in the past.
17   Q.   So in 2001, you've been director of Human
18        Resources?
19   A.   Yes.
20   Q.   What are your job responsibilities?
21   A.   Mainly, recruitment of and hiring of all staff,
22        employee relations, diversity training, any type
23        of legal cases.
24   Q.   In what sense?
```

1    A.  If we had issues, I advise the director of

2        personnel regarding any type of grievances,

3        labor relations.  I'm involved in several.  I've

4        been involved in several of the negotiations of

5        the contract.

6    Q.  So when you say you authorize the director of

7        personnel, who is that?

8    A.  There have been four directors of personnel

9        during my time.

10   Q.  And who was the first one?

11   A.  Deputy Chief Laizza.

12   Q.  And after him?

13   A.  Deputy Chief Joseph Finn.

14   Q.  So why was there a shift from Laizza to Finn?

15   A.  Contractually, they are able to move people

16       there and there was -- you know, the

17       Commissioner wanted, I believe, Chief Finn over

18       Deputy Chief Laizza.

19   Q.  What are the responsibilities of the director of

20       personnel?

21   A.  The director of personnel is mainly all uniform

22       side.  The uniform side and responsibility or

23       issuing rules and make sure the policies and

24       procedures of the fire department are followed.

```
 1    Q.  So the director of personnel reports to you?

 2    A.  No.

 3    Q.  Who does he report to?

 4    A.  He reports directly to the Commissioner or chief

 5        of operations.

 6    Q.  And at the time that you were hired, the

 7        Commissioner was whom?

 8    A.  When I was hired, the Commissioner was -- the

 9        acting Commissioner was Dennis Dimarzio.

10    Q.  And then after Dennis Dimarzio?

11    A.  Was Commissioner Paul Christian.

12    Q.  Then who was chief of operations?

13    A.  Chief Hitchcock and Chief Kevin Mokin.

14    Q.  Did Commissioner Christian ever hold both of

15        those posts?

16    A.  No.  He held Commissioner and chief of staff.

17        Not chief of operations.

18    Q.  Okay.  After Chief Finn, who was the director of

19        personnel?

20    A.  Deputy Chief Ron Keating.

21    Q.  After Ron Keating?

22    A.  Excuse me?

23    Q.  After Ron Keating?

24    A.  Chief Richard Debenedeto.
```

1   Q.   Is he still in there now?

2   A.   Yes, sir.

3   Q.   And where is Chief Finn now?

4   A.   Chief Finn is back out in field.

5   Q.   Where is he exactly?

6   A.   Division 1.

7   Q.   So his responsibility is for what?

8   A.   Fire suppression.

9   Q.   And Chief Keating?

10  A.   Chief Keating is in charge of EMS.

11  Q.   Emergency medical services?

12  A.   Yes.

13  Q.   Okay.  Let me just finish up, go back a little

14       bit on your education.  You had mentioned you

15       got your MA at Framingham College?

16  A.   Yes.

17  Q.   And you mentioned a certificate from New

18       England?

19  A.   Yes.  New England Human Resource Association.

20  Q.   Any other class that you took?

21  A.   In the hotel environment, you always take

22       classes.

23  Q.   Now we're down since 2001?

24  A.   No.  That's why I decided to go back and get my

1      Master's, stay current.

2  Q.  So when you submitted your application for the

3      job with the Boston Fire Department, who did you

4      list as references?

5  A.  I listed Jeff Laird and then general manager of

6      the Hilton, Bert James.

7  Q.  And who was Jeff Laird?

8  A.  Jeff Laird was a labor relations lawyer that I

9      had worked through for negotiations with HERO,

10     which is Hotel Employees Restaurant Association.

11 Q.  Is he a lawyer in Boston?

12 A.  Yes, sir.

13 Q.  And for whom does he work?

14 A.  He's moved since I met him, but I couldn't tell

15     you right now.

16 Q.  At that time, where did he work?

17 A.  Foley -- I would say Foley, Hoag.  I could be

18     incorrect.  I could be incorrect.

19 Q.  No other people on the references?

20 A.  No.

21 Q.  Just the two?

22 A.  Yes.

23 Q.  So after you had the meeting with Dimarzio and

24     Christian that second stage, what happened then?

1   A.   They brought me back a second time.

2   Q.   A second time with them?

3   A.   Correct.

4   Q.   And how did that accommodation go different than

5        the first time?

6   A.   They went over other things that were in the

7        O'Tool report.  They wanted to make sure that I

8        was someone like them.  You know, a person who

9        just would be able to advise, to get the Human

10       Resources Department moving, make sure that we

11       didn't do anything to violate the fair labor

12       standards laws or any type of laws that were out

13       there.

14   Q.  Who was the HR director before you?

15   A.  That position was not called HR director.  It

16       was a person, Dick Finnegan, was in a position,

17       I would say, similar to mine, but I don't

18       believe he had the HR experience that I had.

19   Q.  And did Dick retire after that?

20   A.  He retired before.

21   Q.  Before?

22   A.  Yes.

23   Q.  How long before you came in did he retire?  Half

24       a year?  A year?

1   A.   Half.  It could be two.

2   Q.   Do you know who was filling that position before

3        you came on?

4   A.   My position was Dick Finnegan.

5   Q.   But he left for a gap of time?

6   A.   Correct.

7   Q.   Was anybody doing that job before?

8   A.   Not to my knowledge.

9   Q.   So for how long was Dennis Dimarzio your

10       immediate supervisor when you first came on?

11  A.   Not long.  Not long.  He was a chief financial

12       officer for the City of Boston and shortly after

13       Paul Christian, became Commissioner and the

14       chief of staff.

15  Q.   So months?  Days?

16  A.   Months.  I came in July 21st, 2001.  I believe

17       the Commissioner Christian became Commissioner

18       in November of 2001.

19  Q.   Okay.  So are you in charge of just civilians or

20       civilians and the firefighters?

21  A.   I'm in charge of civilians.  I'm in charge of

22       firefighters for several things.  I advise the

23       director of personnel constantly.

24  Q.   So when Dimarzio was your supervisor, who made

1    the final decisions as to who got fired in a

2    particular position that was underneath your

3    supervision?

4  A.  Ever since I've been there, only Paul Christian

5    made the final decision.  I don't believe I took

6    any candidates up to see Dennis Dimarzio.

7  Q.  Okay.  And since Paul Christian has left?

8  A.  After Paul Christian left, I would send him up

9    to Chief McCurtin when he was acting

10    Commissioner and now I send him up to

11    Commissioner Fraser.

12  Q.  So when you refer to sending them up to

13    Commissioner Christian, once he became

14    Commissioner, does that mean that Christian

15    interviewed all of these people?

16  A.  Yes.

17  Q.  Did you ever provide or ever provide a position

18    to someone who Commissioner Christian did not

19    interview?

20  A.  Not to my knowledge, no.  No, period.

21  Q.  So for a particular position, when you sent

22    people up to Commissioner Christian for him to

23    interview, did he ever interview more than one

24    person to make a decision as to who or --

```
 1   A.   Commissioner Christian, I sent him the best

 2        candidate.

 3   Q.   He would interview that person?

 4   A.   Yes.

 5   Q.   And made the decision whether or not to follow

 6        your recommendation?

 7   A.   Yes.

 8   Q.   Was it ever a time that you sent someone up

 9        there that he did not want to hire?

10   A.   No, sir.

11   Q.   And it's your testimony that Commissioner

12        Christian interviewed each person who was given

13        a position with the Boston Fire Department

14        underneath your supervision?

15   A.   There is a process where I send him the final

16        candidate for his approval.  Yes.

17   Q.   And that happened for each and every position

18        that was awarded to somebody in the Boston Fire

19        Department?

20   A.   Yes, sir.

21   Q.   Did that also apply when Kevin McCurtin was

22        acting Commissioner?  Did he also interview

23        people?

24   A.   Oh, yes.
```

1    Q.   The same question.  Was there ever a position

2         filled while Kevin McCurtin was Commissioner

3         that he did not interview?

4    A.   I would say no.

5    Q.   Okay.  I'll ask the same series of questions for

6         Commissioner Fraser.  Do you always send up that

7         final candidate for Commissioner Fraser or does

8         Fraser do it differently?

9    A.   Commissioner Fraser wants to see the candidate,

10        No. 1.  Then No. 2, meaning the two best.

11   Q.   And for Commissioner Fraser, have you ever just

12        sent him one candidate?

13   A.   Yes, I have.

14   Q.   And who was that?

15   A.   I just sent one person to him.  The name will

16        allude me now because the other person bowed

17        out.  The No. 2 person bowed out.

18   Q.   Male?  Female?

19   A.   Female.

20   Q.   And you can't recall who that was?

21   A.   I'm thinking Francis Martin was the woman that

22        was hired.  And the No. 2 person bowed out.

23   Q.   And what position was that for?

24   A.   Head clerk position.

1    Q.    Do you know an Anthony Renzi?

2    A.    I know Anthony from doing the hiring paperwork

3          on him, yes.

4    Q.    Okay.  Was he given an interview?

5    A.    I interviewed him, yes.

6    Q.    For what position?

7    A.    For lineman position over at fire alarm.

8    Q.    Was anyone else given an interview for that

9          position?

10   A.    No, sir.

11   Q.    Was that position ever posted?

12   A.    That job does not need to be posted.

13   Q.    So the answer is no, it wasn't posted?

14   A.    It was not posted because that job does not need

15         to be posted.

16   Q.    Was Commissioner Fraser the Commissioner at that

17         time?

18   A.    I don't believe so, no.

19   Q.    Was it Acting Commissioner McCurtin or

20         Christian?

21   A.    I believe it was Commissioner Christian.

22   Q.    Did the Commissioner interview Anthony Renzi?

23   A.    Every candidate that I interviewed that I

24         brought up to Commissioner Christian.

```
 1   Q.   And why, in your opinion, did that position not
 2        need to be posted?
 3   A.   It's a 718 position and those jobs are not
 4        posted.
 5   Q.   Explain that more.
 6   A.   There are three contracts.  There are three
 7        contracts over at the fire department.  There is
 8        718, Local 718, AFSCME and SENA.  There is no
 9        job posting requirement for Local 718 positions.
10   Q.   Can you tell me where that's found in that
11        contract?
12   A.   It would be just the opposite.  There isn't
13        anything.  There is no job posting requirement
14        in the contract.
15   Q.   For which kind of positions?
16   A.   718 positions.
17   Q.   For any positions?
18   A.   Correct.
19   Q.   Okay.  And there is a posting requirement in
20        both the AFSCME and SENA contracts?
21   A.   Right.  Yes, there is.
22   Q.   So for 718 positions, how is it determined who
23        gets the position?
24   A.   You would have to talk to somebody in 718 and
```

```
 1        somebody at City Hall for that.
 2   Q.   But you do the interviewing?
 3   A.   I do all of the interviewing.  They sent me
 4        people to interview, yes.
 5   Q.   Do you have any say who does the jobs?
 6   A.   I gave my recommendations on his being hired or
 7        not.
 8   Q.   Okay.  Do you know Sean McGonagle?
 9   A.   Again, same as I know Anthony Renzi, through the
10        hiring process.
11   Q.   And what position did he have?
12   A.   Lineman position.
13   Q.   Did anybody else interview for that position?
14   A.   Not to my knowledge, no.
15   Q.   How did you receive Anthony Renzi's name or
16        application?
17   A.   It came from OHR.
18   Q.   What's OHR?
19   A.   Office of Human Resources, City Hall.
20   Q.   Who handed that application to you?
21   A.   It came through the mail.
22   Q.   For Sean McGonagle?
23   A.   Correct.
24   Q.   Did that also come through the mail?  Was that
```

1       application handed to you by anybody?

2   A.  No, it wasn't handed to me by anybody.  I think

3       it came through OHR or somebody from City Hall.

4       Sean McGonagle -- let me clarify.  Sean

5       McGonagle's application was given to me by

6       Kathleen Curliz, who I report to.

7   Q.  And did Ms. Curliz tell you where she got the

8       application from?

9   A.  No, she did not.

10  Q.  Did she give you any instructions as to his

11      application?

12  A.  Yes.  To interview him, do background checks and

13      to do a drug test on him.

14  Q.  Were there drug tests done on him?

15  A.  Excuse me, please?

16  Q.  Was a drug test done on him?

17  A.  Oh, yes.

18  Q.  And he passed?

19  A.  Yes, sir.

20  Q.  Do you know the name, Brian Nee?

21  A.  I do know Brian Nee, yes.

22  Q.  And where is he working now?

23  A.  He's at a firehouse.  I don't know.

24  Q.  Was he ever in a position in the Boston Fire

1          Department?

2     A.    When I came there, he was in the employees'

3          assistance program, counselor.

4     Q.    Did he get that job while you were director of

5          human resources?

6     A.    No.  Like I said, he was EAP.  Then he took the

7          Boston fire test and became a Boston

8          firefighter.

9     Q.    Do you know where he was before EAP?

10    A.    I don't.

11    Q.    The posting process for SENA and AFSCME -- well,

12         let me go back a second.  Are positions ever

13         posted for 718 jobs?

14    A.    No, sir.

15    Q.    Is there ever more than one candidate for a 718

16         job?

17    A.    I mean, I receive applications all of the time

18         for 718 jobs but they are not posted.

19    Q.    If you can do it accurate or if you can

20         estimate, approximately how many 718 jobs have

21         you conducted interviews for in the course of

22         your --

23    A.    I've been in since 2001.  I think I've hired

24         Renzi, McGonagle only.  They are the only two I

1         can remember from 718.

2   Q.  I'm looking for a particular phrase.  I want to

3         get it right.  Under what union are positions in

4         the fire investigation unit?

5   A.  718.

6   Q.  Okay.  Is there -- I don't know the last name --

7         a person named Chris who was given a position in

8         the fire investigation unit who was Commissioner

9         Christian's former driver?

10   A.  I do not know.

11   Q.  Do you know a Joseph Casper?

12   A.  I know him to say hello.

13   Q.  Okay.  Has he gotten a job in the fire

14         investigation unit while you've been head of

15         human resources?

16   A.  I don't know, sir.

17   Q.  But you would know if he had?

18   A.  Not necessarily.  I mean, transfers come out

19         monthly on general orders.  Who transfers to a

20         position, you know, you might have 30 people.

21         Contractually, people are able to transfer

22         monthly in 718.  Who goes where, I don't keep a

23         tab of that.

24   Q.  So you wouldn't have any interview

```
 1        responsibilities for transferring positions?
 2   A.   It's all contractual with 718.
 3   Q.   So going back to Brian Nee, do you know when he
 4        became a firefighter?
 5   A.   I'm going to say 2005.
 6   Q.   And before he was a firefighter, where did he
 7        work?
 8   A.   EAP.
 9   Q.   After he gave up firefighter, where was he
10        posted?
11   A.   I don't know.  I don't know.  I'm sorry.
12   Q.   Okay.  Did Brian Nee ever work for fire alarm
13        construction?
14   A.   Not to my knowledge.
15   Q.   Is fire alarm construction also under 718?
16   A.   Yes, sir.
17   Q.   Those positions are also not posted?
18   A.   There is no job posting requirement for the 718.
19   Q.   Okay.  So the position that becomes available in
20        718, how do people become aware of the vacancy?
21   A.   They work through personnel assignment.  We have
22        a division in personnel that people let them
23        know what jobs are open and what house is open,
24        what positions are open.
```

```
 1    Q.   Explain that more.  There is a division within

 2         personnel?

 3    A.   Called personnel assignment.

 4    Q.   Under your supervision?

 5    A.   Under the deputy chief of personnel.

 6    Q.   Do they advertise it now?

 7    A.   Monthly people are made aware of what the job

 8         openings are.  They can go to personnel

 9         assignments, see what openings there are, and

10         they work it through that way.

11    Q.   When people are made aware, what people are made

12         aware?

13    A.   Firefighters.

14    Q.   So somehow firefighters are made aware of

15         certain vacancies?

16    A.   Correct.  They are usually attune to every

17         opening that's out there.  If you want them

18         transferred to a certain house or certain

19         location, firefighters are very attuned to what

20         openings there are.

21    Q.   So how does that personnel division notify the

22         firefighters that there is a position open?

23    A.   Usually, I never investigated that.  I can't

24         give you an answer.
```

```
 1    Q.   So you don't know?

 2    A.   I don't know totally.  I don't know.

 3    Q.   Okay.  But you would conduct the interviews for

 4         that position, though?

 5    A.   No, I don't.

 6    Q.   Okay.

 7    A.   It's not an interview process.  It's a

 8         contractual process.

 9    Q.   What about Anthony Renzi and Sean McGonagle?

10         You interviewed them?

11    A.   Correct.

12    Q.   What's the difference between those two?

13    A.   I was told either by Commissioner Christian or

14         by Kathleen Curliz to interview these two

15         people.

16    Q.   Do you know why there was a distinction as to

17         them and not the other people?

18    A.   I don't.

19    Q.   Okay.  Getting back to posted jobs for SENA and

20         AFSCME -- when I say, "AFSME," it's A F S M E?

21    A.   AFSCME.

22    Q.   What does that stand for?

23    A.   American Federation of County and Municipal

24         Employees.
```

1   Q.   What does SENA stand for?

2   A.   Sound Employees of North America.

3   Q.   So is every job for SENA and AFSCME posted?

4   A.   Yes, sir.

5   Q.   And when you say, "posted," where is it posted?

6   A.   It's posted citywide.  It's posted internally at

7        all locations, anywhere where a SENA or AFSCME

8        person can view, easily view them.

9   Q.   When you say, "citywide," what does that mean?

10  A.   It means on COB website.  And so if I was

11       looking for a job in the City of Boston, we

12       recommend to all outside people to look at all

13       of the jobs that are on the City of Boston

14       website.

15  Q.   Is every position first posted citywide?

16  A.   No.

17  Q.   And if they are not, where are they posted?

18  A.   Some -- bear with me.  Now all SENA jobs have to

19       be posted citywide.  That's a new agreement,

20       contractual agreement, that was reached; and

21       internally, we make a decision.

22  Q.   Since when was the new agreement reached?

23  A.   Sometime in 2007.

24  Q.   Okay.  Continue.

1   A.   We make a decision internally.  Management makes

2        a decision internally if a job is going to be

3        posted for AFSCME, externally or internally.

4   Q.   And when they are posted internally, what does

5        that mean?

6   A.   Internally, they mean it's posted just within

7        the fire department.

8   Q.   And which position -- is there a written policy

9        or unwritten policy as to which positions are

10       posted internally versus externally?

11   A.   Well, it's a management decision.

12   Q.   When you say, "management," who would that

13       include?

14   A.   Probably Commissioner Kathleen Curliz and

15       myself.

16   Q.   Anyone else?

17   A.   No, sir.

18   Q.   For how long has Kathleen Curliz been in her

19       position?

20   A.   I would say 2005.

21   Q.   So before she was in that position, who was in

22       her position?

23   A.   I believe Andy Warren was in that position.

24   Q.   So then before Kathleen Curliz, the management

1      would be yourself, Andy Warren, and the

2      Commissioner?

3  A.  In some cases, yes, sir.

4  Q.  Okay.  When you say, "in some cases," are there

5      certain cases that were not?

6  A.  You know, I mean, in some of them, we put in

7      Chief Hitchcock, who was the chief of

8      operations.

9  Q.  So either Andy Warren or Chief Hitchcock would

10     be involved in that?

11 A.  Correct.

12 Q.  Were they ever both or was it either or?

13 A.  It could be both or either or.

14 Q.  Okay.  So if a decision is decided to be posted

15     internally first as opposed to within the Boston

16     Fire Department only?

17 A.  Yes.

18 Q.  Are positions ever posted more than once?

19 A.  Yes.

20 Q.  Under what circumstances?

21 A.  If we don't have the quality of candidates that

22     we're looking for.  We have one time where just

23     one person applied and that person wasn't

24     eligible to apply because of the attendance

1    record.

2    Q.   Okay.  Generally, when somebody applies, is

3         there a decision made by somebody that this

4         person will get an interview or not?

5    A.   Yes.

6    Q.   First threshold level?

7    A.   Yes.

8    Q.   Okay.  So if the person is decided to be given

9         an interview, is there a decision made that that

10        person is qualified?

11   A.   The person has to meet minimum qualifications to

12        be interviewed.

13   Q.   Okay.  Just a general question as well.  Are one

14        of the qualifications Boston residency?

15   A.   Yes, sir.

16   Q.   Okay.  And so if a person is missing an

17        application and they are interviewed, that means

18        that they meet the minimum qualifications?

19   A.   Say that again, please.

20   Q.   If a person submits an application and they are

21        interviewed, that means that that person meets

22        the minimum qualifications?

23   A.   Yes, sir.

24   Q.   Okay.  So for the AFSCME and SENA position, who

```
 1        did the interviewing each time for the first

 2        round of position?

 3   A.   In some cases, I'll do the first round and then

 4        pass them on to the managers.  In some cases,

 5        when managers are more aware they are qualified,

 6        they've been through numerous interviews in the

 7        past, maybe after us meeting, looking at the

 8        applications together, that person will do it,

 9        him or herself alone, but it's usually more than

10        one person involved.

11   Q.   Do you ever get involved in the determination of

12        whether or not a particular applicant will be

13        interviewed?

14   A.   Yes, I do.

15   Q.   Always or sometimes?

16   A.   Sometimes.

17   Q.   And why sometimes and not always?

18   A.   It depends on the seasoning of the -- if I feel

19        that the manager is seasoned enough to take care

20        of the interview process.

21   Q.   So which managers do you think are not seasoned

22        that you get involved in?

23   A.   If they haven't interviewed -- let's say if they

24        haven't interviewed since I've been there or if
```

```
1        they haven't -- if they tell me they don't feel
2        comfortable.
3    Q.  So when is the last time that you got involved
4        in that first layer of process where you
5        determine who would be interviewed?
6    A.  Very recently with fire prevention, Marianne
7        McHugo and I reviewed all of the applications
8        together.
9    Q.  Was that because you didn't think that Marianne
10       McHugo was qualified to evaluate?
11   A.  She asked me for assistance.
12   Q.  And which applicants were reviewed, if you
13       recall?
14   A.  Excuse me?
15           MS. GLASGOW:  Objection.
16   Q.  Which applicants were reviewed?
17   A.  I don't know.
18   Q.  Which applicants --
19   A.  All applications are reviewed.
20   Q.  Do you remember how many applications you went
21       through?
22   A.  40.
23   Q.  There were 40 applications?
24   A.  Yes, sir.
```

1    Q.  Okay.  And when was this?  Let me make it

2        easier.  In fire prevention, what grade level?

3        15 and six?

4    A.  No.

5    Q.  Or nine or 12?

6    A.  We had R9.  Both of us reviewed the

7        applications.

8    Q.  So that was R9?

9    A.  Correct.

10   Q.  Which are 40 applications?

11   A.  Yes.

12   Q.  And how many of those 40 were picked to be

13       interviewed?

14   A.  I believe around ten.

15   Q.  And how many were, in fact, interviewed?

16   A.  It depends.  Some people don't show up.

17   Q.  And who would pick them up?

18   A.  Lauren.  I believe her name is Waters.

19   Q.  Lauren -- I'm sorry?

20   A.  Waters.

21   Q.  How does the interview process go in terms of if

22       you're involved in the interview, for example,

23       in the R9 that you had just mentioned for fire

24       prevention, who did the interviewing?

```
1    A.   In that case, Marianne, the immediate

2         supervisor.  Her immediate supervisor.  Then she

3         sends them down to the assistant fire marshal.

4    Q.   Who was?

5    A.   George Wyman.

6    Q.   So you were not involved in that decision?

7    A.   Correct.

8    Q.   When was the last time you were involved in the

9         interview process?

10   A.   I was involved in the interview process for

11        Jennifer Ryan, who went from an MM4 to an MM5.

12   Q.   And who else interviewed Jennifer?

13   A.   Gerry, Gerard Fontana, who's deputy chief in the

14        fire department.

15   Q.   Have you ever done interviews on your own?

16   A.   Yes, I have.

17   Q.   And who was --

18   A.   I shouldn't say that.  I always have somebody

19        with me.

20   Q.   For example?

21   A.   Barbara Powers or at one point, I had Mary

22        Kilgallen with me and just for a second opinion.

23   Q.   So Mary Kilgallen would be involved in the

24        interview process?
```

1    A.  At one time, she worked in my office from 2001

2        to, I think, 2003.

3    Q.  And would she ask questions during the interview

4        process?

5    A.  Yes, she would.

6    Q.  And give you her opinion?

7    A.  Yes, sir.

8    Q.  Does someone make up a list of questions to ask?

9    A.  I do.

10   Q.  Have you always done that?

11   A.  Yes.

12   Q.  So since 2001?

13   A.  Correct.

14   Q.  So when Mary Kilgallen interviewed with you, you

15       gave her some of the questions to ask?

16   A.  Yes.

17   Q.  Or she asked her own questions?

18   A.  No.  We came up with a script.

19   Q.  Do you always ask -- do you always have a script

20       for each interview?

21   A.  Yes, I do.

22   Q.  Do you require any time without a script?

23   A.  Have I had not a script?  No.  I've always had a

24       script.

1   Q.  Did Mary McHugo work underneath you?

2   A.  No.  She's a manager.  I would say peers.

3   Q.  So she doesn't report to you?

4   A.  No, she doesn't.

5   Q.  She reports to --

6   A.  Kathleen Curliz.

7   Q.  And before Kathleen, who did she report to?

8   A.  Andy Warren.

9   Q.  I'm just organizing things so we don't jump back

10      and forth.  Bear with me.

11              (Pause)

12  BY MR. FEENEY:

13  Q.  This is a general question.  Who is responsible

14      for authorizing overtime for a particular

15      employee?

16  A.  There is a form that we have and it has to be

17      signed off by Kathleen Curliz.

18  Q.  And before Kathleen Curliz, any warning sign?

19  A.  There is only one department that has overtime.

20  Q.  Who's that?

21  A.  Payroll.  Are you talking civilians, sir?

22  Q.  Civilians.

23  A.  Okay.

24  Q.  And help me out a little bit.  When you make a

1    decision between civilians and firefighters, so

2    you make a difference between AFSCME and SENA on

3    one side and 718 on the other side?

4  A.  There are three different contracts.

5  Q.  So when you say, "civilian," you are talking

6    about SENA and AFSCME?

7  A.  Correct.

8  Q.  Are there any firefighters who also work for

9    SENA and AFSCME jobs?

10 A.  No.

11 Q.  Okay.  Are there any civilians who work in

12    firefighter jobs?

13 A.  That would be an incorrect statement.

14 Q.  I just want to make sure I got the reverse.  Are

15    there any firefighters who are doing

16    responsibilities formerly performed by

17    civilians?

18 A.  Formerly done by civilians, not to my knowledge.

19 Q.  So getting back to overtime, how is that

20    overtime approved?

21 A.  The manager has to fill out a form, put the

22    reason why he or she is requesting overtime, and

23    sent down to Kathleen Curliz to be approved.

24 Q.  And you said only payroll on overtime?

```
1   A.   For most parts, yes.  We have an MIS issue.

2   Q.   What does MIS stand for?

3   A.   Managing Information Services.  Technology

4        people.  We had issues with computers but for

5        the most part, payroll is the only department

6        that does some overtime.

7   Q.   And who in payroll gets overtime mostly?

8   A.   Everybody in payroll.

9   Q.   Everybody does?

10  A.   Yes.

11  Q.   Do you know Joseph DoDo Nee?

12  A.   To say hello, yes.

13  Q.   When was the first time you met?

14  A.   I believe it was at a credit -- he's a member of

15       the Boston Fire Credit Union.  That's the first

16       time I met him.

17  Q.   When was the last time you saw him?

18  A.   At a Boston Fire Credit Union meeting.

19  Q.   And before that?

20  A.   I don't recall.

21  Q.   How often has he had meetings with you and your

22       office?

23  A.   I would say for the six years I've been there,

24       he came to my office once.
```

1    Q.   How often have you had meetings with DoDo Nee in

2         which he was a participant in other people's

3         offices?

4    A.   I don't remember.

5    Q.   More than once?

6    A.   I don't remember having a meeting in somebody

7         else's office.

8    Q.   So that it's your testimony the only time that

9         you had met DoDo Nee is at the -- I'm sorry.

10        What was the occasion?

11   A.   Boston Fire Credit.

12   Q.   Boston Fire Credit Union Halls?

13   A.   Yes.

14   Q.   And one time in your office?

15   A.   He came in to inquire how his son was doing on

16        the firefighters' test.

17   Q.   And who was that?

18   A.   Brian Nee.

19   Q.   Brian Nee?

20   A.   Yes.

21   Q.   And Brian Nee was his son?

22   A.   Correct.

23   Q.   That was the only time you recall him being in

24        your office?

1    A.   Yes, sir.

2    Q.   And when he asked you about his son in the

3         firefighters' test, what did you respond?

4    A.   I showed him the listing, where he ranked on the

5         listing on the Civil Service.  They call it the

6         Civil Service list.

7    Q.   And where did he rank, if you remember?

8    A.   You can tell by a ranking if the person is

9         getting on a class, depending upon the size of

10        the class you are hiring.

11   Q.   And to the best of your memory, what does Brian

12        Nee's ranking tell him about or tell you about?

13   A.   A shot.  He had a chance at becoming a

14        firefighter.  I'm sorry.

15   Q.   Is there a person named Jacquelyn McGrath?

16   A.   Yes.

17   Q.   How do you know her?

18   A.   I interviewed and hired her.

19   Q.   For what position?

20   A.   Head clerk.

21   Q.   Is that AFSCME or SENA?

22   A.   That would be AFSCME.

23   Q.   And was she required to take a drug test?

24   A.   Yes, she was.

```
1    Q.   Did she pass?

2    A.   Yes, she did.

3    Q.   Did she pass the first time?

4    A.   She passed, yes.  She passed every time.  She

5         did not fail a drug test, no.

6    Q.   So it's your testimony that she never failed a

7         drug test?

8    A.   Correct.

9    Q.   Is she still working for the Boston Fire

10        Department?

11   A.   She is not.

12   Q.   Why not?

13   A.   She was fired upon my recommendation.

14   Q.   Because?

15   A.   She fell asleep at her desk.

16   Q.   And who reported that to you?

17   A.   Jane Green.

18   Q.   Who was hired in her place?

19   A.   Francis Martin.

20   Q.   That's the same Francis Martin that you

21        mentioned before about getting -- let me see if

22        I can find it.  Strike that.

23            Is Jacquelyn McGrath any relation to

24        Ricardo Firefighter Jack McGrath that you know
```

1       of?

2   A.  I don't know.

3   Q.  Did Jack McGrath ever come to you and inquire

4       about his --

5   A.  He did.

6   Q.  And what did he say?

7   A.  He said that Jacquelyn McGrath is fine.

8   Q.  I'm sorry?

9   A.  He said the candidate put an application in and

10      her name is Jacquelyn McGrath.

11  Q.  And you said?

12  A.  I said, "Thanks for telling me."

13  Q.  Did he tell you who he was?

14  A.  Did he tell me?

15  Q.  Did he introduce himself?

16  A.  Let me get this straight.  Jack McGrath came in

17      and said, "there is going to be an application

18      from Jacquelyn McGrath.  Could you give her a

19      consideration?"  I said, "I'll give her

20      consideration."

21  Q.  And that was before she was hired?

22  A.  That was before she was hired, yes.

23  Q.  How many times was Jacquelyn McGrath given a

24      drug test?

1    A.   To my knowledge, one, sir.

2    Q.   Aside from your one meeting with Joseph DoDo Nee

3         in your office and the time you saw him at the

4         Boston Firefighters Credit Union gala, had he

5         ever called you on the telephone?

6    A.   Yes.

7    Q.   For what purposes?

8    A.   Mainly his son.

9    Q.   And what were those conversations about?

10   A.   What was his chances of becoming a firefighter.

11   Q.   Anything before he was becoming a firefighter?

12   A.   Not to my knowledge, no.

13   Q.   Did he ever call on any other employees or

14        potential employees?

15   A.   I don't recall any.

16   Q.   Have you ever called him on the phone?

17   A.   Have I called him on the phone?  No.

18   Q.   Okay.  Do you have any other members of DoDo

19        Nee's family who's employed at the Boston Fire

20        Department besides Brian?

21   A.   No.

22   Q.   I don't necessarily mean his direct family but

23        any relations, any cousins, nieces, or nephews?

24   A.   Not to my knowledge.

1    Q.   I may have asked you this.  Do you know Fire
2         Captain Joseph Casper?
3    A.   I know him.
4    Q.   Do you know if he's related to Joseph DoDo Nee
5         at all?
6    A.   That I don't know.
7    Q.   Have you ever heard that he was related to
8         Joseph DoDo Nee?
9    A.   No.
10                  MR. FEENEY:  It's 3:30.  Off the record
11        for a second.
12                  (Discussion off the record)
13                  (Short recess)
14   BY MR. FEENEY:
15   Q.   Marianne McHugo, do you know her?
16   A.   Yes.
17   Q.   When did you first meet her?
18   A.   2001.
19   Q.   Was she working at the fire department when you
20        were hired?
21   A.   Yes, sir.
22   Q.   Do you know where she was at before she came to
23        the fire department?
24   A.   City Hall.

```
 1    Q.   In what department?  Do you know?

 2    A.   I don't know.

 3    Q.   Do you know if Marianne McHugo and Andy Warren

 4         know each other?

 5    A.   When I came there, she reported to Andy Warren.

 6    Q.   Okay.  Do you know if they are neighbors or

 7         close neighbors?

 8    A.   I have no idea.

 9    Q.   Do you know if they carpooled together?

10    A.   No.

11    Q.   What are Marianne McHugo's responsibilities?

12    A.   She's in charge of fire prevention, overseeing

13         the civilians.

14    Q.   When you say she's overseeing the civilians, how

15         is that different from your position of

16         overseeing of the civilians?

17    A.   No.  The civilians in fire prevention.

18    Q.   In fire prevention?

19    A.   Yes.

20    Q.   So why is fire prevention underneath your

21         umbrella?

22    A.   It is.  I'm supervisor and manager.  Make it

23         clearer for you.

24    Q.   Go ahead again.
```

```
1    A.   She's in charge of supervisory and managerial

2         for the fire prevention civilians.

3    Q.   How is fire prevention underneath your

4         supervisory umbrella?

5    A.   She does the day-to-day supervisory and

6         managerial.

7    Q.   And what do you do?

8    A.   I oversee the whole civilian population.

9    Q.   And so McHugo reports to you or to Kathleen

10        Curliz?

11   A.   Kathleen Curliz.

12   Q.   Does Kathleen Curliz report to you?

13   A.   No.  Kathleen Curliz reports to the

14        Commissioner.

15   Q.   And you report to the Commissioner as well?

16   A.   On some issues, yes.

17   Q.   On what issues do you report to?

18   A.   Kathleen Curliz.

19   Q.   Prior to that, had you reported to Andy Warren?

20   A.   I've reported directly to Commissioner

21        Christian.

22   Q.   So prior to Kathleen Curliz coming into her

23        position, you would report directly to the

24        Commissioner on all things?
```

1   A.   Yes, sir.

2   Q.   Since she, Kathleen Curliz, came in, you

3        reported certain things to Kathleen Curliz?

4   A.   Yes, sir.

5   Q.   What are those things?

6   A.   Financial budgets, personnel moves.  Stuff like

7        that.

8   Q.   Okay.  Mary McHugo, you testified earlier

9        that -- actually, let me go back.  You testified

10       earlier that you draft up a list of questions?

11  A.   Yes.

12  Q.   For the people that you were going to interview?

13  A.   Yes.

14  Q.   Does McHugo also draft up a list of questions?

15  A.   She does.

16  Q.   Does she do that for each and every interview?

17  A.   She does.

18  Q.   And are these questions the same?  I mean, aside

19       from specific job responsibilities, are they the

20       same format for each interview?

21  A.   No.  Some positions are more specific so you

22       have to tally all of the jobs of persons -- if a

23       person is a customer service person for a person

24       who is detail oriented or whatever it might be.

1          So there are different requirements.

2     Q.   Do you and Marianne work on questions jointly?

3     A.   Sometimes.   (Witness shakes head)

4               MS. GLASGOW:   Is that "yes"?

5     A.   Yes.   Right.

6     Q.   I had asked you earlier about if positions ever

7          were posted more than once.   Can you describe

8          for me the positions that you remember that were

9          posted more than once and what the circumstances

10         were?

11    A.   There was one detail officer, fire prevention

12         was posted more than once.

13    Q.   And who applied, when it was first posted?   Let

14         me go back to the procedure.   When it was first

15         posted, that one posted internally?

16    A.   Correct.

17    Q.   And for how long was it up?

18    A.   I think it's up for two weeks.

19    Q.   And then for that detailed position, how many

20         applicants submitted --

21    A.   One.

22    Q.   Who was that?

23    A.   Lila Brown.

24    Q.   And was there a determination made that Lila

```
 1        should receive an interview or was qualified?
 2   A.   She wasn't qualified because of her attendance.
 3   Q.   And what about her attendance?
 4   A.   It was unacceptable.
 5   Q.   And in what sense exactly?
 6   A.   Management attendance program.  She was in the
 7        management attendance program.  It's a
 8        contractual agreement with AFSCME, with the SENA
 9        and AFSCME.  If you're out so many times in a
10        given quarter, you receive a letter or you're
11        suspended or you're given a final warning.  And
12        Lila was in that program at the time she applied
13        for that position.
14   Q.   In her personnel file, were there any letters or
15        warnings?
16   A.   Yes, sir.
17   Q.   How many letters or warnings were there?
18   A.   Several.
19   Q.   Does that attendance, does it make a
20        determination between family and medical leave
21        attendance?  I mean, absences and sick absences?
22   A.   If you are on Medical Leave Act, you wouldn't be
23        on the management attendance program.  If you
24        are documented, if you bring documents in saying
```

1       why you're absent, why you're sick, you wouldn't

2       be on the management attendance program.  It's

3       the only unexcused absences without any

4       documentation that you're in the managing

5       attendance program.

6   Q.  Okay.  And so for that detailed position, it was

7       posted once and Lila Brown was the only

8       applicant?

9   A.  Correct.

10  Q.  So it was reposted?

11  A.  Yes.

12  Q.  Internally or externally?

13  A.  Both.  Externally.

14  Q.  How many applicants?

15  A.  I would say around 20.

16  Q.  Okay.  And how many of those 20 were qualified

17      to be given interviews?

18  A.  I would say around eight.

19  Q.  Who were those eight?  Do you remember?

20  A.  I don't.

21  Q.  Did you interview them?

22  A.  Yes, I did.

23  Q.  Whom do you recall interviewing?

24  A.  I remember a woman from -- a couple of people

1    from City Hall and the outside candidate we

2    eventually hired.

3  Q.  And who was that?

4  A.  Lois Hart.

5  Q.  Did Denise Barrier ever apply for that job?

6  A.  No, she did not.

7  Q.  Was she ever given any interview for that job?

8  A.  You've got to apply to be interviewed.

9  Q.  So the answer is "no"?

10 A.  Correct.

11 Q.  Why was Lois Hart hired for that job?

12 A.  She had payroll experience with the Boston

13    Public Schools.

14 Q.  Was there any consideration given to Lois Hart

15    because of any of her political connections or

16    affiliations?

17 A.  No.

18 Q.  Were you aware of any political connections

19    with --

20 A.  No, I was not.

21 Q.  Any other job that was posted more than once?

22 A.  Case manager's position.

23 Q.  And when was this?

24 A.  I think around 2003, 2004.

1   Q.  And was that posted internally at first?

2   A.  No.  I think no.  That was always posted

3       externally.

4   Q.  How many applicants were received for that one?

5   A.  Close to 100, I would say.

6   Q.  How many of those were deemed to be qualified

7       and given interviews?

8   A.  I would say close to 20.  20 people were given

9       interviews.

10  Q.  And that's the first time it was posted, the

11      first round?

12  A.  No.  I would say altogether, sir.

13  Q.  So for the first round, when it was first

14      posted, how many interviews were given?

15  A.  I would say around ten.

16  Q.  And were any of those ten offered the job?

17  A.  No.

18  Q.  Why not?

19  A.  They weren't qualified.

20  Q.  Well, they met the minimum qualifications

21      because they had interviews?

22  A.  Right.

23  Q.  But after the interviews, you determined they

24      weren't qualified?

1    A.    Totally -- they weren't qualified.

2    Q.    What were you looking for that they didn't have?

3    A.    Medical insurance background.

4    Q.    I'm sorry?

5    A.    Medical insurance background, Worker's

6          Compensation experience, working with the

7          indemnification, working with firefighters in

8          the indemnification environment.  I mean, that

9          they were self-insured.

10   Q.    So it was reposted?

11   A.    Yes, sir.

12   Q.    And maybe you had grouped them together again.

13         So for the first posting, how many applicants

14         were there?

15   A.    There were a lot.  There were around, I would

16         say, 30 to 45.

17   Q.    So for the second posting, how many applicants

18         were there?

19   A.    Same amount.

20   Q.    Okay.  And were some the same?

21   A.    No.  It would be a different -- it was a

22         different bunch.

23   Q.    Okay.  So did any of the people who were given

24         interviews the first time apply for the second

1    time?

2  A.    No.  You wouldn't do it like that, sir.  You

3        would say, this bunch came in, this bunch came

4        in.  So I mean, until you have a final decision,

5        you don't get the same people over and over

6        again.  We posted this job online at Boston.Com

7        because I needed to get a person that had the

8        background for this position.  It was very

9        specific.

10  Q.    And so none of the people who applied the first

11        time applied the second time?

12  A.    That's not how it's done.

13  Q.    I'm just asking.

14  A.    I'm telling you.  I mean, I get one batch of

15        applications.  It doesn't eliminate them.

16  Q.    I see.

17  A.    But I have this batch -- I have another batch

18        and then I have -- if I have requested a third

19        batch, I will get a third batch.

20  Q.    So for the second posting, you also consider the

21        first batch of applications?

22  A.    You never rule anybody out until the whole

23        process is done.

24  Q.    So that means that when you evaluate for the

1    second posting, you went through all of the
2    applications you received to that date?
3  A. Correct.
4  Q. To determine who, among those, had minimum
5    qualifications and then gave interviews to those
6    people or offered them interviews?
7  A. Yes, sir.
8  Q. So for the second round, how many interviews did
9    you give?
10  A. It's almost exactly the same thing again.
11  Q. About ten or so?
12  A. Yes.
13  Q. And was somebody given an offer at that point?
14  A. I believe it was a third.  I think there were
15    three postings.
16  Q. So after this second round of interviews --
17  A. After the second round, I made an offer and I
18    was turned down.
19  Q. Who did you give the offer to?
20  A. I don't remember the woman's name.  She was a
21    nurse.  She had all of the medical
22    qualifications I was looking for.  I showed her
23    the work environment.  She said it was
24    unacceptable.

1   Q.   And you can't remember her name?

2   A.   I don't.

3   Q.   So you went through a third round?

4   A.   Yes, sir.

5   Q.   And another 33 applicants?

6   A.   Yes.

7   Q.   And about ten interviews?

8   A.   Yes.  At that point, I brought in the people

9        from Worker's Comp, from City Hall.

10  Q.   When you say you brought in --

11  A.   I requested.

12  Q.   How did you do that?

13  A.   Well, we were Worker's Comp. with the civilians

14       and I said, "I'm not getting anywhere closer to

15       the type of people that -- the person that I

16       need."  I sent Linda Kelly, who's in charge of

17       Worker's Comp., all of the people that met

18       minimum qualifications.  I sent her those

19       applications to review.  And then three batches

20       and that's when the candidate that we eventually

21       hired came up and --

22  Q.   Who was that?

23  A.   That was Ian MacKenzie, M A C K E N Z I E.

24  Q.   M A C or M C?

1    A.    I think it's Mac.

2    Q.    At the time that Ian MacKenzie applied, was he a

3          Boston resident?

4    A.    No, he was not.

5    Q.    Was that a requirement?

6    A.    It's a requirement that you must be a resident

7          when you are hired.

8    Q.    And so on his first day of work, was he a Boston

9          resident?

10   A.    Yes, sir.

11   Q.    So at the time that he applied, although he

12         wasn't a Boston resident, he made a

13         representation -- I mean, did he make or -- let

14         me ask a different question.

15               Did he make a representation to you or

16         somebody else that if hired, I will become a

17         Boston resident on that date?

18   A.    It was mandatory.

19   Q.    So it was actually told to him that if we make

20         you an offer, you must become a Boston resident?

21   A.    Correct.

22   Q.    And he agreed?

23   A.    Yes.

24   Q.    Okay.  So McHugo, in your opinion, has Marianne

1       McHugo ever received any job positions, step

2       increases, upgrades, or other purge benefits as

3       a result of any particular affiliation or

4       connections?

5                   MS. GLASGOW:  Objection.

6   A.  No.  No.

7   Q.  Have you ever heard that she has been --

8                   MS. GLASGOW:  Objection.  Let me

9       object.

10  A.  No.

11  Q.  And now you can answer.

12  A.  No.

13  Q.  Okay.  Mary Kilgallen, do you know her?

14  A.  Yes.

15  Q.  How do you know Mary Kilgallen?

16  A.  Mary Kilgallen was in my office working in the

17      HR office when I arrived on July 21st.

18  Q.  Of 2001?

19  A.  2001.

20  Q.  So she was hired before you?

21  A.  Correct.

22  Q.  And so what was her position or level at that

23      point?

24  A.  She was MM6, I believe.  I believe MM6.  Her

1        title was principal administrative assistant.

2   Q.   And she worked for you for how long?

3   A.   She worked for me from 2001 to 2003.

4   Q.   And based on that experience, what is your

5        opinion of her job performance?

6   A.   Very good.

7   Q.   Have you ever had any criticisms of her job

8        performance?

9   A.   No.

10  Q.   Have you ever heard from others criticisms of

11       her job performance?

12  A.   No.

13  Q.   And she was there until 2003?

14  A.   Yes.

15  Q.   And what was her next position?

16  A.   She was administrative to the Commissioner in

17       2003.

18  Q.   And what level is that?

19  A.   She went from -- she didn't receive an increase.

20       She just went from my office to the

21       Commissioner's office to work in that position.

22  Q.   So when that position was first advertised, it

23       was advertised as an MM6, MM8?

24  A.   I think it was lower than the position that Mary

1    Kilgallen was at.  The position was lower than

2    the position than Mary Kilgallen.  The

3    Commissioner went to the budget and said, "how

4    could the person that reports to the director of

5    HR position be higher than the person that

6    reports to the Commissioner," which made sense

7    to me.

8  Q.  Let me go back.  Whose position did Mary

9    Kilgallen fill for that one?  Who had the

10    position before her?

11  A.  I don't know.

12  Q.  Okay.  Is it possible that the person who had a

13    position before it was an MM8 and it was

14    downgraded to an MM6?

15  A.  Anything is possible.

16  Q.  Okay.  But you're not sure about that?

17  A.  I'm not sure.

18  Q.  Who conducted interviews for that position for

19    the Commissioners?

20  A.  It was myself and Mary Kilgallen.

21  Q.  Okay.  And then she is the one who actually got

22    the position?

23  A.  Yes, sir.

24  Q.  Is that typical that the person conduct

1   interviews?

2 A. At one point, I sent at least ten people

3   internally and externally up to see the

4   Commissioner.  At one point, he said, "Bob, I'm

5   more comfortable with Mary Kilgallen than

6   anybody else."

7 Q. When did she apply for the job?

8 A. What's that?

9 Q. I mean, if she did the interviewing on the -- I

10   mean, how many rounds of interviews were there

11   or how many times was it posted?

12 A. Well, see what happened was, it was an MM4 so it

13   had to be reposted as an MM6.

14 Q. So did she apply for it, for MM4?

15 A. No.

16 Q. And then it got --

17 A. Reposted.

18 Q. As MM6?

19 A. Because you have to get budget approval.  So I

20   had to give up a body to accommodate the

21   Commissioner.

22 Q. Okay.  So when it was first posted, it was MM4?

23 A. Right.  She was involved in the interview.

24 Q. Who was interviewed at that point?

1   A.   I would say ten people internally and

2       externally.

3   Q.   And did you send to the Commissioner any people

4       that you recommended?

5   A.   Yes.

6   Q.   Who did you send up?

7   A.   I sent up all ten people.

8   Q.   So Commissioner Christian interviewed ten

9       people?

10   A.   I would say at least ten people, yes.

11   Q.   Let me see if I understand you correctly.  So

12       you sent up to Commissioner Christian all ten

13       people that you had interviewed in that first

14       round?

15   A.   Yes.  It was a unique situation because that

16       person had held that position for 40 years.

17   Q.   So after Commissioner Christian interviewed ten

18       people, he didn't accept any of them?

19   A.   Correct.

20   Q.   And then the job was reposted in MM6?

21   A.   Correct.

22   Q.   And how many interviews were held at that point?

23   A.   Well, at that point, I would say around four

24       more interviews were held.

1   Q.  And who were those four?

2   A.  A couple of people from the City Hall.  I think

3       two internal.

4   Q.  Was Mary Kilgallen interviewed?

5   A.  Yes.

6   Q.  By whom?

7   A.  By the Commissioner.

8   Q.  But she was interviewed below with the other

9       four people?

10  A.  Yes, she was.  I mean, yes.  I sat down with

11      her.  I said to her, when it was reposted MM6, I

12      interviewed all of the candidates that had met

13      minimum qualifications and sent them up to the

14      Commissioner.

15  Q.  And there were four of those?

16  A.  Correct.

17  Q.  Who were those four?

18  A.  Mary Kilgallen and a woman from here.  I think

19      there was another woman from the fire

20      department.

21  Q.  So did you interview Mary Kilgallen?

22  A.  Yes, I did.

23  Q.  You interviewed the other three as well?

24  A.  (Witness shakes head)

1                 MS. GLASGOW:  Say "yes."

2    A.   Yes.

3    Q.   And then Commissioner Christian interviewed

4       those four people?

5    A.   Yes.

6    Q.   And he chose Mary Kilgallen?

7    A.   Yes, he did.

8    Q.   Did you use with Mary Kilgallen the same

9       interview sheet that you used with everybody

10      else?

11   A.   Yes, I did.

12   Q.   Do you score those sheets?

13   A.   Yes, I do.

14   Q.   Has she gotten a promotion since being --

15   A.   No, she has not.

16   Q.   So she's an MM --

17   A.   6, I believe.

18   Q.   It could be an 8?

19   A.   It could be an 8.

20   Q.   Okay.

21   A.   But it was a lateral move.  It was a lateral

22      move.  Monetary and grade-wise.

23   Q.   Okay.  Do you know if Mary Kilgallen has any

24      political affiliations or influence?

1  A.  No, not to my knowledge.

2  Q.  Do you know if she knows a State representative

3      named Mike Moran?

4  A.  No.

5  Q.  You don't know anything about that relationship?

6  A.  Say that again please.

7  Q.  Does she know Mike Moran, a State

8      representative?

9  A.  I believe Michael Moran is from Brighton.  She

10     probably does know Mike Moran.

11 Q.  Okay.  Do you know if she had any, other than

12     just an acquaintance, relationship with Mike

13     Moran?

14 A.  I don't know, sir.

15 Q.  Did she mention anything to you -- has she had

16     any close relationship with Michael Moran?

17 A.  No, she did not.

18 Q.  Are you related to Michael Moran at all?

19 A.  In no way.

20 Q.  Except for the spelling of the last name.  It's

21     like me and Maureen Feeney.  We're not related.

22          Do you know what Mary Kilgallen did

23     prior to working at the Boston Fire Department?

24 A.  She worked here at City Hall.  I think she was

```
 1          in charge of special events.
 2   Q.   What was her duty at special events?  Do you
 3          know?
 4   A.   We have a Christmas party.  The Mayor has a
 5          Christmas party at the Boston Fire Department
 6          every Christmas.  And I know that that's one of
 7          the things that is special.  What they do
 8          outside of that realm, I don't know.
 9   Q.   Okay.  Before the position that Mary Kilgallen
10          got with the Commissioner, were any of the same
11          people interviewed in the second round that were
12          interviewed in the first round?
13   A.   I believe they were, yes.
14   Q.   Who was interviewed twice?
15   A.   I would say Dennis Boyle, I think, comes to
16          mind.  Dennis Boyle.
17   Q.   Dennis Boyle?
18   A.   Yes.
19   Q.   And anyone else?
20   A.   That I don't know.  No, sir.
21   Q.   Why was Janice Boyle interviewed twice as
22          opposed to other people who were not interviewed
23          a second time?
24   A.   Because I think she was -- I would think Janice
```

1    Boyle was interviewed.  She might not have been

2    interviewed the first time.  Again, this is

3    2003.  I think she might have gone for the job

4    now that it went from MM4 to MM6.

5  Q.  So she was --

6  A.  She might have been interviewed the first time.

7    She went for the second time.

8  Q.  So anybody interviewed the first time wasn't

9    interviewed the second time?

10  A.  I don't believe so.

11  Q.  Okay.  Once you're interviewed the first time,

12    are they given consideration to get recommended

13    to the Commissioner for the second round as

14    well?

15  A.  Yes.

16  Q.  Okay.  So were any of those persons interviewed

17    the first time sent to the Commissioner for an

18    interview?

19  A.  Not if they were interviewed once.

20  Q.  Okay.  Do you know if anybody made a phone call

21    on behalf of Mary Kilgallen to get that position

22    with the Commissioner?

23  A.  No.

24           MS. GLASGOW:  Objection.

1    Q.   Have you ever heard that?

2    A.   No.   The Commissioner had said to me, "I'm very,

3         very comfortable with Mary Kilgallen.   I trust

4         her."   And I said, "fine, Commissioner."

5    Q.   In your opinion, was Mary Kilgallen more or less

6         qualified than other applicants?

7    A.   She was more qualified.

8    Q.   Based on her skills and experience?

9    A.   Yes, sir.

10   Q.   Okay.   Do you remember any particular skills

11        that made her more qualified?

12   A.   Administrative.   Administratively, I worked with

13        her.   I found her to be very good, very

14        accommodating, good with the public.   And I just

15        thought she would be a good fit for the

16        Commissioner.

17   Q.   Okay.   Michelle Irso, do you know Michelle?

18   A.   Yes, I do.

19   Q.   When was the first time you met her?

20   A.   The first time I interviewed with her.

21   Q.   For what position?

22   A.   It was R15 down in Bragden Street.   So I would

23        say it's the administrative assistant position.

24   Q.   Okay.   Who else applied for that job?

1    A.   We had around 20 applicants for that job, sir.

2    Q.   And how many of those applicants were given an

3         interview?

4    A.   We must have interviewed, I would say, ten.

5    Q.   And who interviewed them?

6    A.   It was myself, Deputy Chief Calabrisi, Jennifer

7         Ryan, who was in that position and was just

8         promoted, and District Chief McMann.  I can't

9         think of his first name.

10   Q.   And all four of you interviewed all ten

11        applicants?

12   A.   Yes.  I interviewed them by myself.  Then the

13        three of them did together in a group.

14   Q.   You interviewed the same bunches of people?

15   A.   Yes, sir.

16   Q.   Was that posted internally or externally?

17   A.   It was posted both internally and externally.

18   Q.   But only one posting?

19   A.   One posting, yes, sir.

20   Q.   And Michelle Irso came from where?

21   A.   She came from -- she was an office manager from

22        a private sector.

23   Q.   Did she know anybody in the fire department?

24   A.   No.

1    Q.    Did she know anybody in the City of Boston

2          Government?

3    A.    Say that again, sir.

4    Q.    Did she know anybody in the City of Boston

5          Government that you're aware of?

6    A.    No.

7    Q.    Okay.   Did Commissioner Christian interview her?

8    A.    Yes.

9    Q.    Did he interview anybody else?   Was she the only

10         person recommended for --

11   A.    She was the only person that went to see

12         Commissioner Christian.

13   Q.    Okay.   And what made her candidacy more

14         favorable than the other people?

15   A.    Experience.

16   Q.    In what?

17   A.    In office manager, working by herself, managing

18         people, dealing with outside communications,

19         dealing with several interacting groups at once.

20         And the Chief was adamant about attendance at

21         that time.   Chief Calabrisi was adamant about

22         attendance and that was one of the final

23         decisions of why Michelle was chosen over some

24         other candidates.

1   Q.  Over which other candidates?

2   A.  There were several internal candidates.

3   Q.  Who were they?

4           MS. GLASGOW:  Objection.

5   Q.  Okay.  Who were they?

6           MS. GLASGOW:  Well, one of the things

7       that we've had to deal with with regards to job,

8       just the names of these candidates, and we've

9       never given you names of the candidates for the

10      positions.  So I would object and I would have

11      him not answer, unless one of the candidates,

12      they are one of the named Plaintiffs, but we've

13      never given any of the names of the applicants

14      for these positions, other than the names.

15          MR. FEENEY:  We're going to seal the

16      names so we're not going to present them.  I

17      need to know.

18          MS. GLASGOW:  Well, at this point,

19      who's reading this deposition and things like

20      that?  Your clients?

21          MR. FEENEY:  No.  That's pursuant to

22      the protective order.

23          MS. GLASGOW:  You're telling me your

24      clients are not going to be reading these

```
 1      depositions?
 2             MR. FEENEY:  No.  According to Beckter,
 3      they can read it.  Yes.  That's the whole point
 4      of this whole thing.  Otherwise, we can't figure
 5      out what's going on so okay.
 6      BY MR. FEENEY:
 7   Q.  Who was interviewed?
 8   A.  The names I do remember were Julia Barton.  She
 9      took it to arbitration.  Luz Rivera.  And I want
10      to say Lila Brown and Denise Barry.
11   Q.  So which of those four had attendance problems?
12   A.  The Deputy Chief was not happy with Lila Brown's
13      and Denise Barry's.
14   Q.  Okay.  Was Denise in that management program
15      that you're talking about?
16   A.  Not to my knowledge.
17   Q.  So what about her attendance was a problem?
18   A.  He said it was unacceptable.
19   Q.  Chief Calabrisi said that?
20   A.  Yes.
21   Q.  What was Chief Calabrisi's position at that
22      point?
23   A.  He was in charge of that graduate street area.
24      It's the local management emergency planning
```

1    committee.  He was in charge of that.  He was

2    Deputy Chief in charge of that area.

3  Q.  Okay.  Was Denise ever offered that position?

4  A.  She was offered it as an upgrade prior to the

5    posting.

6  Q.  Are any other people offered positions prior to

7    posting?

8  A.  It was the practice that, you know, if there was

9    an opening, that people would be given an

10    opportunity to work internally in that area just

11    in case if it was something of emergency to have

12    somebody down there.

13  Q.  What other positions that you can recall were

14    offered to people prior to postings?

15  A.  We had a woman out sick for a while.  She worked

16    out -- again, it's only temporary.  It's working

17    out of your classification for a very set period

18    of time.  You're not given the personal job.

19    This person is going to work in this

20    classification until a decision is made.

21  Q.  So you're saying that Denise was offered the

22    position for a temporary period of time?

23  A.  Yes, sir.

24  Q.  And did she accept it?

1    A.   No.

2    Q.   Did she say why?

3    A.   She said it was offered to her by the prior

4         Commissioner.  She turned it down.  Then she's

5         going to turn it down now.

6    Q.   The prior Commissioner being --

7    A.   Pierce.

8    Q.   Did she give a substantive reason why she was

9         turning it down?

10   A.   She said, "I'm turning it down.  Mike Pierce

11        offered that to me back before Jen Ryan took the

12        job.  I'm turning it down now, and I said,

13        "fine."

14   Q.   And you were the person who had offered it to

15        her?

16   A.   Correct.

17   Q.   Okay.  So you went to her desk or her office?

18   A.   She came to my office.  Deputy Chief Hitchcock,

19        Chief of Operations Hitchcock came to my office

20        and asked me if anything could be done for

21        Denise.  And I said, "there is.  I could offer

22        her a temporary upgrade to Bragden Street and

23        that would help her financially."

24   Q.   What did Hitchcock say about that?

1   A.   He said, "she needed some money."

2   Q.   For what purpose?

3   A.   I have no idea.

4   Q.   He just said, "she needed more money"?

5   A.   Yes.

6   Q.   "So can you give her a temporary position"?

7   A.   "Well, we can give her an upgrade in her

8        position."  I said, "No.  That's not how it's

9        done.  We can give her an upgrade in a union

10       classified position for a temporary period of

11       time."

12  Q.   Okay.  Has Chief Hitchcock ever requested that

13       of you before?

14  A.   I mean, you talk about personnel moves all of

15       the time, but that was the unique situation.

16  Q.   Did Denise say anything else about that

17       position, why she didn't want to move besides it

18       was offered to her before by Marty Pierce?

19  A.   No.

20  Q.   That was it?

21  A.   That was it.

22  Q.   Okay.  When you offered her the position, it was

23       clear that you were offering it to her on a

24       temporary basis only?

```
 1   A.   Yes, sir.

 2   Q.   Was that in writing or orally?

 3   A.   Orally.

 4   Q.   Okay.  Do you know Carey Manning?

 5   A.   Yes, I do.

 6   Q.   When was the first time that you met Carey

 7        Manning?

 8   A.   When she applied for the storeroom manager's

 9        position.

10   Q.   Okay.  Did you interview Carey Manning?

11   A.   Yes, I did.

12   Q.   Did you interview anybody else for that

13        position?

14   A.   Yes, I did.

15   Q.   Who else did you interview for that position?

16   A.   A couple of internal candidates.  I couldn't

17        tell you.  That goes back to 2001.

18   Q.   December 2002?

19   A.   2002, yes.  It goes back a while.

20   Q.   So you interviewed more than one?

21   A.   Oh, yes.

22   Q.   About how many?

23   A.   I would say for that job, around five people.

24   Q.   They were internal?
```

1    A.   Internal, external.

2    Q.   So that was posted both internally and

3         externally?

4    A.   Yes.

5    Q.   Was Carey Manning internal or external?

6    A.   External.

7    Q.   And where was she from?

8    A.   She had worked in several restaurants, used to

9         working in store rooms, knew the first in, first

10        out type of approach.  Just, you know, had some

11        good experience with storerooms.

12   Q.   Do you know if Carey had any political

13        connections or patrons that helped her get that

14        position?

15   A.   No.  She did not.  No.

16   Q.   So, in your opinion, she was the most qualified

17        person for that job?

18   A.   Oh, yes.

19   Q.   Because of her experience in storerooms?

20   A.   Yes, sir.

21   Q.   Do you know Eileen Stilly?

22   A.   She started working the same day I did.

23   Q.   Did you know her before that?

24   A.   No.

1   Q.   So if I say that she was hired on July 9th,

2        would that be about when you were hired, of

3        2001?

4   A.   I was hired July 21st, 2001.

5   Q.   Okay.  Eileen started the same day you did?

6   A.   I thought she started the same day I did.

7   Q.   I could be wrong.

8   A.   Okay.

9   Q.   You didn't interview her for the job at all?

10  A.   No, I did not.

11  Q.   Do you know if Eileen Stilly has political

12       connections -- do you know if Eileen Stilly has

13       any particular affiliations, patronage, or

14       influence that would have helped her get her

15       position?

16  A.   No.

17  Q.   Have you ever heard that?

18  A.   No.

19  Q.   Do you know Carol Petta?

20  A.   Yes.

21  Q.   For how long have you known Carol Petta?

22  A.   Since July 21st, 2001.

23  Q.   And what position was she in when you got hired?

24  A.   Payroll manager.

1    Q.   Is she still in that position?

2    A.   Yes, sir.

3    Q.   Who is Carol Petta, P E T T A, supervisor?

4    A.   Again, it went from Andy Warren to Kathleen

5         Curliz.

6    Q.   So the person who monitored -- if Carol Petta

7         applied for overtime, the person who monitors

8         that is Kathleen Curliz?

9    A.   Yes, sir.

10   Q.   Did Carol Petta complete or do any of Mary

11        Kilgallen's job responsibilities?

12   A.   Not to my knowledge.  No, sir.

13   Q.   Do you know if Carol Petta has received any job

14        positions, pay upgrades, step increases, or

15        other political favors or other favors that are

16        based on political patronage, influence, or

17        connections?

18   A.   No, sir.

19   Q.   Do you know Priscilla Richardson?

20   A.   Yes.

21   Q.   How do you know Priscilla?

22   A.   Priscilla is our chief telephone operator.

23   Q.   For how long has she been there?

24   A.   She's been there, I would say, 2005.

```
 1    Q.   Was that an AFSCME or SENA position?

 2    A.   That would be AFSCME.

 3    Q.   Did you interview her?

 4    A.   Yes, I did.

 5    Q.   Did you interview anybody else for that

 6         position?

 7    A.   No, I did not.

 8    Q.   Was that job posted?

 9    A.   Yes, it was.

10    Q.   For how long was it posted?

11    A.   It was posted, I believe -- I can't tell you.

12         Normal postings -- we receive no grievances for

13         jobs or if it was posted incorrectly, we would

14         have gotten a grievance.  We had several

15         candidates apply for that job.

16    Q.   Do you remember who else applied?

17    A.   I don't know if anybody internal.  I don't think

18         anybody internally applied for that job.

19    Q.   Was it posted internally and externally?

20    A.   Yes.  It was posted internally and externally,

21         yes.

22    Q.   When it was posted externally, is it posted on

23         the website?

24    A.   Yes, sir.
```

1   Q.   Who held the position before Priscilla?  Do you
2        remember?
3   A.   Gwen Shepard.
4   Q.   And do you remember when it was announced that
5        Priscilla was going to get that position?
6   A.   Every job posting is announced the same way.
7        You go through the process.  Then there is a job
8        selection posting.  You put it up saying that
9        Bob Moran was selected for this position.
10  Q.   Do you remember a going-away party for Gwen
11       Shepard?
12  A.   No, I don't.
13  Q.   Did Gwen retire?
14  A.   No.  Gwen relocated.
15  Q.   Did you ever go to sort of an end-of-work party
16       for Gwen Shepard?
17  A.   We might have had cake for her internally.  Yes.
18       Yes, we had a cake for her.  Yes.
19  Q.   And you were there for that?
20  A.   I believe I was, yes.
21  Q.   Would the Commissioner have been involved?
22  A.   Gwen's office is on the second floor.  I would
23       say probably.
24  Q.   Do you remember at that party if the

1     Commissioner announced at that time that

2     Priscilla would be taking Gwen's place?

3  A.  No.

4  Q.  In your opinion, has Priscilla ever received a

5     position pay upgrade or step increase as a

6     result of political patronage, influence, or

7     connections?

8  A.  No, sir.

9  Q.  Do you know Erica Boiland?

10  A.  Yes, sir.

11  Q.  How do you know her?

12  A.  She works in my office.

13  Q.  As what?

14  A.  Head clerk.

15  Q.  Did she take Mary Kilgallen's place?

16  A.  Well, it was a budgetary restructuring so to say

17     she's R12 where Mary was MM6 or 8, whatever that

18     might be, so it would be hard for me to say she

19     took that position.

20  Q.  I'm looking not more for the label but the

21     actual job responsibilities.

22  A.  An AFSCME person can't do senior work.

23  Q.  Okay.  So who in your office is now doing your

24     job that Mary Kilgallen did?

1    A.    MM6, who is Barbara Powers.

2    Q.    Okay.  How long has Barbara Powers been there?

3    A.    Barbara's been there since, I would say, 15 plus

4          years.

5    Q.    So help me out with this.  So when Mary

6          Kilgallen came on and worked for you, both she

7          and Barbara Powers were working on the same job?

8    A.    No.  When I came there, there was -- when I came

9          there, I had three administrative people in my

10         office.

11   Q.    And who were they?

12   A.    They were Mary Kilgallen, Marie Howard, and

13         Barbara Powers.

14   Q.    Was Mary Kilgallen there when you were first

15         hired?

16   A.    Yes, she was.

17   Q.    Okay.  So is Marie Howard still there?

18   A.    She retired.

19   Q.    So who is in your office now?

20   A.    Barbara Powers and Erica Boiland.

21   Q.    Then you had two people where before you had

22         three?

23   A.    Yes.

24   Q.    So these two are doing the work of these three?

1    A.   (Witness shakes head)

2                    MS. GLASGOW:  Yes?

3                    THE WITNESS:  Yes.

4                    MS. GLASGOW:  Thank you.

5    BY MR. FEENEY:

6    Q.   And are these two getting the same pay or did

7         either Powers or Boiland receive a pay upgrade?

8    A.   Barbara Powers received a pay increase working

9         for me.

10   Q.   And what was that?  Was that because of a step

11        upgrade or was that a union contract?

12   A.   It was an agreement made with SENA with Marie

13        Howard's retirement.

14   Q.   So Barbara Powers and Marie were SENA?

15   A.   Barbara Powers might have been AFSCME.

16   Q.   But she's SENA now?

17   A.   She's SENA now, yes, sir.

18   Q.   Was Marie Howard AFSCME or SENA?

19   A.   She was SENA.

20   Q.   Kilgallen was AFSCME?

21   A.   Kilgallen was SENA.

22   Q.   I'm sorry.  So what responsibility did Powers

23        take over that Kilgallen was doing?

24   A.   Powers took over all of the Civil Service

```
 1          requirements, which are numerous.  And all of

 2          the hiring responsibilities, which, again, are

 3          numerous.

 4    Q.    Okay.  I'm referring back to Erica Boiland.  How

 5          many people did you interview for Erica's

 6          position?

 7    A.    For Erica's, I must have interviewed ten.

 8    Q.    And who were they?

 9    A.    Outside people and a couple of internal people.

10    Q.    Can you list who you interviewed?

11    A.    I interviewed internally -- I can remember

12          interviewing Lousrey Vera, Lila Brown, and

13          Joanne Callahan.

14    Q.    And externally who interviewed --

15    A.    I don't remember, sir.

16    Q.    So another seven more, do you think?

17    A.    Say that again.  Yes.  Oh, yes.

18    Q.    How many applicants did you have?

19    A.    I would say 30.

20    Q.    Were you the one who reviewed the application to

21          see who you had interviewed?

22    A.    Yes.

23    Q.    Did you interview with anyone else?

24    A.    No, I did not.
```

1   Q.   Why was Erica Boiland chosen?

2   A.   Erica Boiland had worked for the Transportation

3        Department prior to that.  I was impressed by

4        her and I gave them all a typing test with --

5        they had to write a letter and she did the best

6        of them all.

7   Q.   Okay.  How was Kilgallen's typing abilities?

8   A.   Good.

9   Q.   Do you know if Erica Boiland has any political

10       connections or affiliations that helped her to

11       get her position?

12  A.   No.

13  Q.   Do you know if she knows anybody in city

14       Government or with influence with the Boston

15       Fire Department?

16  A.   Her mother works in the city.

17  Q.   Does her mother know DoDo Nee?

18  A.   I don't know.

19  Q.   What does her mother do?

20  A.   I don't know.

21  Q.   Have you ever met her mother?

22  A.   No, I have not.

23  Q.   Do you know Karen Cunningham?

24  A.   Karen, I met her the day she was interviewed.

1    Q.   Did you interview her?

2    A.   Yes, I did.

3    Q.   Who else interviewed her?

4    A.   Ian MacKenzie.

5    Q.   And what was she hired for?

6    A.   She was hired for an R9 position in the medical

7         office.

8    Q.   And whose was that position before?

9    A.   I would say Lila Brown.

10   Q.   So she was hired for an R9?

11   A.   Correct.

12   Q.   For how long did she stay in R9?

13   A.   She stayed in R9 for two, three years.

14   Q.   And then she was promoted to --

15   A.   An R12.

16   Q.   In the same position?

17   A.   Yes.  She took on -- no.  I wouldn't say the

18        same position because she took on new

19        responsibilities.

20   Q.   What new responsibilities did she take on?

21   A.   She took on the firefighters' sick leave

22        attendance records.  She took on some other

23        responsibilities in the medical office.

24   Q.   As an R9, what step was she hired at?

1    A.   She was hired as Step 3.

2    Q.   Okay.  For how long did she stay a Step 3?

3    A.   Step 3 until she was either eligible to go to

4         Step 4 contractually or until she became an R12.

5    Q.   So it's your understanding she stayed a Step 3

6         until she became an R12?

7    A.   If her year -- if she had a year there, she

8         would contractually have to go to R4.

9    Q.   Okay.  Thank you.

10                  MS. GLASGOW:  Step 4?

11                  THE WITNESS:  Step 4.  I'm sorry.

12   Q.   Help me.  So once you're hired, you're hired at

13        a particular step and then you only get those

14        raises if it's through the union contract; you

15        have to be there a year before you go to a Step

16        4?

17   A.   Correct.

18   Q.   Okay.  So each year, you go up one step?

19   A.   Correct.

20   Q.   Are there any exceptions made to that that you

21        go up two steps, three steps?

22   A.   No.

23   Q.   This is all useful.

24                  MR. FEENEY:  I need a short break.

1          (Short recess)

2             MR. FEENEY:  Back on the record.

3      BY MR. FEENEY:

4  Q.  We were discussing Karen Cunningham.  Let me

5      just wrap up with that.  Has anybody spoken on

6      behalf of Karen Cunningham to help her get a

7      position or pay upgrade or pay increase or a

8      step increase?

9  A.  No, sir.

10 Q.  Did Chief Ronald Keating ever speak on her

11     behalf to get her --

12 A.  He wouldn't have the final say.  It would be

13     between Ian MacKenzie, myself, and Kathleen

14     Curliz.

15 Q.  Has Cunningham ever received any pay upgrade or

16     step increases?

17 A.  Well, again, when you're hired, it has been the

18     practice, when you're hired at R9 or R12, you

19     can request to City Hall for a 9F letter.  It's

20     called a 9F upgrade, and they will go to that

21     Step 3 like they did with Karen, in Karen's

22     position.

23 Q.  So normally, someone would come in at a nine,

24     Step 1, and then held, come in at a nine, Step

```
 1        3, because of this 9F letter?
 2   A.   Correct.  The person prior to her was Joanne
 3        Callahan.  We did the same thing for her.
 4   Q.   Did Cunningham ever apply for a compensation
 5        grade appeal?
 6   A.   No, not to my knowledge.
 7   Q.   When you went from R9 to R12, did she ever
 8        receive any retroactive pay?
 9   A.   I would say no because you have to be in the
10        position to get the money.
11   Q.   But after she was in a position for a while, did
12        she ever apply from an R9 to R12?
13   A.   It would be retroactive only if the paperwork
14        took longer than she -- if it was approved,
15        let's say, if it was approved two weeks ago and
16        the paperwork -- if the union management agreed
17        two weeks ago that she would receive an R12 and
18        the paperwork wasn't completed, the settlement
19        agreement wasn't completed within that two-week
20        period, then she will get some retroactive pay,
21        but it would be spelled out in the settlement
22        agreement how far the money would go back to
23        him.
24   Q.   Okay.  In your opinion, has Karen Cunningham
```

|   |   |   |
|---|---|---|
| 1 |    | ever received any step upgrades, pay increases, |
| 2 |    | or any other benefits, have any political |
| 3 |    | connections or patronage that she may have? |
| 4 | A. | No. |
| 5 | Q. | The battery man position, are those 718s? |
| 6 | A. | I don't think there is a battery man position, |
| 7 |    | like it's outdated. |
| 8 | Q. | Are there still battery man positions that are |
| 9 |    | in and out? |
| 10 | A. | Not to my knowledge, no.  I've never hired a |
| 11 |    | battery man. |
| 12 | Q. | And you never interviewed anybody for a battery |
| 13 |    | man position? |
| 14 | A. | Correct. |
| 15 | Q. | And you aren't aware -- was the position that |
| 16 |    | Sean McGonagle received, what was that position? |
| 17 | A. | Lineman. |
| 18 | Q. | Okay.  And that's a 718 position? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Denise Barry, do you know Denise? |
| 21 | A. | Yes. |
| 22 | Q. | Does she work under your umbrella? |
| 23 | A. | As a civilian employee, yes. |
| 24 | Q. | What is your opinion of her work performance? |

1  A.  I would have to go to the supervisor and ask

2      that, sir.

3  Q.  Okay.  Have you ever heard anything about her

4      work performance?

5  A.  Her supervisor requested through Chief Hitchcock

6      that I seek a pay upgrade for her.

7  Q.  Who is her supervisor?

8  A.  Let me see.  Not pay upgrade but a step increase

9      for her.

10 Q.  And who is her supervisor?

11 A.  Her supervisor, immediate supervisor, was Chief

12     Ganara.  He went to Chief Hitchcock seeking a

13     pay upgrade for her.

14 Q.  And did he submit anything in support of that

15     pay upgrade request?

16 A.  She had a package that was given to me that I

17     presented to the personnel committee, City Hall,

18     here at City Hall.

19 Q.  And who's on that personnel committee?

20 A.  Members from the budget department, members from

21     the OHR, Office of Human Resources, and a member

22     from the financial office.

23 Q.  Was that request approved?

24 A.  No, it was not.

1    Q.  Have you ever submitted that kind of request for

2        other individuals?

3    A.  Yes, I have.

4    Q.  Who?

5    A.  Mary Kane comes to mind and Kathleen Frechette.

6    Q.  Kathleen with a C or K?  Do you know?

7    A.  K.   Kathleen, F R E C H E T T E.

8    Q.  Frechette?

9    A.  Frechette.

10   Q.  Anyone else?

11   A.  No, sir.  There was one for Kay McMillan that

12       was turned down.

13   Q.  Which ones were approved, if any?

14   A.  The Mary Kane and the Kathleen Frechette.

15   Q.  Do you have any input into whether those are

16       approved or disapproved?

17   A.  No.  I go there with all of the documentation

18       that I have and present the best case possible

19       for the employee.

20   Q.  Did Denise Barry apply for a principal

21       accountant position, R16, in June 2004, to the

22       best of your knowledge?

23   A.  I would say yes.  That would be in payroll.

24   Q.  And was she granted an interview?

1  A.  Yes.

2  Q.  By whom?

3  A.  Carol Petta.

4  Q.  Who else was granted an interview for that

5      position?

6  A.  July 16, there were several.  There were three

7      or four people in payroll that applied for that

8      position, too.

9  Q.  And who got the job?

10 A.  Yui Chin, Y U I  C H I N.

11 Q.  Did she also apply for an assistant principal

12     accountant in July 2004?

13 A.  Correct.  She did.

14 Q.  Was she interviewed for that position?

15 A.  She was, sir.

16 Q.  Who else interviewed for that position?

17 A.  Again, we had a couple of internal candidates.

18     It was given to another person in payroll, Luz

19     Rivera.

20 Q.  Who else was interviewed?

21 A.  I believe Kay McMillan applied, Denise applied.

22     That's all I remember, sir.

23 Q.  Okay.  Do you remember if she applied for the

24     administrative secretary position, R14, in

```
 1        September of '04?

 2   A.   I think that job was the --

 3   Q.   Lois Hart?

 4   A.   Lois Hart, and she did not apply for that job.

 5   Q.   So it's your testimony that you never received a

 6        letter from or that you never received a letter

 7        from Denise saying she did not get the position?

 8   A.   For the --

 9   Q.   The one that Lois Hart got, R14, admin

10        secretary.

11   A.   That would be -- there were a couple of 14.

12        That R14 is the Lois Hart position.  She did not

13        receive that.

14   Q.   Okay.  To the best of your knowledge, did she

15        ever apply for a temporary senior legal

16        assistant, R15, in August 2006?

17   A.   Say again.  16?

18   Q.   Yes.  Temp. senior legal assistant, R15.

19   A.   R15, there was an opening.  Rose Hanley was --

20        she could have applied for that position.

21   Q.   And did she receive an interview for that?

22   A.   I don't know.

23   Q.   Did you do the interviewing process for that?

24   A.   Mary McHugo did.
```

```
 1    Q.   Do you know who got the job?

 2    A.   Internal candidate.  Coretta Henry got the job.

 3    Q.   And Coretta is spelled C O R --

 4    A.   -- E T T A.

 5    Q.   And that's Henry Gardener?

 6    A.   Gardener, yes.

 7    Q.   Are you aware of Denise applying for a senior

 8         admin assistant, MM5, in August 2006?

 9    A.   Do you know what position, sir?

10    Q.   Senior admin associate.

11    A.   MM5 in 2006?

12    Q.   Yes.

13    A.   I don't know that position.  You would have to

14         tell me exactly what position it was.

15    Q.   Okay.  How about an admin assistant, R15, in

16         August 2006?

17    A.   That would be the job that she received.  She

18         got that job over fire arson and then turned it

19         down after a couple of days.

20    Q.   Was that a position that was downgraded from MM6

21         to R16?

22    A.   That would be somebody's terminology.  It

23         wouldn't be mine.

24    Q.   How would you do it?
```

```
 1   A.  It was correctly posted.
 2   Q.  What was it posted at before or who was in that
 3       position before?
 4   A.  I'm saying it was an R15 position.
 5   Q.  It was always R15?
 6   A.  No.  I'm saying there was an R12 person that
 7       left that position.  I would say it was probably
 8       R12.  It was upgraded to R15.
 9   Q.  Okay.  And was it ever an MM6?
10   A.  In some people's mind.  Not mine.
11   Q.  Explain that more.
12   A.  It's a grievance that the union says on a senior
13       position -- and I'm saying you can't have three
14       senior positions in one department.  It makes no
15       sense -- someone has to do AFSCME work.  Someone
16       has to do clerical, typing work.  It can be
17       three managers managing each other.
18   Q.  So AFSCME work is clerical work, you say?
19   A.  Correct.
20   Q.  And SENA work is --
21   A.  Supervisory.
22   Q.  And Mary Kilgallen was SENA?
23   A.  Mary was SENA, yes.
24   Q.  So when she was working with you, who was she
```

1       supervising?

2   A.   The people in Barbara Powers, and we oversee the

3        medical office so she had some input on that,

4        too.

5   Q.   Okay.  When Denise was first offered that

6        position, did the job responsibilities change

7        after that?

8   A.   No.

9   Q.   So she was never informed that the job

10       responsibilities would be different than what

11       she had -- than what she had applied for?

12  A.   The job was posted and the responsibilities that

13       were on the posting were the job

14       responsibilities that she was hired for.

15  Q.   So was she ever informed that she would have

16       different job responsibilities if she took the

17       job that wasn't on the posting?

18  A.   That's an incorrect statement.  The job posting

19       was the job that was posted and the

20       responsibilities fell under the posting.

21  Q.   So to the best of your knowledge, then, nobody

22       ever informed Denise Barry that the job

23       responsibilities that were on the postings were

24       going to be different than what she was going to

1      be actually doing if she took the job?

2              MS. GLASGOW:  Objection.

3   A.   That's incorrect.

4   Q.   Okay.  You're saying basically that the only

5        responsibility she was going to have was on the

6        job posting?

7   A.   Yes.  Correct.

8   Q.   And she was never informed differently?

9              MS. GLASGOW:  Objection.  And she was

10       never informed differently than that?

11       Objection.

12  Q.   Did anybody ever inform her that the job

13       responsibilities that she was going to have if

14       she took the position were going to be different

15       than what was on the posting?

16             MS. GLASGLOW:  Objection.

17  A.   All job postings have a little clause that we

18       have ironed out with AFSCME and SENA saying add

19       responsibilities.  So the job posting doesn't

20       say you have to hang up your jacket every

21       morning but, you know, in that job, there could

22       be any responsibilities.  If there is work to be

23       done that's not related to that job posting,

24       then you would file a grievance saying that this

```
1        is not what I was hired for and this is not what

2        the job posting said.

3    Q.  So prior to her starting in the position, are

4        you aware of anybody who had told her any of

5        those additional responsibilities?

6              MS. GLASGOW:  Objection.

7    A.  There were no additional responsibilities, sir.

8    Q.  Okay.  Was Denise Barry ever put into a

9        temporary slot?

10   A.  Yes, sir.

11   Q.  And what slot was that?

12   A.  She was put into a slot to pay some bills.

13   Q.  On whose request?

14   A.  I had worked it out with Chief Hitchcock to put

15       her in that position.

16   Q.  And what position was that?

17   A.  It was a temporary upgrade into MM5, I believe.

18   Q.  And what position was that?

19   A.  It was, I want to say, case management because

20       it wasn't case manage.  It was just MM5.

21   Q.  What were her responsibilities in that position?

22   A.  Pay bills.

23   Q.  And for how long was she in that position?

24   A.  Three to four weeks, to my knowledge.
```

```
 1    Q.   And that's all she was doing, was paying bills?
 2    A.   Yes, sir.
 3    Q.   Help me out.  What does that entail?  I'm not
 4         writing checks but what does that entail when
 5         you say "pay bills"?
 6    A.   You make sure you have an invoice coming in from
 7         hospitals, primary care physicians, therapists,
 8         and you make sure that those people are getting
 9         paid.
10    Q.   Did you have any other responsibilities?
11    A.   Not to my knowledge.
12    Q.   And how did she perform those responsibilities,
13         to the best of your knowledge?
14    A.   She got bills paid.
15    Q.   Was there a backlog of bills to be paid?
16    A.   Yes, sir.
17    Q.   And did she make up that backlog?
18    A.   No, sir.
19    Q.   Did she almost make up that backlog?
20    A.   No, sir.
21    Q.   Okay.  So was there still a significant backlog
22         while she left?
23    A.   Yes, sir.
24    Q.   Did you ever receive any evaluations of her work
```

```
 1              from her supervisor in that position?

 2    A.   There was no supervisor, except for myself.

 3    Q.   Did she report to anybody else besides yourself

 4         in that position?

 5    A.   She still reported to Chief Ganara.

 6    Q.   So the MM5, which department was that in?

 7    A.   The MM5 position was medical officer.

 8    Q.   So who was in charge of the medical officer at

 9         that time?

10    A.   Deputy Chief Personnel Joe Finn and myself.

11    Q.   Who else was working in the medical office at

12         that time?

13    A.   We had Carol Connors and we had a nurse and Dr.

14         Hamrock.

15    Q.   Who was the nurse?

16    A.   I believe Barbara Ryan.

17    Q.   Did you ever receive any written or oral

18         information from Barbara Ryan or Carol Connors

19         about Denise's performance while she was in the

20         position?

21    A.   Carol Connors wouldn't comment but Barbara Ryan

22         at that time was -- how can I say it?  Her

23         primary responsibility was nurse at the time, to

24         be a nurse.
```

1   Q.   Okay.  And so going back to the original
2        question, did you receive any oral --
3   A.   Not to my knowledge.  I don't remember.
4   Q.   And around what time was this?  What year?
5   A.   I would say 2003 or 2004.
6   Q.   Did Denise Barry ever ask you for a meeting to
7        talk about becoming a full-time position?
8   A.   She asked me for more money for the position.
9   Q.   And your response was?
10  A.   I said, "I can't pay you more for the job.  It's
11       a union job.  I can't pay you more than what the
12       union contract goes for."
13  Q.   Was she still doing the responsibilities of her
14       original job also?
15  A.   I don't know.  I don't know.  Seriously, sir, I
16       don't know.
17  Q.   Did she ever inform you that she was doing both
18       responsibilities?
19  A.   She said she was.
20  Q.   And if she was doing both responsibilities,
21       should she have gotten more?
22  A.   No.  It's an upgrade.
23  Q.   Well, it's an upgrade, but she was doing full
24       responsibilities in the MM5?

1    A.   No, she was not.

2    Q.   What responsibilities was she not doing?

3    A.   She was not negotiating with hospitals.  She was

4         not monitoring the accounts.  She wasn't

5         monitoring the service, after the cast service

6         of the firefighters.  She was just paying bills.

7         So she was not doing the job.

8    Q.   Who was doing the job before that?  Temporary

9         person?  Who was doing the job before that?

10   A.   We had Barbara Ryan doing some of that job.

11        Some of that job, plus some of the nursing job.

12   Q.   And why is it that Barbara Ryan couldn't

13        continue in that job?

14   A.   She was not doing a satisfactory job.  She was

15        in disciplinary mode at that time because we

16        were losing -- we were being threatened to

17        losing accounts because bills weren't being paid

18        on a timely basis.

19   Q.   So when you put Denise Barry into that position,

20        did she help bring that -- bring those bills up

21        to speed?

22   A.   It was just a stop measure on my part.  I wanted

23        the bills to get paid, tried to get some of the

24        bills paid because there were phone calls from

1    all over saying -- I was afraid we were going to

2    lose the New England Baptist Hospital.  They

3    came in and threw all of these bills on our

4    desk, over $600,000 worth of bills that had not

5    been paid.

6  Q.  And after Denise Barry -- after you said she was

7    in the job three or four weeks, what happened

8    after that?  Who was doing those

9    responsibilities after Denise left?

10 A.  Carol Connors.

11 Q.  And who is doing those responsibilities now?

12 A.  Ian MacKenzie is doing the job of the case

13    manager.

14 Q.  And Ian's MM level is what?

15 A.  I would say 5 or 6.

16 Q.  And what was Carol Connors' MM level?

17 A.  She wasn't MM.  She was upgraded from R12 to an

18    MM5, like Denise was.  Just tried to get the

19    bills paid.

20 Q.  So for how long did Carol Connors do the --

21 A.  Until we hired a full-time case manager.

22 Q.  And that was Ian MacKenzie?

23 A.  Yes, sir.

24 Q.  So did Denise ever meet with you in your office

1       with regard to this position?

2    A.   She sent me e-mails.  She sent me e-mails

3       requesting more than the MM5 pay.

4    Q.   Did she ever meet with you in your office with

5       regard to this position?

6    A.   I don't remember that, sir.

7    Q.   Do you remember on or about October 9th of 2003

8       meeting with Denise Barry and Jane Green in your

9       office?

10   A.   No.

11   Q.   You have no recollection of that at all?

12   A.   I wouldn't meet with Jane Green and I wouldn't

13       meet with Jane Green and Denise Barry because

14       Jane Green does not represent Denise Barry.

15   Q.   Okay.  And so it's your testimony today under

16       oath that you have no recollection of meeting

17       with either Jane Green -- actually, with both

18       Jane Green and Denise Barry in your office to

19       discuss a position for Denise Barry with the

20       Boston Fire Department greater than what she had

21       had?

22   A.   There was an altercation between Denise Barry

23       and Barbara Ryan.  There as an altercation.  She

24       said something about Barbara Ryan and I brought

1     down Denise Barry.  I brought Denise Barry.  I

2     brought Jane Green.  I brought Barbara Ryan and

3     I brought Kathy Moore into my office, but it had

4     nothing to do with Denise doing the job in

5     there, but the altercation between Barbara Ryan,

6     McNeil and --

7  Q.  What was the altercation about?

8  A.  It was kind of silly.  Barbara Ryan heard that

9     Denise said something about her and was heresay.

10    It was unsubstantiated.  I said, "folks, please,

11    let's get together.  We have enough issues with

12    the medical office."  This thing -- I think she

13    said this or I thought she said that.  That was

14    the only time I had all four of those people in

15    my office.  I never had Jane Green or Barbara or

16    Denise Barry in my office by themselves.

17  Q.  So the people you had in your office for this

18    altercation was Kathy Moore, Jane Green, Barbara

19    Ryan, and Denise Barry?

20  A.  Right, and then I brought Carol Connors in as a

21    witness to see if she heard anything being said

22    about Denise saying something about Barbara

23    Ryan.

24  Q.  Okay.  And how did this altercation come to your

1       attention?

2   A.  Barbara Ryan was furious, furious.

3   Q.  And she came to your office?

4   A.  Yes, sir.

5   Q.  And what did she say?

6   A.  She said, "Denise is talking about me.  Either

7       it stops or I'm going to do something about it."

8       I said, "Barbara, take it easy.  Let me get the

9       participants together in my room.  We'll try to

10      hammer this out."

11  Q.  What did Barbara say that Denise was saying

12      about her?

13  A.  That she wasn't doing the job properly, that she

14      was back stabbing her.  It was nothing of

15      substance.  There was nothing.  It was more of a

16      personal nature.

17  Q.  So aside from that meeting, did you ever have

18      Jane Green and Denise Barry with or without

19      anybody else in your office?

20  A.  No, sir, I did not.

21  Q.  Okay.  Do you ever recall saying to Denise

22      Barry, in response to her comment regarding

23      chances for advancement or promotions, that

24      "while you're not into politics, little girl,

1    then you're not into a position here?"

2  A.  I could tell you, if I ever said anything like

3    that, she would e-mail me immediately, like she

4    did everything else I did, and say, "why did you

5    say that?"  I never, ever said anything like

6    that in my life

7  Q.  Have you ever said anything similar to that to

8    anybody else?

9  A.  No, I did not.

10  Q.  Have you ever told Barbara Ryan anything to the

11    effect that you would like Denise Barry get a

12    promotion?

13  A.  No.  No.

14  Q.  Did Denise Barry ever try to get additional

15    training to help her to get promotions and pay

16    upgrades?

17  A.  She asked me for a form for college study and I

18    told her, either Barbara Powers or myself, it

19    was on Coby.  You could just download from Coby.

20    But we always tried to do that.

21  Q.  The AFSCME position that -- strike that.

22      MR. FEENEY:  It's 5:25.  Is this a good

23    time to take a break?

24      MS. GLASGOW:  Thank you.

1          MR. FEENEY:  You're welcome.

2          (Whereupon, the deposition was

3          adjourned at 5:25 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          DEPONENT'S ERRATA SHEET

2        AND SIGNATURE INSTRUCTIONS

3

4       The original of the Errata Sheet has been

5  delivered to Karen A. Glasgow, Esq.

6       When the Errata Sheet has been completed

7  by the deponent and signed, a copy thereof

8  should be delivered to each party of record and

9  the ORIGINAL delivered to Thomas F. Feeney,

10  Esq., to whom the original deposition was

11  delivered.

12

13

14      INSTRUCTIONS TO DEPONENT

       After reading this volume of your

15  deposition, indicate any corrections or changes

    to your testimony and reason therefor on the

16  Errata Sheet supplied to you and sign it.  DO

    NOT make marks or notations on the transcript

17  volume itself.

18

19    REPLACE THIS PAGE OF THE TRANSCRIPT

      WITH THE COMPLETED AND SIGNED ERRATA

20    SHEET WHEN RECEIVED.

21

22

23

24

1   ATTACH TO THE DEPOSITION OF: ROBERT J. MORAN
    CASE: BARRY, ET AL., VS. MORAN, ET AL.
2
                    ERRATA SHEET
3
    INSTRUCTIONS:  After reading the transcript of
4   your deposition, note any changes or corrections
    to your testimony and the reason therefor on
5   this sheet.  DO NOT make any marks or notations
    on the transcript volume itself.  Sign and date
6   this Errata Sheet (before a Notary Public, if
    required).  Refer to Page 129 of the transcript
7   for Errata Sheet distribution instructions.
8   PAGE    LINE
                CHANGE:
9               REASON:
                CHANGE:
10              REASON:
                CHANGE:
11              REASON:
                CHANGE:
12              REASON:
                CHANGE:
13              REASON:
                CHANGE:
14              REASON:
                CHANGE:
15              REASON:
16       I have read the foregoing transcript of my
    deposition and except for any corrections or
17  changes noted above, I hereby subscribe to the
    transcript as an accurate record of the
18  statements made by me.
19  Date
20
21              ROBERT J. MORAN
22
23
24

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.                    )

     I, Myriam A. Maracas, Registered
Professional Reporter and Notary Public in and
for the Commonwealth of Massachusetts, do hereby
certify that there came before me on the 13th
day of June, 2007, at 10:10 a.m., the person
hereinbefore named, who was by me duly sworn to
testify to the truth and nothing but the truth
of his knowledge touching and concerning the
matters in controversy in this cause; that he
was thereupon examined upon his oath, and his
examination reduced to typewriting under my
direction; and that the deposition is a true
record of the testimony given by the witness.

     I further certify that I am neither
attorney or counsel for, nor related to or
employed by, any attorney or counsel employed by
the parties hereto or financially interested in
the action.

     In witness whereof, I have hereunto set my
hand this 15th day of June, 2007.

Myriam A. Maracas
Notary Public
My commission expires 1/18/13

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; | ) CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J. | ) |
| McDONOUGH; ELAINE MESITI; LILA | ) |
| BROWN; MARY M. KANE; and | ) |
| JUDITH A. KELLEY, individually and on | ) |
| behalf of all those similarly situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| ROBERT J. MORAN; RONALD | ) |
| KEATING; PAUL A. CHRISTIAN; | ) |
| RODERICK FRASER, Jr.; WILLIAM | ) |
| KESSLER; WILLIAM HITCHCOCK; | ) |
| CITY OF BOSTON (FIRE | ) |
| DEPARTMENT), and JOHN and/or | ) |
| JANE DOES 1-50, | ) |
| | ) |
| Defendants. | ) |

_____ )

**PLAINTIFF JANE B. GREEN'S ANSWERS TO DEFENDANTS' INTERROGATORIES
TO <u>THE PLAINTIFF, JANE B. GREEN</u>**

Plaintiff Jane B. Green [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

<u>GENERAL OBJECTIONS</u>

1.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests seek information which is protected by the attorney/client privilege,

constitutes attorney work product, constitutes material prepared in anticipation of litigation or for

trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for

Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and

requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and

33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for

Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of

information protected by the attorney/client privilege, the attorney work product doctrine,

material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent

said Requests seek information beyond a relevant time period. Notwithstanding said objections,

Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all

responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment

        position with the Boston Fire Department.

        Answer:        Jane Bernadette Green
                       181 Belmont Street
                       Everett, Massachusetts 02149

                       Date of birth: 11 December 1944

                       Position: Senior Administrative Assistant, Fire Prevention Division- MM-5,
                       Step 9

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:    Objection, overbroad.  Subject to and without waiver of said objection,

Defendant answers as follows:

1984 - G.E.D. - Condon School
1997 (approximately) - Computer class - Northeastern University
2000 - April - Access 97, Computer Software Use class - Fire Dept. offer
2000 - Excel 97 - Intermediate - Computer Software Use Class - Fire Dept. offer
2000 - Peoplesoft - Computer Software Use Class - Fire Dept. offer
2001 - May - Leadership 2000 - City of Boston offer


Boston Fire Department
1964, 18 March - 11/01/65 - Civil Service - Statistical Machine Operator (key punch)
1984, 25 July - Principal Clerk - R-8
1986, 28 February - Senior Cashier - R-10
1987, 29 July - Head Clerk - R-11
1994 - 25 November - Head Clerk - R-12
1995 - 26 April - Adminstrative Secretary - R-14 (Temporary)
1996 - 10 July - Administrative Assistant - R-15
1997 - 22 January - Administrative Assistant - MM-4 (acting out of grade)
1997 - 19 March - Senior Administrative Assistant - MM-5
Supervisor of Special Hazards and Permit Department;
Supervising 6 people doing permits. Processed public's applications for permits to store flammable materials.  Processed and maintained all licenses and permits for the storage, transportation, and use of flammable materials. Knowledge of Title 527, C.M.R. and Fire Prevention Code.  Act as liaison on Fire Reports to assist public, and coordinate with outside assistance agencies (e.g., Red Cross and Salvation Army. Research property history for Realtors upon application.

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:    See Answer to Interrogatory No. 2.

4.      For each position within the Boston Fire Department for which you have applied and did

        not receive the position, please set forth the position for which you applied, how you were

        informed of the Fire Department's decision and the reasons for which you believe you did

        not receive the position.

        Answer:      There were approximately three position for which I applied after 1997,
                     but I do not recall at this time what they were.  There were a number of
                     positions subsequent for which I was discouraged from applying because I
                     already knew which political appointee was slated to receive the position.

5.      Please state each and every fact upon which you rely in your assertion that your claims

        against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

        civil action.

        Answer:      In addition to the facts as set forth in the Complaint, consider that the
                     Mayor issued Executive Order 2000 prohibiting political affiliation
                     discrimination for city jobs.  For each of the positions to which I applied
                     after 1997, I was not chosen because I was not politically affiliated or
                     otherwise in support of the then current City and Boston Fire Department
                     administrations, in addition to the positions for which I was discouraged
                     from applying because of the known political appointment process.  As set
                     forth in more detail in the Complaint and herein, I was retaliated against for
                     my opposition to the practice and policy of political affiliation
                     discrimination.

6.      Please state every fact common to you and the other plaintiffs with respect to the claims

        asserted by you and the other plaintiffs against the named defendants in the

        above-referenced matter.

        Answer:      I also was the object of retaliation by the Defendants for opposition to the
                     political affiliation discrimination that was occurring in the BFD.  There are
                     others who are currently class representatives who have also been
                     retaliated against because of their opposition to the discriminatory way that
                     people are treated at Boston Fire Department.

7.      Please set forth in detail the factual basis for any and all claims that you have filed against

        the defendant, Robert J. Moran.

        Answer:      In general, Robert Moran effectuated the political agenda of the policy
                     makers with in the current City of Boston Fire Department administration.

I believe that Bob Moran is retaliating against me because I was a witness to statements that Bob Moran made to Denise Barry in her formal written complaint against Bob Moran.

October 9, 2003
9:30am, I and Denise Barry went to Bob Moran's office and asked if we could have a meeting to discuss Denise's chances of receiving the position in which she was acting temporarily, when it is posted. Moran told Denise Barry that "there are no guarantees". Moran was asked about Mary Anne McHugo refusing to train Barry for the position and denied knowing anything about what took place at the Fire Marshall's Office with Chief Laizza. Denise said to Bob "are you calling Chief Laizza a liar?" and "Do we have to call him and verify what took place?"

Moran completely ignored Barry and changed the subject. Moran said "I don't know if I mentioned this to you but, we have nothing but problems in the Indemnification Office". So people from City Hall are coming to revamp the entire office. Barry said, "are you saying you want me to do all of this work, get you up to date and then someone from City Hall is going to replace me?" "Yes ," he said. Barry said, that's not fair, we have no chance for promotions or advancements here. Moran said, "well if you're not into politics little girl then you are not into a position here." I stood up and said, "I can't believe you are saying this to her, not to mention in front of me." I said also, "Is that so Bob?" Moran said, "that's the way it is around here, yes." Barry said, "so I am going to be punished because I am not into politics." Moran shrugged his shoulders and said "that's politics for you." Then Moran said, "listen kiddo, there are other job opportunities out there you know". With that remark I and Barry walked out of his office.

September 7, 2004
Chief Laizza called Denise Barry and told her that he thinks Bob Moran is retaliating against her already. Barry asked, "what are you talking about?" He said, "Bob just called over here and asked all kinds of questions about Jane Green and Carol Connors' positions." Barry said, "well Bob did tell Chief Hitchcock that he thinks Jane Green is a bad influence on me and that he thinks she influences me with some decisions that I have made around here." Denise Barry came to tell me about this conversation she had just had with Chief Laizza. I said, "how ironic that was just Chief Burke (per order of the Commissioner he said) on the phone asking me all kinds of questions regarding my position." They want to have a meeting regarding our positions.

December 21, 2004
Chief Laizza came into the Training Division's back door at around 9:00 as always. He came over to my desk and apologized to me for what was going on and said, "I don't want to be in the middle of this Jane". I said, "I understand Peter".

Peter Laizza went into the Commissioner's office, the Commissioner, Chief Hitchcock, and Bob Moran were all sitting there. They asked Peter if he told Jane to report to 1010 Mass. Ave., he said, "Yes, I did." Chief Laizza stated "to all of them that not only does Jane's Union want it in writing, but her lawyer too, before she moves." Peter said, "that he let them know that this is pure retaliation and he will not be a part of it." Peter said "the Commissioner said, "I want Jane Green out of this building, no ifs, and, or buts about it". Peter said he stated to all of them that he was not putting it in writing and if they want her moved that they should write it themselves". Peter said he stated that this looks like retaliation to me. The Commissioner responded "you're not a fucking lawyer". Peter said he told the Commissioner "I didn't say that I was a fucking lawyer, I am just telling you that I know the laws from working in Personnel, and retaliation is serious".

Peter said that he mentioned when subpoenas go out that he is not going under the bus." He said the Commissioner said, "what are you talking about?" Peter said that he stated, "you're doing this because Denise has a case against Bob and Jane is one of her witnesses". He said, the Commissioner said, "what case are you talking about?" Peter said "Denise's case!" He said the Commissioner looked around at Chief Hitchcock and Bob Moran and they both stated that they didn't know anything about a case". Peter said, Denise I know that they know and they are playing dumb, but I just wanted to get out of there." Peter said "on his way out of the Commissioner's office Bob Moran said "hey Peter what do you think?" This is the start of getting rid of Jane Green". Peter said that he was appalled that Bob would make a statement like that.

<u>December 23, 2004</u>
At around 12:30, Chief Laizza was sitting in Bob Moran's office. At around 1:00 Bob Moran came into the office and was looking for me. When I came back to my desk Bob Moran was waiting for me at my desk with a piece of paper in his hand. When I got there, Bob handed me the paper and said "your official transfer paper." Then he walked out the office.

Peter said, when he got to Bob's office Chief Finn and Bob Moran assured him that the law department helped them construct and write the letter. Peter said, when he read it he felt better because it was not derogatory. Peter said "If I get called as a witness I am going to make sure to state that I was ordered by Chief Finn and the Commissioner to sign the paper.

Moran and Finn, along with the labor relations law department (Kessler) assisted in drafting the Transfer papers that forced me out of the Southhampton office which contains all of the records that I need, as well as the computer files that are vital to the efficient operation of my job.

When I was moved, I was told that the equipment and files that I would need to do my job, would be moved too. This has never has happened, and I believe that it never will happen. For over two months I was practically unreachable because my old telephone number had been disconnected, without it being re-established at my new location.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

    Answer:    No claims of direct discrimination

9.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

    Answer:    See Answer to Interrogatory No. 7. By way of emphasis, is was Finn who compelled Peter Laizza to sign the transfer paper for my move.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

    Answer:    Paul A. Christian implements and perpetuates a policy of political affiliation discrimination, including having knowledge of and otherwise acquiescing in all of the activities set forth in these answers. By way of emphasis, Paul Christian ordered me out of the building immediately because of my support of Denise Barry and because of my opposition to Christian's policies and practices of political affiliation discrimination.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

    Answer:    See Answer to Interrogatory No. 7. Once Kessler was informed of my support of the claims of Denise Barry, his department was instrumental in getting me transferred unlawfully with the intent to harass and cause me stress.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

    Answer:    See Answers to Interrogatories Nos. 7, 9, 10, and 11. As additional facts, Carol Petta is politically affiliated with, supported by, and otherwise sponsored by Mayor Menino, through her association with both the Mayor and his wife, Angela. For example, Carol Petta is the only person who is entitled to almost $20,000.00 per year in overtime pay (gets 15 minutes

overtime in the morning to do part of Mary Kilgallen's job (because Kilgallen is incapable of doing it), and then is allowed to stay late at night on a regular basis to get overtime (in the same amount as her regular check) for her regular job, that was done without overtime prior to her taking the position). Other employees would prefer to work overtime, but are denied.

13. Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

   Answer:    Yes.

14. If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

   Answer:    <u>Former Employees who were subject to political affiliation discrimination</u>
   Jessica Ahearn
   Rosemarie Clinton
   Karen Denver
   Mary Doherty
   Jane Hickey
   Marie Howard
   Kathryn Kempton
   Stephanie Long
   Maria Lopez
   Sheila Mancuso
   Claire Miller
   Robert Molloy
   Steve Morash
   Patricia Mulkern
   Desiree Russo
   Barbara Ryan
   Gwendolyn Sheppard

   <u>Present Employees who remain whe were victims of the administrations'
   political affiliation discrimination</u>
   JoAnne (Donovan) Allain
   Janice Boyle0
   Crystal Bradeen
   Irene Debbie Burke

Joanne Callahan
Linda Collins
Linda Cleary
Carol Connors
Katy Donovan
Patricia Fiasconaro
Karen Green
Coretta Henry-Gardiner
Paula Hamilton
Maria Hernandez
Maria Lopez
Katherine MacMillen
Angela Marshall
Cathy Moore
Marta Poupart
Barbara Powers
Luz Rivera
Jennifer Ryan

Majority of B.F.D. civilian employees

15.   If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:    All class members have had adverse employment decisions as a result of
direct political affiliation discrimination.  My claims arise mostly as a result
of retaliation for my support of persons who suffered from such
discrimination.  I am informed and believe that not all of the class members
have suffered retaliation as I have.

16.   How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    I have not asserted that I am of the "correct political affiliation."

17.   Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.   Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Botson Group" who constantly vie for power against the Republicans, and within the Democratic party.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or person do you believe you must be affiliated in order to advance in the Boston Fire Department.

Answer:    The "Hyde Park Group" including Mayor Menino, Dennis DeMazio, Carol Petta, Andy Warren, and Mary Ann McHugo, and the "South Boston Group", including Mayor Menino, Joe "Do Do" Nee and Paul Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department extends beyond your department and, if so, state each and every fact upon which you rely in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver of said objection, Plaintiff responds that political affiliation discrimination is widespread throughout the agencies controlled by the Menino administration.  This is not part of the claims as set forth in the complaint, and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire Department, please state the following:

a. the dates of each request for promotion or transfer;

b. the position desired;

c. the date you received a response to each request; and

d. the reason you received for the denial of the request.

Answer:    I cannot recall at this time, which positions I applied to after 1997.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

      Answer:      See Answer to Interrogatory No. 14.

      I, JANE GREEN, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

                Jane Green

AS TO OBJECTIONS:

Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

DENISE M. BARRY; JANE B. GREEN; )    CIVIL NO. 05-10528 RCL
ELIZABETH H. GOLDEN; PATRICIA J. )
McDONOUGH; ELAINE MESITI; LILA )
BROWN; MARY M. KANE; and )
JUDITH A. KELLEY, individually and on )
behalf of all those similarly situated, )
                                        )
              Plaintiffs,               )
                                        )
       vs.                              )
                                        )
ROBERT J. MORAN; RONALD )
KEATING; PAUL A. CHRISTIAN; )
RODERICK FRASER, Jr.; WILLIAM )
KESSLER; WILLIAM HITCHCOCK; )
CITY OF BOSTON (FIRE )
DEPARTMENT), and JOHN and/or )
JANE DOES 1-50, )
                                        )
              Defendants.               )
_____ )

**PLAINTIFF PATRICIA J. McDONOUGH ANSWERS TO**
**DEFENDANTS' INTERROGATORIES TO THE**
**PLAINTIFF, PATRICIA J. McDONOUGH**

Plaintiff Patricia J. McDonough [hereinafter "Plaintiff"] hereby responds to Defendants'

First Request for Answers to Interrogatories as follows:

<u>GENERAL OBJECTIONS</u>

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

        Answer:        Patricia Jean McDonough,
                       31 Woodcliff Road
                       Holbrook, Massachusetts  02343-1129

                       D.O.B. 13 September 1953

                       Senior Administrative Assistant (MM6 – Step 9)
                       Fire Marshal's Office, Fire Prevention Division

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:    Hyde Park High School – Business Course 1968-1971

Computer Courses:
Excel 97 Intro, Excel 97 Intermediate
Word 97 Intermediate

PeopleSoft Training in Spring/Summer of 2000
Leadership 2000 in Fall of 2000

State Department of Mental Health,
Jr. Clerk & Typist, June to September of 1970.

Division of Personnel Administration (Civil Service),
One Ashburton Place
Clerk & Typist from May 24, 1971 to November of 1973
Senior Clerk & Typist from November 1973 to November 5, 1974

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answers:    Senior Clerk & Typist from November 6, 1974 to March 15, 1978
Payroll Office: Answered phones, filed, entered payroll in ledger, assisted
members at counter, distributed checks.  Also, filled in as Telephone
Operator on the switchboard.
Personnel Office:  Handled all inquiries, did the paperwork and all matters
dealing with Indemnification Forms (injury forms) for all Uniform Fire
Department members. I dealt with doctors, clinics and hospitals in these
matters.  Also, filled in as Telephone Operator on the switchboard.

Principal Account Clerk from March 15, 1978 to April 21, 1982
Accounting Office:  I handled all inquiries, bids, correspondence,
proposals, forms and paperwork pertaining to all outside vendor contracts
for the Fire Department.  Also, filled in as Telephone Operator on the
switchboard.

3

Executive Secretary Office: I processed all forms, letters and inquiries pertaining to members for Status Change, Promotion, also appointment forms for new hires.  Also, I filled in as Telephone Operator on the switchboard.

Head Clerk & Secretary from April 21, 1982 to July 4, 1984
Fire Marshal's Office:  Secretary to the Fire Marshal and Asst. Fire Marshal.  I answered all inquiries on the Fire Prevention Code, handled the Fire Prevention Budget, entered all information for the Fire Marshal and Asst. Fire Marshal into the computer.  I performed all secretarial duties pertaining to the Fire Prevention Division.  I maintained all blasting, pyrotechnics and fireworks records.   I performed any related work as required.

Administrative Secretary from July 4, 1984 to December 17, 1986
Fire Marshal's Office:  Secretary to the Fire Marshal and Asst. Fire Marshal.  I answered all inquiries on the Fire Prevention Code, handled the Fire Prevention Budget, used the Dictaphone and transcribed onto the computer all letters and drafts from the Fire Marshal.  I handled all secretarial duties for the Fire Prevention Division.  I maintained all blasting, pyrotechnics and fireworks records.   I performed any related work as required.

Administrative Assistant from December 17, 1986 to September 9, 1988
Fire Marshal's Office:  Secretary to the Fire Marshal and Asst. Fire Marshal, I answered all inquiries on the Boston Fire Prevention Code, inquiries on fire hazard complaints.  I entered all letters, drafts, documents into the computer for Fire Marshal and Asst. Fire Marshal.  I handled the Fire Prevention Budget.  Maintained all blasting, pyrotechnic and fireworks records.  Maintained the records and made appointments for Smoke Detector Certificate inspections on the sale of property under the Smoke Detector Law.  Related work as required.

Senior Administrative Assistant from September 9, 1988 to October 4, 1995
Fire Marshal's Office:  Secretary to the Fire Marshal and Asst. Fire Marshal, I kept all records for the Needless Alarm Program, coordinated and sat in on monthly hearings for the Needless Alarm Citation Appeals.  Coordinated, maintained all records on the newly instituted Sprinkler Retrofit Law (MGL Chapter 148, Section 26).  Maintained blasting, pyrotechnic and fireworks records.  Related work as required.

Senior Administrative Assistant /Fire from October 4, 1995 – To Present
Fire Marshal's Office:  See Attached in Request for Production of Documents  – City of Boston Position Description Questionnaire and letter from Joseph M. Fleming, Fire Marshal dated October 14, 1997.

Senior Administrative Assistant/Fire
Fire Marshal's Office:  Secretary to the Fire Marshal and Asst. Fire
Marshal.  I handle all subpoenas, freedom of information requests, and
record searches that are sent to the Keeper of Records.  Maintain the
blasting records and related material for the West Roxbury Crushed Stone
blasting operations.  I assisted the Fire Commissioner, Chief of
Department, Chiefs of Operation and all other Fire Dept. I assisted
personnel that call looking for information on Fire Prevention issues, laws,
codes, projects etc., that the Fire Prevention Division and the Fire Marshal
oversees.  I assisted the Asst. Fire Marshal in all aspects of the new
Sprinkler law that Massachusetts put into effect this year requiring
sprinkler systems in nightclubs, bars etc., with a place of assembly permit
of 100 persons or more.  I maintain the morning reports for all the units in
Fire Prevention daily.  I do the record keeping of all correspondence in the
Fire Marshal's Office and any related work as required.

4.  For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:     Director of Utilization Review MM-8   In Personnel
I was not interviewed for this position.
I was informed by letter on February 26, 1999 that I did not meet minimum
requirements.
I believe they had someone already in mind who had political patronage,
support, and affiliation, which I did not.

Principal Administrative Assistant MM-8  In Fire Prevention
I was not interviewed for this position.
I was informed by letter on August 23, 2000 that they felt my qualifications
and experience did not match the needs for the position in the Fire
Prevention Division.
A memorandum was sent announcing Mary Ann Creedon (now McHugo)
got the position.
I know they had someone already in mind for the position who had political
patronage, support, and affiliation because I was told this before the
posting for the job opening was even posted.

Principal Administrative Assistant MM-8  In Payroll
I was sent a letter of rejection on June 7, 2001, they did not feel that my
qualifications and experience matched the needs of the position.

I was interviewed by Lt. Leo Stapleton, MaryAnn Creedon (McHugo), Andy Warren.
A memorandum was sent announcing that Carol Petta got the position.
I believe that Carol Petta received this position primarily or substantially because of her political patronage, support, and affiliation.


Principal Administrative Assistant MM-8  In Human Resources
I was sent a letter of rejection on June 14, 2001, they did not feel that my qualifications and experience matched the needs of the position.
I was interviewed by Andy Warren only.
A memorandum was sent announcing Mary Kilgallen got the position.
I believe that Mary Kilgallen received this position primarily or substantially because of her political patronage, support, and affiliation.

Senior Administrative Assistant  MM-6  Commissioner's Office
Job posted June 11, 2003
I was interviewed by Robert Moran and Mary Kilgallen
I was never informed of any results after interview.
No one appointed to this as MM-6
All of a sudden the position was posted again on August 5, 2003 as Principal Administrative Assistant MM-8  Commissioner's Office

Principal Administrative Assistant MM-8  Commissioner's Office
I was never interviewed for this position.
I was not sent any letter of rejection or acceptance.
A memorandum was posted announcing that Mary Kilgallen got the position.
Mary Kilgallen ended up getting the position (for which she had been the interviewer of the applicants when it was posted as an MM-6.).
I believe that Mary Kilgallen received this position primarily or substantially because of her political patronage, support, and affiliation.

Case Manager  MM-8
I was sent a letter of rejection on July 24, 2004, that stated that my background and experience, while impressive, are not matched with this position.
Ian McKenzie obtained this position, even though he was an out of state resident at the time, because of his political affiliation, patronage, and support, and I was at least equally, if not more, qualified for the position.
I believe that I did not receive this position primarily or substantially because of my lack of proper political patronage, support, and affiliation.

5.      Please state each and every fact upon which you rely in Your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
               Interrogatory No. 5 specifically, and generally to all interrogatories herein.
               I know that I, and many others, have been victims of Political Affiliation
               Discrimination in regard to promotional advancement within the Boston
               Fire Department.

               I, and many others, was also denied pay upgrades because of the lack of
               political affiliation, patronage, and support.  People who have been
               advanced soley because of their political affiliation, patronage, and support
               include Carol Petta, Mary Any McHugo, and Mary Kilgallen..

6.      Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
               Interrogatory No. 5 specifically, and generally to all interrogatories herein.
               Other class representatives and potential class members applied also for the
               jobs listed above, and for pay upgrades, and were denied fair consideration
               because of political affiliation discrimination in regards to promotional
               advancement within the Boston Fire Department.

7.      Please set forth in detail the factual basis for any and all claims that you have Filed against

the defendant, Robert J. Moran.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
               Interrogatory No. 5 specifically, and generally to all interrogatories herein.
               Since Robert J. Moran has been with the Boston Fire Department, any
               promotional positions that have been applied for by me, he has either not
               interviewed me because he feels, without any good cause, that I lack the
               qualifications and or experience to do the job.  Or has interviewed me and
               still states that I lack the qualifications and or experience to do the job.

               Robert Moran's  behavior towards my thirty three years of experience in
               numerous positions with the Boston Fire Department has been a character
               and career assassination towards my reputation with the City of Boston and
               Boston Fire Department.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

    Answer:    Not applicable to me.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

    Answer:    Not applicable to me.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

    Answer:    Paul A. Christian, was the Appointing Authority during the time frame of some of the appointments for promotion that are in question for me. As such, Robert Moran follows and implements the preferences and policies of Paul Christian, and thus all of the actions of Robert Moran are taken under the direct or implicit supervision of Paul A. Christian.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

    Answer:    Not applicable to me.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

    Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

           The Boston Fire Department has no policy on Interviewing.

           The Boston Fire Department and representatives of the Fire Department have appointed people solely or substantially because of their political affiliation, patronage, or support.

           I was told by Andrew Warren, Executive Assistant, that "if you are

unhappy with the way promotions are handled in the Fire Department, you should apply elsewhere".

My direct superiors in the Fire Marshal's Office (Fire Prevention Division) did not sign me up to take Peoplesoft Training classes in the Spring of 2000. Knowing that Fire Prevention was going to change to Peoplesoft by the fall, they sent just about everyone else but me. They knew at that time that the position of Principal Administrative Assistant MM-8 in Fire Prevention that would be posted in the near future would need that qualification and still denied me the chance to attend. The only way I got to go was when I insisted that I be able to attend the classes that Paul Dateo was signed up for and could not attend because of his serious illness. (see Peoplesoft Training Schedule in Response for Reproduction).

13.    Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

    Answer:    Yes.

14.    If your answer to the preceding interrogatory Is In 'the affirmative, please Identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

    Answer:    Former Employees who were subject to political affiliation discrimination
             Patricia Fiasconaro
             Maria Lopez
             Steve Morash

             Present Employees who were victims of the administrations' political affiliation discrimination
             Janice Boyle
             Irene Debbie Burke
             Joanne Callahan
             Linda Collins
             Carol Connors
             Katy Donovan
             Paula Hamilton
             Maria Hernandez
             Katherine MacMillen

          Angela Marshall
          Cathy Moore
          Marta Poupart

          Majority of B.F.D. civilian employees.

15.    If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

    Answer:    Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases.  Some Plaintiff were retaliated against because of their
vocal opposition to this system.  That type of retaliation may have a part of
why id did not receive fair consideration, but my claims are more directly
political discrimination claims..  But the individual circumstances are not
exactly the same.

I was employed by the Division of Civil Service in 1971 then transferred to
the Boston Fire Department in 1974, for many years I advanced my career
through promotions by taking Civil Service promotional exams and placing
very well on test scores.  Since approximately 1988, the Boston Fire
Department has not had any Civil Service Promotional Exams for the
civilian employees.

Promotions for me have been non existent since the competitive aspect of
taking Civil Service exams stopped and Political Affiliation took over.
Thirty three years experience in numerous positions and in several
departments within the Boston Fire Department means nothing to the
appointing authorities of the Boston Fire Department.

Since 2000, I have applied for five MM-8 positions in the Boston Fire
Department and have been denied all of them.

I had prior knowledge, of the person selected for the position, before the
position was posted.  Also, shortly after she was appointed she was
upgraded to a Step 9 in the grade of MM-8.  Step 9 is only automatically
given in a promotional situation to an employee with twenty (20) years or
more of City service.  Not employees with only seven (7) years of City
service.  The norm is to work your way up to Step 9 by yearly union
contract step raises, each year gaining another Step, until you max out at
Step 9.

16.    How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:        As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered  because I was of the "correct political
affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:        See Answers to Interrogatories, above.   Political affiliation is the
sponsorship from, support from, and/or close affiliation with a member of
the then existing administration in power and influence in the City of
Boston Administration and Boston Fire Department executive officers,
including the group of individuals known as the "Hyde Park Group" and
"South Boston Group" who constantly vie for power against any other
political group, including other parties (e.g., Republicans and other groups
within the Democratic party).

Political Affiliation as applied in my particular case is that persons were
appointed to positions in the Boston Fire Department because of who they
knew, who sponsored them, and who supported them, rather than merit..  I
was aware, as well as others were aware, of who was being appointed to a
position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the
year 2000.

18.    As set forth in the Plaintiffs' Complaint, to what organization. political group, place or

person do you believe YOU Must be affiliated in order to advance in the Boston Fire

Department.

Answers:       Mayor Thomas M. Menino

"The Menino Administration,"
"Hyde Park Group. Including Menino, Dennis DeMazio, Andy Warren, McHugo, Petta
"South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19. Do you believe "political affiliation"discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answers:     Objection, overbroad, vague and ambiguous, subject to and without waiver
             of said objection, Plaintiff responds that political affiliation discrimination is
             widespread throughout the agencies controlled by the Menino
             administration. This is not part of the claims as set forth in the complaint,
             and therefore irrelevant to the Class Certification issues.

20. For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

    a. the dates of each request for promotion or transfer;

    b. the position desired;

    c. the date you received a response to each request; and

    d. the reason you received for the denial of the request.

Answer:      See answers to Interrogatory Nos. 3 and 4.

21. Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

Answer:      See answer to Interrogatory No. 14.

        I, PATRICIA J. McDONOUGH, HEREBY SWEAR AND AFFIRM UNDER THE
PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO
INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT
INFORMATION AND BELIEF:

                                    _Patricia J. McDonough_
                                    Patricia J. McDonough

AS TO OBJECTIONS:

_Thomas F. Feeney_
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

I, Catherine M. Moore, am writing this affidavit, to let it be known the information that I was told about the Principal Administrative Assistant (MM-8) position in the Boston Fire Department, Fire Prevention Division.

I do not remember the exact date when this conversation took place, but it was in the spring/summer of 2000. One day Deputy Chief Joseph Fleming and District Chief Paul Burke called me into their office to tell me they needed an MM-8 to run Fire Prevention. At the time, I was the Shop Steward and Co Chapter Chair Person for the AFSCME Union. Chief Fleming told me how they were going to put up a posting for an MM-8, I said "that will be a good position for Patti McDonough to put in for, she took on those duties for a year and a half when you needed someone and she has many years of service", then Chief Fleming said "Patti's not getting the job" then he continued to tell me a woman named MaryAnn Creedon (now McHugo) from City Hall, who was a friend of Andy Warren's would be getting the job. Then, both Chief Fleming and Chief Burke continued to tell me about the departments she worked in at City Hall. The two Chiefs showed me a job description that was to be used in the posting. I could not believe they both were discussing this matter with me, being a Representative of the AFSCME Union.

When the position was finally posted, the job description was changed from the one that was shown to me in the office, prior to the posting, they added qualifications that would match MaryAnn's background. Sally Glora, the City Auditor (MaryAnn's former boss), wrote the job description for this position. They also never went through the SENA Union or Civil Service to change the job description.

Patricia McDonough came back from a week's vacation to find out that the interviews were all completed, MaryAnn was already selected and Patti was told she did not get an interview because she did not meet the minimum qualifications.

On several occasions, since appointed to the Fire Prevention Division, MaryAnn told me she was good friends with Andy Warren, Dennis DiMarzio, the Mayor and his wife Angela, also a woman named Janet (I don't remember her last name) that was also a very close personal friend of Angela Menino.

Under the pains and penalties of perjury, I sign this affidavit on the thirty first day of July in the year 2007.

Catherine M. Moore
Fire Prevention Division
Boston Fire Department

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

DENISE M. BARRY; JANE B. GREEN;  )    CIVIL NO. 05-10528 RCL
ELIZABETH H. GOLDEN; PATRICIA J.  )
McDONOUGH; ELAINE MESITI; LILA    )
BROWN; MARY M. KANE; and          )
JUDITH A. KELLEY, individually and on )
behalf of all those similarly situated, )
                                   )
                Plaintiffs,        )
                                   )
        vs.                        )
                                   )
ROBERT J. MORAN; RONALD           )
KEATING; PAUL A. CHRISTIAN;       )
RODERICK FRASER, Jr.; WILLIAM     )
KESSLER; WILLIAM HITCHCOCK;       )
CITY OF BOSTON (FIRE              )
DEPARTMENT), and JOHN and/or      )
JANE DOES 1-50,                   )
                                   )
                Defendants.        )
_____ )

**PLAINTIFF ELAINE MESITI'S ANSWERS TO**
**DEFENDANTS' INTERROGATORIES TO THE**
**PLAINTIFF, ELAINE MESITI**

Plaintiff Elaine Mesiti [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.     Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.     Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.     Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.     Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.     Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.     Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

        Answer:        Elaine F. Mesiti
                       12 Waterman Road
                       Roslindale, MA 02131

Date of Birth: October 14, 1946

Position: Principal Administrative Assistant

2.  Please set forth in detail your complete educational background and employment history
    to date, including in your answer the dates and schools where you received an education
    and the dates, places of your employment and positions held with each employer.

    Answer:      See Resume and Employment personnel card

3.  Please set forth your employment history within the Boston Fire Department, if any,
    including in your answer each position held, the dates for which you held the position, and
    a description of the responsibilities of the position and each position for which you
    applied.

    Answer:      See Resume, Employment personnel card & Job Postings

4.  For each position within the Boston Fire Department for which you have applied and did
    not receive the position, please set forth the position for which you applied, how you were
    informed of the Fire Department's decision and the reasons for which you believe you did
    not receive the position.

    Answer:      Human Resources Director.
                 I was never informed by the B.F.D. in writing or verbally about
                 department's decision or reason I did not receive the job.

5.  Please state each and every fact upon which you rely in your assertion that your claims
    against the Defendants in this matter are equal to or the same as the other Plaintiffs in this
    civil action.

    Answer:      See the facts as alleged in the Complaint filed herein, the Answer to
                 Interrogatory No. 5 specifically, and generally to all interrogatories herein.
                 I know that I, and many others, have been victims of Political Affiliation
                 Discrimination in regard to promotional advancement within the Boston
                 Fire Department.

I, and many others, were also denied positions because of the lack of political affiliation, patronage, and support. People who have been advanced primarily because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, and Mary Kilgallen.

6.      Please state every fact common to you and the other plaintiffs with respect to the claims asserted by you and the other plaintiffs against the named defendants in the above-referenced matter.

     Answer:      See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. Other class representatives and potential class members applied also for the job listed above and were denied fair consideration because of political affiliation discrimination in regards to promotional advancement within the Boston Fire Department.

7.      Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Robert J. Moran.

     Answer:      I applied for the position and the position was given to someone outside the department that I feel, is not as qualified as I am. I believe that am more qualified because I was encouraged by the Boston Fire Department to go back to school with the preface in mind that we would be able to further our careers. I have done just that but it has failed to advance my career due to my lack of political affiliation.

8.      Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

     Answer:      Not applicable to me.

9.      Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

     Answer:      Not applicable to me.

10.      Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

> Answer:      He was the Chief of the department at the time, and I believe that he has the final say in who is appointed to the position.

11.   Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

> Answer:      Not applicable to me.

12.   Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

> Answer:      See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory Nos. 5 and 9 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.
>
> The Boston Fire Department has no policy on Interviewing.
>
> The Boston Fire Department and representatives of the Fire Department have appointed people solely or substantially because of their political affiliation, patronage, or support.

13.   Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

> Answer:      Yes.

14.   If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

> Answer:      <u>Former Employees who were subject to political affiliation discrimination</u>
> Stephanie Long
> Maria Lopez

Desiree Russo
Linda Cleary
Patricia Fiasconaro

Present Employees who remain were victims of the administrations'
political affiliation discrimination
JoAnne (Donovan) Allain
Janice Boyle
Irene Debbie Burke
Joanne Callahan
Linda Collins
Carol Connors
Katy Donovan
Sharon Green
Coretta Henry-Gardiner
Paula Hamilton
Maria Hernandez
Katherine MacMillen
Angela Marshall
Cathy Moore
Marta Poupart
Barbara Powers

Majority of B.F.D. civilian employees

15.  If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:      Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases. The individual circumstances are similar the major
difference is that I did not repeatedly suffer the political discrimination in
that there was only one position that I applied for that was given to an
outsider that was less qualified.

16.  How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions such as the denial of pay raises, upgrades, and denials of promotion, solely because of my lack of political affiliation, sponsorship, support, and/or connection to the then current City and BFD administration, I never have alleged that I have suffered  because I was of the "correct political affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.   Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly vie for power against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

Political Affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit.  I was aware, as well as others were aware, of who was being appointed to a position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the year 2000.
Political Affiliation Discrimination - Defendants policies, practices, regulations, and/or actions have deprived me of my Constitutionally Protected Rights to advance on the basis of merit, qualifications, experience, background and education.

Discrimination however you look at it is a violation of the City of Boston policy and is Illegal, when dealing with hiring, compensation, promotions and term and conditions of employment, not to even mention civil service.

I feel there's an ongoing pattern & practice in the Boston Fire Department for hiring and promoting with little or no regard to those actually or comparatively qualified to those who have political connections or are politically affiliated, associated or otherwise connected to those with power

and influence.  Positions are further tailored to those politically affiliated of which I find all to be in violation of the City's  policy and therefore illegal.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

Answer:        Mayor Thomas M. Menino
               "The Menino Administration,"
               "Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
               "South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answer:        Objection, overbroad, vague and ambiguous, subject to and without waiver
               of said objection, Plaintiff responds that political affiliation discrimination is
               widespread throughout the agencies controlled by the Menino
               administration.  This is not part of the claims as set forth in the complaint,
               and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

a. the dates of each request for promotion or transfer;

b. the position desired;

c. the date you received a response to each request; and

d. the reason you received for the denial of the request.

Answer:        See Answer to Interrogatory Nos. 3 and 4.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

Answer:        See answer to Interrogatory No. 14.

     I, ELAINE MESITI, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

_____
Elaine Mesiti

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| DENISE M. BARRY; JANE B. GREEN; ) | CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J. ) | |
| McDONOUGH; ELAINE MESITI; LILA ) | |
| BROWN; MARY M. KANE; and ) | |
| JUDITH A. KELLEY, individually and on ) | |
| behalf of all those similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| ROBERT J. MORAN; RONALD ) | |
| KEATING; PAUL A. CHRISTIAN; ) | |
| RODERICK FRASER, Jr.; WILLIAM ) | |
| KESSLER; WILLIAM HITCHCOCK; ) | |
| CITY OF BOSTON (FIRE ) | |
| DEPARTMENT), and JOHN and/or ) | |
| JANE DOES 1-50, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## PLAINTIFF LILA BROWN'S ANSWERS TO DEFENDANTS' INTERROGATORIES TO THE PLAINTIFF, LILA BROWN

Plaintiff Lila Brown [hereinafter "Plaintiff"] hereby responds to Defendants' First Request

for Answers to Interrogatories as follows:

## GENERAL OBJECTIONS

1.     Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.    Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.    Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.    Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.    Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

Answer:    Lila Brown
99 Lawrence Avenue, Apt. 2
Dorchester, Massachusetts 02121

Date of Birth: 7/31/72

Position: Administrative Assistant - R-15

2.    Please set forth in detail your complete educational background and employment history
to date, including in your answer the dates and schools where you received an education
and the dates, places of your employment and positions held with each employer.

Answer:

Dorchester High School  - 1991

Quincy Junior College - Associates Degree in Progress

B.F.D.

November 1997 - Principal Clerk in Medical Office - R-9

Manage entire medical office, including scheduling of appointments, paying
bills, preparing and sending reports out each day on each firefighter who
came in.  While I was in the medical office for five years, I repeatedly asked
to be upgraded because the job entailed more than entry level
responsibilities, but was told that it could not be done.  I discovered that
the secretary hired to replace me wanted an upgrade, and when they
eventually told her she could not have it (after telling her that it could
happen), she quit.  The second secretary was given the upgrade supposedly
because she had a child and needed more money.  At the time I was in the
medical office, I was a single mother with three children.  I believe that she
has political patronage that I do not.

June 2002 - Transferred to Fire Prevention - Head Clerk - R-12

Counter work, Sprinkler applications and fire alarm application processing;
work with engineers on applications; prepared Certificate of Occupancies
upon orders of Mary Ann McHugo until I discovered that that should not
have been part of the job.  BFD hired summer help to do COs after it was
discovered that it should not have been part of job; even then, McHugo
tried to order me to train the summer help.  I also asked McHugo if I could
have the CO job, to which she replied that position was not being filled,
except by floating staff.  However, after the summer help left, they
transferred Desiree Russo from the medial office for the position, who quit
because of the stress of the way that she was treated.
When Angela Marshall went out for three months, McHugo ordered

Brown to do Marshall's job without being paid extra in violation of rules. Joseph Finn and Barbara Ryan, after complaining to Dr. Hamrock about the disrespectful behavior of Barbara Ryan towards me. For example, Barbara Ryan would say that if I took a coffee break that I could not take my 15 minute wash-up time at the end of the day to leave early. When I called Pat Mulkearn in the Commisioner's office, I was told that every employee was allowed that time, regardless of coffee breaks. The Doctor told me that he had noted her inappropriate behavior, but explained that perhaps she was going through a difficult time, but may improve once she returned from vacation. Dr. Hamrock suggested that I report Ryan's behavior to Bob Moran. I thus set up a meeting with Bob Moran to include Dr. Hamrock, Ryan, and myself for 30 May 2002. On that day, Ryan, Moran, and Dr. Hamrock met by themselves for aboug 30 minutes without me. Then they came out of the meeting and told me that they thought I was not going to be in that day. Then my union steward (Cathy Moore) arrived for a meeting that included Moran, Mary Kilgallen (Moran's secretary), and myself. At that meeting, Moran told me that I was being transferred because my work record was "shot;" which it was not, because my record was completely absent of any complaints about my work. Whereupon Shop Steward Moore informed Moran that because of the pending complaint, I could not be transferred. Moran said that he did not care and was going to transfer me anyway. Mary Kilgallen said that I probably would be happier in Fire Prevention. I grieved that decision, but was still made to go on 27 June 2002, and the grievance was denied. I went to talk to Joe Finn, who was in charge of Personnel at that time, and he said that my transfer was in the best interest of the department. On 12 June 2002, when I received by transfer notice, I asked Moran if he would put that I am being ordered transferred against my will. Moran said to get an attorney and have my attorney to tell him to put it in writing.

November 2006 - Administrative Assistant - R-15

Prepare Welding, Dumpster, Asbestos, Construction Permits. Job Description includes acting supervisor if my supervisor is absent, but when my supervisor is absent, I never have received such respect.

3.    Please set forth your employment history within the Boston Fire Department, if any, including in your answer each position held, the dates for which you held the position, and a description of the responsibilities of the position and each position for which you applied.

Answer:      See answer to Interrogatory No. 2, above.

4.     For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:

1999 - Applied for a R-14 Administrative Secretary position. I received an
interview. Cathy Moore received the position because she was more qualified
than me.

2000 - Applied for position in Payroll, received an interview. When I went to the
interview at the appointed time, I was told by Bob Moran and Carol Petta to come
back a few minutes later because they were not ready for me. I returned about 10
minutes later and had the interview. I was informed afterwards by Bob Moran
orally that I did get the position because I had shown up late for the interview. I
did not receive the position because I had not political connections. Luz Rivera
received the position.

2000 - Applied for a R-14 position in the Chemist's office. I received an interview
with Bob Moran, Janice Boyle, and Joseph Murphy, but the position was given to
someone else. Joseph Murphy informed me that my supervisor at the time,
Barbara Ryan, was unwilling to fill out a performance review sheet. Barbara Ryan
is politically affiliated with Joseph Finn.

11 December 2001 - Applied for an O-1 position in the Accounting Department. I
did not receive an interview because Rosilind Coppin said that I needed Peoplesoft
skills. They gave the position ti Tans "Doe" and Ilene Stilley, who was from the
outside who did not have PeopleSoft skills. Tans was fired because it was
discovered that she had a criminal record from her work at the Registry.

2002 - When Tans' position came open in about 2002, I applied again, but did not
obtain an interview and did not hear anything about my application.

27 August 2003 - Applied for an Administrative Assistant - R-15. I received an
interview with Bob Morn and Mary Kilgallen. Jennifer Ryan received the position
because she had political patronage. Recently, about three months ago 2007, the
BFD created for Jennifer Ryan an MM-5 position. When the MM-5 position was
posted, everyone knew that the position was reserved for Jennifer Ryan.

2003 - Applied for a position Human Resources. I received an interview, but was
not given the position because Erica Boylan, an outsider with connections to Do
Do Nee, was put in the position.

2004 - I applied a Detail position in Fire Prevention. The position was posted for
the usual week's time. The first time that I applied, I was the only applicant, but I
then was told that it had to be reposted because there supposedly was not enough
time for everyone to see the posting.

The job was reposted, and I was told by Mary Ann McHugo that I did not

need to re-apply because they still had my application. Upon the second posting, I was still the only one who had applied. Instead of giving me the job or informing me that I would not get the job, they reposted it a third time, this time city wide.

For the third posting, I was given an interview with Mary Ann McHugo and Bob Moran. At the interview, McHugo said to me that she did not know why I wanted the job. After explaining that the job would help me, and that I was qualified for the job. At that point, they hired Lois Hart, someone with political patronage that I did not have. Lois Hart, who sits right in front of McHugo, is allowed to leave whenever she wants, without reprimand. After the first time in three years that Hart was told that she could not leave early (because of short staffing) Hart complained to McHugo that if I was allowed to go during work to my doctor's appointment because I am pregnant, then she should be allowed to leave to go to the gym 3 times a week. Instead of McHugo tilling Hart to mind her own business, she continues to allow Hart to monitor what I do on my job. 2005 - Applied for a R-14 Administrative Secretary position. I received an interview with Bob Morn and Mary Ann McHugo. Although I knew the job better, they gave it to a more senior person, without regard to political patronage.

5.    Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatories Nos. 2 and 4 specifically, and generally to all interrogatories herein. I know that I, and many others, have been victims of Political Affiliation Discrimination in regard to pay upgrades and promotional advancement within the Boston Fire Department.

I, and many others, also was denied pay upgrades because of the lack of political affiliation, patronage, and support. People who have been advanced solely because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, Erica Boylan, and Mary Kilgallen.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatories Nos. 2, 4, and 5 specifically, and generally to all interrogatories herein. Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and

were denied fair consideration because of political affiliation discrimination in regards to pay upgrades and promotional advancement within the Boston Fire Department.

7.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Robert J. Moran.

Answer: See Answers Interrogatories Nos. 2, 4, and 5.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

Answer: Not applicable.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

Answer: Joseph Finn helped to push my transfer through because I was out favor with those persons with political patronage, including Bob Moran and Barbara Ryan.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

Answer: Paul Christian supported and acquiesced in my transfer, and told me he did not want to hear about it.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

Answer: In 2001, I complained to the office in which Bill Kessler worked about the hostile environment in the medical office, thinking that I would get fairer treatment in City Hall. Bill Kessler along with someone else, took down my complaint, and did nothing. The next year I was transferred. I believe that Bill Kessler supported the poeple with the authority in the Fire Department against those who were not politically connected.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatories Nos. 2, 4, and 5 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

The Boston Fire Department has no policy on Interviewing considering that we almost always know who the position is going to before interviewing

The Boston Fire Department and representatives of the Fire Department have appointed people or given pay upgrades and other benefits solely or substantially because of their political affiliation, patronage, or support.

13.    Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:    Yes.

14.    If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

Answer:    Former Employees who were subject to political affiliation discrimination
Jessica Ahearn
Rosemarie Clinton
Patricia Fiasconaro
Jane Hickey
Stephanie Long
Maria Lopez
Robert Molloy
Desiree Russo

Present Employees who were victims of the administrations' political affiliation discrimination
Linda Collins

Carol Connors
Katy Donovan
Sharon Green
Maria Hernandez
Angela Marshall

Majority of B.F.D. civilian employees

15.   If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:      Each of Plaintiffs' claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases.  Some Plaintiffs were retaliated against because of their
vocal opposition to this system, I am one of those also.  That type of
retaliation is a part of why I did not receive fair consideration.

16.   How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:      As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered  because I was of the "correct political
affiliation."

17.   Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:      See Answers to Interrogatories, above.   Political affiliation is the
sponsorship from, support from, and/or close affiliation with a member of

the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly go against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

Political Affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit. I also was transferred solely because I lacked political patronage. I was denied positions solely because of my lack of political connections. I was aware, as well as others were aware, of who was being appointed to a position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the year 2000.

18.  As set forth in the Plaintiffs' Complaint, to what organization, political group, place or person do you believe you must be affiliated in order to advance in the Boston Fire Department.

  Answer:      Mayor Thomas M. Menino
               "The Menino Administration,"
               "Hyde Park Group". Including Menino, Andy Warren, McHugo, Petta
               "South Boston Group" - including Joe "Do Do" Nee, Hitchcock, Christian.

19.  Do you believe "political affiliation" discrimination within the Boston Fire Department extends beyond your department and, if so, state each and every fact upon which you rely in this assertion and describe the extent of the alleged discrimination.

  Answer:      Objection, overbroad, vague and ambiguous, subject to and without waiver of said objection, Plaintiff responds that political affiliation discrimination is widespread throughout the agencies controlled by the Menino administration. This is not part of the claims as set forth in the complaint, and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

      a. the dates of each request for promotion or transfer;

      b. the position desired;

      c. the date you received a response to each request; and

      d. the reason you received for the denial of the request.

Answer:      See Answer to Interrogatory Nos. 2, 3, and 4.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

Answer:      See Answer to Interrogatory No. 14.

        I, LILA BROWN, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

Lila Brown

AS TO OBJECTIONS:

Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

DENISE M. BARRY; JANE B. GREEN;  )    CIVIL NO. 05-10528 RCL
ELIZABETH H. GOLDEN; PATRICIA J. )
McDONOUGH; ELAINE MESITI; LILA   )
BROWN; MARY M. KANE; and         )
JUDITH A. KELLEY, individually and on )
behalf of all those similarly situated, )
                                 )
            Plaintiffs,           )
                                 )
      vs.                         )
                                 )
ROBERT J. MORAN; RONALD          )
KEATING; PAUL A. CHRISTIAN;      )
RODERICK FRASER, Jr.; WILLIAM    )
KESSLER; WILLIAM HITCHCOCK;      )
CITY OF BOSTON (FIRE             )
DEPARTMENT), and JOHN and/or     )
JANE DOES 1-50,                  )
                                 )
            Defendants.           )
_____  )

**PLAINTIFF MARY M. KANE ANSWERS TO
DEFENDANTS' INTERROGATORIES TO THE
PLAINTIFF, MARY M. KANE**

Plaintiff Mary M. Kane [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

        Answer:        Mary M. Kane
                       619 East Fifth Street
                       South Boston, Massachusetts 02127

Date of Birth: January 25, 1960

Position: Senior Administrative Assistant MM-5

2.      Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:

|  |  |
|---|---|
| **EDUCATION:** | Boston Business School<br>Boston, MA<br>1978- 1980<br>Bookkeeping |
|  | Cardinal Cushing High School<br>South Boston, MA<br>1973- 1977 |
|  | Saint Augustine's Grammar School<br>South Boston, MA<br>1966 - 1973 |
| **WORK EXPERIENCE:** |  |
|  | BOSTON FIRE DEPARTMENT<br>MAINTENANCE DIVISION<br>OCTOBER 26, 1987 – PRESENT<br>VARIOUS TITLES |

November 2, 2002 - Present

| **HELD WHILE WORKING** | **SENIOR ADMINISTRATIVE ASSISTANT** |
|---|---|
| **IN THE MAINTENANCE DIVISION:** | **MM5** |
|  | July 10, 1996 – November 1, 2002<br>**ADMINISTRATIVE ASSISTANT-MM4** |
|  | June 10, 1993 – July 9, 1996<br>**PROV. PROM. HEAD ADMINISTRATIVE CLERK-R13** |

June 9, 1993 – June 9, 1993
**PERM. HEAD CLERK – From Civil Service List-R11**

December 23, 1992 – June 9, 1993
**APPT. PROV. HEAD ADMINISTRATIVE CLERK-R13**

December 28, 1988 – December 22, 1992
**PROV. APPT. ADMINISTRATIVE SECRETARY-R14**

June 18, 1988 – December 28, 1988
**PROV. HEAD CLERK**

October 26, 1987 – June 15, 1988
PROV. PRINCIPAL CLERK TYPIST-R8

THORTON & EARLY (LAW FIRM)
BOSTON, MA
OCTOBER 1985 – JANUARY 1987
Computer Programmer – designed and implemented programs to assist in the distribution of clients' checks and mailings and other computer printouts
REASON FOR LEAVING – Had my son


CARDOOS
FANUEIL HALL – BOSTON, MA
1985 – 1986
Part-Time Sales Clerk – which included stocking, cashing out and closing the store
REASON FOR LEAVING – Pregnant

EDWARDS FOOD WAREHOUSE
WATERTOWN, MA
1979 – 1982
Cashier
Deli Clerk
Produce Clerk
Part-Time Front End Manager
REASON FOR LEAVING – Decided not to work two jobs any longer

AFSA PROJECT

BOSTON CITY HALL
NOVEMBER 3, 1982 – JUNE 29, 1984
Secretary and Data Entry Clerk – which included
training others
REASON FOR LEAVE – Administration
transferred the entire department to Boston Fire
Department

PROPERTY EQUALIZATION
CITY OF BOSTON – MILK STREET
NOVEMBER 12, 1980 – NOVEMBER 2, 1982
Secretary for the Commercial Property Assessment
Division
REASON FOR LEAVING – Applied and received
the position at AFSA Project

FIRST NATIONAL SUPERMARKET
SOUTH BOSTON, MA
1976 – 1979
Cashier
Deli Clerk
REASON FOR LEAVING – Store burnt down and
transferred to Watertown Store, which eventually
changed names to Edwards Food Warehouse

LABOURE CENTER/ABCD
SOUTH BOSTON, MA
1984 - 1986
Teacher's Aid
REASON FOR LEAVING – applied and received
cashier's position at the First National Supermarket

3.  Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer: See answer to Interrogatory No 2.
   **Duties and Responsibilities for Positions Held in Maintenance:**
   I first started at the Maintenance Division on October 26, 1987.  My title was
   Principal Clerk Typist but I was actually the secretary for the Maintenance and
   Motor Squad Division.  My duties included but were not limited to, civilian

personnel paperwork such as recording daily attendance, sick leave and return for sick leave forms, injury/workers' compensation forms, etc.; answering and routing telephone calls; all typing and word processing; petty cash funds and filing.

When Tom Kelly transferred to Fire Headquarters I received all his duties in addition to my own. Those duties include and are not limited to, filing of all paperwork for fire houses requesting and ordering supplies; keeping a log of purchase order requests and received by Maintenance/Motor Squad Division; keeping running totals of all open requisition accounts so they will balance with the Accounting Office and to keep Maintenance/Motor Squad from overspending in the accounts; logging and filing of monthly fuel reports; filing Out of Service reports for apparatus out of service over 24 hours and filing of 5 OC Forms – Outside Contractors Forms – received from the fire houses.

When Connie Quinlan retired I assumed the following responsibilities along with the above duties I already was performing. These duties include but are not limited to, filling out the firefighters daily morning reports; assigning overtime for firefighters for personal tours, injured leave, death leave and unscheduled overtime; recording of firefighters personal tour schedule; all sick and injury reports for firefighters and other related paperwork until Bob Sances came to the Maintenance Division. I received all these duties back when Bob went out on injured/medical leave. Bob never came back and officially retired in August of 1995.

Since the retirement of Louis Amichetti, Sr. I now do the ordering of all household and janitorial supplies for the Boston Fire Department. I also oversee all the paperwork when other personnel from Maintenance/Motor Squad requests parts and supplies for their areas. This includes overseeing the requests to make sure they properly filled out, all essential information was obtained and the prices and totals were correct. I also do requests for service orders for the Maintenance/Motor Squad this includes getting phone quotes when necessary and forwarding them to the Accounting Division in Headquarters.

Around Fiscal Year 1989, I assumed the responsibilities of the Repetitive Contracts from Elaine Mesiti. Duties include but are not limited to, handling advertising for contract applications, preparing and processing contracts that include approving contracts, assigning contract numbers and dollar amounts to each contract, writing the mayor's letters, etc. for the approval process for various city departments for the Maintenance/Motor Squad Divisions as well as the Fire Alarm Division; Accounts Payable of all Repetitive Contract vendors for all building and automotive/equipment repairs and services; copy all automotive/equipment invoices for vehicles repairs to keep in folders for future reference. I Assign contract numbers and written quote numbers when requested from personnel in fire headquarters because the Fire Department were only issued so many contracts numbers and written quote numbers and I was designated as the

person to keep track of all the contracts numbers and written quote numbers for the Department.

When the department electricians were assigned to the Maintenance Division (approximately 1995), I took on the responsibilities for all their repetitive contracts, correspondence and paperwork. This includes but is not limited to, accounts payable for their repetitive contracts, paperwork for requisitions, purchase orders and service orders as well as keeping running tallies for all the open requisition accounts and payments of all goods and services.

In the spring of 1999 the City of Boston acquired a new computer system. As of July of 1999 my duties now included all accounting responsibilities for the Maintenance and Motor Squad Division. Since that time an abundance of work has been taken off the Headquarters Accounting Office. Approximately 50% of each of the three employees in the Headquarters Accounting office has had their workload reduced due to my taking the responsibility of all the Accounting responsibilities for the Maintenance/Motor Squad Division. This is because the majority of open requisitions and purchase requisitions and some service orders for the Fire Department belonged to the Maintenance/Motor Squad Division. I now handle all the open requisitions, purchase requisitions/orders and service orders along with the Requirement (formerly repetitive) Contracts, Advertised Contracts, Emergency Contracts and Sole Source in addition to ordering all household and janitorial supplies and automotive parts and supplies as requested/needed. This involves entering requisitions and purchase orders into the Peoplesoft program for all goods and services for the Maintenance and Motor Squad Division along with all invoices and payments for all goods and services.

I've also created Account Payable workbooks on the computer for all vendors that have a Requirement Contract, Open Purchase Orders and Open Service Orders. Each vendor has their own worksheet where payments are entered which records date of invoices, invoice numbers and dates of payments. Running totals of each account automatically kept whenever an entry is made. Balance sheets are printed regularly and distributed to the appropriate Maintenance/Motor Squad personnel for spending purposes. These worksheets keep running totals of each vendor's accounts. Balance sheets are printed regularly and are distributed to the appropriate Maintenance/Motor Squad personnel for spending purposes. I also have workbooks for all non-open requisitions keeping which list parts/supplies ordered, when goods were received and when the payments were processed.

All Fire Department vehicles are on the computer and listings are updated regularly. These lists include all cars, small truck and vans and the divisions and personnel they are assigned to; what their registrations and vehicle identification numbers are and where they are housed at night. All fire apparatus are also on the computer with the registrations and vehicle identification numbers. Listings are

distributed to various fire personal including the Fire Commissioner, Chief of the Department and Chief of Operations. It is also used as a quick reference.

Cleaning supplies requests are also on the computer. When a firehouse calls for supplies I can look up the last time supplies were requested and what supplies were issued. The request for supplies form is then printed and I assign a member of the Maintenance Division to fill the order and deliver the supplies to the appropriate firehouse. All requests are signed by members of the firehouses receiving supplies and returned to me and I file them in the firehouse's file.

I am also authorized to contact vendors to assign building repairs and services for various Fire Department locations. This first started when then Assistant Superintendent of Maintenance Joseph Nee was out of the office e.g. department business, vacation or other type of leaves. When Assistant Superintendent Nee retired James Pyke was made the Assistant Superintendent and the procedure continued. This responsibility has been in effect since July of 1999.

I also copy automotive work repairs/invoices for specific vehicles when requested by Fire Headquarters and/or the City of Boston Law Department. The requests from the Law Department are for when Boston Fire Department vehicles/apparatus are involved in automobile accidents and the attorneys need back up for lawsuits.

When Maintenance was assigned Critical Funding the responsibility of the majority of contracts and payments that are through the Critical Funding. This includes advertised, emergency and sole source contracts as well as purchase orders for service. I oversee the majority of the spending the Maintenance Division handles and have on the computer worksheets for year fiscal year with the work done, by whom, cost and payment as well as a continuous balance for each fiscal year. These contracts can run up to up $200,000.00 or more.

I'm also responsible for assisting with the Fiscal Year budgets for Maintenance/Motor Squad Division. This includes requests for items the division/department may need in the coming year and giving a breakdown of all costs by various building, automotive and equipment categories.

4.    For each position within the Boston Fire Department for which you have applied and did not receive the position, please set forth the position for which you applied, how you were informed of the Fire Department's decision and the reasons for which you believe you did not receive the position.

Answer:    **August 5, 2003**    Principal Administrative Assistant – MM8
Told by Bob Moran I didn't have to be re-interviewed since he and Mary Kilgallen interviewed me for the same position when it was posted as Sr. Administrative Assistant MM6
Notified on August 22, 2003 that Mary Kilgallen was offered and accepted

the MM8 position via email from Bob Moran.

**June 18, 2003**          Sr. Administrative Assistant – MM6
Interviewed by Bob Moran and Mary Kilgallen.  Position changed to
Principal Administrative Assistant MM8 and Mary Kilgallen received the
MM8 position.
Notified via MM8 job posting about this position no longer being an MM6
title.

**June 18, 2003**          Administrative Assistant – MM4
Told by Andrew Warren that this title was the same title that I held – I
withdrew application even though I didn't realize and I was never told I
could have done a lateral promotion.

**October 29, 2001**          Sr. Administrative Assistant – MM5
Interview by Rosalyn Coppin
Never notified why I was denied the position and I don't believe the title
was even awarded to anyone.

**May 20, 1996** Sr. Administrative Assistant – MM5 (2 positions available)
Interviewed by Jerry Horgan
Never notified who received the positions until posting selection is
forwarded and/or posted or why I was denied the positions.

**July 3, 1995**    Administrative Assistant – R15
Application was submitted – not sure who interviewed back then
Never notified who received the positions until posting selection is
forwarded and/or posted or why I was denied the positions.

**December 20, 1988**    Administrative Assistant – MM3
Application was submitted – not sure who interviewed back then
Never notified who received the positions until posting selection is
forwarded and/or posted or why I was denied the positions.

5.     Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:     See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.
I know that I, and many others, have been victims of Political Affiliation
Discrimination in regard to promotional advancement within the Boston
Fire Department.

I, and many others, were also denied pay upgrades because of the lack of political affiliation, patronage, and support. People who have been advanced solely because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, and Mary Kilgallen.

6.  Please state every fact common to you and the other plaintiffs with respect to the claims asserted by you and the other plaintiffs against the named defendants in the above-referenced matter.

> Answer:     See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and were denied fair consideration because of political affiliation discrimination in regards to promotional advancement within the Boston Fire Department. The Defendants failed to follow proper procedure when job positions became available.

7.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Robert J. Moran.

> Answer:     A.  Giving Mary Kilgallen the MM8 position after she interviewed candidates for MM6 title and second interviews for MM8 position were never given.
>
> **INTERVIEW FOR MM6 – PAT MULKERN'S POSITION**
>
> Mary Kilgallen and Bob Moran interviewed me for the MM6 position. During the interview I was asked a question that deal with negative issues with the Fire Department. My response had something to do about current employees and longevity and not being able to advance because people from outside the department with much less time were receiving the higher titles. At that time Mary Kilgallen snapped at me saying how she was tired of everyone saying that. I felt she took it personally because she then told me how she had six or seven years of service with the City. I, in turn, told her how I had 20.
>
> This position was bumped back to the original MM8 it was supposed to be and I applied again. I was told by Bob Moran that I didn't have to be re-interview because I was just interview for the same job when it was the MM6 title by him and Mary Kilgallen.
>
> Mary Kilgallen received the position. I find this to be a conflict of interest

due to the fact that she interviewed all the applicants for the original job and as a far as I know, nobody was re-interviewed

B.  Telling me that I could have an MM6 title in payroll of a person who he stated was going to retire, she was on medical leave at the time...she never retired.

### BOB MORAN & THE MM6 POSITION

On October 2, 2002, Dennis Flynn told me that Bob Moran wanted to see the both of us in his office.  When I asked Dennis what it was about he said it was about me working in Payroll.

We arrived in Bob's office and Bob asked me if I would be interested in Paula Hamilton's position (MM6) in Payroll (Paula at the time was on, I believe, medical leave).  Bob said that Paula was retiring and I could have her position if I wanted it.  He felt it would be a good opportunity for me because I could then apply to other City departments to run their payrolls.

I felt that statement was insulting.  It was as if Bob Moran wanted me out of the Fire Department.  I also felt that someone thought that I had a good thing working in Maintenance and wanted me out so they could have my position.  I told Bob first of all that I had a great relationship with not only my co-workers but with my vendors and members of the Fire Department. Secondly, I asked Bob what they pay would be and he said he wasn't sure but would get back to me.  I told Bob nobody would do the work I do for the money I make and I felt that if I left Maintenance then my position would be filled with a higher title/pay.

I then asked Dennis Flynn if he had anything to say and he said how he thought I had to look out for myself because I had a son that would soon be attending college.

I told Bob I didn't want to leave the Maintenance and that was the end of the meeting.  I did ask Bob via email for a description of the job because I wanted to compare the work done there with all the work I do for less money.  Paula Hamilton never retired.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

Answer:        Not applicable to me.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

Answer:        Not applicable to me.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:        **REQUESTING MM6 TITLE**

In the fall/winter of 2001 I requested and received a meeting with then
Chief of Department Christian. In that meeting I explained how both Betty
and I perform the same duties and how I believed my duties, especially the
contracts duties were considerable more than Betty (approximately 20
compared to 80-100). The Chief actually had a payroll printout and
compared our two salaries and said how Betty made quite a bit more
money than I did at that time (I was an MM4 and Betty was an MM6). I
believe he told me he would see what he could do and when I didn't hear
anything I went to Chief William Hitchcock. I explained what Chief
Christian and I discussed and he asked me to put it in writing explaining
what I was looking for, what Betty received, etc. (see email dated
1/31/02).

When Chief Christian became Commissioner Chief Hitchcock spoke to him
about getting me a high title. I meet with Commissioner Christian again I
believe in the Spring/Summer of 2002 and again, I explained the situation
of being upgraded to an MM6. He told me that City hall would only give
me an MM5 and asked if I could take it to hold me over for a while. I did
receive the MM5 in November 2002 and nothing has ever been done on
upgrading me to an MM6.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:        Not applicable to me.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against

the City of Boston Fire Department.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.

The Boston Fire Department and several of its members have instituted a character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

The Boston Fire Department has no policy on Interviewing.

The Boston Fire Department and representatives of the Fire Department have appointed people solely or substantially because of their political affiliation, patronage, or support.

**No Pay Acting and Upgrade**
More specifically, on June 11, 1998, I wrote a letter to the Fire Commissioner, Martin E. Pierce requesting Acting pay while Joseph (Joe) Nee was out on injured leave and a promotion. (See copy). I also mentioned in that letter that I was requesting to be compensated on my own due to the fact that whenever I mentioned a pay raise to Joe Nee, my supervisor, it was always taken in a joking manner and I would receive comments about how I make enough money or how I shouldn't complain or I'll be sent over to work at the main building of Fire Headquarters.

The Commissioner requested a meeting with Dennis Flynn, Superintendent of Maintenance and myself (I don't remember the exact date) a short time later.  The letter was addressed first and I was told how I didn't go through the proper procedure when I sent my letter to him.  Thus, I believe the reason Dennis Flynn was requested to attend the meeting was to make sure that he knew that I went over Dennis' head.

I was told I wouldn't be compensated for acting money nor get a pay raise. The acting money was because Joe Nee was a firefighter and I was a civilian and acting money goes to firefighters.  When he addressed a pay raise I mentioned how I am constantly being told by Fire Department personnel on what a great job I was doing in Maintenance and how I appreciated the compliments but "pats on the back doesn't pay my bills". The Commissioner told me if I wanted a raise I would have to apply for a job title when one was posted.  When I mentioned how I liked my current job and how I didn't want to leave it I was told if this was Edison and a job came up on say the third floor you would have to move.  I then asked why/how Pat Mulkern and Susan Gailunas received higher titles and they didn't have to apply for other titles and move into other offices. Commissioner Pierce never answered the question.  I also asked Dennis Flynn if he wanted me to leave the Maintenance Division and he said no because I am such an asset to the Maintenance Division.

The meeting ended and I left it without being compensated for acting out

of grade or with a pay raise.

**Requesting MM6 title**
On January 19, 2006 I attended a Fiscal Year 2007 budget meeting with
Dennis Flynn, Andy Warren, Mike Grigalunas and Kathleen Kirleis. At the
end of the meeting I addressed two issues with Kathleen. The first was
about getting my title upgraded to an MM6 the same as Betty Golden. I
said how we both do the same work and I felt how we should be
compensated the same. She jotted my request down in her notes

The second was the new job posting for an MM5 Manager Analyst. I
asked Kathleen if all the MM5 titles (which is Senior Administrative
Assistant) are going to be change to Manager Analyst because I thought
the Civil Service title for an MM5 was Senior Administrative Assistant.
Kathleen said that the MM5 Manager Analyst title was a Civil Service title
and the Richie Driscoll from the Office of Human Resources gave them the
job description and she would check with him on it. She also said that this
is a new title that doesn't exist in the Fire Department. I then said that
many of the responsibilities and duties sound like I do. She then said to me
how that title doesn't do accounts payable.

When I started to leave the meeting I told Kathleen the difference between
Betty and my pay is around $5,000 - $8,000. I gave Kathleen an estimate
because I was not sure exactly because I did not have the figures in front of
me.

13.    Are you aware of other employees of the Boston Fire Department not already named in

the above-captioned matter that you claim or understand to be, in your opinion, subject to

the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:        Yes.

14.    If you answer to the preceding interrogatory is in the affirmative, please identify (a) the

number of those individuals; and/or (b) identify those individuals by name, residence

address and office within the Boston Fire Department. If you are unable to provide the

name and address of these individuals, please set forth the number of those individuals.

Answer:        <u>Former Employees who were subject to political affiliation discrimination</u>
               Rosemarie Clinton
               Steve Morash
               Barbara Ryan

<u>Present Employees who were victims of the administrations' political
affiliation discrimination</u>
Linda Collins- trained pay role director
Katy Donovan
Paula Hamilton- trained pay role director
Marta Poupart

Majority of B.F.D. civilian employees

15.    If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:    Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases. Some Plaintiff were retaliated against because of their
vocal opposition to this system. That type of retaliation may have a part of
why I did not receive fair consideration, but my claims are more directly
political discrimination claims. But the individual circumstances are not
exactly the same.

16.    How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered  because I was of the "correct political
affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.    Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly vie for power against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

Political Affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit.  I was aware, as well as others were aware, of who was being appointed to a position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the year 2000.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or person do you believe you must be affiliated in order to advance in the Boston Fire Department.

Answer:    Mayor Thomas M. Menino
"The Menino Administration,"
"Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
"South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department extends beyond your department and, if so, state each and every fact upon which you rely in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver of said objection, Plaintiff responds that political affiliation discrimination is widespread throughout the agencies controlled by the Menino administration.  This is not part of the claims as set forth in the complaint, and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire Department, please state the following:

a. the dates of each request for promotion or transfer;

b. the position desired;

c. the date you received a response to each request; and

d. the reason you received for the denial of the request.

Answer:    See Answer to Interrogatory Nos. 3, 4, 7, 10, and 12.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint. Answer: See

Answer to Interrogatory No. 14.

I, MARY M. KANE, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

_____
Mary M. Kane

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

DENISE M. BARRY; JANE B. GREEN; )    CIVIL NO. 05-10528 RCL
ELIZABETH H. GOLDEN; PATRICIA J. )
McDONOUGH; ELAINE MESITI; LILA )
BROWN; MARY M. KANE; and )
JUDITH A. KELLEY, individually and on )
behalf of all those similarly situated, )
                           )
           Plaintiffs, )
                           )
       vs. )
                           )
ROBERT J. MORAN; RONALD )
KEATING; PAUL A. CHRISTIAN; )
RODERICK FRASER, Jr.; WILLIAM )
KESSLER; WILLIAM HITCHCOCK; )
CITY OF BOSTON (FIRE )
DEPARTMENT), and JOHN and/or )
JANE DOES 1-50, )
                           )
          Defendants. )
_____ )

**PLAINTIFF JUDITH A. KELLEY ANSWERS TO
DEFENDANTS' INTERROGATORIES TO THE
PLAINTIFF, JUDITH A. KELLEY**

        Plaintiff Judith A. Kelley [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.     Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.     Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.     Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.     Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.     Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

       Answer:       Judith A. Kelley
                         20 Turner Road
                         Rockland, Massachusetts 02370

Date of Birth: 2/18/60

Position: Senior Administrative Assistant MM-5

2.     Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:     Objection, overbroad.  Subject to and without waiver of said objection,
Plaintiff answers as follows:

**Education**

South Boston High School - 1977

Quincy Jr. College -            Word Processing, 9/83-11/83

Boston Business School -     Business Math 2/5/88-4/29/88
                             Business Law June,1988
                             Psychology 9/15/88-12/15/88
                             Word Perfect I (Multi Mate) 9/89-12/89
                             Word Perfect II

**Employment**

Boston Fire Department -                          4/1979 - Present
MM-5 Sr. Administrative Assistant (Fire Prevention) - 7/7/1997 - present
MM-5 Senior Administrative Assistant(Accounting)-11/22/1991- 7/7/1997
MM-6 Senior Administrative Assistant(Fire) - 5/8/1991 - 11/22/1991
R-14 Administrative Secretary - 12/28/1988 - 5/8/1991
R-13 Head Administrative Clerk - 10/30/1985 - 12/28/1988
R-11 Head Clerk - 5/22/1985 - 10/30/1985
R-8 Principal Clerk 8/17/1983 - 5/22/1985
Emergency R-12 Head Clerk & Secretary - 4/4/1983 - 4/10/1983
R-5 Senior Clerk & Typist - 3/23/1983 - 8/17/1983
Reinstated as an R-2 Clerk & Typist - 10/25/1982 - 3/23/1983
I Resigned - 8/21/1981 - 10/25/1982
R-5 Senior Clerk & Typist - 12/18/1980 - 8/21/1981
R-2 Clerk & Typist - 4/11/1979 to 12/18/1980

UNA Corporation -                          4/1978-4/1979
Secretary to Executive Manager         .
My duties were typing, filing, answer phone, use adding  machine,
calculator, helped out in various other departments, including sales &
purchasing, used telex machine, filled in for the secretary to the President
of the company, was right-hand for receptionist.

Johnson Bros. Florist in Woburn, MA -                5/1977-4/1978
Grader
My duties were to cut & wrap roses. I also helped out in the front office. I
filed, answered the phone, typed payroll checks.

3.      Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:       See answer to Interrogatory No. 2, above.

In addition Plaintiff answers, for the above positions I had taken Civil
Service Tests and was made permanent, off a list, for each one. All my
positions I held were in the Accounting Office except my present position
which I also hold the same title in the Fire Prevention Division.

My job duties were as follows:
Clerk & Typist - Answer phone, file, use adding machine, calculator, type
requisitions, record information in journals, fasten various forms of material
together.

Senior Clerk & typist - same as above plus processing payments, receives
requests, basic math computations, addresses and mails correspondence.

Principal Clerk - same as above plus maintains files, types forms and
letters, investigates records, checks for accuracy.

Head Clerk - same as above plus gives information to vendors and other
departments over the phone, takes care of balances for accounts.

Head Administrative Clerk - same as above plus uses IBM computer,
checks purchase orders for accuracy, takes care of all heating fuel and
gasoline for headquarters and fire houses across the city, handles all the
problems the fire houses might have with same.

Administrative Secretary - same as above plus takes care of problems with
materials on purchase orders being delivered or ordered, receives all
requests for materials to be purchased, processes purchase orders, oversees
work of Head Administrative Clerk and takes care of problems he/she
might have.

Senior Administrative Assistant - provides instructions as required and procedural and policy guidance, assigns work and reviews performance through conferences and report for effectiveness. Directly supervises several personnel, oversees and coordinates the activities of subordinates in connection with the preparation and maintenance of reports, records and documents.

Senior Administrative Assistant - When I first went to Fire Prevention I still have the same title but did different things but never had a new job description written out. I overseen the floor, which consisted of the cashier, permits, special hazards, 21E reports, lawyers assistant. I had roughly 10 or more people under me. I also did the quarterly/annual inspections.

Senior Administrative Assistant - assigns work and reviews performance through conferences and reports for effectiveness and compliance with laws, rules and regulations, directly supervises clerical personnel including the planning and assigning of work according to the nature of the job to be accomplished, reviews, analyzes and prepares reports concerning assigned unit activities in order to improve work methods, determine progress, revise established procedures and/or to provide information to superiors, oversees and coordinates the activities of subordinates in connection with the preparation and maintenance of reports, records and documents, performs related work as required. As supervisor of Permitting my specific duties also include supervision of the permit application unit, cashier and paid detail office, responsible for scheduling adequate staffing and training to service the public, serves as back-up when needed for any member of the unit, supervises a staff of 10.

I transferred down the back to do places of assembly. It was a lateral transfer, there was no difference in pay. My duties have changed a bit. I still fill in up front when needed with the duties of above plus I am responsible for scheduling adequate staffing and training to cover the administrative functions of special occupancies, special hazards, planned fire education, fire marshal's office, do the place of assembly permits, type abatements, lab registrations. I was not politically connected.

4.  For each position within the Boston Fire Department for which you have applied and did not receive the position, please set forth the position for which you applied, how you were informed of the Fire Department's decision and the reasons for which you believe you did not receive the position.

Answer:          The following are positions I applied for and didn't get. You were usually
                 notified when the selection came out with whoever's name was on it. You
                 also heard thru the coworkers who was getting the job before you even put
                 in for it. As soon as the posting went up it was known who would be
                 getting the position.

                 Head Administrative Clerk - R-13  6/83
                 Head Clerk & Secretary - R-12   8/83
                 Head Clerk - R-11  6/84
                 Head Clerk - R-11  7/84
                 Head Clerk & Secretary - R-12  7/84
                 Head Clerk & Secretary - R-12  10/85
                 Administrative Assistant - R-15  6/87
                 Administrative Secretary - MM-3 (changed to MM-4)  9/87
                 Administrative Assistant - R-15  10/88
                 Administrative Secretary - MM-3  12/88
                 Administrative Assistant (Fire) - MM-4 (changed to MM-6)  6/03
                 Principal Administrative Assistant - MM-8  8/03
                 Case Manager/Utilization Review - MM-6 (changed to MM-8)  12/03

5.       Please state each and every fact upon which you rely in your assertion that your claims

         against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

         civil action.

         Answer:          See the facts as alleged in the Complaint filed herein, the Answer to
                          Interrogatory No. 5 specifically, and generally to all interrogatories herein.
                          I know that I, and many others, have been victims of Political Affiliation
                          Discrimination in regard to promotional advancement within the Boston
                          Fire Department.

                          I, and many others, was also denied pay upgrades because of the lack of
                          political affiliation, patronage, and support.  People who have been
                          advanced solely because of their political affiliation, patronage, and support
                          include Mary Any McHugo, and Mary Kilgallen.

6.       Please state every fact common to you and the other plaintiffs with respect to the claims

         asserted by you and the other plaintiffs against the named defendants in the

         above-referenced matter.

         Answer:          See the facts as alleged in the Complaint filed herein, the Answer to
                          Interrogatory No. 5 specifically, and generally to all interrogatories herein.

Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and were denied fair consideration because of political affiliation discrimination in regards to promotional advancement within the Boston Fire Department.

7.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

Answer:    I interviewed for an MM-6 position. Robert Moran and Mary Killgalen both interviewed me for the position. Mary Killgalen ended up getting the MM-6 position after having been a part of the interviews with the candidates.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

Answer:    Not applicable to me.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

Answer:    Not applicable to me.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:    Not applicable to me.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:    Not applicable to me.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against

the City of Boston Fire Department.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a

character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

The Boston Fire Department has no policy on interviewing as can be seen from the fact that Mary Killgalen interviewed me for th MM-8 position and ended up being the one who was given the position.

The Boston Fire Department and representatives of the Fire Department have appointed people solely or substantially because of their political affiliation, patronage, or support.

13.    Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:        No.

14.    If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

Answer:

15.    If you believe the facts or nature of your claims against the defendants is different in anyway than the facts and nature of the claims of the other plaintiffs named in the above-captioned matter, please set forth each and every fact which you believe distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:        Each of Plaintiff's claims are similar in that we all were discriminated against in similar ways in our efforts to obtain promotions, pay upgrades, and step increases.  Some Plaintiff were retaliated against because of their vocal opposition to this system.  That type of retaliation may have a part of why I did not receive fair consideration, but my claims are more directly political discrimination claims.  But the individual circumstances are not exactly the same.

16.    How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered  because I was of the "correct political
affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.   Political affiliation is the
sponsorship from, support from, and/or close affiliation with a member of
the then existing administration in power and influence in the City of
Boston Administration and Boston Fire Department executive officers,
including the group of individuals known as the "Hyde Park Group" and
"South Boston Group" who constantly vie for power against any other
political group, including other parties (e.g., Republicans and other groups
within the Democratic party).

Political Affiliation as applied in my particular case is that persons were
appointed to positions in the Boston Fire Department because of who they
knew, who sponsored them, and who supported them, rather than merit.  I
was aware, as well as others were aware, of who was being appointed to a
position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the
year 2000.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

Answer: Mayor Thomas M. Menino
    "The Menino Administration,"
    "Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
    "South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19. Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

  Answer: Objection, overbroad, vague and ambiguous, subject to and without waiver
    of said objection, Plaintiff responds that political affiliation discrimination is
    widespread throughout the agencies controlled by the Menino
    administration. This is not part of the claims as set forth in the complaint,
    and therefore irrelevant to the Class Certification issues.

20. For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

    a. the dates of each request for promotion or transfer;

    b. the position desired;

    c. the date you received a response to each request; and

    d. the reason you received for the denial of the request.

  Answer: See Answer to Interrogatory Nos. 3 and 4.

21. Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

  Answer: See Answer to Interrogatory No. 14.

I, JUDITH A. KELLEY, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

       _Judith A. Kelley_
       Judith A. Kelley

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

To whom it may concern:

Sometime around late spring or early summer of the year 2000, while I was having a conversation with the Fire Marshal, Deputy Chief Joseph Fleming, he informed me that he went to Andy Warren and requested to have a job posted for a supervisor for the civilian employees in the Fire Prevention Division. Chief Fleming also stated to me, that as soon as he made the request, Andy Warren said he knew just the woman for the job, as she had to get out of the Auditors Office at City Hall.

When the position for a Principal Administrative Assistant (MM8), in Fire Prevention was filled by MaryAnn Creedon (McHugo) it became evident to me that this was the woman that Andy Warren was talking about prior to the job being posted. She talked openly about being friends with Andy Warren.

I state these facts under the pains and penalties of perjury this date July 23, 2007

Maurice J. Mahoney
Fire Captain
Special Hazards Unit
Fire Prevention Division

1 (Pages 1 to 4)

## Page 1

VOLUME: 1
PAGES: 1-146
EXHIBITS: 1-9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-10528-RCL

DENISE M. BARRY; JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA
J. MCDONOUGH; ELAINE MESITI;
LILA BROWN; MARY M. KANE; and
JUDITH KELLY, individually and
on behalf of those similarly situated
                Plaintiffs
v.
ROBERT J. MORAN; RONALD KEATING;
PAUL CHRISTIAN; RODERICK J. FRASER, JR;
WILLIAM KESSLER; WILLIAM HITCHCOCK;
CITY OF BOSTON (Fire Department) and
JOHN and/or JANE DOES 1-50
                Defendants.

DEPOSITION OF DENISE M. BARRY, Plaintiff,
called on behalf of the Defendant, pursuant to the
provisions of the Massachusetts Rules of Civil
Procedure, before Mary Jo Boxer, Professional Court
Reporter and Notary Public, in and for the Commonwealth
of Massachusetts, at the City of Boston Law Department,
One City Hall Plaza, Boston, Massachusetts, on Friday,
April 13, 2007, commencing at 10:20 a.m.

## Page 3

```
 1
 2              I N D E X
 3
 4   WITNESS: DENISE M. BARRY
 5
 6   EXAMINATION BY:                    PAGE:
 7   Mr. Holmes                        11/141
 8   Mr. Feeney                       131/142
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 2

```
 1   APPEARANCES:
 2   City of Boston Law Department
 3   (By: Scott Holmes, Esquire)
 4   (Karin A. Glasgow, Esquire)
 5   One City Hall Plaza
 6   Boston, Massachusetts  02201
 7   Tel: 617-635-3238
 8   Fax: 617-635-3199
 9   On behalf of the Defendants
10
11   Law Offices of Thomas F. Feeney
12   (By Thomas F. Feeney, Esquire)
13   29 Sheafe Street, Suite 1
14   Chestnut Hill, Massachusetts  02467
15   Tel: 617-277-5750
16   feeneyatlaw@cs.com
17   On behalf of the Plaintiffs
18
19
20
21
22
23
24
```

## Page 4

```
 1
 2              E X H I B I T S
 3                                        PAGE
 4   Exhibit No. 1, Letter                  5
 5   Exhibit No. 2, Depo notice             5
 6   Exhibit No. 3, Request for production of docs  5
 7   Exhibit No. 4, Answers to Interrogatories    5
 8   Exhibit No. 5, Interrogatories         5
 9   Exhibit No. 6, Letter                  5
10   Exhibit No. 7, Letter                  5
11   Exhibit No. 8, Answers to Interrogatories    5
12   Exhibit No. 9, Documents               5
13
14        (Exhibits retained by Mr. Holmes.)
15
16
17
18
19
20
21
22
23
24
```

Page 5

1    (Deposition Exhibit Nos. 1-9 marked for
2    identification.)
3        MR. HOLMES:  Before I begin, I would just
4    like to go on the record with some things here,
5    Tom, that have been on my mind having to deal
6    with this case.
7        MR. FEENEY:  Sure.
8        MR. HOLMES:  I would like to refer you
9    to --
10        MR. FEENEY:  On the record or off the
11    record?
12        MR. HOLMES:  On the record.
13        MR. FEENEY:  Okay.
14        THE WITNESS:  Exhibit 6, which is a copy
15    of my first letter to you with a deposition
16    notice for Denise Barry.  Denise Barry's original
17    deposition was scheduled for January 23, 2007.
18    It is reflected in Exhibit No. 1.
19        A copy of a letter dated January 9, 2007,
20    Exhibit No. 7, includes or discusses the fact
21    that we were serving the Defendants, all of them,
22    with discovery requests, including
23    interrogatories; that letter is dated January 9,
24    2007.

Page 6

1        Exhibit No. 5 is interrogatories to Denise
2    Barry with a date of January 9, 2007.
3        Exhibit 2 is a deposition notice for the
4    deposition here today, which is for April 9, 2007
5    but was continued to April 13 at your request.
6        Exhibit No. 3 is defense request for
7    production of documents also dated January 9,
8    2007.
9        Exhibit 8 is Denise Barry's answers to
10    Defendant's interrogatories, which I received
11    yesterday.
12        MR. FEENEY:  Uh-huh.
13        MR. HOLMES:  You may have E-mailed them
14    the night before, but I received them yesterday,
15    and today you bring to me the response to the
16    Defendant's request for production of documents,
17    this morning, 10:20 is the first time I see your
18    response.
19        Now, I understand it's your position that
20    these documents were disclosed by automatic
21    disclosure, but to put me in a position where you
22    deliver documents today to a response to the
23    clients I represent in this matter is something
24    that I've never seen before, Tom.  I have respect

Page 7

1    for you and I admire you, but I mean, to come
2    here and bring these documents at this time puts
3    me in a very difficult position, which I will
4    clearly represent to the Court at some point in
5    time because it's beyond the scope of the rules
6    and I find it highly unprofessional.
7        That being said, good morning, my name is
8    Scott Holmes.  Do you wish to respond?
9        MR. FEENEY:  If I may, yes.
10        MR. HOLMES:  Go ahead.
11        MR. FEENEY:  Discovery in this matter has
12    been going on for quite some time.
13        MR. HOLMES:  I know.
14        MR. FEENEY:  We did not receive -- just to
15    put this in perspective -- any initial disclosure
16    until I think about a week and a half ago and
17    those were due last year.  Despite requests for
18    those, despite the court rules, those were never
19    forthcoming.
20        The documents that were produced that are
21    being produced now have been produced before with
22    our initial disclosures, which were produced in a
23    timely fashion pursuant to court rules.
24        MR. HOLMES:  But I don't know that, Tom.

Page 8

1        MR. FEENEY:  You do.  You have had those
2    documents in your possession because the
3    Plaintiff complied with the court rules and
4    produced in accordance with the Court's
5    deadlines.
6        Your clients, and you weren't involved in
7    the case at that point, your clients did not
8    produce those.  Then, you know, as you are aware,
9    with prior counsel, eventually we got a request
10    to completely surround those with a protective
11    order, which I agreed to, but unfortunately, the
12    documents still were not forthcoming until
13    several months later.  And so I can understand
14    that as you said, you don't know if the documents
15    are different or not.
16        MR. HOLMES:  That's my position.
17        MR. FEENEY:  And I'm representing to you
18    that they are not different.  They are the same
19    documents that you received over a year ago, so
20    you had those in your possession to review them
21    for that much time.
22        The Answers to Interrogatories, I
23    apologize for the delay, but most of those
24    answers are the same information that's in those

Page 9

1  documents that your client has had for over the
2  last year, so just put it on the record.
3      MR. HOLMES: I understand that, and I
4  would like to respond to that. I understand
5  that, but you know that the rule provides and
6  gives me the means of filing a request for
7  production of documents, and I'm not sure if my
8  request also conforms to what you think is
9  disclosed to this date, but by giving them here
10 to me today, at the time of your client's
11 deposition, you rob me of the opportunity to even
12 go into it, Tom, and that's the problem I have
13 with these late, last-minute release of
14 information from your side.
15     MR. FEENEY: To the extent that you
16 file -- to the extent that you find something in
17 those documents that you want to ask questions
18 on, we will be happy to come back.
19     MR. HOLMES: I understand. I'm going to
20 try to do my utmost to limit this to the
21 precertification issues that are involved, and I
22 understand that we have talked about this or I
23 mentioned in an E-mail to you that there are
24 going to be areas that blend in with some of the

Page 10

1  merits of the case; I'll do my utmost to stay
2  away from those, but the late hour in which I've
3  gotten discovery responses has handicapped me in
4  some regards, and the way it has handicapped me
5  is without having your client's information in at
6  least a couple of days beforehand does not let me
7  know how to direct this deposition without
8  getting into the merits to some degree, and I
9  would like to avoid that, to be honest with you.
10 I consider my duty and our duty here today was to
11 discuss the precertification issues. But that
12 being said, the late hour of the discovery
13 responses, especially with the backdrop of an
14 April 30 deadline on the discovery by the court
15 order of Judge Dean, it's a very difficult
16 position to be put in, Tom.
17     MR. FEENEY: Well, and also given your
18 client's refusal to produce for a deposition
19 Marianne McHugo, Peter Laizza, and Mary Kilgallen
20 may extend the motion to compel those responses.
21     MR. HOLMES: Okay, well, I'm not going to
22 hash that out now because we will go into that
23 some other time, but you had the same discovery
24 rules that we have gone by, so much so that I

Page 11

1  hurried in January to get out discovery requests.
2  I have never seen a deposition notice for the
3  people that you just discussed here today, and I
4  have not denied that that is an issue that could
5  be and should be addressed by Court if we differ
6  on it, but to bring up at the late hour is again
7  a matter that I will contest.
8
9      DENISE M. BARRY, Plaintiff, having
10 satisfactorily identified by the production of her
11 driver's license, and duly sworn by the Notary Public,
12 was examined and testified as follows:
13
14 EXAMINATION BY MR. HOLMES:
15     Q.   That being said, good morning, Ms. Barry.
16 My name is Scott Holmes. I'm an attorney that
17 represents the Defendants in this case.
18          Have you ever been deposed before?
19     A.   Yes.
20     Q.   Well, I'm going to remind you of the
21 ground rules here today just so we can make sure that
22 this goes smoothly and this woman's job is a little bit
23 easier; okay?
24     A.   Sure.

Page 12

1      Q.   I'm not here to trick you or confuse you;
2  I'm just here to do my job, so if you don't understand
3  my question, please speak up and let me know, and I will
4  gladly accommodate you or shift them around or find a
5  question that suits you, that you understand what I'm
6  asking. If you don't raise that point, I'm going to
7  assume for the record that you understood my question
8  and you are answering truthfully, okay?
9      A.   Sure.
10     Q.   Secondly, if you need to take a break at
11 any point in time to use the restroom, speak to your
12 attorney, whatever you want, we will accommodate you.
13 It's no biggie, okay.
14     A.   Thank you.
15     Q.   You're welcome. Some of the general
16 rules, because of the stenographer here, is in human
17 experience, when you know what a question is if you're
18 talking to a friend or family member, you often start
19 the answer because you know what the question is; but in
20 this setting, she's taking down my question and your
21 answer, so if you just hold back for a second.
22     A.   That's fine.
23     Q.   If it happens, we will deal with it, but
24 that's just one of the realities of taking a deposition.

Page 13

1    And, finally, you have to verbalize an
2  answer. Having done this for some time, you see people
3  give the uh-huh, you know, signals or signs. You have
4  to at least say yes or no to every question.
5    A.  Fine.
6    Q.  Could you please state your full name and
7  spell your last name?
8    A.  Denise M. Barry, Denise Marie Barry,
9  B-A-R-R-Y.
10    Q.  What is your resident address?
11    A.  4 Essex Street, Charlestown, Mass, 02121.
12    Q.  Are you required to be a resident of the
13  City of Boston to work for the Boston Fire Department?
14    A.  Up until this contract, yes, but not any
15  longer.
16    Q.  That's true for every civilian employee at
17  the Boston Fire Department?
18    A.  Depending on the union, you have to have
19  ten years of service, and then you can have the
20  opportunity to move out. That was just with the recent
21  contract.
22    Q.  Are you a member of a union?
23    A.  Yes.
24    Q.  And what union are you a member?

Page 14

1    A.  AFSCME.
2    Q.  Could you tell me how long you have been a
3  member of AFSCME?
4    A.  Since August 21, 1996.
5    Q.  Just for the record, what does AFSCME
6  stand for?
7    A.  American Federation of State, County
8  Employees -- American Federation of State, County
9  employee members, something. I don't remember. It's so
10  long.
11    Q.  Okay. Do you hold any position within the
12  union?
13    A.  No.
14    Q.  Could you outline for me, please, your
15  educational background?
16    A.  From --
17    Q.  From, say, high school on.
18    A.  I graduated from Matigon High in
19  Cambridge. I basically worked, and then I have been
20  taking classes at Bunker Hill Community College as well
21  as Quincy Community College.
22    Q.  Could you just briefly outline for me what
23  those classes were that you have taken at Bunker Hill
24  Community College?

Page 15

1    A.  Before I came to the City of Boston, I
2  went to a business school in East Boston, and that's how
3  I obtained my job, went on a job interview with the
4  city, on a, what do you call it, like a school outing,
5  and we went from -- the school was just trying to show
6  us the proper ways to seek out jobs and stuff, so I went
7  through that process first. I graduated with a
8  certificate from there, from business school, you know,
9  all secretarial.
10    And then as I had been working at City --
11  the Boston Fire Department, I wasn't aware that our
12  union has a little -- I don't know if you call it an
13  agreement with Quincy College. You know, I just found
14  this out recently; that's why I'm so late in life.
15  Otherwise I would have done it long ago, but, you know,
16  they give you a voucher to go to school for Quincy
17  College. And, you know, at Bunker Hill you have to pay
18  upfront. But just from all the monotonous, I just need
19  to go back to school and get out of where I am.
20    Q.  And at the Harborside Business Skills
21  Training Program that you went to in 1996 or graduated
22  from --
23    A.  Yes.
24    Q.  How long was that program?

Page 16

1    A.  I believe it was nine months; it was 9:00
2  to 4:00 every day.
3    Q.  And it says in your Answer to
4  Interrogatory No. 2 that you went to Bunker Hill
5  College, and it says 2005; is that when you graduated
6  from Bunker Hill?
7    A.  No. I'm still enrolled there. I have a
8  five-year-old so I kind of have to work around her
9  schedule.
10    Q.  Okay. And what classes have you taken at
11  Bunker Hill Community College?
12    A.  I've just taken the normal prerequisites.
13  college writing, math; I think I have only taken two
14  courses so far, and then at Quincy College I did anatomy
15  and physiology and, you know, with the lab.
16    Q.  And the two courses you have taken so far
17  were in the year 2005?
18    A.  I believe so.
19    Q.  Did you take any courses in 2006?
20    A.  No, sir.
21    Q.  And the Quincy College, in your answer No.
22  2 to your interrogatory, says 2005; did you graduate
23  from some program there?
24    A.  No, like I said, I'm still enrolled.

## Page 17

1    Q.    What classes are you taking there?
2    A.    I haven't enrolled for any classes at the
3  moment.
4    Q.    Did your working for the city, did that
5  pay for Bunker Hill Community College courses?
6    A.    I paid for it. You have to get a -- I
7  think it's a B or above for them to reimburse you, which
8  I did get reimbursed.
9    Q.    Good. And do you intend to take any
10  courses at Qunicy College in the near future?
11    A.    I do.
12    Q.    You do. Can you outline for me your work
13  experience prior to working with the Boston Fire
14  Department?
15    A.    I worked at Fleet Bank in Malden. I was
16  the compliance clerk. I handled the political campaigns
17  and the RCC accounts, the political campaigns, the ones
18  that were published in the newspaper for the general
19  public to see where they were spending their money.
20    Q.    How long did you work there?
21    A.    I don't know; it's been so long.
22    MR. HOLMES: Just have the record reflect
23  the Plaintiff is looking at her Answers to
24  Interrogatories.

## Page 18

1  BY MR. HOLMES:
2    Q.    Thank you. Go ahead, please.
3    A.    Probably from '93 to '94, a year.
4    Q.    Why did you leave?
5    A.    That's when I went back to school.
6    Q.    That was Harborside Business Skills?
7    A.    Yes.
8    Q.    Did you work while at Harborside?
9    A.    No. Wait, I think I did waitress. No.
10    Q.    Where did you work next?
11    A.    I worked at the Warren Tavern waitressing.
12    Q.    How long did you do that?
13    A.    Probably about a year.
14    Q.    Where else have you worked?
15    A.    Once I graduated from Harborside, I
16  applied for a position. We went to City Hall for a -- I
17  don't know, like a -- I can't think of the word. We
18  just went from different businesses; our teacher was
19  trying to show us, like this is the Human Resource
20  Office; this is where you would come for the city if you
21  wanted to apply for a city job. And it just so happened
22  there was a job for the Boston Fire Department, and it
23  was the last day it was posted, and I just took a whim
24  and put my application in, and that's how I got. I went

## Page 19

1  for like two interviews with the Boston Fire Department,
2  and I got a call that I was accepted for the position,
3  and I have been there since.
4    Q.    What year was that?
5    A.    '96, August 21, 1996.
6    Q.    Back in 1996, did you have any family
7  members that worked in the City of Boston, worked for
8  the City of Boston, I'm sorry?
9    A.    I believe my sister did as a meter maid.
10    Q.    No one else.
11    A.    No, sir.
12    Q.    Did you speak to any -- did you ever ask
13  any family member or political representative or anyone
14  to help or to call anyone on your behalf with respect to
15  that job at the Boston Fire Department?
16    A.    No, sir.
17    Q.    Did they ask for job references when you
18  applied for that job?
19    A.    Yes.
20    Q.    Who did you give?
21    A.    The teacher that I had at Harborside. I'm
22  brutal with names, Patricia McQueen, and I can see her
23  face, but I can't think of her name.
24    Q.    That's okay. When you first worked for

## Page 20

1  the Boston Fire Department in 1996, what was the
2  position?
3    A.    It was an R-8 position, a principal clerk.
4    Q.    What department was that?
5    A.    Training.
6    Q.    Okay. Who was your immediate supervisor
7  then?
8    A.    It was Deputy Chief William Hitchcock.
9    Q.    He was the most immediate supervisor;
10  there's no intermediary between --
11    A.    No, sir. I'm sorry.
12    Q.    That's okay. It happens all the time.
13    There was nobody in between; he was the
14  person you reported to?
15    A.    Yes, sir.
16    Q.    And what were your job responsibilities in
17  that position?
18    A.    Just general business correspondence,
19  incoming, outgoing, you know, fax, and I used to
20  transcribe; they had these meetings; I used to
21  transcribe the meeting minutes, you know, letter format
22  so I could hand them out to people, know what the
23  minutes were. Just basically kept up -- you know, I
24  dealt with a lot of outside agencies, the federal,

Page 21

1   state, county, you know, for putting on classes for the
2   fire department, you know, did a lot of correspondence.
3       Q.   Okay. Did you ever get a pay raise while
4   working in that position?
5       A.   No, sir.
6       Q.   How long did you have that position?
7       A.   I'm actually still in that same position,
8   but I didn't get a pay raise until July of '98.
9       Q.   So you were in the same position, and you
10  got a pay raise?
11      A.   Only because they did a budget. They --
12  they analyzed -- they audited some positions, and they
13  felt that my position was -- should have been marked
14  higher than an R-8, and it was Jerry Horgan at the time
15  and Mike Rigalona, they were working on the budget, and
16  they upgraded my position to an R-11.
17      Q.   And Chief Hitchcock was still your
18  supervisor --
19      A.   Yes, sir --
20      Q.   -- at the time?
21      A.   Yes, sir.
22      Q.   If you can just hold back one second so
23  she gets these questions and answers right.
24          And that upgrade was the same job

Page 22

1   responsibilities as when you were an R-9?
2       A.   Yes.
3       Q.   When was the first time that you applied
4   for a different position with the Boston Fire
5   Department?
6       A.   I would say around 2000.
7       Q.   Can you take me back to 2000; what was the
8   position that you applied for?
9       A.   I believe one of them was an
10  administrative analyst, and I'm not sure where the
11  position was, but it was in headquarters.
12      Q.   You said one of them, so you applied for
13  more than one in 2000?
14      A.   I applied for two.
15      Q.   What was the other position?
16      A.   Administrative assistant.
17      Q.   Excuse me, I'm going to have to ask that
18  you not refer to Answers to Interrogatories during the
19  deposition. It's just on your best memory. If you
20  don't know, you can just answer "I don't know."
21      A.   No problem.
22      Q.   I would rather not have it be your Answers
23  to Interrogatories rehashed. .
24          And then I'm sorry, the second position

Page 23

1   was administrative assistant?
2       A.   Administrative assistant or secretary, one
3   or the other.
4       Q.   For the first position, what grade or what
5   level was that?
6       A.   Anything that's administrative usually is
7   an R-15.
8       Q.   And do you know what the job
9   responsibilities were for the administrative analyst?
10      A.   I don't recall.
11      Q.   Do you recall who the supervisor would
12  have been for that position?
13      A.   No.
14      Q.   Who the department head was for that
15  position, do you know?
16      A.   No, I don't know.
17      Q.   Did you interview for that position?
18      A.   No.
19      Q.   How about the administrative assistant
20  position, who was the department head for that?
21      A.   I don't know.
22      Q.   Do you know what level that was?
23      A.   I believe it was an R-15.
24      Q.   And did you interview for that position?

Page 24

1       A.   No, sir.
2           MR. FEENEY: Objection. Ambiguous. Are
3   you asking if she chose to interview or she was
4   offered an interview?
5           MR. HOLMES: I'm sorry, that's better.
6   I'll correct that.
7   BY MR. HOLMES:
8       Q.   Did you receive an interview for that
9   position?
10      A.   No, sir.
11      Q.   With respect to these two positions, you
12  did file an application --
13      A.   Yes, I did.
14      Q.   If you could just hold on a second. You
15  did file an application?
16      A.   Yes.
17      Q.   Just wait until I finish my question,
18  please.
19      A.   Okay.
20      Q.   I just want to make sure there's an
21  accurate record, okay?
22      A.   Okay.
23      Q.   Is it your position here today that you
24  were denied those positions because of some political

## Page 25

1 discrimination?
2     A.    I'm sorry?
3     Q.    Okay, are you claiming here today that you
4 did not get the administrative analyst position in 2000
5 or the administrative assistant position in 2000 because
6 you were the subject of political discrimination?
7     A.    Yes.
8     Q.    Can you tell me -- strike that.
9           Do you believe, testifying here today,
10 that you were the most qualified person for those two
11 positions?
12     A.    I don't know if I was the most qualified.
13 I never got an interview.
14     Q.    With respect to the position of
15 administrative analyst, you testified that you felt that
16 you were the subject of political affiliation
17 discrimination; can you tell how you conclude that?
18     A.    It's just common knowledge in the Boston
19 Fire Headquarters.  If you are not in the political
20 circle, then you don't fit.
21     Q.    And you knew that when you applied for the
22 administrative analyst position?
23     A.    I was hoping they wouldn't use it, but
24 they do.

## Page 26

1     Q.    And it's your testimony here today that
2 the same is true when you applied for the administrative
3 assistant position?
4     A.    Yes.
5     Q.    But you still applied?
6     A.    Yes.
7     Q.    I believe you just testified if you are
8 not "connected," I think that's the word you used; is
9 that correct?
10     A.    Yes.
11     Q.    What does that mean, who connected to
12 whom?  This is 2000.
13     A.    2000.  There's always political cliques in
14 any agency, and it just seems that the Boston Fire
15 Department, because I work there, it's just blatant
16 behavior they have.  It's just whoever is the
17 administration head at that time, usually has their
18 little, you know, circle that they make sure that they
19 take care of their friends.  I'm a nobody; I don't know
20 anybody, and that's why I'm in the position I am in.
21     Q.    Was any member of your family ever a part
22 of the Boston Fire Department?
23     A.    Yes.
24     Q.    Who was that?

## Page 27

1     A.    My father.
2     Q.    How long was he a firefighter?
3     A.    I don't remember, not long.
4     Q.    Was anyone else a member of the Boston
5 Fire Department in your family?
6     A.    How far back?
7     Q.    Since you have been alive.
8     A.    Yeah, my uncle is a firefighter.
9     Q.    What is his name?
10     A.    Thomas Crilley.  My father was Joseph
11 Crilley.
12     Q.    Thank you.  Anyone else a member of the
13 Boston Fire Department in your family since you have
14 been alive?
15     A.    Leo Martin.  He's my uncle by marriage.
16     Q.    Did you ever complain to anybody in 2000
17 that you felt that you did not get the administrative
18 analyst position because you were not properly
19 politically affiliated?
20     A.    I went to Chief Hitchcock.
21     Q.    Okay, anyone else?
22     A.    No, he's my immediate supervisor.
23     Q.    You were a member of a union in 2000?
24     A.    Yes.

## Page 28

1     Q.    Did you ever file a grievance?
2     A.    I really wasn't aware of the union's
3 policies and procedures.  I mean, when you get hired
4 there, you just notice in your check that so and so is
5 taking money out, and I had no idea what it was, and no
6 one ever contacts you and says welcome to the union, if
7 you ever need anything, never happened like that.
8     Q.    Did you ever file a grievance for any
9 position that you felt you were denied because of some
10 political affiliation discrimination?
11     A.    Yes.
12     Q.    When was that?
13     A.    Just recently.  Kathy Frecherette, she
14 went from R-15 to a 17; Karen Cunningham walked in the
15 door; she went from an R-9; instead of starting off at a
16 step 1, she started off at a step 3 because, you know,
17 she negotiated her step with Bob Moran.  And I was told
18 that you can't negotiate steps, but it depends on who
19 you know.
20     Q.    I understand that that's an answer, but
21 it's not an answer to my question.  I asked you when you
22 filed a grievance.
23     A.    I want to say it's -- probably about 2003,
24 October 2003, almost positive.

Page 29

1    Q.    October 2003.
2          MR. FEENEY: I'm going to enter an
3    objection at this point. The question is a bit
4    vague because it seems to imply that she has
5    filed a grievance alleging political affiliation.
6    The grievance, I don't think, alleges that. I
7    think it alleges violations of certain union
8    rules.
9          MR. HOLMES: Okay. Objection noted for
10   the record.
11   BY MR. HOLMES:
12   Q.    Can you tell me the next job that you
13   applied for?
14   A.    I applied for an R-13. It was a temporary
15   vacancy.
16   Q.    Do you know when that was?
17   A.    It was -- was it 2000 or 2001?
18   Q.    What was that position and title?
19   A.    It was a temporary secretary, R-13.
20   Q.    Okay, what would have been the job
21   responsibilities for you in that position if you had
22   gotten it?
23   A.    It was -- I can't think of them.
24   Q.    If you know?

Page 30

1    A.    No, it's when you process.
2    Q.    It's okay if you don't remember.
3    A.    I remember what it is; I can't think of
4    the name. Just like general administrative duties, you
5    know, secretarial duties.
6    Q.    Do you know who got that position?
7    A.    Eileen Stille.
8    Q.    Do you believe you did not get that
9    position because of political affiliation
10   discrimination?
11   A.    Yes.
12   Q.    Do you believe that you were more
13   qualified than she for that position?
14   A.    Yes.
15   Q.    Did you ever file a grievance with your
16   union, AFSCME, as a result of the decision that resulted
17   in you not getting the job?
18   A.    I don't remember if I did.
19   Q.    Were you aware at that point in time that
20   you had the right to file a grievance or were you still
21   learning your rights?
22   A.    I was still basically learning.
23   Q.    Learning. What was the next job that you
24   applied for?

Page 31

1    A.    R-15.
2    Q.    When was that?
3    A.    2003.
4    Q.    And you filed an application for that
5    position?
6    A.    Yes, sir.
7    Q.    Were you interviewed for that position?
8    A.    Yes.
9    Q.    Did you get that position?
10   A.    No.
11   Q.    What was that position entitled or what
12   was the actual job title?
13   A.    It was administrative assistant, an R-15.
14   Q.    And what department was that in?
15   A.    I believe it was over on Bragdon Street;
16   it was something like OMO and EMS, something affiliated
17   with Homeland Security.
18   Q.    Do you believe that you did not get that
19   position because of some political affiliation
20   discrimination?
21   A.    Yes.
22   Q.    Do you know who got that position?
23   A.    Yes.
24   Q.    Who got that position?

Page 32

1    A.    Michelle Urso.
2    Q.    Do you believe that you were more
3    qualified than Michelle Urso for that position?
4    A.    Yes.
5    Q.    Did you ever file a grievance with your
6    union at that point in time?
7    A.    Yes.
8    Q.    What was the outcome of that grievance?
9    A.    Denied.
10   Q.    Who denied it?
11   A.    Alice Kessler.
12   Q.    Who is Alice Kessler?
13   A.    She's -- when you go to labor relations,
14   she's like the hearing officer. I don't know if that's
15   her exact title.
16   Q.    Did you ever appeal that decision?
17   A.    No.
18   Q.    Do you know if there was ever an
19   arbitration on that position?
20   A.    I believe there was.
21   Q.    And do you know what the outcome of that
22   arbitration hearing was?
23   A.    There was three of us that grieved it, and
24   I believe the proper protocol is they pick the most

## Page 33

1 senior person who should have gotten the job, so I
2 believe Julie Barton was the most senior person out of
3 the three of us.
4       Q.    Was that arbitration before anybody who
5 was a City of Boston employee?
6       A.    I don't understand.
7       Q.    The person who was the arbitration hearing
8 person, officer, judge, whatever you want to call them,
9 do you know if that person was employed by the City of
10 Boston?
11      A.    I'm not sure. I wasn't there.
12      Q.    Okay. Do you disagree with the
13 arbitration decision?
14      A.    Disagree. I just -- no, I'm saying -- do
15 I disagree with it?
16      Q.    Yes.
17      A.    That not one of us got the position and
18 someone else did?
19      Q.    Yes.
20      A.    Yes, I do disagree with it.
21      Q.    So you think that decision was also
22 political affiliation discrimination?
23      A.    Absolutely.
24      Q.    And you felt that you were more qualified

## Page 34

1 than the person who got that position?
2       A.    Yes, she didn't even meet the minimum
3 qualifications of the position.
4       Q.    What was the next position that you
5 applied for in the Boston Fire Department?
6       A.    I believe it was senior principal
7 accountant.
8       Q.    And which department would that have been
9 in?
10      A.    Payroll.
11      Q.    Is that -- what is the rating on that?
12      A.    An R-16.
13      Q.    At the time you applied for that, you were
14 an R --
15      A.    12.
16      Q.    -- 12 still. And had you, in your
17 position as an R-12, ever had any payroll experience?
18      A.    Yes, working at the bank.
19      Q.    And that's -- you were talking about Fleet
20 Bank --
21      A.    In Malden.
22      Q.    Okay. The job from February 1993 to March
23 1994?
24      A.    Yes.

## Page 35

1       Q.    Did you file an application for that
2 position?
3       A.    Yes.
4       Q.    For the R-16?
5       A.    Yes.
6       Q.    Did you have an interview for that
7 position?
8       A.    Yes.
9       Q.    Who was at the interview?
10      A.    Carol Petta and myself; she's the head of
11 payroll.
12      Q.    Did you get that position?
13      A.    No, sir.
14      Q.    Who got that position?
15      A.    Yui Chin, Y-U-I, C-H-I-N.
16      Q.    Thank you. Do you believe that you did
17 not get that position because you were the subject of
18 political affiliation discrimination?
19      A.    No.
20      Q.    Do you believe that Yui Chin was more
21 qualified --
22      A.    Yes.
23      Q.    Hang on a second, please -- more qualified
24 than you in that position?

## Page 36

1       A.    Yes.
2       Q.    And when was the next position that you
3 applied for?
4       A.    I'm not too sure on the dates, but the
5 next one was right after that. It was principal
6 accountant.
7       Q.    So sometime after 2000, 2001, that you
8 applied for that?
9       A.    Yes.
10      Q.    And what department was that in?
11      A.    Payroll Department.
12      Q.    Is that the same payroll department that
13 you just applied for that other position?
14      A.    Yes.
15      Q.    And who was the department head for that?
16      A.    Carol Petta.
17      Q.    And what level was that position?
18      A.    A 14.
19      Q.    And did you interview for that position?
20      A.    Yes.
21      Q.    And did you get that job?
22      A.    No.
23      Q.    Who got that job?
24      A.    Julie Barton, B-A-R-T-O-N.

Page 37

1      Q.    Thank you.  And do you believe that you
2  were the subject of political affiliation discrimination
3  in that decision?
4      A.    Yes.
5      Q.    Do you believe you were more qualified
6  than Julie Barton for that position?
7      A.    I would say we were equal, yeah, just as
8  qualified.
9      Q.    How long had she been working at the
10  Boston Fire Department, if you know?
11      A.    I'm not really sure, to be honest with
12  you; she transferred over from City Hall.
13      Q.    You are saying she's a more senior person
14  than you?
15      A.    Yes.
16      Q.    All right.  What was the next position
17  that you applied for?
18      A.    I believe it was an MM5.
19      Q.    And when was that, if you recall?
20      A.    It was just recently, between 2003 or
21  2004.
22      Q.    Did you file an application for that
23  position?
24      A.    Yes.

Page 38

1      Q.    And were you interviewed for that
2  position?
3      A.    No.
4      Q.    What department was that in, I'm sorry?
5      A.    That was over at Fire Prevention Division.
6      Q.    What would have been the job description
7  for that?
8      A.    I don't know what the titles are.  I want
9  to say senior administrative assistant.
10      Q.    Do you know who got that position?
11      A.    Karen Rankin, R-A-N-K-I-N.
12      Q.    Do you believe that you did not get that
13  position because your were the subject of political
14  affiliation discrimination?
15      A.    No.
16      Q.    Do you believe she was more qualified for
17  the position than you?
18      A.    Yes.
19      Q.    When was the next position that you
20  applied for?  I think we're up to 2003, 2004 now.
21      A.    Yeah, I know.  Okay, 2003, I know I
22  applied for a case manager, utilization review, because
23  I was acting in that position so I applied for it when
24  it was posted.

Page 39

1      Q.    You said you were acting in that position
2  before you applied for it?
3      A.    Yes.
4      Q.    Can you describe for me what your job
5  responsibilities were as an acting case manager
6  utilization review, as you just testified?
7      A.    It was maintaining the medical records,
8  making sure that, you know, people's medical bills got
9  paid, and you call up the hospital, and they kind of --
10  they don't pay the full; you kind of negotiate prices,
11  what the city is going to pay, you know, what they are
12  going to give the city to pay.  I made phone calls for
13  people for their prescriptions; some patients would come
14  in, you know, they wait a few months to hand in their
15  prescription instead of doing them all, you know, so I
16  just accommodated everybody accordingly.  I processed
17  the claims, you know, and I handled the amount of claims
18  that were submitted and how much money I saved up to the
19  budget, signed off, and it was just a consistent,
20  repetitious, more, you know, every week.
21      Q.    How long were you in that acting position?
22      A.    I was doing it for a month.
23      Q.    Did anybody train you for that?
24      A.    Yes.

Page 40

1      Q.    Who trained you?
2      A.    Katy Donovan.
3      Q.    But you did make the phone calls to
4  hospitals and to insurance carriers during that acting
5  position?
6      A.    Yes.
7      Q.    And negotiated on behalf of the Boston
8  Fire Department?
9      A.    Yes, and I reported to the nurses.  The
10  only thing I didn't do was -- I was told from Barbara
11  Ryan, she was the nurse at the time, there is medical
12  notes on there and they are private, and she would just
13  ask if I would remove those from the bills, just flip
14  them over so no one could read, which I agreed with her,
15  you know, it's personal information, and I just
16  submitted those to her.
17      Q.    Absolutely.
18      A.    We had, you know, staff meetings all the
19  time just to make sure everybody was up to par.
20      Q.    And when you applied for that position,
21  did you submit an application?
22      A.    Yes.
23      Q.    Did you receive an interview?
24      A.    No.

## Page 41

1    Q.    Do you believe that you were the subject
2  of political affiliation discrimination in the decision
3  there for that position?
4    A.    Yes.
5    Q.    What do you base that on?
6    A.    On what?
7    Q.    What facts do you base upon -- what facts
8  do you base your position that you were the subject of
9  political affiliation discrimination in that position?
10    A.    Because the person they hired was a
11  previous employer (sic) from '96 to '97, and he lived
12  out of state, lived in Maryland at the time, and it says
13  that Boston City requirement on the application, so as
14  far as I'm concerned, that was an illegal hiring they
15  did. He wasn't even living in Boston when he got the
16  job.
17    Q.    In your answer, you said "employer"; do
18  you mean a former employee?
19    A.    Yes.
20    Q.    Did you ever file a grievance with your
21  union as a result of that decision?
22    A.    I don't recall if I did. More than likely
23  I did.
24    Q.    More than likely you did?

## Page 42

1    A.    I started to get to know the rules more
2  and I think I did.
3    Q.    Do you know what the outcome of that
4  grievance was?
5    A.    I think it's actually still pending.
6    Q.    Okay. And what was the next position that
7  you applied for?
8    A.    Next position applied for was R-15,
9  administrative assistant in the Arson Division.
10    Q.    Okay. And is that located at headquarters
11  also?
12    A.    Yes.
13    Q.    And did you file an application for that
14  position?
15    A.    Yes.
16    Q.    Did you receive an interview?
17    A.    Yes.
18    Q.    And did you obtain that position? Did you
19  get that position offered to you?
20    A.    Yes.
21    Q.    Did you take it?
22    A.    No.
23    Q.    Who offered that position to you?
24    A.    Kathleen Kirleis.

## Page 43

1    Q.    Would that position have paid you more
2  money than you were making?
3    A.    Yes.
4    Q.    How much more money would you have made?
5    A.    $20 more.
6    Q.    Per week?
7    A.    Yes.
8    Q.    Why didn't you take it?
9    A.    Because when I got offered the position,
10  first of all, it was demoted from an MM5 to an R-15 but
11  the job title and the description and the duties didn't
12  change, but when I was offered the position, Chief Burke
13  came over to me, you know, to congratulate me, you know,
14  welcome aboard, and he said, "I just want to let you
15  know, Denise, that job is not what I want you to do,"
16  and he totally changed the job description on me for
17  something completely different than I applied for.
18    Q.    Chief Burke, that is?
19    A.    Chief Paul Burke, District Chief Paul
20  Burke.
21    Q.    He's not a person that's a defendant in
22  this lawsuit, is he?
23    A.    No.
24    Q.    Do you feel that his decision to change

## Page 44

1  what the job requirements were was as a result of some
2  political affiliation discrimination?
3    A.    Sorry, can you repeat that?
4    Q.    Sure. Do you believe that Chief Burke's
5  decision to change the job responsibilities of that
6  position was because you were being politically
7  affiliation discriminated against, political affiliation
8  discrimination?
9    A.    No, I just think he wanted me to do
10  something completely different than I was supposed to,
11  and I brought it to Kathleen Kirleis' attention that he
12  changed the job description, therefore I wasn't
13  accepting it.
14    Q.    Did you file a grievance with your union
15  as a result of that?
16    A.    No, because that position actually is in
17  arbitration at the present time.
18    Q.    Have you applied for any other jobs after
19  the R-15 position that you applied for sometime in 2003
20  or 2004?
21    A.    No.
22    Q.    So that's the last one, the R-15
23  administrative assistant in the Arson Division, correct?
24    A.    I believe, yes.

## Page 45

1   Q.   Have you ever been offered a position or
2   an upgrade in your title. in your standing within the
3   Fire Department by any employee of the Fire Department?
4   A.   Yes.
5   Q.   Who offered the first position to you?
6   A.   Bob Moran.
7   Q.   Which position was that?
8   A.   That was the acting MM5.
9   Q.   And did you take that offer?
10  A.   Yes.
11  Q.   And then you eventually applied for that
12  position?
13  A.   Yes.
14  Q.   It's your understanding that you were
15  offered that position on a permanent basis --
16  A.   I asked him.
17  Q.   -- when Bob offered it?
18  A.   I asked him; I had asked Bob Moran; I had
19  a meeting with Bob Moran because I was getting
20  phenomenal ratings from the City itself for the job I
21  did. I learned that job in two hours.  He probably went
22  through three people, and I was the first one who
23  actually picked it up and took the ball and ran with it,
24  and I did exceptionally well. So I felt that because I

## Page 46

1   did such a great job, that he might consider me for a
2   permanent job, but that's when he told me that someone
3   from City Hall was coming over to take the position
4   over.
5   Q.   What person was that that came over to
6   take the position?
7   A.   No one actually did.
8   Q.   Okay.  So no one actually ever filled that
9   position that you were acting in, the MM5 position?
10  A.   No, I stepped back away from it because I
11  was doing that job on top of my regular training job,
12  and that was consuming the majority of my day, and I
13  felt that if I could get that as a permanent job, you
14  know, it would be a great opportunity.
15  Q.   Okay.  Were you ever offered another
16  position with the Boston Fire Department?
17  A.   No.
18  Q.   How did you get your current position?
19  You are an R-15 now, right?
20  A.   No, I'm an R-12.
21  Q.   You are still an R-12?
22  A.   Yes.
23  Q.   I was of the understanding that you
24  recently had a raise or a position change.

## Page 47

1   A.   I just got a step raise; I went from a
2   step 8 to a 9.  When you are there a year, you get a
3   step increase raise. I only just recently got my last
4   step.
5   Q.   So you are currently an R-12 --
6   A.   Step 9.
7   Q.   Step 9.  Are there other steps to go?
8   A.   No.
9   Q.   That's the highest step?
10  A.   That's it.
11  Q.   Did you request that step increase?
12  A.   No, it's automatic.
13  Q.   Does your union contract also provide for
14  automatic cost of living increases?
15  A.   No.
16  Q.   Have you ever gotten a cost of living
17  increase during the time you've worked for the Boston
18  Fire Department?
19  A.   No.
20  Q.   I would like to go over some of the people
21  that you have named in this lawsuit as defendants.  You
22  know what a defendant is?
23  A.   Yes.
24  Q.   Do you believe that Robert J. Moran has

## Page 48

1   discriminated against you as a result of some political
2   affiliation?
3   A.   Yes.
4   Q.   Can you tell me how that's so?
5   A.   In October of 2003, I don't know the exact
6   date, as I mentioned, I was inquiring about the MM5
7   position, and if there was a possibility -- if the job
8   did get posted, since I was doing a great job with it.
9   what my, you know, guarantee would be if I got the job.
10  And he said there's no guarantee, and I
11  said understandably, but that's when he told me that
12  someone from City Hall was coming to take over the job.
13  And I explained to him, I said. I have
14  been sitting here doing -- that office is so backlogged
15  because they can't get an individual -- it really is a
16  busy office -- so I probably did like six months of
17  backlog for him. I proved myself that I was doing a
18  great job, and I just said I just can't understand why I
19  can't have the opportunity to keep this job if I'm as
20  good as I am in it.  And he said someone from City -- we
21  have nothing but problems in that office, someone from
22  City Hall is coming to take it over. and I -- that's
23  when I was sitting with Jane Green.  She was the senior
24  shop steward in the office at the time, and when I had

Page 49

1   my conversation with him, I said -- you know, he said
2   someone from City Hall, and I said, you know, so after
3   all my work, someone from City Hall is going to take
4   over, and he said, you know, that's the way it is.
5   That's when he got into -- he blatantly told me that if
6   I wasn't in politics, little girl, then you're not into
7   a position here, and he told me if I didn't like the way
8   he runs things around here, and he pointed to the
9   window, and he said there's other job opportunities out
10  there if you don't like the way I run things around
11  here.
12      Q.   The person that he talked about never
13  showed up?
14      A.   No.
15      Q.   But someone was eventually hired in that
16  office?
17      A.   They reposted that position, I want to say
18  a year later, and it was Ian MacKenzie, who lived in
19  Maryland.
20      Q.   When he applied for it?
21      A.   Yes.
22      Q.   Any other facts that led you to that
23  conclusion?
24      A.   He told Barbara Ryan, the nurse, after my

Page 50

1   conversation with him, because I was working alongside
2   of Barbara, and Barbara had asked him why, you know,
3   since I'm doing impeccable work, why -- I was the first
4   one that actually -- this job is either you get it or
5   you don't, and I picked up on it, and, you know, a lot
6   of people couldn't do it, and I was able to do that.
7   And Barbara was just -- they were sick of looking for
8   people to keep picking up the work, so she said we have
9   somebody that's capable; I don't understand why you
10  couldn't give it to her, and he said, you know, that
11  little girl is not going to hold me hostage, you know,
12  basically I'm going to hold -- "That little girl isn't
13  going to hold me hostage," he said to her, and Barbara
14  said so, you know, you're going to be spiteful to her,
15  and he said "I'm just going to remember who gave me
16  headaches."  And ever since then, I have been denied
17  everything, and he's just holding a personal vendetta;
18  he has a personal thing with me now.
19      Q.   But do you believe that's political?
20      A.   He told me.
21      Q.   No, let me finish my question, please.  Do
22  you believe that his decisions were based on some fact
23  that you were not connected to the right people?
24      A.   Yes.

Page 51

1       Q.   And that's consistent to you with it being
2   personal, right, you just said it's a personal thing
3   now?
4       A.   Ever since then, ever since I confronted
5   him and he said what he said, it seems like -- and then
6   he, you know, went in to Barbara Ryan and he made it
7   personal that he was going to remember who gave him
8   headaches.
9       Q.   And you weren't at that conversation with
10  Barbara Ryan and Bob Moran, were you?
11      A.   No.  Barbara came to me and she told me
12  what happened.  She said he's going to be spiteful to
13  you, and every job and ever opportunity I had to
14  upgrade, he's denied.
15      Q.   Is that it, is that everything that you
16  recall or everything that has happened to you that you
17  believe you were discriminated against because of
18  political affiliation?
19      A.   Yes.
20      Q.   How about with respect to Paul A.
21  Christian, a defendant in this lawsuit?  What exactly
22  did he do that leads you to believe and allege here
23  today under oath that his actions against you were
24  politically motivated?  This is Paul Christian we are

Page 52

1   talking about.
2       A.   What do I believe his political -- I'm
3   sorry, can you repeat that?
4       Q.   What do you believe Paul A. Christian did,
5   his motivation was because of your political affiliation
6   or nonpolitical affiliation, what did he do that
7   discriminated against you?
8       A.   He sided with Bob Moran, and he let Bob
9   have a meeting with him, and I couldn't have a meeting
10  with him, and he just said he doesn't want to hear it.
11      Q.   Okay.  Do you believe that that was
12  politically motivated?
13      A.   Yes.
14      Q.   How so?
15      A.   Because Dodo Nee made a phone call to me
16  and he said "I was told that Bob Moran offered you that
17  job."  Paul Christian is under the impression that Bob
18  Moran offered you that job and you refused it, and I
19  said, "Dodo, that is not true."  I said it's probably
20  $600 more a week than I make; it's probably an extra
21  week of vacation, so many personal days, I said, "Who in
22  their right mind would refuse that job?"  I said it was
23  never offered to me and I never refused it because I
24  wouldn't refuse it.  I would be crazy to refuse it.

Page 53

1    Q.    And you believe that Paul A. Christian did
2    something to put somebody in the position in the Boston
3    Fire Department in front of you?
4    A.    Yes.
5    Q.    How do you know that?
6    A.    Because they hired Ian MacKenzie from
7    out-of-state.
8    Q.    Who is "they"?
9    A.    Paul Christian and Bob Moran; they are in
10   charge of the place.
11   Q.    And do you believe Ian MacKenzie was
12   politically connected or affiliated at the time he was
13   hired?
14   A.    Yes.
15   Q.    Do you know what his political affiliation
16   or connection was that resulted in him getting a job?
17   A.    It was definitely Chief Hitchcock, Chief
18   Finn; he was great friends with Bruce Howell.  You know,
19   as I mentioned, he did work there from '96 to '97.
20   Q.    And in what position did he work there?
21   A.    Case manager.
22   Q.    In that position?
23   A.    Yes, he left because they wouldn't give
24   him money, so he left.

Page 54

1    Q.    And that's an MM5 position?
2    A.    Well, since Ian has it, it's an MM8.
3    Q.    But when Ian MacKenzie got it, it was the
4    MM5 position we talked about earlier with you?
5    A.    Yes.
6    Q.    And he got the same exact position that
7    you were doing, the same exact job that you were doing?
8    A.    Yes.
9    Q.    Is there anything else against Paul A.
10   Christian that you claim he did that made you the
11   subject of political affiliation discrimination?
12   A.    Well, my problem with Paul Christian is he
13   thinks Jane Green, who was shop steward at the time in
14   the meeting with Bob Moran, is influencing me to -- as
15   he would say, you know, cause trouble, but I'm just
16   defending my rights, and she was in there as a union
17   rep.  And because she was representing me, Chief
18   Hitchcock, Christian were under the impression that Jane
19   was there to cause trouble.  In reality, they didn't
20   know I was acting in her union, outside of my union in
21   her union, so they accused her of causing trouble.  And
22   I tried to explain that she was in there not to cause
23   trouble.  She was in there because I wasn't familiar
24   with their rules because they are different from my

Page 55

1    union rules.
2    Q.    So Jane Green is not in the same union as
3    you?
4    A.    No.  She's in SENA.
5    Q.    That's S-E-N-A?
6    A.    Yes.
7    Q.    Okay.  How about William Kessler, another
8    defendant in the lawsuit, how do you claim that he
9    discriminated against you?
10   A.    Because I went to him on Bob Moran, and I
11   told him exactly what Bob Moran called me, and, you
12   know, told me if I wasn't into politics, then I'm not
13   into a position there, and if I didn't like the way he
14   ran the place, like I said, he pointed to the window,
15   said there's other job opportunities out there, kiddo,
16   so I had mentioned this to Bill Kessler; I was with Dan
17   Moriarty, the union president, Jen Springer, Cathy
18   Moore, the shop steward, and I don't think Bob Moran, no
19   just Bill Kessler and Winnie Yam.
20   Q.    When did this take place?
21   A.    I believe it was September 9 of 2004; I'm
22   not positive on the year, but September.
23   Q.    What position was it that you were trying
24   to address with Mr. Kessler?

Page 56

1    A.    It was about the MM5, about Bob Moran's
2    behavior towards me.
3    Q.    All right, and what was the result of that
4    meeting?
5    A.    He just said being called "little girl"
6    and "kiddo" was not discriminatory.
7    Q.    Did you grieve his decision with your
8    union?
9    A.    My union was going back and forth with
10   correspondence with him, and, you know, I would imagine
11   you have the paperwork somewhere.
12   Q.    Is that a matter that is also currently
13   the subject to some kind of arbitration or some kind of
14   further action?
15   A.    I'm not really sure, to be honest with
16   you.  I do have a couple of cases pending.
17   Q.    A couple of grievances?
18   A.    Yes, and I'm not sure what they are.
19   Q.    Anything else against Mr. Kessler, other
20   than that meeting?
21   A.    I gave him plenty of documentation, plenty
22   of ammunition, as they call it, you know, to verify my
23   story, include it in my -- the union lawyer, the union
24   president and the shop steward and he just automatically

## Page 57

1  sided with Bob Moran. He said he didn't see anything --
2  he investigated Bob Moran, and he didn't see any cause.
3      Q.    What was Mr. Kessler's title or position?
4      A.    He's the human resource -- I don't know if
5  it's director, but like harassment chief.
6      Q.    All right, how about William Hitchcock, do
7  you believe that he has discriminated against you as a
8  result of some political affiliation or nonpolitical
9  affiliation?
10     A.    Yes.
11     Q.    Can you tell me how that is so?
12     A.    Because Chief Hitchcock was my immediate
13 supervisor, and he's the one that initiated me getting a
14 raise to Bob Moran; he said I want you to go sit with
15 Bob Moran; I did everything that he told me to do, and
16 when it started getting, you know, kind of heated, you
17 know, Billy Hitchcock just kind of -- just let me take
18 the fall. He said, "I just wish you would drop it."
19 And I said, well, you are the one that initiated all
20 this, you know, me getting a raise. I didn't want to
21 sit with Bob Moran.
22     Q.    What position was it that you were dealing
23 with Chief Hitchcock on --
24     A.    I was just trying to upgrade my current

## Page 58

1  position.
2      Q.    Were you ever offered anything by Chief
3  Hitchcock or Bob Moran as a result of your contact with
4  Chief Hitchcock?
5      A.    No.
6      Q.    You weren't offered an R-15 position?
7      A.    No.
8      Q.    Chief Hitchcock never offered you a
9  position personally?
10     A.    No. He said that he had a conversation
11 with Bob Moran to upgrade my position because he thought
12 that I deserved a higher grade and it wasn't something
13 astronomical; it was something that I deserved, and
14 Chief Hitchcock is the one that wrote the letter and I
15 had like 12 or 13 letters of recommendation, and Bob
16 said he took it down to City Hall and they felt that my
17 position was a 12, and if I wanted to be upgraded, that
18 I should apply for other jobs.
19     Q.    I apologize if I'm asking the same
20 question again, but just to make sure, so your testimony
21 here today is, under oath, that Chief Hitchcock never
22 offered you an R-15 position?
23     A.    No.
24     Q.    Anything else against Chief Hitchcock, any

## Page 59

1  other facts that you have to support your allegation
2  that he politically discriminated against you?
3          MR. FEENEY: If I can object.
4          MR. HOLMES: Sure.
5          MR. FEENEY: The Plaintiff is not alleging
6      that Chief Hitchcock acted --
7          MR. HOLMES: Okay, it's against other --
8      okay, thanks.
9  BY MR. HOLMES:
10     Q.    Do you know here today of anyone else that
11 you claim -- strike that.
12         Do you know of anyone else, sitting here
13 today, who you believe discriminated against you because
14 of nonpolitical affiliation, not being politically
15 affiliated?
16     A.    As a defendant?
17     Q.    Yes.
18     A.    A defendant on that list?
19     Q.    No, anyone else beside the people named on
20 that list?
21     A.    In the Boston Fire Department?
22     Q.    Yes.
23     A.    Am I aware of other people that have
24 discriminated against me?

## Page 60

1      Q.    Yes.
2          MR. FEENEY: If I can interject, are you
3      asking prior to the filing of the complaint or
4      after filing of the complaint?
5          MR. HOLMES: I'll break it down that way
6      if you want.
7  BY MR. HOLMES:
8      Q.    Prior to the filing of the complaint, do
9  you know of anybody else who you claim discriminated
10 against you on the job because of you not being
11 politically connected or affiliated?
12     A.    No.
13     Q.    After filing the complaint, do you know of
14 anybody who works for Boston Fire Department who you
15 claim discriminated against you, other than the people
16 that we have named so far?
17         MR. FEENEY: Other than the people named
18     in the complaint?
19         MR. HOLMES: As I just said, other than
20     the people named in the complaint.
21         THE WITNESS: I can't think off the top of
22     my head, not that I'm aware of. I don't know.
23 BY MR. HOLMES:
24     Q.    In your complaint, you have a John and/or

16 (Pages 61 to 64)

## Page 61

1  Jane Does 1 through 50. Who else do you intend to name
2  who you claim discriminated against you at the Boston
3  Fire Department?
4       A.   I wasn't sure about the question; that's
5  why --
6       Q.   Sure, I'm sorry, I should have made it
7  clear.
8       A.   That's okay. I didn't realize you were
9  referring to the 1 through 50.
10      Q.   Yes.
11      A.   I don't recall right now.
12      Q.   That's fine. How about within the City of
13 Boston itself, the government of the City of Boston,
14 City Hall or any other agency, do you know of any other
15 people who discriminated against you because of
16 political affiliation or nonpolitical affiliation? If
17 you know.
18      A.   I just had a brain freeze right now. Can
19 you repeat that?
20      Q.   Sure, is there anybody in the City of
21 Boston government, either City Hall or any other agency
22 that you believe discriminated against you in your
23 employment because you were not politically connected or
24 affiliated?

## Page 62

1       A.   Yes.
2       Q.   Who is that?
3       A.   Mary Kilgallen.
4       Q.   Where does she work?
5       A.   She's the Commissioner's secretary.
6       Q.   She works at the Fire Department?
7       A.   Yes.
8       Q.   I'm talking outside of the Fire
9  Department.
10      A.   It would have to be Alice Kessler, Bill
11 Kessler's wife, Winnie Yam; I took my complaint to them,
12 and I'm not comfortable with their investigation because
13 I just think it was a botched investigation. I had
14 plenty of documentation that was more than enough to go
15 on, and they still sided with Bob Moran.
16      Q.   Have you ever been a party to an
17 investigation like that before?
18      A.   No.
19      Q.   But your testimony here today is it was
20 botched?
21      A.   Yes.
22      Q.   In your Answers to Interrogatories,
23 Exhibit No. 4, answer No. 14, you list people in that
24 answer who you believe or you are stating here in your

## Page 63

1  answer that these are former employees who were subject
2  to political affiliation discrimination, correct?
3       A.   Yes.
4       Q.   And this is information that you gave to
5  your attorney, correct?
6       A.   Yes.
7       Q.   Now, I'm just going to deal right now with
8  the former employees who were subject to political
9  affiliation discrimination. Did you ever speak to any
10 of these people about becoming a party in this lawsuit?
11      A.   No.
12      Q.   Do you know these people on the list, any
13 one of them personally?
14      A.   No.
15           MR. FEENEY:  Objection, what do you mean
16 by the word "know"?
17           MR. HOLMES:  All right, she just answered
18 no. If you want, I'll go in and we'll explore
19 what "know" means.
20 BY MR. HOLMES:
21      Q.   Any of the people listed as former
22 employees who were subject to political affiliation
23 discrimination, have you ever socialized with?
24      A.   Yes.

## Page 64

1       Q.   Who on the list have you socialized with?
2       A.   No, I'm just saying --
3       Q.   You can enjoy the benefit of the list at
4  this time if you want to look at your answers.
5       A.   Which page?
6       Q.   Page 16.
7       A.   These are previous employees?
8       Q.   Yes, former employees.
9       A.   Okay. Jessica Ahearn.
10      Q.   Have you socialized with her?
11      A.   Yes.
12      Q.   Have you worked with her?
13      A.   Do you mean in the same department, in the
14 Fire Department?
15      Q.   Yes.
16      A.   These are all Fire Department people.
17      Q.   I understand, but did you ever work with
18 her?
19      A.   No.
20      Q.   Did you ever share an office or sit next
21 to her?
22      A.   No, I've worked by myself the ten years I
23 have been there.
24      Q.   Okay. What department did Jessica Ahearn

Page 65

1  work in?
2      A.    Payroll.
3      Q.    What do you know about her having been the
4  subject of political affiliation discrimination as your
5  answer states?
6      A.    She left because she couldn't get on --
7  she couldn't get upgraded or advance because she didn't
8  know anybody.
9      Q.    And have you had that conversation with
10  her?
11      A.    No, I just knew it.
12      Q.    Did she ever tell you --
13      A.    She left because of it.
14      Q.    Did she ever tell you she left because she
15  couldn't get an upgrade?
16      A.    Yes.
17      Q.    So you had that conversation?
18      A.    Yes.
19      Q.    And did you tell her that you had filed a
20  lawsuit against the Boston Fire Department, that you
21  were trying to certify a class action lawsuit against
22  the Boston Fire Department, that you were being
23  designated or potentially designated as a representative
24  of the class action; did you ever tell her that?

Page 66

1      A.    No.
2      Q.    How about Rosemary Clinton, did you ever
3  work next to her?
4      A.    No.
5      Q.    Did you ever socialize with her?
6      A.    No.
7      Q.    Did you ever talk to her about your
8  lawsuit here today?
9      A.    No.
10      Q.    Do you understand why she left the Boston
11  Fire Department?
12      A.    Unfortunately, she just passed away.
13      Q.    Okay.  That is unfortunate.
14          Do you know whether or not she was the
15  victim of political affiliation discrimination while she
16  was alive and working at the Boston Fire Department?
17      A.    Yes.
18      Q.    What do you base that opinion on?
19      A.    She was stuck in the same position.
20      Q.    Did she ever tell you that she felt she
21  was the subject of political affiliation discrimination?
22      A.    No.
23      Q.    So it's your conclusion because she was
24  stuck in the same position, that she was the subject of

Page 67

1  political affiliation discrimination?
2      A.    Yes.
3      Q.    Nothing she ever said to you?
4      A.    No.
5      Q.    How about Karen Denver, do you know her?
6      A.    Yes.
7      Q.    How long have you known Karen Denver?
8      A.    Not long.  I mean, I really never dealt
9  with her.
10      Q.    Did you ever have a conversation with her
11  about whether she felt she was the subject of political
12  affiliation discrimination?
13      A.    No.
14      Q.    Did you ever tell her about this pending
15  lawsuit that you have against the Boston Fire Department
16  and the other named defendants?
17      A.    No.
18      Q.    Did you ever contact her with the intent
19  to try to get her as a party in this lawsuit?
20      A.    No.
21      Q.    Do you know where she lives or works now?
22      A.    No.
23      Q.    Do you know where Jessica Ahearn lives or
24  works now?

Page 68

1      A.    I know she works for the MBTA.
2      Q.    How about Mary Doherty, do you know Mary
3  Doherty?
4      A.    Yes.
5      Q.    How long have you known Mary Doherty?
6      A.    My whole life.
7      Q.    And have you ever had a conversation with
8  her where she told you that she felt she was the subject
9  of political affiliation discrimination?
10      A.    No.
11      Q.    Did you ask her if she would like to join
12  this lawsuit that you have pending here?
13      A.    No.
14      Q.    Do you believe she was the subject of
15  political affiliation discrimination?
16      A.    Possibly.
17      Q.    What do you base that "possibly" upon?
18      A.    She left because it was monotonous there.
19  You know, she thought she deserved a higher grade, and,
20  you know, she didn't get what she rightfully deserved,
21  so --
22      Q.    And she said that to you?
23      A.    Yes.
24      Q.    When did she say that to you?

18 (Pages 69 to 72)

Page 69

1    A.    I think she was there 2000 -- she was
2  there about -- I want to say 2002, 2003.
3    Q.    Okay, and when did that conversation take
4  place?
5    A.    In her office.
6    Q.    And what was her position?
7    A.    She was the case manager.
8    Q.    Is that that MM5 that we talked about
9  before?
10    A.    Yes.
11    Q.    And you believe she left because she felt
12  the subject of political affiliation discrimination?
13    A.    Yes.
14    Q.    Although she never said that to you?
15    A.    We discussed it.
16    Q.    Okay. Do you know where she lives now?
17    A.    Charlestown.
18    Q.    How about Jane Hickey, do you know Jane
19  Hickey?
20    A.    No.
21    Q.    Do you know from any of whatever
22  information you have or sources you have whether or not
23  she felt that she was the subject of political
24  affiliation discrimination?

Page 70

1    A.    No.
2    Q.    How did you include her in your answer to
3  these interrogatories if you don't know her or know that
4  she felt she was subject to political affiliation
5  discrimination?
6    A.    No, I did have a conversation with Jane
7  Hickey.
8    Q.    You did, so you know her?
9    A.    I don't know her like --
10    Q.    Strike that --
11    A.    When you say "know," are you talking a
12  friend or are you talking an acquaintance?
13    Q.    I'm sorry, I'll be clear on that. You are
14  absolutely right.
15    A.    Everybody that you work with naturally is
16  your acquaintance. Everybody socialized with everybody.
17    Q.    So you are an acquaintance of everyone
18  that is on this answer who is designated as former
19  employees who were subject to political affiliation
20  discrimination?
21    A.    Yes.
22    Q.    And so you had a conversation with Jane
23  Hickey that involved her telling you she felt she was
24  the subject of political affiliation discrimination?

Page 71

1    A.    Yes.
2    Q.    When did that conversation take place?
3    A.    I don't remember the exact date. It was
4  up in the payroll office.
5    Q.    What did she say to you?
6    A.    She filed a grievance to have her position
7  upgraded.
8    Q.    Did you ever tell her that you had filed a
9  lawsuit against the defendants in this case?
10    A.    No.
11    Q.    Did you ever ask her if she would like to
12  be a party to a lawsuit against the defendants in this
13  case?
14    A.    No. The majority of these people left
15  before I filed this case. I don't have any contact with
16  these people.
17    Q.    So you don't have any contact with them?
18    A.    If I needed to, I could probably seek them
19  out, but I don't have contact with them.
20    Q.    How about Marie Howard, did you ever have
21  a conversation with her where she said she felt she was
22  the subject of political affiliation discrimination?
23    A.    No.
24    Q.    Did you ever speak to her about whether

Page 72

1  she wanted to be a party to this lawsuit?
2    A.    No.
3    Q.    Do you know where she lives now?
4    A.    No.
5    Q.    How about Kathryn Kempton, did you ever
6  have a conversation with her where she said that she
7  felt she was the subject of political affiliation
8  discrimination?
9    A.    Yes.
10    Q.    Where did that conversation take place?
11    A.    Third floor.
12    Q.    When did it take place?
13    A.    I'm not sure of the date.
14    Q.    What did she say to you?
15    A.    I mean, this girl had almost her Master's
16  degree; I don't understand why she was wasting her time
17  there anyway, but she was just discouraged that, you
18  know, she couldn't get a position that she was qualified
19  for because someone political came in and took it.
20    Q.    She said that to you?
21    A.    Yes.
22    Q.    You have a memory of that conversation
23  today?
24    A.    Yes.

Page 73

1    Q.    How about Stephanie Long, did you ever
2    have a conversation with her where she said she felt she
3    was the subject of political affiliation discrimination?
4    A.    No, but I had a conversation with her
5    about being sexually harassed by one of the gentlemen.
6    Q.    Okay, well, that's not part of this
7    lawsuit, is it?
8    A.    Okay.
9    Q.    No, I'm asking you, is that part of this
10   lawsuit?
11   A.    I don't know.
12   Q.    You can't ask your attorney for advice
13   here; it's my question, unless he objects or tells you
14   not to answer.
15   MR. FEENEY:  The complaint speaks for
16   itself.
17   MR. HOLMES:  I'm just asking her whether
18   there are some allegations that have not been
19   fleshed out in the complaint, Tom.
20   BY MR. HOLMES:
21   Q.    Are there allegations that you have been
22   sexually harassed by anybody at the Boston Fire
23   Department?
24   A.    Well, being belittled and called "little

Page 74

1    girl" or "kiddo," does that come under sexual
2    harassment?
3    Q.    I ask the questions, unfortunately.
4    A.    I know, but I don't know if that falls
5    under the rules of sexual harassment, because if so,
6    yes, I do have a complaint.
7    Q.    Okay.  All right.  How about Maria Lopez,
8    did you ever have a conversation with her where she felt
9    she was the subject of political affiliation
10   discrimination?
11   A.    Yes.
12   Q.    When was that?
13   A.    Probably a year ago over at 1010 Mass Ave.
14   Q.    What did she say to you?
15   A.    She can't get a position because she's not
16   connected.
17   Q.    Do you know where she lives?
18   A.    No.
19   Q.    Is she still employed by the Boston Fire
20   Department?
21   A.    Wait a minute, Maria Lopez.  No, I'm
22   sorry, there's two Marias.
23   Q.    There is actually two Maria Lopezes in
24   your answers.

Page 75

1    A.    Okay, Maria Lopez no longer works there.
2    Q.    This is on the top half.
3    A.    Sorry, I know there's two Marias, that's
4    why.
5    Q.    That's okay.  There could be two Maria
6    Lopezes, I suspect.
7    MR. FEENEY:  Let's flesh it out now if we
8    can.  It could be a typo.
9    THE WITNESS:  This Maria down here, you
10   can cross -- okay, yeah, you can cross that one
11   out down here, Maria Lopez.
12   BY MR. HOLMES:
13   Q.    That's on the part that says "Present
14   employees who remain who were victims of the
15   administration"?
16   A.    Yes.  She's no longer an employee.
17   Q.    Maria Lopez is not?
18   A.    On this second.
19   Q.    And you recall having a conversation with
20   her where she claimed she felt she was the subject of
21   political affiliation discrimination?
22   A.    Yes.
23   Q.    And that, you said, happened at 1010?
24   A.    1010 Mass Ave.

Page 76

1    Q.    What did she say to you?
2    A.    We were just discussing about positions
3    and we're at a standstill, and she said, you know, "It's
4    who you know around here, not what you know."
5    Q.    And she no longer works for the Boston
6    Fire Department?
7    A.    Wait a minute, this one, no.  I'm getting
8    confused here.  Maria Hernandez does.
9    Q.    Did you ever approach her about being a
10   party to this lawsuit?
11   A.    Yes.
12   Q.    What did she say?
13   A.    She was going through another avenue; she
14   had a different lawyer and she was going through MCAD.
15   Q.    Okay.
16   A.    And Department of Labor.
17   Q.    Okay, how about Sheila Mancuso, did you
18   ever have a conversation with her where she said to you
19   she felt she was the subject of political affiliation
20   discrimination?
21   A.    No.
22   Q.    No conversation.  Do you have any
23   information here today that leads you to conclude that
24   she was the subject of political affiliation

Page 77

1   discrimination?
2       A.   No.
3       Q.   Why is she in this answer then?
4       A.   Because I did have a conversation with
5   her.  She left because she was trying to have a
6   different position, almost similar to everybody else
7   that she left because of the monotonous there, and she
8   wasn't getting paid.  She thought she should have been
9   paid more for the job she was doing.
10      Q.   So you did have a conversation with her?
11      A.   Yes.
12      Q.   Did you ever tell her that you had filed
13  this lawsuit?
14      A.   No.
15      Q.   How about Claire Miller, did you ever have
16  a conversation with her where she stated to you that she
17  felt she was the subject of political affiliation
18  discrimination?
19      A.   No.
20      Q.   Do you have any information here today
21  which leads you to believe that she was the subject of
22  political affiliation discrimination?
23      A.   No.
24      Q.   Why is she on this list?

Page 78

1       A.   Because she did have a conversation with
2   another plaintiff.  She lasted a day or two because she
3   had an altercation with Bob Moran.
4       Q.   But these are your Answers to
5   Interrogatories, and these questions were asked of you.
6       A.   Okay.
7       Q.   So you don't know because you didn't have
8   a conversation with her, but you know her from some
9   other party?
10      A.   Yes.
11      Q.   Who told you that?
12      A.   Mary Kane.
13      Q.   How about Robert Malloy, were you ever
14  party to a conversation where he conveyed to you where
15  he was the subject or felt he was the subject of
16  political affiliation discrimination?
17      A.   Yes.
18      Q.   And when did that conversation take place?
19      A.   I don't recall the exact date, but it
20  would have been on the first floor at headquarters.
21      Q.   And what did he say to you?
22      A.   He was being discriminated; Chief
23  Christian didn't like him.
24      Q.   And he felt that it was politically

Page 79

1   motivated why Chief Christian didn't like him?
2       A.   Yes.
3       Q.   He said those words to you?
4       A.   Yes.
5       Q.   Did you ever approach him about being a
6   party to this lawsuit?
7       A.   No.
8       Q.   Did you ever tell him that you had filed a
9   lawsuit against the defendants named in this suit?
10      A.   No.
11      Q.   Do you know where he lives now?
12      A.   No.
13      Q.   I'm going to finish this list and we'll
14  take a quick break.
15           Steve Morash, M-O-R-A-S-H, did you ever
16  have a conversation with him where he felt he was the
17  subject of political affiliation discrimination?
18      A.   Yes.
19      Q.   Where did that take place?
20      A.   At my desk.
21      Q.   When did it take place?
22      A.   When he was saying goodbye to everybody.
23      Q.   Roughly a year?
24      A.   Whenever he left, not really sure.

Page 80

1       Q.   What did he say to you?
2       A.   He just felt that he was harassed
3   politically, you know, he wasn't the political candidate
4   for the position, and he held the position for
5   20-something years, and they found somebody political to
6   fill his position.
7       Q.   He used those words with you?
8       A.   Yes.
9       Q.   Did you ever tell him that you had filed a
10  lawsuit here against the defendants named in this case?
11      A.   No.
12      Q.   How about Patricia Mulkern, did you ever
13  have a conversation with her where she said to you,
14  conveyed to you that she felt she was the subject of
15  political affiliation discrimination?
16      A.   No.
17      Q.   Were you told by any of the parties to
18  this lawsuit that she ever had those claims?
19      A.   From the plaintiffs?
20      Q.   Yes.
21      A.   Yes.
22      Q.   Who told you that?
23      A.   Jane Green.
24      Q.   And what is it that you learned from Jane

Page 81

1  Green about Ms. Mulkern, her claims?
2      A.   I'm not really sure, to be honest with
3  you.  She mentioned it to me, but I completely forget.
4  I know she wasn't happy, but Jane can elaborate on that.
5      Q.   How about Desiree Russo, did you have a
6  conversation with her where she felt she was the subject
7  of political affiliation discrimination?
8      A.   Yes.
9      Q.   Where did that conversation take place?
10     A.   In her office.
11     Q.   What did she say to you?
12     A.   She was told that if she knows somebody,
13  because she was trying to get a raise, and Bob Moran had
14  told her -- and I was in there with Dan Moriarty as
15  well, the union president -- that it's not what she
16  knows; it's who she knows, and if she knows somebody who
17  can make a phone call, things can happen.
18     Q.   She said that to you?
19     A.   Yes.
20     Q.   Who else was present?
21     A.   Dan Moriarty, the union president.
22     Q.   What year was that?
23     A.   She probably just left last year, I
24  believe, a year, year and a half, she just left.

Page 82

1      Q.   So she left after you filed this lawsuit?
2      A.   Yes.
3      Q.   Did you ever tell her that you had filed a
4  lawsuit on these grounds against the defendants named in
5  this lawsuit?
6      A.   Yes.
7      Q.   And did you ever ask her if she would like
8  to join in?
9      A.   No.
10     Q.   Did she ever express to you her desire to
11  be a party to this lawsuit?
12     A.   Yes.
13     Q.   What did you say in response to that?
14     A.   I gave her Thomas's number.
15     Q.   Do you know if she's ever contacted your
16  attorney to discuss this?
17     A.   I'm not aware, no.
18     Q.   How long ago was it that you gave her your
19  attorney's number?
20     A.   That day.
21     Q.   So we're talking a year, year and a half
22  ago?
23     A.   Actually, no.  They had a going-away party
24  for her upstairs in the second floor conference room,

Page 83

1  and that's when I wrote down the number for her.
2      Q.   Was that a year, year and a half ago?
3      A.   Yeah, just about the time she was leaving,
4  probably a couple of weeks after we had the conversation
5  in her office.
6      Q.   Barbara Ryan, did you ever have a
7  conversation with her where she conveyed to you or
8  expressed to you that she felt she was the subject of
9  political affiliation discrimination?
10     A.   Yes.
11     Q.   Where did that conversation take place?
12     A.   In her office, in the doctor's office.
13     Q.   When did that take place?
14     A.   Probably around October '03.
15     Q.   What did she say to you?
16     A.   She just felt that she wasn't, you know,
17  politically connected and they were bringing somebody
18  in, you know; they harassed her so bad that they
19  actually forced her to leave, and she wasn't happy with
20  it.  She was aware that I was filing a lawsuit, and she
21  said "good for you."  She was aware that I did file it.
22  We had the conversation, and I asked her if she would be
23  interested.
24     Q.   What did she say in response to that?

Page 84

1      A.   To let her know, that she would think
2  about it.
3      Q.   Did you ever give her your attorney's
4  phone number?
5      A.   Yes.
6      Q.   How long ago was that?
7      A.   I don't know when she left; she came in to
8  me because they wanted her to sign a memorandum of
9  understanding between the City and SENA, and I told her
10  I wouldn't sign it, and that was -- I can't even
11  remember when she left, probably '03, not really sure.
12     Q.   You had not filed the suit then but you
13  had already intended to?
14     A.   Yes.
15     Q.   But you remember having that specific
16  conversation where she made those allegations to you?
17     A.   Yes.
18     Q.   How about Gwendolyn Shepard, were you ever
19  a party to a conversation where she conveyed or
20  expressed that she felt she was the subject of political
21  affiliation discrimination?
22     A.   Yes.
23     Q.   Where did that conversation take place?
24     A.   At the switchboard where she worked.

Page 85

1   Q.   She still works at the Boston Fire
2   Department?
3       A.   No, where she worked.
4       Q.   When did that conversation take place?
5       A.   I'm not really sure, to be honest with
6   you.
7       Q.   And what did she say to you?
8       A.   She just said it's politics, you know,
9   it's who you know to get somewhere in here, and she left
10  on that basis.
11      Q.   Have you ever contacted her to tell her
12  that you instituted this action against the named
13  defendants in this case?
14      A.   No.
15      Q.   Do you know where she lives now?
16      A.   South Carolina or North Carolina, not
17  sure.
18          MR. HOLMES:  Let's take a break for a few
19  minutes.
20          (Brief recess.)
21          MR. HOLMES:  Back on the record.
22  BY MR. HOLMES:
23      Q.   If I could just step back for one second
24  because I didn't have a copy of the third amended

Page 86

1   complaint in this lawsuit, and there are just a couple
2   of other defendants that I didn't ask you about.  I
3   would just like to go back to that for a second.
4          What actions of Chief Keating do you feel
5   happened that were politically motivated that resulted
6   in political affiliation discrimination?
7       A.   Kay MacMillen and I have been trying to
8   get upgraded since at least 2000.  Kay MacMillen was
9   under Chief Keating at the time.  Chief Keating moved on
10  to a different division and then he became the chief of
11  personnel.
12          Karen Cunningham got hired, and like I
13  said, she came in as an R-9.  She negotiated a step 3,
14  where everybody else starts off at a step 1.  He
15  initiated her to help out the doctor's office doing drug
16  testing on potential firefighters, you know, coming on
17  the job, which is he changed her complete job
18  description without going through the union.  I brought
19  that to the union's attention, and then he bragged to
20  Kay MacMillen and myself about getting Karen
21  Cunningham -- it's called a compensation grade appeal.
22  She filed in July of '06, and she was awarded that
23  through Richie Driscoll in October and it was retro to
24  July.

Page 87

1       Q.   You are saying that was a decision made by
2   Keating?
3       A.   Yes.
4       Q.   And it was politically motivated?
5       A.   Yes.
6       Q.   And the Kay MacMillen you are taking
7   about, is that Katherine MacMillen?
8       A.   Yes.
9       Q.   Now, with respect to Commissioner Fraser,
10  what exactly is it that you claim that he did that
11  discriminated against you because of political or
12  nonpolitical affiliations?
13      A.   I feel that Commissioner Fraser is just
14  carrying on the -- I don't know what you could call it
15  there, the old schoolboy network, he's just carrying on;
16  it's just repetitious behavior that --
17      Q.   Well, that's an answer, but again, it's
18  not the answer to the question.
19      A.   I know.  I'm trying to --
20      Q.   What did he do to you?
21      A.   I went up for an interview with him, and I
22  never -- in all my life that I have been there, all the
23  years I have been at the Fire Department, I've never
24  been interviewed by a Commissioner.  And ironically,

Page 88

1   when I was interviewed by Commissioner Fraser, I felt
2   like I was being deposed rather than interviewed with
3   him, and I was insulted by that, by him and Kathleen
4   Kirleis, if I was politically affiliated, who I knew at
5   the mayor's office, do I know anybody at City Hall.  I
6   felt like it was an interrogation more than -- because
7   he went off of Chief Keating's -- because when I went in
8   to the office to meet with the Commissioner, Chief
9   Keating had went in there probably a few seconds before
10  I was going in there, and they stopped me from going in
11  there.  And Chief Keating shut the door and was in there
12  for probably five to ten minutes with Kathleen Kirleis
13  and the Commissioner.  And there is no way that Roderick
14  Fraser would know anything about me, other than Chief
15  Keating, you know, filling him in on my name because he
16  was very curious when he started to come down and
17  personally introduce himself and, "Oh, are you Denise?"
18          And I just feel like people had given him
19  information about me, you know, and it's making it
20  personal, and I feel like, you know, the Commissioner is
21  taking their word for it because he's on the same fence
22  as them where I'm on the opposite side of the fence.
23          And I feel like Commissioner Fraser should
24  make his own judgment on people rather than go on that.

## Page 89

1   So I feel like he already made his decision about me;
2   and I -- like I said, I'm insulted by that because when
3   I went into his office to have that interview, it was an
4   interrogation; it was not an interview by any means
5   because he didn't ask me one question about my job,
6   didn't ask me one question about the job for arson. It
7   was just all about who I know and how did I get my job,
8   you know, probably 15 to 25 questions and they were
9   totally irrelevant for the job interview.
10      Q.   Didn't he offer you an R-15 position after
11  meeting with you?
12      A.   No.
13      Q.   And when was this interview?
14      A.   Around September '06.
15      Q.   '06. And you have a memory here today
16  that he asked you who you were politically connected
17  to --
18      A.   Yes. I'm sorry.
19      Q.   That's okay. He did have -- you have a
20  memory of him asking you those questions?
21      A.   Yes.
22      Q.   What did you say back in response?
23      A.   I asked him if I was being deposed or if I
24  was being interviewed. I felt like I was being deposed.

## Page 90

1   And he said I like to know my employees; I take
2   confidentiality very serious, and I want to know who is
3   going to be -- you know, there is a leak out in the
4   media and I want to know if confidentiality is important
5   to you, which it is.
6       Q.   How about with respect to defendant Joseph
7   Finn, Deputy Chief Finn, what exactly are you claiming
8   against him? What facts are you basing your opinion on
9   that he has politically discriminated against you?
10      A.   Again, he used his authority as the chief
11  of personnel to get his secretary an upgrade. In the
12  meantime, my boss, Chief Granara and Chief Shea for two
13  years was trying to get Kay MacMillen's and my position
14  upgraded to where it rightfully should be, and he told
15  Bart Shea to leave Bob Moran alone. He told Bart Shea,
16  right in the office, you know, it's not about what they
17  know; it's about who they know. Do they know anybody?
18  It's about politics.
19      Q.   Who is Bart Shea?
20      A.   He's Chief Bartholomew Shea.
21      Q.   And he's also --
22      A.   He was working in the office at the time.
23      Q.   Okay.
24      A.   And he was going and meeting with Bob

## Page 91

1   Moran. Chief Granara and Chief Shea went in and Bob
2   Moran was walking them through everything that they
3   needed to submit to him. He calls it ammunition to
4   bring to City Hall so, you know, so you can get an
5   upgrade. And Chief Finn didn't have to do that avenue
6   because he was chief of personnel and he knew the people
7   up at City Hall. His secretary went from an R-15 to an
8   R-17; he didn't have to go through the process that we
9   had to go through.
10      Q.   How about as it pertains just to you, did
11  he ever make a decision that you are aware of directly
12  about anything that you were applying for?
13      A.   Yes, he stopped us from applying for -- to
14  have our positions upgraded.
15      Q.   Fill me in. I don't understand that. How
16  did he do that?
17      A.   He was the chief of personnel. When he
18  makes a direct command, you have to respect that
19  command.
20      Q.   Is that a command that was conveyed to
21  you?
22      A.   Yes, to leave Bob Moran alone; it's dead
23  fish in the water is exactly what he said.
24      Q.   He said that to you?

## Page 92

1       A.   Yes, me and Kay MacMillen.
2       Q.   And Kay MacMillen was present at the
3   time --
4       A.   Yes.
5       Q.   -- with you?
6       A.   Yes.
7       Q.   Okay, back to Answers to Interrogatories.
8   No. 14; the second portion of your answer states
9   "Present employees who remain" -- there's a word
10  "W-H-E," I don't know what that means -- who remain were
11  victims of the administration's political affiliation
12  discrimination.
13      A.   Can I look at it?
14      Q.   Yes, please.
15          MR. FEENEY: If I may correct, we can fix
16      the typo. Cross out the word "remain" and
17      "W-H-E."
18          MR. HOLMES: I got you. Okay. All set?
19          THE WITNESS: Yes.
20  BY MR. HOLMES:
21      Q.   The first person is JoAnn Donovan Allaine.
22      A.   Yes.
23      Q.   Did you ever have a conversation with her
24  where she conveyed to you that she felt she was the

Page 93

1   subject of political affiliation discrimination?
2       A.   Yes.
3       Q.   Where did that conversation take place?
4       A.   Up on the second floor.
5       Q.   When did it take place?
6       A.   Just about -- I want to say 2003.
7       Q.   Did you initiate the conversation or did
8   she?
9       A.   I don't remember.
10      Q.   How did it come up in the conversation?
11      A.   She was just saying she was sick and tired
12  of the way things were being run.
13      Q.   Was it in response to a question by you?
14      A.   I don't recall the entire conversation.
15      Q.   Okay.  Was anyone else present at the
16  time?
17      A.   No, it was just her and I.
18      Q.   Was this during work hours?
19      A.   I believe it was lunch.
20      Q.   Did you ever convey to her that you had
21  filed a lawsuit on this?
22      A.   Yes.
23      Q.   And did she ever express any interest in
24  being a party to the lawsuit?

Page 94

1       A.   I didn't really ask her.
2       Q.   Did she ever ask for any information about
3   who your attorney was?
4       A.   No.
5       Q.   And the desire to speak to him?
6       A.   No, she made a comment about something
7   needs to be done about this place, and I said I'm going
8   to try to -- I said, you know, I'm going to file a suit,
9   you know, she just said, "I hope something happens out
10  of it."  And I told her that Chief Hitchcock was upset
11  with me.
12      Q.   Why did you feel Chief Hitchcock was upset
13  with you?
14      A.   He told me he wished that I wasn't the one
15  to initiate this, to let someone else do it.
16      Q.   Do you have an understanding of why he
17  said that to you?
18      A.   Because he's afraid of Paul Christian.
19      Q.   Does Chief Hitchcock still work there?
20      A.   No.  At the time he did.
21      Q.   I'm just asking now.
22           But she never expressed any interest in
23  being a party to this lawsuit?
24      A.   We had a couple of other conversation.  I

Page 95

1   believe everybody is aware because it was in the
2   newspaper that this lawsuit is, you know, but I don't
3   really go around talking about it.
4       Q.   You know, you raise a newspaper article;
5   did anybody come forward to say that they would like to
6   be a party to the lawsuit after they read --
7       A.   Yes.  I know.
8       Q.   That's okay, happens all the time.
9       A.   Sorry.
10      Q.   Believe me, when you do this job, it
11  happens all the time.
12           Let me just go back and ask the question
13  again.  After reading the newspaper article, did people
14  come forward to you and express an interest to be a
15  party to the lawsuit?
16      A.   Yes.
17      Q.   And who were those people?
18      A.   It was Jane Green and I that initiated the
19  lawsuit, and Patricia McDonough, Betty Golden, Elizabeth
20  Golden, Mary Kane, Elaine Mesiti, Judith Kelley, Lila
21  Brown joined in on it.
22      Q.   Did anybody else come forward and express
23  an interest to be a party to the lawsuit?
24      A.   A few people have.

Page 96

1       Q.   Who was that?
2       A.   Katherine MacMillen, Joanne Callahan,
3   Angela Marshall, Cathy Moore had displayed an interest.
4       Q.   So who was it, Cathy Moore, Katherine
5   MacMillen, Joanne Callahan?
6       A.   Yes.
7       Q.   Those are the three?  Did I miss someone?
8       A.   Cathy Moore, Angela Marshall, Katherine
9   MacMillen, Joanne Callahan.
10      Q.   The four of them?
11      A.   And Irene Burke.
12      Q.   Okay, let's go down this; we will take a
13  little sidestep here; when did Irene Burke convey an
14  interest to be a party to the lawsuit to you?
15      A.   Just probably about September of '06,
16  September, October '06.
17      Q.   Do you know if she's contacted your
18  attorney about being a party to this lawsuit?
19      A.   No.
20      Q.   You do not know?
21      A.   No, I do not know.
22      Q.   She still works at the Fire Department?
23      A.   Yes.
24      Q.   Does she work in the building you work in?

Page 97

1    A.    No, she works at the Arson Division.
2    Q.    How about Joanne Callahan, when did she
3  express any interest to be a party to this lawsuit?
4    A.    When the newspaper article came out.
5    Q.    How much after that?
6    A.    She was in the next newspaper article, the
7  second one. I really don't know, to be honest with you,
8  what the date was.
9    Q.    But it was within that timeframe?
10   A.    Yes.
11   Q.    Did she express a desire to be a part of
12 the lawsuit?
13   A.    Yes.
14   Q.    She's not a part of the lawsuit now, is
15 she?
16   A.    I don't believe so.
17   Q.    And did you give her the name or address
18 of your attorney?
19   A.    Yes.
20   Q.    And do you know if she's expressed any
21 interest to be a party to this lawsuit?
22   A.    Yes.
23   Q.    Do you know if she's going to be a party
24 to the lawsuit?

Page 98

1    A.    I'm not sure.
2    Q.    When did she express this interest most
3  recently to you?
4    A.    I haven't spoken to her since that
5  article.
6    Q.    Does she work in your building?
7    A.    No, she works over at Arson.
8    Q.    She's also in Arson?
9    A.    She just recently started over there.
10   Q.    Where did she work before that?
11   A.    Headquarters.
12   Q.    Where you work?
13   A.    Arson is headquarters but it's two
14 different buildings.
15   Q.    Okay.
16   A.    Like, headquarters falls on South Hampton
17 Street, and the back of the building is Mass Ave but
18 it's headquarters.
19   Q.    You can walk between buildings?
20   A.    Yes.
21   Q.    And when was the most recent time that she
22 expressed interest to be a part of the lawsuit?
23   A.    When the first newspaper article.
24   Q.    And I believe you said Katherine, who you

Page 99

1  call Kay MacMillen, also expressed interest?
2    A.    Yes.
3    Q.    And was that because of the article also
4  or because of your conversations with her?
5    A.    A little of both.
6    Q.    And do you know if she's contacted your
7  attorney?
8    A.    No.
9    Q.    You don't know or she hasn't?
10   A.    I don't know.
11   Q.    Okay. Did you ever ask her -- strike
12 that.
13         Have you asked her in the last six months
14 whether or not she was going to be a party to this
15 lawsuit or join in this lawsuit?
16   A.    No.
17   Q.    Angela Marshall, I believe, is also
18 another name, correct?
19   A.    Yes.
20   Q.    Has she expressed an interest to be a
21 party to this lawsuit?
22   A.    Yes, she actually sought me out, called
23 me, asked me for my attorney's number.
24   Q.    And how long ago was that?

Page 100

1    A.    Probably two months ago.
2    Q.    Do you know if she's contacted your
3  attorney?
4         MR. FEENEY: Objection. Attorney-client
5         privilege if you're asking her to tell you what
6         she talked about me --
7         MR. HOLMES: That's fine.
8  BY MR. HOLMES:
9    Q.    Did Ms. Marshall ever convey to you that
10 she contacted your attorney?
11   A.    No.
12   Q.    Cathy Moore, M-O-O-R-E, with a C for the
13 first name, did she ever express interest to you that
14 she wanted to be a party to this lawsuit?
15   A.    She contacted me at my desk to ask me for
16 my attorney's number.
17   Q.    How long ago was that?
18   A.    When the article came out, the first
19 article. I'm sorry, I just don't know the dates.
20   Q.    That's what I was going to ask you.
21   A.    I have the article, but I don't know the
22 date offhand.
23   Q.    Do you know what year that was even?
24   A.    If I filed it in 2003, maybe it was '04 or

## Page 101

1  '05.
2      Q.    And that's when she first made initial
3  contact?
4      A.    Yes.
5      Q.    Did you provide the attorney's name and
6  number to her at the time?
7      A.    Yes.
8      Q.    And in any conversations you had with her,
9  did you have the understanding at all that she's
10 contacted your attorney?
11     A.    I'm not sure if she contacted him.
12     Q.    All right, back to the list. Janice Boyle
13 and there's a zero.
14     A.    I think that's a typo.
15         MR. FEENEY:  Those are open and closed
16 parens.  They should be crossed off.
17         MR. HOLMES:  Sorry, I don't understand
18 that.  They should be open and closed parens
19 around Boyle?
20         MR. FEENEY:  No, at the end of Janice
21 Boyle, there is an open and closed paren; those
22 should be deleted.  That's a typographical error.
23         MR. HOLMES:  All right.
24 BY MR. HOLMES:

## Page 102

1      Q.    Does she currently work at the Boston Fire
2  Department?
3      A.    Yes.
4      Q.    Have you ever been in a conversation with
5  her, you personally, where she expressed to you that she
6  felt she was the victim of political affiliation
7  discrimination?
8      A.    No.
9      Q.    Has she ever expressed it to anyone you
10 know who is a party to this lawsuit?
11     A.    I'm not sure; I'm not aware.
12     Q.    Why is she on this list?
13     A.    Like I said, somebody else could have put
14 her.
15     Q.    But these are your answers.
16     A.    You can take her off.
17     Q.    Okay.  Crystal Bradeen, B-R-A-D-E-E-N, and
18 Crystal with a C, did you ever have a conversation with
19 her where she expressed to you or conveyed to you that
20 she felt she was the victim of political affiliation
21 discrimination?
22     A.    No.
23     Q.    Did any of the other plaintiffs in the
24 lawsuit tell you that she expressed that to them?

## Page 103

1      A.    I don't believe so.
2      Q.    Why is she on this list?
3      A.    I had conversations with her about it,
4  about just positions and, you know, I don't know if
5  Crystal is politically affiliated.  You know what, I'm
6  sorry, I did have a conversation with Crystal about
7  political affiliation.
8      Q.    And when was that?
9      A.    It just seemed like when the article came
10 out, that's when everybody started coming up and
11 questioning me, probably about the same time.
12     Q.    Did she express to you that she felt she
13 had been discriminated against because of political
14 affiliation?
15     A.    Yes.
16     Q.    And where did that conversation take
17 place?
18     A.    I believe at my desk.
19     Q.    And was that during working hours,
20 obviously?
21     A.    I don't remember, to be honest with you,
22 could be in my area or something, if I was walking
23 around or something.
24     Q.    Did she initiate the conversation or did

## Page 104

1  you?
2      A.    Usually if Crystal comes, Crystal comes
3  from the third floor, you know.  I don't go anywhere in
4  the building but my desk, so --
5      Q.    So it's your testimony that she must have
6  initiated the conversation?
7      A.    Obviously.
8      Q.    Irene Debbie Burke, were you ever in a
9  conversation where she expressed or conveyed to you that
10 she felt was she was a victim of the administration's
11 political affiliation discrimination?
12     A.    Yes.
13     Q.    And when did that conversation take place?
14     A.    Over at the Arson Division when I was --
15 after I interviewed or when I was waiting to be
16 interviewed.  I was sitting in her office waiting for
17 the other person to come out, and they had me sitting in
18 with her, and we had a conversation about it.
19     Q.    Is that the R-15 position that you applied
20 for?
21     A.    Yes.
22     Q.    Did she initiate the conversation or did
23 you?
24     A.    I don't recall.

Page 105

```
 1      Q.   What did she say to you?
 2      A.   We were talking about the position being
 3  demoted, and, you know, a comment was made that I
 4  changed the job description. I don't really remember,
 5  but it was a conversation about the job title, the Arson
 6  position that I was applying for, and, you know, it
 7  took -- she was just discouraged because it took her
 8  forever to get where she was and she almost didn't get
 9  the position, and she was pretty upset.
10      Q.   She got the position though?
11      A.   She did.
12      Q.   We went through Joanne Callahan. How
13  about Linda Collins, did you ever have a conversation
14  with her where she conveyed or expressed to you that she
15  felt she was a victim of political affiliation
16  discrimination?
17      A.   Yes.
18      Q.   Where did that conversation take place?
19      A.   I believe at lunchtime. I'm not sure; it
20  was, you know, like I said, everybody came up to me
21  after the article came out, and she was doing the
22  payroll position, and she went on vacation and they
23  threw Carol Petta in her position.
24      Q.   Was she discharged, Linda Collins?
```

Page 106

```
 1      A.   She was stripped from all her -- she did
 2  payroll for over 25 years. She went on vacation, and
 3  they threw Carol Petta in her position.
 4      Q.   Was she discharged?
 5      A.   No.
 6      Q.   Did they find a job for her?
 7      A.   Just little odds and ends, I guess.
 8      Q.   Does she still work at the Boston Fire
 9  Department?
10      A.   Yes.
11      Q.   She wasn't suspended or anything?
12      A.   No, she's a great worker.
13      Q.   Did she ever express any interest to you
14  about being part of this lawsuit?
15      A.   Yes.
16      Q.   She did. That's right. Did you convey to
17  her the name and address of your attorney?
18      A.   I don't believe I did.
19      Q.   Did she ever ask you more than once that
20  she wanted to be a part of this lawsuit?
21      A.   Yes, she was very upset.
22      Q.   So you had more than one conversation
23  about being a party to this lawsuit?
24      A.   Yes.
```

Page 107

```
 1      Q.   And you don't recall whether she ever
 2  asked for information about your attorney? You have to
 3  say yes or no.
 4      A.   I'm trying to think.
 5      A.   It's okay.
 6      A.   No, I don't remember, no.
 7      Q.   Linda Cleary, have you ever been a part of
 8  a conversation where she expressed to you that she felt
 9  she was a victim of political affiliation
10  discrimination?
11      A.   No.
12      Q.   Are you aware of any conversations she had
13  with any of the other plaintiffs in this lawsuit where
14  there was conversation that she conveyed that she felt
15  he was a victim of political affiliation discrimination?
16      A.   No.
17      Q.   Why is she on this list?
18      A.   I think it was just a list of all people.
19  I think there was a little confusion with some people,
20  when it comes to discrimination, I think these people
21  were discriminated but not all political affiliated
22  discrimination, you know.
23      Q.   Okay, got you. What was the other type of
24  discrimination then that these people conveyed to you?
```

Page 108

```
 1      MR. FEENEY:  We are talking about Linda
 2  Cleary?
 3      MR. HOLMES:  Yes, other than political
 4  affiliation discrimination.
 5      THE WITNESS:  Just discrimination in
 6  general.  I'll give you a little scenario.
 7  BY MR. HOLMES:
 8      Q.   Before the scenario, if you just answer my
 9  question.
10      A.   What kind of discrimination?
11      Q.   Yes.
12      A.   From just being bypassed for positions
13  that you rightfully are qualified for.
14      Q.   Okay.  I'm sorry, you don't have to give
15  me the scenario.
16      A.   No.
17      Q.   Carol Connors, did you ever have a
18  conversation with her, part of a conversation with her
19  where she conveyed to you that she felt she was a victim
20  of political affiliation discrimination?
21      A.   Yes.
22      Q.   When did that conversation take place?
23      A.   I would have to say '03.
24      Q.   What did she say to you, or he?
```

|  | Page 109 |
|---|---|
| 1 | A.   It's a woman. |
| 2 | Q.   Okay.  Thank you. |
| 3 | A.   She was highly upset about, you know, not |
| 4 | getting jobs and people from outside, you know, that |
| 5 | connected to somebody go into a higher position than |
| 6 | her. |
| 7 | Q.   And where did this conversation take |
| 8 | place? |
| 9 | A.   I believe it was in the main lobby.  I |
| 10 | think she was having a cigarette break, and I happened |
| 11 | to be walking by. |
| 12 | Q.   Did you initiate the conversation or did |
| 13 | she, with respect to this lawsuit? |
| 14 | A.   I don't remember. |
| 15 | Q.   Did she ever express any interest to you |
| 16 | about being a party to this lawsuit? |
| 17 | A.   Yes. |
| 18 | Q.   And did she ever ask for the name or |
| 19 | address of your attorney? |
| 20 | A.   Yes. |
| 21 | Q.   Did you give it to her? |
| 22 | A.   Yes. |
| 23 | Q.   This is back in 2003? |
| 24 | A.   Yes. |

|  | Page 111 |
|---|---|
| 1 | THE WITNESS:  It was '05? |
| 2 | MR. FEENEY:  Yes. |
| 3 | THE WITNESS:  Because when I was doing the |
| 4 | Arson MM5 job and I stopped, they gave it to |
| 5 | Carol Petta.  And I had the conversation that I |
| 6 | didn't hire an attorney, and I believe it was |
| 7 | '03. |
| 8 | BY MR. HOLMES: |
| 9 | Q.   Okay, Katy Donovan. is that -- |
| 10 | A.   Katy Donovan. |
| 11 | Q.   Katy Donovan, were you ever part of a |
| 12 | conversation where she expressed to you or somebody in |
| 13 | this conversation that she felt she had been the victim |
| 14 | of administration's political affiliation |
| 15 | discrimination? |
| 16 | A.   Yes. |
| 17 | Q.   Where did that conversation take place? |
| 18 | A.   When she was training me for that |
| 19 | position. |
| 20 | Q.   For which position? |
| 21 | A.   The acting MM5 case manager. |
| 22 | Q.   What did she say to you? |
| 23 | A.   She was very upset, just like everybody |
| 24 | else, that, you know, political people seem to get the |

|  | Page 110 |
|---|---|
| 1 | Q.   Do you know from any conversations you had |
| 2 | with her, do you know whether or not she had contacted |
| 3 | your attorney? |
| 4 | A.   No. |
| 5 | Q.   You do not know? |
| 6 | A.   I do not know. |
| 7 | MR. FEENEY:  If I can interject, clarify |
| 8 | something.  You mentioned this is back in 2003; |
| 9 | you are basing that on her earlier testimony that |
| 10 | she filed the complaint in '03? |
| 11 | MR. HOLMES:  No, she just said that the |
| 12 | conversation she had with Carol Connor was in |
| 13 | '03. |
| 14 | THE WITNESS:  I don't remember the exact |
| 15 | date. |
| 16 | MR. FEENEY:  I just want to clarify |
| 17 | something; is that the '03 -- if I could? |
| 18 | MR. HOLMES:  Sure, please. |
| 19 | MR. FEENEY:  The '03 that you had |
| 20 | mentioned before, that was based on your |
| 21 | understanding that we filed the complaint in '03? |
| 22 | THE WITNESS:  Was it '03 or '04? |
| 23 | MR. FEENEY:  The complaint was filed in |
| 24 | '05. |

|  | Page 112 |
|---|---|
| 1 | jobs over qualified people who have been employed there. |
| 2 | Q.   Did she initiate that statement or did you |
| 3 | ask her? |
| 4 | A.   No, she initiated it. |
| 5 | Q.   Does she still work at the Boston Fire |
| 6 | Department? |
| 7 | A.   Yes. |
| 8 | Q.   Did she ever express any interest to be a |
| 9 | part of the lawsuit that you filed here? |
| 10 | A.   I know she thought about it, but I'm not |
| 11 | sure.  I never had a conversation with her after. |
| 12 | Q.   How do you know she thought about it? |
| 13 | A.   Because we had a conversation. |
| 14 | Q.   Okay, and that was -- the conversation you |
| 15 | had with her was after you filed the lawsuit? |
| 16 | A.   Yes. |
| 17 | Q.   How about Patricia Fiasconaro, did you |
| 18 | ever have a conversation with her where she expressed |
| 19 | she felt like she was the victim of political |
| 20 | affiliation discrimination? |
| 21 | A.   I never had a conversation with her. |
| 22 | Q.   Did you know of anyone else who did and |
| 23 | who is a party to this lawsuit? |
| 24 | A.   I'm not sure. |

Page 113

1    Q.    Why is she in the answer to this question?
2    A.    Like I said, you know, I think there was a
3  little confusion with discrimination and political
4  discrimination, and I just listed everybody who was
5  discriminated against. I didn't realize it had to be
6  political affiliation discrimination.
7    Q.    And you feel that your case is political
8  affiliation discrimination, is that how I'm to
9  understand it, or the other type of discrimination?
10   A.    Yes. I know, I'm --
11   Q.    I know, I was saying two things; we were
12  both talking at the same time. Is it your testimony
13  here today that your claim is political affiliation
14  discrimination only or other forms of discrimination in
15  there also?
16   A.    And other forms of discrimination.
17   Q.    Okay. And the other forms of
18  discrimination are?
19   A.    Being bypassed for, you know, when you are
20  a qualified person and you are already employed there
21  and people are being hired that don't have the minimum
22  qualifications, you know, that are required, and they
23  get the job because they know so and so, you know.
24   Q.    Back to the list, we're almost done.

Page 114

1  Sharon Green. It says Karen on my answer but your
2  attorney corrected this at the beginning of the
3  deposition.
4       Sharon Green, did you ever have a
5  conversation with her where she expressed to you that
6  she felt she was the victim of political affiliation
7  discrimination?
8    A.    No.
9    Q.    Do you know if any other plaintiffs have
10  had a conversation?
11   A.    No.
12   Q.    You do not know?
13   A.    No, I'm not sure.
14   Q.    Do you have an opinion here today that she
15  was the victim of some other type of discrimination?
16   A.    She is discriminated against.
17   Q.    What do you base that on?
18   A.    She tried to have her -- you know, like my
19  boss, her boss, John Perry, tried to have her job, her
20  position upgraded to where it should be to no avail.
21  She was denied. You know, it seems like the people that
22  should be compensated don't get compensated, and the
23  people that, you know, are political get everything
24  handed to them, and it's like a revolving door lately,

Page 115

1  and I feel like she earned her years there; she is a
2  great employee; she does her job; she's there every day,
3  and I think she should be compensated for being a
4  positive employee. And I feel like they discriminated
5  against her because she's only R-15 and she's been there
6  over 15 years.
7    Q.    All right. Coretta Henry-Gardiner, were
8  you ever party to a conversation with her where she
9  expressed to you that she felt that she was a victim of
10  political affiliation discrimination?
11   A.    No.
12   Q.    Do you know if any of the other plaintiffs
13  in this lawsuit, have they ever expressed to you that
14  they were in a conversation where she expressed that she
15  felt she was a victim of this discrimination?
16   A.    I don't recall.
17   Q.    Do you believe that she was discriminated
18  against?
19   A.    Yes.
20   Q.    And what do you base that on?
21   A.    Bypassed for a position she's qualified
22  for.
23       MR. FEENEY: Can I interject?
24       MR. HOLMES: Sure.

Page 116

1       MR. FEENEY: Clear it up now, instead of
2  later. You testified that you have been bypassed
3  for upgrades or promotions. Is it your testimony
4  that they have been bypassed because they are not
5  politically connected or sponsored by somebody in
6  power in the administration and that's the reason
7  why they have been bypassed?
8       THE WITNESS: Yes. I know it's political.
9       MR. FEENEY: And so -- and I'm trying to
10  clarify that there's been a distinction made, and
11  I think there is a bit of confusion here because
12  you are using the word "political," and when she
13  responds, I'm hearing that she's saying that in
14  fact these people, for example, Sharon Green was
15  attempting to upgrade and was denied. Why do you
16  think she was denied, because she was not
17  politically connected?
18       THE WITNESS: I don't know why was
19  denied.
20       MR. FEENEY: Or otherwise sponsored by
21  somebody in power?
22       THE WITNESS: I really don't know.
23       MR. FEENEY: Okay.
24       MR. HOLMES: Thank you. I think her

30 (Pages 117 to 120)

|  | Page 117 |
|---|---|

1  testimony speaks for itself on this one, Tom.
2  BY MR. HOLMES:
3  Q.  Paula Hamilton, were you ever a part of a
4  conversation with her where she expressed to you that
5  she felt she was a victim of political affiliation
6  discrimination?
7  A.  Yes.
8  Q.  When did that take conversation take
9  place?
10  A.  I don't recall the exact time and place,
11  but I remember the conversation.
12  Q.  Where did it take place?
13  A.  I think we were in the lunch room.
14  Usually most conversations are in the lunch room.
15  Q.  What did she say to you?
16  A.  She was very upset because she applied for
17  the director of payroll, and, you know, she was well
18  qualified, and she was the acting payroll, and Carol
19  Petta was appointed the position.
20  Q.  Okay, and was that -- in that
21  conversation, did she feel that that was a political
22  decision from the administration from outside the Fire
23  Department?
24  A.  Yes, we believe she -- Carol Petta is very

|  | Page 119 |
|---|---|

1  A.  You know, like myself, she applied for
2  positions she was more than qualified for and somebody
3  that had political ties was handed the position.
4  Q.  That's what she said to you?
5  A.  Yes.
6  Q.  And these were people from outside of the
7  Boston Fire Department who were given these jobs that
8  she applied for?
9  A.  Yes.
10  Q.  Did she ever express any interest to be a
11  part of the lawsuit that you filed that we are here for
12  today?
13  A.  Yes.
14  Q.  Did she ever ask for the name and identity
15  of your attorney?
16  A.  Not at the time.
17  A.  Not at the time?
18  A.  Not at the time.
19  Q.  And this is back in '04, '05?
20  A.  Uh-huh.
21  Q.  Have you ever spoken to her about it again
22  after '04 or '05?
23  A.  No.
24  Q.  Katherine MacMillen we've spoken about.

|  | Page 118 |
|---|---|

1  good friends with Angela Menino.  She's a very powerful
2  person, Carol Petta.
3  Q.  And she said to you that that's what she
4  felt, that Carol Petta got the job because she was
5  friends with Angela Menino?
6  A.  No, she just said she was politically
7  connected.  She didn't specify, but that's what Carol
8  Petta's influence is.
9  Q.  Maria Hernandez, did you ever have a
10  conversation with her where she expressed to you that
11  she felt she was the victim of the administration's
12  political affiliation discrimination?
13  A.  Yes.
14  Q.  When did that take place?
15  A.  It was at a union meeting.
16  Q.  When exactly?
17  A.  A couple of years ago.
18  Q.  Can you be more specific?
19  A.  Around -- I want to say '04, '05.
20  Q.  And what did she say to you?
21  A.  In regards to?
22  Q.  The statement about feeling like she was a
23  victim of the administration's political affiliation
24  discrimination.

|  | Page 120 |
|---|---|

1  She expressed to you that she felt she was a victim of
2  the administration's political affiliation
3  discrimination?
4  A.  Yes.
5  Q.  Angela Marshall, you talked about earlier,
6  and she also expressed to you that she felt she was a
7  victim of the administration's political affiliation
8  discrimination?
9  A.  Yes.
10  Q.  And not other discriminations, political
11  affiliation discrimination?
12  A.  Yes.
13  Q.  And that she applied for jobs that she did
14  not get because somebody else from outside got the job
15  who was more connected?
16  A.  Yes.
17  Q.  Cathy Moore we talked about.  Did I just
18  do Angela Marshall?
19  A.  You did Angela Marshall.
20  Q.  Thank you.  Cathy Moore, we talked about
21  her, and she felt that she was a victim of the
22  administration's political affiliation discrimination?
23  A.  Yes.
24  Q.  She said that to you?

## Page 121

1    A.   Yes.

2    Q.   Okay. Marta Poupart, were you ever a part

3 of a conversation where she was -- where she expressed

4 to you that she felt she was a victim of the

5 administration's political affiliation discrimination?

6    A.   Yes.

7    Q.   When did that take place?

8    Probably about two years ago, 2005.

9    Q.   Did she -- what did she say to you?

10    A.   Same thing, she applied for positions that

11 she was qualified for and somebody from the outside of

12 the Fire Department was hired for the positions.

13    Q.   And did you ever tell her that you had

14 intended or had filed a lawsuit in this matter?

15    A.   I did, but she has her own lawyer and she

16 is going her own avenue.

17    Q.   Do you know if she's filed suit on that

18 matter?

19    A.   I believe so.

20    Q.   And Barbara Powers, have you ever had a

21 conversation with her where she expressed that she had

22 been the victim of the administration's alleged

23 political affiliation discrimination?

24    A.   Yes.

## Page 122

1    Q.   And when did that take place?

2    A.   Roughly about two years ago.

3    Q.   And where did that take place?

4    A.   I believe it was at a retirement party

5 that we had for somebody.

6    Q.   What did she say to you?

7    A.   She was sick and tired of being qualified

8 and unqualified candidates were coming in and getting

9 the position.

10    Q.   Coming from the outside?

11    A.   Yes.

12    Q.   Did you ever tell her about the lawsuit

13 that you had filed or intention of filing a lawsuit when

14 you had this conversation?

15    A.   No, she actually brought it to my

16 attention about the paper; she read the article.

17    Q.   Did she ever express any interest to be a

18 party to the lawsuit?

19    A.   No.

20    Q.   Did you ever give her the name and

21 identity of your attorney?

22    A.   No.

23    Q.   Luz Rivera, did you ever have a

24 conversation with her where she expressed to you that

## Page 123

1 she felt she was a victim of the administration's

2 political affiliation discrimination?

3    A.   Yes.

4    Q.   When did that take place?

5    A.   When we were going to labor relations for

6 a grievance of Michelle Urso's position.

7    Q.   That's the one that had the arbitration

8 hearing ultimately?

9    A.   Yes.

10    Q.   What did she say?

11    A.   She was upset, the same scenario, that

12 somebody from outside who doesn't meet the minimum

13 qualifications, somebody from outside was coming in and

14 taking over the job.

15    Q.   Got it. Took over a job that she had

16 applied for?

17    A.   Yes.

18    Q.   And did she ever express any interest to

19 you about being part of the lawsuit which you intended

20 to file or did file?

21    A.   Yes.

22    Q.   And what did she say to you?

23    A.   I haven't spoken to her since; she got an

24 upgrade up in payroll with Carol Petta.

## Page 124

1    Q.   Did she ever ask for the name or identity

2 of your attorney?

3    A.   No.

4    Q.   Jennifer Ryan, did you ever have a

5 conversation with her where she expressed to you that

6 she felt she was a victim of the administration's

7 alleged political affiliation discrimination?

8    A.   Yes.

9    Q.   Where did that take place?

10    A.   I believe it was -- maybe it was upstairs

11 on the third floor. We were looking for grievance

12 papers in the same place at the same time.

13    Q.   Was anyone else present with you?

14    A.   I believe Cathy Moore.

15    Q.   What did she say to you?

16    A.   You know, she applied for the position,

17 and, you know, somebody from outside came in and got

18 the position, and she was doing a position, and they

19 handed her job to firefighters, you know, so she was

20 grieving all that.

21    Q.   All right, did she ever express any

22 interest to be part of the lawsuit that you intended to

23 file, or in fact did file at the time of conversation?

24    A.   No.

32 (Pages 125 to 128)

Page 125

1    Q.    Did you ever convey to her the name and
2    identity of your attorney?
3    A.    No.
4    Q.    To the best of your knowledge, are all the
5    people that you named in that second portion of the
6    answer to No. 14 all Boston residents?
7    A.    This second section right here?
8    Q.    Yes, please.
9    A.    No, because a lot of them have been there
10   for -- I have been there ten years. A few of them
11   probably there 20-something years and they are
12   grandfathered in back when the residency was -- I think
13   it's 1994, almost positive it was 1994, so they were
14   grandfathered in.
15   Q.    Can you identify which ones meet that
16   criteria?
17   A.    Linda Collins doesn't have to live in the
18   city. Paula Hamilton doesn't have to live in the city.
19   Marta Poupart doesn't have to live in the city. I'm
20   almost positive Cathy Moore doesn't have to live in the
21   city. Barbara Powers -- are you asking me if they live
22   in the city or --
23   Q.    No, if they live in the city.
24   A.    Everybody lives in the city but I think --

Page 126

1    I don't know, to be honest with you.
2    Q.    Do you have a sense of who doesn't live in
3    the city?
4    A.    I think they all live in the city, I
5    think.
6    Q.    Just to backtrack on one quick thing that
7    you said earlier, just to clear this up, and your
8    attorney even asked you about it, but you said this list
9    comprises people who you believe that were victims of
10   political affiliation discrimination and other forms of
11   discrimination?
12   A.    Yes.
13   MR. HOLMES: Let me go through some notes
14   and this could be over. I just have a few more
15   questions.
16   BY MR. HOLMES:
17   Q.    You understand that this is -- because
18   this is called pre-class certification, depositions are
19   discovery, do you understand that?
20   A.    Yes.
21   Q.    And that you, through the documents that I
22   have read, you apparently are going to be -- if this is
23   a class action, if it's certified, you are going to be a
24   representative of the class; do you understand that?

Page 127

1    A.    Yes.
2    Q.    Do you understand what those
3    responsibilities are as a class representative?
4    A.    Yes.
5    Q.    What are they?
6    A.    To tell the truth, not lie.
7    Q.    Do you understand if there's any financial
8    requirements of being a class representative?
9    A.    Yes.
10   Q.    And what do you understand that to be?
11   A.    For fees, financial, I don't understand.
12   Q.    Do you understand -- I'll ask it
13   differently. Are you aware that as a result of class
14   representative, that you will be required to advance any
15   money to fund the class action lawsuit?
16   A.    Yes.
17   Q.    And what is your understanding?
18   A.    Whatever the -- like, depositions or just
19   different -- I don't know that what the legal
20   terminology -- like a deposition, you know, there is an
21   amount they give you have to pay upfront.
22   Q.    And you are prepared to advance that?
23   A.    Yes.
24   Q.    And you're prepared to advance that for

Page 128

1    other class members if this is a class certified action?
2    A.    Absolutely.
3    Q.    Do you have an estimate in your mind about
4    how much it is going to cost you?
5    A.    I don't really care how much it costs.
6    Q.    And you feel you have the resources to pay
7    for depositions?
8    A.    Absolutely.
9    Q.    Do you know how much a deposition costs?
10   A.    About 400 or $500, depending on how many
11   pages you have, $5 a page and you pay 195 processing
12   fee, and you pay for the deposition. I'm fully aware.
13   Q.    And you are prepared to do that?
14   A.    Absolutely.
15   Q.    Do you feel that your claim in this
16   lawsuit are different than any of the claims of the
17   other people who are plaintiffs in this lawsuit?
18   A.    No.
19   Q.    So it's your testimony here today that
20   your claims are the exact same claims as Jane B. Green?
21   A.    Yes.
22   Q.    It's your testimony today that your claims
23   are the same claims as Elizabeth H. Golden?
24   A.    Yes.

Page 129

1    Q.    It's your testimony today that your claims
2  are equal to or similar to or are the same claims as
3  Patricia J. McDonough?
4    A.    Yes.
5    Q.    And it's your testimony here today that
6  your claim is equal to or the same as Elaine Mesiti?
7    A.    Yes.
8    Q.    It's your testimony here today that your
9  claim is equal to or the same as Lila Brown's?
10    A.    Yes.
11    Q.    It's your testimony here today that your
12  claim is the same as Mary M. Kane?
13    A.    Yes.
14    Q.    And it's your testimony that your claims
15  are the same or similar to Judith A. Kelley?
16    A.    Yes.
17    Q.    And you have discussed their claim with
18  them?
19    A.    Well, I see it in the paper. I mean, it's
20  evidence. If we sit down and discuss this, everybody
21  has the same claim.
22    Q.    Have you discussed the particulars of your
23  claim with these other people, your claims?
24    A.    I believe I have.

Page 130

1    Q.    Do you have a recollection of discussing
2  it with Elizabeth Golden?
3    MR. FEENEY: Objection, attorney-client
4  privilege.
5  BY MR. HOLMES:
6    Q.    Do you have a recollection of having
7  discussed your claim, without your attorney present,
8  with Elizabeth Golden?
9    A.    Not a specific claim.
10    Q.    Do you have a recollection here today of
11  ever having had a discussion with Patricia J. McDonough,
12  when your attorney wasn't present, when you discussed
13  the nature of your claim?
14    A.    Not specifics.
15    Q.    Do you have recollection of ever having a
16  conversation with Elaine Mesiti, when your attorney was
17  not present, where you discussed the nature of your
18  claim?
19    A.    Not specifics.
20    Q.    Do you have a recollection of ever having
21  a discussion with Lila Brown, when your attorney was not
22  present, where you discussed the nature and details of
23  your claims?
24    A.    I didn't get into specifics.

Page 131

1    Q.    Did you ever have a discussion with Mary
2  M. Kane, when your attorney was not present, where you
3  discussed the nature and the details of your claims?
4    A.    Never details.
5    Q.    Did you ever have a conversation with
6  Judith A. Kelley, when your attorney was not present,
7  where you discussed the details of the claim that you
8  have?
9    A.    Not specifics.
10    Q.    Do you have an idea as to what your
11  damages are?
12    A.    I haven't actually sat down and, you know,
13  reconciled to the penny.
14    Q.    Well, I'm not asking to the penny. Do you
15  have a reasonable estimate as to what your damages are?
16    A.    I would say over $100,000.
17    Q.    What do you base that on?
18    A.    I base that on the difference of all the
19  jobs I could have gotten but I didn't get, the raises in
20  those jobs, and, you know, the difference in the pay
21  scales, and if there were raises in that, those years,
22  you know, you just -- I base it upon that, and I base it
23  upon being aggravated.
24    MR. HOLMES: Okay, that's all. Thank you

Page 132

1  very much. I appreciate your time.
2    MR. FEENEY: I have a few questions.
3  EXAMINATION BY MR. FEENEY:
4    Q.    You mentioned that Julie Barton got a
5  position instead of you. Is it your testimony that she
6  got the position because of political affiliation over
7  you?
8    A.    I think it was more so seniority.
9    Q.    Okay.
10    A.    Because some jobs they do choose
11  seniority; some jobs they don't.
12    Q.    Were you equally qualified to Julie
13  Barton?
14    A.    Yes.
15    Q.    Was she more politically affiliated than
16  you were?
17    A.    I believe she was politically -- she came
18  from City Hall; she had some political ties up there.
19    Q.    You were asked earlier about the John Does
20  and other people. You had also mentioned an incident
21  after the complaint was filed involving Chief Paul
22  Burke; do you think that Chief Paul Burke discriminated
23  against you based on your lack of political affiliation?
24    A.    No.

Page 133

```
 1    Q.    Okay.  Are there people who are involved
 2  in, you know, the practice that you had described
 3  regarding political affiliation discrimination who you
 4  haven't named?
 5    A.    Yes.
 6    Q.    Who are those people?
 7    A.    I'm sorry, defendants?
 8    Q.    Well --
 9    A.    The Jane Does?
10    Q.    Right, people who you haven't named
11  specifically but may be involved in this policy and
12  practice.
13    A.    Yes.
14    Q.    Who are those?
15    A.    Thomas Menino, Dennis DiMarzio, who was
16  the Commissioner at the time, Andy Warren.
17    Q.    Do you have enough specific facts --
18         MR. HOLMES:  Was she finished?  Were you
19  finished?
20         THE WITNESS:  I'm just trying to think.
21  There are so many people involved, I just can't
22  because we are still getting discovery, and we
23  are still in the process of who should we have,
24  who should we eliminate.  I don't have a definite
```

Page 134

```
 1  list, but if I was to -- five people that I would
 2  definitely put on this lawsuit would be Mayor
 3  Menino, because I brought all of this to his
 4  attention, a certified letter to him; I E-mailed
 5  him; Dennis DiMarzio, Andy Warren, Kathleen
 6  Kirleis; I would definitely add here because
 7  she's just, you know, continuing the practice;
 8  she told me in a meeting in September that she
 9  was going to, you know, make changes, and she
10  hasn't.  So I feel Kathleen Kirleis would be one.
11  You know, just basically the Menino
12  administration.  And Joe Nee, Joseph Nee.
13  BY MR. FEENEY:
14    Q.    You were asked to testify earlier about
15  the facts that you have that shows that Robert Moran
16  engaged in political affiliation discrimination against
17  you; are some of these facts included in your Answers to
18  Interrogatories?
19    A.    Yes.
20    Q.    Are some of those facts included in the
21  complaint that you filed?
22    A.    Yes.
23    Q.    Have you listed every single detail of
24  Mr. Moran's involvement?
```

Page 135

```
 1    A.    No.
 2    Q.    Is it possible to do so today?
 3    A.    No.
 4    Q.    Are you aware of Robert Moran's -- are you
 5  aware of actions or are you aware of consistent actions
 6  by Robert Moran in terms of political affiliation as to
 7  other people in the department?
 8         MR. HOLMES:  Objection to the form.  Go
 9  ahead.
10         MR. FEENEY:  If you need me to clarify
11  that?
12         THE WITNESS:  Please.
13  BY MR. FEENEY:
14    Q.    Sure.  Essentially aside from what you've
15  alleged today, and what is listed in the complaint and
16  in your Answers to Interrogatories, as Robert Moran
17  acted towards you that you feel are politically
18  motivated, are you aware of any of his actions as to
19  other people in the department?
20    A.    Yes.
21    Q.    From whom does Robert Moran take orders
22  with regard to political affiliation issues?
23    A.    His boss would be the Commissioner so it
24  would be the Commissioner.
```

Page 136

```
 1    Q.    As to defendant Paul Christian, can any of
 2  the political appointments that you have listed today or
 3  listed in the complaint or listed in your Answers to
 4  Interrogatories, can any of those appointments occur
 5  without Paul Christian's say-so?
 6    A.    Can any of them occur without his say-so,
 7  no.
 8    Q.    So is it your testimony that the political
 9  appointees all have the approval and support of Paul
10  Christian?
11    A.    Yes.
12    Q.    Just to try to clarify an early -- earlier
13  you were asked whether or not Commissioner Fraser
14  offered you an R-15 position; what were the positions
15  you were interviewing for when you went to interview
16  with Commissioner Fraser?
17    A.    R-15.
18    Q.    Was that the one that you initially took?
19    A.    Yes.
20    Q.    And who offered that to you?
21    A.    Kathleen Kirleis.
22    Q.    So that's why you said that Commissioner
23  Fraser didn't offer it to you because it was Kathleen
24  Kirleis that offered it to you?
```

Page 137

1    A.   She was the one that called me up to her
2  office, offered it to me.  I didn't speak to the
3  Commissioner.
4    Q.   Talking about some of the people on the
5  list of former employees who were victims of the
6  administration's political affiliation discriminations,
7  you had mentioned political affiliation discrimination
8  and other discriminations.  Is it your testimony that
9  there is a policy in practice of political affiliation
10  discrimination?
11    A.   Yes.
12    Q.   And some of the people on the list, and I
13  won't go over them again, you had specific conversations
14  with them, those people told you that they felt
15  discriminated against because of lack of political
16  affiliation?
17    A.   Yes.
18    Q.   But there are other people that you did
19  not have conversations with but you were aware that they
20  did not get promotions that were upgrades?
21    A.   Yes.
22    Q.   So that are you making an assumption that
23  they were politically affiliated -- that they were
24  discriminated against based on political affiliation?

Page 138

1        Let me ask it a different way.  If
2  somebody with political ties, a political sponsorship
3  seeks an upgrade or a promotion, would they get it?
4    MR. HOLMES:  Objection to form.
5    THE WITNESS:  Yes.
6  BY MR. FEENEY:
7    Q.   If somebody without political ties and
8  sponsorship seeks an upgrade -- strike that.
9        So are you assuming that for the people
10  you listed on this list, the ones who you testified to
11  did not get promotions or upgrades, are you making an
12  assumption that were denied that promotion or
13  upgrade because of their lack of political affiliation?
14    A.   No, I had conversations with them, but it
15  was about discrimination, but they never mentioned
16  political affiliation, but they did mention
17  discrimination, so I didn't get in depth with them, so I
18  don't know if it was political.
19    Q.   Okay.
20    A.   I've got enough problems.  I don't want to
21  get into everybody else's problems.
22    Q.   Fair enough.  Focusing again on two of
23  the -- at least one -- you mentioned than two of the
24  people on the list, you mentioned had other attorneys?

Page 139

1    A.   Yes.
2    Q.   Pursuing other claims?
3    A.   Yes.
4    Q.   Are you aware that they have other claims
5  of discrimination besides political affiliation
6  discrimination?
7    A.   I'm sorry, am I aware?
8    Q.   They have other claims aside from --
9    A.   Yes.
10    Q.   And what kind of claim are they that you
11  are aware of?
12    A.   I know that they have other claims, but I
13  don't know what they are.
14    Q.   Are they related at all to any sexual
15  harassment claim, either Maria Lopez or Marta Poupart?
16    A.   No, not that I know of.
17    Q.   And just to clarify, you testified earlier
18  that some of Bob Moran's actions against you became
19  "personal."  Are you saying that because -- it became
20  personal because of your opposition to his political
21  affiliation discrimination?
22    MR. HOLMES:  Objection.
23    THE WITNESS:  Can you just clarify that?
24  BY MR. FEENEY:

Page 140

1    Q.   Sure.  Are you alleging that Bob Moran
2  acted in retaliation to certain things that you did?
3    MR. HOLMES:  Objection.
4    THE WITNESS:  Yes.
5  BY MR. FEENEY:
6    Q.   Is that what you mean by the word
7  "personal"?
8    A.   Yes.
9    Q.   And are there some members of the class
10  representatives named in the complaint who have not been
11  retaliated against and have just been the victim of
12  political affiliation discrimination?
13    A.   Can you repeat that?
14    Q.   Sure.  Are some of the class -- I mean
15  some of the class representatives, have all of them been
16  the victims of political affiliation discrimination and
17  retaliation or have some of them only been the victims
18  of retaliation --
19    A.   The only one I can think of is Jane Green.
20    Q.   Explain that further.
21    A.   Like I mentioned, she went in as a union
22  rep for me, and people got the wrong idea that she was
23  in there to cause trouble when they didn't realize I was
24  acting in a different union, which was her union, when I

36 (Pages 141 to 144)

Page 141

1  was doing the job. And as soon as Commissioner
2  Christian got wind that Jane Green -- and Chief
3  Hitchcock got wind that Jane Green was in the office
4  with me at the time with Bob Moran, they immediately
5  moved her out of the headquarters to 1010 Mass Ave.
6      Q.   So you are alleging that Jane Green's
7  claim arrives primarily as a result of retaliation?
8      A.   Yes.
9          MR. FEENEY: Nothing further.
10         MR. HOLMES: I just have to ask; I wanted
11     to let you go, but you've got me very confused
12     about what you consider to be political
13     discriminated, so if I could just ask you just
14     two or three questions.
15 FURTHER EXAMINATION BY MR. HOLMES:
16     Q.   Do you consider anybody that gets
17 bypassed, who is an employee of the Boston Fire
18 Department, if they get bypassed, that it's because of
19 political affiliation discrimination?
20         MR. FEENEY: Objection to form.
21         MR. HOLMES: It's just to the form. You
22     can answer.
23         THE WITNESS: Yes.
24 BY MR. HOLMES:

Page 142

1      Q.   And do you believe that if somebody gets
2  hired from outside of Boston Fire Department for a
3  position inside the Boston Fire Department, that that's
4  political affiliation discrimination?
5      A.   Yes.
6      Q.   Even if they are not an employee of the
7  City of Boston before they get hired by the Boston Fire
8  Department?
9      A.   Yes.
10         MR. HOLMES: Thank you. That's all I
11     have.
12         MR. FEENEY: If I could follow up on that.
13 FURTHER EXAMINATION BY MR. FEENEY:
14     Q.   You testified earlier there were some
15 positions that you didn't get because somebody more
16 qualified got it?
17     A.   Yes.
18     Q.   So there are some positions that are
19 awarded on the basis of merit?
20     A.   Seniority, yes.
21     Q.   So you are not alleging that every single
22 promotional decision or upgrade is based purely on
23 political affiliation?
24     A.   Not every single solitary one. I told you

Page 143

1  the two for the payroll.
2          MR. FEENEY: Nothing else.
3          MR. HOLMES: Thank you very much for your
4      time.
5          (Deposition concluded at 1:10 p.m.)

Page 144

1  INSTRUCTIONS TO DEPONENT
2
3      After reading this volume of your deposition,
4  indicate any corrections or changes to your
5  testimony and the reasons therefor on the Errata
6  Sheet supplied to you and sign it. DO NOT make
7  marks or notations on the transcript volume itself.
8
9  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED
10 AND SIGNED ERRATA SHEET WHEN RECEIVED.
11 ATTACH TO THE DEPOSITION OF DENISE M. BARRY
12 CASE: BARRY v. CITY OF BOSTON
13
14
15
16
17
18
19
20
21
22
23
24

Page 145

1   ATTACH TO THE DEPOSITION OF DENISE M. BARRY
2
3        ERRATA SHEET
4
5        INSTRUCTIONS: After reading the transcript
    of your deposition, note any changes or correction
6   to your testimony and the reason therefor on this
    sheet.  DO NOT make any marks or notations on the
7   transcript volume itself.  Sign and date this errata
    sheet (before a Notary Public, if required).
8
9   PAGE LINE
10  _____ _____ CHANGE _____
               REASON _____
11  _____ _____ CHANGE _____
               REASON _____
12  _____ _____ CHANGE _____
               REASON _____
13  _____ _____ CHANGE _____
               REASON _____
14  _____ _____ CHANGE _____
               REASON _____
15  _____ _____ CHANGE _____
               REASON _____
16  _____ _____ CHANGE _____
               REASON _____
17  _____ _____ CHANGE _____
               REASON _____
18  _____ _____ CHANGE _____
               REASON _____
19  _____ _____ CHANGE _____
               REASON _____
20
        I have read the foregoing transcript of my
21  deposition and except for any corrections or changes
    noted above, I hereby subscribe to the transcript as
22  an accurate record of the statements made by me.
23  _____
        DENISE M. BARRY
24

Page 146

1        I, MARY JO BOXER, a Notary Public in and for
2   the Commonwealth of Massachusetts, do hereby certify
3   that DENISE M. BARRY came before me on the 13th day of
4   April, 2007 at the City of Boston Law Department, One
5   City Hall Plaza, Boston, Massachusetts, and was duly
6   sworn to testify to the truth and nothing but the truth
7   as to her knowledge touching and concerning the matters
8   in controversy in this cause; that she was thereupon
9   examined upon her oath and said examination reduced to
10  writing by me; and that the statement is a true record
11  of the testimony given by the witness, to the best of my
12  knowledge and ability.
13      I further certify that I am not a relative or
14  employee of counsel/attorney for any of the parties, nor
15  a relative or employee of such parties, nor am I
16  financially interested in the outcome of the action.
17      WITNESS MY HAND this 20th day of April, 2007.
18
19  Mary Jo Boxer          My Commission expires:
20  Notary Public          August 6, 2010
21
22
23
24

Page 1

VOLUME: I
PAGES: 1-88
EXHIBITS: NONE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL NO. 05-10528RCL

* * * * * * * * * *
DENISE M. BARRY; JANE B. GREEN;     *
ELIZABETH H. GOLDEN; PATRICIA J.    *
MCDONOUGH; ELAINE MESITI; LILA      *
BROWN; MARY M. KANE; AND JUDITH A.  *
KELLEY, INDIVIDUALLY AND ON BEHALF  *
OF THOSE SIMILARLY SITUATED,        *
                    Plaintiffs,     *
                                    *
vs.                                 *
                                    *
ROBERT J. MORAN; RONALD KEATING;    *
PAUL A. CHRISTIAN; RODERICK FRASER, *
JR., WILLIAM KESSLER; WILLIAM       *
HITCHCOCK; CITY OF BOSTON           *
FIRE DEPARTMENT), AND JOHN AND/OR   *
JANE DOES 1-50,                     *
                    Defendants.     *
* * * * * * * * * *

        DEPOSITION OF PATRICIA MCDONOUGH,
taken on behalf of the Defendants, pursuant to
the Massachusetts Rules of Civil Procedure,
before Melinda M. Piccirilli, Certified
Shorthand Reporter and Notary Public within and
for the Commonwealth of Massachusetts, at the
City of Boston Law Department, City Hall,
Boston, Massachusetts, on Wednesday, May 23,
2007, commencing at 2:05 p.m.

Page 2

A P P E A R A N C E S

Thomas F. Feeney, Esquire
Law Office of Thomas F. Feeney
39 Sheafe Street, Suite One
Chestnut Hill, MA  02467
feeneyatlaw@cs.com
For the Plaintiffs

Scott C. Holmes, Esquire
Karen A. Glasgow, Esquire
City of Boston Law Department
City Hall, Room 615
Boston, MA  02201
For the Defendants

Page 3

I N D E X

DEPONENT                              PAGE
PATRICIA MCDONOUGH

Examination by Mr. Holmes             4, 83

Examination by Mr. Feeney             79, 85

E X H I B I T S

NO.    DESCRIPTION                    PAGE

       NONE

Page 4

P R O C E E D I N G S

1    MR. HOLMES:  Stipulations, Tom?
2    MR. FEENEY:  Usual.  Read and sign 30
3 days.
4    MR. HOLMES:  Okay.  Waive the notary.
5        *****
6    PATRICIA MCDONOUGH, a witness
7 called by counsel for the Defendants, having
8 been satisfactorily identified by the
9 production of her driver's license and
10 having been duly sworn, testified as
11 follows:
12    EXAMINATION BY MR. HOLMES
13 Q. Good afternoon.
14 A. Good afternoon.
15 Q. Could you please state and spell your last
16    name.
17 A. McDonough, M-C, capital D, O-N-O-U-G-H.
18 Q. Ms. McDonough, my name is Scott Holmes, and
19    I'm an attorney for the City of Boston.
20    Karen Glasgow is to my right.
21        Have you ever been deposed before?
22 A. No.
23 Q. I'm just going to go over some of the ground

Page 5

1  rules. This is kind of a different setting
2  than many people are used to. I'm going to
3  be asking you questions. If you don't
4  understand my question, please let me know
5  and I'll do my utmost to clear up any
6  confusion, okay?
7  A. Okay.
8  Q. If you do answer the question, we're going
9  to assume for the purposes of this that you
10 understood my question and you're answering
11 to the best of your ability, okay?
12 A. Okay.
13 Q. Secondly, you have to at least say "yes" or
14 "no" to these questions. It's human nature
15 for many people in these depositions where
16 people will say "uh-huh" or do a hand
17 gesture or a nod. You at least have to say
18 "yes" or "no," and I'll remind you if
19 anything goes off as far as these go.
20     Also, if you'd at least hold back
21 until I complete my question. When people
22 speak in the normal activities of life, you
23 kind of know what the question is and people
24 tend to answer, but because this woman here

Page 6

1  is going to be typing this down, if you can
2  just hang back a second, and your attorney
3  may want to object as well, okay?
4  A. Okay.
5  Q. Finally, if you need to take a break or
6  speak to your attorney or run to the ladies'
7  room, just let me know and we'll stop
8  immediately and I'll accommodate you in any
9  way I can, okay?
10 A. Okay.
11 Q. Can you please give me your current resident
12 address?
13 A. 31 Woodcliff Road in Holbrook, Mass. 02343.
14 Q. How long have you lived there?
15 A. Thirteen years, fourteen; thirteen and a
16 half.
17 Q. Are you married?
18 A. Yes.
19 Q. To whom are you married?
20 A. Kevin.
21 Q. What does Kevin McDonough do for work?
22 A. He's a fire lieutenant.
23 Q. At which fire department?
24 A. Boston Fire.

Page 7

1  Q. Do you have any children?
2  A. I have a stepson.
3  Q. Can you please summarize for me your
4  educational background.
5  A. Educational background is I graduated from
6  high school.
7  Q. What year did you graduate from high school?
8  A. 1971.
9  Q. From which high school?
10 A. Hyde Park High.
11 Q. Any other schooling after that?
12 A. No. Just courses, like computer courses.
13 Q. Where did you take computer courses?
14 A. Fidelity.
15 Q. Fidelity Investments?
16 A. Yes.
17 Q. Did you ever work for Fidelity?
18 A. No.
19 Q. How did you get involved in taking courses
20 there?
21 A. Chief Fleming and Chief Burke had set us up
22 to go there from fire prevention, from work.
23 Q. That was paid for by work?
24 A. I don't think there was a charge to it. I

Page 8

1  think they had extra seats open when they
2  were doing their employees, and they let us
3  go over.
4  Q. Can you outline for me your employment
5  history?
6  A. From the fire department?
7  Q. From after you graduated high school.
8  A. Right after I graduated from high school I
9  started working civil service division,
10 which is now division of personnel
11 administration.
12 Q. Is that with the City of Boston?
13 A. It's the State.
14 Q. How long did you work there?
15 A. Approximately three and a half years.
16 Q. How about after that?
17 A. I transferred over to the Boston Fire
18 Department.
19 Q. How did that come about?
20 A. I worked in the department that certified
21 you off of civil service lists, and I saw
22 the vacancy come through for the Boston Fire
23 Department. So I called and set up an
24 interview and they said that they would do

Page 9

1   it as a transfer. So I actually didn't
2   resign and get hired. It was an actual
3   transfer.
4   Q. Were you interviewed for the position?
5   A. Yes.
6   Q. What position was that that you first
7     started off in?
8   A. Junior clerk and typist.
9   Q. Was there a rating to that?
10  A. To my knowledge it was like an R-3 at the
11    time.
12  Q. Did you join the union at that point in
13    time, or any union?
14  A. Yes. I've been in a union since I started.
15  Q. Which unions have you been in through the
16    Boston Fire Department?
17  A. AFSCME and then the SENA union.
18  Q. When did you switch from AFSCME to SENA?
19  A. I don't know the year, but it was when I got
20    the title of senior administrative
21    assistant, I believe. That brought me into
22    the SENA.
23  Q. Can you tell me, after you started off at
24    the junior clerk position, what was the next

Page 10

1   position you had with the Boston Fire
2   Department?
3   A. Senior clerk and typist.
4   Q. What year did that kick in?
5   A. That actually started the day that I got
6     transferred over. I got transferred over as
7     a junior clerk, because they had to do that
8     because that was the vacancy. And then I
9     was a senior clerk in the State so they
10    honored that and brought it over.
11  Q. Who was the commissioner at that point in
12    time, do you recall?
13  A. The commissioner was James Kelley.
14  Q. Senior clerk typist, what was that position
15    rating, do you recall?
16  A. Probably like an R-8.
17  Q. How about the next position that you had
18    with the Boston Fire Department?
19  A. I went up the line, so it must have been
20    principal clerk.
21  Q. Which part of the Boston Fire Department
22    were you working in as a principal clerk?
23  A. I believe it was -- I don't know the dates
24    that I actually got that, off the top of my

Page 11

1   head, but I believe I was probably working
2   in the accounts department.
3   Q. What was that rating?
4   A. I'm not sure.
5   Q. Did you have to apply for that position in
6     order to get it?
7   A. Yes.
8   Q. How long did you work as a principal clerk?
9   A. I'm not sure. It was a long time ago.
10  Q. What was the next position you had within
11    the Boston Fire Department?
12  A. I believe I went from a principal clerk to
13    -- I'm not sure if it was principal account
14    clerk next or it was administrative
15    assistant.
16  Q. Do you recall roughly when that was, what
17    year?
18  A. Not off the top of my head.
19  Q. Did you have to apply for that position?
20  A. Yes.
21  Q. Did you get that position that you applied
22    for?
23  A. Yes.
24  Q. Do you know what the rating was for that

Page 12

1   position?
2   A. Possibly about a 12, an R-12.
3   Q. Which department was that in, which division
4     of the Boston Fire Department, if you know?
5   A. When I actually got it, I'm not sure. Like
6     I said, it was a long time ago, but possibly
7     was in what they called human resources at
8     the time.
9   Q. How about the next position within the
10    Boston Fire Department, what was that?
11  A. Administrative assistant.
12  Q. Did you apply for that job?
13  A. Yes.
14  Q. You got that job?
15  A. Yes.
16  Q. What was the rating of that?
17  A. Taking a guess, back then it was probably an
18    R-14. I've been out of that union for a
19    while.
20  Q. Was that AFSCME at that time?
21  A. Yes.
22  Q. Up to that point in time, had you ever filed
23    any grievances or been denied any job that
24    you felt that you were entitled to or

4 (Pages 13 to 16)

## Page 13

1  qualified for?
2  A. I did have a few grievances in, but to be
3     honest with you, right now, off the top of
4     my head, I can't remember which ones they
5     were for and at what year they were.
6  Q. Up to that point in time --
7  A. We had civil service exams that we actually
8     took to get promoted at that time, and so
9     most of these, or if not all of these, were
10    as a result of the civil service exams that
11    we took that I usually scored quite well on.
12 Q. What time frame are we talking; do you know
13    the years?
14 A. Not for each one of them, no, I couldn't be
15    sure.
16 Q. Just the last one that you had. I'm just
17    trying to get some kind of context here as
18    far as time goes.
19       That's okay if you don't remember.
20 A. I don't remember.
21 Q. How about after that, what was the next
22    position that you applied for?
23 A. The next position that I got would have been
24    senior administrative assistant.

## Page 14

1  Q. What was the rating on that?
2  A. I think that was when I went into the SENA
3     union, which would have been an MM-5, I
4     believe.
5  Q. Which division or subdivision of the Boston
6     Fire Department was that?
7  A. I think at that time I was in the fire
8     marshall's office.
9  Q. Do you know what year this was, that
10    position?
11 A. Not exactly, but it might have been
12    approximately around '82, and that's a
13    guess.
14 Q. As long as it's a reasonable guess, that's
15    okay. Is it a reasonable guess?
16 A. I assume so, yes.
17 Q. How about the next position that you got or
18    applied for?
19 A. That would have been senior administrative
20    assistant/fire, which makes the MM-5 an
21    MM-6.
22 Q. You were still a SENA member at the time?
23 A. Yes.
24 Q. What department was that in?

## Page 15

1  A. The fire marshall's office.
2  Q. Do you recall how long you worked there?
3  A. I've actually been in the fire marshall's
4     office since I was a senior administrative
5     assistant.
6  Q. Did you apply for that MM-5 position?
7  A. The MM-5, yes. The slash fire that makes it
8     a 6, no. That's like a seniority basis.
9     They have a slash fire that they put it on
10    it, and the people who are highest in the
11    rank with seniority get the slash fire when
12    it's available.
13 Q. Did you eventually get an MM-6?
14 A. That made it a 6.
15 Q. That's the current position you're in?
16 A. Yes.
17 Q. Did you have to apply for that position?
18 A. No. That was -- that's not a position
19    that's actually vacant. It's how -- the
20    best way I could put it would be like an
21    add-on, and they add a slash fire to it.
22    And the fire department has so many of them
23    contractual, and it was a seniority basis
24    that you had that put on.

## Page 16

1       In other words, if somebody retired
2     or, God forbid, died and left that position,
3     a slash fire opened, the person that had the
4     most seniority as a 5 would get it.
5  Q. That was you?
6  A. That was me.
7  Q. You had the most seniority in that office as
8     a 5; someone died or quit and then you get
9     the 6, just so I understand correctly?
10 A. Not just in that office; in the fire
11    department itself.
12       It's an add-on. It's not an actual
13    -- a title, I guess you could say.
14 Q. Have you applied for any other positions
15    within the Boston Fire Department?
16 A. Yes.
17 Q. What positions was that?
18 A. There was a few MM-8s.
19 Q. What was the first MM-8 position that you
20    applied for?
21 A. The utilization review, and I think that was
22    in 1999.
23 Q. Did you get that position?
24 A. I didn't even get an interview.

Page 17

1  Q. Do you know who got that position?
2  A. Mary Doherty.
3  Q. Do you believe that you were equally
4     qualified or more qualified than Mary
5     Doherty for that position?
6  A. Equally qualified.
7  Q. Do you know why you didn't even get an
8     interview?
9  A. I believe they had said that my
10    qualifications didn't fit it.
11 Q. Do you know Mary Doherty?
12 A. I knew who she was after she started the
13    job, yes.
14 Q. Did you ever look at her resume or see what
15    her qualifications were for that position?
16 A. No.
17 Q. How do you know you were equally qualified
18    then?
19 A. I used to do -- as a prior job in my earlier
20    years on the fire department, I actually
21    worked doing that job.
22 Q. What year was that?
23 A. I don't know offhand.
24 Q. What job was that?

Page 18

1  A. What title was I in?
2  Q. Yes.
3  A. I don't know offhand. But I did work in
4     that office in my earlier years on the fire
5     department.
6  Q. Do you believe that you did not get this
7     MM-8 position because of some political
8     affiliation discrimination?
9  A. Yes.
10 Q. Can you tell me about that, please, what you
11    base that on.
12 A. Because everybody said that they knew who
13    was going to get it before they even posted
14    it.
15 Q. Who was "they" that told you this?
16 A. I can't remember back to then, but everybody
17    talked about it.
18 Q. You believed everyone to be telling you the
19    truth?
20 A. Well, later on it kind of came true that
21    that's what it was.
22 Q. Did anybody ever tell you that Mary Doherty
23    was going to get the position?
24 A. I never heard the name.

Page 19

1  Q. How much longer after you heard this
2     conversation was it that Mary Doherty got
3     the position?
4  A. Probably within approximately a couple of
5     months, because it was when they posted it
6     or just before.
7  Q. Do you know if Mary Doherty has some kind of
8     political connections?
9  A. Not directly I don't know that.
10 Q. You're basing the statement that you believe
11    that you were denied this job because of
12    some political affiliation discrimination
13    because of the conversations of a few people
14    that work at the Boston Fire Department?
15 A. Yes.
16 Q. Did you ever file a grievance with your
17    union about that?
18 A. No.
19 Q. Did you ever write a letter to anybody
20    regarding that?
21 A. Not that one, no.
22 Q. Did you ever speak to an attorney about
23    that?
24 A. No.

Page 20

1  Q. What was the next position that you applied
2     for after this MM-8 utilization review in
3     1999?
4  A. In 2000 it was an MM-8 that was a principal
5     administrative assistant in the fire
6     prevention division under the fire marshal.
7  Q. Were you interviewed for that position?
8  A. No.
9  Q. Do you know who got that position?
10 A. Maryanne McHugo. Her name was Creden at the
11    time.
12 Q. Do you believe that you were not given an
13    interview or denied that position because of
14    some political affiliation discrimination?
15 A. I know for a fact that it was.
16 Q. Are you claiming that you were equally
17    qualified or more qualified for that
18    position than Ms. McHugo?
19 A. At least equally.
20 Q. What were the job responsibilities for that
21    MM-8 position in 2000?
22 A. It was to be the supervisor of approximately
23    ten girls and to do PeopleSoft, which
24    encompasses all the girls who do the

Page 21

1   permits, the entering into the PeopleSoft,
2   the budget, and I do not recall what else
3   was on there, to be honest with you.
4   Q. Prior to this position, had you ever had a
5   supervisory position with the Boston Fire
6   Department?
7   A. Yes, I did.
8   Q. What position was that?
9   A. It was while I was working in the fire
10  marshall's office. One of the girls retired
11  and I took over that job for approximately
12  -- about a year and a half, but never got an
13  upgrade for it.
14  Q. How many people did you supervise in that
15  position?
16  A. It was approximately ten or eleven girls and
17  one guy.
18  Q. You were qualified and trained in PeopleSoft
19  by the time you applied for that position?
20  A. Yes, but it was -- I had to demand that I
21  went for it.
22  Q. You had to demand to go get PeopleSoft
23  training?
24  A. Yes, I did.

Page 22

1   Q. With whom did you demand that?
2   A. Chief Fleming, who was the fire marshall at
3   the time.
4   Q. What year was that?
5   A. Probably the beginning of 2000.
6   Q. Where did you get the PeopleSoft training?
7   A. Here at City Hall.
8   Q. Did you ever file a grievance with your
9   union with respect to that position?
10  A. Yes, I did.
11  Q. Who was your shop steward?
12  A. The shop steward at the time -- I'm not sure
13  at the time, but that went through the
14  president, Richard Finnergan.
15  Q. The president of SENA?
16  A. Yes.
17  Q. What was the outcome of that grievance?
18  A. It was waiting to go to arbitration.
19  Q. It is waiting now or was waiting?
20  A. It still is waiting.
21  Q. What have you done to try to advance that?
22  A. A lot.
23  Q. Please tell me.
24  A. I have gone through the union. I have

Page 23

1   e-mails to the union. I have done
2   everything possible that I can do.
3   Q. Do you have any understanding as to what the
4   delay is or causing the delay?
5   A. They -- the union kept telling me that it
6   was labor relations, with all the different
7   changes of all the attorneys it was going at
8   the bottom of the pile. Then another
9   attorney would leave and it would go at the
10  bottom of the pile.
11  Q. Did anybody at the union ever say it was
12  anything that they did wrong, or was it
13  always labor relations that they were
14  claiming did something wrong?
15  A. To my recollection back at all the e-mails,
16  it was labor relations.
17  Q. Did you ever speak to an attorney about this
18  at all?
19  A. Not until I retained Tom.
20  Q. But never about this particular incident
21  back in 2000?
22  A. No. Just the union attorney.
23  Q. Who was the union attorney?
24  A. Warren Pyle.

Page 24

1   Q. Did you express to him your frustration with
2   the delay?
3   A. Yes.
4   Q. Is Warren Pyle still a union attorney?
5   A. To my knowledge, yes.
6   Q. What do you believe to be Ms. McHugo's
7   political connection?
8   A. Her political connection as far as names?
9   Q. You said that you thought that you were not
10  given the job because she had more political
11  connections.
12  A. Correct. Are you looking for names, is what
13  I'm asking?
14  Q. Let's start with that.
15  A. She's a friend of Andy Warren, and Andy
16  Warren was the person who was doing the
17  hiring for this job.
18  Q. Who is Andy Warren?
19  A. Andy Warren at the time, and still is, but
20  he's in a different capacity, was executive
21  assistant.
22  Q. Executive assistant to someone?
23  A. That was just his title, to my knowledge,
24  executive assistant.

Page 25

1  Q. Is it your belief that Andy Warren got her
2     this job?
3  A. Yes.
4  Q. Do you believe Andy Warren is somehow
5     politically affiliated with some group or
6     organization?
7  A. Yes.
8  Q. Which group or organization is that?
9  A. The Menino administration, Dennis DiMarzio.
10 Q. Anyone else other than Dennis DiMarzio?
11 A. That's the only one that I know of.
12 Q. Did someone tell you this?
13 A. Yes.
14 Q. Who told this?
15 A. Chief Flemming. And also, after Maryanne
16    got hired they put her right next to me in
17    my office, and every day I heard it.
18 Q. What particularly did you hear?
19 A. Her on the phone.
20 Q. Saying what?
21 A. Just about all the people that she knew,
22    that she was the assistant city auditor at
23    one time. She made no bones about people
24    she knew.

Page 26

1  Q. She got a position you wanted and ended up
2     sitting next to you?
3  A. Yes.
4  Q. How much would you have gotten paid if you
5     had gotten that position, how much more
6     money?
7  A. Approximately $225 a week at that time.
8  Q. That was for an MM-8?
9  A. Yes.
10 Q. Per week?
11 A. Per week.
12 Q. What was the next position that you applied
13    for?
14 A. An MM-8 principal administrative assistant.
15    I believe the next one was payroll.
16 Q. What were the job responsibilities for that
17    position?
18 A. Doing the payroll for the whole Boston Fire
19    Department.
20 Q. Had you ever had any position before this
21    where you did the payroll?
22 A. Yes, I did. That was my first office that I
23    worked in when I first started at the fire
24    department many years ago.

Page 27

1  Q. You were involved in some way in the payroll
2     in that position?
3  A. Yes.
4  Q. Correct me if I'm wrong, but that's 1974?
5  A. Correct.
6  Q. You applied for this position to run the
7     payroll in what year?
8  A. 2001, I believe, approximately.
9  Q. What training had you had between 1974 and
10    2001 that would qualify you for this
11    position?
12 A. In payroll?
13 Q. Yes.
14 A. Basically, they were looking for PeopleSoft
15    training and supervisory training, and I
16    feel I was as qualified as the girl who got
17    it from the outside.
18 Q. Who was the woman that got it?
19 A. Carol Petta.
20 Q. Did you ever see Carol Petta's resume?
21 A. No.
22 Q. Do you know what her work experience is?
23 A. No.
24 Q. Do you know what her educational background

Page 28

1     is?
2  A. No.
3  Q. Do you know what her extra training is
4     besides courses in school?
5  A. No. But I believe she had to have
6     PeopleSoft training after she was hired.
7  Q. Do you believe that you were denied that
8     position because of some political
9     affiliation discrimination?
10 A. Yes.
11 Q. Can you tell me about what gives you that
12    reason, that statement.
13 A. I believe that she was friendly with
14    Maryanne McHugo and Andy Warren and possibly
15    Dennis DiMarzio from Hyde Park.
16 Q. How did you learn that?
17 A. Just by people talking. You hear them.
18    Everybody knows them out there in Hyde Park.
19 Q. Did somebody specifically tell you that she
20    got this position because of her connection
21    with other people?
22 A. No. Somebody didn't walk up to me and
23    actually say that, no.
24 Q. You just concluded that on your own?

## Page 29

1  A. Yes.
2  Q. What other positions have you applied for in
3    the City of Boston?
4  A. Another MM-8 in -- it was a principal
5    administrative assistant position in what I
6    believe they would call human resources.
7  Q. Just back to the prior one, were you
8    interviewed for that MM-8 position in
9    payroll?
10  A. Yes.
11  Q. Do you know how many interviews there were
12    with other people?
13  A. No, I don't.
14  Q. Did you physically file an application for
15    the MM-8 in human resources?
16  A. Did I apply for it, yes.
17  Q. Did you have an interview for that job?
18  A. Yes, I did.
19  Q. Do you know how many people were
20    interviewed?
21  A. No, I don't.
22  Q. Do you know who got the position?
23  A. Mary Killgallen.
24  Q. Do you believe that you were denied that

## Page 30

1    position because of some political
2    affiliation discrimination?
3  A. Yes.
4  Q. Can you tell me what facts you have to
5    support that?
6  A. She was dating a Mike Moran who worked in
7    the City Counselor Murphy's office, and she
8    made that pretty well known, too, after she
9    had gotten the job. And he's now a state
10    rep.
11  Q. Are you aware that Mr. Moran made a phone
12    call on her behalf?
13  A. No.
14  Q. Are you aware that Mr. Moran or anybody on
15    his behalf made a call to the mayor on that?
16  A. No.
17  Q. So you base that on the fact that she was
18    dating somebody who was a city counselor --
19  A. That worked in the city counselor's.
20  Q. You're claiming that she got the position
21    because she was dating somebody that worked
22    in the city counselor's office?
23  A. Yes.
24  Q. Did anybody ever tell you that?

## Page 31

1  A. That that's why she got the job?
2  Q. Yes.
3  A. They didn't come right out and say that that
4    was why she got the job, but...
5  Q. Did you ever have a chance to review Mary
6    Killgallen's resume?
7  A. No.
8  Q. Did you ever have a chance to talk about or
9    find out about her work experience?
10  A. I know she worked in special events.
11  Q. Did you ever have a chance to review or talk
12    about her educational background?
13  A. No.
14  Q. Do you believe that you were as qualified
15    for that position as Mary Killgallen was?
16  A. As -- more.
17  Q. What makes you say that?
18  A. With just my background in the fire
19    department. I've worked in many, almost --
20    almost every division there.
21  Q. What year was that, Ms. McDonough?
22  A. That was, I think, 2001.
23  Q. Have you applied for anything after that?
24  A. Yes. There was one in the commissioner's

## Page 32

1    office that was originally posted as an
2    MM-6, and it would have been a lateral
3    transfer for me. I have interviewed for
4    that when it was an MM-6.
5  Q. Was that an administrative assistant
6    position?
7  A. Yes. They had lowered it. The girl who
8    retired was an MM-8, and the position was
9    lowered to an MM-6.
10  Q. Do you know who got that position?
11  A. As an MM-6 they ended up not filling it as
12    an MM-6, and out of the blue it changed to
13    an MM-8.
14  Q. Do you know who received that position?
15  A. Mary Killgallen.
16  Q. Do you believe that you did not get that
17    position because of some political
18    affiliation discrimination?
19  A. Yes, I do.
20  Q. What do you base that opinion on?
21  A. For the same reason when she originally came
22    over to the fire department.
23  Q. Did anybody tell you that she got that
24    position because of dating somebody who

Page 33

1    worked in the city counselor's office here
2    at City Hall?
3    A. No, not directly. They didn't say it in
4    those words, no.
5        She also did the interviews for that
6    position when it was an MM-6. I thought it
7    seemed awfully odd that somebody who
8    interviewed for the job ended up getting the
9    job.
10   Q. Did you ever file a grievance for any of the
11   positions we just discussed?
12   A. Yes.
13   Q. Which one was that?
14   A. All three of them.
15   Q. What were the outcome of those grievances?
16   A. The one in human resources, which is the one
17   Mary Killgallen originally got, was -- my
18   grievance was dropped because a deal was
19   made.
20   Q. What was the deal?
21   A. A deal was made with a woman that was
22   retiring, and the union agreed to drop my
23   grievance to give her an upgrade for her
24   retirement.

Page 34

1    Q. And did you consent to that?
2    A. No. I didn't even know about it.
3    Q. But that was strictly a union decision?
4    A. Yes.
5    Q. How about the other grievance that you
6    filed?
7    A. The grievance for the one in payroll is
8    still pending for arbitration also.
9    Q. How is that grievance worded? What did you
10   say to generate a grievance?
11   A. To my knowledge, I think it was written as
12   -- on that one the most senior person in the
13   fire department, something about being the
14   senior person in the fire department, and I
15   wasn't considered, something to that effect.
16   I'm not exactly sure how it was actually
17   worded. It was seven years ago, six years
18   ago.
19   Q. Did you say to anybody when you filed that
20   grievance that you were the victim of what
21   you claim to be political affiliation
22   discrimination?
23   A. To the union?
24   Q. Yes.

Page 35

1    A. Yes.
2    Q. That was reflected in some of the documents
3    you've seen regarding that grievance?
4        MR. FEENEY: Objection. Misstates
5    any testimony you've heard so far.
6    Q. Does that language occur or can it be found
7    in the grievance that you drafted, or
8    whatever you did to file this?
9    A. In the actual union grievance itself?
10   Q. Yes.
11   A. I'm not sure.
12   Q. How about any other grievance after that;
13   HR, payroll, anything after that?
14   A. The payroll one, the one in the fire
15   marshall's office, and the human resource
16   one were all under a grievance.
17   Q. Two were still pending and the one HR has
18   been dropped?
19   A. Correct.
20   Q. Any other positions that you've applied for
21   other than the ones you just testified to?
22   A. There was one more MM-8. I believe it was
23   case manager.
24   Q. Which Department of the Boston Fire

Page 36

1        Department was that in?
2    A. It falls under the personnel division,
3    medical office.
4    Q. When did you apply for that position?
5    A. Approximately, I'm going to say, it was
6    around 2002, late 2001. 2002, in and around
7    there.
8    Q. Were you interviewed for that position?
9    A. Yes.
10   Q. Did you receive that position?
11   A. No.
12   Q. Do you understand why you did not receive
13   that position?
14   A. They said that my qualifications didn't meet
15   the position.
16   Q. Do you believe that you did not get that
17   position because of some political
18   affiliation discrimination?
19   A. Yes.
20   Q. Who is it that got the position?
21   A. Ian McKenzie.
22   Q. What are Ian McKenzie's political
23   affiliations, according to you?
24   A. I'm not exactly sure who he's affiliated

| Page 37 | Page 39 |
|---|---|
| 1   with, but the word was -- and he was hired | 1   it. |
| 2   from out of state also. I'm not sure who he | 2   Q. When was the last time you had a |
| 3   was actually affiliated with. | 3     conversation about it? |
| 4   Q. Did someone tell you that he was affiliated | 4   A. Probably just before she retired last year. |
| 5     with someone? | 5   Q. What did she say to you? |
| 6   A. Everybody said he was in. | 6   A. That it's not even worth putting in for |
| 7   Q. Can you identify any of those "everyones"? | 7     positions because they already know who's |
| 8   A. Not off the top of my head, no. It was just | 8     getting them before they post them. |
| 9     common knowledge. | 9   Q. Do you know whether she ever got any |
| 10  Q. Any other positions that you applied for | 10    positions that she applied for? |
| 11    after this MM-8 position? | 11  A. She got a few through all the years that she |
| 12  A. No. | 12    was there. |
| 13  Q. That's the last position you applied for, in | 13  Q. How long was she there? |
| 14    2002? | 14  A. Approximately 20 years or so. |
| 15  A. Yes. | 15  Q. She retired? |
| 16  Q. What is your current rating? | 16  A. Yes. |
| 17  A. MM-6. | 17  Q. How about Maria Lopez, did she ever express |
| 18  Q. How much higher does it go from there? | 18    to you that she felt that she was the victim |
| 19  A. There's a few 8s. And when we first started | 19    of political affiliation discrimination? |
| 20    working there, that was like, if I may say, | 20  A. Yes. |
| 21    the pinnacle of where you strived for. | 21  Q. When did she tell you that? |
| 22  Q. MM-6? | 22  A. I don't have dates on that either. She |
| 23  A. Was an MM-8. | 23    worked there for a long time, and we talked |
| 24      And at that time when I first | 24    about it all the time. |

| Page 38 | Page 40 |
|---|---|
| 1   started, that was probably the highest | 1   Q. What did she say to you? |
| 2   promotion that you could get. | 2   A. The same as Patty, that they don't even -- |
| 3   Q. An MM-8? | 3     not even to bother putting in for things |
| 4   A. An MM-8. | 4     because it was a waste of time. |
| 5     But since then we have 9s, 10s, 12s. | 5   Q. She said this to you personally? |
| 6   Q. Since 2002 have you taken any courses or | 6   A. Yes. |
| 7     outside studies to help advance within the | 7   Q. How about Steve Morash, did he ever say to |
| 8     Boston Fire Department? | 8     you that he felt he was the subject of |
| 9   A. No. | 9     political affiliation discrimination? |
| 10  Q. I'm going to ask you some questions about | 10  A. I don't know if Steve actually put it in |
| 11    Interrogatory Answer No. 14. When asked | 11    those words, but Steve was very upset with |
| 12    about former employees who were subject to | 12    the department and left. |
| 13    political affiliation discrimination, you | 13  Q. But he never said to you that he felt he was |
| 14    provided some answers about that, so I'm | 14    the victim of political affiliation |
| 15    going to ask you some questions about those | 15    discrimination or some other discrimination? |
| 16    people, okay? | 16  A. Not in those words. |
| 17  A. Yes. | 17  Q. You next list in this answer present |
| 18  Q. Patricia Fianscoanro, did she ever express | 18    employees who were victims of the |
| 19    to you that she felt that she was the victim | 19    administration's political affiliation |
| 20    of political affiliation discrimination? | 20    discrimination. |
| 21  A. Yes. | 21  A. Yes. |
| 22  Q. When did she do that? | 22  Q. Janice Boyle, did she ever express to you |
| 23  A. I don't have an exact date because it was | 23    that she felt she was the victim of the |
| 24    almost on a regular basis we talked about | 24    administration's political affiliation |

Page 41

1    discrimination?
2    A. Yes.
3    Q. Where was it that she told you this?
4    A. Multiple places. I talk to her all the
5      time.
6    Q. Does she still work with you?
7    A. Yes.
8    Q. Can you tell me what she said to you?
9    A. Same as the other ones. This is a waste of
10     time. We put in for them and we don't get
11     them. They already know who's getting them.
12   Q. Was anyone else present when you had this
13     conversation?
14   A. I don't remember. Numerous times. This is
15     over a seven-, eight-year period.
16   Q. Irene Debbie Burke, were you ever with her
17     when she expressed to you that she felt she
18     was a victim of political affiliation
19     discrimination?
20   A. Yes.
21   Q. When was that?
22   A. Again, I don't know. It's over a six- or
23     eight-year period, and it's basically all
24     the time when we talk to each other.

Page 42

1    Q. What did she say to you?
2    A. It's a waste of time, an absolute waste of
3      time.
4    Q. How about Joanne Callahan, did she ever
5      express to you that she felt she was a
6      victim of the administration's quote/unquote
7      political affiliation discrimination?
8    A. Yes.
9    Q. Where did that conversation take place?
10   A. Again, multiple times.
11   Q. Where? Give me a where once.
12   A. Well, I would assume always at work because
13     I don't see her outside of work. It would
14     be inside work.
15   Q. Who else was present?
16   A. I don't know at each time that we talked
17     about it. Numerous times.
18   Q. Did you ever tell Ms. Burke that you had
19     filed a lawsuit against the City?
20   A. She's aware of it.
21   Q. Did she ever express any interest to be a
22     part of this lawsuit?
23   A. She never came out and said, Can I join, to
24     me.

Page 43

1    Q. Did she ever express to you that she had
2      talked to an attorney about filing a suit
3      against the City for any of the claims that
4      she made to you whenever?
5    A. She's never said anything to me about an
6      attorney.
7    Q. Joanne Callahan, did you ever have a
8      conversation with her where she expressed to
9      you that she was a victim of the
10     administration's quote/unquote political
11     affiliation discrimination?
12   A. Yes.
13   Q. When did that take place?
14   A. I think we just answered that.
15   Q. It was Joanne Callahan we just went through?
16   A. Yes.
17   Q. I thought it was Irene Debbie Burke?
18   A. No. We did Joanne Callahan.
19   Q. Indulge me. When did you have it?
20   A. During working hours because I don't hang
21     with her outside.
22   Q. How about Linda Collins, did you ever have a
23     conversation with her where she felt she was
24     a victim of the administration's

Page 44

1    quote/unquote political affiliation
2    discrimination?
3    A. Yes.
4    Q. What did she say to you?
5    A. Again, they know who's going to get the job
6      before it's posted.
7    Q. Did you ever tell her that you got jobs
8      there that you applied for?
9    A. This was under -- yes, under the civil
10     service examination policy, yes, we did. We
11     did get promotions when they conducted civil
12     service exams.
13   Q. It's your testimony here today that you
14     never got a promotion if it wasn't for the
15     civil service exam?
16   A. To my knowledge, that is correct, except the
17     additional slash fire I told you about
18     previously.
19   Q. That's a promotion?
20   A. It's an add-on title.
21   Q. Did you get more money for it?
22   A. Yes.
23   Q. Helps benefit your retirement status?
24   A. Yes.

Page 45

1  Q. More responsibility?
2  A. It's the -- yes, I would say so. Well,
3     maybe not, because you're actually in the
4     same job you were in.
5  Q. How do you define "promotion"?
6  A. "Promotion" is when they post it and there's
7     a vacancy and it's a higher job than what
8     you are presently in.
9  Q. And you got paid more?
10 A. Yes.
11 Q. How about Carol Connors, did you ever have a
12    conversation with Ms. Connors where she
13    expressed that she felt she was a victim of
14    political affiliation discrimination?
15 A. Yes.
16 Q. When did that conversation take place?
17 A. Numerous times at work.
18 Q. When was the last time it took place?
19 A. Probably not too long ago. Within a month
20    maybe.
21 Q. Where was that?
22 A. At work.
23 Q. Where within the building?
24 A. I'm not sure on every single one, but I talk

Page 47

1     they post it.
2  Q. Paula Hamilton, did you ever have a
3     conversation with her where she felt that
4     she was a victim of the administration's
5     political affiliation discrimination?
6  A. Yes.
7  Q. When did that conversation take place?
8  A. That was a while ago too because she's not
9     in my building anymore, so I'm going to say
10    around the time that the payroll promotion
11    was bid on. She worked in payroll.
12 Q. She received a promotion from it?
13 A. No. But that was around the time that we
14    were having this discussion, when that job
15    was up for bid.
16 Q. How about Maria Hernandez, did you ever have
17    a conversation with her where she expressed
18    that she felt she was a victim of political
19    affiliation discrimination?
20 A. Yes.
21 Q. Where did that conversation take place?
22 A. At work.
23 Q. Where at work?
24 A. Could have been numerous places, but I'll

Page 46

1     to her every morning when I come in at her
2     desk.
3  Q. About a month ago she expressed these
4     thoughts to you?
5  A. Yes. We always talk about it.
6  Q. She said what to you?
7  A. That they know who's getting the job before
8     it's posted.
9  Q. How about Katie Donovan, did you ever have a
10    conversation with her when she expressed to
11    you she felt she was a victim of some
12    political affiliation discrimination?
13 A. Yes.
14 Q. When did that conversation take place?
15 A. That was a while ago because I haven't
16    really seen her. I'm working in a different
17    building.
18 Q. Was anybody else present during that
19    conversation the last time you spoke to her?
20 A. I don't recall. It was a while ago.
21 Q. What did she say to you?
22 A. The same that everybody else does, that it's
23    almost crazy to put in for promotions
24    because they know who's getting it before

Page 48

1     say her desk.
2  Q. What did she say to you?
3  A. Same as everybody else. She doesn't put in
4     for jobs because it's a waste of time
5     because they know who's getting it.
6  Q. She said it was because of political
7     affiliation discrimination or because she
8     was not qualified for anything other than
9     what she was doing?
10 A. Neither of those. That they always know
11    who's getting it before they put it up for
12    bid so it's a waste of time to put in for
13    it.
14 Q. Did she say to you because people who get it
15    were politically connected?
16 A. That they know people, in those words.
17 Q. Catherine McMillan, did she ever express to
18    you that she felt she was a victim of
19    political affiliation discrimination?
20 A. Yes.
21 Q. When's the last time she expressed that to
22    you?
23 A. A while ago. She's in another building.
24 Q. What did she say to you?

Page 49

1    A. That she doesn't put in for the jobs because
2    of that reason, that they know who's getting
3    it before they post it.
4    Q. Of the women I just named, Janice Boyle,
5    Irene Burke, Joanne Callahan, Linda Collins,
6    Carol Connors, Katie Donovan, Paula
7    Hamilton, Maria Hernandez, and Katherine
8    McMillan, did you ever tell them about the
9    fact that you filed a suit against the City
10   of Boston?
11   A. I never came out and actually told them, but
12   they saw it in the paper.
13   Q. Did any of them express any interest to be a
14   part of this lawsuit?
15   A. They never said that they -- to me.
16   Q. Based upon your years of service in the
17   Boston Fire Department, do you know if any
18   of them ever got a raise in a position or
19   promotion?
20   A. Oh, I'm sure they have somewhere in their
21   career.
22   Q. Angela Marshall, did you ever have a
23   conversation with her where she expressed to
24   you she felt she was a victim of political

Page 50

1    affiliation discrimination?
2    A. Yes.
3    Q. When did that conversation take place?
4    A. I don't know the date, but in work. She
5    works with me.
6    Q. Within the last year?
7    A. Yes, probably within the last year, year and
8    a half.
9    Q. What did she say to you?
10   A. The same thing. She doesn't bother putting
11   in for them; when you do they already know
12   who's getting it.
13   Q. Cathy Moore, did you ever have a
14   conversation with her where she expressed to
15   you that she felt she was a victim of
16   political affiliation discrimination?
17   A. Many conversations with Cathy Moore.
18   Q. Is she a friend of yours?
19   A. Through work, yes.
20   Q. When's the last time you had that
21   conversation?
22   A. Probably last week.
23   Q. What did she say to you?
24   A. We were just discussing work in general and

Page 51

1    what's goes on there about promotions.
2    Q. What did she say to you?
3    A. She knows all about it.
4    Q. All about what?
5    A. All about the political affiliation.
6    Q. Did you ask her what she meant by that?
7    A. I know what she meant by that.
8    Q. What did she mean by that?
9    A. She means by that -- she was a -- she's a
10   representative of the AFSCME union at the
11   fire department and she knows all about it.
12   Q. Marta Poupart, did you ever have a
13   conversation with her where she expressed to
14   you she felt she was a victim of political
15   affiliation discrimination?
16   A. Yes.
17   Q. When did that conversation take place?
18   A. A while ago because she's in a separate
19   building too. It's been a while.
20   Q. Within the last year?
21   A. No. Probably a little longer than that.
22   Q. What, if anything, did she say to you?
23   A. The same thing. It's a waste of time.
24   Q. To finish off your answer, you say, "The

Page 52

1    majority of the B.F.D. civilian employees."
2    I understand that to mean they're also
3    victims of political affiliation
4    discrimination?
5    A. A majority, yes.
6    Q. Can you tell me how many civilian employees
7    there are in the Boston Fire Department?
8    A. No, not exactly. I can guesstimate.
9    Q. A reasonable guesstimate is okay here, I
10   think.
11   A. Civilians, 75, 100.
12   Q. So it's your testimony that more than 50
13   percent have equal claim of political
14   affiliation discrimination?
15   A. It might be that. I'm not sure. Close to
16   it.
17   Q. That's because you've spoken to them about
18   it?
19   A. Yes.
20   Q. But you've only listed in your answer twelve
21   people, so that leaves, if there's 100
22   people -- we'll go with your number, 75. If
23   you take 12 out of 75, there's a lot more to
24   go. So are you saying that you spoke to the

Page 53

1  rest of these people or a majority of them
2  and they expressed to you that they felt
3  they were also victims of political
4  affiliation discrimination.
5  A. I'm just going on the ones that I know.
6  Q. But you've put in your answer "Majority of
7  B.F.D. civilian employees," and that's just
8  what I'm trying to figure out.
9  A. What I mean by that is, the ones -- when you
10  say civilians, how many civilians were on
11  the fire department, there are civilians
12  that I don't even know, met. They work in
13  fire alarm but they are categorized
14  civilians.
15      When I answered that question, I'm
16  talking about the administrative civilians
17  that work in the fire department.
18  Q. That's what I was talking about too, so
19  we're on the same page.
20      But you say the majority of them.
21  A. The majority of probably 50 of them that I
22  work with.
23  Q. But in your answer you only listed 12
24  people, so if there's more people involved

Page 54

1  -- there's 50 people total, and the majority
2  must mean more than 25, right?
3      Why didn't you include the rest of
4  them on this answer?
5  A. I can't answer that.
6  Q. Is it your testimony here today that not a
7  majority of the Boston Fire Department
8  civilian employees feel like they've been
9  victims of political affiliation
10  discrimination?
11      MR. FEENEY: Objection. Misstates
12  her testimony.
13  Q. I'm just trying to figure out here what you
14  mean by "majority."
15  A. A good amount.
16  Q. More than the 12 you listed?
17  A. Probably.
18  Q. How many more?
19  A. I don't know. I don't have an exact number.
20  Q. But you wrote "majority"?
21  A. Right.
22  Q. You understand in this case that you are
23  trying to have a class-action lawsuit
24  brought against the Boston Fire Department;

Page 55

1  you understand that, correct?
2  A. Correct.
3  Q. And that the number of people who have
4  claims is an important consideration, not
5  only for your side but equally so for our
6  side; you understand that, right?
7  A. Yes.
8  Q. So when you make an assertion like that, it
9  catches an attorney's eye. And I'm trying
10  to figure out here now how many more people
11  you think have a claim for political
12  affiliation discrimination. You answered
13  the question. I didn't. I'm trying to find
14  out how many.
15  A. There could be -- I'm guessing -- 10, 15,
16  20.
17  Q. What would you be basing that on?
18  A. Everybody in the whole fire department
19  civilianwise talks about this.
20  Q. The whole civilian side says that they've
21  not gotten advancement in positions because
22  of political affiliation discrimination?
23  A. Everyone that I come in contact with. I
24  wouldn't say 100 percent.

Page 56

1  Q. That I understand, because you said
2  majority. That would be 100 percent?
3  A. Right.
4  Q. Who not on this list has expressed to you
5  that they felt that they've been a victim of
6  political affiliation discrimination?
7  A. I would have to think about that for a
8  while.
9  Q. We got some time.
10      MR. FEENEY: Can we take a short
11  break?
12      MR. HOLMES: Absolutely.
13      (Recess)
14  Q. Ms. McDonough, you've now had a little bit
15  of time break here. Are there any other
16  people not listed in 12 that you know of
17  that have claimed to you that they have been
18  victim of political affiliation
19  discrimination?
20  A. Right now I can't think of names, but in the
21  same respect, an answer for that would be --
22  if we -- if I had gotten promoted or if any
23  other person in the department that was a 6
24  that got promoted, it would cause a ripple

Page 57

1  effect all the way down for -- the 5s would
2  move up to a 6, the 4s would move to a 5,
3  and all the way down. So for each person
4  who didn't get promoted from a 6 to an 8, it
5  would leave four or five positions below you
6  that the people below you could not jump.
7  So that would encompass a few people
8  in the fire department for all those 8
9  jobs.
10 Q. But that would mean that everybody they got
11   to bump up would also get a raise, right?
12 A. Correct.
13 Q. So that would have been more money for the
14   Boston Fire Department according to each
15   bump up?
16 A. Correct. But by brining people in from the
17   outside and not allowing the people in the
18   fire department these promotions, everybody
19   below you also got affected by this.
20      In other words, I didn't get any of
21   those 8s that we previously discussed. If I
22   had gotten one of those 8s, then somebody
23   that was a 5 in the fire department could
24   have moved up to my 6, and all the way down

Page 58

1  the line. There was promotional benefits
2  for everybody -- not everybody, but quite a
3  few people for that one promotion. And
4  there was -- I think we had down there that
5  there was five or six 8 positions that we
6  are discussing here.
7      And if five 6s got promoted up to
8  those 8s, each one of us would have left a
9  gap all the way down to four or five people
10 below us who would have also gotten a
11 promotion by giving us the promotion at the
12 top.
13 Q. Everyone down the line would have gotten
14   more money as a result of the promotions?
15 A. Yes. But we all missed out on that because
16   they brought people in from the outside,
17   which would encompass quite a few civilians.
18 Q. Just looking at the complaint here, I'm
19   going to ask you, do you believe that you've
20   been a victim of political affiliation
21   discrimination by any acts or inactions of
22   Robert J. Moran?
23 A. Yes.
24 Q. Can you tell me what facts you know that

Page 59

1  support that answer?
2  A. He was the head of human resources in a few
3    of the positions in question here.
4  Q. And you believe that he intended to have
5    some discrimination occur against you?
6  A. Yes.
7  Q. In what way or what manner did that happen?
8  A. By allowing this to happen in the fire
9    department.
10 Q. Allowing what to happen?
11 A. Bringing people in from the outside and not
12   promoting from within and people that were
13   new people.
14 Q. Just so I understand, do you believe that
15   these people from the outside were all not
16   qualified for the positions that they got?
17 A. I'm not saying they weren't qualified. I'm
18   just saying that they got it because they
19   knew people.
20 Q. Do you believe that any of the people that
21   you know that you have in your mind that
22   were brought in have not been effective in
23   the positions that they have?
24 A. Not to my knowledge.

Page 60

1  Q. So they've been good in their jobs?
2  A. As far as I know. I'm not in an
3    authoritative position that somebody would
4    tell me that.
5  Q. You believe that it's incumbent upon the
6    Boston Fire Department to hire only or give
7    raises only to people within the Boston Fire
8    Department?
9  A. Excuse me?
10 Q. Is it your feeling that the Boston Fire
11   Department is required to promote or give
12   raises to people only within the Boston Fire
13   Department?
14 A. If there's somebody qualified to do the job,
15   yes, I do.
16 Q. If a person from the outside is more
17   qualified than the person on the inside, you
18   believe that person should get the job?
19 A. If the person on the outside is more
20   qualified?
21 Q. Yes, than the person on the inside who
22   applies for the job. Do you believe that
23   that person should get the job?
24 A. I don't believe that they are more

16 (Pages 61 to 64)

Page 61

1 qualified.
2 Q. It's your opinion that since you've been
3 there since 1974 that nobody more qualified
4 has ever applied for a job in the Boston
5 Fire Department than somebody who was
6 already employed there?
7 A. We're talking from '99 on.
8 Q. Let's do that then. From '99 on it's your
9 belief that no more qualified person was
10 ever hired from the outside than that was
11 available on the inside?
12 A. What I'm saying is that since the civil
13 service exam policies have not been there
14 anymore in the fire department, they do take
15 in people from the outside that they know
16 that I do not believe are more qualified
17 than the people there.
18 Q. And you know that because you've looked into
19 it?
20 A. I know that because I myself have been there
21 for 37 years, and somebody from the outside
22 knows more about the fire department and
23 doing that job than I do?
24 Q. It's not conceivable to you?

Page 62

1 A. They don't even know how the fire department
2 works, to my knowledge, when they first come
3 in Day 1.
4 Q. Did you ever apply for a job outside of the
5 Boston Fire Department?
6 A. No.
7 Q. No job application in the private sector at
8 all?
9 A. No.
10 Q. Can you tell me, do you know Mike Galvin?
11 A. Yes, I know who he is.
12 Q. How do you know Mike Galvin?
13 A. I know Mike Galvin through -- my husband
14 sits on a board, I think, with him.
15 Q. Is he a friend of the family, friend of
16 yours?
17 A. No.
18 Q. Have you ever asked Mike to do anything for
19 you?
20 A. Did I, no.
21 Q. Your husband ever?
22 A. To my knowledge, no, not that I know of.
23 Q. Back to the complaint, with respect to
24 Ronald Keating, what facts do you have that

Page 63

1 support your theory that he somehow
2 participated in political affiliation
3 discrimination against you?
4 A. He had nothing to do with my stuff. Not
5 applicable to me.
6 Q. How about Paul A. Christian, is he
7 applicable to you for having, according to
8 you, behaved in such a way that amounts to
9 political affiliation discrimination?
10 A. He was the commissioner during, I think, two
11 of those promotions.
12 Q. But what facts do you have that he had
13 knowledge of it or participated in the
14 decision-making process?
15 A. As the head of the fire department, he has
16 to sign off on them all.
17 Q. So you feel you do have claims against Paul
18 Christian?
19 A. For allowing those to happen, yes.
20 Q. You know that he had knowledge of each one
21 of the promotions?
22 A. If he had to sign off on them, yes.
23 Q. How about Roderick Fraser, Jr., what facts
24 do you have to support any claims that you

Page 64

1 might have against him for political
2 affiliation discrimination?
3 A. I have nothing against him. He wasn't here
4 when this all happened.
5 Q. So you present no claims against him in this
6 lawsuit in your mind?
7 A. For the positions that I put in for?
8 Q. For any of the conduct you feel that you've
9 been affected by.
10 A. That I've been affected by, no. He's only
11 been there a year.
12 Q. You know he's a party to this lawsuit?
13 A. Yes.
14 Q. You know that by virtue of having claims,
15 that you filed claims against him as well?
16 A. Nothing that I am putting in for as far as
17 my promotions fall under the time that he
18 was on the job.
19 Q. Chief Finn, what, if any, facts or
20 allegations do you have to support any of
21 the conduct of political affiliation
22 discrimination that you allege in this
23 complaint as they are directed towards Chief
24 Finn?

Page 65

1  A. Chief Finn is not applicable to me.
2  Q. How about William Kessler, is he applicable
3      to you?
4  A. No.
5  Q. How about William Hitchcock, is he
6      applicable to you?
7  A. No.
8  Q. Are there any people not mentioned in this
9      lawsuit who you believe are applicable to
10     you?
11 A. Yes.
12 Q. Who is that?
13 A. Andrew Warren, Dennis DiMarzio. To my
14     knowledge I think that's it as far as
15     defendants.
16 Q. You intend to see them named as defendants?
17 A. If it has to be, yes.
18 Q. Under what scenario would it have to be, in
19     your mind?
20 A. They were part of what was done to me, I
21     feel, so yes, they should be included.
22 Q. Do you believe that your claims are equal
23     and the same as the claims of Denise Barry?
24 A. I'm not absolutely sure exactly what her

Page 66

1      claims are.
2  Q. How about Jane Green, are your claims the
3      same as Jane B. Green's?
4  A. The part of political affiliation of either
5      one of them, yes, would be the same.
6  Q. How about Elizabeth Golden?
7  A. If it's political affiliation on her, yes.
8  Q. So you're saying that the same
9      discrimination that she claims you also
10     experienced?
11 A. Yes.
12 Q. How about Elaine Mesiti, same claims as you?
13 A. If it's political affiliation, yes.
14 Q. Lila Brown, same claims as you?
15 A. On political affiliation, yes.
16 Q. You know that because you've had
17     conversations with Lila Brown about this?
18 A. If she has any claims on political
19     affiliation, yes, they would be the same as
20     mine.
21 Q. That's not my question. My question is, did
22     you have conversation with her about the
23     nature of your claim and her claim?
24 A. Yes, we've discussed this case.

Page 67

1  Q. Based upon the discussion, you believe your
2      claims are the same as hers?
3  A. The same as hers regarding...?
4  Q. Discrimination.
5  A. I mean, we went for different promotions, so
6      that wouldn't be the same, but as far as
7      political affiliation, yes.
8  Q. That distinguishes your claim from her
9      claim, is that she's filed for different
10     jobs and you've filed for different jobs?
11 A. Correct.
12 Q. You have a different educational background;
13     she has a different educational background,
14     right?
15 A. I assume so. I never went into her
16     schooling.
17 Q. How about Mary M. Kane, did you ever have
18     any conversations with her about the claims
19     that she has?
20 A. Yes.
21 Q. Do you feel that they're similar to your
22     claims?
23 A. Similar. They're political, yes.
24 Q. And Judith A. Kelley, do you believe the

Page 68

1      claims are the same?
2  A. Yes.
3  Q. Can you define for me what you mean by
4      "political affiliation discrimination"?
5  A. People who are associated with the
6      administration, Menino administration.
7  Q. Who is that, in your mind?
8  A. Who is?
9  Q. Who is affiliated with the Menino
10     administration, in your mind, within the
11     Boston Fire Department?
12 A. Just in the fire department or in the
13     administration?
14 Q. In the fire department?
15 A. Dennis DiMarzio, who was acting fire
16     marshall, Andy Warren, Maryanne McHugo, and
17     anybody in the Menino administration. That
18     would cover the Menino administration. They
19     don't actually work in the fire department.
20 Q. He's my boss too.
21 A. That's what I'm saying.
22 Q. Are you claiming me too?
23 A. No. I'm just -- you're asking me for the
24     ones in the fire department, but most of

Page 69

1   them don't work in the fire department.
2   Q. You believe that these people, DiMarzio,
3      Andy Warren, somehow came up with an idea
4      about choosing certain people to advance in
5      the Boston Fire Department and against other
6      people?
7   A. Yes.
8   Q. You base that upon what facts?
9   A. That, like we discussed earlier, they --
10     Maryanne talked about it.
11  Q. Did Maryanne ever say to you that you
12     weren't getting any promotions because of
13     any such plan or conspiracy?
14  A. No. She never said that to me.
15  Q. So you just concluded that?
16  A. No. I heard her on the phone about all the
17     people that she knew.
18  Q. So you overheard phone conversations that
19     she had?
20  A. Yes. And she also told us. She made it
21     known to everybody there.
22  Q. But primarily it was from eavesdropping on a
23     phone conversation?
24  A. I wasn't eavesdropping. She sat right next

Page 70

1   to me and said it very loud on a daily
2   basis.
3   Q. In your Answer to Interrogatory No. 17, I'd
4      like to have you look at the question and
5      read it to yourself. I'm just going to ask
6      you some questions about it.
7          Ms. McDonough, did you have a chance
8      to read Interrogatory No. 17 and your
9      answer?
10  A. Yes.
11  Q. Are these your words in this answer?
12  A. Yes.
13  Q. Verbatim what you told to put in this
14     answer, these are your words?
15  A. Yes. To the best of my knowledge, yes, they
16     are.
17  Q. It says in your answer, "Political
18     affiliation is a sponsorship from, support
19     from, and/or close affiliation with a member
20     of the then existing administration and
21     power and influence in the City of Boston
22     administration and Boston Fire Department
23     executive officers, including the group of
24     individuals known as the "Hyde Park Group"

Page 71

1   and "South Boston Group" who constantly vie
2   for power against any other political group,
3   including other parties (e.g. Republican and
4   other groups within the Democratic Party)."
5          Those are your words?
6   A. Yes. Might not be word for word, but
7      that's...
8   Q. What does that answer mean?
9   A. That people from South Boston and Hyde Park,
10     if you know the right people you get in.
11  Q. It's your testimony today that the people
12     from the outside who have been hired by the
13     Boston Fire Department are either Hyde Park
14     residents or South Boston residents?
15         MR. FEENEY: Objection. Misstates
16     her testimony.
17  Q. Is it your testimony that the people who
18     have been hired from the outside, as you
19     testified earlier, are either residents of
20     Hyde Park or South Boston?
21  A. Just about, yes.
22  Q. And that's wrong for what reason?
23  A. For the reason that they're getting the job
24     because they know somebody.

Page 72

1   Q. Who is the Hyde Park Group in this answer?
2   A. Would be DiMarzio, Andy Warren. Those would
3      be the higher ones that would make those
4      decisions.
5   Q. Do you know if they are residents of Hyde
6      Park?
7   A. To the best of my knowledge, yes.
8   Q. Who comprises the South Boston Group?
9   A. It would be Paul Christian and Dodo Nee.
10  Q. Is Paul Christian even involved in the
11     Boston Fire Department anymore?
12  A. Not anymore.
13  Q. Is Dodo Nee still involved with the Boston
14     Fire Department?
15  A. He's retired.
16  Q. When did he retire?
17  A. Few years ago. I don't know the date.
18  Q. When did Paul Christian retire?
19  A. Approximately a year, year and a half ago,
20     two years. I don't know the exact date on
21     Christian, but it's been within the last
22     little while.
23  Q. Is it your testimony that some "South Boston
24     Group" comprised of two men who are now

Page 73

1   retired still has some kind of influence
2   over the hiring decisions of the Boston Fire
3   Department?
4   A. As far as Dodo Nee, you mean?
5   Q. As far as the people that you just testified
6   to.
7   A. The two that are retired, Chief Christian
8   and Dodo Nee?
9   Q. Yes.
10  A. Yes.
11  Q. It's your testimony that they still wield
12  some influence over the hiring process of
13  the Boston Fire Department?
14  A. I don't know about Chief Christian, but Dodo
15  Nee, yes.
16  Q. Still does?
17  A. Yes.
18  Q. How do you know that?
19  A. Because everybody talks about it.
20  Q. Who's everyone?
21  A. Just about everybody. He's always been
22  connected.
23  Q. It's your testimony here today that Dodo Nee
24  somehow has made decisions that have

Page 74

1   affected your career within the Boston Fire
2   Department?
3   A. I don't know if it's specifically in the
4   jobs I went for, but others, other jobs in
5   the department that could have even been
6   lower than my position.
7   Q. This is all about you today, so anything
8   else, that's other matters that we don't
9   have to concern ourselves with.
10      MR. FEENEY: Objection. It's all
11  about the class certification issue today,
12  so it's not just all about her.
13      MR. HOLMES: I know. But as it
14  pertains to her. I mean, commonality is a
15  big thing, so I'm trying to see if she's got
16  the common thread that binds all these
17  parties together, and that's just really all
18  I was trying to do.
19  Q. Then in your answer you include something in
20  here and I just can't figure -- "e.g.
21  Republicans and other groups within the
22  Democratic Party." What do you mean by
23  that?
24  A. I guess whether you're a Democrat or -- our

Page 75

1   parties aren't politically affiliated.
2   You're affiliated through who you know, so
3   it doesn't mean that your political
4   affiliation is saying that you're in the
5   Democratic Party or the Republican Party.
6   It's saying that you're affiliated through
7   who you know.
8   Q. But you mention Republicans. Why did you
9   include them in this answer?
10  A. I put it down there to show that it's not
11  being political because of what party you're
12  in; it's political from who you know how you
13  get the job.
14  Q. But you say in your answer that "The City of
15  Boston administration and Boston Fire
16  Department executive officers, including the
17  group of individuals known as the "Hyde Park
18  Group" and "South Boston Group," who
19  constantly vie for power against any other
20  political group, including other parties."
21      So are you saying the South Boston
22  Group vies for power against Republicans?
23  A. No, not against Republicans.
24  Q. There's only about three in the state

Page 76

1   anyway. I'm one of them. That's why I
2   know. That's why I take it personally when
3   you throw in Republicans.
4   A. Can we have a break for a second?
5   Q. Sure.
6       (Recess)
7   Q. With respect to your complaint, in Paragraph
8   121 of the complaint, which deals with your
9   claims in particular, it states, "As a
10  direct and proximate result of the
11  discrimination and other violations of law
12  perpetrated by the Defendants, Plaintiff
13  McDonough has been deprived of approximately
14  $70,000 in wages and benefits and continues
15  to suffer such losses at the rate of
16  approximately 251.22 per week."
17      What other violations of law were you
18  talking about there?
19  A. That I'm missing out on $250 a week because
20  of the political affiliation.
21  Q. And how did you come up with $70,000?
22  A. We went over the last six years per week
23  from the date that Maryanne McHugo got her
24  job and multiplied that through the date

Page 77

1    that that was filed, and that was where that
2    amount came up with.
3  Q. So the $70,000 pertains to the Maryanne
4    McHugo hiring?
5  A. Yes.
6  Q. From the date of Maryanne McHugo being hired
7    coming forward, you calculate it out to be
8    $70,000 on the nose, when you filed this?
9  A. Yes.
10 Q. The 251.22 per week, that's the difference
11   between what you would have earned if you
12   had gotten the job that Maryanne McHugo got?
13 A. And what I'm making now, or at the time. It
14   was an approximate in there.
15 Q. The 251.22 or the 70,000?
16 A. Well, I don't think that was to the penny,
17   but I think the 251 was probably when that
18   was filed, which was so many years after --
19   that Maryanne got on the job. It wasn't 251
20   the date that she got the job. That wasn't
21   the amount that was the difference. It was
22   probably like 225 or something like that,
23   but it worked it's way up each year because
24   of the contract raises.

Page 78

1  Q. Maryanne McHugo, you have not filed for any
2    positions since that?
3  A. I haven't filed for any what?
4  Q. I'm asking whether or not you filed for any
5    other positions since the Maryanne McHugo
6    thing where --
7  A. Yes.
8  Q. You did?
9  A. Yes.
10 Q. And those positions you didn't get, and
11   they're calculated in here as well?
12 A. Well, it would have been the same pay scale
13   if I had gotten them, and Maryanne's was the
14   first one.
15 Q. And that triggers the amount of money that
16   starts to accrue, according to you?
17 A. Correct, going back to when she was
18   appointed. That was the one that I wasn't
19   interviewed for.
20      MR. HOLMES: I have nothing else.
21   Thank you.
22      MR. FEENEY: I've got a few
23   questions.
24      EXAMINATION BY MR. FEENEY

Page 79

1  Q. You heard some of the questions from
2    Attorney Holmes asking you about the
3    qualifications of people who actually got
4    the jobs.
5  A. Yes.
6  Q. Let's focus on Mary Killgallen for a second.
7    Is Mary Killgallen qualified for the job
8    that she has gotten, in your opinion?
9       Let me rephrase it.
10      Have you heard anything about Mary
11   Killgallen's performance that would indicate
12   that she would not be qualified for the job?
13 A. Yes.
14 Q. What have you heard?
15 A. I've heard that she couldn't do the job very
16   well in human resources, which was the one
17   she was originally appointed to when she
18   first came there, that she was making all
19   kinds of mistakes and having kind of a
20   problem.
21 Q. How about the job she's doing now?
22 A. In the job she's doing now also I heard that
23   -- and I've seen different things that come
24   out of that office that there's terrible

Page 80

1    misspellings and problems like that.
2  Q. Have you heard about people filling in for
3    Mary Killgallen's position or doing her job?
4  A. Doing it while she's in it?
5  Q. Or doing part of her responsibilities.
6  A. I've heard that people did -- yes, I did
7    hear that some of the responsibilities did
8    come out of the position of the girl that
9    had it previous. They took some of the
10   duties away.
11 Q. Going to Steve Morash, in what words did he
12   use to express his situation in terms of how
13   he was treated by the fire department?
14 A. I can't recall the whole conversation, but
15   it was -- he was just fed up. He was fed up
16   with the whole place.
17 Q. In what sense?
18 A. To my knowledge, I think some of his duties
19   were taken away, and he was upset about
20   that. He went to the private sector and got
21   out.
22 Q. Did he give you an opinion as to why they
23   were taken away?
24 A. No. I can't really recall the whole

Page 81

1    conversation. It was after the fact, after
2    he had left.
3    Q. Following up on that, so then what makes you
4       think that he was subject to political
5       affiliation discrimination or didn't get
6       what he needed because of the lack of --
7          Did he ever express to you about any
8       lack of political patronage or political
9       affiliation?
10   A. No, not to my knowledge.
11   Q. The Hyde Park Group, as you have entitled
12      them, does that include Mayor Menino?
13   A. Yes.
14   Q. Are you saying that everybody in Hyde Park
15      is politically connected to Mayor Menino?
16   A. No.
17   Q. Are you saying that you have to live in Hyde
18      Park in order to be politically connected to
19      the Hyde Park Group?
20   A. No.
21   Q. So what are you saying?
22   A. You just have to know them and be -- whether
23      you're a relative or friend or...
24   Q. That would apply to the South Boston Group

Page 82

1       as well?
2    A. Yes.
3    Q. You were asked a question about Mike Galvin.
4    A. Yes.
5    Q. And you were asked if you had asked him for
6       any favors. Have you ever asked Mike Galvin
7       for any favors?
8    A. No.
9    Q. Have you ever asked Mike Galvin for any
10      information?
11   A. Yes. Not myself. My husband.
12   Q. What did your husband ask him?
13   A. My husband called him and asked him if he
14      knew anything about what was going on with
15      the position of the MM-8 principal
16      administrative assistant that was posted for
17      fire prevention in the fire marshall's
18      office, and he asked him if he knew about
19      Maryanne McHugo.
20   Q. Was Mr. Galvin able to give you any
21      information on that?
22   A. To my knowledge, I think he was going to
23      look into it, but I don't think we ever
24      heard back anything on it.

Page 83

1    Q. Going back to Mary Killgallen, did you ever
2       hear Mary Killgallen talk about any of her
3       political connections?
4    A. No, I don't -- I don't recall really talking
5       to Mary Killgallen specifically.
6          MR. FEENEY: No further questions.
7          MR. HOLMES: Just a few just to fill
8       in some blanks as I was sitting here.
9          REEXAMINATION BY MR. HOLMES
10   Q. Where in the City of Boston did you ever
11      live in order to be working at the Boston
12      Fire Department?
13   A. I lived in Dorchester. I'm grandfathered.
14   Q. I didn't mean that there's anything wrong.
15      I just wanted to know where you lived in the
16      city because --
17   A. I lived in Dorchester.
18   Q. What is your current position with fire
19      department?
20   A. Senior administrative assistant.
21   Q. Pardon me for forgetting, but which branch?
22   A. I work in the fire marshall's office, fire
23      prevention division.
24   Q. What are your duties there?

Page 84

1    A. I am the administrative assistant to the
2       fire marshall and the assistant fire
3       marshall.
4    Q. Could you just be more specific because I
5       don't know what that means. Can you tell me
6       what that means?
7    A. I take care of anything that they are
8       involved in as far as letters, secretarial
9       work, answering phones, doing the mail. I
10      take care of the blasting for the West
11      Roxbury Crushed Stone. I handle all the
12      morning reports for all the units in fire
13      prevention.
14         The subpoenas, I handle all the
15      subpoenas that come in to the keeper of
16      records for the fire marshall. I handle
17      anything that comes up on a daily basis
18      that's needed for the fire marshall's
19      office.
20   Q. It's all administrative, though?
21   A. All administrative.
22         MR. HOLMES: That's all I have.
23      Thank you.
24         MR. FEENEY: One follow-up question

## Page 85

```
 1    to wrap this up.
 2         REEXAMINATION BY MR. FEENEY
 3    Q. In 1999 Mary Doherty got a position that you
 4       applied for, correct?
 5    A. Yes.
 6    Q. When you were asked a question if you knew
 7       about any political connections that she
 8       had, you said, Not directly.  Had you heard
 9       indirectly about any political patronage or
10       connection?
11    A. Indirectly, yes.
12    Q. What have you heard?
13    A. In passing you heard -- this was a while
14       back too.  This was like years ago people
15       just said that she knew someone to get the
16       job.
17    Q. Do you remember who those people were?
18    A. No, I don't.
19         MR. FEENEY:  No further questions.
20         MR. HOLMES:  That's it.
21         (Whereupon, this deposition concluded
22         at 3:50 p.m.)
23
24
```

## Page 86

```
 1         C E R T I F I C A T E
 2
 3    COMMONWEALTH OF MASSACHUSETTS
 4    MIDDLESEX, SS.
 5
 6         I, Melinda M. Piccirilli, a
 7    Certified Shorthand Reporter and Notary Public
 8    in and for the Commonwealth of Massachusetts,
 9    do hereby certify that Patricia MCDONOUGH, the
10    witness whose deposition is hereinbefore set
11    forth, was duly sworn by me and that such
12    deposition is a true and accurate record, to
13    the best of my knowledge, skills, and ability,
14    of the testimony given by such witness.
15         IN WITNESS WHEREOF, I have hereunto
16    set my hand and affixed my seal of office this
17    14th Day of June, 2007.
18
19
20         Melinda M. Piccirilli, CSR
21         Notary Public
22
23    My commission expires:
24    December 5, 2008
```

## Page 87

```
 1    DEPONENT'S ERRATA SHEET
 2    AND SIGNATURE INSTRUCTIONS
 3
 4         The original of the Errata Sheet
 5    has been delivered to Thomas F. Feeney, Esq.
 6         When the Errata Sheet has been
 7    completed by the deponent and signed, a copy
 8    thereof should be delivered to each party of
 9    record and the ORIGINAL delivered to Scott. C.
10    Holmes, Esq. to whom the original deposition
11    transcript was delivered.
12
13         INSTRUCTIONS TO DEPONENT
14
15         After reading this volume of your
      deposition, indicate any corrections or changes
16    to your testimony and the reasons therefor on
      the Errata Sheet supplied to you and sign it.
17    DO NOT make marks or notations on the
      transcript volume itself.
18
19    REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20    COMPLETED AND SIGNED ERRATA SHEET WHEN
21    RECEIVED.
22
23
24
```

## Page 88

```
 1    ATTACH TO THE DEPOSITION OF Patricia MCDONOUGH
      CASE: BARRY, ET AL. VS. MORAN, ET AL.
 2    DATE HELD:  WEDNESDAY, MAY 23, 2007
 3         ERRATA SHEET
 4    INSTRUCTIONS:  After reading the transcript of
      your deposition, note any change or correction
 5    to your testimony and the reason therefor on
      this sheet.  DO NOT make any marks or notations
 6    on the transcript volume itself.  Sign and date
      this errata sheet before a Notary Public, if
 7    required).  Refer to Page 87 of the transcript
      for errata sheet distribution instructions.
 8
      PAGE  LINE
 9         CHANGE:
           REASON:
10         CHANGE:
           REASON:
11         CHANGE:
           REASON:
12         CHANGE:
           REASON:
13         CHANGE:
           REASON:
14         CHANGE:
           REASON:
15         CHANGE:
           REASON:
16         CHANGE:
           REASON:
17         CHANGE:
           REASON:
18         CHANGE:
           REASON:
19
         I have read the foregoing
20    transcript of my deposition and except for any
      corrections or changes noted above, I hereby
21    subscribe to the transcript as an accurate
      record of the statements made by me.
22
23         PATRICIA MCDONOUGH
24         DATE:
```

```
                              VOLUME:   I
                              PAGES:  1 - 156
                              EXHIBITS:  1
           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS

                          Civil No. 05-10528RCL
```

DENISE M. BARRY; JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA J.
MCDONOUGH; ELAINE MESITI; LILA
BROWN; MARY M. KANE; AND JUDITH
A. KELLEY, INDIVIDUALLY AND ON
BEHALF OF ALL THOSE SIMILARLY
SITUATED,

  Plaintiffs,

vs.

ROBERT J. MORAN; RONALD KEATING;
PAUL A. CHRISTIAN; RODERICK FRASER,
JR.; WILLIAM KESSLER; WILLIAM
HITCHCOCK; CITY OF BOSTON (FIRE
DEPARTMENT), AND JOHN AND/OR JANE
DOES 1-50,
  Defendants.

       DEPOSITION OF ELIZABETH GOLDEN, a
witness called on behalf of the Defendants,
pursuant to the provisions of the Massachusetts Rules
of Civil Procedure, before Laura Naylor, Registered
Professional Reporter and Notary Public, in and for
the Commonwealth of Massachusetts, at City of Boston
Law Department, One City Hall Plaza, Room 615,
Boston, Massachusetts, on Wednesday, June 20, 2007,
commencing at 2:00 p.m.

```
APPEARANCES:

        THOMAS F. FEENEY, ESQ.

        39 Sheafe Street, Suite One

        Chestnut Hill, MA  02467

            Attorney for the Plaintiffs


        CITY OF BOSTON LAW DEPARTMENT

        City Hall, Room 615

        Boston, MA 02201

        BY:  Karen A. Glasgow, Esq.

             Scott C. Holmes, Esq.

             Attorney for the Defendants.
```

INDEX

WITNESS:            DIRECT        CROSS         REDIRECT     RECROSS

Elizabeth Golden

By Ms. Glasgow       4                           152

By Mr. Feeney                      143


                         EXHIBITS

1      Answers to Interrogatories              41

```
 1                    P R O C E E D I N G S
 2    Thereupon,
 3                    ELIZABETH GOLDEN,
 4    having been first duly sworn or affirmed was examined
 5    and testified as follows:
 6                    DIRECT EXAMINATION
 7            MS. GLASGOW:  Stipulations?  Read and
 8        sign, 30 days?
 9            MR. FEENEY:  By all means.
10            MS. GLASGOW:  Waive notary?
11            MR. FEENEY:  Sure.
12            MS. GLASGOW:  All objections except as
13        to form?
14            MR. FEENEY:  Sounds good to me.
15    BY MS. GLASGOW:
16    Q.   Good afternoon.  Please state your full name and
17         spell your last name for the record.
18    A.   Elizabeth H. Golden, G-o-l-d-e-n.
19    Q.   My name is Karen Glasgow.  And I represent the
20         defendants in this case.  I represent Robert
21         Moran, Ronald Keating, Paul A. Christian,
22         Roderick Fraser, William Kessler, William
23         Hitchcock, City of Boston, and Chief Finn,
24         whatever his first name is.
```

1              MR. FEENEY:  Joseph.

2    BY MS. GLASGOW:

3    Q.   Joseph.  Thank you.  Have you ever had your

4         deposition taken before?

5    A.   No.

6    Q.   I am sure your attorney has given you some

7         ground rules.  But I will go over them again.

8         Basically, I am going to ask you a set of

9         questions concerning this lawsuit.

10             And I need all your answers to be

11        verbal.  The court reporter is here.  And

12        everything that is spoken she is going to be

13        taking down.  She can't take down a shake of the

14        head or a nod of the head.  Everything has to be

15        verbal.

16             So if at any time you don't understand

17        the question, let me know.  If you answer a

18        question, I am going to assume you understood

19        it.  If you don't understand, ask me.  And I

20        will rephrase it.  Okay?

21             If you need to take a break at any

22        time, let me know.  If you need to get some

23        water, if you need to take a restroom break or

24        anything like that, just let me know.  The only

```
 1         thing I will ask you to do, if there is a

 2         question pending I ask you to answer that

 3         question first before taking a break.

 4                  Where do you currently reside?

 5    A.   74 Tremont Street, Charlestown.

 6    Q.   How long have you lived there?

 7    A.   Almost 17 years now.

 8    Q.   Who do you live there?

 9    A.   My husband and my five children.

10    Q.   What is your husband's name?

11    A.   Peter G. Golden, Jr.

12    Q.   What does he do for a living?

13    A.   He is retired from the Boston school department.

14    Q.   He was a teacher?

15    A.   Yes.

16    Q.   You have five children?

17    A.   Yes.

18    Q.   What are their ages?

19    A.   They range from 26 to 33.

20    Q.   And they all live with you say?

21    A.   They enjoy living at home.  They go on their

22         trips and buy their cars.

23    Q.   Can you summarize your educational background,

24         please?
```

```
1    A.    Do you want me to start from --

2    Q.    From high school.

3    A.    -- high school?

4    Q.    Yes.

5    A.    I started originally at St. Mary enunciation

6          high school in Cambridge and transferred to

7          Charlestown High School.  I started after

8          graduation from there.  I started at U-Mass

9          Boston, but was one of those individuals that

10         only stayed for a semester.  And I was going to

11         take off a year.

12               Then back in, I believe it was the

13         late 80's, the city through the union gave us

14         the opportunity to go to Boston Business School.

15   Q.    What is Boston Business School?

16   A.    Well, right now it is actually part of Roxbury

17         Community College now.  It is on Commonwealth

18         Avenue.  It was more like a -- it is basically a

19         business school.  But where they were affiliated

20         with Roxbury Community College we would have the

21         opportunity to work towards an associate's

22         degree.

23               And, of course, over the years I

24         had -- the longer I was out of school even once
```

```
 1        my kids were smaller it started to become like a
 2        personal goal for me to get the degree.  So I
 3        did end up going, continuing to Boston Business.
 4        And I did get the associate's degree from
 5        Roxbury Community College.
 6                And then approximately about a year
 7        later while my own kids were in college I
 8        started at Emmanuel College.  And a couple of
 9        years later I graduated with a bachelor's degree
10        from there.
11   Q.   When did you get your associate's degree?
12   A.   I can't think of the exact year.  It was the
13        early 90's.  Maybe '92, '93.
14   Q.   What was your associate's degree in?
15   A.   Accounting.
16   Q.   You said you got a bachelor's from Emmanuel
17        College?
18   A.   Yes.
19   Q.   When did you get that?
20   A.   Business administration.
21   Q.   When did you get that?
22   A.   1997.  I graduated when my kids did.
23   Q.   Besides this lawsuit which you have against the
24        8 defendants, have you filed any other lawsuits
```

```
 1           against the city?
 2    A.     I don't know if you consider a discrimination
 3           suit?
 4    Q.     Yes.
 5    A.     With the MCAD I did, yes.
 6    Q.     When was that?
 7    A.     Initially when it was filed I believe it was
 8           2000 -- I could be wrong with the year.  2005?
 9    Q.     And what was the --
10    A.     It was so long I can't remember if it was 2004
11           or 2005.
12    Q.     What would the alleged discrimination in that
13           case?
14    A.     Basically discrimination as far as jobs and
15           things go.
16    Q.     What do you mean by that?
17    A.     In the sense along the same lines what I would
18           consider a discrimination even in this case as
19           well that jobs were basically given mainly to
20           the men.
21                  The posted positions we would know who
22           got the job before they even held interviews, if
23           they held interviews.  The majority of the ones,
24           the positions that I applied over the years and
```

1    things and myself they were all politically

2    connected people with the administration, within

3    the fire department administration that there

4    was no opportunity for people with legitimate

5    qualifications and things versus people that

6    didn't have any qualifications.

7  Q.  So what was the outcome of that claim with the

8    MCAD?

9  A.  They denied it.  But the biggest issue being

10    that they would not, the main -- I don't know

11    what you would call it.  The main claim that I

12    was making to the investigator at the time, she

13    wouldn't hear anything about it, because she was

14    saying it went past so many days.

15         But we were trying to, between Thomas

16    and myself, even for an appeal to try to explain

17    to them that what it was for the main job that I

18    was complaining of, I did not, I did not find

19    out about it until a certain date, which it

20    would fall into, I think it was 180 days, a

21    certain number of days that it was.

22         You know, they still didn't hear that.

23    I did get -- they did request further things --

24    when we did appeal it they requested further

```
 1              things from the City of Boston to supply some

 2              information and things, which I have no idea

 3              what they replied, the city.  But all I do know

 4              is that it was denied at the end.

 5       Q.     Do you recall when it was denied, the final

 6              denial?

 7       A.     I can't say off hand at the top of my head.

 8       Q.     Besides that claim at the MCAD, any other

 9              claims against the city?

10       A.     Grievances with the union.

11       Q.     We will get to those.  Have you sued any other

12              municipalities other than the City of Boston

13              before?

14       A.     No.

15       Q.     When did you start working for the City of

16              Boston Fire Department?

17       A.     July of 1985.

18       Q.     What did you do prior to July of '85?

19       A.     Basically I was more at home with my children

20              when they were younger.

21       Q.     And so you began in July of '85.  What was the

22              position you began in?

23       A.     Principal clerk.

24       Q.     A what?
```

| | | |
|---|---|---|
| 1 | A. | A level entry, RE grade. |
| 2 | Q. | What were your duties? |
| 3 | A. | I basically was going to be doing some work |
| 4 | | taking over for a gentlemen who was going to be |
| 5 | | retiring.  It was in a local 718 union, the fire |
| 6 | | alarm division. |
| 7 | | Sort of a variety of different things, |
| 8 | | but it was mainly purchase orders, service |
| 9 | | orders.  Basically -- it was mainly accounting |
| 10 | | work.  I am more or less, for where I am at the |
| 11 | | fire alarm division on the Fenway I handle all |
| 12 | | the accounting work except for that division |
| 13 | | that people would normally do at the accounting |
| 14 | | office via headquarters. |
| 15 | Q. | So the principal clerk position was in fire |
| 16 | | alarm? |
| 17 | A. | Yes. |
| 18 | Q. | What experience did they require when you got |
| 19 | | that position? |
| 20 | A. | Basically general, general office or business. |
| 21 | | No major things to handle.  I mean, we didn't |
| 22 | | have the computers or things like that. |
| 23 | Q. | Everything was manual? |
| 24 | A. | Probably some light typing.  Yes, everything was |

1    done on a typewriter.

2  Q.   Okay.

3  A.   And it was basically, for what I did do, it was

4       hands on learning, you know, for the different

5       forms that the city uses and the different

6       things.  There was no type of formal training or

7       anything that you had to go through for the

8       position.

9  Q.   What is done at the fire alarm division?  What

10      kind of work takes place over there?

11 A.   The fire alarm -- I am the only civilian in the

12      building.

13 Q.   When you say the only civilian, what do you

14      mean?

15 A.   Everyone else in the building is considered --

16      it depends on what classification the fire

17      department wants to give them.  They are members

18      of 718.

19 Q.   And that's a union?

20 A.   But the fire fighters consider them a uniform

21      civilian instead of considering them uniformed

22      and fire fighters.

23            You have all the master boxes that are

24      in the buildings, the high rise buildings, the

```
 1         hotels and things, the fire boxes and stuff that
 2         are on the street.  When those are pulled not
 3         say from my office because it is mainly just
 4         money things but when those boxes are pulled the
 5         alarm automatically goes into the fire alarm
 6         division and they have a dispatch area, same as
 7         like the police department would have.
 8    Q.   Okay.
 9    A.   They dispatch and have radio communications and
10         stuff with the apparatus and everything, from
11         whether it be for boxes or fires are going on,
12         you know, they dispatch all those things.  That
13         is one part of it.
14              And then downstairs in the building is
15         the fire alarm construction crew.  They mainly
16         handle a lot of the overhead wires, all the
17         underground cables that runs the connections,
18         like from the master boxes out on the street.
19              The cables would say in a sense be
20         connected to the building.  And they run them
21         through the man holes and things.  And they are
22         all connected into say the fire alarm office.
23    Q.   Okay.
24    A.   Mainly getting that direct connection for the
```

```
1         fire.  And we did have a couple of others, there
2         are a few other sections that are still
3         considered part of the fire alarm division even
4         though they are not at the division.
5    Q.   What are those?
6    A.   Those would be the machine shop.  That is over
7         fire quarters.  They had moved them for space.
8         They would do different types of things.  If the
9         fire boxes are not on the street, they might
10        connect a wheel.
11             Everything is coded with individual
12        numbers and stuff.  They do types of work with
13        that, with boxes, replacing and repairing them.
14        And then there is what is considered the
15        internal systems section, which they were
16        previously in the building.  They are now over
17        at 1010 Mass Ave.
18             And, basically, what they do is the
19        inspection of the fire alarm system during the
20        high rise buildings.  And even so far as
21        reviewing plans with engineers and different
22        ones when they are contemplating putting new
23        systems and things in the building then
24        quarterly checks and things like that nature.
```

```
1            They are part of the division too.
2    Q.    Are they part of local 718?
3    A.    Yes.
4    Q.    All of them in the fire alarm division are all
5          local 718?
6    A.    Except me.
7    Q.    Except you.  And what union are you?
8    A.    SENA.
9    Q.    What does SENA stand for?
10   A.    Salaried Employees of North America.
11   Q.    How long have you been a member of SENA?
12   A.    I would say roughly -- I can't remember when I
13         became an MM-5.  Basically it is based on from
14         when you, you go into SENA when you are an MM.
15         I really can't say off hand off the top of my
16         head what year.
17   Q.    So you began as a principal clerk R-8 level --
18   A.    Yes.
19   Q.    -- 1995.  How long did you hold that position
20         for?
21   A.    Probably a year, 2 years, basically any time I
22         got the opportunity -- it could even be a little
23         longer.  The big thing at that time was that you
24         did have civil service examinations.  And that
```

1        is how you progressed.   You could move.

2                And basically for all the positions

3        that I had up to an R-15 were all civil service

4        tests.   Then civil service stopped having tests.

5   Q.   So for you to get the position, the principal

6        clerk R-8, you took a civil service exam?

7   A.   No.   I took a civil service test to be made

8        permanent after I had been in the position.

9   Q.   How did that --

10  A.   They hire you provisionally.

11  Q.   Okay.

12  A.   So then once I took the civil service test and

13       was high enough up on the list they were looking

14       to fill two permanent slots.   Then I was given

15       the title permanently.   Then each grade that I

16       had above that worked the same way.

17  Q.   So each time you were looking for a promotion

18       you would take the civil service exam in order

19       to --

20  A.   Yes.   Occasionally, occasionally I can't

21       remember if there was more than one -- there may

22       have been one title there wasn't an exam for.

23       But basically overall most exams was strictly by

24       the civil service.

```
1    Q.    Do you recall when they stopped doing civil

2          service exams for those positions?

3    A.    It's been quite a while.

4    Q.    Is it more than ten years ago?

5    A.    I think it probably is.

6    Q.    More than 15?

7    A.    No, probably somewhere in there.

8    Q.    Okay.

9    A.    Because even back, I think it was, I could be

10         wrong on the number of years, but even back

11         about 6 years ago even all the provisional

12         employees, people that were provisional in a

13         position, they were automatically made permanent

14         regardless.

15   Q.    When the civil service stopped doing the exams

16         those people switched over to permanent?

17   A.    Yes.   There was something on people -- I think

18         it had been public works or somewhere that

19         people had been in the same job classification

20         for years and everything and still were

21         provisional status.

22               So civil service at that time had

23         given just about everybody permanent status in

24         whatever title they were, even if they had never
```

```
 1              taken a civil service test.

 2    Q.    Okay.  You were in the RA position for

 3          approximately 1, 2, 3 years?

 4    A.    Yes.

 5    Q.    Then what happened you took the civil service

 6          exam?

 7    A.    I was principal clerk.  I think then I was head

 8          clerk.  Then I was head clerk and secretary.  I

 9          believe then head administrative clerk, then

10          administrative assistant.  I think

11          administrative assistant was the last civil

12          service test they did offer.

13                   And I was made permanent in that

14          title.  And then I received the MM-5, I believe

15          only because I had complained and had gone to

16          the commissioner for filling an MM-5 position,

17          which I felt I was more qualified for than the

18          individual they decided to give it to.  And I

19          did receive the MM-6 on a grievance as well.

20    Q.    So head clerk.  After you were principal clerk

21          you became head clerk.  How long were you in

22          that position for?

23    A.    Probably a couple of years.  I would say most of

24          them probably at least 2 to 3 years.
```

```
1   Q.   Okay.  And each time you got a change in title
2        it changed the amount of money you were making?
3        You got an increase?
4   A.   Yes.
5   Q.   When you were head clerk, what level were you?
6   A.   I think the grade went from an R-8, and I
7        believe the fire department at that time didn't
8        have an R-9.  You went to an R-10.
9   Q.   Okay.
10  A.   Then a 12.  Then a 14 and 15.
11  Q.   So head admin clerk you were a 14 and
12       administrative assistant you were an R-15?
13  A.   Yes.
14  Q.   And those were all admin positions?
15  A.   Yes.
16  Q.   You said then after that you got an MM-5.  You
17       said you got that partly because you complained
18       to the commissioner.  Who was the commissioner
19       at the time?
20  A.   I believe the one that was there at the time was
21       Marty Pearce.
22  Q.   What was that position, the MM-5 for?
23  A.   That was for the senior administrative
24       assistant.
```

```
 1   Q.   What would you be doing for that position?
 2   A.   Actually, it was for the position that I had.
 3        It is like you could say each job it has been
 4        more and more work still doing the original
 5        work, but just taking on more and more as the
 6        years went on.
 7             It would still be basically the
 8        accounting work.  The responsibilities were more
 9        I started doing contracts.  I am trying to
10        think.
11   Q.   Did you supervise anybody?
12   A.   At different times.  At different times.  There
13        was a few different times as many as maybe five
14        other civilians in the building.  And at
15        different times there may have been a couple
16        that I supervised.
17             Sometimes occasionally they would get
18        summer help.  Then I would have them in the
19        summer time.  Yes.  But that basically -- I
20        mean, not now.  I am more or less what I
21        consider an independent.
22   Q.   When did you begin that MM-5 position?
23   A.   Let's see.  I believe it was back somewhere
24        around -- I am not sure on the years because I
```

1    have everything on paper.  It could have even

2    been a little earlier.  I am not exactly sure on

3    the year.

4  Q.  Do you remember when Commissioner Pearce left?

5  A.  He has been gone probably --

6  Q.  Did he leave before 2000?

7  A.  -- about 6 years?

8  Q.  You say he left in 2001?

9  A.  Not necessarily.  I would say probably about 6

10   years since he has been gone.  And what this

11   basically had to do with the MM-5, because I

12   couldn't be -- the main reason that I had gone

13   to the commissioner was because the MM-5 at the

14   time, I would say I was an R-15.

15         I was APSNI.  The MM-5 position was

16   SENA.  So SENA really didn't want to do anything

17   for me because I was still an APSNI employee.

18   And APSNI didn't want to do anything really for

19   me because it was a SENA position.

20  Q.  So you were in limbo?

21  A.  Yes.  So I had gone to Marty Pearce.  And there

22   were a number of different jobs that were even

23   spoken about at the time, not just the MM-5, but

24   that I was basically looking for them.  I had

1    been told by the executive assistants who was

2    the one that was giving a lot of the

3    notifications and who they were given a position

4    to.

5    Q.   Who --

6    A.   Gerry Horgan.

7    Q.   Okay.

8    A.   And I was looking for them to tell me to put it

9         in writing to me what qualifications I was

10        missing.  What anything -- because I basically

11        had put it to them that I had been -- this was

12        for the supervisor at the accounting office.

13   Q.   That was MM-5?

14   A.   Yes.

15   Q.   Okay.

16   A.   I had been asking for the position for two

17        years.

18   Q.   Were you getting the equivalent money --

19   A.   I was getting the acting.

20   Q.   Okay.

21   A.   And the one that was the supervisor at the time

22        was going to be coming back to work.  And she

23        was going to, of course I was told during this

24        two years the next available MM-5 that came up I

| 1 | | would get it. |
|---|---|---|
| 2 | Q. | You were acting in it for two years? |
| 3 | A. | Yes. |
| 4 | Q. | Okay. |
| 5 | A. | The woman who was the supervisor, at the time |
| 6 | | she had been out on two different leaves of |
| 7 | | absence.  So they decided to have -- the woman |
| 8 | | was coming back to work, but they decided she |
| 9 | | wasn't going back to the accounting office. |
| 10 | | They wanted me to stay there as an R-15. |
| 11 | Q. | And continue doing the job -- |
| 12 | A. | And continue doing the MM-5.  So I had to -- I |
| 13 | | ended up filing a grievance to return to my |
| 14 | | position at the fire alarm office, which is over |
| 15 | | on the Fenway, fire alarm division. |
| 16 | Q. | Where was this position? |
| 17 | A. | That was at fire headquarters at South Hampton |
| 18 | | Street. |
| 19 | Q. | Let's get this straight.  The acting MM-5 in |
| 20 | | accounting -- |
| 21 | A. | Yes. |
| 22 | Q. | -- you were also doing your position -- |
| 23 | A. | Yes. |
| 24 | Q. | -- that was for fire alarm? |

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And the accounting, did it deal with the whole |
| 3 | | fire department or specifically -- |
| 4 | A. | The whole department. |
| 5 | Q. | Who was the woman who had been out? |
| 6 | A. | Judy Kelley. |
| 7 | Q. | Judith Kelley who is one of the plaintiffs? |
| 8 | A. | Yes. |
| 9 | Q. | So you were doing her job in accounting -- |
| 10 | A. | Yes. |
| 11 | Q. | -- as well as your own? |
| 12 | A. | And I was also handling everything for central |
| 13 | | artery that another woman was supposed to do. |
| 14 | Q. | Who was that woman? |
| 15 | A. | Ann Holmes. |
| 16 | Q. | So you were basically doing three different |
| 17 | | jobs? |
| 18 | A. | Yes. |
| 19 | Q. | And you were getting paid at the MM-5 rate? |
| 20 | A. | Yes. |
| 21 | Q. | How did you get in to see the commissioner? |
| 22 | A. | I had to make an appointment. |
| 23 | Q. | Okay. |
| 24 | A. | The appointment was denied afterwards. |

| 1 | Q. | On what basis? |
| 2 | A. | Just that he cancelled the appointment. |
| 3 | Q. | Okay. |
| 4 | A. | I could see someone else.  So I had just called |
| 5 |    | him and told him I would like a written response |
| 6 |    | to a letter I had sent to Gerry Horgan because I |
| 7 |    | was going to get in touch with an attorney.  And |
| 8 |    | then about five minutes later I got a call back |
| 9 |    | that the commissioner would see me.  And that is |
| 10 |   | how I got to see him. |
| 11 | Q. | Was anyone else present at that meeting? |
| 12 | A. | Gerry Horgan. |
| 13 | Q. | Okay. |
| 14 | A. | And we discussed a lot of different things. |
| 15 |   | That is all I was looking for.  Tell me.  What |
| 16 |   | was I missing for qualifications?  That I felt I |
| 17 |   | had more qualifications, more experience.  I had |
| 18 |   | acted in the position. |
| 19 |   | I was a permanent civil service |
| 20 |   | employee.  All the different things down the |
| 21 |   | list.  And there was nothing that they could do. |
| 22 |   | So before Gerry Horgan ended up retiring they |
| 23 |   | sent out, I believe they sent out a memo about a |
| 24 |   | few different changes that were being made.  And |

```
 1              I got the MM-5.
 2    Q.   How long after the meeting which you had with
 3         the commissioner and Gerry Horgan did you get
 4         that permanent status as an MM-5?
 5    A.   I couldn't say off hand.
 6    Q.   Was it a matter of weeks, months, days?
 7    A.   I couldn't even guess.  I couldn't even guess.
 8    Q.   Did you continue working in that position as
 9         MM-5 until you were made permanent?
10    A.   No.  I got to go back to the fire alarm
11         division.
12    Q.   Okay.  So you returned back to your R-15
13         position?
14    A.   Yes.
15    Q.   And you just continued doing your own duties in
16         the fire alarm division?
17    A.   Yes.
18    Q.   Do you know who continued on doing the MM-5
19         accounting division?
20    A.   Yes.  Rosyln Copin.
21    Q.   And what about the central artery stuff?  Who
22         took over that?
23    A.   The central artery stuff eventually ended most
24         of it.
```

```
 1   Q.   Okay.

 2   A.   Ann Holmes, when I was taking care of things for

 3        her, she was handicapped.  And they really

 4        didn't want her working with things dealing with

 5        money.

 6   Q.   What does that mean?

 7   A.   There were so many different things where we do

 8        more accounts payable, different things.  A lot

 9        of the different projects, things on the project

10        were dealing with a lot of different

11        departments, say here at city hall all the

12        various companies throughout the whole country.

13                 It was considered a big money thing.

14        And they wanted -- I don't think they felt that

15        she could really do the job that they would like

16        her to do.

17   Q.   Who is they?

18   A.   The administration.

19   Q.   Who was the commissioner when you were first

20        hired?

21   A.   Leo Stapleton.

22   Q.   How many commissioners have you seen since you

23        have been there?

24   A.   We have had some acting too.  Demazio, Paul
```

```
 1         Christian, Marty Pearce.

 2    Q.   So it was Leo Stapleton then Martin Pearce?

 3    A.   Yes.

 4    Q.   And then Dennis Demazio?

 5    A.   Yes.

 6    Q.   Paul Christian.

 7    A.   Paul Christian.

 8    Q.   And now we have commissioner --

 9    A.   And we had Kevin McCurtin.

10    Q.   Kevin McCurtin.

11    A.   Sometimes it is like to get the players

12         straight.

13    Q.   Do you have a supervisor currently?

14    A.   Basically they consider the supervisor as being

15         the superintendent in charge of the fire alarm

16         division.

17    Q.   Who is the supervisor?

18    A.   John Henderson.

19    Q.   I'm sorry?

20    A.   John Henderson.  Basically we were considered --

21         sometimes even city hall refers to us as being

22         in a remote location even though we are about I

23         would say a mile and a half from fire

24         headquarters.
```

```
 1              Because there were questions of that

 2         over the years and stuff as to, you know, who

 3         is -- even when there were other civilians say

 4         working in the building there were questions who

 5         really is the direct supervisor.

 6              There was some conflict people getting

 7         approval for vacation time or something else.

 8         It is basically the executive assistant

 9         designates, say supervisor or whatever you want

10         to call it, to whoever is in charge.

11              Say for my division, we were on there,

12         superintendent.  The maintenance division would

13         be the superintendent over there.  It would work

14         that way.

15    Q.   The person who helps out the commissioner --

16    A.   Yes.

17    Q.   -- he or she designated the --

18    A.   Yes.  Originally in the case it were Gerry

19         Horgan.

20    Q.   Gerry Horgan said your supervisor will be the

21         superintendent of fire alarms?

22    A.   Yes.

23    Q.   During the year that you moved up from R-8 to

24         R-15, had you filed any grievance?  I believe
```

1          you said with the MM-5 to get that position you

2          said you went to your union and filed a

3          grievance?

4    A.    No.  At that time I was an APSNI employee.  They

5          weren't interested that I was looking for a SENA

6          position.  And SENA wasn't interested because I

7          was an APSNI.

8    Q.    When were you working and acting in that

9          position?  Who were you paying your union dues

10         to?

11   A.    Union dues were going to SENA.

12   Q.    During your time working in fire alarm, besides

13         getting your two degrees, did you take any other

14         training classes?

15   A.    I had had some computer things.  I had Excel.  I

16         had gone for Word.  We received training on

17         People Soft on the financials.

18   Q.    What is People Soft?

19   A.    People soft is the software system that the city

20         uses.  I think they wasted their money.

21   Q.    Do you use that currently?

22   A.    Yes, all the time.  It has gotten to the point

23         that just about everything you do you need

24         People Software on the financial side.  Now,

```
 1            since December because I have been contemplating
 2            looking for an upgrade again, the city now, the
 3            fire department, they have been authorized
 4            through a city ordinance that they can charge
 5            $600 per master box in the city.
 6                        So back in December I had believed, I
 7            thought I was only going to get to mail out the
 8            envelopes for the bills that are mailed.  All of
 9            the bills have my phone number on them for any
10            questions or anything else.  So I am handling
11            that now.  That is getting to be --
12       Q.   So you are customer service as well?
13       A.   Yes.  And it is almost like a job.  I must have
14            spent three weeks answering the phone with
15            questions people not knowing what it was.  But
16            back in 2004 the city counsel, I believe they
17            amended a city ordinance authorizing the
18            commissioner to charge $600 for a master box.
19       Q.   You say just recently they started to do that?
20       A.   Yes.  The first bills went out in December.  But
21            even say since then, it is a constant thing of
22            people changing buildings, saying it doesn't
23            belong to them.  Finding out if bills should be
24            written off.  If they are the correct owners.
```

```
 1            It is a good amount of work.  I hate something
 2            that just sits because there is other work that
 3            needs to be done.
 4    Q.   So have you applied for an upgrade?
 5    A.   No, not as yet.
 6    Q.   What is the process to get an upgrade?
 7    A.   It depends who you speak to because sometimes we
 8            are told that if you are looking for an upgrade
 9            you have to go through the union.
10    Q.   And the upgrade -- what is your current level?
11    A.   MM-6.
12    Q.   So you would be looking for an upgrade to an
13            MM-7 or a step increase?
14    A.   There are no 7's.  They go to an 8.
15    Q.   You would be going from a 6 to an 8?
16    A.   Yes.
17    Q.   Is that what you are hoping for?
18    A.   Yes.
19    Q.   Are there steps in between?
20    A.   No.
21    Q.   Okay.
22    A.   And it's the same title.  You are a senior
23            administrative assistant if you are, I believe
24            it's a 5, 6, an 8.  And sometimes I think that
```

```
1              is about the highest.  It is not the highest the

2              MM's go, but historically, but it the highest

3              that the women go.

4      Q.      The women go?

5      A.      Yes.

6      Q.      What does that mean?

7      A.      You won't find -- with the exception of Cathleen

8              Kurles who is the chief financial operator,

9              officer, which I thought was wonderful when she

10             did get the position.  Historically none of the

11             woman have ever gone beyond an MM-8.  The men

12             are MM-9, 10, 15.

13     Q.      MM-15.

14     A.      Yes.

15     Q.      Who has an MM-15?

16     A.      We were told that is what they ended up giving

17             to Dick Fenergen who retired.  He had the, I

18             guess he would have the position that was

19             previously what Bob Moran has now.

20     Q.      All right.

21     A.      I believe the administration --

22     Q.      When you say, administration --

23     A.      Whoever is the current administration at the

24             time.
```

Q.   City hall or fire headquarters?

A.   Maybe a combination of both.  Sometimes just the
     fire department too.  But it is almost as though
     a lot of them don't think that the women are too
     bright or have the capabilities.
          I mean, Paul Christian, we did sit at
     different times over the past several years,
     mainly with Paul Christian, a couple times Bob
     Moran over different issues and things that the
     woman did have in the department.
          The one reason why I was glad that
     Cathleen Kurles got the position that she does
     currently have is there were about 8 to 10 of us
     in a conference room with Paul Christian and Bob
     Moran in one of the meetings we had.
          And Paul Christian made the
     statement -- we were discussing jobs and
     different things.  Paul Christian made a comment
     there will never be a civilian in a decision
     making position in the fire department.
          So I knew when Cathleen Kurles got the
     position that she would be making decisions in
     the department.  But historically, I mean there
     were a few women now at MM-8.  And the ones that

```
 1           do have them we knew who was getting the job

 2           before they came.  But historically most woman

 3           only got as far as an MM-6.

 4    Q.     So technically you have made it?

 5    A.     That's right.  Gerry Horgan say when he was

 6           there, people, all different ones have their

 7           different styles.  Gerry Horgan was one that I

 8           know when some of the woman were close to retire

 9           who were an MM-6 he would boost them up the last

10           couple of years to an MM-8.

11    Q.     So he did help them out?

12    A.     He knew they were going to be retiring.

13    Q.     Could he technically do that?

14    A.     Yes.

15    Q.     How did that come about?

16    A.     I got it through a grievance.  I am hoping I

17           don't get the two of them confused either.  I

18           did get -- it is the MM-6.  I had mentioned

19           before Roslyn Copin.

20                  Roslyn was with the MM-6.  And it was

21           the supervising of the accounting.  That was

22           part of the grievance settlement, that the

23           grievance went through, I guess, here at city

24           hall, labor relations and such.
```

Page 37

```
 1    Q.   So you filed a grievance --

 2    A.   Yes.

 3    Q.   -- SENA?

 4    A.   Yes.

 5    Q.   Do you recall when that was?

 6    A.   I know Andy Warren was the executive assistant.

 7         It was probably -- I don't know.  How many years

 8         I have had this position now?  I am not sure how

 9         many years I have had the MM-6 now.  Maybe about

10         5.  Sometimes when you are thinking in time it

11         can seem longer -- it can seem longer -- it can

12         seem less than it was or longer.

13    Q.   And since you have had this MM-6 position, what

14         exactly have your duties been?

15    A.   I do -- for the division I do all the purchase

16         orders, all the requisitions.  All of their

17         repetitive service contracts.  I do not only

18         just for the fire alarm division anymore, I also

19         do the MIS division, or information technology

20         division, which is at fire headquarters.  I do

21         all of that stuff for them as well too.

22              I do all the non-orders for the radio

23         communications line regardless of all of the

24         different communication companies, Verizon,
```

```
 1          AT&T, Mobile satellite phones.  Basically, we
 2          will say like Verizon will be all of the radio
 3          lines.  And each radio lines has so many
 4          circuits on it.
 5   Q.     This is all for the fire alarm division?
 6   A.     Yes.
 7   Q.     Okay.
 8   A.     And I do all the non-orders and things for that
 9          and for the IT division as well.  I work on
10          special projects.  I will do different things
11          with grants, the funding for the different
12          things.  Different years and things.
13                 Things have to be done differently.
14          We have a big project that we just finished,
15          they are putting a big model pole over in
16          Dorchester.  It is a great big antennae type of
17          thing for better communication.
18                 Public works used to take care of
19          them.  And I guess a lot of these contracts they
20          are not doing anymore.  So it is a whole new
21          learning experience, the different types of
22          contracts.
23                 Other special contracts that they
24          might be working on that they might want help
```

```
 1         with.  I was basically what I would consider a
 2         jack of all trades.  I do a lot of the ordering
 3         of equipment and stuff.
 4              We will say even with the fire alarm
 5         construction I order all the cable, do the
 6         different things with the specifications, all of
 7         their tools, anything they use.  Ordering the
 8         boxes for the streets.
 9    Q.   So the MM-5 -- just to go back for a second.
10         The MM-5 when you spoke with Commissioner
11         Pearce --
12    A.   It might have been a little bit less.
13    Q.   You were doing less for that MM-5 position?
14    A.   Yes.
15    Q.   But that MM-5 again did not include the
16         accounting and everything else at that point?
17    A.   Some of it.
18    Q.   Some of it you were doing?
19    A.   Yes.  It is basically with each -- I think as
20         each -- I won't say just when there is a change
21         of title, but over the years the position has
22         just grown more and more over the years.
23    Q.   Do you know when you think you will put in to
24         get the upgrade from MM-6 to MM-8?
```

```
 1   A.    I am waiting to see how things go with these
 2         next bills going out.  They will go out again in
 3         November.  I don't even have the corrections
 4         made, all of them made from last year.  But I
 5         assume by the end of the year.
 6   Q.    By the end of this year 2007?
 7   A.    Yes.
 8   Q.    Who do you think you will approach?
 9   A.    Probably Cathleen Kurles in the sense I have
10         always been one that I will -- I do more than I
11         have to do but in a sense at times I do my own
12         time too.
13                I mean, I can sit and work right
14         through lunch.  And it doesn't mean a thing to
15         me.  You know, missed breaks or stay 15 minutes
16         or a half hour longer.  If I was denied on it
17         for some reason or whatever, I would just say I
18         won't spend anymore of my own time doing it.
19   Q.    When you say if you are denied on --
20   A.    If I looked for an upgrade.
21   Q.    Okay.  And if you were denied then you would
22         stop dealing with those issues?
23   A.    Well, I just wouldn't continue doing it on my
24         own time.  I would continue doing what I could
```

1          do.
2      Q.   But within your 9:00 to 5:00 -- what are your
3           hours?
4      A.   7:00 to 3:00.
5      Q.   Let's deal with the positions that you say you
6           applied for and didn't get or could have applied
7           for but didn't because you were put off.
8      A.   The question is, which one do you want to start
9           with?
10     Q.   Let's go through what we have in your answers to
11          interrogatories, shall we?
12              (Exhibit No. 1 was marked.)
13     BY MS. GLASGOW:
14     Q.   I am going to show you what has been marked as
15          Exhibit No. 1.  I will show you the back page.
16          Can you tell me, is that your signature?
17     A.   Yes.
18     Q.   What has been marked Exhibit No. 1, Plaintiff
19          Elizabeth Golden's Answers to Defendant's
20          Interrogatories to the Plaintiff Elizabeth
21          Golden.
22              Question No. 4, for each of the
23          positions within the Boston fire department for
24          which you have applied and did not receive the

1       position, please set forth the position for

2       which you applied, how were you informed of the

3       fire department's position, and the reasons for

4       which you believe you did not receive the

5       position.

6               Let's start with lineman.  You say

7       multiple.  Can you explain what a lineman is?

8   A.  The fire alarm division, construction crew.

9       They are the ones that do the cable, the

10      connections to the master boxes and the overhead

11      wiring and stuff.  They rod it.  They rope it.

12      They pull it in.  Basically the cable

13      connections.

14  Q.  The lineman position, what union is that?

15  A.  718.

16  Q.  What qualifications does it take to become a

17      lineman?  What do you need to be a lineman?

18  A.  They don't put qualifications on the postings.

19      Most of them.

20  Q.  They were posted -- were these lineman positions

21      posted?

22  A.  They were always posted.

23  Q.  When you say always, what do you mean?

24  A.  Well, I have been there for 23 years almost.  Up

1      until this year they have always been posted

2      whenever there is a vacancy.

3  Q.  So up to 2007 a lineman position has always been

4      posted?

5  A.  Always been posted.

6  Q.  Okay.

7  A.  And even before I started working there posted

8      as well too.  That would be for lineman --

9      sometimes they grouped them.  Lineman or cable

10     splicer or lineman and/or cable splicer.

11 Q.  Do you need to have knowledge of electrical to

12     be a lineman?

13 A.  It depends on when the posting is put out and

14     who put it out because they did have one or two

15     times when the posting went out that all you had

16     to be was a city of Boston resident.

17 Q.  How long ago was that?

18 A.  That was probably a good 15 years ago.

19 Q.  When is the first time you applied for a lineman

20     position?

21 A.  I would say probably back around 1987, around

22     '87 or '88.

23 Q.  How many lineman positions have you applied for?

24 A.  I have no idea, but every single one they

1    posted.  I got to be known even through various

2    people throughout the fire department I applied

3    for every position.

4  Q.  Do you know who got these positions?

5  A.  Yes.

6  Q.  Who?

7  A.  How far back do you want me to go?

8  Q.  Let's start with the very first one you applied

9    for if you remember.

10  A.  Probably the first ones would have been probably

11    Donald Lee.

12  Q.  Donald Lee.  Do you know how to spell the last

13    name?  L-e-e?

14  A.  L-e-e.  He was the son in-law of Joe Fisher who

15    was Ray Flynn's right-hand man.

16  Q.  Okay.  Do you know what his qualifications were

17    other than the fact --

18  A.  Supposedly none.

19  Q.  Okay.

20  A.  It has been one of my contentions over the years

21    for all the different positions that I have

22    applied for they didn't have any more

23    qualifications than I did.

24  Q.  Did you see them actually performing the work?

1   A.   They basically will train them.  I have seen

2       people that have interviewed for positions,

3       another position that was later on, a Mark

4       Cuddahy.  He was also a son in-law of Joe

5       Fisher.

6          MR. FEENEY:  How do you spell Cuddahy?

7          THE WITNESS:  I believe it's C-u-d-d-a-h-y.

8       He received a position too.  And there was

9       approximately, there had to be over 30 people

10      interviewed.

11            And the things was some of these --

12      and it was mainly men that were applying.  They

13      held the interviews.  There were men that were

14      linemen for say Boston Edison at that time.

15      there were line men.

16            And they gave the job to this --

17      everyone knew it was going to Mark Cuddahy

18      even before the interview because I had said it

19      was a disgrace to go through the motions of

20      holding interviews and having qualified people

21      apply -- you know, taking time off work or

22      whatever, to go to an interview that was going to

23      be a complete waste of their time.

24   BY MS. GLASGOW:

```
 1    Q.    How do you know he was going to get the job?

 2    A.    Because we were told before.

 3    Q.    Who told you?

 4    A.    I don't know specifically who told me.  But

 5          usually just about any position in the fire

 6          department even recent too.  Whether you want to

 7          say through rumor or through talk throughout the

 8          department we know who was getting the position.

 9          I mean, I just had one last month.

10    Q.    We will get to that.  We will work our way

11          forward.

12    A.    Donald Lee.

13    Q.    So you have -- when you were talking you have

14          got Donald Lee. You have got Mark Cuddahy.

15          These were all lineman positions you were

16          applying for?

17    A.    Yes.   There were others in-between Mark Cuddahy

18          too.

19    Q.    Did you ever get interviewed for any of those

20          positions?

21    A.    I got interviewed once.

22    Q.    When was that?

23    A.    Well, actually it wasn't for a lineman.  It was

24          a battery man.  But for the jobs specifically
```

```
 1          for lineman I never received an interview.
 2   Q.    And you don't recall how many -- in the years
 3          you were there how many lineman positions --
 4   A.    No because I had even gone -- probably further
 5          on I had even gone through Bob Moran back about
 6          two months ago to go through the personnel
 7          folder.
 8                 And specifically what I was looking
 9          for was jobs that I had applied for over the
10          years and stuff.  And there was nothing in my
11          personnel folder at all.  So I had asked him.
12          And he said those are in file under.  I asked
13          him what was file under?
14                 So they keep them separate, I guess,
15          in some of the piles.  So I had asked him if I
16          could see them.  And he said he was busy with
17          the budget at that time.  Maybe he would get
18          back to me when they were done with the budget.
19   Q.    Okay.
20   A.    Because I was looking for exactly what ones I
21          did apply and the exact years and stuff.
22   Q.    Okay.  So you don't know -- approximately how
23          many lineman positions you applied for?
24   A.    No, they have had postings over the years that
```

1        they may be -- they might have one posting and

2        they are looking for two or three positions.

3  Q.  You would apply for each and every one of those?

4  A.  No.  You would only have to fill out one

5        application.  But it was just that they had two

6        or three positions available.

7  Q.  Besides Donald Lee and Mark Cuddahy, anybody

8        else get positions as linemen --

9  A.  Michael Farnham.

10        MR. FEENEY:  Can you spell that,

11        please?

12        THE WITNESS:  F-a-r-n-h-a-m.

13  BY MS. GLASGOW:

14  Q.  And do you recall when he got a job?

15  A.  He was back I would say early 90's, late --

16        somewhere in there.  Say between I would say

17        maybe '88, '90, somewhere in there.  There was

18        Paul Kelly.

19  Q.  And who is Michael Farnham connected to?

20  A.  His father in-law was captain of the

21        headquarters, fire headquarters.

22  Q.  When you began at the fire department, did you

23        know anybody there?

24  A.  At the fire department?

```
 1   Q.    Yes.

 2   A.    I don't think so.

 3   Q.    Any family had ever worked for the fire

 4         department?

 5   A.    No.

 6   Q.    Paul Kelly, do you recall when he got the

 7         position?

 8   A.    He was back in the late 80's.

 9              MR. FEENEY:  Is Paul Kelly with an e-y

10         or y?

11              THE WITNESS:  I believe y.

12   BY MS. GLASGOW:

13   Q.    With regard to Paul Kelly.  Who do you believe

14         he was connected to that he got this position?

15   A.    Him I am not sure.

16   Q.    So he may have gotten the position because he

17         was qualified?

18   A.    Rumor didn't have it that way.

19   Q.    What were the rumors?

20   A.    Rumor had it that he knew someone at city hall.

21   Q.    But you don't know who --

22   A.    No.

23   Q.    You never had any inkling?  You never asked him?

24   A.    Not really, no.
```

```
1   Q.   Anybody else besides Paul Kelly?

2   A.   We had some that transferred to the position.

3   Q.   Who was that?

4   A.   That there were no postings for.  We had some

5        that were fire alarm operators and either they

6        may not have liked the position or they couldn't

7        do the job.  So they would transfer them into

8        other civil service titles that jobs weren't

9        similar.

10  Q.   Okay.

11  A.   There were a number of them.  And they went in

12       all different directions too.

13  Q.   Did you have any names?

14  A.   Yes.  I am trying to think specifically.  One of

15       them I can place -- I can picture him in my

16       head.  I am just trying to think of the name.

17       What is his name?  I hate it when a name just

18       escapes you.

19  Q.   We will move on.  Just blurt it out when you

20       remember it.  Besides those individuals you

21       already named for lineman position, did you ever

22       see any of their resumes?

23  A.   No.

24  Q.   Did you ever speak to them about their
```

1          qualifications?

2    A.    Some, yes.

3    Q.    Who did you speak to about their qualifications?

4    A.    One I haven't named yet, Bill Landry.

5    Q.    Bill Landry is one of those who got a lineman

6          position?

7    A.    Yes.

8    Q.    Do you recall when he got that position?

9    A.    He got that position probably about two or three

10         years ago.  He was laid off from our radio shop,

11         but he had a different position, radio repair

12         man.  He was the one that I really was trying to

13         file the MCAD suit that they were saying didn't

14         get in the timeframe.

15               He was at -- I believe he worked for

16         the MWRA before coming to work for the fire

17         department.  But he came in as a radio

18         repairman, which I applied for.  And I was told

19         that I couldn't apply for the position by the

20         superintendent of that time of the fire alarm

21         division because I don't have the required FCC

22         license.

23               And I had a copy of the letter when

24         Bill Landry got the position as radio repair man

| | | |
|---|---|---|
| 1 | | that he didn't have the FCC license either, but |
| 2 | | they gave him the position and gave him a year |
| 3 | | to get the license. |
| 4 | Q. | What kind of letter did you have? |
| 5 | A. | From the superintendent of fire alarm.  Andy |
| 6 | | Warren.  He was the executive assistant at the |
| 7 | | time at the fire department. |
| 8 | Q. | What did the letter say? |
| 9 | A. | Whatever -- due to the posting of the radio |
| 10 | | repair man, whatever, and that they gave William |
| 11 | | Landry one year to get the FCC license. |
| 12 | Q. | How did you get a copy of letter? |
| 13 | A. | It was just a fire alarm.  I don't know how I |
| 14 | | came across it.  But I do have the letter. |
| 15 | Q. | Did you provide the letter to your attorney to |
| 16 | | provide to us as part of documentation? |
| 17 | A. | Yes. |
| 18 | Q. | So it is probably in this big pile of stuff? |
| 19 | A. | Yes. |
| 20 | Q. | Okay. |
| 21 | A. | That was the main case that I was going after. |
| 22 | | I can say that Bill Landry plays the piano some |
| 23 | | of the times for the mayor and some other city |
| 24 | | functions that go on.  But then they laid him |

1          off.

2                    The ones in the building that I work

3          in they were quite pleased that they laid him

4          off because, supposedly due to budget cuts,

5          because he didn't do the work in a radio shop as

6          repair man.  So then a few months later they

7          brought him back.  And they gave him the

8          position as line man in the construction crew.

9     Q.   Let's do this.

10    A.   There are just so many of them.

11    Q.   Joseph Quary, is that Jane Green's brother?

12    A.   Yes.  He was the superintendent of the building

13         at the time.

14              MR. FEENEY:  From Exhibit G.

15              THE WITNESS:  He is the one that told

16         me that I couldn't apply because I didn't

17         have the FCC license.

18    BY MS. GLASGOW:

19    Q.   Did you take that up with Jane?

20    A.   Well, I had even said to Jane because I had told

21         her even before he would be -- I named his name.

22         She said she didn't care.  He shouldn't do

23         things like that anyway.

24    Q.   All right.

```
1   A.    I had complained to Bob Moran when they didn't

2         post the line man position that they gave Bill

3         Landry.  I said he couldn't do the other job and

4         it is like rewarding him for not doing.

5              MR. FEENEY:  Just for the record, the

6         letter to which Ms. Golden is referring has

7         been provided to the city --

8              MS. GLASGOW:  Yes.

9              MR. FEENEY:  -- as Exhibit G, the

10        second document in Exhibit G.

11             MS. GLASGOW:  Yes.

12  BY MS. GLASGOW:

13  Q.    All right.  There is a pile of stuff you have

14        provided.  I haven't had a chance to look

15        through it.  Let's get this clear.  1987 you

16        applied for, you submitted your name for the

17        title of electrical equipment repair man; is

18        that correct?

19  A.    Yes.

20  Q.    You were told this was filled by somebody who

21        was related to then Mayor Flynn, and that was

22        Edward Downs?

23  A.    Yes. he was the brother in-law of Ray Flynn.

24  Q.    Okay.
```

```
1    A.    He had been a fire alarm operator, but he didn't

2          like the job.

3    Q.    That was a local 718 position?

4    A.    Yes.  They all are.

5    Q.    And you applied for two postings in 1987 for the

6          position of lineman, cable splicer.  And you

7          were told you didn't have the qualifications for

8          the position and the jobs were already promised

9          to particular individuals?

10   A.    Yes.

11   Q.    And you never received interviews?

12   A.    No.

13   Q.    You don't recall who got those positions?

14   A.    That was probably around the time of, probably

15         around the time of Donald Lee.  I am still

16         trying to think of that other one.

17               He was a transfer.  I had always been

18         of the contention that -- and none of them have

19         been able to tell me, the administration of the

20         fire department, that I don't believe that even

21         civil service from how I interpret their rules

22         that you can just take someone who is in a civil

23         service position and just give them a different

24         civil service title.
```

1    Q.    That had come through civil service?

2    A.    Yes.   There are procedures and overall for all

3          the positions and stuff they don't follow any

4          standard procedures.

5    Q.    Who is they?

6    A.    The administration.

7    Q.    The fire department administration?

8    A.    Yes.

9    Q.    Let's try to do this a little more orderly.

10   A.    My stuff can be all around.

11   Q.    A lot of these are before 2000.  And I believe

12         everything you said started from 2000 forward.

13         Am I correct about this?  Because in court you

14         said that you were claiming, all the things that

15         you were claiming were for actions 2000 forward?

16              MR. FEENEY:  Claiming damages from

17         2000 forward, but this information will

18         basically be submitted to show not for damages

19         but for pattern of practice.

20   BY MS. GLASGOW:

21   Q.    What I am looking at is what has been marked as

22         Exhibit D of your request for production of

23         document responses.  I believe you provided

24         these documents to your attorney through the

```
 1              course of litigation.  Am I correct in that?
 2    A.   What do you mean by course of litigation?
 3    Q.   That you provided them to him through this
 4         lawsuit as a result of this lawsuit these
 5         documents were given to your attorney?
 6    A.   Yes.
 7    Q.   So Exhibit D, do you have a copy there you can
 8         take a look at that?  Appendix D section 103.
 9    A.   Yes.
10    Q.   1987 you submitted your name for the title of
11         electrical equipment repair man.  That was
12         discussed.  Edward Downs got that position?
13    A.   Yes.
14    Q.   Did you ever get an interview for that position?
15    A.   No.
16    Q.   Did you ever get a letter telling you why you
17         didn't get the position?
18    A.   No.
19    Q.   Did you ever get a letter saying you were not
20         going to be considered for the position?
21    A.   No.
22    Q.   Did you speak to anybody about that position,
23         the fact that you didn't hear anything about it?
24    A.   I think probably not because all you would see
```

1          is a paper that would come out saying so and so

2          is such and such.

3     Q.   Did you write a letter to anybody about that

4          1987 position that Edward Downs got?

5     A.   No.

6     Q.   And at the time in 1987 you were a member of

7          APSNI; correct?

8     A.   Yes.

9     Q.   And also in 1987 you applied for two positions

10         for the lineman, cable splicer.  And you said

11         you were told you didn't have the qualifications

12         for the position.  And the jobs were always

13         promised to two particular individuals.  And who

14         did you say told you that you didn't have the

15         requisite qualifications?

16    A.   I am trying to remember if that was the time it

17         was Chief Tramatozi.

18    Q.   He was the chief of fire alarms?

19    A.   Fire alarms.  Yes.  Sometimes we have had a

20         chief there.  Sometimes we haven't a deputy

21         chief.

22    Q.   You don't recall?

23    A.   No.  I probably have that at home.

24    Q.   And you never received an interview for that

```
 1            position?
 2    A.      No.  I know that there was one, whether it was
 3            the '87 or the '88.  I forget which one it was.
 4            I can remember -- and it wasn't just myself.  It
 5            was this other woman, Linda Short.  She had
 6            worked in the building at that time as a
 7            civilian as well.  And we had both applied.
 8    Q.      Were there any women working any of those line
 9            man positions?
10    A.      No.  There still has never been.
11    Q.      Let's keep going.  1988, '89, applied for 2
12            postings for the position of lineman.  I was
13            told I do not have the qualifications for the
14            position.  And again I was told the jobs were
15            already given out.  Who told you that?
16    A.      I think probably at that time it may have
17            been -- I think the superintendent of the
18            building at that time was Robert McCarthy.
19    Q.      He was the head of fire alarm?
20    A.      Yes.
21    Q.      And you would have put in your application to
22            him?
23    A.      No.  All applications that you fill out all go
24            to the personnel office at headquarters.  They
```

```
 1            generally would time stamp you too.
 2   Q.    Did you ever hear from somebody at headquarters
 3         that the positions were being filled by somebody
 4         else?
 5   A.    You mean in the administration?
 6   Q.    Yes.
 7   A.    No.
 8   Q.    Okay.
 9   A.    If you would ask or mention something they would
10         tell you that is not true.
11   Q.    Did you speak to anybody?  You said you spoke
12         to -- Strike that.
13                   Did you speak to anybody at
14         headquarters regarding those positions you just
15         talked about in 1988, 1989, the two applications
16         for lineman?
17   A.    No.
18   Q.    Did you write a letter to anybody?
19   A.    No.
20   Q.    Did you file any grievances with anybody?
21   A.    No.
22   Q.    With any union?
23   A.    No.
24   Q.    Did you speak to Chief Tramatozi about the
```

1           fact --

2    A.     Whatever particular year it was with him, myself

3           and this Linda short did apply.  We both

4           applied.  She was starting to get to the point

5           that anything that was posted she would put in

6           an application.

7                    She would come in -- he had come into

8           the office.  And we were both in there at the

9           same time.  And said that we don't -- they were

10          holding interviews at that time.

11   Q.     They were holding interviews?

12   A.     They didn't need to interview us because we

13          wouldn't have the qualifications.  I can

14          remember distinctly saying back to the chief, I

15          believe this was one of the postings as well.

16          How can you say we are not qualified when the

17          only qualification on the posting is to be a

18          city of Boston resident?

19   Q.     What was the response?

20   A.     Oh, well, maybe the department somewhere down

21          the road would get to us.  Almost as though --

22   Q.     Did you file any complaints with city hall about

23          those comments?

24   A.     No.  I think over the years, over the years, and

```
1            I won't say just myself either, but I think even
2            a lot of the other civilians in the department
3            felt that in some point in time that maybe they
4            will get to the different individuals that were
5            applying.
6                    I have always -- I mean, I am not
7            naive to think that, you know, that there wasn't
8            any patronage in the city.  You know, there
9            always has been, I believe, patronage whether
10           you are in the city, state, federal government
11           level.
12                   But it gets to a point where for
13           myself after so many years of the same thing you
14           get to the point where it is like are you ever
15           going to be given your opportunity.
16    Q.     You weren't interviewed for those two positions
17           in 1989.  You were told those positions had been
18           given to political individuals?
19    A.     Uh-huh.
20    Q.     Who told you that?
21    A.     I believe it was -- I can't say.  I hate to
22           give someone's name when I am not actually sure.
23           I don't know who was superintendent at the time.
24           But he would have been like, I don't know if he
```

```
 1          had the title chief or superintendent.
 2   Q.   Did he tell you they were political individuals
 3        or were those words you were using?
 4   A.   Yes.   That is not words I am using.
 5   Q.   That is what he said?
 6   A.   Yes.
 7   Q.   And do you recall who those people were or those
 8        three people were specifically?
 9   A.   I can't say.  I would think that it possibly
10        could have been Paul Kelly.  Another might have
11        been Mark Farham.  I can't say specifically
12        which one it was.
13   Q.   In your position at fire alarm, were you able to
14        see them on the job?
15   A.   No.  Say if you want to do cable work in the
16        street, no.  But if they had some different
17        things they could do, they could, I could be
18        outside the building.  They could be roping the
19        things they do, you know, putting the things
20        together.
21   Q.   And you never saw any of their resumes or their
22        applications, anything like that?
23   A.   No.  We were told at one time by Paul Christian
24        he believed that was management's right.
```

```
 1    Q.    What was management rights?

 2    A.    We questioned Paul Christian about, you know,

 3          why should we accept -- they wouldn't give

 4          anything in writing, what qualifications we

 5          might be missing or what better qualification

 6          the individual that was hired.

 7                   They would not give us anything,

 8          whether it with verbal or written.  And he said

 9          it was management's rights.  They didn't have to

10          tell us, explain to us who they were hiring.

11          And we more or less put it back to Paul

12          Christian why should we believe they hired the

13          most qualified individual, with no response?

14                   (Thereupon, a break was had.)

15    BY MS. GLASGOW:

16    Q.    You have listed a bunch of people in different

17          positions that got jobs that you didn't.  Let's

18          start with the one back in 2000 at the bottom of

19          the next page.

20    A.    Yes.

21    Q.    You applied for the position of radio repair

22          man?

23    A.    That was the one that I spoke to you about that

24          they gave to Bill Landry.
```

```
 1    Q.    When you say the individual who did not have a
 2          license that was Bill Landry?
 3    A.    Yes.
 4    Q.    And that is what you referred to in the
 5          exhibits --
 6    A.    Yes.
 7    Q.    The next page 2001, approximate date, you
 8          applied for the position of lineman cable
 9          splicer.  Two positions.  You didn't get an
10          interview?
11    A.    Yes.
12    Q.    Did you speak to anybody about those positions
13          in 2001?
14    A.    Yes.
15    Q.    Who did you speak to?
16    A.    I spoke to Bob Moran.
17    Q.    Do you recall when in 2001 you applied for those
18          positions?
19    A.    When in 2001?  I really don't know.  That is
20          probably why I put down approximate date.
21    Q.    You spoke to Bob Moran?  Did you go to fire
22          headquarters and speak to him?
23    A.    I am trying to recall.  I may not.  I may not
24          have gone to see him on those.  I am trying to
```

```
 1            think of who were the last ones that got those

 2            back in 2001.

 3                      I can't recall off the top of my head

 4            back in 2001 because I think the first time I

 5            went to see Bob Moran it was more recent than

 6            that.  It may have been in 2003.

 7                      I know when they transferred Michael

 8            Murphy into the position of lineman I had gone

 9            to see Bob Moran.  I may have even seen him once

10            before that.  I can't say off the top of my

11            head.  I usually try to keep notes on

12            everything.

13      Q.    Other than the positions of lineman and cable

14            splicer and radio repair man and battery man,

15            what other positions have you applied for that

16            you did not get and you believe that you did not

17            get as a result of political affiliations?

18      A.    Senior administrative assistant MM-8.

19      Q.    When was that?

20      A.    That was for -- I don't know the exact years.

21            This was for the position that is now currently

22            being held by Mary Ann McHugo.  Her name was

23            Creden at the time.

24      Q.    Okay.  So Mary Ann McHugo's position did you --
```

```
 1    A.   Go ahead.  I thought you were looking for the
 2         title.  I was going to say senior administrative
 3         assistant.
 4    Q.   You applied for that position?
 5    A.   Yes.
 6    Q.   Did you get an interview?
 7    A.   Yes.
 8    Q.   Who interviewed you?
 9    A.   I believe there at the time was chief, I don't
10         know if his first name was Jay or John Flemming.
11              MR. FEENEY:  It's Joseph.
12              THE WITNESS:  It is Joseph?
13              MR. FEENEY:  Yes.
14              THE WITNESS:  Chief Flemming, Andy
15         Warren.  I don't even know the name of the
16         person, but it was some person from city
17         hall.  I don't recall what her name was.
18    BY MS. GLASGOW:
19    Q.   What was that position for?
20    A.   This was for over in the fire prevention
21         division.  That was one of the purposes, I
22         believe having Chief Flemming there.  He was the
23         fire marshal at the time.
24    Q.   And at the time that you applied for this MM-8
```

1          position, what was your current level?

2     A.   I probably was the MM-6.

3     Q.   What was the position doing, did you say, at the

4          fire alarm division?  What was the position for?

5          I mean, I know you said senior administrative

6          assistant?

7     A.   This would have been at the fire prevention

8          division.  I know they were starting the process

9          of moving from fire headquarters to 1010 Mass

10         Ave where they are now.

11    Q.   Okay.

12    A.   And interviews were held.

13    Q.   Do you know how many people were interviewed?

14    A.   I don't know.  But I know at that particular

15         time the awards in process seems to be in the

16         administration at that time at the fire

17         department to try to eliminate anyone from

18         interviewing for any little thing they could

19         possibly eliminate them for.  I had sort of --

20    Q.   What do you mean by that?

21    A.   Well, because the different positions,

22         especially the women that had held at the

23         department that were more clerical and

24         administrative and things, occasionally we would

```
1          hear how, say it was someone in the payroll

2          office might have applied for such and such a

3          position and might have been told, well, they

4          didn't think she had enough telephone

5          experience.  You know, it wasn't like a switch

6          board operator or something, just someone to

7          answer -- you know, part of everybody's job you

8          have to answer a phone usually somewhere.

9                    But, I mean, little things.  For me,

10         in particular, I may have been one of the only

11         current employees at that time to get an

12         interview.  And that was like sort of like

13         pulling teeth to get the interview.

14                   And I had even heard from a couple of

15         woman that worked up here in the transportation

16         department we had heard even before interviews

17         were held that Mary Ann was getting this

18         position.

19    Q.   Who was the woman you spoke to?

20    A.   This is up in the transportation department.

21         One of the woman, her name is Barbara.  I am not

22         sure if she is still upstairs or not.  I don't

23         recollect off hand the other one in particular.

24    Q.   What is Barbara's last name?
```

```
 1    A.   I am not sure, but I can probably find out.
 2    Q.   How would people in transportation know about
 3         what Mary Ann McHugo was going to be doing?
 4    A.   Because they had said that Mary Ann, I guess was
 5         supposedly going around city hall and telling
 6         people that the position was posted.  And she
 7         was telling people that was her job at the fire
 8         department.  This is what they had told me.
 9    Q.   Did you ever hear her say --
10    A.   No.
11    Q.   Did anybody other than those two women at
12         transportation --
13    A.   Yes.
14    Q.   Who else?
15    A.   I can't remember who specifically.  But I know
16         that there were even a couple in the auditing
17         department that were saying how the auditing
18         department was trying to -- they wanted to move
19         her out of the department to someplace else.
20         And the fire department was going to take her.
21    Q.   Okay.
22    A.   And I did bring this up at the -- I did bring
23         this up at the interview that I had with J.
24         Flemming and Andy Warren there.  Because I said
```

```
 1          to them that I did not like to be in an
 2          interview if the job was going to be just given
 3          to someone.
 4                    You know, that I didn't want to waste
 5          my time either.  I had told them that I had
 6          heard that the position was being given to Mary
 7          Ann and, of course, they denied it.  But she did
 8          get the position any way.
 9   Q.     Besides you being, you got this interview,
10          anyone else --
11   A.     I don't think that anyone else got the
12          interview.  Even myself, to me, they were trying
13          to disqualify from having the interview saying
14          that I didn't have -- at that time Susan
15          Gulinus, she was the secretary for Andy Warren.
16          She had called me saying that Andy Warren didn't
17          think that I had the supervisory experience that
18          was listed on the posting.
19   Q.     Was she told to call you?
20   A.     Yes.
21   Q.     With this after the interview?
22   A.     No, this was before the interview.
23   Q.     So they still interviewed you?
24   A.     Only because -- it was a little bit after that.
```

```
 1   Q.    Okay.

 2   A.    She had called me on that.  And then it was that

 3         Andy Warren wanted a current resume.  The

 4         biggest thing is we never -- I think it was

 5         probably one of the first times that for people

 6         that were working in the department for a number

 7         of years were being asked for a resume.

 8               I did.  I provided a resume.  And then

 9         he called me.  Susan Gulinus called me again the

10         second time.  And that Andy Warren didn't think

11         I had enough supervisory experience according to

12         the resume.  And I said it says the things right

13         on it.

14               I can break it down even more if he

15         wants to.  So I did.  He called me himself.  And

16         I did have listed for the bank that I worked at,

17         supervisory things for the fire department,

18         whatever.

19               I think it may have been on the

20         posting for three years, supervisor experience.

21         The first thing he said to me I still don't

22         think you have enough supervisory experience.

23   Q.    How many people were they expecting you to

24         supervise if you were in the position that Mary
```

```
 1            Ann McHugo holds now?
 2    A.    I really don't know how many are over there.  I
 3           really don't.
 4    Q.    Do you believe --
 5    A.    But it wasn't like that was the reason why.  It
 6           was more the thing that he didn't think I had,
 7           because we will say the postings, three years
 8           supervisory experience.  He didn't think I had
 9           three years worth on the resume.  And I did.
10           And I ended up that I did get the interview
11           finally.
12    Q.    Do you believe you were equally qualified or
13           more qualified for that position than Mary Ann
14           McHugo?
15    A.    I believe I was equally qualified.
16    Q.    Did you ever look at her resume or see her
17           resume?
18    A.    No, but she would speak of different things
19           herself even.
20    Q.    Did you ever see what her qualifications were
21           for that position?
22    A.    No.
23    Q.    What was it that you believe makes you equally
24           qualified as Mary Ann for that position as
```

1          senior administrative assistant MM-8?

2    A.    I would say just about anyone who works in the

3          fire department.  When you work in a specific

4          department you do have, different things you do

5          have more knowledge of than others would.

6                     It would be the same way, even though

7          say for over the years, say even like these

8          linemen positions I probably know more about

9          what their job involves, the tools to use.  How

10         to use --

11   Q.    How did you come up with that knowledge?

12   A.    Just from being there.

13   Q.    By watching them or by speaking with them?

14   A.    Partly.  But, I mean, even for the same thing --

15         I will give you an example.  Because I would ask

16         questions over the years too.  We will say, as

17         an example, it might have been the first year I

18         was there.  They need to order cable.

19                     So when I think of cable, I just think

20         of cable running -- you have cable TV.  Just

21         from asking questions and for them showing me we

22         want to order 7 conductor cable and 90 conductor

23         cable.  I can't tell what is the difference.

24         Well, they would bring me cable.  They would

1          bring me pieces and show me.

2    Q.   And show you?

3    A.   In the sense I got to know they had to be a

4         certain specification.  It had to have a red

5         jacket on the outer shell.  You know, even the

6         process of putting the cable together --

7    Q.   All right.  But in terms of Mary Ann McHugo's

8         position --

9    A.   I am saying in the sense, relating to the same

10        thing --

11   Q.   Had you ever worked in fire alarm -- what was

12        she?  Fire prevention?  Had you ever worked in

13        fire prevention before?

14   A.   No.

15   Q.   That was in a separate building from where you

16        had always worked; is that correct?

17   A.   Yes.  But they did different things with, worked

18        a lot too with internal systems, which basically

19        was really in my office that I was in, internal

20        systems, basic fire alarm systems and things.

21   Q.   Do you believe that you didn't get the position

22        because of some political affiliation

23        discrimination?

24   A.   Yes.

```
 1   Q.   Can you tell me what you base that on?

 2   A.   Mainly that, I guess not only for, not only for

 3        the fire department for Mary Ann as well too.

 4        She was looking for the position.

 5   Q.   What was Mary Ann connected to?

 6   A.   That I don't know for sure.  I don't know.

 7   Q.   Do you believe she got the position because she

 8        was politically connected?

 9   A.   Yes.

10   Q.   Who do you think --

11   A.   I believe, I think that is the only way you

12        would get an MM-8 position.

13   Q.   That it wasn't because of her qualifications she

14        got the position?

15   A.   Not alone, no.

16   Q.   But you don't know who she was politically

17        connected to?

18   A.   No.

19   Q.   Did you ever file a grievance for the fact that

20        you didn't get that position --

21   A.   No.

22   Q.   -- that Mary Ann McHugo now has?

23   A.   No.

24   Q.   Did you ever complain to anybody or write a
```

```
 1          letter to anybody about that position?
 2   A.     No, not at that time.
 3   Q.     Other than Mary Ann McHugo, Mary Ann McHugo's
 4          position, what other positions did you apply
 5          for?
 6   A.     I applied for the position that Mary Kilgallin
 7          currently holds.
 8   Q.     And what position is that?
 9   A.     Secretary to fire commissioner.
10   Q.     What level is that?
11   A.     Well, it's kind of strange the way it worked
12          out.  They originally posted it -- Pat Mulcurren
13          had been the commissioner's secretary for years
14          and she retired.  She was an MM-8 or a 10 when
15          she retired.
16               They put the position back to an MM-6
17          and posted it.  Well, the rumors going around
18          the fire department at the time was that Mary
19          Kilgallin wasn't doing a very good job in the
20          personnel office.
21   Q.     Okay.  Let's talk about that.  You were over in
22          Fenway; correct?
23   A.     Yes.
24   Q.     And then there were rumors what was going on at
```

```
 1        fire headquarters?

 2   A.   Yes.

 3   Q.   How did you hear these rumors?

 4   A.   Either people just telling me that I might talk

 5        to on the phone.  I do spend time at different

 6        times back and forth over at headquarters as

 7        well.

 8   Q.   What were those rumors?

 9   A.   That supposedly that she could not do the job

10        that she had in the personnel office working

11        with Bob Moran.

12   Q.   Who would say these things?

13   A.   You could probably talk to just about anybody

14        and they would have --

15   Q.   Who can you tell me that you spoke to that said

16        Mary Kilgallin couldn't do her job in

17        personnel?

18   A.   Specific people?

19   Q.   Yes.

20   A.   Michael Grigalunas.

21   Q.   Who is that?

22   A.   He is the budget analysis.

23   Q.   For the fire department?

24   A.   Yes.
```

```
 1   Q.   And you spoke to him?

 2   A.   Yes.

 3   Q.   Anybody else?  Actually, what did he say?

 4   A.   He had said that someone who worked in the

 5        personnel office down here said that every bit

 6        of paperwork that Mary Kilgallin handled that is

 7        personnel related is all a mess.

 8   Q.   Who said that to him?

 9   A.   I don't know the guy's specific name.  I know

10        him to see him.  But I don't know what his name

11        is.

12   Q.   Someone who worked in personnel with her?

13   A.   No, worked personnel at city hall here.

14   Q.   So through the grapevine you heard that somebody

15        said that somebody said that Mary --

16   A.   Yes.

17   Q.   Did you ever witness this yourself?

18   A.   No.  I would say that every time I was going by

19        the personnel office she would be on the

20        computer playing, not working.

21   Q.   And how often would that be?

22   A.   Any time I was at headquarters.

23   Q.   And that was when she was at the personnel

24        office?
```

```
1    A.    Yes.

2    Q.    Did you ever get interviews for the position

3          that Mary Kilgallin holds now?

4    A.    Yes.

5    Q.    Who interviewed you?

6    A.    I think at the time -- it may have been just Bob

7          Moran.  But it had been originally an MM-6.  And

8          there were some people that were interviewed.

9          And Bob Moran and Mary Kilgallin interview the

10         people.

11               Then when we were hearing that Mary

12         Kilgallin wanted the position --

13   Q.    How did you hear that Mary Kilgallin wanted the

14         position?

15   A.    This was when there was all the talk of her

16         discussion of her not being able to do her job.

17   Q.    Did you ever hear her say I want that position?

18   A.    No.

19   Q.    It was all talk?

20   A.    Uh-huh.

21   Q.    Anybody point to who heard her say it?

22   A.    And then we thought it kind of strange because

23         then it was reposted as an MM-8.

24   Q.    Did you hear -- okay.  Go ahead.
```

```
 1    A.   And then Mary Kilgallin got the position.

 2    Q.   So you weren't at headquarters at the time when

 3         interviews were going on for Mary Kilgallin's

 4         position?

 5    A.   I was at headquarters?

 6    Q.   You were not.

 7    A.   No.  Fire alarm division.

 8    Q.   Okay.  You were not part of the personnel

 9         department at fire headquarters?

10    A.   No.

11    Q.   You were not part of Commissioner Christian's

12         office at headquarters?

13    A.   No.

14    Q.   You were not part of the interview process that

15         took place other than being interviewed

16         yourself; is that correct?

17    A.   That is right.

18    Q.   When did you come to learn that Mary Kilgallin

19         had gotten the job that she now holds?

20    A.   I believe they sent the paper around that they

21         just put up on the bulletin board.

22    Q.   Is that the regular notice they send out?

23    A.   Usually.

24    Q.   Who made the decision in terms of Mary Kilgallin
```

1          getting the position?

2    A.    I have no idea.

3    Q.    Whose choice is it in terms of whether or not

4          who gets -- who gets the final say in terms of

5          who gets the position?

6    A.    That is what we would like to know.  We would

7          like to know that too in the sense of, as an

8          example, I think I had written it in one of the

9          pages too that one of the meetings I did, Marty

10         Pearce on a battery man position.

11   Q.    But --

12   A.    No.  I mean, as an example.  At the time I had

13         said to Marty Pearce that I know that the job

14         doesn't even exist anymore and that I can empty

15         waste baskets and sleep and watch TV.

16              And Marty Pearce's response to me was,

17         well, strictly off the record, I did get a call

18         from city hall.  So, I mean, it is like we

19         wonder at times whether it is the fire

20         department's administration or who at city hall.

21   Q.    Okay.  Do you think Mary Kilgallin -- do you

22         believe that Mary Kilgallin got the --

23   A.    We had heard originally --

24   Q.    Let me finish the question.

```
 1    A.    Okay.

 2    Q.    Do you believe that Mary Kilgallin got the

 3          position because of some political affiliation

 4          she had?

 5    A.    Yes.

 6    Q.    And who is she politically affiliated with?

 7    A.    Dennis Damazio.

 8    Q.    How is she politically affiliated with Dennis

 9          Demazio?

10    A.    I believe she had worked with him here at city

11          hall before going to the fire department.

12    Q.    Mary Kilgallin?

13    A.    Yes.

14    Q.    And do you believe -- so you believe you did not

15          get the position because of political

16          affiliation discrimination?

17    A.    Yes.

18    Q.    And that is because you were not affiliated with

19          Dennis Demazio?

20    A.    With either Dennis Demazio or the

21          administration.

22    Q.    Did anybody ever tell you that Mary Ann

23          Kilgallin was going to get that position before

24          she got the position?
```

1     A.    Yes.

2     Q.    Who told you?

3     A.    I couldn't say off hand.  I really don't know

4           off hand.

5     Q.    Was it somebody at the fire department or

6           somebody at city hall?

7     A.    It would have been someone at the fire

8           department.

9     Q.    Do you recall how long after you heard that she

10          was gong to get the position that she got the

11          position?

12    A.    I would say that she got the position a couple

13          weeks time.

14    Q.    Besides Mary Ann McHugo and the Mary Kilgallin

15          position, what other positions did you apply for

16          that you believe you did not receive as a

17          result --

18    A.    Case manager for Ian McKenzie.

19    Q.    Okay.  And when did you apply for the Ian

20          McKenzie position?

21    A.    That was probably -- I would say roughly

22          somewhere around 3 or 4 years ago.

23    Q.    2004?

24    A.    3 or 4.  Somewhere around there.

1    Q.    And what level is the --

2    A.    Case manager.  MM-8.

3    Q.    Is that case manager utilization?

4    A.    Yes, something like that.

5    Q.    What are the requirements of that position?

6    A.    I am trying to remember everything from the

7          posting.  Well, basically it is dealing with

8          the medical bills and things for the fire

9          department.  Supposedly contacted Bob Moran had

10         told me before I didn't have the experience.

11              I think he even brought this up at the

12         MCAD hearing that I didn't have the, like

13         telephone experience with the insurance

14         companies.

15   Q.    Did you file -- did part of the MCAD complaint

16         involve the Ian McKenzie position?

17   A.    Yes.

18   Q.    Do you believe that you didn't get that position

19         because of some political affiliation

20         discrimination?

21   A.    I can't say for -- I do.  I do believe that.

22   Q.    What do you base that on?

23   A.    In the sense that one of the main things that we

24         brought up, even for giving the position to Ian

1            McKenzie, one of the, on the posting itself it
2            said that Boston residency is required and Ian
3            McKenzie wasn't a resident of Boston.
4     Q.     When was he not a resident of Boston?  Was he a
5            resident on the first day of the job?
6     A.     No, I don't believe so.
7     Q.     How do you know that?
8     A.     When you read the residency --
9     Q.     I know.  But how do you know that he was not a
10           resident on the first day when he began that
11           job?
12    A.     Because we had been told they were still going
13           to move his family and his things from Maryland.
14    Q.     But that is his family and things.  But how do
15           you know that he was not a resident?
16    A.     Well, he even still had his Maryland license
17           plates on the car.  The residency makes the
18           distinction between where is your primary
19           residence even in the sense that people have
20           been fired by having what they consider a
21           mattress address under the residency.  But, I
22           mean, we just couldn't fathom how they would
23           even, would even give him the job that he still
24           wasn't a resident.

1  Q.  Do you know if he had, if Ian McKenzie had some
2      kind of political affiliation?
3  A.  I believe he probably did because originally
4      when he worked for the department a number of
5      years previous to that, one of the captains that
6      was at fire headquarters was the main one that
7      was responsible for getting him into the
8      department.
9  Q.  Who was that captain?
10 A.  I think he is retired now.  I am trying to think
11     of his name.  I can't remember what his name
12     was.  He was like say the captain that was in
13     charge of this particular area that Ian McKenzie
14     was initially working in.
15 Q.  Other than that, anybody else that you believe
16     Ian McKenzie was politically affiliated with
17     that got him the position?
18 A.  Not off hand I can't really say, no.
19 Q.  Have you ever seen Ian McKenzie's resume?
20 A.  Yes.
21 Q.  When did you see that?
22 A.  During the MCAD hearings.
23 Q.  Do you believe you were equally qualified or
24     more qualified for that position than Ian

1          McKenzie was?

2    A.    I believe I would be equally.

3    Q.    Did you get interviewed for that position?

4    A.    Yes, I did.

5    Q.    And who interviewed you?

6    A.    Bob Moran.

7    Q.    Anybody else interview you?

8    A.    No.

9    Q.    Were you informed that you did not get the

10         position?

11   A.    It was probably a paper that went up on the

12         wall.  I don't really remember getting a letter

13         or anything.

14   Q.    Did you file a grievance about not getting that

15         position?

16   A.    No.

17   Q.    Any other positions after the Ian McKenzie

18         position that you applied for that you did not

19         get?

20   A.    No, I think since then they had just given them

21         to people and haven't even posted them.

22   Q.    What positions were those?

23   A.    One at internal systems.  There was a Michael

24         Murphy who was a lineman.  And Mark Cuddahy who

1    was working in internal systems.  He resigned

2    the position like a forced resignation.  He was

3    resigned.

4              This Michael Murphy who is the lineman

5    they told him, let's say it was Friday, he could

6    report, that was going to be his new job.  So he

7    suddenly went from a lineman to an electrical

8    equipment repair man.  No posting, no nothing.

9  Q.    That's a 718 position?

10 A.    Yes.

11 Q.    And anybody else, other positions --

12 A.    Yes.

13 Q.    -- that you have applied for or would have

14        applied for?

15 A.    Yes.

16 Q.    Other than the ones you already told me about.

17 A.    There was going back maybe 6 months ago an

18        Anthony Renzi.  I think it is R-e-n-z-i.

19 Q.    Right.

20 A.    There was no posting for the job.  No mention of

21        anything anywhere.  Bob Moran just escorted him

22        into the building one day and he was a new

23        lineman.  And even for the one going back to

24        Michael Murphy.  I did go see Bob Moran about

1    that and basically really didn't get anything

2    for answers.

3              For Anthony Renzi I E-mailed Bob Moran

4    on two different occasions probably over the

5    course of a month and got absolutely no response

6    from him as to how they could post, how they

7    could not post jobs and just give them to

8    someone.

9  Q.  What union was that position?

10 A.  718.

11 Q.  718.  Let me ask these questions then.

12 A.  Uh-huh.

13 Q.  In your answers to interrogatory number 14 you

14    were asked about former employees, former and

15    present employees who were subject to political

16    affiliation discrimination.  And you provided

17    the answers.  I am going to ask you about those.

18              The first one, Jessica Ahearn, did she

19    ever express to you that she felt she was a

20    victim of political affiliation discrimination?

21 A.  Personally, no.  I mean, I didn't speak to her.

22 Q.  Do you know who spoke to her?

23 A.  I can't say off hand.

24 Q.  Who told you about this, about her?

1    A.    It probably would have come up in conversation

2          when I was at headquarters.  It could be a

3          variety, whether it be someone at fire

4          prevention or headquarters.

5    Q.    Herbert Ceruvales, C-e-r-u-v-a-l-e-s.  Did he

6          ever express to you that he felt he was a victim

7          of political affiliation discrimination?

8    A.    Yes.

9    Q.    When did he do that?

10   A.    He had been working -- he did work in the

11         building where I am, the fire alarm division.

12         He had been out on workers comp I think for a

13         couple of years.  He had come back and was

14         working at fire headquarters.

15               I would run into him occasionally over

16         there.  I think they had him on light duty or

17         something.  His contention even before he

18         stopped working for the fire department was he

19         felt the department was trying to get rid of

20         him.

21   Q.    Did he say because he was not connected?  What

22         did he actually say that led you to believe that

23         --

24   A.    At different times it can come up in

    1        conversation that it is usually -- it may come

    2        up in conversation with a number of different

    3        things as to how it seems some people are taking

    4        care of for different things and other people

    5        aren't.

    6              That will come up in a lot of

    7        different conversations regarding multiple

    8        things in the department.  So the administration

    9        will take care of some people.  It won't take

   10        care of some people.

   11   Q.   Did you know for a fact that was political

   12        affiliation discrimination or was it just the

   13        fact --

   14   A.   Well, in a sense I would say it was something,

   15        mainly for the fact when they have had other

   16        individuals who were in the position that he was

   17        as a fire alarm operator that they will take

   18        care of some people, give them another job, give

   19        them a different job title, and they are not

   20        consistent in doing the same for everybody.

   21   Q.   When was the last time you spoke to him about --

   22   A.   This was back -- God, I am trying to think.  I

   23        couldn't even remember the year.

   24   Q.   Linda Cleary.  Did she ever express to you that

```
1          she felt she was the victim of political

2          affiliation discrimination?

3   A.     Yes.

4   Q.     When did she do that?

5   A.     It would have been on occasions for when she

6          applied for positions.

7   Q.     When is the last time you had a conversation

8          about that with her?

9   A.     With her?  I would say maybe four years ago,

10         three or four years ago.

11  Q.     Rosemarie Clinton.

12  A.     Rosemarie.

13  Q.     Did she ever express to you she felt she was a

14         victim of political affiliation discrimination?

15  A.     Yes.  From both ends.

16  Q.     Excuse me?  What do you mean by that?

17  A.     From both ends.  Rosemarie was one -- she

18         originally worked at city hall here.  And

19         Rosemarie is one that she would tell you for a

20         number of years I am a political hack.  That is

21         what she would tell you.

22                And I know from her and Gerry Horgan

23         that even her she was brought into the

24         department because the purchasing department
```

1      wanted to get rid of her.  She was creating too

2      many problems.  They did tell me this.

3   Q.   Who is they?

4   A.   Rosemarie Clinton and Gerry Horgan.

5   Q.   Okay.

6   A.   Mainly because when she came to the fire

7      department the only place that Gerry Horgan

8      could put her was over in my division with me.

9      And, of course, a person who I think at the time

10     I might have been, I don't know if I was an R-12

11     or an R-14.

12              Rosemary came from the purchasing

13     department where she was, I believe, she was an

14     R-15 and they gave her a promotion to an MM-5 in

15     the fire department.  She had no job

16     responsibilities.  No set work.

17  Q.   So how was she a victim of political

18     affiliation?

19  A.   She would say it that way to then.

20  Q.   Because she was moved?

21  A.   She had everything done politically for her.  As

22     time went on at the fire department, she did end

23     up going to work at fire headquarters.  And as

24     time went on and administration changed she was

1    on the opposite end of it when she was applying

2    for different positions.

3  Q.  Do you know if she ever filed any claims?

4  A.  I don't know if she ever did.

5  Q.  Karen Denver, did she ever tell you or express

6    to you that she felt she was a victim of

7    political affiliation discrimination?

8  A.  Yes.

9  Q.  When did she do that?

10 A.  The last time was probably as well 2 or 3 years

11   ago.

12 Q.  Mary Doherty, did she ever tell you that she

13   felt she was the victim of political affiliation

14   discrimination?

15 A.  Yes.

16 Q.  When was that?

17 A.  She ended up -- she held the position that Ian

18   McKenzie has now.  And I won't say specifically,

19   I would say her to an extent because I believe

20   once she had told me she was looking for an

21   upgrade or additional money for herself as well.

22        But I think she felt as well too that

23   even people that were working with her at the

24   time that she would be trying to be doing things

```
 1            for maybe getting something, an upgrade, and
 2            completely getting shot down say with the
 3            administration as well.
 4                   But I think one of the things
 5            politically for her may have had more to do with
 6            the grades and things of the jobs then let's say
 7            for the money and stuff.
 8   Q.       Jane Hickey.
 9   A.       Jane Hickey is another one.  She is retired now.
10            She would always apply for various jobs more so
11            on the clerical end than the administrative end.
12   Q.       Do you know if she ever filed any grievances
13            about these positions?
14   A.       I don't know if she did.
15   Q.       Marie Howard.  She is retired now, isn't she?
16   A.       Yes.
17   Q.       Did she ever make any complaints to you that she
18            felt she was the victim of political affiliation
19            discrimination?
20   A.       Yes.
21   Q.       Stephanie Long.  Did she ever make any comments
22            to you that she felt she was a victim of
23            political affiliation discrimination?
24   A.       Overall I would say yes.
```

1    Q.    What do you mean by that?

2    A.    Because I wouldn't say one hundred percent

3          specific.

4    Q.    She didn't say I have been discriminated against

5          based upon my political affiliations?  What did

6          she actually say?

7    A.    More or less along the lines for one of the

8          positions that she was looking to get before she

9          had left for the city was that she had been told

10         she probably wouldn't get the position because

11         she wasn't politically connected.

12   Q.    How long ago was that?

13   A.    I would say probably a good 5 or 6 years ago.

14   Q.    Did she file any complaints, to your knowledge,

15         about those comments?

16   A.    I don't know.  The only thing, I think, I am

17         pretty sure she had filed a sexual harassment

18         complaint.  I am not sure about that.

19   Q.    Other than the positions you have applied for

20         within the fire department, have you ever

21         applied for any jobs outside of the fire

22         department since you started at the fire

23         department back in 1985?

24   A.    No.

```
1    Q.    No.

2    A.    Because I always loved my job.

3    Q.    Let me switch tactics a second here.  In

4          paragraph 34 of the complaint you listed a bunch

5          of different people who you believe -- let's

6          start with Jack McGraw.

7    A.    Who.

8    Q.    Jack McGraw.  Do you know Jack McGraw?

9    A.    No.

10   Q.    Do you know what his connection was, his

11         political connection?

12   A.    Supposedly it is either his father or

13         grandfather is a big supporter of the mayor.

14   Q.    Okay.

15   A.    He was the physical therapist before becoming a

16         line man.

17   Q.    Do you know if he ever received any benefits,

18         step increases or upgrades or advanced or

19         anything as a result of his political

20         affiliation?

21   A.    I don't think he has got any other positions.

22         You mean, in addition to originally getting the

23         job that he got?

24   Q.    Yes.
```

1    A.    Well, they have the opportunity to work over

2          time.  And they get very good benefits from the

3          718.  I mean, there is a lot more involved than

4          just the position, I think.

5    Q.    Priscilla Richardson.  Do you know her?

6    A.    Yes.

7    Q.    Do you know if Priscilla Richardson ever

8          received any benefits, step increases, or

9          advancements as a result of her political

10         affiliation?

11   A.    Yes.

12   Q.    What do you believe?

13   A.    Her husband was the supervisor of the radio shop

14         at the fire alarm division.  That is one section

15         I forgot to mention, the radio shop is there

16         too.  He passed away a couple years ago.

17               So discussion at that time, the

18         superintendent of the building, the assistant

19         superintendent was that they have to try to do

20         something for Priscilla Richardson because she

21         didn't work.

22               Then there was the posting for the

23         telephone receptionist.  And I can't remember

24         exactly who, but I guess there were some kind

1        of, I don't know if it was the mayor's breakfast

2        or something over at fire headquarters.  And, I

3        guess, even before it was posted as to who would

4        get the job that Paul Christian presented her as

5        the new telephone operator even before the job

6        was given, interviews were given out.

7  Q.   Did anybody else -- do you know anybody else,

8        any of the plaintiffs, that would have applied

9        for that position had it been posted?

10  A.   I don't know.  I have no idea if even anyone

11        applied.

12  Q.   This was a -- do you know what level her

13        position was, what rating?

14  A.   No.  I don't believe it's an 8.  It could have

15        been a 10 or a 12.

16  Q.   In your complaint you make the allegation that

17        the position was never posted.  Certain members

18        of the class would have applied for this

19        position had it been offered?

20  A.   Which one?

21  Q.   Answering the telephone.

22  A.   No.  That one was posted.

23  Q.   But Priscilla Richardson got the job?

24  A.   Yes.

1   Q.   Would you have applied for that position?

2   A.   No.  It is a lower grade.

3   Q.   Do you know if Denise Barry would have applied

4        for that position?

5   A.   It may be the same grade or she may be higher.

6        I am not sure.  I don't know what her grade was.

7   Q.   Jane Green?

8   A.   Jane wouldn't, no, because she is a higher

9        grade.

10  Q.   Patricia McDonough?

11  A.   No.

12  Q.   Elaine Mesiti?

13  A.   No.

14  Q.   Lila Brown?

15  A.   I have no idea what Lila's grade is.

16  Q.   Mary Kane?

17  A.   No.

18  Q.   Judith Kelley?

19  A.   No.

20  Q.   Lois Hart.  Do you know if Lois Hart received

21       any benefits, step increases, or advancements as

22       a result of her political affiliation?

23  A.   I can't really say.

24  Q.   Karen Cunningham.  Do you know if Karen

```
 1          Cunningham received any benefits, step
 2          increases, or advancements as a result of her
 3          political affiliation?
 4   A.     I have heard rumor that she has.
 5   Q.     And what are those rumors?  What evidence do you
 6          have to support that belief?
 7   A.     What do you mean, like documentation?
 8   Q.     Yes.
 9   A.     I don't have any documentation, no.
10   Q.     You believe Ian McKenzie received benefits,
11          increases, advancements as a result of his
12          political affiliation?
13   A.     I do.
14   Q.     What evidence do you have to support that
15          belief?
16   A.     Documentation?  I don't have anything
17          documented.
18   Q.     What do you have other than -- let me ask that
19          again.  Who do you have to support that belief
20          that he got all the advancements and benefits
21          and everything as a result of his political
22          affiliation?
23   A.     I would say overall from what we have heard over
24          the years.
```

```
 1   Q.   Just rumors?

 2   A.   Yes.

 3   Q.   Erica Boylan.   Do you know Erica Boylan?

 4   A.   Who?

 5   Q.   Erica Boylan?

 6   A.   Yes, I know Erica.

 7   Q.   Do you know if Erica received any benefits, step

 8        increases, or advancements as a result of her

 9        political affiliation?

10   A.   I believe I was told through Mary Cane that

11        Erica is, I think it is her mother dates Doto

12        Nee's -- see, I am trying to get it straight.

13        Doto Nee's brother, whichever way it is.  But

14        there is a relationship.

15   Q.   Erica Boylan's mother dates Doto Nee's brother?

16   A.   I think that is the way it goes.  It is some

17        sort of a relationship thing.

18   Q.   Do you know that for a fact?

19   A.   Do I know it for a fact?  No, I don't know it

20        for a fact.

21   Q.   Do you have any documentation to show --

22   A.   No.

23   Q.   -- that Erica got her job because of her

24        political affiliation or connected to Doto Nee?
```

1   A.    No.

2   Q.    Do you know Doto Nee?

3   A.    Yes, I do.

4   Q.    Did you work with him?

5   A.    No.

6   Q.    Are you on friendly terms with him?

7   A.    No.  I speak with him.

8   Q.    How long did you work with him for?

9   A.    Well, I didn't work with him.  They were in a

10        different -- they were over at 900 Mass Ave.

11        But I have spoken -- actually, I was told myself

12        over the years.  I had summer help at the fire

13        department.

14  Q.    Okay.

15  A.    And, of course, over a number of years people

16        would complain.  So then it had to be that they

17        had to be city of Boston residents and things.

18              So over the years when my own kids

19        were going to college or whatever I would see,

20        or high school, I would mention to Gerry Horgan

21        or other different ones about the summer jobs.

22        And, basically, what I was told is that Doto Nee

23        controls all of the summer jobs.

24  Q.    Who told you that?

```
1   A.   Gerry Cahill who retired from the fire alarm
2        construction crew.  And Mary Cane has basically
3        corroborated that as well too.
4   Q.   How does Mary Cane know this?
5   A.   She works right over there in the maintenance
6        division.
7   Q.   Michelle Urso, do you know her?
8   A.   Yes.
9   Q.   Do you know if Michelle Urso has received any
10       benefits, step increases, or advancements as a
11       result of her political affiliation?
12  A.   Yes.
13  Q.   What evidence do you have to support that
14       belief?
15  A.   Just what I was told.
16  Q.   What were you told?
17  A.   I was told that she received the, for leaving
18       the fire department for coming to work at city
19       hall that through political connections, I don't
20       know who through, but through political
21       connections she received a promotion into the
22       budget office here at city hall.
23  Q.   So she no longer worked at fire headquarters?
24  A.   No.
```

1   Q.   Who told you that?

2   A.   I believe that may have been Michael Grigalunas,

3        the budget analyst.

4   Q.   Do you know Karen Manning?

5   A.   Yes.

6   Q.   Do you know if Karen Manning received any

7        benefits or advancements or step or grade

8        increases as a result of her political

9        affiliation?

10  A.   Not since she has gone into the position that

11       she had.

12  Q.   Before that?

13  A.   Well, we had all -- rumor again say that she was

14       brought in politically for the position that she

15       originally got in the fire department, that she

16       worked with one that is considered James Hogan

17       who also was working for the fire department

18       that she works with him politically for the

19       mayor.

20  Q.   So as a result of her connection to somebody

21       who may or may not know the major?

22  A.   They do.

23  Q.   You know that for a fact?

24  A.   I know Jim Hogan does.

```
 1    Q.    But do you know for a fact that Karen Manning
 2          got --
 3    A.    No.
 4    Q.    -- that position -- it was just rumor?
 5    A.    Uh-huh.
 6    Q.    Nothing in writing to support those allegations?
 7    A.    No.  But when we questioned as to what her
 8          qualifications were for the position that she
 9          had because there were other woman in the
10          department who interviewed for the same position
11          one of them being Joanne Callahan that the
12          response that Joanne Callahan had received about
13          her qualifications she worked in a bakery.
14    Q.    We have already gone through Mary Kilgallin.
15          What are Mary Kilgallin's political
16          affiliations?
17    A.    Mainly from what we heard Dennis Damazio and I
18          believe, I can't -- I am only going by what
19          others -- Dennis Damazio was the man, the one we
20          were told that brought her into the department.
21          And I am just going by hearsay on the record
22          that we were told that either she dates a state
23          rep or the brother of one of the state reps.
24    Q.    Who told you this?
```

```
 1    A.    I can't pick out, pin point anyone in

 2          particular.

 3    Q.    It was just talk?

 4    A.    Yes.

 5    Q.    Have you ever seen it in the newspaper that Mary

 6          Kilgallin is out with a state rep?

 7    A.    I think that -- I am trying to think if there

 8          was Rosalyn who works in headquarters.  I think

 9          she has seen them together at the state of the

10          city address.

11    Q.    Are you aware if that person, that state rep or

12          anybody made a phone call on behalf of Mary

13          Kilgallin?

14    A.    No.

15    Q.    Anybody at all other than Dennis Demazio that

16          she was affiliated with --

17    A.    No.

18    Q.    -- that you believe she got the job?

19    A.    No.

20    Q.    Anyone else?

21    A.    No.

22    Q.    Do you know if Bob Moran received any benefits

23          or advancements or upgrades as such as a result

24          of his political affiliations?
```

```
 1    A.    I can't say offhand, no.

 2    Q.    Do you believe Bob Moran is politically

 3          affiliated with anybody?

 4    A.    Yes.

 5    Q.    Who?

 6    A.    I don't know who, but I believe he is.

 7    Q.    Do you have anything based on that?

 8    A.    This was one of the instances even when he came

 9          to work for the fire department we were

10          questioning at different times the

11          administration regarding qualifications and

12          different things too.

13    Q.    Do you know what Bob Moran's qualification are?

14    A.    I know what some of them are.

15    Q.    Do you know at the time when he got the position

16          what his qualifications were?

17    A.    I think mainly we had heard he had worked in

18          human resources for one of the hotels.  But as

19          to what capacity of what type of work and stuff

20          we weren't really told too much.

21    Q.    Do you feel you should be informed as to each

22          and everybody's position when --

23    A.    Well, when people --

24    Q.    Let me finish the question.
```

```
 1    A.    Okay.
 2    Q.    When somebody gets a position, do you believe
 3          that you should be informed as to what their
 4          qualifications are as to why they got those
 5          positions?
 6    A.    I think we should, yes.
 7    Q.    Why is that?
 8    A.    Because I think that is fair and equitable
 9          treatment.  And for the city, even for the city,
10          you know, having their employee handbooks and
11          everything being say a fair and equal employer,
12          you know, how can you even, the city say that
13          they are being fair if they won't even tell
14          people, you know, what is the difference?  What
15          I am lacking or what do they have better?
16    Q.    Did you ever apply for the position of Bob
17          Moran?
18    A.    No, I didn't.  But the reason it came up,
19          questions of qualifications and stuff, was
20          when -- now, because now, even for Bob's
21          position, now Elaine Mesiti I know had even
22          applied for that because I had even spoken to
23          Elaine about it.
24                     And Elaine had excellent
```

```
 1         qualifications too, but I don't believe that she
 2         was ever told what did he have that was more
 3         than her or did he even have as much.
 4    Q.   Do you know how many years of experience Bob
 5         Moran had in the human resources area?
 6    A.   No.
 7    Q.   Do you know whether or not he had any degrees,
 8         anything in terms of human resources?
 9    A.   Well, we knew when we he started working for the
10         department -- I don't know how much longer
11         after, but he was going to school to get a
12         degree.
13    Q.   Do you know what type of degree --
14    A.   No.  I think he had something before in
15         industrial relations or something.  But even the
16         posting, that was outside his job originally.
17         It had -- and I can't see for him working in
18         human resources in the hotel business why he
19         would have knowledge of civil service laws and
20         the list of different things on there that to me
21         people would not have knowledge of unless they
22         were working within the confines of particular
23         things, civil service, or the city's laws or
24         ordinances, different things like that.  I can't
```

1           see that he would have met all the

2           qualifications posted either.

3      Q.   Have you ever seen his resume?

4      A.   We have seen part of it.  But to me that

5           wouldn't be included in there.  I think the

6           average person, if the average person saw that

7           so and so was a human resource something for a

8           hotel what would that have to do with civil

9           service, civil service laws, the Commonwealth

10          that wouldn't relate to hotels at all.

11               That was the only thing that we ever

12          had seen on paper was that he had the hotels, he

13          worked in something in the hotels in human

14          resource.

15     Q.   Eileen Stille, do you know her?

16     A.   Yes.

17     Q.   Do you know if she has ever received any

18          benefits, step increases, or advancements as a

19          result of her political affiliations?

20     A.   No.

21     Q.   Do you believe --

22     A.   Only from what I have heard.

23     Q.   What have you heard?

24     A.   She is in the payroll office at this time.  But

```
 1          that I had heard basically rumor has it,

 2          everything is rumor has it that she moved from

 3          the accounting office to the payroll mainly

 4          based on political work.

 5     Q.   Political work for whom?

 6     A.   The current mayor.

 7     Q.   But you don't know that --

 8     A.   No.

 9     Q.   For a fact?

10     A.   No.  People would never put things like that on

11          paper.

12     Q.   Not even Denise Barry?

13     A.   No.  I mean in the sense that -- what do you

14          mean?

15     Q.   Well, you say in e-mails and things like that.

16     A.   I mean, in the sense it's the same as -- how can

17          I word this?

18     Q.   Just say it.

19     A.   That someone isn't going to say to me.  It's the

20          same way that Bob Moran wouldn't answer my

21          E-mails that I asked him how can you give this

22          person this job?  He wouldn't answer me.  I

23          mean, I am trying to go through the process -- I

24          would consider that most people with half an
```

1    ounce of brains they are not going to put

2    something like that in writing.  They don't want

3    it used against them.  That is generally why you

4    won't have written documentation on a lot of

5    things.

6  Q.  So you don't know for a fact whether or not

7    Eileen Stille is politically connected?

8  A.  No.

9  Q.  She is not connected to anyone like the mayor or

10   the Hyde Park group or the South Boston group?

11 A.  Yes.

12 Q.  How is she connected to those people?

13 A.  I don't know whether it's -- I believe the over

14   all thing, some, which way, working for the

15   mayor, whether for election or whatever.

16 Q.  Has there ever been a Charlestown group?  When

17   there was Commissioner Pearce, was there a

18   Charlestown group?

19 A.  Not really.  He didn't live in Charlestown.  He

20   grew up there.  He grew up there.

21 Q.  Where did he live?

22 A.  I'm trying to think.  I can't remember.  Was he

23   in -- I can't remember if he was in Hyde Park.

24   I am trying to think of where Marty Pearce was.

1        And I used to know too.  No, it seems like most

2        of the time I have been at the fire department

3        it has been the South Boston group or the Hyde

4        Park group.

5    Q.   Carol Petta.  Has Carol Petta ever received any

6         benefits, step increases, or advancements as a

7         result of her political affiliation?

8    A.   I would say, yes.

9    Q.   And what evidence do you have to support that

10        belief?

11   A.   Because Carol Petta, she is from Hyde Park.  She

12        is one that is considered part of that Hyde Park

13        group.

14   Q.   Who considers her part of that Hyde Park group?

15   A.   I would say a lot of the civilians in the fire

16        department.

17   Q.   Is that just the mere fact she lives there that

18        she is a part of the group?

19   A.   No.  I think there are a lot of people who will

20        come up with that distinction.  A lot of the

21        different ones they evolve around each other and

22        they know each other outside of work as well.

23             I think if you spoke to the majority

24        of the civilians in the fire department that

1    were there when Carol Petta was hired that a

2    majority of them would more than likely tell you

3    that they felt the person who was second in

4    charge of the payroll office was the more

5    qualified individual.

6  Q.  Who was that?

7  A.  Paula Hamilton.

8  Q.  Do you know if Paula Hamilton applied for the

9    position that Carol Petta got?

10 A.  Yes.

11 Q.  Do you know if Paula Hamilton ever filed a

12   grievance?

13 A.  That I don't know.

14 Q.  Other than the fact that Carol Petta lives in

15   Hyde Park --

16 A.  Uh-huh.

17 Q.  -- what else do you have to support the fact

18   that she got the position as a result of her

19   affiliation?

20 A.  Well, I believe she is politically, very

21   politically active in the Manino administration.

22 Q.  Do you know that as a fact?

23 A.  No.  Just by --

24 Q.  Rumor?

1   A.   No.  Well, yes, a lot of different ones that

2        will tell.

3   Q.   Other than that, anything else that you have to

4        support the fact that she got her position --

5   A.   Because I feel even from talking to others that

6        were working in the payroll office at the time

7        that I had said at the time when they hired

8        Carol Petta, Paula Hamilton, who had been say

9        the second in charge in there for years and had

10       acted in the position as the head of the payroll

11       office and everything, her and one of the other

12       woman in there, this Jane Hickey, they had said,

13       they had both told me that they were told that

14       they had to train Carol Petta in the position in

15       payroll.

16            Of course, my response which is

17       probably most employees don't like my response

18       was that I wouldn't train her.  If I applied for

19       the position and I wasn't good enough to get the

20       position then I must not be good enough to train

21       her either.

22   Q.   Does Paul Hamilton still work --

23   A.   Yes.

24   Q.   Is she still in the second in command position?

1   A.   Yes.  And they didn't feel -- the two of them
2        didn't feel they could do that with her coming
3        into the department.
4             So they did basically train Carol.
5        And one of the -- supposedly one of the
6        qualifications for the job was that you had
7        People Soft experience.  And they hired her
8        without People Soft experience and let her go
9        for training.  And other jobs that required
10       People Soft experience they have turned down
11       because they didn't have the People Soft
12       experience.
13  Q.   Do you know who interviewed Carol Petta?
14  A.   I have no idea.
15  Q.   Have you ever spoken to Carol Petta?
16  A.   Yes.  I get along well with Carol.
17  Q.   The people that you have listed in your answers
18       to interrogatories number 14, I am just going to
19       list them for the record under, they are listed
20       under present employees who remain who were
21       victims of the administrations political
22       affiliation discrimination.
23            Those people are Janice Boyle, Irene
24       Debbie Burke, Joanne Callahan, William Chisolm.

```
 1          Is William Chisolm still with the department?

 2   A.   No, he is retired.

 3   Q.   Okay. Carol Connors.  Katy Donovan.  Denise

 4        Evers.  Patricia --

 5   A.   Denise isn't there now either.

 6   Q.   Did she quit?

 7   A.   She went to work in New York.

 8   Q.   Okay.  Patricia Fiasconaro.

 9   A.   She just recently retired.

10   Q.   Sharon Green.  Paula Hamilton.  Maureen

11        Hartnett.

12   A.   Maureen is not there anymore either.  She was

13        fire alarm operator and she left.  I can't

14        remember exactly what year.  Going back probably

15        half a dozen years.

16   Q.   She left half a dozen years ago?

17   A.   Yes.

18   Q.   Maria Hernandez.  Katherine MacMillen.  Cathy

19        Moore.  Michael O'Reilly.

20   A.   Michael O'Reilly is gone.

21   Q.   Marta Poupart.  Luz Rivera.  Jennifer Ryan.

22        Linda Short.  Mary Ann Quilty.

23   A.   Linda Short is retired.  And Mary Ann Quilty is

24        deceased.
```

1   Q.   Besides Mary Ann Quilty who is now deceased,

2        have any of those people whose names I have read

3        ever expressed wanting to join your lawsuit?

4   A.   I think there are a couple that are questioning

5        they may.

6   Q.   Who is that?

7   A.   One I know, one positively that I would mention,

8        her name is Ruthie Martapupa.

9   Q.   Anybody else?

10  A.   Not saying definite only a mention of maybe.

11  Q.   Who would those be?

12  A.   Where they just said maybe I don't think they

13       would want me to say who they are.  Actually,

14       another one as well too is William Chisolm.

15  Q.   You mentioned, you said the majority of Boston

16       fire department civilian employees because of

17       non advancement that have all been, who have

18       been, who have alleged they have been subjected

19       to political affiliation discrimination?

20  A.   Basically because there is so many people they

21       are not, the department, there is no real

22       opportunity for anyone for advancement.

23  Q.   What do you mean by that?

24  A.   Whether it be going further in their position.

```
 1          Going into different areas.  Learning new jobs.

 2          There is -- It is like there is nothing else

 3          there.

 4                    I mean, it is probably one of the

 5          reasons that I love my job it is such a variety.

 6          I love learning things.  It is like people are

 7          stagnating in the positions.

 8   Q.     Is there anything that those people that you are

 9          mentioning could they do anything different?

10   A.     Could they do anything different?  Not really.

11          Because it has even become an issue with the

12          fire department that they don't really like to

13          give the civilian positions like acting out of

14          grade, to give you the opportunity to learn a

15          new job.

16   Q.     But you have had the opportunity to act out of

17          grade.  And you have been able over the years --

18   A.     Just once.  It is only because I did that kind

19          of work even from when I was doing the

20          supervisor at the accounting office I was the

21          only one at the department really that they

22          could have.

23                    Because in the accounting office they

24          had one person who only did purchase orders.
```

```
 1          One person who only did contracts.  Another

 2     person who only did service orders.  That is the

 3     way the accounting office broke it up.

 4              I was the only one at the fire alarm

 5     division that did some of it all.  That is

 6     mainly why they were looking for me to act in

 7     the office.  But overall, yes, there is, there

 8     is no real opportunity.  Say I suddenly got an

 9     interest in things related to fire prevention.

10     There is no opportunity to even --

11  Q.  Just as an example would you be able to explore

12     that?

13  A.  We have brought those types of issues up with

14     the administration before.

15  Q.  Have you done that with this current

16     administration?

17  A.  With the current commissioner?

18  Q.  Yes.

19  A.  No.  We have done it with Bob Moran and Paul

20     Fisher.

21  Q.  Let's do this then.  Other than the people who

22     you have listed in your answers to

23     interrogatories, number 14, are there any others

24     that you believe that would have an equal say
```

```
 1              with political affiliation discrimination that

 2              you have not listed there?

 3    A.    That I have not listed?

 4    Q.    Yes.

 5    A.    I don't think so.

 6    Q.    With regard to Ronald Keating, what facts do you

 7              have to support your theory that he somehow

 8              participated in political affiliation

 9              discrimination against you?

10    A.    I don't really know.  I don't really have

11              anything to do with that.

12    Q.    What facts do you have to support your theory

13              that he somehow participated in political

14              affiliation discrimination against you?

15    A.    I don't think I really put anything in the case.

16              But I had one issue which I brought up with the

17              superintendent of the fire alarm division.  They

18              had put, I will try to make it as short as I

19              can.  They put a fire alarm operator who had

20              been out for about a year and a half, two years,

21              on injured leave.  She came back to work.

22    Q.    Who was that?

23    A.    Christine Lacourt.  And they had put her in the

24              office with me.  And she was going to be doing
```

```
 1          light clerical duty.

 2    Q.    I think I know about Christine Lacourt.

 3    A.    Okay.

 4    Q.    Anything else other than Christine Lacourt and

 5          her issues?

 6    A.    What I am getting at is the political thing

 7          isn't so much her doing the job, but that I

 8          heard at the time the superintendent of the

 9          building speaking to Chief Finn on the phone.  I

10          guess apparently he wasn't aware that I was

11          there.  We have connecting open doors to our

12          office.

13    Q.    Who was that super?

14    A.    John Henderson.  Because it was him I brought it

15          up to afterwards that he was asking Chief Finn

16          about changing Christine LaPorte's title from

17          fire alarm operator to something else, to more

18          of an administrative title.

19                     And I had questioned John Henderson

20          about that later.  His thing was that wasn't

21          part of the phone call.  I said, well, I am not

22          standing with my ear over by the door.  I said

23          maybe you didn't think I was here.  Because I

24          had been questioning it so much.  Because I
```

```
 1            said, I am not going to have all the
 2            responsibilities that I have.  And someone else
 3            and, you know, they are working less hours and
 4            getting more money.  So that I was looking at it
 5            to change the title to administrative position,
 6            which should be something that was a 718.  If it
 7            was a clerical job it should be --
 8      Q.    But how --
 9      A.    Because he had -- in the sense that Chief Finn
10            from the things that were being discussed that
11            Chief Finn had the capabilities of doing things
12            like that.
13      Q.    But how was Christine LaPorte -- let me strike
14            that.
15                     Chief Finn, how was his political
16            affiliation, how does he participate in a
17            political affiliation discrimination against
18            you?
19      A.    No, he hadn't.  And that is why I said there
20            really wasn't anything in there.  But that
21            was -- in a sense I still look at it, that he
22            had the capability --
23      Q.    But under political affiliation --
24      A.    But for me, no.
```

```
 1   Q.   Chief Hitchcock.  What facts do you have to
 2        support your theory that Chief Hitchcock,
 3        William Hitchcock had somehow participated in
 4        political affiliation discrimination against
 5        you?
 6   A.   I never really had anything to do with Chief
 7        Hitchcock.
 8   Q.   Commissioner Robert Fraser.  What facts do you
 9        have to support your theory that he somehow
10        participated in political affiliation
11        discrimination against you?
12   A.   Him I don't either.
13   Q.   Paul Christian.  What has Paul Christian done?
14        What facts do you have to support your theory
15        that he somehow participated in political
16        affiliation discrimination against you?
17   A.   Some of the things that have gone on in the
18        department while he was commissioner.
19   Q.   That he directed against you specifically?
20   A.   Well, I have been told at one of the chief's
21        meetings that he held, this was after I had gone
22        to see Bill Kessler here at city hall that my
23        name wasn't specifically mentioned.  But he did
24        present to the chief, of course.  They probably
```

```
 1           would all know who I was anyway.  That someone
 2           at city hall, and this is the thing that I don't
 3           like with supposedly things being
 4           confidential --
 5   Q.      Even things off the record?
 6   A.      Huh?
 7   Q.      Even things off the record?
 8   A.      Yes.  When you wait for someone to get back to
 9           you and they don't, that he didn't need --
10           someone is making complaints at city hall from
11           fire alarm and that he doesn't need, I don't
12           know, need her help in running my department.
13                   Of course, most of the chiefs that
14           were there didn't know what he was talking about
15           at all because they didn't have any idea what
16           was going on.
17   Q.      How did you hear about this?
18   A.      From one of the deputy chiefs.
19   Q.      Who was that deputy chief?
20   A.      Let me get the name.  What is his name?  And I
21           work with him too.  Dunbar.
22   Q.      Is he still there?
23   A.      Yes.
24   Q.      He told you this?
```

```
 1    A.    Yes.

 2    Q.    In what context did he tell you this?

 3    A.    What do you mean, what context?

 4    Q.    How did it come about in a conversation?

 5    A.    I don't know.  Just general conversation.

 6          Usually any time --

 7    Q.    Did he say, Betty, let me tell you what the

 8          commissioner said today in a meeting?

 9    A.    Sometimes we do that.

10    Q.    Okay.

11    A.    You know, or something that you heard you are

12          surprised at.  I can't really say.

13    Q.    Your name was never mentioned.

14    A.    No, but there were some that did know that it

15          was me.

16    Q.    Okay.  And you mentioned in your answers to

17          interrogatories and your responses in terms of

18          what you have against Bill Kessler --

19    A.    Yes.

20    Q.    -- for his failure to respond to what you

21          believe to be adequately to your --

22    A.    It is not even so much adequately because I had

23          said to him, the main reason I went to Bill

24          Kessler was because I said -- and this was one
```

1    thing that I had even said at one time to Bob

2    Christian.

3            I said, I went through what I

4    considered to be the correct procedure that they

5    want you to go.  I said, I brought -- I said, it

6    is not like I hid anything.  I brought

7    everything to headquarters.  I brought

8    everything to Bob Moran.  We presented some

9    things to Paul Christian.

10  Q.  And his response to you --

11  A.  He did nothing.  Bob Moran and Paul Christian,

12      basically the same response.  Everything,

13      everything falls under the umbrella of 718

14      collective bargaining agreement to the point I

15      had to buy a copy.

16            I said to Bob Moran tell me where it

17      says this in the collective bargaining

18      agreement.  Well, he didn't have anything.  He

19      never had anything there to show you.

20  Q.  Did you ever take it to labor relations?

21  A.  Some of the issues are.  I am still trying to

22      find out on one of them that I had filed back in

23      2005.  On the specific ones that I brought to

24      Paul Kessler, I didn't bring to labor relations,

1    I brought directly because our understanding was

2    from one of the union people at the time was

3    that if there were issues that weren't resolved

4    that you did bring to the personnel office, same

5    with the department, then it was -- I forget

6    what it was.  Last name was Dalton in the union.

7    I forget what his exact title was in the union.

8    We had asked.

9         I had even said to Bill Kessler when I

10    went, it is like nothing is being addressed.

11    You know, some of these issues they don't even

12    seem like they are legal.

13  Q.   His final response to you was it fell under the

14    local 718?

15  A.   Yes.

16  Q.   And that was his response to you too?

17  A.   Yes.  And basically I had, you know, sent a

18    letter back to Bill Kessler and telling him, I

19    had asked him if he would after spending a few

20    hours with him and presenting him with what I

21    had, would he at least contact me before he

22    decided anything?  Or that I would like some

23    more contact with him.  And that I wouldn't get

24    like a blanket response from him regarding the

```
 1            issues that I was bringing to him.  And that is

 2            basically what he did.

 3                  And I had even sent a letter back

 4            asking him, you know, could he tell me

 5            specifically what sections of the collective

 6            bargaining agreement, you know, he felt the

 7            thing fell under or whatever, still no response.

 8            So it is like nothing got settled there either.

 9   Q.   Are there any people that have been mentioned --

10            any other people who have not been mentioned as

11            defendants that you would add to the list that

12            we already have?

13   A.   What would you want --

14   Q.   We have Robert Moran.  We have Christian.  We

15            have the city of Boston fire department.  We

16            have Bill Kessler.  Bill Hitchcock.  Ronald

17            Keating.  Roderick Fraser and Joseph Finn.

18            Anybody else who has not been added to that list

19            that you believe are applicable to you and

20            should be added to the list?

21   A.   It would depend on what degree you are

22            talking --

23   Q.   Well, in terms of political affiliation

24            discrimination, anybody else that you have not
```

```
 1        mentioned?

 2    A.  I don't think so.

 3    Q.  Do you believe your claims are the same as or

 4        equal to those of Denise Barry?

 5    A.  Yes.

 6    Q.  Do you believe your claims are equal to or the

 7        same as Jane Green?

 8    A.  I can't say that I know all of Jane's claim.

 9        Probably more so than anything, probably more so

10        Denise.  But the rest of them I really don't

11        know what all their claims are.

12    Q.  Lila Brown, do you know what her claims are?

13    A.  No.

14    Q.  Patricia McDonough do you know what her claims

15        are?

16    A.  I would say I know some of them.  Not all.  But

17        I would say I know a number of them.

18    Q.  Elaine Mesiti?

19    A.  A know a number of hers.

20    Q.  Are her claims the same or equal to yours?

21    A.  I would say so.

22    Q.  Mary Kane, do you believe that your claims are

23        equal or the same as -- equal to or --

24    A.  Yes.  Overall I would say, yes.
```

```
 1   Q.   Have you had conversations with each of these
 2        individuals -- Jane Green, Patricia McDonough,
 3        Lila Brown, Denise Barry, Elaine Mesiti, Mary
 4        Kane, and Judith Kelley about their claim?
 5   A.   Maybe bits and pieces here and there.  Lila
 6        Brown I can say no on Lila.
 7   Q.   What does -- can you define what political
 8        affiliation discrimination is?
 9   A.   I look at the political affiliation
10        discrimination more as someone or a group, a
11        political organization, a political person or
12        whatever who through their own office or others
13        within -- we will say for the city, whether it
14        be the Manino administration, everything goes
15        from the top down hill.  All your departments
16        play into it.
17             Any time a person, depending on if
18        they are working for politicians or doing
19        something for the politicians, that there is
20        some type of privilege or an award or a job
21        given out, pay raises, that someone is going to
22        benefit in some way from the administration,
23        from the top all the way down that something can
24        be done that someone is going to gain some way,
```

```
 1            whether it is jobs, compensation, upgrades,

 2            anything.

 3                      And, as I said even earlier, there has

 4            always been patronage in every level of

 5            government.  But not to the point that it is a

 6            hundred percent.  And that is basically, I feel

 7            that it has become 100 percent as relates to

 8            jobs and things.

 9    Q.      You say in your answer to number 17, political

10            affiliations is a sponsorship from, support from

11            and/or close affiliation with the member of the

12            then existing administration in power and

13            influence in the city of Boston administration

14            and Boston fire department executive offices,

15            including the group of individuals known as the

16            Hyde Park group and South Boston group who

17            constantly vie for power against any other

18            political group including other parties, for

19            example, republicans and the other groups within

20            the democratic parties.

21                      Is that your answer?

22    A.      Yes.

23    Q.      Are those your words?

24    A.      A good part, yes.
```

```
 1    Q.   Which part is not yours?

 2    A.   More the ands, the buts.  But that is basically

 3         my answer.

 4    Q.   What does it really mean?

 5    A.   You have your groups.  You have your groups such

 6         as even as we talked earlier the south Boston

 7         group, the Hyde Park group, most of the time

 8         that I have worked at the fire department it has

 9         been the Ray Flynn administration.  And it has

10         been the Thomas Manino administration.

11              And that is where a lot of your Hyde

12         Park and your South Boston groups play into it.

13         From South Boston you have Doto Nee.  Basically,

14         that is what we have always been told.

15         Basically, he controls the job.  He controls

16         everything that happens in South Boston.  Even

17         though he is retired now from the fire

18         department too.

19    Q.   Do you know for a fact in regard to Doto Nee

20         anybody, other than you mentioned Erica Boylin

21         and her connection to him, anybody else that you

22         know for a fact got a job because Doto Nee gave

23         them their job?

24    A.   Off the top of my head -- I can't say off the
```

```
 1            top of my head.  If I sat and thought about it

 2            for a while, I probably could come up with a few

 3            names.

 4    Q.      You can supplement your interrogatories.  With

 5            regard to the Hyde Park group, can you list

 6            those who are members of the Hyde Park group?

 7    A.      Andy Warren, Carol Petta, Steven Henderson.

 8            Probably more so to the fifth degree, no longer

 9            lives in Hyde Park but there is still

10            affiliation, John Henderson.  I am not sure if

11            it is Hyde Park, but it could be.  Mario

12            Calucci.  The names escape me.

13    Q.      Is the mere fact they live in Hyde Park makes

14            them a member of the Hyde Park group?

15    A.      That has partly to do with it.  It is mainly

16            it's the, when you are considered the Hyde Park

17            group, you don't necessarily just have to be

18            from Hyde Park.  The Hyde Park group can mean

19            that, but it also can mean that you work for a

20            certain individual who will run things.  We will

21            say currently the Manino administration out of

22            Hyde Park.  That area.  We will say Jim Horgan,

23            who I believe has received benefits through

24            politics.  He is in Dorchester, one of the
```

1      Dorchester Manino workers.

2              In South Boston it would be say Doto

3      Nee.  I can't say for all the different sections

4      of the city, but the main ones supposedly will

5      control things.  And this Jim Hogan.  He has

6      been one -- he has flaunted in front of people.

7  Q.  And where does Jim Hogan work?

8  A.  He is one of the ones that came on as a battery

9      man.

10  Q.  Okay.

11  A.  The job that doesn't exist.

12  Q.  Is it your feeling that the Boston fire

13      department is required to promote or give raises

14      to people who only -- only those people who are

15      within the Boston fire department?

16  A.  No.

17  Q.  If there is a person who is from outside of the

18      Boston fire department and that person is more

19      qualified than the person on the inside, do you

20      believe that person should get the job?

21  A.  I do.

22  Q.  Do you believe that any of the people that you

23      know that were brought in from the outside have

24      been effective in the positions that they have?

```
1    A.    Cathleen Kurley.

2    Q.    Okay.

3    A.    She is one.

4    Q.    Anybody else?

5    A.    I can't really say for payroll.  Of course,

6          maybe not for payroll.  They never used to have

7          over time, now they have over time.

8    Q.    So that's a good thing.

9    A.    No.

10   Q.    For people in payroll?

11   A.    For people in payroll.  But if you are trying to

12         say would it be good for payroll, to me if it is

13         costing you more to run your department you

14         can't be doing a better job.  Do you know what I

15         mean?  I would say overall probably mainly

16         Cathleen Kurles.

17   Q.    Do you know or do you believe whether -- strike

18         that.  Start over again.

19   A.    If I can add one more thing.  Cathleen Kurles is

20         probably the only one that I could really speak

21         of.  Besides the payroll I know the department

22         it is costing more.  But the rest of them I

23         really couldn't say because I don't really have

24         the contact with them.  I have a lot of contact
```

```
 1            with Cathleen Kurles.
 2    Q.   Do you know if Denise Barry has ever received
 3            any benefits, step increases, or advancements as
 4            a result of her political affiliation?
 5    A.   As far as I know, no.
 6    Q.   Do you know if Jane Green has received any
 7            benefits, step increases, or advancements as a
 8            result of her political affiliation?
 9    A.   I don't believe so.
10    Q.   Same for Patricia McDonough?
11    A.   I would say the same.  I don't believe so.
12    Q.   Lila Brown?
13    A.   Her I don't know.
14    Q.   Elaine Mesiti?
15    A.   Say the question again.
16    Q.   Do you know if Elaine Mesiti received any
17            benefits, step increases, or advancements as a
18            result of her political affiliation?
19    A.   Not that I know of.
20    Q.   Do you know if Mary Kane has ever received any
21            benefits, step increases, or advancements as a
22            result of her political affiliation?
23    A.   She may have in the past.
24    Q.   What do you mean by that?
```

```
1    A.   Going back years ago.

2    Q.   How long has she worked with the department?

3    A.   Mary, she is over 20 years too.  I think -- we

4         were lower grade at the time.  We might have

5         been like R-10 or something.

6              And I can remember going to Gerry

7         Horgan because all I ever used to hear from him,

8         because I would say to him, why do you post

9         these different positions and stuff?  You know,

10        you can apply for things.

11             He said, we try to take care of who is

12        the senior people, you know, in the different

13        grades and stuff.  Give everybody an opportunity

14        to be moving.  Of course, I didn't like it at

15        the time.  I said okay.

16             Same thing a few years later I applied

17        for such and such.  I think I had a little more

18        seniority than Mary or something.  He ended up

19        giving it to Mary.  That was so many years ago.

20        I can't even really remember.

21   Q.   At that point was Mary Kane politically

22        affiliated with somebody?

23   A.   Yes.  I think -- well, Mary was?

24   Q.   Who was she affiliated --
```

1   A.   She usually would say so too.  She did work for

2        different ones in the Flynn administration.  But

3        Mary has always been, you know, I don't think

4        she has ever -- she would never hide something

5        like that anyway.

6   Q.   Judith Kelley, do you know if she has ever

7        received any benefits, step increases, or

8        advancements as a result of her political

9        affiliations?

10  A.   No.

11  Q.   How is it that none of these people to your

12       knowledge have received, other than Mary Kane,

13       has received any advancements but then you hear

14       about everybody else?

15  A.   Because just about everybody else the same as I

16       got to the grade that I was at through civil

17       service tests.  A lot of people didn't like

18       civil services tests, but it was probably the

19       best thing we had for work in the city.

20            And not even so much -- because it was

21       a more fair and equitable way, you know, of

22       giving people promotion and the opportunity for

23       different things.  And it's like now there is

24       nothing and most of them got to the positions

1        that they were at through those tests.

2   Q.   Some of these people have recently been promoted

3        isn't that correct like Lila Brown?

4   A.   I don't know.  I couldn't say on Lila.

5   Q.   Denise Barry was recently given a promotion.

6   A.   I don't believe -- I don't believe she took

7        that.

8   Q.   But she was offered one; isn't that correct?

9   A.   I heard.  I can't document that, but from what I

10       heard.

11  Q.   How did you hear that?

12  A.   I think one of them at the squad told me.

13  Q.   Do you believe that Doto Nee has made any

14       decisions that have affected your career at the

15       Boston fire department?

16  A.   Affected mine?

17  Q.   Yes.

18  A.   I don't know.  I was already to say no.  But for

19       the way things seem to go on in the

20       department --

21  Q.   But nothing documented?

22  A.   Nothing documented.

23  Q.   Nothing but supposition?

24            MR. FEENEY:  Objection.  Misstates the

```
 1            testimony.
 2      BY MS. GLASGOW:
 3      Q.    Do you have anything other than something not
 4            documented?  Anything else that you may have
 5            that would support that contention?
 6      A.    No.
 7                  MS. GLASGOW:  I think I am going to call it
 8            a day.  Do you have any questions?
 9                  MR. FEENEY:  Quick question.
10      BY MR. FEENEY:
11      Q.    In your suit at the MCAD --
12      A.    Yes.
13      Q.    -- were they considering only your sexual
14            discrimination claim or were they also
15            considering political affiliation?
16      A.    They were mostly just considering sexual
17            discrimination.
18      Q.    Do you know Shawn McKunagle?
19      A.    Yes.  Shawn McKunagle started working at the
20            fire department -- I am not sure of the date.
21            It was around May 8.  He just started working.
22            He had been at fire headquarters approximately
23            two weeks prior to that for an interview for a
24            position of linemen, fire alarm construction.
```

1        And the job wasn't posted.  And when I
2    had heard that he was in for an interview at
3    fire headquarters, I E-mailed Bob Moran.  And I
4    had told him that rumor had it that there was a
5    Sean McKunagle who was being given the position
6    at the fire alarm division with no posting and
7    as always would be interested in applying, as in
8    the past I would be interested in applying for
9    the position.  And basically was there any truth
10   to the rumor.
11        And I didn't get any response from him
12   at all.  I went on vacation.  I specifically
13   named Shawn McKunagle because I got the name
14   from someone at headquarters.  And I went on
15   vacation for about a week and I came back.
16        And I think it was probably on May 9th
17   or 10th.  I got a letter at home from Cathleen
18   Kurles at the fire department.  She was
19   responding to Bob Moran's e-mail.  And basically
20   in the letter she was telling me that 718
21   positions that don't have examinations they
22   don't have to post and that the department would
23   retain their right to do that.
24        But I do contend that there was no

```
 1          where -- I had to pay Bob Moran $294 to copy the

 2          718 agreement, which was a complete mess because

 3          he never had anything there to reference.  And I

 4          could find nothing in 718's contract that says

 5          that positions that don't have an examination we

 6          can do what we want with.

 7                    They have posted these jobs for as

 8          long as I have been there and before.  They post

 9          all of APSNI and SENA's jobs.  Even within the

10          718 collective bargaining agreement, it does

11          have on there that they continue to post, that

12          they have to post.

13                    And generally special orders are

14          issued by the top chiefs in the department.  And

15          usually vacancies and stuff are posted in there.

16          And that is what it says in the collective

17          bargaining agreement.

18                    So I had basically looked at it that

19          Shawn McKunagle and then Anthony Renzi before,

20          it would be like me saying to my next door

21          neighbor, a young guy there or girl, come over

22          to the fire department tomorrow.  There is a

23          $50 job you can have.  You can have it.

24     Q.   Would you have applied for the position of
```

1          Shawn McKunagle and Anthony Renzi?

2     A.   Yes.

3     Q.   Who was the commissioner at the time of these

4          jobs?

5     A.   For Shawn McKunagle it is the current

6          commissioner.  And also for Anthony Renzi I

7          believe the same.

8     Q.   When Commissioner Christian was the

9          commissioner, did he have the final word of who

10         would get what position?

11    A.   That I have no idea.  We have never really

12         known -- we have never really known who does

13         have the final say on the position.  I was

14         saying earlier from Marty Pearce, when I met

15         with him, he was saying, you know, he could get

16         a call from city hall almost as though he didn't

17         have any control over the selection.

18    Q.   So in your opinion is Commissioner Frazer

19         continuing with the same policy that

20         Commissioner Christian had with regard to these

21         positions?

22    A.   That is the way it appears to me.  My big thing

23         is that I can't get anyone to, within the

24         administration to show me anything in black and

```
1          white whether it be civil service laws,
2          collective bargaining agreement, anything as to
3          why they don't even have to post them.
4                    I do know that over the years and
5          things, even when we would hear some individual
6          was getting a job, a particular position, at
7          least the department, why did they go through
8          the motions of posting the jobs, holding the
9          interviews, and having people interview if they
10         knew they were going to give it to and they
11         didn't have to post.  It is just all of a sudden
12         just these last 6 months not even the
13         opportunity to apply.
14    Q.   Did you ever hear -- I don't know if you ever
15         worked near or around her, did you ever hear
16         Mary Ann McHugo talk about her political
17         affiliations or her connections?
18    A.   Occasionally, yes.
19    Q.   What would she say?
20    A.   Mainly probably more small talk.  She might be
21         going to such and such a rally to the mayor, you
22         know.  Or there could be a new election coming
23         up.  And she would busy doing different things.
24         She wouldn't say specifically what, but more or
```

1       less working politically whether it was, what do

2       they call it?  Visibility or something?  Signs

3       and things.  But more smaller things but

4       political.

5  Q.   We have heard the word rumor.  Describe when you

6       say it is rumor what does that mean?  When you

7       say rumor if you can describe what rumor means

8       in terms of the information that you are

9       speaking of?

10         Who is speaking this quote, unquote,

11      rumor?  How many people are talking about this

12      within the department?  How do you define the

13      word rumor?

14  A.   Basically it would be started someplace like a

15       grapevine.  And the majority of times we believe

16       it does start at a good source.  And for what I

17       would classify as rumors we will say even for

18       jobs as to who is getting them.

19         Even though you want to say it is a

20      rumor that when probably 90 to 95 percent of the

21      time the rumor comes true.  You just don't have

22      something factual on paper.

23  Q.   So do you hear the rumor before you get the

24       decision on who gets the job?

```
 1    A.    Yes.

 2    Q.    So it is not like you hear it afterwards?

 3    A.    No, it is always before.  As an example, Shawn

 4          McKunagle, who was just hired a few weeks ago.

 5          We had heard, even before I even heard his name

 6          I heard probably a year ago or even more, two

 7          years ago, that Jimmy Kelly was waiting,

 8          counselor Jimmy Kelly was waiting for an opening

 9          in the construction division because there was

10          someone he wanted in the position.

11                And he supposedly, Shawn McKunagle was

12          supposedly Jim Kelly's god son.  And also I

13          had -- one was even the superintendent, John

14          Henderson.  Of course, after the day I e-mailed

15          Bob Moran he came to the door at the office and

16          was telling me how they were holding interviews

17          for a lineman position at headquarters.

18                I said, how can you have interviews

19          for one person especially when there was nothing

20          posted?  So it was more or less just like a

21          meeting.  And he said that supposedly, from what

22          I have heard, he had been waiting two or three

23          years for this position.

24                And I said, I really don't feel for
```

```
 1          the guy, I said, because I have been applying

 2          for this job for over 20 years.

 3    Q.    And how is Kelly at all related to either the

 4          Hyde Park or South Boston?

 5    A.    He was for the counselor.  He is deceased.

 6    Q.    And so when you talk about we heard -- what

 7          percentage of the people who work in the

 8          department know about these quote, unquote

 9          rumors based on your experience?

10    A.    I would say a majority of them.

11    Q.    Over 50 percent?

12    A.    Usually everyone, I would say for the rumors

13          that I hear, usually everybody else has heard

14          them but me, by the time they get to me, because

15          as they say, that is a remote location.

16    Q.    So essentially of the people that you speak to

17          in the department, what percentage of those

18          people related to you the information that you

19          are talking about?

20    A.    I think it was from multiple sources.  Even this

21          Shawn -- when I had heard Shawn McKunagle was at

22          headquarters for an interview, I even called

23          down at the construction crew where the job was

24          going to be.  And I was even surprised speaking
```

1    to the foreman, Kevin.  I had asked him, did you

2    hear anything about someone named Shawn

3    McKunagle coming for the job?  He said, yes, I

4    heard that last week too.

5    Q.    So is another way to describe the word rumor,

6          would it also be called common knowledge?

7    A.    Yes.  I think the only reason that we call them

8          rumors is because we don't have any factual

9          proof.

10   Q.    How would you describe factual proof?

11   A.    Written proof.

12   Q.    So it was just oral?

13   A.    Yes.

14   Q.    So when you spoke about Doto Nee having

15         influence with jobs in the department, is it

16         direct influence or did he have to go through

17         somebody else in the administration, either the

18         South Boston group or the Hyde Park group?

19                Who had the authority to give the

20         position?  Did Doto Nee have the authority or

21         did someone else have the authority?

22   A.    It probably had to come from someone else even

23         higher than Doto Nee.  Who I couldn't say.

24                MR. FEENEY:  I don't think I have anymore

1    questions.

2    BY MS GLASGOW:

3    Q.    In your complaint, paragraph 130, you claim that

4          you have $68,000 of damages calculated in lost

5          wages?

6                       As a direct and proximate result of

7          the discrimination and other violations

8          perpetrated by the defendants, plaintiff has

9          been deprived of approximately $68,000 in wages

10         and benefits.

11                      How did you come up with the 68,00?

12   A.    I think -- I think that was between the MM-6

13         position that I had and MM-8.

14   Q.    What was the MM-8 position you would have had?

15   A.    Same title, different grade.

16   Q.    And that would have been the one that Mary

17         Kilgallin had?

18   A.    From either Mary Kilgallin or Mary Ann McHugo.

19         Of course, if I wanted to go to the line man it

20         would be a lot more.  It would probably be up

21         around $250,000.  I would have liked to have

22         been a lineman 20 years ago.

23   Q.    And you said that Shawn McKunagle you heard his

24         name --

```
 1   A.   Uh-huh-
 2   Q.   -- before he even got the position.  How did you
 3        hear his name?  Who in headquarters told you his
 4        name?
 5   A.   Denise Barry.
 6   Q.   How did Denise hear the name?
 7   A.   I don't know.
 8   Q.   Did you ever ask her?
 9   A.   She is at headquarters.
10   Q.   Which department did she work in at
11        headquarters?
12   A.   Training.
13   Q.   Does training have anything to do with hiring?
14   A.   No.
15   Q.   Does training have anything to do -- is training
16        next to the commissioner's office?
17   A.   No.
18   Q.   Is training near, dealing with human resources?
19   A.   No, it is down the hall from training.
20   Q.   So you don't know how she actually heard the
21        name?
22   A.   No.
23             MS. GLASGOW:  We are done.
24        (Whereupon, the deposition concluded at
```

1          5:30 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1                        CERTIFICATE
2    The Commonwealth of Massachusetts,      )
3    Middlesex, SS                           )
4
5         I, Laura Naylor, Registered Professional
     Reporter and Notary Public in and for the Commonwealth
     of Massachusetts, do hereby certify that:
6
7         WITNESS, the witness whose deposition
     is hereinbefore set forth, was duly sworn by
     me, that I saw a picture identification for him
8    in the form of his driver's license, and that the
     foregoing transcript is a true and accurate
9    transcription of my stenotype notes to the best
     of my knowledge, skill and ability.
10
11        I further certify that I am not related
     to any of the parties in this matter by blood or
     marriage and that I am in no way interested in
12   the outcome of this matter.
13        IN WITNESS WHEREOF, I have hereunto set
     my hand and notarial seal this 16 th day
14   of July    , 2007.
15
16   Laura Naylor
     Laura Naylor
17     Notary Public
18              THE FOREGOING CERTIFICATION OF THIS
                TRANSCRIPT DOES NOT APPLY TO ANY
19              REPRODUCTION BY ANY MEANS UNLESS
                UNDER THE DIRECT CONTROL AND/OR
20              DIRECTION OF THE CERTIFYING REPORTER
21
22
23
24
```

# ORIGINAL

VOLUME: II
PAGES: 1 to 69
EXHIBITS: One

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 05-10528-RCL

DENISE M. BARRY; JANE B.            )
GREEN; ELIZABETH H. GOLDEN;         )
PATRICIA J. McDONOUGH;              )
ELAINE MESITI; LILA BROWN;          )
MARY M. KANE; and JUDITH            )
KELLEY, Individually and on         )
behalf of those similarly           )
situated,                           )
                Plaintiffs,         )
                                    )
v.                                  )
                                    )
ROBERT J. MORAN; RONALD             )
KEATING; PAUL CHRISTIAN;            )
RODERICK J. FRASER, JR.;            )
CITY OF BOSTON (Fire                )
Department) and JOHN and/or         )
JANE DOES 1-50,                     )
                Defendants.         )

        CONTINUED DEPOSITION of ROBERT J. MORAN, a
witness called on behalf of the Plaintiffs,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before
Myriam A. Maracas, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the City of

Boston Law Department, One City Hall Plaza, Room 615, Boston, Massachusetts, on Monday, July 9, 2007, commencing at 2:10 p.m.

APPEARANCES:

       FEENEY & ASSOCIATES AT LAW
           (by Thomas F. Feeney, Esq.)
           39 Sheafe Street, Suite One,
           Chestnut Hill, MA  02467, for
           the Plaintiffs.


       CITY OF BOSTON LAW DEPARTMENT
           (by Scott C. Holmes, Esq.)
           One City Hall Plaza, Room 615,
           Boston, MA  02201, for the
           Defendants.


         ALSO PRESENT:  Margaret Pastuszak,
                    Law Clerk.

I N D E X

Testimony of:                    Direct, Continued


Robert J. Moran, Resumed

(By Mr. Feeney)                    4




E X H I B I T S



No.                 Description                 Page



1        Document.                    28

```
 1                    P R O C E E D I N G S
 2              MR. FEENEY:  Okay.  Let's go back on
 3         the record.  Mr. Moran, thank you for coming
 4         back.  We are back on the record on this second
 5         day of your deposition.
 6                   ROBERT J. MORAN, RESUMED
 7            A witness called for examination by counsel
 8         for the Plaintiffs, having been first duly
 9         sworn, was examined and testified as follows:
10                       DIRECT EXAMINATION
11         BY MR. FEENEY:
12    Q.   The last time we were here, I don't know if you
13         recall or not, you were speaking about a meeting
14         that you had with Denise Barry, Jane Green,
15         Barbara Powers, Carol Connors, regarding an
16         altercation.
17    A.   And Barbara Ryan.
18    Q.   Sorry.  Was Barbara Powers involved in that or
19         Barbara Ryan?
20    A.   Barbara Ryan.
21    Q.   I apologize.  And we got to that conversation
22         about that meeting where I had asked you a
23         question regarding a meeting that was alleged by
24         the Plaintiffs in this action between you,
```

1    Denise Barry, and Jane Green, in which Denise

2    Barry used words, "if you're not into politics,

3    you're not getting the position here." You said

4    no, that meeting never occurred, correct?

5  A.  Correct.

6  Q.  And then you began to describe a meeting that

7    actually did occur among the people. And who

8    initiated that meeting?

9  A.  Barbara Ryan initiated that meeting.

10  Q.  So she came to your office?

11  A.  Right.

12  Q.  And what did she say?

13  A.  She said that Carol Connors had come to her and

14    said that Denise Barry had said that when she

15    worked in the medical office, that Barbara Ryan

16    did nothing. So Barbara Ryan came to me very

17    upset, said, "file a harassment charge against

18    Denise Barry," and I said, "please, take it

19    easy. Take it easy." And I said, "let me get

20    all of the participants," and what I did was I

21    called -- I had Barbara Ryan there. I called

22    Denise, the shop steward, who was Kathy Moore.

23    She was present at that meeting. I brought in

24    Jane Green, who was Barbara Ryan's shop steward,

```
 1            and I brought in Carol Connors and Denise Barry.
 2    Q.   Was anybody else present?
 3    A.   Excuse me, please?
 4    Q.   Was there anybody else present?  Erica Boylan,
 5         was she present?
 6    A.   No, she was not.
 7    Q.   Was she working for you at that time?
 8    A.   I don't think so.
 9    Q.   So what came out of that meeting?
10    A.   Basically, it was he said/she said type of deal.
11         Denise Barry said that she never said anything
12         about Barbara Ryan at that meeting.  Carol
13         Connors said she did.  And I said, "please."
14         Basically, it was, "please, let's end the
15         gossip.  If there are any type of grievances
16         that you have, please bring them to me or bring
17         them to your shop steward.  If someone, in your
18         mind, if that person is violating the contract,
19         bring it to the shop steward and we'll take care
20         of it."
21    Q.   So was the issue resolved at that meeting or
22         were there further meetings about the issue with
23         somebody else?
24    A.   That was it.  That was the only meeting we had.
```

1    Q.   Okay.  So none of those parties present had

2         suggested that they have a meeting without you

3         present in order to resolve that?

4    A.   I don't follow your question.

5    Q.   I'm saying, was there a meeting after that among

6         the parties in your room without you?

7    A.   They might have left.  The shop steward might

8         have talked among themselves or something of

9         that nature.  I don't know.

10   Q.   Okay.  You had mentioned earlier about the 718

11        position, firefighters' union?

12   A.   Yes.

13   Q.   And that you had mentioned that there was no

14        requirement for posting positions for 718.  Is

15        that for alternating positions or just certain

16        kinds of positions?

17   A.   All positions.  There are Civil Service

18        positions.  So when you hire a firefighter, you

19        have to put a requisition into Civil Service so

20        it's Civil Service's responsibility to get us

21        the names of the individuals that we're hiring.

22   Q.   And does that include the firefighter positions

23        that are based in headquarters or at the other

24        office locations?

```
 1   A.  Well, most of the firefighters that work at

 2       heardquarters, basically, most of them have

 3       started in the field.  So if they move into

 4       headquarters, they have done field work in most

 5       cases.  I don't know anybody who went from the

 6       training academy into fire headquarters.

 7   Q.  And so for the positions that are located in the

 8       office, are those positions posted?

 9   A.  They are not posted.  No, sir.

10   Q.  Okay.  I'm going to show you what I would like

11       to mark as Exhibit 1 to think.  Take a look at

12       that.

13   A.  (Witness complies)

14   Q.  Is this a 718 position?

15   A.  No, it's not.

16   Q.  What is it?

17   A.  SCNA.

18   Q.  And is this a posting that you would normally

19       see on the board and on the Internet?

20   A.  Yes, sir.

21   Q.  And who drafts this?

22   A.  My office usually drafts this.

23   Q.  And who in your office drafts it?

24   A.  It depends.  It could be -- we have samples of
```

```
 1        prior jobs.  If a job doesn't change, then we

 2        basically use the same template or something

 3        like this.  I might work with a committee of

 4        people, try to look at the right requirements

 5        that are needed for a position.

 6   Q.   And who drafted this one?  Do you know?

 7   A.   I did, along with Katherine Kirleis,

 8        K I R L E I S.

 9   Q.   Did anybody else have any input into drafting

10        this?

11   A.   No.

12   Q.   Okay.  And have you received applications for

13        this job?

14   A.   Not yet, sir.

15   Q.   And I know we discussed this before, but Boston

16        residency is required.  As we discussed last

17        time, that means that when we start the job,

18        they have to be a Boston resident, correct?

19   A.   That is correct.

20   Q.   So that when they apply for the job, that's not

21        necessarily the case?

22   A.   Correct.

23   Q.   Okay.  And put it another way, you can apply for

24        a job even though you're not a Boston resident?
```

```
 1   A.   You can apply even though you're not a Boston
 2        resident, correct.
 3   Q.   But is it true that on the start date of the
 4        job, you have to be a Boston resident?
 5   A.   Yes, sir.
 6   Q.   Is there any kind of a grace period when you
 7        start and when you have to move into Boston?
 8   A.   We ask for residency upon -- at the fire
 9        headquarters we ask for immediate.
10   Q.   What would happen if they weren't a resident on
11        that start date?
12   A.   Well, I would have to get the type of clearance
13        from City Hall, if something like that would
14        happen.  I've never been there so I can't tell
15        you, sir.
16   Q.   Would that clearing have to be in writing?
17   A.   Oh, I would think so.
18   Q.   Do you know an employee named Michelle Urso?
19   A.   Yes.
20   Q.   And what position does she hold?
21   A.   I don't know her current position, sir, because
22        she is no longer a member of the fire
23        department.
24   Q.   Where is she based?
```

1    A.    Homeland security.

2    Q.    Since when?

3    A.    I don't know, sir.

4    Q.    Within the last year?

5    A.    It could be.  It could be.

6    Q.    Who has the position now?

7    A.    Jennifer Ryan.

8    Q.    Was Michelle Urso's position posted?

9    A.    Which position are you talking about, sir?

10   Q.    Well, the position that she left to go to

11         homeland security.

12   A.    That I don't know.  I have nothing to do with

13         postings or anything at homeland security.

14   Q.    Did you interview -- no.  I'm sorry.  Not

15         homeland security.  Maybe I misspoke.  The

16         position that Ms. Urso was in before she went to

17         homeland security, was Michelle Urso's fire

18         position, you said that Jennifer Ryan now has

19         that position?

20   A.    Correct.

21   Q.    Did you interview Jennifer Ryan?

22   A.    Yes, I did.

23   Q.    Who else did you interview for that position?

24   A.    Coretta Enry and Eileen Stille.

1   Q.   Who else did apply?

2   A.   Kathleen Freschette applied and she pulled

3        herself out.

4   Q.   Did anybody else apply?

5   A.   Not to my knowledge, sir.

6   Q.   The position that Michelle Urso held before she

7        left, how long has she been in that position?

8        Do you know?

9   A.   I think she came into the position around 2003.

10       I think 2003.

11  Q.   Did you interview her for that position?

12  A.   Yes, I did.

13  Q.   Who else did you interview for that position?

14  A.   Excuse me, sir?

15  Q.   Who else did you interview for that position?

16  A.   There were several people.  I'll miss some but I

17       know that Denise Barry was a candidate.  Louise

18       Vera was a candidate and another person in

19       payroll who was a candidate.

20  Q.   And did you recommend that Michelle Urso get

21       that position?

22  A.   Did I recommend?  No, I didn't recommend, sir.

23  Q.   Who did you recommend to get that position?

24  A.   I interviewed -- I scored my score and I made a

1       final decision on who should be hired, was

2       Deputy Chief Robert Calibricy and Commissioner

3       Christian, of course, being Commissioner.

4  Q.  So after you did the interviews, you testified

5       on the first day that you provided to Chief

6       Calibricy or to Commissioner Christian your

7       recommendations?

8  A.  Yes.

9  Q.  As to who should get the position; who did you

10      recommend for that job?

11  A.  I was leaning towards both.  I was leaning both

12      towards Denise Barry and Michelle Urso.

13  Q.  Did you communicate your leanings to

14      Commissioner Christian and Calibricy?

15  A.  No, I did not.  Calibricy was looking at the

16      attendance record of Denise and decided that he

17      would go with Michelle Urso.

18  Q.  And when you say that he decided he would go

19      with Michelle Urso, does that mean that he will

20      recommend that to Commissioner Christian?

21  A.  Correct.

22  Q.  And when you said that you had scored Michelle

23      Urso and Denise Barry, do you have a written

24      score sheet?

```
 1   A.   I do.

 2   Q.   And that would be in the file?

 3   A.   I believe so.

 4   Q.   And what about Denise Barry's attendance record

 5        was not satisfactory?

 6   A.   I did not look at the attendance records, sir,

 7        so I don't know what -- Bob Calibricy went to

 8        payroll and requested a printout of her

 9        attendance record; and after he saw that, he

10        said, "I'll go with Michelle Urso."

11   Q.   As to the best of your memory, you scored

12        Michelle Urso and Denise Barry roughly equal?

13   A.   I scored Michelle Urso a little bit higher.

14   Q.   On what factors?  Do you remember?

15   A.   Yes.  It was office manager.  She would be

16        independent so a lot of private thinking and her

17        coordination with working with different

18        agencies in which she had done in the previous

19        work.

20   Q.   And where was she coming from?  Was she a Boston

21        firefighter employee before that?

22   A.   No, she was not.

23   Q.   Where was she employed?

24   A.   She came from the outside.
```

1    Q.   And where from the outside?

2    A.   All I remember, sir, is that she was an office

3         manager.   I forget where she was an office

4         manager.

5    Q.   Who recommended her for the position?

6    A.   She applied.

7    Q.   And what references did she put on her

8         application, if you remember?

9    A.   Previous employers.

10   Q.   You don't remember who those are?

11   A.   No, I would not.

12   Q.   And did you have the opportunity to supervise

13        Michelle Urso's job performance?

14   A.   No, sir.

15   Q.   Did you ever see or hear of any negative job

16        evaluation for Michelle Urso?

17   A.   Michelle Urso was highly regarded by all of the

18        members that worked over at the local emergency

19        management planning.   She did receive a

20        promotion to go to homeland security.

21   Q.   When you say, "homeland security," is that a

22        federal agency?

23   A.   That's us.

24   Q.   State homeland security?

```
 1   A.   City.

 2   Q.   City homeland security?

 3   A.   Yes, sir.

 4   Q.   Thank you.  Who was her supervisor there?  Do

 5        you know?

 6   A.   I don't know, sir.

 7   Q.   Do you know Kerri Manning?

 8   A.   I now know Kerri Manning, yes.

 9   Q.   Okay.  And did you interview Kerri Manning?

10   A.   Yes, I did.

11   Q.   For what position?

12   A.   Storeroom manager.

13   Q.   And what was her background at that time?

14   A.   She worked as a pastry chef and knew how to keep

15        storerooms.  She knew the giving of, you know,

16        supply in, supply out, stocking, storing.  She

17        had very good experience in the private sector.

18   Q.   Who else applied for that job?

19   A.   The only other internal candidate was Joanne

20        Callahan and she withdrew.

21   Q.   So there were only two applications for the job?

22   A.   No.  There were, I would say, around 25.

23   A.   So the only two who were determined to be

24        qualified were Joanne Callahan and Kerri
```

1        Manning?

2    A.  No.  That's incorrect.  There were several

3        candidates I thought could be considered.

4    Q.  So who were offered an interview?

5    A.  I interviewed around five different people for

6        that.

7    Q.  Who else did you interview?

8    A.  I have no idea, sir.

9    Q.  I'm a little confused because you said the only

10       other person was Joanne Callahan who withdrew.

11   A.  Internally.  I'm talking about internally, sir.

12   Q.  There were other people external who you offered

13       interviews to?

14   A.  Yes, sir.

15   Q.  Do you know who recommended Kerri Manning for

16       that position?

17   A.  I recommended Kerri Manning, I and Andy Warren.

18   Q.  Andy Warren interviewed her?

19   A.  Yes.

20   Q.  Who else interviewed her?

21   A.  The Commissioner.

22   Q.  At the same meeting or different meeting?

23   A.  No.  At a different meeting.

24   Q.  So you and Andy Warren interviewed her?

```
 1   A.   No.  I interviewed five candidates.  I brought

 2        in one gentleman.  When I told him what the

 3        starting salary was, he said, "no, I'm not

 4        interested."  It was too low, but Kerri, I

 5        thought, fit the bill great so I sent her up to

 6        Andy a different time.  Andy concurred with me

 7        that Kerri was a good candidate and we both sent

 8        her to Commissioner Christian for final

 9        approval.

10   Q.   Andy Warren interviewed one person, Kerri

11        Manning?

12   A.   That I wouldn't remember, sir.

13   Q.   Do you know or do you have a belief based on

14        what you've heard that Kerri Manning got that

15        position because of any political affiliation,

16        patronage, or sponsorship?

17   A.   No.

18   Q.   Do you know Eileen Stille?

19   A.   No.  I do now.  Yes, I do now.  Did I know

20        her -- could you ask that question a little more

21        clearer?

22   Q.   Sure.  Do you know Eileen Stille?

23   A.   Yes, I know Eileen Stille now.

24   Q.   When did you first meet her?
```

```
 1    A.   I think we started on the same day.  Yes.

 2    Q.   So were you involved in her hire?

 3    A.   I was not.

 4    Q.   Were you ever involved in any promotional --

 5    A.   Yes, I was.

 6    Q.   And what promotion was that?

 7    A.   It was a promotion from accounting to payroll.

 8    Q.   And who applied for that position?

 9    A.   There were several candidates.  Several

10         candidates applied for that position.

11    Q.   How many interviews did you hold for that

12         position?

13    A.   I didn't interview anybody for that position.

14         It was mostly -- it was done solely by the

15         payroll manager, Carol Petta.

16    Q.   And why were you not involved?

17    A.   Carol Petta is a top payroll manager, one of the

18         best I've ever seen.  Carol Petta knows exactly

19         what she needs for the payroll.

20    Q.   Have you ever interviewed people who were in

21         payroll positions before?

22    A.   I might have started it because I was new to the

23         position.  I stayed in maybe a couple of

24         interviews.  Then I saw how thorough and how
```

```
 1        professional Carol Petta was; and I said,
 2        "Carol, you know the shop inside out.  You know
 3        what you're looking for.  You know the
 4        technology, the skills, the experience that's
 5        necessary for this job.  You go ahead and you
 6        tell me who your recommendations are."
 7   Q.   And she recommended Eileen Stille?
 8   A.   For one position, yes, she did.
 9   Q.   Did she give you one recommendation or more than
10        one recommendation?
11   A.   No.  There were two position openings.  She
12        promoted somebody internal from payroll up and
13        brought Eileen Stille from accounting over to
14        payroll.
15   Q.   And accounting was where Eileen Stille was when
16        you and her started, roughly the same time?
17   A.   Yes, sir.
18   Q.   Do you know where she used to work before
19        accounting?
20   A.   Eileen Stille?
21   Q.   Prior to accounting.
22   A.   Prior to the Boston Fire Department?
23   Q.   Or prior to when you were there.
24   A.   Say it again.
```

```
 1   Q.   I'm not sure if she worked for the Boston Fire
 2        Department before.
 3   A.   Like I said, she started the same day I did.
 4   Q.   In the fire department?
 5   A.   Yes.
 6   Q.   And you don't know where she was employed before
 7        that?
 8   A.   No, I don't.
 9   Q.   And so when Carol Petta failed the interview
10        process for that position, she recommended
11        Eileen Stille for the job?
12   A.   Yes, she did.
13   Q.   Are you sure of anybody else to be considered?
14   A.   No.  She had a grading system and she showed me
15        the grades and Eileen Stille was the clear
16        choice in that one.
17   Q.   And then you would then forward that onto
18        Christian?
19   A.   Yes.
20   Q.   And did he interview Eileen Stille?
21   A.   Yes, he did.
22   Q.   And then Commissioner Christian made a choice to
23        hire her?
24   A.   Yes.
```

```
 1   Q.   Do you believe or do you have an opinion, based

 2        on what you know or what you've heard, regarding

 3        whether or not Eileen Stille has gotten her

 4        positions as a result of political affiliations,

 5        patronage, or sponsorship?

 6   A.   No.

 7   Q.   Does that mean -- and my question would be, does

 8        that mean no, you don't believe she got that

 9        because of that?

10   A.   She got it because of her qualifications.

11   Q.   And not because of political affiliations?

12   A.   That is correct.

13   Q.   Okay.  Carol Petta, when did you first meet her?

14   A.   The first day I started working.

15   Q.   She wasn't working in payroll at the time?

16   A.   Yes, she was.

17   Q.   Have you ever had to interview Carol for any

18        position?

19   A.   I interviewed her for a position?

20   Q.   Right.

21   A.   No.

22   Q.   Has she always been in the same position since

23        you started?

24   A.   That is correct.
```

```
 1   Q.   Are you Carol Petta's supervisor?

 2   A.   No, I'm not.

 3   Q.   Who is?

 4   A.   Andy Warren.

 5   Q.   So if Carol Petta were to leave her position,

 6        would it fall to you to interview for that

 7        position?

 8   A.   I would probably do the screening, yes.

 9   Q.   Let me clarify this.  As head of personnel, are

10        you in charge of the firefighter and civilian

11        positions?

12   A.   I do a lot of work with both departments.  Both

13        uniform and civilian.

14   Q.   Going back to your question, are you in charge

15        or are you responsible for hiring for the

16        positions?

17   A.   I'm responsible for hiring for both positions,

18        yes.

19   Q.   Okay.  And so when you say that the firefighter

20        positions do not require to be posted, is that

21        because you've done your own independent

22        research on contract divisions on that or are

23        you relying on somebody else's word on that?

24   A.   It's not contractual.  It's Civil Service.
```

```
 1            There are Civil Service guidelines, Mass.

 2            General Laws that we have to follow to hire

 3            firefighters.

 4    Q.      And you've done your own independent research on

 5            that and determined that those positions don't

 6            need to be posted?

 7    A.      They are not posted.  Correct.

 8    Q.      Answer the question exactly, if you can.  Have

 9            you done your own independent reading of those

10            statutory terms and any other applicable, other

11            contractual terms or statutory or regulatory

12            terms and had determined for yourself that those

13            positions do not need to be posted?

14    A.      I'm familiar, very familiar with Mass. General

15            Laws and I'm very familiar with the union

16            contract.  And there is no requirement for

17            posting.

18    Q.      Okay.  Have any firefighter positions ever been

19            posted?

20    A.      No.

21    Q.      And that includes those in the offices?

22    A.      Correct.

23    Q.      So when a firefighter position becomes open or

24            in office now, not as a firefighter, the field,
```

1      a 718 position, is there any official challenge
2      for posting that open position?
3  A.  What we do is on general orders, we put it not
4      openings but positions to make the people aware
5      of what jobs need to be filled.  We put down
6      general orders.  So if I worked in personnel,
7      assignment as a firefighter and I transferred to
8      a house that says Bob Moran transferred from
9      personnel assignment to Engine 22 so that would
10     mean that there is an opening in personnel.
11 Q.  And then when you say general orders, is that
12     something in writing?
13 A.  General orders comes from the Commissioner or
14     chief of staff and they just give you their
15     instructions, information, transfers, new
16     orders, new apparatus.  It's a form of
17     communication so that everybody in the field
18     knows what's going on.  They are posted.  They
19     are kept in general order books.  Some people
20     want to know what's the guidelines for screening
21     apparatuses.  They can go to the general orders
22     and say, you know, the apparatus must be cleaned
23     by 8:00 a.m. each morning.
24 Q.  So with regard to those open positions that the

1           Boston Fire Department is notified of a position

2       through general orders and those general orders

3       are submitted how?  Are they posted in a case or

4       on a wall?

5    A.  They are sent to each department, each

6       department in each firehouse.

7    Q.  So each department within the offices at 1010

8       Mass. Avenue?

9    A.  And headquarters, yes.  And they are also on the

10      shared drive.  So I can go to -- say I missed a

11      eneral order.  It somehow was in my mail.  I can

12      make sure I go to the shared drive and see if

13      there is anything that I need to know.  Just a

14      way of communication.

15   Q.  So when they are sent to the headquarters and

16      1010 Mass. Ave., is there a wall or a case that

17      general orders have been posted or are they left

18      on a book or desk?

19   A.  They are mostly put in a book and a desk.

20   Q.  When you say "mostly," does that mean --

21   A.  I'm saying most -- I can't tell you.  They may

22      post them out in the firehouse but at

23      headquarters where they are originated,

24      people -- we keep the general orders in our

```
 1        files, general order file.
 2   Q.   And how is that distinguished between the job
 3        postings under SCNA and AFSME?
 4   A.   SCNA, they are true job postings.  They are the
 5        job descriptions, what requirements you have
 6        there, what's needed for the position.  They are
 7        I would classify as job postings.
 8   Q.   And where are they posted?  Are they in a case?
 9   A.   In a case.  By contract they have to be posted
10        in a case.  They are also on the Internet.  They
11        are all fours.
12   Q.   Are general orders that notify the fire
13        department personnel of job positions, are they
14        ever posted in a case?
15   A.   Not to my knowledge.
16   Q.   As head of personnel, would it be your
17        responsibility to make sure that those
18        notifications of 718 positions are disseminated?
19   A.   It would be the chief of personnel -- deputy
20        chief of personnel responsible for that.
21   Q.   Who is that?
22   A.   That's Richard Debenedito.
23   Q.   Does he report to you?
24   A.   No.  I report to him.
```

```
 1                   MR. FEENEY:  I'd like to have this

 2         marked as Exhibit No. 1, if you would.

 3                   (Document marked as Exhibit 1 for

 4                   identification)

 5    Q.   When I say "this," I meant the Boston Fire

 6         Department posting date, 6/26/07, for senior

 7         administrative assistant in (fire) MM-6.  Going

 8         back to Carol Petta, how much interaction on an

 9         official job basis do you have with her?

10    A.   A lot.

11    Q.   And are you aware if she works overtime on a

12         consistent basis?

13    A.   Yes, she does.

14    Q.   Is she, as part of her overtime, devoted to

15         anything but payroll?

16    A.   No, sir.

17    Q.   As part of her overtime, is she doing

18         responsibilities that Mary Kilgallen had at all?

19    A.   No, sir.

20    Q.   Do you think that the overtime she works is

21         excessive?

22    A.   No.

23    Q.   Do you think the overtime she works is very well

24         justified?
```

```
1    A.   Very well justified.

2    Q.   Do you believe or do you have an opinion as to

3         whether or not any positions, benefits, or other

4         sponsorship received by Carol Petta are a result

5         of any political affiliations or partnership

6         that she may have?

7    A.   No, sir.

8    Q.   Do you know a Priscilla Richardson?

9    A.   Yes, I do.

10   Q.   What do you know about her?

11   A.   Priscilla Richardson is a telephone operator,

12        switchboard operator at the Boston Fire

13        Department.

14   Q.   When did she get that position?

15   A.   Around two years ago, sir.

16   Q.   Who interviewed her for that position?

17   A.   I did.

18   Q.   With anyone else?

19   A.   Commissioner Christian.

20   Q.   At the same time or different times?

21   A.   Different times.

22   Q.   So you interviewed her first?

23   A.   (Witness shakes head)

24             MR. HOLMES:  You have to say yes or no.
```

```
 1    A.    Yes.

 2    Q.    Was the job posted?

 3    A.    Yes, it was.

 4    Q.    How many applicants were there?

 5    A.    I'll say there were probably around ten.

 6    Q.    How many people did you interview?

 7    A.    I interviewed Priscilla Richardson and I think

 8          two other people.

 9    Q.    Who were the other people?  Do you know?

10    A.    I don't know, sir.

11    Q.    Would that be contained in the job description

12          file?

13    A.    Yes, it would.

14    Q.    Whose position did Priscilla Richardson fill?

15    A.    Gwendolyn Shepherd.

16    Q.    And do you recall attending a going away party

17          for Gwen Shepherd?

18    A.    I think I did, yes.

19    Q.    And at that party, did you hear Commissioner

20          Christian announce that Priscilla Richardson was

21          to fill Gwen Shepherd's position?

22    A.    I don't remember that, sir.

23    Q.    Could it have occurred?  You just don't

24          remember?
```

1              MR. HOLMES:  Objection.  Go ahead.

2    A.   I don't remember the Commissioner saying that,

3         sir.

4    Q.   Did that mean he didn't say it or you're not

5         sure if he did or not?

6    A.   When I was there, he did not say it.

7    Q.   Were you there for the whole time from beginning

8         to end?

9    A.   I would doubt it.

10   Q.   Okay.  For how long were you there?  Do you

11        remember?

12   A.   I have no idea, sir.

13   Q.   A majority of the time?  Half the time?

14   A.   I had a piece of cake and left.

15   Q.   In your opinion or from what you've heard or

16        know, did Priscilla Richardson obtain that

17        position through political affiliation,

18        sponsorship, or support?

19   A.   No.

20   Q.   Did you know of Priscilla Richardson before

21        interviewing her?

22   A.   No, I did not.

23   Q.   Did you know if she had any connections to the

24        Boston Fire Department personnel?

1   A.   Her husband was a radio repairman, I believe.

2   Q.   Do you know an Erica Boylan, B O Y L A N?

3   A.   Yes, I do.

4   Q.   What do you know about her?

5   A.   She works in my office.

6   Q.   And what are her job responsibilities?

7   A.   Her job responsibilities are postings, Civil

8        Service, hiring for Civil Service.  She's in

9        charge of benefits.  She's responsible for all

10       retirements, and she did a lot of administrative

11       work for me.

12  Q.   Who else works in your office besides Erica?

13  A.   Barbara Powers.

14  Q.   Anyone else?

15  A.   That's it.

16  Q.   And how long had each of them been there?  Do

17       you remember?

18  A.   Barbara has been there 20 plus years.  And Erica

19       came in 2004, I believe.

20  Q.   So did you interview Erica Boylan?

21  A.   Yes, I did.

22  Q.   With whom else?

23  A.   I interviewed Erica by myself.

24  Q.   Who else did you interview for that position?

```
 1    A.   Louise Rivera internally and Lila Brown, two

 2         other internal people that I interviewed for

 3         that job.

 4    Q.   And external people?

 5    A.   Yes.

 6    Q.   Who was that?

 7    A.   I don't remember.

 8    Q.   How many people were there?

 9    A.   I would say another six or seven.  I wanted to

10         get the right person.

11    Q.   And what was Erica Boylan's background?  Where

12         did she come from?

13    A.   Department of Transportation.

14    Q.   And who was her supervisor there?  Do you

15         remember?

16    A.   I talked to him for reference, but I don't know

17         who.

18    Q.   Is part of Erica's responsibilities reviewing

19         applications for FMLA leave?

20    A.   No.

21    Q.   Whose responsibility is that?

22    A.   That's my job.  Ian MacKenzie, Dr. Hamrock and

23         personnel assignment.

24    Q.   So when you say that Erica Boylan is responsible
```

1          for benefits, what is benefits?

2     A.   Life insurance, deferred compensation,

3          short-term, long-term insurance, explaining all

4          of the benefits to new hires, so that's where

5          she comes in with benefits.

6     Q.   Who's responsible for processing the sick time

7          applications?

8     A.   Say again, sir.

9     Q.   Who's responsible for processing sick time

10         applications?

11    A.   Applications?

12    Q.   Or any time off sick.

13    A.   Erica takes care of that.  She is the one who

14         takes care of that.

15    Q.   Is that true for vacation as well?

16    A.   No, sir, it's not true.

17    Q.   Who's responsible for processing the requests

18         for vacation time?

19    A.   The individual managers would.  Each individual

20         manager handles vacation requests.

21    Q.   So is your office responsible for any of those?

22         Did your office manage any people that they

23         would submit to your office for vacation time?

24    A.   Erica and Barbara Powers would put in writing

1       requests for vacations to me.  I put my

2       verification request into Katherine Kirleis and

3       whoever you report to.

4    Q.  I see.  If somebody puts in a request for sick

5       time, that goes through Erica and she processes

6       that?

7    A.  No.  That's incorrect.  What Erica does with

8       managing the tenants' program is she looks at a

9       quarter.  January, February, March.  She looks

10      and sees how many days out absent, sick absences

11      that you are and if you're over a certain amount

12      of sick time without proper documentation, then

13      you could be disciplined under the managing

14      attendance program.

15   Q.  So then Erica's the person who people would

16      report to when they are out sick?

17   A.  No.  Incorrect.

18   Q.  How does that work?

19   A.  You report to your manager.  If I woke up and I

20      was sick, I would call Katherine Kirleis as soon

21      as possible.  Say, "Katherine, I can't come to

22      work today.  So please be advised I'll be out

23      for the day."

24   Q.  And would the managers then put those to your

```
 1         office at some point?

 2  A.  What they would do is they would note it on the

 3         payroll time sheet so the next day I came in, I

 4         would put down, seven hours sick on my time

 5         sheet and then at the end of the week, when the

 6         payroll report is due, the manager signs off and

 7         says, "Bob came and worked 28 hours regular

 8         days.  One day sick."  He or she would sign it

 9         and send it to payroll.

10  Q.  So if somebody had a request for family and

11         medical leave act time off, who would they

12         submit that request to in writing?

13  A.  To me.

14  Q.  To who?

15  A.  To me.

16  Q.  And how would you process that?

17  A.  Well, what we do is we take the family medical

18         leave request, look at it, get opinions from the

19         medical office, from personnel assignment; and

20         if this warrants a family medical leave act

21         request, then --

22  Q.  Does Erica Boylan or Barbara Powers have any

23         responsibilities for filing those or keeping

24         track of those?
```

1    A.    They might file them, yes.

2    Q.    When you say, "they might file them" --

3    A.    I'm thinking most of them -- they are kept over

4          because this has to do with medicals.  I'll take

5          that back.  Because it has to do with medicals,

6          it's filed over in the medical office.  So we

7          can avoid any type of -- (inaudible) --

8          regulations.

9    Q.    So you get the written request?

10   A.    Yes.

11   Q.    Then you send it over to the medical office?

12   A.    Correct.

13   Q.    And which person, Barbara Powers or Erica Boylan

14         or both, are responsible for transferring those

15         documents over to them?

16   A.    No.  It would be me.

17   Q.    Okay.  Do you know Kerin Cunningham?

18   A.    Kerin Cunningham, yes.

19   Q.    Is it K E R I N?

20   A.    Yes.

21   Q.    And Cunningham is spelled C U N N I N G H A M?

22   A.    Correct.

23   Q.    When did you first meet Kerin?

24   A.    When I first interviewed her.

```
 1    Q.   And for what position was that?

 2    A.   For the R-9 position.  I would say head clerk.

 3    Q.   And who else did you interview for that

 4         position?

 5    A.   Several people.

 6    Q.   Do you remember who?

 7    A.   I don't.  No, I don't.  They were all from the

 8         outside because it was such a low position.

 9    Q.   What was Kerin's prior job?

10    A.   She had worked as an administrator --

11         administrative in a health club, I believe.

12    Q.   And do you recall who Kerin's referrals were or

13         who recommended her for the position?

14    A.   Nobody recommended her for the position.

15    Q.   How did she say she discovered the job posting?

16    A.   She saw the job posting online.

17    Q.   And she was hired for the job?

18    A.   Yes, she was.

19    Q.   Is it R-9?

20    A.   R-9, yes, sir.

21    Q.   When somebody is hired for the position, at what

22         step do they come in at?

23    A.   Either they come in first step or the

24         possibility they can come in third step.
```

1    Q.  And what determined whether they come at the

2        first or third step?

3    A.  At the time that you can negotiate at the hiring

4        process.  We see each case as it comes in.

5    Q.  In your memory, how many R-9s came in at higher

6        than the first step?

7    A.  Around four, I would say.

8    Q.  And who were those four?

9    A.  Joanne Callahan was one.  Kerin was one.  I

10       believe Francis Martin was one, a new one we

11       hired.  And I believe Lois Sharp was one.

12   Q.  When you say, Joanne Callahan, so she was

13       external and came in at a higher step or

14       external?

15   A.  Yes.  Exactly.

16   Q.  So where was Joanne Callahan from?

17   A.  I have no idea.

18   Q.  She came in as a third step?

19   A.  Yes, sir.

20   Q.  And Francis Martin?

21   A.  She came in -- it's usually that R-9 position

22       which we try to go to the third step because

23       it's such a low position.  It's the lowest

24       position we have administratively so we try to

```
 1         make it somewhat more attractive to people.
 2    Q.   Do you recall how many R-9s came in at the first
 3         step while you've been head of personnel?
 4    A.   I think recently we just hired a woman for R-9.
 5    Q.   And who's that?
 6    A.   Lauren Waters.
 7    Q.   Waters?
 8    A.   Yes.
 9    Q.   Anyone else?
10    A.   That's the only one I can remember, sir.
11    Q.   Do you recall any other even higher than R-9,
12         R-10s or R-11s that would be promoted to third
13         step?
14    A.   I don't know.  Lois Hart was not an R-9.
15    Q.   And did Kerin Cunningham submit an application
16         to be considered as a third step?
17    A.   She was part of the negotiations, yes.  Did she
18         give us an application for the job?  Yes.  Did
19         she provide an application for -- there is no
20         application for 9-F, which is the third grade.
21    Q.   When you say, "9-F," what are you referring to?
22    A.   9-F is a form that is used that you have to send
23         to City Hall and request to start the third step
24         instead of the first step, sir.
```

```
 1    Q.   And who fills out that form?

 2    A.   My office would fill out that form.

 3    Q.   And you did that for Kerin Cunningham?

 4    A.   Yes, I did.

 5    Q.   Did you do that for Lois Hart?

 6    A.   Yes, I did.

 7    Q.   Did you do that for Francis Martin?

 8    A.   Yes, I did.

 9    Q.   Did you do that for Joanne Callahan?

10    A.   That was before my time, sir.  So someone from

11         my office did that.

12    Q.   Okay.  Who reviews the 9-F applications?

13    A.   The director of OHR.

14    Q.   Which is whom?

15    A.   Vivian Leonard.

16    Q.   Who does Vivian report to?

17    A.   Vivian reports to -- she's a department head.

18         She reports directly to, I believe, the Mayor or

19         one of the department heads.

20    Q.   When Ian MacKenzie was hired, were you head of

21         personnel at the time?

22    A.   I was director of HR.

23    Q.   I'm sorry.  Director of HR at that time?

24    A.   Yes, sir.
```

| 1  | Q. | And did he come in a third step?                        |
|----|----|---------------------------------------------------------|
| 2  | A. | I would have to go back, sir, and look. I don't         |
| 3  |    | know.                                                   |
| 4  | Q. | Is there any way for a person to come in as a           |
| 5  |    | seven step?                                             |
| 6  | A. | Again, that would be the only time that you             |
| 7  |    | could negotiate. There could be. I was hired            |
| 8  |    | not at the first step.                                  |
| 9  | Q. | At what step were you hired?                            |
| 10 | A. | I believe I was hired as a nine-step, I think.          |
| 11 |    | I could be wrong.                                       |
| 12 | Q. | And who submitted that 9-F form on your behalf?         |
| 13 | A. | My office would have done that through Leonard.         |
| 14 | Q. | It was your testimony that when you were hired,         |
| 15 |    | you started out as, perhaps, a nine-step?               |
| 16 | A. | Correct.                                                |
| 17 | Q. | And so who on your behalf, who submitted that to        |
| 18 |    | apparently Vivian Leonard?                              |
| 19 | A. | Either Barbara Powers or Marie Howard who were          |
| 20 |    | two people at the office, my office.                    |
| 21 | Q. | But at the time, it wasn't in your office yet?          |
| 22 | A. | Correct, but they were working there.                   |
| 23 | Q. | Okay. So who was in charge of the office that           |
| 24 |    | you know at the time that you applied?                  |

```
 1    A.   The Commissioner.  I mean, it was a vacant
 2         position at that time.
 3    Q.   So somebody from the personnel office would have
 4         had to submit a 9-F form to Vivian Leonard in
 5         HR?
 6    A.   I believe so, yes.
 7    Q.   But you don't know who submitted it?
 8    A.   I don't.
 9    Q.   Who did you request to submit it?
10    A.   Who did I request?  I never did.
11    Q.   So then why would you request it?
12    A.   A salary was negotiated.
13    Q.   So they submitted the 9-F request to conform to
14         the salary negotiations?
15    A.   That is correct, sir.
16    Q.   Going back to Kerin Cunningham, after she was
17         hired as an R-9, for how long did she stay in
18         R-9?
19    A.   She was hired in 2004.  I would say she was
20         there until 2006.
21    Q.   And then where did she go?
22    A.   She went to R-12 in the same position.
23    Q.   And why?
24    A.   In the same office.  I'm sorry.
```

1  Q.  Did her job responsibilities change?

2  A.  Greatly, yes.

3  Q.  In what sense?

4  A.  We posted for the R-12 position and we asked her

5      to take over the sick leave and several other

6      job responsibilities.

7  Q.  And how many people did you interview for that

8      position?

9  A.  I would say around five.

10 Q.  Do you remember who it was?

11 A.  I don't, sir.

12 Q.  And that was for an R-12?

13 A.  That was R-12.

14 Q.  I apologize for going back and asking, perhaps,

15     the same question, but how did her job

16     responsibilities expand from an R-9 to an R-12?

17 A.  Well, we posted a new job for R-12 and we laid

18     it out in the posting what her new job

19     responsibilities would be, and she applied for

20     the position and she received it.

21 Q.  And going back to my question, what

22     responsibilities were different or new in the

23     R-12 versus the R-9?  What more was she doing?

24 A.  Like I said, I know she took over sick leave.  I

```
 1        know she was submitting, helping with the
 2        billing process, which she wasn't.  Basically,
 3        an R-9 position.  She was only responsible for
 4        the scheduling of the doctors' appointments,
 5        answering phones.  And so it went from R-9 to
 6        R-12.
 7   Q.   R-12 is Step 1?
 8   A.   That's not the formula for R-12.  There is a
 9        contractual formula that you might move up a
10        couple of steps.  It happens to everybody when
11        you go to a different -- when you have X amount
12        of years, like Kerin had two years, so you would
13        follow the formula for that so she might have
14        went to R-12, Step 3, which I don't have the
15        formula in mind.
16   Q.   But it's your understanding that she followed
17        that formula?
18   A.   Yes.
19   Q.   That she didn't gain any extra step grade
20        because of that?
21   A.   That's correct.
22   Q.   For how long did she stay in R-12?
23   A.   She's still in R-12.
24   Q.   And her R-12 occurred in 2006?
```

1  A.  I believe so, yes, sir.

2  Q.  Whose initiative was it to create that new

3      position?

4  A.  It's initiative when you do the budget.  Each

5      year you do the budget and you say -- you look

6      at each department and you say, "what can we do

7      better?  How can we do things better?"  We had a

8      person there who we thought we could use more

9      wisely so what we do is we have to talk, first

10     of all, talk to the union.  Let me take that

11     back.  No.  We have to talk to budget first, get

12     the approval to expand somebody's job to new

13     responsibilities into the person.  See if the

14     money is funded budgetarily-wise and that we

15     have to meet with the local AFSCME and say,

16     "listen, this is what we're going to do."  We

17     expand this person's job.  Because we're

18     expanding this job, we're going to contractually

19     raise her from R-9 to R-12.  I mean, the union

20     has a major say if we can do that.

21 Q.  Okay.  When does a person's pay increase take

22     effect when they are approved?

23 A.  Say again, please.

24 Q.  When is a person's pay increase, if you went

1   from R-9, R-12, she gets a pay increase?

2 A. Yes.

3 Q. When does that pay increase take effect?

4 A. It takes effect when there is an agreement on

5   all parties' part.  Union, management.  When I

6   was actually doing the job.

7 Q. Is that always the case?

8 A. Well, again, it's negotiations.  Are you talking

9   about negotiations?  And so I remember in

10   Kerin's case, there was a delay in signing the

11   labor agreement with her and then she got some

12   retro pay back but we agreed on a certain date.

13   She didn't see that money, actually see the

14   money, even though she was doing the job at that

15   agreed-upon date.  She didn't see that money

16   until, I would say, maybe two or three months

17   just because of the union and management

18   couldn't get together and get the agreement

19   signed on.

20 Q. You say there was a delay in signing the labor

21   agreement?

22 A. Yes.

23 Q. And what was the cause of that delay?

24 A. I know the union president was out for a bit and

1          they had ironed out some contract clause

2          agreements.

3     Q.   And that creates the new position?

4     A.   Excuse me?

5     Q.   And that would create the new position?

6     A.   Yes.

7     Q.   Are you aware of any other Boston Fire

8          Department personnel who has been given

9          retroactive pay?

10    A.   It's not retroactive pay, no, to anybody else

11         who got retroactive pay, but that wasn't really

12         retroactive pay.  That was, you know,

13         bureaucracy.

14    Q.   Well, she was approved for a position on a

15         certain date?

16    A.   Correct.

17    Q.   But she was paid at that higher rate prior to

18         that approval date, correct?

19    A.   That's incorrect.  The pay came when all of

20         the -- when everything was signed and dotted.

21         That's why it wasn't really retroactive.  She

22         should have been paid, you know, on the day that

23         she started doing the new work.

24    Q.   Was there a document that says, "we hereby

1    approve you to be an R-12"?

2  A.  Yes, there is.

3  Q.  And there was a date on that document?

4  A.  Yes, there was.

5  Q.  So there was an approval date?

6  A.  Yes, sir.

7  Q.  All right.  But she was paid -- and correct me

8      if I'm wrong, but she was paid as an R-12 for a

9      time period before that approval date, correct?

10 A.  No.  That's incorrect.  That's incorrect.

11     Because I remember going down there and I said,

12     "I'm sorry, Kerin.  I'm sorry.  You're not

13     receiving your correct pay but I still don't

14     have a signed document from the local.  I don't

15     know where it is but you have my word.  We will

16     follow that contractual agreement."  I think

17     it's called memorandum of understanding.  "We

18     will follow it to the T.  And you have my word

19     that we'll do that."  So then she was not paid

20     the R-12 exactly the date that she did but we

21     had to wait until the document was signed and

22     then I went up to payroll with the change

23     employee action form, make sure she received the

24     right pay.

```
1    Q.   And so, again, there is a date on a document

2         that approves her as an R-12?

3    A.   Correct.

4    Q.   But because there is some other agreement out

5         there, a memo of understanding you mentioned?

6    A.   Yes.

7    Q.   That approves her as an R-12 prior to the

8         official approval?

9    A.   No.   No.   I can't go up to payroll and say to

10        the pay master, payroll manager, Kerin is an

11        R-12 now.   She'll say, "what do you mean, Bob?"

12        You have to have something in writing and that's

13        the memorandum agreement.   So I kept on calling

14        labor relations here in City Hall and the union

15        saying we all agreed at a meeting she will be an

16        R-12.   And this is how we're going to, you

17        know --

18   Q.   Who was at that meeting?

19   A.   Michael O'Conto and the president of the union,

20        whose name escapes me right now.

21   Q.   Don Moriarty?

22   A.   No.   Higher.   Don Moriarty is a shop steward.   I

23        can't think of the name.

24   Q.   Who is Michael O'Conto?
```

1   A.   Michael O'Conto was a lawyer in labor relations.

2   Q.   So there was Michael O'Conto, who's an attorney

3        at labor relations?

4   A.   Correct.

5   Q.   That was the head of the SCNA or AFSCME?

6   A.   AFSCME.

7   Q.   So the president of the AFSCME union?

8   A.   Yes.

9   Q.   And you don't know who that is?

10  A.   I do.  The name escapes me right now.

11  Q.   And who is in the meeting?

12  A.   Don Moriarty might have been there.  I don't

13       remember.

14  Q.   Anyone else?

15  A.   Myself.

16  Q.   That's it.  It was at that meeting that it was

17       determined when she would be determined to be

18       R-12?

19  A.   Correct.

20  Q.   And then how soon after that meeting did the

21       official paper come down approving her as an

22       R-12?

23  A.   It could have been a month.  It could have been

24       two months.  I remember going to see Kerin and

1    saying, "Kerin, I apologize.  You should be

2    receiving this money.  We all agreed to it at a

3    party.  And believe me, we'll follow it."  I

4    gave my word that we'll follow the memorandum of

5    agreement or understanding.

6  Q.  So the date determined for Kerin Cunningham at

7    this meeting with O'Conto, the president of

8    AFSCME, yourself and maybe Moriarty, was that

9    date prior to the date of the meeting?

10  A.  No.

11  Q.  Was that the date of the meeting?

12  A.  We looked at -- we said Kerin Cunningham was the

13    candidate we want.  We'll go with this date.

14  Q.  The date of the meeting?

15  A.  It could have been.  It could have been, sir.  I

16    don't remember.

17  Q.  And they were trying, but was the date that you

18    were going to approve Kerin Cunningham, I think,

19    at the R-12 position and pay, was that the date

20    of this meeting with O'Conto, et cetera, or a

21    date after that?

22  A.  It's usually a Saturday.  It's usually a

23    Saturday when we agree upon because that's the

24    way payroll runs, Saturday and Friday.

1   Q.  So was it the next Saturday, you say?

2   A.  It could have been.  It could have been.

3   Q.  But it wasn't before the meeting?

4   A.  No.  No.

5   Q.  It was the time after the meeting?

6   A.  It was agreed upon at the meeting this would be

7       the date that she would do the R-12 work and she

8       would be paid the R-12 salary.

9   Q.  And are you aware of any other Boston Fire

10      Department civilian/employee where that

11      occurred, where the person was paid an R-12

12      prior to the date of the official paper came

13      down?

14   A.  I mean, every time -- any time we try to make

15      any type of agreement, you have to have the

16      buy-off of the union so if we move things around

17      or move people around, I mean, we just can't do

18      it unilaterally.  We have to have the union in

19      there.  We move the person from the medical

20      office down to 1010.  We moved some other people

21      around.  So I mean, you just can't do these

22      things unilaterally.  You've got to be part and

23      parcel with the union, letting them know what's

24      going on, your reasons for any type of changes

1          or anything of that nature.

2                    MR. FEENEY:  Bathroom break?

3                    MR. HOLMES:  Yes.

4                    (Short recess)

5                    MR. FEENEY:  Okay.  Back on the record,

6          sir.

7     BY MR. FEENEY:

8     Q.   I'm going to ask my prior question again.  So

9          are you aware of any other Boston Fire

10         Department employee that has been given the

11         higher pay of the new position prior to the

12         order coming out granting you that position?

13    A.   No.

14    Q.   Okay.  As to Kerin Cunningham, are you aware --

15         well, actually, let me back up a second.  What's

16         a compensation grade appeal?

17    A.   I believe it's a contractual clause in the

18         contract saying that if you think you are not

19         being fairly compensated, you can go to a --

20         have a hearing up here in OHR and they will look

21         at your job to make sure that you're being

22         fairly compensated, that your R-12 is the same

23         R-12, is the same R-12, is the same R-12.

24    Q.   Did Kerin Cunningham submit a compensation grade

| | | |
|---|---|---|
| 1 | | appeal for the R-12? |
| 2 | A. | She did not. |
| 3 | Q. | To the best of your knowledge, did any person |
| 4 | | with political influence assist Kerin Cunningham |
| 5 | | to get that R-12 position? |
| 6 | A. | No.  There is no political influence. |
| 7 | Q. | To get either the position itself or the back |
| 8 | | pay? |
| 9 | A. | Correct.  There was no political influence. |
| 10 | Q. | Okay.  Are you aware whether information, either |
| 11 | | from information you heard or personal |
| 12 | | knowledge, of any political affiliation that |
| 13 | | Kerin Cunningham may have? |
| 14 | A. | I'm not aware of any political affiliations that |
| 15 | | Kerin Cunningham may have. |
| 16 | Q. | I believe last time we discussed Caplain |
| 17 | | McGrath. |
| 18 | A. | We did. |
| 19 | Q. | I will not rediscuss it.  I was referring to |
| 20 | | Joseph Dodoni and you mentioned that you had met |
| 21 | | him once at a credit union gala? |
| 22 | A. | No.  It's a yearly gala.  It's a yearly party. |
| 23 | Q. | And you met him once at one of those? |
| 24 | A. | No.  He's part of the board for the credit union |

```
 1        so I met him at the yearly gathering.
 2   Q.   And the only time you had contact with him was
 3        on the telephone?
 4   A.   No.  He came in once when his son was a
 5        candidate for the firefighter department.
 6   Q.   And that was Brian Nee, right?
 7   A.   That was Brian Nee.
 8   Q.   And then the other contact you've had with him
 9        has only been through telephone?
10   A.   Yes, sir.
11   Q.   He has called you?
12   A.   I found out that he was sick and I called him up
13        to see how he was doing.
14   Q.   Was that the only time you called him?
15   A.   I called him one time when he was sick and a
16        couple of times when his son was a candidate for
17        the fire department.
18   Q.   And you discussed only his son's candidacy?
19   A.   Correct.
20   Q.   And did he ever call you?
21   A.   He called me a couple of times yesterday.
22   Q.   For what reasons?
23   A.   Just to say, "Hi, see how you're doing."  That
24        was it.
```

```
 1   Q.   Okay.  Was he working for the department?

 2   A.   When he was working for the fire department, no.

 3   Q.   So what would give him cause to call you to see

 4        if you are doing well?

 5   A.   Mainly, his son.

 6   Q.   When you say, "mainly," what else?

 7   A.   His son.

 8   Q.   Do you know Jane Green?

 9   A.   Yes.

10   Q.   Is Jane Green a position under your supervision?

11   A.   No, it's not.

12   Q.   Under the department human resources controls?

13   A.   Yes, but she's not a direct report to me.

14   Q.   Has Jane ever come to you in her capacity as a

15        shop steward?

16   A.   Yes.

17   Q.   When was the last time she did that?

18   A.   We had a couple of people out.  We had a couple

19        of opening positions.  She wanted to know when

20        they were going to be filled.  And I tried to

21        give her a good guesstimate.

22   Q.   Okay.  Do you recall when Jane Green was

23        transferred?

24   A.   Yes, I do.
```

1  Q.  From 1010 Mass. Avenue?

2  A.  Yes, I do.

3  Q.  Do you recall the impetus for that transfer?

4  A.  I was one of the impetus to get her transferred

5      because I had first-hand experience of people

6      coming in, looking for fire reports and not be

7      able to find anybody from either Jane Green or

8      the person that worked with her, Carol Connors,

9      that couldn't find either one of them.  People

10     were leaving without fire reports and I brought

11     it up to the Commissioner.  I was very -- I

12     said, "there is something wrong with having the

13     whole reason" -- ten people went down.  1010 was

14     for guest service, customer service.  So there

15     was a location that people, if they needed a

16     permit, reasons, report, they would go to 1010

17     and I brought it up to the Commissioner that on

18     several occasions, people had been walking

19     around fire headquarters at 115 South Hampton

20     Street and I said, "it's unacceptable," that the

21     reason we brought fire prevention was up on the

22     third floor at 115 South Hampton and everybody

23     was transferred to 1010; and when I inquired

24     with the fire marshal and the district chief of

1       fire prevention, I had asked them -- I had sent

2       them an e-mail.  I said, "why were these people

3       not transferred," because it kind of defeats the

4       whole purpose of the move to 1010.

5   Q.  When did you send that e-mail?

6   A.  I sent it approximately, I would say, September

7       of, I think -- August or September of 2003.

8   Q.  Have you or your attorney produced that e-mail

9       in request to the production of documents?

10  A.  I think we have, yes.  I don't know.

11          MR. HOLMES:  I'll double-check.  Would

12      it be in there, Maggie?  Do you know?

13          MS. PASTUSZAK:  No.

14          MR. HOLMES:  I'll double-check that,

15      Tom.

16          MR. FEENEY:  That's okay.

17  A.  It was sent to Pete Liser and Paul Burke.

18  Q.  And what was Peter Liser's or Paul Burke's

19      response?

20  A.  They said that the reports, because the archive

21      reports were in large cabinets and microfiche or

22      film -- I don't know if I'm saying it

23      correctly -- were located at 115.  They couldn't

24      be transferred down to 115 -- down to 1010.  I'm

1      sorry.  And I only told the Commissioner, "I

2      think that's unacceptable."  I mean, why

3      couldn't these things be moved down like

4      everything else is moved down to 1010 Mass.

5      Ave.?  And the Commissioner agreed with me.

6  Q.  So was Jane Green and the file moved down

7      simultaneously?

8  A.  Yes.  First Jane Green was there.  It took us a

9      while to move down to -- I would say it took a

10     couple of weeks to move the film, everything

11     down there, but it was eventually moved.  They

12     have been down there ever since.

13 Q.  So what were the gaps in time between Jane Green

14     moving down and --

15 A.  Jane grieved through the union, grieved the

16     transfer.  So we had to wait.  It was a waiting

17     period where if she wanted the grievance, she

18     would have moved back to 115 South Hampton

19     Street.  So the grievance was settled.  Then we

20     moved everything down there.

21 Q.  How soon after she was transferred did she

22     grieve it?

23 A.  I would say she grieved it right away.

24 Q.  When she was transferred to 1010, was Jane Green

1    provided a telephone for her desk?

2  A.  To my knowledge, yes.  Sure.

3  Q.  And what's that knowledge based on?

4  A.  I mean, all she was provided is a cubicle with

5      an office, as far as I know.

6  Q.  Did you ever have a meeting with Commissioner

7      Christian, Peter Liser, Deputy Chief Hitchcock

8      regarding the transfer of Jane Green?

9  A.  Yes.

10 Q.  What occurred during that meeting?

11 A.  The Commissioner told Peter Liser that provided

12     him the courtesy of being fire marshaled to let

13     him know that Jane Green and Carol Connors will

14     be moving down to 1010 Mass. Ave.

15 Q.  Did Peter Liser express any objection to that?

16 A.  He did.

17 Q.  And what did he say?

18 A.  He said, "we can't move the files," and I think

19     he said, "the boys are not going to be happy

20     about this."  The Commissioner said, you know,

21     this was the whole reason behind 1010.  The

22     whole reason behind 1010.  That would be one

23     stop shopping.

24 Q.  When you say, "one stop shopping," that's for

1        customer service?

2    A.  Correct.

3    Q.  Obtaining permits?

4    A.  Correct.

5    Q.  Obtaining applications?

6    A.  Correct.

7    Q.  Obtaining decisions from the fire department?

8    A.  Yes.

9    Q.  Basically, the public would go just to 1010

10       Mass. Avenue?

11   A.  Correct.

12   Q.  So Jane Green's unit was the last vestige of

13       customer service located at 115?

14   A.  Right.  It used to be all fire prevention was on

15       the third floor with Jane Green moving down to

16       1010.  All fire prevention was at 1010.

17   Q.  Are there any other customer service units still

18       located at 115 South Hampton?

19   A.  No.

20   Q.  And when Deputy Chief Liser voiced his objection

21       to the transfer, what was the response of

22       Commissioner Christian?

23   A.  It was a quick five-minute meeting.  And he

24       said, "you know, the Deputy has decided that we

```
 1        will -- that fire reports will be located with

 2        fire prevention at 1010 Mass. Avenue."

 3   Q.   Who provided to Jane Green the order

 4        transferring her from 115 to 1010?

 5   A.   Peter Liser.

 6   Q.   He handed her the paper?

 7   A.   To my knowledge, yes, sir.

 8   Q.   Did you ever hand Jane Green any transfer

 9        papers?

10   A.   No.  I think the letter was written by labor

11        relations and Peter produced it to Jane Green.

12   Q.   Who in labor relations wrote the letter?

13   A.   I think Michael O'Conto did.

14   Q.   Was William Kessler involved at all in writing

15        that letter?

16   A.   No.

17   Q.   Was Chief Finn involved in the process at all?

18   A.   No.

19   Q.   Okay.  I'm going to ask you a few final

20        questions just to confirm the 718 position ever

21        posted in the same case as the AFSCME and SCNA

22        jobs.

23   A.   No.  Again, there are no postings.

24   Q.   Aside from Brian Nee, how many other children,
```

```
 1        cousins, nieces, or nephews does Joseph Nee have

 2        working for the fire department?

 3   A.   No idea.

 4   Q.   Prior to your employment with the Boston Fire

 5        Department, you testified that you worked at the

 6        Sagamore up in Lake George?

 7   A.   Yes.

 8   Q.   For the Hilton Hotel?

 9   A.   Omni.

10   Q.   Omni Parker House?

11   A.   Omni House.

12   Q.   Omni Hotels?

13   A.   Omni Hotels.

14   Q.   Also for Hyatt or Hilton?

15   A.   Hilton.

16   Q.   Is there an organization of the human resources

17        managers nationwide that you're involved in as

18        well?

19   A.   I have the human resource managers.  I used to

20        be a member there.

21   Q.   From when to when?

22   A.   I would say from 1995 to 2000.

23   Q.   Do you hold any offices or positions there?

24   A.   None.
```

1    Q.    During the course of your employment outside of

2          the Boston Fire Department, did you receive good

3          reviews for your performance?

4    A.    Yes, I did.

5    Q.    Did you receive any negative reviews?

6    A.    Never.

7    Q.    Did you ever receive any negative feedback in

8          performance from the Society of Human Resource

9          managers?

10   A.    No.  They don't do that.

11   Q.    Okay.  Are you aware of any positions at the

12         Boston Fire Department that are subject to

13         political patronage or influence?

14   A.    None.

15   Q.    Okay.  So it's your testimony today that all

16         positions are given as a matter of merit?

17   A.    You hire the most qualified person.

18              MR. FEENEY:  I think I'm almost done.

19              (Pause)

20              MR. FEENEY:  One thing I would like to

21         put on the record, perhaps, similar to Attorney

22         Holmes, at one point is that I just received

23         today certain documents in response to my

24         request for production of documents.  I have not

1    had a chance to go through them.  I received, I

2    believe, on Friday, the answers to

3    interrogatories.  Thank you, by the way, for

4    faxing them to me as soon as you could.

5              MR. HOLMES:  Sure.

6              MR. FEENEY:  Especially during the

7    summertime, it's very hard to do, but I reserved

8    the right to recall Mr. Moran, given my review

9    of those things.

10             MR. HOLMES:  Yes.  Not a problem with

11   us.

12             MR. FEENEY:  That's fine.  And so given

13   that, I will close the deposition for today.

14             MR. HOLMES:  Okay.  Thank you.

15             (Whereupon, the deposition was

16              concluded at 3:55 p.m.)

17

18

19

20

21

22

23

24

1          DEPONENT'S ERRATA SHEET

2        AND SIGNATURE INSTRUCTIONS

3

4          The original of the Errata Sheet has been

5   delivered to Scott Holmes, Esq.

6          When the Errata Sheet has been completed

7   by the deponent and signed, a copy thereof

8   should be delivered to each party of record and

9   the ORIGINAL delivered to Thomas F. Feeney,

10  Esq., to whom the original deposition was

11  delivered.

12

13

14          INSTRUCTIONS TO DEPONENT

            After reading this volume of your

15  deposition, indicate any corrections or changes

    to your testimony and reason therefor on the

16  Errata Sheet supplied to you and sign it.  DO

    NOT make marks or notations on the transcript

17  volume itself.

18

19          REPLACE THIS PAGE OF THE TRANSCRIPT

            WITH THE COMPLETED AND SIGNED ERRATA

20          SHEET WHEN RECEIVED.

21

22

23

24

```
 1      ATTACH TO THE DEPOSITION OF: ROBERT J. MORAN
        CASE: BARRY, ET AL., VS. MORAN, ET AL.
 2
                        ERRATA SHEET
 3
        INSTRUCTIONS:  After reading the transcript of
 4      your deposition, note any changes or corrections
        to your testimony and the reason therefor on
 5      this sheet.  DO NOT make any marks or notations
        on the transcript volume itself.  Sign and date
 6      this Errata Sheet (before a Notary Public, if
        required).  Refer to Page 68 of the transcript
 7      for Errata Sheet distribution instructions.
 8      PAGE    LINE
                    CHANGE:
 9                  REASON:
                    CHANGE:
10                  REASON:
                    CHANGE:
11                  REASON:
                    CHANGE:
12                  REASON:
                    CHANGE:
13                  REASON:
                    CHANGE:
14                  REASON:
                    CHANGE:
15                  REASON:
16          I have read the foregoing transcript of my
        deposition and except for any corrections or
17      changes noted above, I hereby subscribe to the
        transcript as an accurate record of the
18      statements made by me.
19      Date
20
21                  ROBRT J. MORAN
22
23
24
```

COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS.                     )

I, Myriam A. Maracas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 9th day of July, 2007, at 2:10 p.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand this 11th day of July, 2007.

*Myriam Maracas*
Myriam A. Maracas
Notary Public
My commission expires 1/18/13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL L. SHAKMAN and<br>PAUL M. LURIE, *et al.*,<br>    Plaintiffs,<br><br>v.<br><br>DEMOCRATIC ORGANIZATION OF<br>COOK COUNTY, *et al.*,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 69 C 2145

Wayne R. Andersen
United States District Court Judge

## ANNUAL REPORT OF MONITOR FOR 2006

The Monitor, Noelle C. Brennan ("Monitor"), by and through her counsel, Ines M. Monte of the law firm of Brennan & Monte, Ltd. and Susan E. Cox of the Law Offices of Susan E. Cox, submits this Annual Report pursuant to the Order of the Court entered on August 2, 2005.

## I.    APPOINTMENT OF *SHAKMAN* DECREE MONITOR

The principles embodied in the *Shakman* Decree are grounded in Constitutional rights guaranteed to all persons and apply to all government hiring. "Political belief and association constitute the core of those activities protected by the First Amendment," the Supreme Court has explained. *Elrod v. Burns*, 427 U.S. 347, 355 (1976). Patronage, the Court explained, "can result in the entrenchment of one or a few parties to the exclusion of others" and "is a very effective impediment to the associational and speech freedoms which are essential to a meaningful system of democratic government." *Id.* at 370-371. Thus, although some may espouse the view that patronage is a preferred system, supporting the implementation of such a system is tantamount to supporting the denial of rights guaranteed by the Constitution.

On August 2, 2005, the Court appointed a Monitor "to ensure future compliance" with the Court's prior orders in *Shakman, et al. v. The Democratic Organization of Cook County, et al.*, Case No. 69 C 2145, in response to the Plaintiffs' Application to Hold the City of Chicago and its Mayor in Civil Contempt for Violations of the Court Orders. Following the August 2, 2005 appointment, the Monitor and her counsel conducted a preliminary study of the City's existing employment practices. Since that time, the Monitor and her staff have actively overseen the City's hiring processes. Hiring at the City has not been impeded under the Monitor's supervision. In fact, the City has hired significantly *more* employees under the Monitor's oversight than in prior years. From August of 2005 through July of 2006, the City hired 6,231 employees, a substantial increase over the same period during the previous two years when the City hired only

1

5,304 individuals between August 2003 and July 2004 and 5,601 employees from August 2004 through July 2005.

The Monitor's initial objective was to investigate the City's existing employment practices in order to detect potential impediments to the City's ongoing compliance with the *Shakman* judgments and to identify systemic problems which may lead to such future noncompliance. On September 6, 2005, the Monitor issued her "First Report" that included "Recommendations for Immediate Implementation" as a means to increase immediate compliance with the Court's previous Orders. *See* Appendix A. The City agreed with many of these recommendations and they were formally incorporated into a Court Order entered on November 2, 2005. *See* Appendix B. Since the September 6, 2005 First Report, the Monitor and her counsel have filed several status reports outlining some of the work conducted by the Monitor's office. *See* Appendix C.

The Monitor's September 6, 2005 report concluded, in part, that that the City had been substantially non-compliant with many of the *Shakman* provisions for a significant period of time. Since that time, the City's compliance with the *Shakman* Decree has significantly increased. For example, the City's Department of Human Resources ("DHR") now conducts all screening of applicants and creates all referral lists. The hiring departments no longer submit names of candidates to DHR or add names to referral lists. There has been no evidence that DHR has received and/or acted upon any inappropriate recommendations from any individual in the Office of Intergovernmental Affairs or the Mayor's Office. There is no evidence that the type of overt manipulation of interviews presented during the criminal trial of *USA v. Sorich, et al.* continues to exist. As explained below, however, additional measures are necessary to increase compliance now and to ensure future compliance.

## II.    MONITOR'S ACTIVITIES

### A.    Information Gathering

A significant part of the Monitor's activities continue to focus on gathering information and viewpoints from multiple constituencies. The Monitor and her staff meet on a weekly basis with officials from the City of Chicago to discuss reform initiatives, issues related to specific hiring sequences, and a myriad of topics that relate to eliminating the unlawful use of political considerations in City employment. The Monitor and her staff also regularly meet with management and personnel at the Department of Human Resources. Notably, an individual from the Monitor's office is present and available at the Department of Human Resources on a daily basis.

The Monitor's office has also continued to meet with officials within individual City Departments, including the Department of Aviation, the Department of Water, Streets and Sanitation, the Department of General Services, the Chicago Public Libraries, the Fire and Police Departments, and others. Often, these meetings arise because of compliance issues or questions raised by the Departments. Similarly, the Monitor and her staff have met regularly with representatives from various unions, to discuss specific

2

union issues related to the City's compliance with the law and reform of employment practices. The Monitor's office regularly meets with the Plaintiffs' counsel to discuss these same issues. Finally, the Monitor has also met with the City Council's attorneys, the Black Caucus and their attorneys, and any other interested individuals who request a meeting.

Generally, the employees with whom the Monitor has worked with at the City of Chicago have been receptive to changing past employment practices. In particular, the Mayor's Chief of Staff and the Commissioner of the Department of Human Resources have been actively attempting to implement fair and open employment practices. Nonetheless, there remains an element of resistance to the *Shakman* principles expressed during a limited number of interviews and/or discussions with City employees and a small group of Aldermen. These individuals have openly expressed a preference for a patronage system and believe that the advantages of such a system outweigh any ill effects. Thus, these same individuals are adverse to the requirements of the *Shakman* Decree and its resultant restrictions on the employment practices at the City. The activities of the Monitor and her counsel are an attempt to counter these pockets of resistance. 

## B.    Oversight of City Hiring

One of the primary findings in the Monitor's initial report was that the Department of Personnel (now known as "DHR") had abdicated its role under the existing Detailed Hiring Plan to screen qualified candidates for open City positions and create appropriate referral lists for the City Departments to use for their pool of qualified applicants to interview. Instead, City Departments were screening applicants for positions, sometimes with the motive of ensuring that favored candidates were included on the interview lists. Further, as the United States Attorney's federal prosecutions have made plain, improprieties often occurred in the interview and rating process of candidates. Finally, despite apparently widespread violations of the *Shakman* decree, the Monitor found no evidence of any investigation by the Department of Personnel into any complaints made regarding potential *Shakman* violations during her initial investigation into City hiring.

To address these concerns on a going-forward basis, the Monitor and her counsel retained several individuals to serve as auditors for all aspects of City hiring, including the proper notification of job opportunities; the creation of appropriate referral lists; proper conduct of interviews, testing, and scoring of candidates; and related actions. These auditors, who currently number six, are trained in both City hiring and the *Shakman* decree prior to beginning their work. One auditor is based at DHR and is responsible for performing a variety of crucial monitoring functions, including auditing hiring packets, reviewing referral lists, tracking all hiring sequences and interviews, and responding daily to issues and questions presented by the City's personnel analysts and personnel liaisons related to compliance with the *Shakman* decrees.

3

The Monitor requires forty-eight hour notification prior to the commencement of any interview.[1] The purpose of this notification is to allow the Monitor and her staff to assign an auditor to the hiring sequence if one is deemed necessary. Although there were difficulties with this requirement initially, most Departments have adapted to this requirement. The Monitor has the discretion to cancel an interview if sufficient notification is not given and has done so on occasion. Similarly, there have been a limited number of instances where no notice has been provided to the Monitor at all. Those interviews generally have to be repeated to allow for auditing.

As set out in the tables below, the Monitor's staff has audited close to 3,000 interviews to help ensure that the hiring is in accordance with the *Shakman* decree. Although the auditors have attended interviews in most departments, auditing activities have focused on the City's Infrastructure Departments, given their history of improprieties. In addition, when the Monitor and her staff are alerted to a potential problematic hiring sequence by a complainant, that hiring sequence is audited, if possible.

## INFRASTRUCTURE DEPARTMENT INTERVIEWS AUDITED

| | |
|---|---|
| AVIATION DEPARTMENT | 771 |
| FLEET MANAGEMENT | 92 |
| GENERAL SERVICES | 105 |
| STREETS AND SANITATION | 394 |
| TRANSPORTATION | 86 |
| WATER MANAGEMENT | 776 |

## OTHER CITY DEPARTMENT INTERVIEWS AUDITED

| | | | |
|---|---|---|---|
| Administrative Hearings | 4 | Department on Aging | 4 |
| Department of Buildings | 75 | Business Aff. & Lic. | 29 |
| Children & Youth Serv. | 15 | City Clerk's Office | 31 |
| Construction & Permits | 17 | Consumer Services | 13 |
| Cultural Affairs | 12 | Environment | 25 |
| Finance | 30 | Fire Department | 11 |
| Health Department | 41 | Housing Department | 27 |
| Human Resources | 26 | Human Services | 5 |
| Inspector General Office | 12 | Law | 11 |
| Library | 3 | Mayor's Off. Spec. Events | 8 |
| Off. Emer. Manag. & Comm. | 77 | O'Hare Modernization Prog. | 32 |
| Planning | 10 | Police | 161 |
| Procurement | 35 | Revenue | 34 |
| Treasurer | 4 | Zoning | 18 |

---

[1] The Monitor has recently requested, but not required, that she be provided one week notice of any interviews scheduled.

4

The auditors help ensure that there is no collusion in scoring; that rating sheets are filled out individually; and that each applicant is treated fairly and questioned consistently. The auditors collect the rating sheets and copy them immediately after the interview has concluded so that there can be no change to them after the conclusion of the interview process. These documents are kept in the Monitor's files. The auditors also assist in ensuring that each applicant meets the minimum requirements for the position as stated on the "A" form. The auditors do not question applicants, nor do they advise the interviewing panel on how they should score the applicants.

After each interview, the auditors draft a memo on the hiring sequence and include any questions which were directed to them by the interview panels. The auditors attach the appropriate paperwork for the hire, including the A form, referral list and rating sheets to the memorandum, which are circulated to the Monitor and her staff and kept in a file at the Monitor's office. Each week, the auditing team meets with the Monitor and her counsel to discuss the week's work and to discuss any problems which have occurred and to discuss possible solutions which have included, from time to time, a new set of interviews. Beginning recently, the auditor at DHR has also prepared a weekly memorandum reporting the status of those hires which have been questioned by members of the Monitor's staff. In this way, the Monitor can track DHR's response to issues raised. The Monitor and her counsel report problematic hiring sequences to the City.

Hiring sequences where the interviews are not actively audited are also reviewed. Specifically, the Monitor's DHR auditor reviews and tracks every "A" form (request for hire) and each referral list. Before a candidate's hire can be processed, the auditor reviews the entire "hire packet" including the referral list, the A form hiring criteria, the interview scoring sheets and the application or resume. If any of the steps in the hiring sequence are suspect, the auditor notifies both the Monitor and DHR and the hire is not processed until it can be further reviewed.

The auditors are an integral and necessary component of the Monitor's work. Their presence helps to prevent the practices which occurred in the past and which violated the decree. Their efforts, and those of DHR and new personnel in the departments responsible for hiring, have resulted in a much fairer and open hiring process. In fact, the hiring practices which were the subject of the federal prosecutions have been largely dismantled through these efforts. Although hiring errors still occur and institutional and other barriers persist, the presence of the auditors has done much to prevent further violations of the decree.

## C.    Complaint Investigations

As noted in the Monitor's First Report, a significant deficiency in the City's employment system is the absence of an effective and credible internal City process for responding to complaints of unlawful politically-based employment practices. Beginning in September of 2005, the Monitor was tasked with investigating such complaints, with the agreement of both parties. Based on the Monitor's initial recommendations, the City also designated a new "*Shakman* Complaint Officer" in DHR to receive *Shakman*-related

complaints. Complaints received by the City's *Shakman* Complaint Officer are promptly forwarded to the Monitor's office for investigation. Current City employees have been notified about this new avenue for registering complaints. Complaints may also be submitted through email via the Monitor's website at
Finally, complaints often come directly to the Monitor's office. As part of the investigation process, the Monitor's office has implemented a comprehensive system for receiving, tracking, reviewing and responding to any complaints received regarding current or recent alleged *Shakman* violations in City employment.

To date, the Monitor's office has received more than 440 complaints for review. Not all complaints received by the Monitor fall within her jurisdiction. For an investigation to be undertaken, a complaint must allege specific conduct that: (1) relates to employment actions based on improper political factors; (2) is believed to have occurred since the Monitor's appointment on August 2, 2005; and (3) directly involves the City of Chicago and its departments. Over 175 complaints are currently under active investigation by the Monitor's staff. Files are assigned by department to an attorney on the Monitor's staff who directs the investigation. Paralegals assist in the investigative process. Investigations typically involve detailed interviews of the complainant, other witnesses, and other appropriate City personnel. Additionally, any relevant records related to the job action at issue are evaluated, along with any other available information or documents. The attorneys and staff involved in these investigations meet on a regular basis to discuss the status and progress of the investigations and to share information that may be useful in identifying and addressing systemic problems.

In certain cases the file is shared with the City's Inspector General Office. Typically, the Monitor's office prepares the complaint and its investigative results and then meets with a representative from the Inspector General. If the complaint is one that the Inspector General's Office believes is within its jurisdiction and is sufficiently timely, the Inspector General's Office assumes responsibility for investigating that complaint and the Monitor's investigation ceases. This work sharing agreement allows the Inspector General to recommend appropriate discipline where applicable and prevents duplication of efforts by both offices.

Significant benefits have been obtained as a direct result of this complaint process. As an initial matter, the City has been able to improve its on-going compliance with the *Shakman* Decrees and the Detailed Hiring Plan in the immediate short-term. In numerous cases where there has been an adequate basis to conclude that a complaint is well-founded, the Monitor has requested the City to take specific corrective action, as discussed below. Moreover, systemic problems have been identified and addressed.

## D.    Development and Implementation of Reforms

### 1.    SYSTEMIC REFORMS

Information learned through auditing activities and complaint investigations has led to broad-based reforms in the City's employment practices. Key examples include

reforms to the hiring process for Motor Truck Drivers ("MTDs"), reforms in the hiring process for laborers, reform of an informal promotion practice known as "acting up," and implementation of a City-wide system that identifies individuals previously terminated "for cause" by the City if or when such individuals reapply.

### a.    Elimination of Interviews for MTD Positions/MTD Pools

The City employs MTDs across several City departments.  MTD drivers are needed at different times by different departments and are generally qualified to work in several departments.  The City has also employed "seasonal truck drivers."  Some of these seasonal MTDs are hired for snow removal work, for example, and are laid off after the winter season.  This has created a patchwork of different MTD positions within the different departments which employ MTDs.

A number of complaints regarding the hiring and promotion of MTDs have been brought to the Monitor's attention.  Complainants alleged that seasonal MTDs were promoted to permanent career service positions based on political connections rather than merit.  Complainants have also alleged that the interview process for MTDs was used to hire "clouted" individuals over others, regardless of skill and/or experience.

The Monitor's office raised these concerns with the City.  The City, in turn, had been in the process of negotiating a new kind of MTD position: cross-departmental pool MTDs who could be utilized in four of the main departments which use MTDs as the needs of the City's departments changed.    These departments are Aviation, Transportation, Water Management and Streets and Sanitation.  The pool concept would allow the City to dispense with hiring of seasonal MTDs who would be laid off and rehired yearly and instead (with certain limited exceptions), have qualified MTDs move from one department to another based on need.

Although the pool concept should eliminate many of the complaints regarding promotion from "seasonal" to permanent career service positions, it does not address the allegations of manipulation of the interview process.)  When the City conducted MTD interviews for the Department of Water Management in April of 2006, the Monitor formally requested that the City abolish interviewing for entry level MTDs.  This request was prompted by a number of factors, including observations by the auditors of widely disparate scoring of candidates and the use of scoring criteria (such as "oral communication skills") that were unrelated to the actual work performed by MTDs.  In addition, a disproportionate number of selected candidates had very recent seniority dates with the City which were after December 2005.  Finally, the Teamsters Union raised concerns that the City was violating its members' seniority rights, but also that certain of the successful applicants were, in fact, political hires.

The Monitor concluded that there were enough "red flags" to require disposing of the list that had been generated from the interview process.  None of the successful bidders had been notified about the results, thus redoing the hiring sequence should not have caused any disruption to these employees.  The Monitor recommended that the City

agree to a process which would eliminate the need for interviews, but would focus on previous driving and work experience as a way of gauging qualifications for the job.

The newly agreed upon hiring process for MTDs is as follows. Internal applicants for the position will be ordered into a list by seniority. These bidders will then take a pass/fail driving test. The successful applicants' work histories then will be examined to determine whether their attendance is adequate by a pre-determined formula and whether they have been suspended from work based on discipline records. The successful applicants will then be selected in seniority order.[2]    External pool applicants will be assessed similarly, but the list of those with the required licensure will be randomized (instead of ordered by seniority). These applicants also take a pass/fail driving test and those who pass will be selected for open positions by lottery order. The elimination of the interview process in favor of more objective measures will decrease the likelihood of manipulating the MTD hire process in the future.

**b.    Creation of (Lottery for) Laborer Positions in City**

Among various recommendations made by the Monitor and agreed to by the City was the recommendation that the City purge all existing eligibility lists and referral lists that had been created by the City prior to January 1, 2004. *See* Appendix B. Such a purge was recommended due to significant concerns about the integrity of these lists. On May 3, 2006, the City's Corporation Counsel contacted the Monitor's office to advise that the City had actually not purged all eligibility lists as previously agreed. Specifically, the Monitor was advised that the City's eligibility list for the title of "Laborer" had not been purged. The Laborer eligibility list had been created more than six years earlier and contained approximately 20,000 names of job applicants who had applied for the title at that time.

The City alerted the Monitor that in attempting to fill approximately 60 "Hand Laborer" positions within the Department of Streets and Sanitation in the spring of 2006, the City had been using the unpurged Laborer eligibility list. Many of the individuals on this list were no longer viable job candidates, either because they could not be reached at their stated address or phone number, or they were no longer interested in or available for the job.

Based on numerous complaints of improprieties in filling Laborer positions in Streets and Sanitation, the Monitor concluded that the City's request to continue using the unpurged list must be brought to the attention of the Court and the Plaintiffs. The Monitor filed a motion related to this issue on May 4, 2006. *See* Appendix D. As a result, the parties entered into an agreement for filling these 60 Laborer openings that permitted filling the slots as expeditiously as possible, with adequate oversight. The Agreed Order entered by the Court on May 5, 2006 provided that the City would be allowed to utilize the unpurged eligibility list only for the purpose of filling those 60

---

[2] Eventually, the City would like to also use previous work performance as part of the hiring criteria, but, until more objective and verifiable means are developed to determine performance, the Monitor's view is that this is inadvisable.

Hand Laborer openings in Streets and Sanitation, as long as the list was randomized anew in a manner that was open and transparent and that permitted review by the Court and the Monitor. *See* Appendix E.

Upon completion of these 60 hires, however, the City had to purge the list. In order to fill any future Laborer vacancies, the City was required to create a current eligibility list, so these vacancies could be filled expeditiously and fairly. The City proceeded with creation of a new eligibility list for the Laborer titles, with direct oversight from the Monitor's office. First, the City informed all affected individuals about the recently purged list. Purge notifications were sent by the City to the entire list of applicants on the old eligibility list advising the applicants of the need to reapply and of the new application period and locations. A Job Announcement for the Laborer title was prepared and the position was opened for application from May 14, 2006 through May 27, 2006. The City also used press announcements to publicize the opening of the title, in addition to using its normal job posting processes.

Over 15,000 individuals submitted new job applications for the Laborer title. The City, with oversight from the Monitor, used a lottery process to randomize the list of job applicants. Since the creation of the new Laborer lists[3] each of the Infrastructure Departments have hired Laborers from these lists, with the oversight of the Monitor. Although certain complaints regarding the hire of specific laborers have continued to be lodged with the Monitor, investigations conducted thus far indicate that these hires were completed pursuant to the lotterized list and were subject to political manipulation. Thus, although complaints will likely continue to be made regarding these coveted positions, both the City and the Monitor are now equipped to investigate quickly whether any improper influence occurred in any particular hiring sequence.

## c.    Reforms to the City's "Acting-Up" Practice

"Acting Up" refers to the discretionary selection of certain City employees to perform higher level and/or higher paid positions. This City practice was particularly problematic because it violated the *Shakman* Decree's Detailed Hiring Plan. Significant numbers of employees had historically been hand-picked by supervisors to "act up" for extended periods of time, sometimes as long as several years, without any formal selection process or the use of any objective criteria. The Monitor received dozens of complaints alleging that certain employees had been selected to "act up" based on unlawful political considerations. Employees complained that individuals with greater seniority and better qualifications had been passed over for "acting up" assignments in favor of less qualified politically connected individuals. Union employees that are "acting up" receive additional pay for their work. Although non-union employees "acting up" may not receive additional compensation, they do gain valuable experience that can provide a decided advantage in permanently obtaining the higher position at a later date.

---

[3] There are six different "Laborer" lists to account for the different Laborer titles.

The inherent problems with this informal promotion practice are clear. Managers and supervisors "promote" employees into these positions with unfettered discretion in this non-competitive selection process. As the following table demonstrates, between January 1, 2006 and October 15, 2006 at least 1,000 different employees within the City's six infrastructure departments held "acting up" positions. These employees received additional pay and experience in the title as a result.

| Department | Total # People Acting Up | Total Payment Acting Up |
|---|---|---|
| General Services | 86 | $342,586.58 |
| Fleet | 100 | $140,399.06 |
| Streets & Sanitation | 402 | $576,893.79 |
| CDOT | 13 | $20,012.32 |
| Aviation | 91 | $83,501.91 |
| Water | 373 | $145,211.39 |
| **Totals for Infrastructure** | **1,065** | **$1,308,605.05** |

Thus, in a period of ten (10) months the City paid over one million dollars for individuals that "acted up" into promotions for which they did not have to compete.

There are, however, benefits in allowing some form of "acting up" to be available in the City. In certain cases the ability to quickly select an employee to "act up" into a position may be critical for the City's legitimate operational needs. For example, a position may need to be filled temporarily, as when an employee is selected to "act up" during an incumbent's medical leave of absence.

After carefully studying the City's existing "acting up" practice, the Monitor recommended certain reforms. As a result, the City recently agreed to and implemented a new City-wide "Procedure for Use of Acting Up." *See* Appendix F. The key features of the new policy include: (1) limiting the total time any individual may be selected to act up within any given year; (2) providing employees notice of the anticipated "acting up" assignment and equal opportunity to express interest in the assignment; (3) requiring the use of objective and specific criteria for selecting employees who "act up"; (4) requiring employees "acting up" for more than ninety days as of November 24, 2006 to be removed from their "acting up" assignment; and (5) requiring the selected employee, all those involved in his or her selection and the respective commissioner or department head to complete *Shakman* certifications as part of the selection process. These reforms are intended to minimize the potential abuse of "acting up" while providing the City the flexibility to meet its operational needs. The City has begun educating departments on the new "Procedure for Use of Acting Up." The Monitor intends to work cooperatively with the City to ensure on-going compliance with the new policy.

d.     **Reform to DHR's Screening Protocol**

The Monitor received a complaint alleging *Shakman* violations following a hiring sequence for Aviation Motor Truck Drivers in the fall of 2005, prior to the elimination of

interviews for these positions, discussed above. The complainant alleged that several individuals hired as MTDs had previously been terminated "for cause" by the City. The complainant asserted that these individuals were being favored for political reasons. During this investigation, it was determined that DHR had no system for identifying applicants who had been previously terminated for cause by the City if or when such individual reapplied to the City. Although individual departments often were aware of previous "for cause" terminations, that information was not shared with other departments. Thus, a person fired from Streets and Sanitation could be rehired in Aviation.

The Monitor investigated this complaint and obtained a list of all Aviation MTDs hired in the fall of 2005 who had previously been terminated by the City (i.e., before they were hired in the fall of 2005). The list contained seven individuals whose employment histories indicated that each had been terminated by the City for disciplinary reasons (marked under Termination Reason as "Termination – Disciplinary" or "Discharge") and hired into Aviation in the fall of 2005. (These hires were distinct from MTDs who were previously "laid off" and designated as "terminated"-- but not for disciplinary reasons.) The Monitor's office also interviewed individuals involved in that hiring sequence who confirmed that a manager had raised objections to the rehire of certain individuals and had brought those objections to a more senior hiring official. The more senior hiring official instructed the manager to process the questioned hires. (The more "senior hiring official" has since been removed from her position and reassigned to a position with no personnel responsibility.)

As a result of this investigation, the Monitor recommended that DHR implement a system whereby any individual previously terminated for cause could be identified before that individual was rehired by the City. DHR informed the Monitor that it had also recently identified this deficiency and had been working with the Inspector General's Office to implement such a system. Further, the Monitor has recommended that any individual previously terminated for cause not be eligible for rehire with the City.

## 2.    SPECIFIC CORRECTIVE ACTIONS

Where possible, the Monitor's office has made specific recommendations for discreet corrective action to avert or promptly correct possible *Shakman* violations discovered via monitoring or investigating complaints, especially when the hiring sequence at issue has not been completed. Thus, the violation, if there is one, can be averted *before* it actually happens. In some instances, these recommendations have involved specific adjustments in particular job actions.

Additionally, the Monitor has recently instituted a practice of preparing memos to the City outlining complaints and/or problems with recent or ongoing hiring sequences. In response, the City is given an opportunity to promptly review and correct problematic hiring decisions or sequences. In many instances, the City freezes the hiring sequence until remedial or corrective action, if appropriate, can be decided upon. For example, in approximately twenty different hiring sequences, the City has ordered that the entire

interview process be repeated. Often, where interviews are repeated, the City has mandated that different individuals conduct the new interviews to eliminate any potential impropriety. In other instances, referral lists have been corrected, and hiring decisions have been revisited. Similarly, information brought to the attention of the City by the Monitor has resulted in counseling and/or training of individuals involved in City hiring regarding proper procedures and, in other instances, the City has removed certain individuals from having any personnel decision-making authority. In still other instances, the City and the Monitor have agreed to postpone filling certain positions until appropriate remedial action can be agreed upon.

Some examples where corrective actions for discrete violations include a few instances where the Monitor discovered and notified the City that interviewers had altered their scores for specific candidates after the Monitor's auditor collected the original rating sheet. In response to one such instance, the City demoted one individual and provided training to another. In response to another such instance (where the alterations were minor and did not impact the candidate selected), the City counseled the individual. On one occasion, the Monitor discovered that interviewers altered the rating sheets for *all* candidates. The altered scores resulted in the selection of a different candidate than the one who had initially been deemed most qualified. Upon investigation by the City, the offending individual admitted that he and the other interviewer collaborated on their scores and altered the rating sheets. The City ordered that the hiring sequence be repeated. Although that interview sequence will be repeated, the failure by the City to discipline the offending individuals constitutes an inadequate response to the investigation. Thus, the Monitor has continued to investigate this matter.

Similarly, although the City is often willing to repeat interview sequences identified as problematic, it is reluctant to conclude that any substantive *Shakman* violation has occurred based on circumstantial evidence. Thus, without an admission from an employee that he or she explicitly relied upon prohibited political factors in taking an employment action, the City will not conclude that a substantive *Shakman* violation has occurred. This reluctance impedes the City's ability to ensure continuing and increased compliance in the future.

## 3.    CHANGES TO HIRING BY THE IGO, CPL AND DHR

In an effort to assist certain departments with extraordinary and/or unusual hiring needs and in response to requests by the City, including the Inspector General's Office and the Chicago Public Library, the Monitor's office provided direct assistance with screening and hiring and in obtaining Court approval to modify prior Orders in order to expedite hiring.

For example, the Inspector General contacted the Monitor in late 2005 seeking assistance in formulating a specialized hiring process that would both ensure expedited hiring capabilities and maintain independence for his office. Consequently, the Monitor facilitated an agreement between the parties on a new hiring process for the Inspector General's Office (IGO) to meet that office's specific needs. *See* Appendix G. Under that

plan, the IGO can recruit candidates directly, receive applications at their office, screen candidates independently, and conduct Hiring Committee meetings to discuss the candidates' qualifications after the interviewers have evaluated each candidate independently. As a result, the IGO's office has hired approximately thirty (30) new employees since late 2005.

The Monitor is permitted to sit in on all IGO Hiring Committee meetings at which candidates are discussed and reviews all paperwork related to the IGO hires. The Monitor also reviews all completed Hiring Files and retains this documentation. This collaboration has ensured that the IGO has the opportunity to fill its hiring needs in a prompt and efficient manner while protecting the integrity of the *Shakman* decree and its goals.

In late May of 2006, representatives from the Monitor's office were asked to meet with officials of the Chicago Public Libraries ("CPL") to discuss CPL's concerns about the City's process for screening job applicants for certain positions. CPL's primary concerns related to their need to fill numerous existing "Librarian" and "Library Associate" vacancies throughout the City's libraries before the close of the school year and the on-set of the summer reading season. Specifically, CPL officials had concerns that the referral lists generated by the Department of Human Resources (formerly known as the Department of Personnel) for interview purposes would not yield viable candidates for hiring purposes in a timely fashion because: (1) these referral lists have historically been outdated and have included job applicants who were no longer available or interested in the position to which they had applied; and/or (2) in the past, these referral lists have sometimes contained few or no viable candidates because the applications had not been properly screened for specific requirements for different positions.

After discussions with CPL and City officials including representatives from the City's Law Department, the Department of Human Resources, and the Mayor's Office, and with the agreement of the Plaintiffs, the Monitor's office agreed to assist CPL meet its hiring needs expeditiously by screening applicants for various Library Associate and Librarian I through Librarian IV vacancies for a limited period beginning in May of 2006 to the present. As part of this process, the Monitor's office reviewed all current on-line and paper applications and resumes of candidates for these positions and compiled referral lists of candidates for interviews for various vacant positions. To date, the Monitor's Office, with the full cooperation of the Department of Human Resources and CPL, has successfully created referral lists for numerous vacancies in the following vacant positions: Librarian I (Cataloguing), Librarian II (Cataloguing), Librarian III (Branch Manager), Librarian IV (Branch Manager) and Children's Library Associate. As a result, CPL has been able to interview, select and hire well-qualified candidates for numerous vacancies in a timely manner. The Court was advised of the parties' agreement to have the Monitor play this role.

### E.     Additional Activities of Monitor

In addition to the foregoing work, the Monitor and her counsel were actively involved in the attempted resolution of motions and petitions filed in the case. Specifically, at the request of the Court and with agreement of the parties, the Monitor and her counsel engaged in substantive legal and mediation work in attempts to reach agreement between the parties on a number of disputed issues. Finally, the Monitor and her staff have also engaged in other activities, including:

- Requiring that the Department of Human Resources (DHR) conduct all scoring and screening for all *Shakman* covered positions;

- Ensuring that notice of the City's purging of applications submitted prior to January of 2004 was disseminated;

- Auditing of the *Shakman* Exempt position list and eliminating the City's former practice of moving *Shakman* Exempt positions from one department to another in violation of then existing Court orders;

- Auditing of the newly required *Shakman* certifications signed by each individual involved in each stage of hiring for *Shakman* covered positions and requiring the City to obtain the missing certifications where necessary;

- Maintaining a *Shakman* Monitor website for collecting and disseminating information about City employment practices;

- Providing training on *Shakman* principles to all Department Commissioners, personnel liaisons, DHR employees, the Mayor's Office and the City of Chicago Aldermen;

- Establishing a protocol for sharing information with the Inspector General's office regarding information and complaints received by the Monitor's office;

- Brokering agreements between the parties resulting in Agreed Orders presented to the Court.

## III.     ADDITIONAL REFORMS UNDER CONSIDERATION

### A.     *Shakman* Exempt Positions/Senior Management Hires

In her Initial Report to the court, the Monitor stated that she would further examine how the City was implementing its *Shakman* exempt list. She preliminarily concluded in her first Report that there were many titles included in the list which did not seem to meet the standard articulated in *Branti v. Finkel*, 445 U.S 507, 518 (1980) which disallows political affiliation from consideration in employment unless it is an

appropriate requirement for the effective performance of the job positions. Her further review of the list revealed that there were many titles which in one department would be "exempt" from the requirements of the *Shakman* decree, but in another department would be covered. Further, the list had been amended so many times that the City had substantial difficulty producing a list which actually reflected the reality "on the ground" in the departments. Although the City was required to maintain such a list under the decree, the only list which could be generated was, in fact, highly inaccurate. To correct this, the plaintiffs agreed that the City could file an amended list with the Court which accurately set forth those positions filled in the City (or would be filled) which currently were *Shakman* exempt. The City filed such a list with the Court.

One reason that the *Shakman* list has been such a patchwork of titles is that the exemptions had been used by the City to allow managers maximum discretion to pick senior hires. That is, these applicants are not picked for their political affiliation *per se*, or because political affiliation is necessary to accomplish the job duties, but because the managers hiring them wanted discretion to pick whom they believed was best suited for the position without going through the requirements of the Detailed Hiring Plan.

The Monitor and the City, with substantial feedback from the Plaintiffs, began to work toward a plan which would allow managers to exercise discretion in picking the City's senior management team, but would still provide enough safeguards (which then could be audited) to ensure that political factors were not guiding the hire. In that way, the *Shakman* exempt slots would be used for those positions which are truly political, and not simply to avoid the Detailed Hiring Plan.

The Monitor first drafted a proposal for Senior Manager Hires and a revised *Shakman* Exempt list in January 2006 which it presented to the City and Plaintiffs. Both sides offered revisions to these proposals. In March, the City and Plaintiffs, under the Court's supervision, began to negotiate a settlement of the Plaintiffs' claims against the City which would include an agreed *Shakman* exempt list, as well as a list of senior management hires to which a less restrictive hiring process would apply.

**B.    Hire Process for Foremen in Infrastructure Departments**

In addition to the reforms in hiring MTDs, the City has taken the lead in reforming and standardizing the process for hiring MTD foremen. Although this process is still being formalized, the City plans on using a combination of testing (written and oral) and interviews to select appropriate foremen for MTDs. The City has shared its proposed written testing materials with the Monitor and her counsel for comment. In addition, the City, the Monitor and her counsel and the affected unions have met regarding the implementation of the tests and to address fairness concerns. The City intends to roll out its MTD Foremen testing by the end of the year. The MTD Foremen testing is intended to be a pilot for using the same type of testing in other Foremen positions within the Infrastructure departments. The new testing proposed by the City for the Foremen positions, with proper oversight, will result in a significant improvement over the interview process currently in use.

15

## C.    Fire and Police Potential Reforms

The Monitor has received several complaints alleging political discrimination in the Police and Fire departments. In the Fire Department, the complaints have centered on the testing procedures for fire battalion chiefs and other supervisory positions. Complainants allege that the Fire Department has failed to promote certain disfavored candidates on the battalion chief promotion list. The allegations asserted that although the Fire Department needed additional battalion chiefs, it elected to pay overtime to existing chiefs in order to avoid awarding any promotions. In 2005 the City paid $2.9 million in overtime to existing fire battalion chiefs. In the spring of 2005, the Fire Department held a new exam for battalion chiefs which generated a new rank order list for that position. For that test, the oral component of the examination was weighted the same as the written test and seniority/experience for the first time, but the answers given by applicants were not recorded in any way. Complainants allege that the oral examination is deliberately scored higher for favored candidates to ensure a place on the promotion list even though their written test scores are not as high as other candidates. Because the oral test answers for candidates are not preserved, there is no way to test this allegation. Accordingly, the Monitor has recommended to the City that these oral examinations be recorded and preserved in the future.

With respect to the Police Department, almost all of the complaints that the Monitor has received deal with Merit Promotions. In the usual promotion process, sworn police officers seeking promotion up the ranks take a civil service exam (except for promotions to Captain for which the civil service exam has been abolished). Applicants do not receive the results of their exam but do receive their ranking on the promotion list, which is based on their exam score and on their seniority. Generally, promotions are subsequently made in the rank order.

The Merit Promotion system, however, allows 30% of promotions to occur outside the testing process and without regard to an individual's rank order. Thus, applicants at the bottom of the rank order list can jump ahead to the top. The rationale for this process is to reward those officers who do not test well, but nonetheless have proven to be commendable officers in the field. The Merit Promotion selections are made by exempt rank personnel (Commanders, Deputy Superintendents, and Deputy Chiefs). Their picks are reviewed by a Merit Board (comprised of the deputy superintendents) which narrows down the list and forwards it to the Superintendent who makes the final selections for merit promotions.

In response to complaints regarding the Merit System selection process, the Monitor discovered that there are no *Shakman* safeguards to ensure these selections are not politically motivated. Complainants allege that some individuals are promoted not based on ability but due to their relationship with the Superintendent's office, the Mayor or an alderman. One retired Commander reported that he received phone calls from an Alderman requesting that he nominate someone for a Merit Promotion. There is nothing, *per se*, improper about an Alderman recommending an individual for a Merit Promotion. In fact, many Aldermen may know the officers that work in their Wards and may be

making recommendations based on their observations and familiarity with that officer's work.

Notably, the Monitor is not aware of any actual *Shakman* violation with respect to the Merit Promotion system. Rather, she has merely received complaints of such violations. Nonetheless, because of the lack of *Shakman*-type safeguards with respect to the Merit Promotion system, she would recommend that the City review the process and institute such safeguards for future promotions.

### D.    Chicago Public Library Hiring Plan

The Chicago Public Library has proposed a hiring plan to centralize hiring within the Library itself for certain professional titles. The plan calls for more detailed bid forms and job postings, more targeted recruitment efforts, and for CPL's own human resources department to take over the screening of candidates and creation of referral lists for certain positions in order to expedite the hiring process and meet CPL's business needs. The proposed plan is under review and has not been finalized.

### E.    Development of Standardized Procedures

The City has recognized many of the problems which are outlined below in Section IV and has begun to address them with the Monitor's input. One important step in this direction is the development of uniform standards for the use of lack of attendance statistics and discipline data in promotion decisions which, until this development, had been applied differently throughout City departments. Similarly, the City has also developed written guidelines for conducting interviews which will improve the process and make it more uniform and fair throughout the City. Finally, the City has begun to use controlled testing in the infrastructure departments to assess skills required for certain titles.

## IV.    ONGOING COMPLIANCE BARRIERS

### A.    Interview Procedures

Despite the Monitor's oversight of interviews and hiring sequences, certain areas of potential abuse remain in the City's current interview procedures. These areas permit potential manipulation of the interview process for prohibited purposes. The following issues continue to present compliance barriers and should be examined.

### 1.    Interview Bias

The current interview process does little to prevent an interviewer from "assisting" a preferred candidate by steering the applicant to appropriate interview question responses. Additionally, it is not difficult for an interviewer to score a particular applicant very highly to skew the result in the applicant's favor.

## 2.    Use of One Name Referral Lists

On occasion, DHR will have only one qualified applicant or bidder apply for a position. When DHR provides a department with a "one name" referral list, the Monitor attempts to closely review the hiring sequence. In some instances, there are benign explanations for the one name referral list. However, a one name referral list might also be the product of the failure to adequately post the position in order to reduce the number of individuals competing against a favored applicant. Where there is an indication of such impropriety, the hiring sequence is redone.

## 3.    Manipulation of Job Criteria

Qualifying and hiring criteria for a given position are drafted by the departments where the vacancy exists. No mechanism currently prevents departments from manipulating the critieria in order to favor a particular applicant or provides any safeguards on this front. In cases where the qualifying or hiring criteria are suspect, Monitor has required a review of the criteria to help ensure that the criteria are not being improperly sued to eliminate or reduce real competition for the position.

## 4.    Manipulation of Referral Lists

Another practice that can improperly influence the hiring process occurs when a department strikes a candidate from consideration for an interview. Currently, the department has the ability to review the referral list provided by DHR and to strike candidates from consideration, provided a justification is given. The auditors have encountered instances when candidates were stricken from the interview list though they appear qualified for the position based on their applications. In these cases, the justification for striking the applicant has been closely reviewed.

## 5.    Interview Questions

There are virtually no existing safeguards within the City designed to ensure that interview questions are appropriate and reflect the actual criteria for the positions. When departments rely on outdated or immaterial interview questions to evaluate applicants, the interview is ineffective and open to potential manipulation. For example, the City continues to subjectively rate applicants on interview questions that relate to a basic objective job requirements. Sometimes these questions are as basic as "do you live in Chicago?" and "do you have a valid license?" Subjectively rating candidates based on answers to such questions is inefficient and subject to abuse.

## 6.    Discord Between Interview Questions and Rating Criteria

A related problem in the City's current interview procedures is that the hiring criteria used to rate an applicant's interview does not correlate to the information solicited by the interview questions. For example, applicants are often rated on their writing skills, without any method of measurement. Similarly, interviewers often assess

and score hiring criteria such as "previous satisfactory performance in positions involving similar duties within the City" even if the interviewer is unfamiliar with an applicant's prior performance. Consequently, this provides an avenue for manipulating an applicant's interview score.

### B.    Aldermanic Recommendations

Another problematic area in ensuring on-going compliance with *Shakman* involves Aldermanic recommendations for employment actions. A number of the City's Aldermen have raised concerns about their ability to recommend applicants and employees for hire or promotion at the City. During *Shakman* training provided to the Aldermen and in conversations with various Aldermen, the Monitor has consistently informed the Aldermen that recommendations based on personal knowledge of an individual's job-related skills, work experience, or other job-related qualifications are permissible. Recommendations based on political activities, associations and/or views, however, are clearly prohibited from being considered for *Shakman* covered positions.

In order to eliminate even the appearance of impropriety, the Monitor has suggested (although not required) that Aldermen submit job recommendations in writing. Despite all of this, however, certain Aldermen continue to make job recommendations that are not in writing and/or that do not appear to be based on relevant job-related factors. For example, in one case, an Alderman recommended an employee for transfer based on the employee's purported "excellent work record" even though that employee had just received a disciplinary suspension. Another Alderman simply instructed the Department of Streets and Sanitation to promote a recently hired Motor Truck Driver from "seasonal" to "permanent" (a highly coveted promotion) without any justification at all. In another instance, an Alderman requested the rehire of a recently laid off employee based on the employee's status as a "good employee" despite the fact that the employee had received two separate disciplinary suspensions within the prior six months. Thus, despite *Shakman* compliance by the vast majority of Aldermen in the practice of recommending hires and promotions, there must be a system in place to audit Aldermanic recommendations which may improperly interfere with a hiring sequence.

### C.    City's Compliance with Agreements

A recurring difficulty in monitoring City hiring arises from a lack of cohesiveness in the City. Thus, although the Monitor may reach agreements with the Mayor's Office, DHR and the Law Department, those agreements are not always adhered to by all departments within the City. For example, despite repeated directives from the Mayor's Office to each department that notice of any interviews must be given to the Monitor at least 48 hours in advance, some departments still fail to comply with this agreement. Similarly, despite the City's agreement that all interviews will be conducted by more than one individual and that all rating sheets will be individually and contemporaneously completed, some departments continue to conduct interviews with one only interviewer and/or fail to contemporaneously complete the rating sheets. In fact, on a few occasions, despite explicit instructions from the Mayor's Office, DHR and/or the Law Department,

interviewers have altered scores for particular candidates after the Monitor collected the original rating sheets.

The City also failed to honor an agreement reached between members of the Mayor's Office, the Law Department and the Monitor. As described above, after numerous concerns were raised regarding the Water Department's interviews for career service Motor Truck Drivers in April of 2006, the Monitor requested and the City agreed to eliminate interviews from the hiring process for MTDs and rely instead, upon testing and other objective factors. That agreement was explicitly intended to apply to those Water Department MTD hires in April of 2006. After these MTDs were hired and notified of the hire, it was discovered that the City had, despite the agreement with the Monitor, relied upon the suspect interview scores in making the MTD hires. As a result, those hires had to be rescinded causing significant disruption to the workers who believed they were selected for the MTD positions.

There have also been breaches of agreements that have been formalized in different Court Orders. For example, despite the Order that all applications and lists from before 2004 be purged, the City failed to purge the Laborer's list discussed above. As a result, there was a delay in hiring and need to modify the Court's order. This also resulted in a substantial amount of additional work on the part of the Monitor's office. Similarly, as discussed in the Monitor's Status Report of March 23, 2006, the City also initially failed to comply with the requirement that *Shakman* Certifications be signed *prior* to the hiring of any individual. As a result, the Monitor's office and the City were required expend hundreds of hours reviewing *Shakman* Certifications to identify and obtain missing or incomplete certifications. Thus, the Monitor's role has included not simply making recommendations and reaching agreements with the City on reforms in hiring, but has also required auditing compliance with even these agreements.

## V.     RECOMMENDATIONS

- **ESTABLISHMENT OF AN EFFECTIVE ANTI-PATRONAGE POLICY**
- **ON-GOING OVERSIGHT OF HIRING PROCESS**
- **IMPROVEMENTS IN JOB APPLICATION PROCESS**
- **COMPREHENSIVE *SHAKMAN* TRAINING FOR PERSONNEL EMPLOYEES**
- **INCREASED ACCOUNTABILITY FOR PERSONNEL EMPLOYEES**
- **COMPREHENSIVE AUDIT OF HIRING CRITERIA AND JOB POSITIONS**
- **IMPROVEMENTS IN INTERVIEW PROCESS**
- **INCREASED ACCOUNTABILITY FOR NON-COMPLIANCE**
- **PERFORMANCE MANAGEMENT FOR DHR**
- **REGULAR TRAINING FOR ALL EMPLOYEES ON *SHAKMAN* PRINCIPLES**
- **ELIMINATION OF INTERVIEWS FOR "WILLING AND ABLE" POSITIONS**
- **IMPROVEMENTS IN DHR'S SCREENING**

Respectfully submitted this 4th day of December, 2006

___/s/ Noelle C. Brennan_____
Noelle C. Brennan
Monitor
Brennan & Monte Ltd.
20 S. Clark St.
Suite 1530
Chicago, IL 60603
(312) 422-0001

__/s/ Ines M. Monte_____
Ines M. Monte
Counsel to the Monitor
Brennan & Monte Ltd.
20 S. Clark St.
Suite 1530
Chicago, IL 60603
(312) 422-0001

__/s/ Susan E. Cox_____
Susan E. Cox
Counsel to the Monitor
The Law Offices of Susan E. Cox, Ltd.
53 W. Jackson Blvd.
Suite 1220
Chicago, IL 60604
(312) 663-3764

**U. S. Department of Justice**



*United States Attorney*
*Northern District of Illinois*
*Federal Building*

Patrick J. Fitzgerald
United States Attorney

*219 South Dearborn Street, Fifth Floor*
*Chicago, Illinois  60604*
*(312) 353-5300*

FOR IMMEDIATE RELEASE
MONDAY JULY 18, 2005

PRESS CONTACT:
AUSA/PIO Randall Samborn   (312)353-5318

### U.S. CHARGES TWO CITY OF CHICAGO OFFICIALS
### WITH FRAUDULENTLY RIGGING HIRING AND PROMOTIONS

CHICAGO – Two City of Chicago officials are facing federal fraud charges for allegedly engaging in widespread corrupt hiring and promotion practices that involved the rigging of jobs by conducting sham employment interviews, falsifying interview scores, and violating federal court orders, state laws and city codes, federal authorities announced today.  **Robert A. Sorich**, a top official in the Mayor's Office of Intergovernmental Affairs (IGA), and **Patrick R. Slattery**, an official in the city's Department of Streets and Sanitation, were taken into custody this morning.  The defendants allegedly rigged hiring and promotions in city departments, and were each charged with mail fraud in separate criminal complaints that were obtained yesterday and unsealed today.  The charges are an outgrowth of the ongoing federal investigation of alleged corruption in the city's Hired Truck Program and represent a new arena of alleged corruption involving city personnel practices for more than a decade.

Sorich, 42, and Slattery, also 42, both of Chicago, were released on their own recognizance after appearing before U.S. Magistrate Judge Jeffrey Cole.  Sorich has a preliminary hearing scheduled for 2 p.m. on July 27 and Slattery has a preliminary hearing set for 2 p.m. on July 26.

Sorich allegedly directed a system in which Slattery and other co-schemers routinely manipulated the interview and selection process for certain city jobs, including skilled and unskilled positions, by conducting sham interviews, falsely inflating interview scores, and otherwise guaranteeing that certain pre-selected candidates who were favored by high-ranking city officials – whether because of their connection to particular political organizations, unions, or other influence – would win employment, often to the exclusion of equally or more qualified candidates. The charges against Sorich rely upon evidence gathered from more than 30 current and former city officials in various departments who are cooperating in the investigation, including five former commissioners, four former and two current personnel directors and many other high-ranking and supervisory officials.

According to one former personnel director, IGA officials were more influential than department commissioners in the city's hiring and promotion process. In many instances, cooperating witnesses described regular meetings with Sorich and other IGA officials in which they would be given lists of pre-selected applicants for whom IGA wanted to obtain available non-policymaking positions in various departments, and, at times, were told to conceal IGA's role.

Sorich is identified as an IGA official who exercised authority over certain employment decisions at the city for at least the last 12 years through early 2005. Slattery is identified as having been a full-time city employee since 1988. After working for about 12 years as an electrical mechanic, Slattery was chosen in early 2000 to become the Director of Staff Services in Streets & Sanitation, in which capacity he supervised the interview process for positions that were both covered by and exempt from federal court hiring orders. In approximately mid-2004, Slattery briefly

2

functioned as acting Assistant Commissioner, and then again served as Director of Staff Services from July 2004 to about June 2005.

Under two federal court orders in 1972 and 1983 – known collectively as the *Shakman* decree – the city is prohibited from basing hiring and promotion decisions on political considerations for roughly 37,000 non-policymaking jobs, which are referred to as *Shakman*-covered positions. Employment decisions for approximately 1,000 of the city's remaining positions, which are managerial or policy-making, are exempt from the *Shakman* decree.

According to the complaint affidavits, the investigation has revealed that IGA routinely and consistently influenced hiring and promotions for *Shakman*-covered positions, and used its authority over individual departmental personnel officers to maintain a hiring process for those positions that was not based on merit or non-political factors, but was instead manipulated with artificial scores and false certifications to ensure jobs for applicants who worked on behalf of, or were associated with, groups affiliated with campaign organizations, aldermen, and union officials.  Sorich and others pre-selected applicants to receive jobs or promotions.  After receiving instructions from Sorich and others identifying those applicants who should win (instructions that both defendants sought to conceal), their co-schemers, including Slattery and others, manipulated and falsified the ostensibly merit-based ratings given to prospective employees in order to favor IGA's selections.

Both affidavits rely upon information from the various cooperating witnesses who have described the city's hiring and promotion practices, particularly as to *Shakman*-covered positions. The cooperators include former commissioners of city departments who participated in political activity, approved the results of interviews, and/or consulted with IGA concerning *Shakman*-covered positions; current or former high-ranking department employees who coordinated organizations of

3

city employees in campaign work and/or implemented scoring decisions on job or promotion candidates; former and current department personnel directors who received instructions from IGA concerning hiring and promotion decisions and implemented IGA's decisions through their supervision of the interview and rating process; current or former supervisory employees in departments who conducted interviews and/or scored applicants based on instructions to favor campaign workers; and other current or former city employees who joined political organizations and obtained jobs or promotions in exchange for their work on behalf of political campaigns.

"Every resident of Chicago has the right to compete fairly for a job if he or she is qualified, without regard to political affiliation or whether they do campaign work. Every applicant who sits for an interview is entitled to an honest evaluation. And the residents of Chicago are entitled to the best qualified laborers, plumbers, foremen and inspectors. And when a federal court order requires that people be hired or promoted without regard to political affiliation, the court order must be followed. Yet, for a decade, certifications by city officials that the law has been complied with have often been fraudulent. Qualified persons sat for interviews for jobs that had already been doled out as a reward for political work," said Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois.

"The defendants are charged with a pervasive fraud scheme that included fixing applicant interviews and ratings, guaranteeing that preferred job candidates would be chosen over other equally or better-suited individuals and then falsifying personnel documents to conceal their wrongdoing," Mr. Fitzgerald said. "The diversion of public resources to benefit political organizations, by using fraudulently-obtained jobs and promotions as currency to compensate political workers, cheats the City and its employees, and improperly advantages those political organizations with influential government sponsors," he added.

Mr. Fitzgerald announced the charges with Robert D. Grant, Special Agent-in-Charge of the Chicago Office of the Federal Bureau of Investigation; Kenneth T. Laag, Inspector-in-Charge of the U.S. Postal Inspection Service in Chicago; James Vanderberg, Special Agent-in-Charge of the U.S. Department of Labor, Office of Inspector General in Chicago; and Byram Tichenor, Special Agent-in-Charge of the Internal Revenue Service Criminal Investigation Division in Chicago. The investigation is continuing, they said.

Among the details contained in the charges are that:

‣ the winners of competitions for jobs and promotions were routinely determined by IGA before interviews had been conducted and applicants had been evaluated on the merits;

‣ an official in another city department said he received a list of names referred to as "the blessed list," which he understood to be people that the Mayor's Office wanted hired for the position;

‣ on April 29, during a search of Individual B's office at City Hall, agents seized a color-coded document reflecting the winners' names at the end of a hiring sequence, as well as the political organization or union sponsor associated with the particular winners;

‣ when a city department official complained to Sorich that a particular pre-selected candidate was "a drunk," Sorich replied, "Do the best you can with him;" and

‣ another official in that same department complained that some of the winning candidates were "goofballs" who should not have been awarded positions.

In one alleged example of fraud, agents recovered a hand-written list of five names corresponding to the pre-selected winners for an equipment dispatcher position in Department 3 during the summer of 2004. One of the people on the list, Individual J, a political worker in CW-14's organization, died before the interviews were conducted.

Another instance of alleged fraud involved the awarding of a coveted career service truck driving job to a seasonal driver after the applicant, CW-19, worked on a gubernatorial and U.S. Congressional campaign as part of CW-14's political organization. CW-19 was on active military

duty in Iraq in 2003 and 2004, and submitted his application after returning, approximately a month or so after the bidding period for the job had closed.  Agents recovered an allegedly falsified rating form indicating that CW-19 was interviewed on March 27, 2004, and received the highest possible 5.0 rating, when, in fact, he was still in Iraq, according to the complaints.

As part of the fraud scheme, cooperating witnesses described the process by which coordinators of political organizations, composed mostly of city employees, sought and in many instances obtained jobs or promotions – sometimes referred to as "getting made" – as a result of campaign work performed by their organization.  Cooperating political coordinators, such as CW-1, CW-7, CW-10, CW-14 and CW-21, typically had several meetings a year, usually with Sorich at IGA offices in City Hall, to recommend politically active city employees for *Shakman*-covered positions.  According to one coordinator, CW-7, Sorich and Individual N fostered the competition for city jobs for political workers in order to encourage the political coordinators to work campaigns, the complaints allege.

While discussing the lists of personnel requests CW-14 submitted in 2003, Sorich told CW-14, "We shouldn't be meeting in City Hall to discuss stuff like this, if anything we should meet outside," according to the affidavits.

CW-14 also told investigators that Sorich told CW-14 in 1999 to form a political group, saying the "Mayor's organization" needed a group of white political workers to complement existing groups of African-American and Hispanic city workers within a particular department.  Various cooperating political coordinators said they typically received instructions from Sorich or others at IGA, including Individual N, to engage in political activity, including working on various city, state and federal campaigns.

The government is being represented by Assistant U.S. Attorneys Manish Shah, Julie Ruder, Barry Miller, Patrick McGovern and Patrick Collins.

If convicted, mail fraud carries a maximum penalty of 20 years in prison and a $250,000 fine.  The Court, however, would determine the appropriate sentence to be imposed.

The public is reminded that a complaint contains only charges and is not evidence of guilt. The defendants are presumed innocent and are entitled to a fair trial at which the government has the burden of proving guilt beyond a reasonable doubt.

# # # #

VOLUME:  I

PAGES:  1 - 61

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil No. 05-10528RCL

DENISE M. BARRY; JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA J.
MCDONOUGH; ELAINE MESITI; LILA
BROWN; MARY M. KANE; AND JUDITH
A. KELLEY, INDIVIDUALLY AND ON
BEHALF OF ALL THOSE SIMILARLY
SITUATED,

ORIGINAL

   Plaintiffs,

vs.

ROBERT J. MORAN; RONALD KEATING;
PAUL A. CHRISTIAN; RODERICK FRASER,
JR.; WILLIAM KESSLER; WILLIAM
HITCHCOCK; CITY OF BOSTON (FIRE
DEPARTMENT), AND JOHN AND/OR JANE
DOES 1-50,
   Defendants.

        DEPOSITION OF PETER LAIZZA, a
witness called on behalf of the Plaintiffs,
pursuant to the provisions of the Massachusetts Rules
of Civil Procedure, before Laura Naylor, Registered
Professional Reporter and Notary Public, in and for
the Commonwealth of Massachusetts, at City of Boston
Law Department, One City Hall Plaza, Room 615,
Boston, Massachusetts, on Thursday, May 31, 2007,
commencing at 10:00 a.m.

APPEARANCES:

    THOMAS F. FEENEY, ESQ.

    39 Sheafe Street, Suite One

    Chestnut Hill, MA  02467

       Attorney for the Plaintiffs


    CITY OF BOSTON LAW DEPARTMENT

    City Hall, Room 615

    Boston, MA 02201

    BY:  Karen A. Glasgow, Esq.

       Scott C. Holmes, Esq.

       Attorney for the Defendants.

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

Peter Laizza

By Mr. Feeney        4

```
 1                    P R O C E E D I N G S
 2    Thereupon,
 3                      PETER LIAZZA,
 4    having been first duly sworn or affirmed was examined
 5    and testified as follows:
 6                    DIRECT EXAMINATION
 7    BY MR. FEENEY:
 8    Q.   Mr. Laizza, my name is Thomas Feeney.  I am the
 9         attorney for the plaintiff in this lawsuit.  I
10         am going to ask you to say certain things just
11         for the record.  While everyone here may know
12         who you are, this is going on a transcript.  So
13         can you please state your full name for the
14         record.
15    A.   Peter A. Laizza.
16    Q.   How do you spell your last name?
17    A.   L-a-i-z-z-a.
18    Q.   I apologize for putting one Z in there.  Have
19         you ever had your deposition taken before?
20    A.   Twice.
21    Q.   So your attorney has gone through some of the
22         standard procedures for that?
23    A.   I don't remember.
24    Q.   I will just run through them for you.  And these
```

1    are just basic things.  Since we have a court

2    reporter taking down a transcript we need yes

3    and no as opposed to nodding your head and

4    things like that.  If I catch it, I will remind

5    you.

6         MS. GLASGOW:  Just one thing.

7         MR. FEENEY:  Sure.

8         MS. GLASGOW:  Chief Laizza has informed

9    me he has to be out of here at 11:45.

10        THE WITNESS:  About quarter to 12:00.

11        MR. FEENEY:  Okay.  If we need to

12   continue we can.  So about 11:45?

13        MS. GLASGOW:  Yes.

14        MR. FEENEY:  I will do my best to get

15   through.  I will do what I can.  We can

16   reschedule.  Thank you for that.

17   BY MR. FEENEY:

18   Q.   Also in a deposition you are under oath.  And so

19        this is testimony that could be presented at

20        trial under certain circumstances.

21             Also, wait until I finish my question

22        before you answer.  Your attorney may have an

23        objection to my question.  You can answer after

24        an objection.  It is always good to pause and

```
 1        wait for any objections.  But also I will wait

 2        until you are done speaking so that the court

 3        reporter can get everything down.

 4   A.   Okay.

 5   Q.   Let's start.  If you want to take a break at any

 6        time, just let us know.  We will stop.

 7                   Where do you live, sir?

 8   A.   Norfolk, Massachusetts.

 9   Q.   What is your address?

10   A.   29 Lake Street.

11   Q.   For how long have you lived there?

12   A.   12, 13 years.

13   Q.   Are you married?

14   A.   No.

15   Q.   Do you have any children?

16   A.   No.

17   Q.   What is your knowledge as to your role in this

18        litigation today?

19             MS. GLASGOW:  Objection.

20   BY MR. FEENEY:

21   Q.   But you can answer.

22   A.   I don't know.

23   Q.   Do you know that you are here as a witness only?

24   A.   Yes.
```

1  Q.    And that you are not a party in this litigation?

2        You are not being sued?

3  A.    Apparently.

4  Q.    Okay.  Have you read the complaint?

5  A.    I read something the other day, yes.

6  Q.    Just to refresh your recollection, is this

7        something that you were presented with?  And I

8        am showing the witness what is entitled The

9        Third Amended Complaint for Injunctive Relief of

10       Damages?

11 A.    I believe so.

12 Q.    And what else did you do to prepare for today's

13       deposition?

14 A.    Nothing.

15 Q.    You had mentioned that you spoke to -- you had a

16       meeting a few days ago to prepare for this

17       deposition?

18 A.    I was just called in Tuesday with Karen.

19 Q.    And for how long did you speak with them?

20 A.    An hour.

21 Q.    And who was present during that meeting?

22 A.    Just myself and Karen.

23 Q.    In that meeting did they ask you what you intend

24       to say during this deposition?

1     MS. GLASGOW:  Objection.

2     THE WITNESS:  No.

3  BY MR. FEENEY:

4  Q.    Did they give you any advice as to what to say?

5  A.    No.

6  Q.    If I can just ask you some background questions

7        for the record.  What is your educational

8        background?  Where did you go to school?

9  A.    Boston Latin School for high school in the city

10       of Boston.

11 Q.    What year did you graduate?

12 A.    1973.  And I have an associate's from Bunker

13       Hill Community College and a bachelor's from

14       Salem State.

15 Q.    When did you graduate with those?

16 A.    Bunker Hill was probably '90, and maybe '95 for

17       Salem State.

18 Q.    What year did you start working for the Boston

19       Fire Department?

20 A.    1979.

21 Q.    So those two degrees that you had mentioned,

22       Bunker Hill associate's and the Salem

23       bachelor's, were those funded by the Boston Fire

24       Department in any way?

1   A.   No.

2   Q.   So you paid for those?

3   A.   Yes.

4   Q.   And when you first started, again, what was the

5        job you had immediately preceding your job here

6        at the Boston Fire Department?

7   A.   I worked as a corrections officer for the state

8        of Massachusetts.

9   Q.   For how long?

10  A.   2-1/2 years.

11  Q.   Where were you posted during that time?

12  A.   NCI Norfolk, Norfolk, Mass.

13  Q.   And when you first got your position with the

14       Boston Fire Department, what was your -- can you

15       run down for me your history with the Boston

16       Fire Department?

17  A.   Okay.  I came on September '79.  And I was

18       assigned to ladder 16.  That's in Roslandale.

19       And I was promoted to lieutenant in 1988.  And I

20       took an assignment at ladder 9 in Charlestown.

21              In 1991, January, I was promoted to

22       captain.  And I was assigned to engine 28 in

23       Jamaica Plain.  And in 1994, November, I was

24       assigned, I was promoted to district fire chief.

1       And I worked about 8 months at headquarters as

2   the emergency management director.

3           And then I took an assignment at

4   district 10 in West Roxbury.  And I was

5   subsequently promoted in August 1997 to deputy

6   fire chief.  And I worked as the head of

7   personnel from August '97 until October 2001.

8           And then I was activated in the air

9   force for a year after 911.  And when I got out

10  in November of '02 I was assigned as a fire

11  marshal at 1010 Mass Avenue.

12  Q.  When were you assigned as fire marshal?

13  A.  November '02.  And I was there through about

14  January, first week of January '07.  And I have

15  been at Fleet Facilities at 900 Mass Avenue

16  currently.

17  Q.  What were your job responsibilities going back

18      to the time when you became the district fire

19      chief?  What were your job responsibilities?

20  A.  Emergency management.  You have to recall this

21      was before 911.  But we would out reach with

22      various agencies at the federal, state, and city

23      levels on preparing for any kind of disaster in

24      having drills, multi-agency drills, on an annual

1    basis as well as the Hancock might call and say

2    they want to have a drill if a bomb goes off or

3    what have you.  Basically prepared for the big

4    events.

5  Q.  Prepared for the worst?

6  A.  Yes.

7  Q.  Did you have a staff that you worked with?

8  A.  Yes.

9  Q.  Was that a civilian staff or a firefighter

10    staff?

11  A.  Mostly uniform.  I believe we had one female.  I

12    forgot her title.  Her name was Stephanie Long.

13    I don't recall what her title was.

14  Q.  And Stephanie Long reported directly to you?

15  A.  Excuse me?

16  Q.  Stephanie Long reported directly to you?

17  A.  Yes.

18  Q.  And then you said in 1997 you were promoted to

19    deputy fire chief?

20  A.  Yes.

21  Q.  And then in August of '97 you were appointed to

22    be head of personnel?

23  A.  Correct.

24  Q.  What were your job responsibilities?

1    A.    Personnel you were in charge of administering

2          the contract.  You had all the hiring.  Working

3          in conjunction with civil service.  Hiring fire

4          fighters, uniform.

5    Q.    When you say, the contract, you mean the union

6          contract?

7    A.    Yes, the union for the local 17.  All

8          disciplinary, sick leave, the doctor's office

9          was under us.  And then we had a headquarter's

10         pool of lieutenants, newly promoted lieutenants

11         and captains acting and filling in various

12         locations.

13   Q.    As head of personnel were you also in charge of

14         any of the civilian employees?

15   A.    No.

16   Q.    Do you ever act in a capacity that you were

17         responsible for supervising the civilian

18         employees?

19   A.    No.

20   Q.    During the time when you were head of personnel,

21         were you responsible for conducting the

22         interviews for the open positions?

23   A.    Uniform only.

24   Q.    And if you could describe for me that procedure

1    if a position becomes open?

2  A.   For the uniform?

3  Q.   Right.

4  A.   Well, initially we work with a certified civil

5       service list.  So they would had to have taken

6       the test.  The test is scored by civil service.

7       They would send us the list.

8            So we would send a notice that we want

9       to hire 50.  And they would send us a list of

10      the first 100.  And we would send notices out

11      where they come and sign the book indicating

12      that they were interested.  They haven't moved

13      out of state or had another job.

14           Then they would be drug tested.  They

15      go through a physical.  Send them over to

16      undergo a physical.  They would have a strength

17      test, a strength and agility test administered

18      by the state.

19           And whichever 50 were left -- and we

20      would have to consider a minority candidate for

21      every non-minority candidate.  And we would come

22      up with the list who makes it.

23           We would send the list to civil

24      service stating why we are hiring them.  Then

1       civil service if there was any discrepancy.    And

2       let us know it was okay.    And let the

3       commissioner know that the 50 are ready to hire.

4           (Thereupon, a break was had.)

5    BY MR. FEENEY:

6    Q.   As head of personnel, where is your office

7         located?

8    A.   115 South Hampton.

9    Q.   Did you have staff there?

10   A.   Yes.

11   Q.   Who was in your staff?

12   A.   I had acting Chief Albert Giannetti,

13        G-i-a-n-n-e-t-t-i.

14   Q.   Thank you.

15   A.   A Lieutenant Bruce Howell.    Firefighter Henry

16        Baston, B-a-s-t-o-n.    Administrative assistant

17        Cathleen Frechette, F-r-e-c-h-e-t-t-e.    And as

18        time progressed there was a little turn over in

19        personnel.    I don't know if you want me to name

20        who --

21   Q.   Sure.

22   A.   Al Giannetti left the job, retired.    And they

23        had a District Chief Joseph Holland.    And we had

24        a Lieutenant Leo Stapleton, Jr. who replaced

1    Lieutenant Howell who left.  And then we had a

2    Lieutenant James Foley in there as well.  The

3    other two stayed.

4  Q.  And was Cathy Frechette ever replaced?

5  A.  No, I believe she is still there to this day.

6  Q.  Was Cathy Frechette on the job when you were

7    appointed or was she hired while you were there?

8  A.  No.  She was in personnel when I became in

9    charge of personnel.  I don't know when she was

10    hired.  Did you mean when I got hired on the

11    fire department or in personnel?

12  Q.  When you got hired in personnel?

13  A.  She proceeded me there.

14  Q.  So when your staff -- when the firefighter staff

15    you had, the acting chief, a lieutenant, and the

16    firefighter, when they were replaced, what was

17    the process by which the replacements got those

18    positions?

19  A.  Well, the firefighter is still there.

20  Q.  Okay.

21  A.  Henry Baston is still there.  He has never been

22    replaced.  The former commissioner Kristin asked

23    Chief Holland, who was the captain at the time,

24    but asked if he would take the position.  It was

```
 1          always difficult to get someone to work in

 2          headquarters.

 3   Q.    Or to get fire fighters to work in headquarters?

 4   A.    Correct.

 5   Q.    Because they signed on to be fire fighters?

 6   A.    That is one of the reasons, yes.

 7   Q.    For the position that Lieutenant Holland had

 8          filled --

 9   A.    Howell, you mean?

10   Q.    Holland.  He was one of the newer hires or the

11          original ones?

12   A.    I am confused.  Are you saying Holland or

13          Howell?

14   Q.    Holland.

15   A.    He was the chief.

16   Q.    I'm sorry.  So the first chief was whom again?

17   A.    Acting Chief Albert Giannetti.

18   Q.    He was replaced by whom?

19   A.    Chief Holland, Joseph Holland.

20   Q.    And the lieutenant, the first lieutenant was

21          whom?

22   A.    Bruce Howell.

23   Q.    And he was replaced by whom?

24   A.    Leo Stapleton.  Lieutenant Leo Stapleton.  And
```

1   they also brought in Lieutenant James Foley.

2 Q. After Stapleton?

3 A. Shortly after, correct.

4 Q. So let's just focus on Lieutenant Stapleton and

5   Foley's appointment to the position.  How was

6   that position filled?

7 A. The commissioner asked them and they were put in

8   there.

9 Q. Were the jobs ever posted?

10 A. I don't recall.  I don't recall.

11 Q. But you recall the commissioner basically saying

12   here?

13 A. Yes.

14 Q. Are you aware -- so after -- you were head of

15   personnel until October of 2001?

16 A. Yes.

17 Q. And then you went back into the air force?

18 A. Yes.  I was activated for one year.

19 Q. When you came back, what position --

20 A. Fire marshal and fire prevention.

21 Q. And what were your responsibilities there?

22 A. Well, fire prevention you have a myriad of

23   duties from all buildings that are built in the

24   city have to be code, compliant to codes.  And

```
 1          then you have enforcement and inspection, smoke

 2          detector inspections, gas propane tanks,

 3          different permitting for different things.  The

 4          night club inspectors would go around and check

 5          capacities at night clubs.

 6    Q.    How many people were you supervising as fire

 7          marshal, roughly?

 8    A.    60, 65.

 9    Q.    And they were based on what location?

10    A.    1010 Mass Avenue.

11    Q.    And how many of those people that you were

12          supervising were civilian personnel?

13    A.    15 to 20, I would believe.

14    Q.    And while you were fire marshal -- and you were

15          fire marshal from when to when?

16    A.    November 2002 to January, early January of '07.

17    Q.    And during that time period was there any turn

18          over in the civilian personnel under you?

19    A.    Yes, there was some.

20    Q.    If you could describe for me how the process

21          worked whereby these civilian positions were

22          filled?

23    A.    Well, we had one woman was fired.  She was in

24          the management attending policy they have with
```

```
 1        people with sick leave.  And she was disciplined
 2        and eventually let go.
 3   Q.   Who is that?
 4   A.   Maria Lopez, I believe it was.  Maria Lopez.
 5   Q.   Okay.  How was her position filled?
 6   A.   They interviewed from within.
 7   Q.   Okay.
 8   A.   And hired.
 9   Q.   Was the job posted first?
10   A.   I believe that they post them all the time.
11        However, I don't -- I don't deal with that.  I
12        would have the -- there was a civilian female up
13        there that was in charge of the civilians.  I
14        wouldn't get into the nuts and bolts with her.
15   Q.   Who was that?
16   A.   Mary Ann McHugo.
17   Q.   When was she hired?
18   A.   I don't recall the dates.  She proceeded me.
19        She was at 1010 when I got there, so I don't
20        know when she was hired.
21   Q.   So it was Mary Ann McHugo who supervised the
22        process of filling the civilian positions as
23        they became open?
24   A.   Well, as far as that would go.  I wouldn't
```

1    really -- the only time she would discuss the

2    civilians with me is if there might have been a

3    problem.  I would usually say to her take it up

4    your chain of command.

5              My concern would be if there was no

6    one there for the job it had to be done.  I

7    would try to rearrange to get someone there.

8    Q.  So when you say, take it up the chain of

9        command, what was the chain of command?

10   A.  From her it would go to Robert Moran in

11       headquarters who was hired whenever he was hired

12       because he was in charge of the civilians.

13   Q.  So Robert Moran was head of personnel for the

14       civilians --

15   A.  Correct.

16   Q.  -- in the same manner you were head of personnel

17       for the fire fighters?

18   A.  Correct.

19   Q.  What was the, if there is, is there a grade

20       level for head of personnel?

21   A.  Excuse me?

22   Q.  Is there a grade level for head of personnel?

23   A.  Deputy fire chief.

24   Q.  So there is no --

```
 1   A.   That is just a civilian -- I'm sorry.  Were you

 2        talking Moran or when I was there?

 3   Q.   You.

 4   A.   Yes.

 5   Q.   So in '97 you became deputy fire chief and you

 6        are deputy fire chief now?

 7   A.   Correct.

 8   Q.   Did the fire marshal have more or less

 9        responsibility than the head of personnel, in

10        your opinion?

11   A.   Different.  I wouldn't say -- having done both

12        different, but not more or less.

13   Q.   When you came back, how was it determined which

14        position you would be put into?

15             MS. GLASGOW:  Objection.

16             THE WITNESS:  Commissioner Kristin

17        came to my mother's wake.

18   BY MR. FEENEY:

19   Q.   Excuse me?

20   A.   Commissioner Kristin came to my mother's wake

21        and told me I am the new fire marshal.

22   Q.   Sorry.  To hear about your mother.

23   A.   Yes.

24   Q.   Have you ever, aside from the positions that you
```

1     spoke about this morning, have you ever been

2     acting in a different position?

3   A.   Yes.

4   Q.   And please name those for me.

5   A.   You wouldn't have enough paper on all of those.

6     By acting --

7   Q.   Let's do it chronologically backwards.

8   A.   We couldn't do it.

9   Q.   What was the last time --

10   A.   It would be 52 times a year for about ten years.

11   Q.   Okay.

12   A.   I couldn't even begin to tell you.

13   Q.   I will try to structure it so we can do it a

14     little bit at a time.

15   A.   It would be impossible.  Outside of what I am

16     telling you, when you initially get promoted you

17     might be acting for a year before you have a

18     birth.  And a birth means a permanent

19     assignment.

20         So every week they would say, go to

21     this group for one week.  Go to that group.  I

22     couldn't ever tell you.  It is just too many.

23     It would be every engine and ladder company in

24     the city at one time or the other.

```
 1    Q.   Okay.  What I am going to focus on, and I will
 2         narrow it down.  We are talking about either at
 3         1010 Mass Avenue or 115 South Hampton?
 4    A.   Never.  Never any jobs other than the ones I
 5         just gave you.
 6    Q.   So basically while you were either head of
 7         personnel or while you were fire marshal, you
 8         were never placed into an acting position other
 9         than those --
10    A.   No.  I had 8 months at EMD, that was at
11         headquarters.  Emergency management.  That was 8
12         months.  I was the acting directing.
13    Q.   But it's your testimony this morning that while
14         you were head of personnel and while you have
15         been fire marshal you were never placed into a
16         position where you were acting as something
17         other than fire marshal or head of personnel?
18    A.   No.
19    Q.   And so you have, aside from the one year Air
20         Force duty, you have been either in 115 South
21         Hampton and 1010 Mass Avenue since 1994 when you
22         were the EMD?
23    A.   No.  1997 August until today I have been there
24         straight out.  But I voluntarily went in for
```

1      about 8 months in '96.  But then I left and went

2      in the field in the fall of '96 until I was

3      promoted in '97.

4  Q.  Thank you for that clarification.  So

5      essentially since August of '97 you have been at

6      the offices?

7  A.  Right.

8  Q.  Where did they post the jobs for the civilians?

9  A.  I don't know all the places.  I know I have seen

10     them on the second floor on the bulletin board

11     second floor lobby.  I don't know if there are

12     any other places.

13  Q.  But there are places where they do post?

14  A.  Yes.  I just never read them because they don't

15     concern me.  I know they post them.

16  Q.  Have you ever been involved in any interview

17     process for civilian positions?

18  A.  Yes.

19  Q.  And please name those.

20  A.  They would all be at 1010 Mass Avenue.  And they

21     were for -- I don't know what job titles, but

22     Lila Brown was interviewed.

23  Q.  And you were on that panel?

24  A.  Yes.  I interviewed with Mary Ann McHugo.  She

| | |
|---|---|
| 1 | was the one that was the lead interviewer.  And |
| 2 | I would throw in a basic question.  There was |
| 3 | Judy Kelley that was interviewed. |
| 4 | Q.  For what job? |
| 5 | A.  Well, what would happen they would almost leap |
| 6 | frog.  Somebody would get bumped up.  And then |
| 7 | the other candidates would all apply for that |
| 8 | position. |
| 9 | And we had I think it was almost with |
| 10 | one or two exceptions there were mostly -- we |
| 11 | had a few people from outside, whether at City |
| 12 | Hall or what. |
| 13 | They would come and interview.  I |
| 14 | don't recall who they were, but it was mostly |
| 15 | people that are still there today. |
| 16 | Q.  So you mentioned Laura Brown.  You mentioned an |
| 17 | interview where Judy Kelley was an applicant? |
| 18 | A.  There was Carol Conners.  We interviewed for |
| 19 | engineers, an engineer's position. |
| 20 | Q.  Is that a civilian position? |
| 21 | A.  Yes.  Fire protection engineer. |
| 22 | Q.  So you mentioned Lila Brown, Judy Kelley, Carol |
| 23 | Connors.  Who else? |
| 24 | A.  I can't recall if there is anyone else up there |

```
1        now.

2    Q.  I am not concerned who is up there now, but just

3        generally?

4    A.  I don't know.  If there was somebody who was not

5        up there and they just came in for an interview

6        at City Hall I am sure they are going to totally

7        slip my mind because a half hour into the

8        interview you never seen them again.

9    Q.  Approximately how many of those interviews for

10       civilians did you participate in?

11   A.  Maybe half a dozen.

12   Q.  For what position was Lila Brown applying for?

13   A.  It was a job vacated by Karen Rankin.  I don't

14       recall who she got.  She may have gotten Judy

15       Kelley's position.

16   Q.  And when you interviewed Lila Brown was there,

17       at the time that you were interviewing Lila

18       Brown, were there any other applicants for that

19       position?

20   A.  It was Carol Connors and --

21   Q.  Hang on.

22   A.  Okay.

23   Q.  When you interviewed Lila Brown for whatever

24       position, do you remember the position she was
```

```
 1          going for?
 2   A.     I don't know the title.  It was Karen Rankin's
 3          job.
 4   Q.     Okay.  Were there any other applicants for Karen
 5          Rankin's job besides Lila Brown --
 6   A.     Right.
 7   Q.     -- at the time that you interviewed Lila Brown?
 8   A.     Carol Connors.  Carol Connors.  And there was
 9          one that didn't show up.  Cathy Moore.  She
10          didn't show up.  She was supposed to be
11          interviewed.  For whatever reason that day she
12          was not there.
13   Q.     Roughly when was this?
14   A.     Within a year.  It wasn't too very long ago.
15   Q.     Who got the position?
16   A.     Lila.  Lila Brown.
17   Q.     Okay.  So this was the interview for the
18          position that Lila now has?
19   A.     Correct.
20   Q.     Had you ever interviewed Lila Brown before this?
21   A.     I don't think so.  I am not sure.  I am not
22          sure.
23   Q.     So it's possible you could have and you are not
24          sure?
```

1   A.   I don't think I have.  I don't know.  I don't

2        remember.

3   Q.   Judy Kelley, what position was she interviewed

4        for?

5   A.   We had a retirement.  A woman named Patty

6        Fiasconaro.  Don't ask me to spell it.  And she

7        interviewed for that.  It was her and Karen

8        Rankin.  And Judy was given the position.

9   Q.   And Carol Connors, what position did she

10       interview for?

11  A.   The one that Lila Brown got that was Karen

12       Rankin's position.

13  Q.   So based on your experience with interviewing

14       civilian employees, describe for me the best you

15       can what the process is for posting and hiring

16       civilian positions.

17  A.   I wouldn't be able to give you an answer on that

18       on the civilians.  All I did was part of the

19       interview.  Everything prior and up to the

20       interview was Mary Ann McHugo.

21  Q.   So who notified you that you were going to be

22       responsible for interviewing the --

23  A.   Mary Ann would say we are going to interview

24       tomorrow.  What is a good time?  I would say I

```
 1        am free after 10:00, what have you.  They would

 2        contact the applicant.  And we would hold an

 3        interview.

 4   Q.   After the actual interview was over, what input

 5        did you have on who was chosen?

 6   A.   We would just go back and forth and, you know,

 7        our little notes.  Mary Ann would provide a list

 8        of say ten questions and have scores.  This one

 9        is worth 20.  This one is worth 10.  So we would

10        score the answers and compare notes.  That is

11        how we would do it.

12   Q.   So for the position that Lila Brown got, the

13        other applicants were one, Carol Connors.  Who

14        else?

15   A.   Cathy Moore, who didn't show up.  So it was just

16        two we interviewed.

17   Q.   As between Carol Connors and Lila Brown --

18   A.   Was that a question?

19   Q.   Sorry.  As between Carol Connors and Lila Brown,

20        why was Lila Brown chosen?

21   A.   She just seemed so much more qualified.

22   Q.   What about her qualifications made her better

23        for the job, if you remember?

24   A.   I don't remember specifics.  But I remember she
```

1      gave a good interview.  I couldn't tell you what

2      the specifics were.

3  Q.   In the course of your experience and knowledge,

4      based on your presence at 115 South Hampton and

5      1010 Mass Avenue are you aware or have you heard

6      of any jobs for which a candidate is identified

7      as having a favorable disposition for that job

8      before it is posted?

9          MS. GLASGOW:  Objection.

10          THE WITNESS:  Yes.

11  BY MR. FEENEY:

12  Q.   Can you give me a recent example?

13  A.   Most recent?

14  Q.   Sure.

15  A.   One of the engineer positions that I

16      interviewed.  We interviewed about ten people.

17      And we had four of us that conducted the

18      interview.

19              And we came to a unanimous ranking

20      that candidate A was the best candidate for the

21      job and candidate A didn't get the job.

22  Q.   And why not?

23  A.   I don't know.

24  Q.   Who was put into that position?

1    A.    Patrick Toomey, I believe his name is.

2    Q.    And who was the person that you thought was best

3          qualified?

4    A.    His name was Mark Anderson.

5    Q.    In your opinion, based on what you have heard or

6          based on what you know, why did Patrick Toomey

7          get the job over Mark Anderson if he was not the

8          best qualified?

9              MS. GLASGOW:  Objection.

10             THE WITNESS:  I don't know why.

11   BY MR. FEENEY:

12   Q.    What do you think?

13             MS. GLASGOW:  Objection.

14             THE WITNESS:  He knew somebody.  I

15         don't know.

16   BY MR. FEENEY:

17   Q.    Any other positions like that where --

18   A.    Once an EMD I had, I had that happen.

19   Q.    Describe what happened.

20   A.    I was called in by, I believe it was

21         Commissioner Pierce at the time.  And they

22         showed me a list of 20 candidates.  I was also

23         with the superintendent of fire alarm, which was

24         Joseph Clarity.  And they said we have a list of

```
 1              these 20 candidates for whatever the position

 2              was called, inside wire.  They had a bunch of

 3              names.

 4                       They said we like number whatever on

 5              the list.  I looked at the person's name.  It

 6              was John Dorsey.  The assistant to the

 7              commissioner was Robert Dorsey, the chief who

 8              was right there.

 9                       I said, is this your son? He said,

10              no, my brother.  So I handed the list to Clarity

11              and said, I don't want any part of this.  You do

12              the interview and he did.

13   Q.    And being this is Boston, in your experience

14         during the Kristin administration of the fire

15         department, is it your belief that kind of

16         practice continues?

17              MS. GLASGOW:  Objection.

18              THE WITNESS:  I think it does.  Yes.

19   BY MR. FEENEY:

20   Q.    Just following up on that.  With the new

21         Commissioner Fraser, do you think it is

22         continued during his administration?

23   A.    No.

24   Q.    Has he done anything to try to stop that?
```

```
 1   A.   I don't know.

 2   Q.   If you know?

 3   A.   I don't know.  I don't know.

 4   Q.   Fair enough.  Are jobs ever, in your experience

 5        or from what you have heard from the folks that

 6        are now in the civilian jobs that you may be

 7        aware of underneath you, are they ever posted

 8        more than once?

 9   A.   I don't know.  I don't know.

10   Q.   Have you ever heard of them being posted more

11        than once?

12   A.   I wouldn't pay attention.  I don't follow that.

13   Q.   And not the most recent position that Lila

14        Brown just got, did you ever hear of a job that

15        Lila went to an interview that was actually

16        posted after she received an interview it was

17        posted again?

18   A.   No.

19   Q.   Are you aware of any circumstances where -- and

20        I go back to an earlier comment that the jobs

21        are posted in house first.  Are you aware of

22        jobs that are posted for people outside of the

23        fire department?

24   A.   I don't know that they were posted in house
```

1    first.  I don't know the rules.  I don't know.

2    Mary Ann, when I worked there, she would do it.

3    I don't know how she did it.

4  Q.  Okay.  Are you ever involved or asked to be

5    involved when a civilian employee under your

6    department is asking for a pay increase or a

7    step upgrade?  I am talking about civilian

8    personnel?

9  A.  No.  I have had some claims, but I would always

10    direct them to Mary Ann.

11  Q.  Has anybody, has any civilian employee including

12    fire fighter employees within the fire

13    department asked you for a political favor?  And

14    by that has anyone asked you to intervene in

15    their seeking a position or pay up grade or step

16    increase?

17  A.  I don't recall.  I can't recall.

18  Q.  I am not saying whether you actually act on it.

19    I am asking if they asked?

20  A.  I have written letters for people.  I don't know

21    if they were off the job or on.  I have had

22    people from the Air Force call me about trying

23    to get on the police department.  I don't know

24    who I tried to help or not.  But I don't recall

```
 1        that.
 2   Q.   When you were promoted to deputy fire chief, how
 3        does that process work?
 4   A.   Civil service examination.
 5   Q.   Is that still the case?
 6   A.   Yes.
 7   Q.   For the civilian employees, did they go through
 8        the same process with the civil service
 9        examination?
10   A.   I don't know their process.  I don't believe
11        that they do, but I don't know.
12   Q.   Did they ever at one time?
13   A.   I don't know.
14   Q.   You mentioned that Mary Ann McHugo worked in
15        your department.  Are you her supervisor?
16   A.   I was.
17   Q.   When you were fire marshal?
18   A.   Right.
19   Q.   What are you now?
20   A.   Deputy Chief of Fleet Facilities and
21        Maintenance.
22   Q.   That's right.  What are your responsibilities?
23   A.   All apparatus and all facilities, fire houses
24        that the fire department has.
```

```
 1   Q.   What does that entail?

 2   A.   Well, apparatus making sure they are fixed if

 3        they are broken preventative maintenance all

 4        repairs in fire houses, renovations, and things

 5        of that nature.

 6   Q.   Where is your office located now?

 7   A.   900 Mass Avenue.

 8   Q.   And how many people do you have working under

 9        you?

10   A.   Daily about 8.

11   Q.   Are they civilian or fire fighters?

12   A.   I have a mix.

13   Q.   What is that mix?

14   A.   Probably have about six fire fighters.  And

15        there is actually maybe six or seven civilians.

16   Q.   If you could name for me the six or seven

17        civilians.

18   A.   Richard Carato, the welder.  Robert Peckham,

19        P-e-c-k-h-a-m.  Thomas O'Hare, O-h-a-r-e.

20        Thomas Gagin, G-a-g-i-n.  I am not sure of the

21        spelling.

22              And Joe, we call him Joe Cap.  I don't

23        know.  There is one Woody.  I don't know his

24        name.  We have a couple others.  One is deaf and
```

```
 1              hard of hearing.  And one is a little bit -- I
 2              don't know the names.  One is Woody.  And one
 3              they just call the kid.
 4       Q.     Any woman?
 5       A.     Mary Cane.
 6       Q.     And Peckham, O'Hare, Gagin, Cap, Woody, what are
 7              their positions?
 8       A.     Carato was a welder.  Peckham does ladders.
 9              Gagin and O'Hare are more or less maintenance.
10              Woody and the other two, Joe Cap, they do really
11              anything we ask.
12       Q.     What was the reason for the shift from fire
13              marshal to the head of fleet?
14       A.     I don't know.
15       Q.     Did you request it?
16       A.     No.
17       Q.     Were you assigned there over objection?
18       A.     I didn't object.
19       Q.     Where would you rather be fire marshal or head
20              of fleet?
21       A.     Head of fleet.
22       Q.     Why is that?
23       A.     I just like the job better.
24       Q.     What do you like about the job better?
```

```
1    A.    It is not political.

2    Q.    In what sense is it not political oriented?  In

3          what sense was the fire marshal political?

4    A.    I had politicians calling me.  They wanted this

5          place open by Friday, or what have you.  And I

6          would not do it if it wasn't ready to be opened.

7    Q.    Is that one of the reasons why you are now head

8          of fleet and not fire marshal?

9              MS. GLASGOW:  Objection.

10             THE WITNESS:  It could be.  It could

11         be.  No one told me why.

12   BY MR. FEENEY:

13   Q.    How did you get word that you were head of

14         fleet?  Who told you?

15   A.    The chief of the department.

16   Q.    Who is that?

17   A.    Chief McCurtin.  Kevin McCurtin.

18   Q.    And what did he say?

19   A.    He called me in his office and said at the end

20         of the day you are no longer the fire marshal.

21   Q.    Did you ask him why?

22   A.    Yes.

23   Q.    What did he say?

24   A.    We are making changes.
```

1  Q.   Is that all he said?

2  A.   Yes.

3  Q.   What else did he say?

4  A.   He went on to tell me about I am going to be

5       head of fleet.  And he said there is no position

6       there.

7  Q.   So they actually created a position for you?

8  A.   Correct.

9  Q.   More or less find a place to put you, as it

10      were?

11              MS. GLASGOW:  Objection.

12              (Thereupon, a break was had.)

13 BY MR. FEENEY:

14 Q.   Turning our attention back to Mary Ann McHugo,

15      she was in the department when you were fire

16      marshal?

17 A.   Yes.

18 Q.   What was her position or what is the position?

19 A.   I don't know the title.  She is the head of the

20      civilians.

21 Q.   And she reported to you or Bob Moran?

22 A.   It depends what it is for.

23 Q.   For example?

24 A.   She reports to me to tell me what is going on on

```
 1          the floor, but ultimately it has to work its way

 2          to Moran from her, not from me to Moran.

 3     Q.   Are you satisfied with her job performance?

 4     A.   Yes.  She is competent.

 5     Q.   Do you know how she got her job?

 6     A.   No.

 7     Q.   Have you ever heard her say how she got her job?

 8     A.   No.

 9     Q.   Has she ever mentioned that she had political

10          connections?

11     A.   I know she said she was friends with the mayor's

12          wife.

13     Q.   In what context did she say that?

14     A.   I think boastful.

15     Q.   Do you know where she was before she was at --

16     A.   Here.  Somewhere in this building.  I don't know

17          what she did.

18     Q.   Do you know Andy Warren?

19     A.   I know him.

20     Q.   What is his position?

21     A.   He has a new one.  I am not sure what he does

22          now.  I really don't know.

23     Q.   Does Andy Warren know Mary Ann McHugo at all?

24          Are they friends?
```

1    A.    I don't know.

2    Q.    To the best of your knowledge has Mary Ann

3          McHugo ever received any form of either pay up

4          grade, job positions, step increases, or any

5          other benefits as a result of her connections

6          with people in power?

7    A.    I don't know.  I really don't know.

8    Q.    Have you heard any rumors that she has?

9    A.    No.  No.

10   Q.    Do you know Mary Cugal?

11   A.    I know of her.

12   Q.    What do you know of her?

13   A.    She works outside the commissioner's office.

14   Q.    Do you know the kind of things she does for the

15         commissioner?

16   A.    If they type out general orders and special

17         orders, she does all of that.

18   Q.    Have you ever seen the general orders that she

19         types out?

20   A.    Yes.

21   Q.    Based on what you have seen of her work product,

22         do you think she is competent for the job?

23   A.    Spell check.  She does have a lot of grammatical

24         mistakes.

```
 1   Q.   What else do you see of her work product, if
 2        anything?
 3   A.   What do I see of her?
 4   Q.   Of her work product?
 5   A.   Really nothing.  She just answers the phone if
 6        you call the commissioner's office.  But I don't
 7        really -- outside of orders I don't see
 8        anything.
 9   Q.   Do you know when she got her current position?
10   A.   I remember when it was.  I was on personnel.  I
11        don't know when.
12   Q.   So you were in personnel as head of the fire
13        fighters?
14   A.   Right.  She wasn't hired where she is.  She was
15        working I think in personnel for a while up in
16        civilian, second floor.
17   Q.   Is that where you worked?
18   A.   No.  On the second floor they had civilians
19        working there.  They would support our end,
20        hiring, and all that kind of thing.
21   Q.   So you were in personnel as head of personnel?
22   A.   Yes.
23   Q.   When she was hired?
24   A.   I am not sure.
```

1   Q.   Okay.

2   A.   I had nothing to do with it.  I may have been

3        there.  I think I was there when she was hired

4        and worked on the second floor.  I was gone, I

5        think, when she was in the position she is

6        working now.

7   Q.   To the best of your knowledge or from what you

8        have heard, did she get her initial position

9        based on who she knew?

10  A.   I have heard that, but I don't know that to be

11       true.

12  Q.   What did you hear?

13  A.   I heard her boyfriend is connected at city

14       council or something.

15  Q.   Who is her boyfriend?

16  A.   I don't know his name.

17  Q.   And were you aware that she was promoted in or

18       around August of 2003?

19  A.   Yes.

20  Q.   Do you know who Lois Hart is?

21  A.   Yes.

22  Q.   Who is she?

23  A.   She worked up at 1010.

24  Q.   Since when do you recall?

1    A.    During the time I was there she started after

2          me.  I don't recall exactly when.

3    Q.    Do you know where she came from?

4    A.    I believe city hall.

5    Q.    Did she get the position at the fire department

6          because of who she knew?  Do you know?

7    A.    I don't recall.  I don't know.

8    Q.    I know her last name is Hart.  Is she related to

9          anybody in politics?

10   A.    I don't know.  I don't know.  I know there is a

11         Hart in south Boston.  I don't know.

12   Q.    I mean, in your opinion, based on what you have

13         heard or based on what you know, either one, has

14         Lois Hart ever received any kind of favor in the

15         form of a pay upgrade, job position, step

16         increases, or other perks as a result of her

17         political connections?

18   A.    I am not aware.

19   Q.    Have you ever heard that?

20   A.    No.  I have heard she knew somebody to get the

21         job.  But I am not aware of anything that she

22         may have gotten.

23   Q.    Okay.

24   A.    I wasn't part of any interviewing process with

1              her.

2    Q.    Fair enough.  So you had no personal knowledge?

3    A.    No.

4    Q.    But that is just what you heard?

5    A.    Yes, typical grapevine of headquarters.

6    Q.    Ever heard the phrase, rumor control?

7    A.    I just heard that in general.  I never heard

8          that on the job, as far as that kind of term.

9    Q.    Basically there is no such thing as rumor

10         control?

11   A.    Yes.

12   Q.    But you heard the phrase, rumor control?

13   A.    Yes.

14   Q.    Michelle Urso, do you know her?

15   A.    Never heard of her.

16   Q.    Fair enough.  We will skip her then.  Kerry

17         Manning?

18   A.    I know who she is.

19   Q.    What do you known about who she is?

20   A.    She works at stationery at headquarters, the

21         stationery office.

22   Q.    What is the stationery office?

23   A.    That is where they keep all the pens, paper, and

24         supplies, things like that, whatever.

```
1   Q.   When did she get that job?

2   A.   Five years ago, roughly.  I am just guessing.

3   Q.   It's a good guess.  The impression I have is

4        December 12 of 2002.

5   A.   Pretty close.

6   Q.   Almost the same question.  In your opinion, or

7        based on what you have heard, rumor control, has

8        this person ever received her position or step

9        increases or benefits?

10  A.   That is the rumor.  When you hear it -- again,

11       when you hear something I don't know what is

12       true or not.

13  Q.   No question about it.  What have you heard of

14       who she knows?  What is her connection?

15  A.   I don't know who she supposedly knows.

16  Q.   How about Eileen Stille?

17  A.   Never heard of her.

18  Q.   Carol Petta?

19  A.   Payroll.

20            (Thereupon, a break was had.)

21  BY MR. FEENEY:

22  Q.   You mentioned Carol Petta was in payroll?

23  A.   Yes.

24  Q.   Do you know roughly when she got that job?
```

1  A.  4 years, I guess.

2  Q.  Have you ever had any dealings with her?

3  A.  Personal level, no.

4  Q.  Not personal, at a job level.

5  A.  No.  Every once in a while I might have said

6      when are they going to pay us for the holiday or

7      something like that.  Not really.

8  Q.  Almost the same question.  It runs through the

9      whole theme of this.  In your opinion or based

10     on what you heard, has this person ever received

11     her position, step increases, grade upgrades, I

12     mean, job upgrades, or any other benefits as a

13     result of her connections?

14 A.  I am not aware of any job upgrades.

15 Q.  Okay.  Any other benefits?

16 A.  Again, she is supposed to be friends of the

17     mayor or you hear.  That's the rumor.  But,

18     again, rumors.  Who knows what is true.  At

19     least that is what the scuttle is.

20 Q.  Where do you hear that from?

21 A.  I don't know.

22 Q.  Just generally?

23 A.  At headquarters sitting there having lunch.  I

24     don't know who it was attributed to.

1  Q.   Do you know a Priscilla Richardson?

2  A.   No.

3  Q.   Erica Boylin?

4  A.   Yes.

5  Q.   What do you know about Erica?

6  A.   Nothing.  I just know who it is.  I don't know

7       anything about her.

8  Q.   Where does she work?

9  A.   Personnel, I believe.

10 Q.   Do you know when she started in the job?

11 A.   No.  4 years, roughly that timeframe.

12 Q.   January 2004?

13 A.   3-1/2.

14 Q.   Good instincts.

15 A.   Right.

16 Q.   Once again, same question.  In your opinion,

17      based on information you have heard, has Erica

18      Boylin received that position or other benefits

19      because of her connections?

20 A.   I may have heard that.  I don't know.  I don't

21      recall any particulars.  I think I have heard

22      her name mentioned, related to somebody.  Who I

23      don't know.

24 Q.   Carol Cunningham?

1    A.    I don't think I know her either.

2    Q.    How about Jacqueline McGraph?

3    A.    No idea.

4    Q.    Ian McKenzi?

5    A.    I know him.

6    Q.    What do you know about him?

7    A.    He used to be there when I was in personnel

8          years ago.  Left for a job.  And he is back.

9          That is the extent of it.

10   Q.    So you knew him before he left?

11   A.    Yes.  Professionally.

12   Q.    In what sense did you interact with him

13         professionally?

14   A.    He was in the ID, identification,

15         indemnification officer.  When I was in

16         personnel he was the person managing the

17         injured, paying the doctors, all of that.

18   Q.    To the best of your knowledge or understanding,

19         why did he leave?

20   A.    A better job, I believe.

21   Q.    Where?

22   A.    I don't know.  Somewhere outside the city.

23         Maybe outside the state.  I think he left the

24         state.

```
 1    Q.   And when he came back, do you remember when he

 2         came back?

 3    A.   No.  I know it was fairly recently.  And I think

 4         he came back to a bigger job.  I don't know any

 5         particulars.

 6    Q.   Are you aware of how he got that job?

 7    A.   No.

 8    Q.   Have you ever heard that he received that

 9         through his political connections?

10    A.   No.  I never heard anything attributed to him.

11         I don't know.

12    Q.   Bob Moran.  Do you know Bob?

13    A.   Yes.

14    Q.   What do you know about Bob?

15    A.   He was brought in towards the end of my return

16         of personnel and he was hired as a civilian.

17    Q.   What is your opinion of his job performance

18         skills?

19    A.   I don't know.  I don't have an opinion of his

20         job.

21    Q.   Okay.

22    A.   Just kind of think he is an odd duck.

23    Q.   Do you believe that he deals with all employees

24         honestly?
```

```
 1              MS. GLASGOW:  Objection.
 2              THE WITNESS:  I don't know.  I have
 3         never personally had a problem with him.  I
 4         know others have had problems.
 5    BY MR. FEENEY:
 6    Q.   What kind of problems have you heard?
 7    A.   Well, I know the nexus of this whole thing is
 8         supposed to be Bob Moran.  That is what I heard,
 9         but I don't know.
10    Q.   And was Bob Moran hired while you were working?
11    A.   Yes.
12    Q.   What do you know about his hiring process?
13    A.   Nothing.  I wasn't part of it.
14    Q.   Are you aware of Bob Moran -- I mean, do you
15         ever observe Bob Moran in his dealings with
16         other people in the fire department?
17    A.   I am not even in the building with him.
18    Q.   Were you?
19    A.   I think maybe 6 months in personnel.  Once I was
20         either at 1010 or 900 Mass Ave, just by phone.
21         Occasionally he would come over and discuss an
22         employee at 1010, if there was an issue.
23    Q.   Does Bob Moran have responsibility for dealing
24         with fire fighters as well as civilians?
```

1   A.   No, I don't believe so.

2   Q.   Does he interact with fire fighters?

3   A.   I don't know.

4   Q.   So you never witnessed that interaction at all?

5   A.   I don't know what you mean, interact.

6   Q.   Does he ever have to do deal with fire fighters?

7   A.   I don't believe so.  At least, not when I was in

8        personnel.

9   Q.   Or more recently -- when is the last time you

10       spoke to Bob Moran?

11  A.   I don't know.  Maybe a month ago passing him in

12       the hallway headquarters saying hello.

13  Q.   When is the last time you had anything to do

14       with him or have him do something for you or you

15       had to do something for him?

16  A.   Some time at fire prevention.  I don't know what

17       particular time.

18  Q.   So do you have an opinion about whether he deals

19       with these civilian employees in an honest

20       manner?

21            MS. GLASGOW:  Objection.

22            THE WITNESS:  I don't have an opinion.

23       I really don't know.

24  BY MR. FEENEY:

```
1    Q.    What do you believe?
2              MS. GLASGOW:  Objection.
3              THE WITNESS:  I don't know.  Is it
4        even -- is it fair game to ask me opinions?
5        I don't know.
6    BY MR. FEENEY:
7    Q.    I am just asking for your belief.
8    A.    I don't think about the guy.  That is my belief.
9        He is not even a speck in the ocean.  I don't
10       think of him.  Nothing against him.  I just
11       don't think of Bob Moran.
12   Q.    You mentioned he was an odd duck?
13   A.    Yes.
14   Q.    What about him --
15   A.    I just use the would you want to drink a beer
16       with the guy analogy.  And as soon as I met him
17       it was no.
18   Q.    In your opinion is Bob Moran politically
19       connected?
20   A.    I have no idea.  I never thought that.  I
21       thought he was an out of stater.  But I don't
22       know.  I don't know what people know unless
23       somebody mentioned it and I haven't heard that.
24   Q.    Do you know a person name Shawn McGonigl?
```

1          M-c-G-o-n-i-g-l, I believe.

2    A.    No.  Never heard of him.

3    Q.    Ever hear of a Doto Nee?

4    A.    Yes.

5    Q.    What do you know about Doto?

6    A.    He used to work where I work now, but he is

7          gone.

8    Q.    To the best of your knowledge does he have any

9          input into the decisions of the fire department

10         now?

11   A.    No.  Now?  I don't know about now.

12   Q.    I will try to ask it again.  To the best of your

13         knowledge or information does Doto Nee have any

14         influence in any of the decisions of the local

15         fire department now, whether hiring or

16         otherwise?

17              MS. GLASGOW:  Objection.

18              THE WITNESS:  Again, I don't know on

19         the now part.

20   BY MR. FEENEY:

21   Q.    Okay.  But before?

22   A.    I have heard before.

23   Q.    What have you heard?

24   A.    I have always heard that almost every one of the

| | | |
|---|---|---|
| 1 | | civilians hired, he is the 6 degrees of |
| 2 | | separation, so to speak. |
| 3 | Q. | Meaning if he wants somebody in, they are in? |
| 4 | A. | That is what I heard. |
| 5 | Q. | How does he have an influence?  Through what |
| 6 | | connection? |
| 7 | A. | I don't know. |
| 8 | Q. | Does he know the major?  To the best of your |
| 9 | | knowledge, who does he know the best? |
| 10 | A. | I don't know who he knows the best.  I know he |
| 11 | | is a player in south Boston.  I don't know who. |
| 12 | Q. | Denise Farrow?  Do you know Denise? |
| 13 | A. | Yes. |
| 14 | Q. | How do you know Denise? |
| 15 | A. | She has worked in training for several years.  I |
| 16 | | am real good friends with the deputy of |
| 17 | | training.  So I am down there all the time.  So |
| 18 | | I have known her. |
| 19 | Q. | I will ask you the same question of her.  In |
| 20 | | your opinion, has Denise ever received any |
| 21 | | political favors, either positions or pay |
| 22 | | upgrades, or anything else because of any |
| 23 | | political connections that she may have? |
| 24 | A. | No, I don't believe so. |

```
1    Q.   Jane Green, do you know Jane?

2    A.   Yes.

3    Q.   What do you know about Jane?

4    A.   What do I know about her?

5    Q.   How have you worked with her?

6    A.   She worked recently at 1010.  She was assigned

7         to me working in the other building, south

8         Hampton Street.  And I have known her.  She has

9         been at headquarters forever.  So I was aware of

10        who she was.  Because she is a Clarity.

11   Q.   She is working in which building now?

12   A.   Well, when I left 1010 she was there at 1010

13        Mass Avenue.

14   Q.   Where was she working before?

15   A.   115 South Hampton.

16   Q.   Were you aware of the circumstances of her

17        transfer?

18   A.   Yes.

19   Q.   Tell me about that?

20   A.   Well, I don't know if -- she did something that

21        raised the commissioner's eye.  I don't recall

22        what it was.  And they wanted to move her the

23        next day to 1010.

24   Q.   Were you involved in that decision at all?
```

```
 1   A.   Yes.  Well, not in the decision.
 2   Q.   When I asked you if you were involved, were you
 3        ever in any meetings in which it was decided to
 4        move her?
 5   A.   Yes, I believe I was.
 6   Q.   Who was involved?  Was it one meeting or more
 7        than one meeting?
 8   A.   I don't recall.  I remember the commissioner.
 9        That is the one I remember the most.
10   Q.   What did the commissioner say?
11   A.   He just said I want her moved over there.  And I
12        said there is no space for her.
13   Q.   Who else was in that meeting?  Was Bill --
14   A.   There were other people. I can't recall good
15        enough to tell you who was there.
16   Q.   Did you say anything during that meeting?
17   A.   Yes.
18   Q.   What did you say?
19   A.   Well, I just didn't agree with it.  I said why
20        don't you move her?  Why don't you call her in
21        and move her?
22   Q.   Did you say that to the commissioner or someone
23        else?
24   A.   The commissioner.
```

```
 1    Q.   And what was --

 2    A.   And I told him, I said that would be a

 3         retaliatory move.

 4    Q.   And did you sign any transfer papers?

 5    A.   Yes.

 6    Q.   Under duress?

 7    A.   Well, I didn't want to sign it.  So, yes, I

 8         guess you could say that.

 9    Q.   When you said to the commissioner it was a

10         retaliatory move, in retaliation for --

11    A.   Yes, whatever was -- I don't recall exactly what

12         it was.  All of sudden it was move her

13         immediately.

14    Q.   Did it have anything to do with Jane Green's

15         involvement in an issue with Denise Barry and

16         Bob Moran?

17    A.   Probably, but I don't know.  You know, I don't

18         recall.  I knew there was something that just

19         happened.  But I don't recall what it was.

20         Probably that was it.

21    Q.   Just for consistency sake, in your opinion has

22         Jane Green ever received in the last 7 years any

23         positions, pay up grades, because of her

24         political connections?
```

```
 1   A.    I don't know.

 2   Q.    You haven't heard?

 3   A.    No idea.

 4   Q.    Do you know Patty McDonough?

 5   A.    Yes.  That was my administrative assistant at

 6         1010.

 7               (Thereupon, a break was had.)

 8               (Thereupon, a discussion was had off the

 9         record.)

10    (Whereupon, the deposition suspended at

11         11:45 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    CERTIFICATE
 2   The Commonwealth of Massachusetts,     )
 3   Middlesex, SS                          )
 4
 5        I, Laura Naylor, Registered Professional
     Reporter and Notary Public in and for the Commonwealth
     of Massachusetts, do hereby certify that:
 6
          WITNESS, the witness whose deposition
 7   is hereinbefore set forth, was duly sworn by
     me, that I saw a picture identification for him
 8   in the form of his driver's license, and that the
     foregoing transcript is a true and accurate
 9   transcription of my stenotype notes to the best
     of my knowledge, skill and ability.
10
          I further certify that I am not related
11   to any of the parties in this matter by blood or
     marriage and that I am in no way interested in
12   the outcome of this matter.
13        IN WITNESS WHEREOF, I have hereunto set
     my hand and notarial seal this 19th day
14   of June, 2007.
15
16   _____
     Laura Naylor
17     Notary Public
18            THE FOREGOING CERTIFICATION OF THIS
              TRANSCRIPT DOES NOT APPLY TO ANY
19            REPRODUCTION BY ANY MEANS UNLESS
              UNDER THE DIRECT CONTROL AND/OR
20            DIRECTION OF THE CERTIFYING REPORTER
21
22
23
24
```

ATTACH TO DEPOSITION OF:  PETER LAIZZA
CASE:  BARRY V MORAN
DATE:  5-31-07
                    ERRATA SHEET
INSTRUCTIONS:  After reading the transcript of your
deposition, note any change or correction to your
testimony and the reason thereforon this sheet.
DO NOT make any marks or notations on the transcript
volume itself.  Sign and date this errata sheet
(before a Notary Public, if required).  Refer to
Page 60 of the transcript for errata sheet
distribution instructions.

PAGE      LINE

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____

____      _____      CHANGE:    _____
        I have read the foregoing transcript of my
deposition and except for any corrections or changes
noted above, I hereby subscribe to the transcript as
an accurate record of the statements made by me.
        Signed under the pains and penalties of
perjury this ____day of _____, 2007.


_____
Witness

VOLUME: II
PAGES: 1 to 41
EXHIBITS: None

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 05-10528-RCL

DENISE M. BARRY; JANE B.                )
GREEN; ELIZABETH H. GOLDEN;             )
PATRICIA J. McDONOUGH;                  )
ELAINE MESITI; LILA BROWN;              )
MARY M. KANE; and JUDITH                )
KELLY, individually and on              )
behalf of those similarly              )
situated,                               )
            Plaintiffs,                 )
                                        )
v.                                      )
                                        )
ROBERT J. MORAN; RONALD                 )
KEATING; PAUL CHRISTIAN;                )
RODERICK J. FRASER, JR.;                )
CITY OF BOSTON (Fire                    )
Department) and JOHN and/or            )
JANE DOES 1-50,                         )
            Defendants.                 )


    CONTINUED DEPOSITION of PETER A. LAIZZA, a
witness called on behalf of the Plaintiffs,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before
Myriam A. Maracas, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the City of

Boston Law Department, City Hall Plaza, Room

615, Boston, Massachusetts, on Wednesday, June

13, 2007, commencing at 10:10 a.m.

APPEARANCES:

      LAW OFFICE OF THOMAS F. FEENEY
           (by Thomas F. Feeney, Esq.)
           39 Sheafe Street, Suite One,
           Chestnut Hill, MA  02467, for
           the Plaintiffs.


      CITY OF BOSTON LAW DEPARTMENT
           (by Karen A. Glasgow, Esq.)
           City Hall Plaza, Room 615,
           Boston, MA  02201, for the
           Defendants.

1

I N D E X

2

3

Testimony of:                    Direct          Cross

4

5    Peter A. Laizza, Resumed

6        (By Mr. Feeney)              5, 37
         (By Ms. Glasgow)                          37

7

8

9

10              E X H I B I T S

11

12

    No.              Description              Page

13

14

15                  (None)

16

17

18

19

20

21

22

23

24

 1                    P R O C E E D I N G S

 2              MR. FEENEY:  Okay.  We're back on the

 3      record.  Today is the 13th of June, I believe.

 4      We have with us Karen Glasgow, counsel for the

 5      Defendants; Peter Laizza, the deponent, and I'm

 6      Thomas Feeney, counsel for the Plaintiffs.

 7              PETER A. LAIZZA, RESUMED

 8          A witness called for examination by counsel

 9      for the Plaintiffs, having been first duly

10      sworn, was examined and testified as follows:

11                   DIRECT EXAMINATION

12      BY MR. FEENEY:

13  Q.  Mr. Laizza, thank you for coming back.  We're

14      going to finish off, hopefully, in relatively

15      short order.  The last time we were here, we

16      were talking about Jane Green, one of the

17      Plaintiffs in this suite.  And essentially, you

18      had recalled a meeting with Commissioner

19      Christian, Bob Moran, I think Bill Hitchcock, in

20      which they were discussing the transfer of Jane

21      Green from 115 Mass. Ave. To 1010 Mass. Ave.  Do

22      you remember sort of towards the end of that

23      meeting, Bob Moran saying to you, "so, Pete,

24      this is the start of getting rid of Jane Green"?

```
 1              MS. GLASGOW:   Objection.
 2   A.   I don't recall that.  As I recall, I don't
 3        remember all of the people in there.  I remember
 4        Christian being there because I had a little
 5        exchange, but I don't recall all of the people
 6        in that meeting.
 7   Q.   Do you remember Bob Moran being at that meeting?
 8   A.   I really don't, not to say he wasn't.  I just
 9        can't picture that he was there.
10   Q.   Okay.  Do you remember somebody, perhaps you
11        don't remember who it was, saying something
12        about, "this is the start of getting rid of Jane
13        Green"?
14   A.   No.
15   Q.   Do you remember about how many people were in
16        that meeting besides you and Commissioner
17        Christian?
18   A.   I really don't know.  A few.
19   Q.   A few more?
20   A.   A few more people, yes.  I don't recall it being
21        too big.
22   Q.   Okay.  You explained Bob Moran.  Does Bob Moran
23        treat civilians any differently than he treats
24        firefighters?
```

```
1              MS. GLASGOW:  Objection.

2    A.  I don't know.

3    Q.  You wouldn't have an opinion on that either way

4        based on your experience with Bob Moran?

5              MS. GLASGOW:  Objection.

6    A.  I've heard about what this is about and I've

7        heard that.  I've never witnessed it.  So, you

8        know --

9    Q.  Okay.  So you never witnessed Bob Moran treating

10       firefighters any differently than civilians?

11   A.  Outside of myself, I never had.  I never

12       witnessed him really interact with anybody.

13       I've never --

14   Q.  Okay.  You had mentioned that you have most

15       familiarity with the firefighters rather than --

16   A.  Right.

17   Q.  -- civilians.  Are you familiar with the fire

18       investigation unit?

19   A.  Yes.

20   Q.  Are vacant positions posted for that union?

21   A.  Excuse me?

22   Q.  Are vacant positions posted for that unit?

23   A.  I don't think it was the practice -- I don't

24       think that was the practice.
```

```
1   Q.  Going back to his familiarity with the fire
2       investigation unit, are vacant positions posted
3       for that?
4   A.  I don't know if they are today, but I don't
5       believe they were.
6   Q.  Okay.  Is it true that people got the position
7       because of their political connections?
8           MS. GLASGOW:  Objection.
9   A.  That's how it always was.
10  Q.  So, for example, Joseph Casper, he got that
11      position because of his connections?
12  A.  I don't know the individual scenarios.  However,
13      I know that I never could put someone in there
14      that I wanted and --
15  Q.  Because?
16  A.  Because it just wasn't -- that's just how it
17      wasn't done.  It was people would call.  A
18      politician would call the Commissioner and say
19      so and so started tomorrow.  That's how I
20      understood that he was started.
21  Q.  Do you know Joseph Casper?
22  A.  I know him, yes.
23  Q.  Do you know any relation of Joseph to anybody in
24      influence with the fire department?
```

```
 1   A.   I don't know.  I know Casper was, I believe, at
 2        some point was a politician in South Boston.
 3        Not Joseph.  A relative, I believe, but I'm not
 4        sure.
 5   Q.   Isn't Joseph DoDo Nee's brother-in-law?
 6   A.   That I don't know.
 7   Q.   Do you know a firefighter named Chris who was
 8        Commissioner Christian's driver and he's now in
 9        the fire investigation unit?
10   A.   If it's just Chris, if he's African/American, I
11        believe I know who he is.  I don't recall.  I
12        don't know his name but if that's -- I recall
13        him being a driver.  Correct.
14   Q.   And is he now in the fire investigation unit?
15   A.   I believe so.
16   Q.   And he got the position because Christian --
17   A.   I don't know the nexus, to tell you the truth,
18        of that.  It would appear that was the case, but
19        I don't know.
20   Q.   Okay.  Do you know a firefighter named Brian
21        Nee?
22   A.   No.
23   Q.   DoDo's son?
24   A.   No.
```

1  Q.  Is he now in the fire investigation unit?

2  A.  I don't know.

3  Q.  Are you familiar with the position in the fire

4      alarm construction unit?

5  A.  Somewhat.  Somewhat.

6  Q.  Would you say that people get those positions in

7      the same way they get them with the fire

8      investigation unit?

9            MS. GLASGOW:  Objection.

10 Q.  Their connections?

11 A.  I don't know how that end of it works.

12 Q.  Are the positions for fire alarm construction

13     posted?

14 A.  Again, those are civilian type of positions and

15     I really don't know how that would work.

16 Q.  Are they uniform civilians or are they

17     non-uniform civilians?

18 A.  I believe it's like fire alarm operators, but it

19     might be -- I don't know if it's a different

20     Civil Service test.  I don't know if they hire

21     them off the street.  I really don't know how

22     they hire those guys.

23 Q.  So when you were head of personnel for the

24     firefighters, that wasn't part of your --

```
1    A.   No.

2    Q.   Who was that under?

3    A.   I believe that went under the superintendent of

4         fire alarm.

5    Q.   Which would have been whom?

6    A.   At the time, probably Joe Floherty.

7    Q.   And who is it now?

8    A.   Right now, it's John Henderson.

9    Q.   Did you have control over the employees

10        assistance program and people that worked in

11        there?

12   A.   Yes.

13   Q.   Okay.  Were those positions posted?

14   A.   I don't think so.

15   Q.   So people got those positions in the same way

16        they got the fire --

17   A.   Yes.  They were most of the same people for so

18        many years.  And I don't recall really the

19        turnover.

20   Q.   Do you know a Richard Kerato?

21   A.   Yes.

22   Q.   Do you know if he has any relationship to people

23        with political influence in the department?

24   A.   I don't know.  He works in my division now, but
```

```
 1            I really don't know that.
 2      Q.    Is he related to DoDo Nee at all?
 3      A.    I think he has something to do with DoDo Nee,
 4            but I don't know.
 5      Q.    A nephew or something?
 6      A.    Something.  I was told by somebody, someone who
 7            was pointing out this one is -- I believe he was
 8            one of them.  I don't know.  I don't recall what
 9            their relationship was.
10      Q.    How about Robert Peckham?
11      A.    He works, again, under me.
12      Q.    Is he related to DoDo Nee?
13      A.    Again, I don't know.
14      Q.    Had you heard that he was?
15      A.    I heard something but I heard something.
16      Q.    Okay.  And both Kerato and Peckham work in
17            maintenance?
18      A.    Yes.
19      Q.    Are those jobs posted?
20      A.    Again, I don't know how -- they are civilians
21            that are working there so I don't see the
22            postings or how that -- when they both preceded
23            me, I just started in January and they were
24            there so I have no idea how long.  I believe
```

```
1         they've been there for a while, but I don't know
2         how, the circumstances.
3    Q.   Okay.  Do you know Patti McDonough?
4    A.   Yes.
5    Q.   What do you know about her?
6    A.   She was my administrative assistant for four
7         years when I was a fire marshal.
8    Q.   What's your opinion of her work performance?
9    A.   It was good.  She did what she was asked to do.
10   Q.   Did she do it well?
11   A.   Excuse me?
12   Q.   Did she do it well?
13   A.   Yes.  She just didn't -- it wasn't the busiest
14        job but she did it adequately.  Whatever I asked
15        her to do, she did and she seemed to do it fine.
16   Q.   Okay.  In your opinion, has Patti ever received
17        any favors in the form of pay upgrades, job
18        positions, or step increases, or any other
19        benefits as a result of political connections?
20             MS. GLASGOW:  Objection.
21   A.   I have no idea.  I have no idea.
22   Q.   Have you ever heard that?
23   A.   No, I never heard that.
24   Q.   Do you know Lila Brown?
```

```
1    A.   Yes.

2    Q.   What do you know about Lila?

3    A.   Well, she worked when I was in human resources.

4         She was hired and she worked out of the medical

5         office; and then when I came back from the

6         military, she was now working at fire

7         prevention.  When I took that over and

8         relatively recently, maybe within a year, she

9         interviewed and got a promotion.

10   Q.   Based on your experience, knowing what she did

11        or what you heard, do you have any opinion of

12        her performance?

13   A.   I think she was competent.

14   Q.   Okay.  Any --

15   A.   No.  A lot of the women up there, some of them

16        had a little bit of problems with attendance;

17        and other than that, they did their jobs and she

18        was, you know, discussed and as far as I know,

19        her attendance is not an issue any longer.  I

20        don't know anymore.  I'm not there.

21   Q.   Was Patti McDonough's attendance ever an issue?

22   A.   No.

23   Q.   Was Lila Brown's attendance ever an issue?

24   A.   Well, I believe hers was.  I think she had a
```

```
 1        little bit of an issue with it.
 2   Q.   And do you know what that was about when you say
 3        attendance?  What does that mean?
 4   A.   I think use of sick time or overuse of sick
 5        time.
 6   Q.   So she was using too much sick time?
 7   A.   Yes.
 8   Q.   Over the amount that she was given?
 9   A.   Right.  I don't know.  Again, I don't administer
10        the civilian contracts but a number of women
11        there, Mary Mecudo would bring it to my
12        attention, "well, this one is sick again.  We
13        have to move so and so to cover her spot."  So a
14        lot of the women had problems with their
15        attendance.
16   Q.   Was Mary Mecudo one of those women who had
17        problems with attendance?
18   A.   Yes.
19   Q.   What was her problem?
20                   MS. GLASGOW:  Objection.
21   A.   She would take her -- she was out a lot and I
22        believe a lot of people took their X from her,
23        apparently.
24   Q.   Okay.  In your opinion, has Lila Brown ever
```

1          received any pay upgrades, step increases, or

2          job positions or any benefits because of any

3          political connections that she may have?

4     A.   Not that I'm aware of.

5     Q.   Anything you heard?

6     A.   No.

7     Q.   Do you know Elaine Mesiti?

8     A.   Yes.

9     Q.   How do you know Elaine?

10    A.   Well, she's been on the job for about 35 years,

11         I believe.  And I never really worked with her

12         until I first came to Mass. Ave. and then she

13         was working in the juvenile firesetters program.

14    Q.   Based on your experience with her or what you

15         heard about her, what is your opinion of her job

16         performance?

17    A.   I believe in that particular job, she just

18         didn't want to share whatever she has.  I had a

19         meeting with her and I asked her, where is she

20         all day?  We're trying to contact her.  And I

21         was clutching a folder and I said, "what do you

22         have in there?"  And she wouldn't show what it

23         was and about a day later, someone called up and

24         said, "she's now working in the paid detail

```
 1        office."  So she went and got another job.  I
 2        didn't ask her to leave.
 3   Q.   When was this?
 4   A.   Maybe 2002.
 5   Q.   So can you give me more details?
 6   A.   Well, they brought in --
 7   Q.   Who's "they"?
 8   A.   I just got assigned there.
 9   Q.   Assigned as?
10   A.   The fire marshal.  I just got out of my year in
11        the military.  I was there November of 2002.  So
12        within a month or two, we're probably talking
13        very early '03.  I'm sorry.  Chief Burke, who
14        was assistant fire marshal, said that it was a
15        problem with the juvenile firesetters program.
16        There was a Mark Callahan who was a firefighter
17        brought in to work in that unit and he felt that
18        Elaine wasn't cooperating, sharing information
19        with him.
20   Q.   Sharing what kind of information?
21   A.   Anything about the program.  She was just very
22        secretive, according to him.  So we brought them
23        all in.  Well, Mark, Elaine, myself, and Chief
24        Burke, and we were trying to iron it out.  And
```

```
 1        we asked, where is she all day?  When we look

 2        for her, she doesn't answer the phone.  We don't

 3        have a cell phone number.  The next day --

 4        excuse me.  Let me get this.

 5                  (Phone interruption)

 6                  MR. FEENEY:  Off the record.

 7                  (Pause)

 8        BY MR. FEENEY:

 9   Q.   So this was the name of the program, was the

10        juvenile --

11   A.   Juvenile firesetters program.

12   Q.   Firesetters?

13   A.   That was a program whereby if a young person

14        exhibited any arson tendencies, lit a fire, we

15        would take the child and we would put him in a

16        little education program and teach him that fire

17        is bad and what have you.  And it's a very good

18        program.

19   Q.   And that was a program that Elaine had been

20        running?

21   A.   Excuse me?

22   Q.   That was a program that Elaine had been running

23        at that point?

24   A.   Yes.
```

1   Q.   And then a Mark Callahan was transferred over to

2        that division to help out with that?

3   A.   Right.

4   Q.   And there were issues about Elaine sharing

5        information about the program with Mark

6        Callahan?

7   A.   Yes.  Yes.

8   Q.   And then you guys had a meeting?

9   A.   Correct.

10  Q.   Among yourselves?

11  A.   Chief Burke, Elaine, Mark, and I don't recall if

12       anyone else was at the meeting.  Probably not.

13  Q.   And what was the outcome of that meeting?

14  A.   Well, we just asked, "what's the story?  Why

15       aren't you sharing information?"  And, you know,

16       it was, more or less -- I've been doing this for

17       so long.  Obviously, she had a problem.  It

18       appeared to me that she liked her autonomy, come

19       and go without anybody really knowing her

20       business and when pressed about, "what do you do

21       all day, give me a little itinerary of what your

22       day is like," she was defensive and the next

23       day, apparently, she went to somebody in

24       headquarters and asked to leave the job and she

1     got a new job at the paid detail office, and I

2     believe she may still be there.  That's the

3     extent of my relationship with Elaine Mesiti.

4  Q.  Aside from the juvenile firesetters program,

5     what else were her responsibilities?

6  A.  I think that was it.  I think at that point in

7     time, I believe that was her --

8  Q.  Okay.  In your opinion, has Elaine ever received

9     a position or a job step increase, pay upgrade,

10    based on her political connections?

11  A.  I have no idea.  I have no idea.

12  Q.  You don't have any rumors to that effect?

13  A.  No.  I just know she's had a lot of jobs over

14    the years, almost every job in headquarters.  I

15    don't know how, why, or what.

16  Q.  Do you know Judy Kelleher?

17  A.  Yes.

18  Q.  How do you know Judy?

19  A.  Just from 1010 Mass. Ave.

20  Q.  In what sense?

21  A.  She works up there.  She's one of the people

22    that works -- she worked up at the counter.

23  Q.  Where is she working now?  Do you know?

24  A.  She's still there but she got a lateral move

1    where she no longer works the counter with the

2    public.  She interviewed for that job.

3  Q.  Do you know who interviewed her?

4  A.  Yes.  Myself and Marianne Mecudo.

5  Q.  And who else interviewed for that position?

6  A.  Karen Rankin.  I believe that might have been

7    it.  It's possible -- I'm not sure.  It's

8    possible somebody from outside interviewed.  I

9    recall an interview with a middle aged woman and

10   I don't know if it was for that position.

11  Q.  So when you and Marianne Mecudo interviewed Judy

12   Kelley, what was that process like in the

13   interview?  Did you have certain questions to

14   ask her?

15  A.  Yes.  Marianne would make up the questions and

16   give them a weight that would total 100.  And I

17   would ask a couple of the questions, more

18   general questions, and she would ask the ones

19   more specific to the jobs.  Marianne was more

20   familiar with the job and then at the end, we

21   would just score it up and come up with a

22   decision.

23  Q.  So Marianne would make up all questions and then

24   give you some?

```
 1   A.   Yes.

 2   Q.   Okay.  And she would ask more specific questions

 3        dealing with the job responsibilities?

 4   A.   Correct.

 5   Q.   And you had more general ones?

 6   A.   I would get the ones, "why do you want the job,"

 7        things that you could ask for any interview, so

 8        to speak.

 9   Q.   And you would score your questions?

10   A.   We would both have, let's say, ten questions,

11        however many there were, and we would both

12        individually score, if it was worth 20, what out

13        of 20 we think it was.  Then we would combine --

14        come up with our score and made our decision.

15   Q.   So you would both score all questions?

16   A.   Yes.

17   Q.   And did you both rank Judy Kelley above the

18        other applicants, Karen Rankin and whoever

19        other --

20   A.   Yes, I believe.  Yes.  Yes.  It was close but I

21        think we both had it that way.

22   Q.   Did you score Judy Kelley higher than Marianne

23        Mecudo?

24   A.   I have no idea.
```

```
1    Q.   Okay.

2    A.   I don't have any idea.

3    Q.   And this was back when?

4    A.   Oh, about a year and a half ago.  It's a guess.

5    Q.   In your opinion, had Judy ever received any sort

6         of favors, other job position upgrades, step

7         increase?

8    A.   I have no idea.

9    Q.   So in the course of this interview, nobody ever

10        spoke to you and said, "we want Judy Kelley's

11        position"?

12   A.   No.

13   Q.   Do you know Betty Golden?

14   A.   I know her a little bit.

15   Q.   How do you know her?

16   A.   Back in about 1997 or '98, whenever I was

17        working at emergency management, she had

18        something to do with fire alarm and I remember

19        meeting her, but I don't really know her.

20   Q.   So you wouldn't have any opinion on her job

21        performance?

22   A.   No.  Not her job.  She just seemed like a nice

23        lady, but I don't know anything about her at

24        work, even what she does, to tell you the truth.
```

1    Q.   Okay.  So in your opinion, or from what you even

2         heard, has Betty Golden ever received any sort

3         of benefits?

4    A.   I never heard her name really until almost any

5         context brought up.

6    Q.   Okay.  Do you know Mary Kane?

7    A.   Yes.  She works with me now.

8    Q.   For how long has Mary worked with you?

9    A.   Since January.

10   Q.   And had she worked with you before that at all?

11   A.   No, never.  She was just always a voice when you

12        called the maintenance division that would

13        answer the phone.  So whether you're looking to

14        get Nap apparatus fit or supplies for the

15        firehouse, she was the one that would take the

16        call.

17   Q.   And what is your opinion of her job performance?

18   A.   I think she's -- from what I know, since I've

19        been here, she seems like a very solid worker.

20        She is very busy, has a very busy, pretty high

21        pressured job.

22   Q.   And she did that job well?

23   A.   Yes.  She does seem to -- you know, she seems

24        the type that can keep all balls up in the air,

1        so to speak, juggling.

2   Q.   In your opinion, has Mary ever received any kind

3        of favors or job positions or step upgrades?

4   A.   I never heard anything about that.  If that were

5        true, I don't know.

6   Q.   Okay.  What building do you work now?

7   A.   900 Mass. Ave.  It's on the rear part of

8        headquarters.  Headquarters is on South Hampton

9        and we're on the other side of the peninsula.

10  Q.   And you work at South Hampton, right?

11  A.   Since January.  Oh, no.  South Hampton, that was

12       from '97 to 2001.

13  Q.   And at 900, that's --

14  A.   900 Mass. Ave is from January of this year to

15       the present.  And 1010 Mass. Ave. was from 2002,

16       November to January of this year.  That's why

17       many of the years, if you just see, I wasn't in

18       that building.  So I'm not really familiar with

19       a lot of those people.  I had been in South

20       Hampton for several years.

21  Q.   I'm going to ask you an interesting question.

22       At 900 Mass. Ave., any problems with mice?

23  A.   Excuse me?

24  Q.   Any problems with mice?

1   A.   Mice?

2   Q.   Yes.

3   A.   I haven't seen a mouse, no.

4   Q.   Mice or rats?

5   A.   American water bugs but not mice.

6   Q.   Did you hear problems about mice at Mass. Ave?

7   A.   I haven't heard that, no.  Well, no, because

8        since I've been there, we're pretty proactive.

9        We just sprayed twice recently for these.  They

10       look to me like giant cockroaches.  They called

11       them American water bugs.  But that's what the

12       exterminator said.  He said they look like

13       cockroaches to me.  They are this big.  I

14       haven't seen a mouse, no.

15  Q.   From what you've heard, historically 900 Mass.

16       Ave never had any problems with mice?

17            MS. GLASGOW:  Objection.

18  A.   I don't know.

19  Q.   All right.  At 115 South Hampton, any problems

20       with mice?

21  A.   I've seen mice.  I've seen dead mice in there

22       and I've seen rodent droppings and what have

23       you.  But we got McDonald's to one side and the

24       meat district to the other.  So rats, mice, they

```
 1         are all around there.
 2    Q.   And how about 1010 Mass. Ave.?
 3    A.   I don't think in that building that I know of.
 4         But interestingly, we do have a problem with
 5         rats and mice chewing the wires in the vehicles
 6         that are parked outside headquarters to the
 7         point your vehicle won't start.  They just chew
 8         through the ignition wires and open up your
 9         trunk and there would be chicken bones.
10    Q.   So as between the two, 115 South Hampton and
11         1010 Mass. Ave., 115 seems to have a greater
12         mice problem?
13                   MS. GLASGOW:  Objection.
14    A.   Yes.  The building is more wide open.  Sure.  I
15         would say yes.
16    Q.   Okay.  Bragden Street, any mice problems?
17    A.   Not since I've been in -- I would be getting a
18         call, my division, and not since January have I
19         ever heard Bragden mentioned in any way, shape.
20    Q.   How about before then?
21    A.   I've never heard that, no.  I would also think
22         that's not our building.  It's not our property.
23         So probably DMS would have to manage that if
24         they had a problem.
```

```
 1    Q.   Okay.  Are there any firefighters who are

 2         currently doing civilian jobs?

 3                   MS. GLASGOW:   Objection.

 4    A.   I have no idea.

 5    Q.   Well, I ask because you said you were familiar

 6         with the firefighters' side of things?

 7    A.   Yes.  Are they doing civilian jobs?  I don't

 8         believe so.

 9    Q.   Have you ever heard of a light house duty?

10    A.   Oh, yes.

11    Q.   And what's that?

12    A.   What light house duty was about maybe two

13         contracts or maybe the last contract where if a

14         guy was on injured, his doctor could decree that

15         he's able to do light house duty, might have

16         some restrictions, as he can only lift so much,

17         stand for so much time or what.  And with that,

18         the personnel division could assign someone to

19         answer a phone or whatever it was, depending on

20         the restrictions.

21    Q.   So they will put them in civilian spots?

22    A.   Oh, I don't think they would put them in

23         civilian spots.

24    Q.   They would put them in the firehouse?
```

```
 1   A.   No.  Somewhere in headquarters.

 2   Q.   Did every firefighter who become disabled, did

 3        they get light house duty or were only certain

 4        firefighters?

 5                 MS. GLASGOW:  Objection.

 6   A.   I don't know.  You know, I haven't -- when I was

 7        in personnel, we didn't have light house duty at

 8        the time.  So I haven't been aware of how they

 9        assign that.  I'm not sure.

10   Q.   Do you know Eddie White?

11   A.   Yes.  I know Eddie White.

12   Q.   Is he still working for the fire department?

13   A.   I believe so, yes.  Yes, he is.

14   Q.   Is he retiring soon?

15   A.   Excuse me?

16   Q.   Is he retiring soon?

17   A.   I don't know.  I don't believe so.

18   Q.   Do you know a Herbert McGrath, also known as

19        Joe?

20   A.   Yes.  I know him.  Yes.

21   Q.   Is he still working for the fire department?

22   A.   I don't believe so.

23   Q.   Was he disabled from being a firefighter?

24   A.   Yes.
```

```
1   Q.  Was he given light house duty?

2   A.  He worked -- I don't know where he worked, to

3       tell you the truth.  I don't know.  I think he

4       was off.  I think they wanted him to resign.

5   Q.  Why did they want him to resign?

6   A.  I have no idea.  Once in a while, they just --

7       once in a while, Christian just wanted to purge

8       people that he thought were just hanging out.

9   Q.  Did Christian ever conduct interviews of job

10      applicants?

11  A.  I don't know.  I don't recall.

12  Q.  Do you know the policy on who gets a

13      firefighter's car or a car with firefighter

14      plates?

15          MS. GLASGOW:  Objection.

16  A.  I don't think there is a policy.  I don't

17      believe there is a written policy on that.

18  Q.  So who determines who gets a car?

19  A.  Well, it depends on --

20          MS. GLASGOW:  Okay.  Can we just stop

21      right there?  I mean, this is going way beyond

22      the purposes of this deposition with regards to

23      the -- I lost my train of thought.  Way beyond

24      the purposes of this deposition with regards to
```

1    the cause action requirements.  I mean, cars and

2    things like that, that has nothing to do with

3    the commonality of claims.  Where are we going

4    with this?

5              MR. FEENEY:  If it does, if the people

6    we've named in the complaint receive

7    firefighter's cars as perks of their political

8    connections --

9              MS. GLASGOW:  When did this -- this was

10   never an issue.  This is in terms of --

11             MR. FEENEY:  Purposes has always been

12   an issue based on political connections.

13             MS. GLASGOW:  All right.  Go ahead.

14   BY MR. FEENEY:

15   Q.  Anyway, getting back to firefighter cars, who

16       determines who gets those cars?

17   A.  I believe the positions, generally.

18   Q.  Could you have one?

19   A.  Yes.

20   Q.  Do you use it for personal business as well?

21   A.  No.

22   Q.  Do you drive it back and forth to work from your

23       home?

24   A.  No.

```
 1    Q.  So your car stays here?

 2    A.  My car stays at the firehouse and I take the

 3        train, commuter rail.

 4    Q.  Is that the policy with firefighter cars, that

 5        they have to stay here so people commute?

 6    A.  They can't leave the city unless some people --

 7        the Commissioner could take -- well, his car --

 8        he lives in the city but we have some higher

 9        ranking officials that are allowed to take city

10        vehicles home.

11    Q.  For example, who are those higher ranking people

12        that you know of?

13    A.  The chief of operations.

14    Q.  Who's that?

15    A.  Well, he lives in the city so that would be

16        mute.  The guy that was chief of operations,

17        Moore, he could take his home.  Paul Moore, he

18        lived in Bridgewater.

19    Q.  And who else can take their cars home now that

20        you know of?

21    A.  Well, several people that can take it home who

22        live in the city.  So it's not really leaving

23        the city.

24    Q.  So as long as they keep it in the city, they can
```

```
 1         use it for personal use?
 2   A.    Right.  Right.  Yes.  I think certain positions,
 3         EAP, I'm not sure where the rental is, but he
 4         could take his home.  Few others.  I don't have
 5         it written down.
 6   Q.    So they can use it to commute back and forth?
 7   A.    Yes.
 8   Q.    Can they use it for personal business outside
 9         of --
10   A.    I don't believe anybody can do that.
11   Q.    Can they allow anybody else to drive the
12         firefighter vehicles themselves?
13   A.    No.
14   Q.    Do you know if Bob Moran has a firefighter
15         vehicle?
16   A.    I believe so.
17   Q.    Does he drive it into work and back?
18   A.    I believe so.
19   Q.    Do you know if he has ever used that car for his
20         personal benefit?
21   A.    No, I don't.
22   Q.    Just going back, for firefighters, if they
23         become disabled and they can't do their job,
24         what's the policy of the Boston Fire Department?
```

1    I mean, are they required to retire at that

2    point because of that disability?

3         MS. GLASGOW:  Objection.

4    A.  That's the medical examiner that will make that

5    determination.  Sometimes a guy just has a

6    problem where he couldn't stand the rigors of

7    firefighters but he can work a job at

8    headquarters if he can find a job.

9    Q.  Okay.  In your opinion, based on what you know

10   about firefighters or even civilians, is

11   discipline imposed in an even-headed manner or

12   is it imposed in a selected manner?

13        MS. GLASGOW:  Objection.

14   A.  I don't know.  I would say -- I never agreed how

15   it was done but it's not anything -- what's the

16   right word?  Intentionally.  It's just that you

17   have eight deputies in the field who all have a

18   different opinion of how to treat a similar

19   offense.  So I had recommended years ago having

20   a chief of personnel when I was there administer

21   all disciplines because I have one -- I would

22   treat one offence, infraction, the same but they

23   wouldn't go for it.

24   Q.  In your opinion, was discipline ever handed out

```
 1         in a certain way or withheld based upon that
 2         particular -- based on the subject person's
 3         political connections or favoritism?
 4                   MS. GLASGOW:  Objection.
 5    A.   Yes, it's happened, I'm sure.  I'm sure it's
 6         happened in the past.
 7    Q.   Does it still happen now, do you think?
 8    A.   I'm not in that loop.  I'm not in personnel.  I
 9         haven't been there for a long time.
10    Q.   So the last time you were in personnel, it was
11         happening?
12    A.   Yes.  It had happened.  Yes.
13    Q.   When you were head of personnel, did anybody in
14         authority, either the Commissioner or other
15         chiefs or deputy chiefs or other people with
16         influence in the fire department ever ask you to
17         place a person in a physical position?  Did they
18         ever ask you to place a person up to a position,
19         "hey, I need to have this person have this job"?
20    A.   No.  That never happened, I don't believe.
21    Q.   So nobody ever asked you for that kind of favor?
22    A.   I don't recall if they did.  I don't recall
23         that, no.
24    Q.   It could have happened?  You just don't recall
```

```
 1        it?
 2   A.   No, I doubt it happened because I think I would
 3        recall that.  Everything would be about a bid.
 4        It would be seniority with their uniforms so
 5        that's, you know, what we do.  If someone put in
 6        a paper, we give them back a copy of it so that
 7        they know they have it for proof.  That couldn't
 8        happen.
 9   Q.   So you didn't have any control over who got into
10        the deposition in the fire investigation unit?
11   A.   No, not there.
12   Q.   So that was outside of your --
13   A.   That was for years and years, I think, going
14        back to the May, way back when, Ray Flynn, the
15        Mayor.  The FIU was always something there.  The
16        Mayor of the city, more or less, put in who they
17        wanted.
18   Q.   And that included Mayor Menino when he got in?
19   A.   It's always been that way so I don't know.  I
20        can't point to someone and say, "this one got in
21        because of Mayor Menino" or what, but that's the
22        way it always was.
23             MR. FEENEY:  Okay.  I have no further
24        questions of this deponent.
```

```
 1                   MS. GLASGOW:  Just one question.
 2                     CROSS EXAMINATION
 3       BY MS. GLASGOW:
 4   Q.  You mentioned somebody who was a superintendent
 5       of fire alarm, Joe Floherty?
 6   A.  Yes.
 7   Q.  Is he a relation to Jane Green?
 8   A.  Sister.  Brother, sister.
 9   Q.  Okay.  And Jane Green works where?
10   A.  She works at 1010 Mass. Ave, fire prevention
11       right now.
12                   MS. GLASGOW:  Okay.  I'm done.
13                   MR. FEENEY:  Let me ask a follow-up
14       question on that one.
15                    REDIRECT EXAMINATION
16       BY MR. FEENEY:
17   Q.  Do you think that Jane Green has ever gotten a
18       position based on her political connections?
19   A.  I don't know.
20   Q.  Have you ever heard that?
21   A.  I never had, at least not while I was there.
22   Q.  Okay.  Great.
23                   MS. GLASGOW:  All right.  See you at
24       2:00.
```

1           MR. FEENEY:  You're done.  Thank you,

2    sir.

3                (Whereupon, the deposition was

4                 concluded at 10:47 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    DEPONENT'S ERRATA SHEET
 2                  AND SIGNATURE INSTRUCTIONS
 3
 4          The original of the Errata Sheet has been
 5     delivered to Karen A. Glasgow, Esq.
 6          When the Errata Sheet has been completed
 7     by the deponent and signed, a copy thereof
 8     should be delivered to each party of record and
 9     the ORIGINAL delivered to Thomas F. Feeney,
10     Esq., to whom the original deposition was
11     delivered.
12
13
14              INSTRUCTIONS TO DEPONENT
                After reading this volume of your
       deposition, indicate any corrections or changes
15     to your testimony and reason therefor on the
       Errata Sheet supplied to you and sign it.  DO
16     NOT make marks or notations on the transcript
17     volume itself.
18
19          REPLACE THIS PAGE OF THE TRANSCRIPT
            WITH THE COMPLETED AND SIGNED ERRATA
20          SHEET WHEN RECEIVED.
21
22
23
24
```

```
1       ATTACH TO THE DEPOSITION OF: PETER A. LAIZZA
        CASE: BARRY, ET AL. VS. MORAN, ET AL.
2
                        ERRATA SHEET
3
        INSTRUCTIONS:  After reading the transcript of
4       your deposition, note any changes or corrections
        to your testimony and the reason therefor on
5       this sheet.  DO NOT make any marks or notations
        on the transcript volume itself.  Sign and date
6       this Errata Sheet (before a Notary Public, if
        required).  Refer to Page 39 of the transcript
7       for Errata Sheet distribution instructions.
8       PAGE   LINE
                    CHANGE:
9                   REASON:
                    CHANGE:
10                  REASON:
                    CHANGE:
11                  REASON:
                    CHANGE:
12                  REASON:
                    CHANGE:
13                  REASON:
                    CHANGE:
14                  REASON:
                    CHANGE:
15                  REASON:
16          I have read the foregoing transcript of my
        deposition and except for any corrections or
17      changes noted above, I hereby subscribe to the
        transcript as an accurate record of the
18      statements made by me.
19      Date
20
21              PETER A. LAIZZA
22
23
24
```

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS.                    )

        I, Myriam A. Maracas, Registered
Professional Reporter and Notary Public in and
for the Commonwealth of Massachusetts, do hereby
certify that there came before me on the 13th
day of June, 2007, at 10:10 a.m., the person
hereinbefore named, who was by me duly sworn to
testify to the truth and nothing but the truth
of his knowledge touching and concerning the
matters in controversy in this cause; that he
was thereupon examined upon his oath, and his
examination reduced to typewriting under my
direction; and that the deposition is a true
record of the testimony given by the witness.

        I further certify that I am neither
attorney or counsel for, nor related to or
employed by, any attorney or counsel employed by
the parties hereto or financially interested in
the action.

        In witness whereof, I have hereunto set my
hand this 15th day of June, 2007.

                    _Myriam Maracas_
                    Myriam A. Maracas
                    Notary Public
                    My commission expires 1/18/13

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| DENISE M. BARRY and<br>JANE B. GREEN,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>ROBERT J. MORAN; PAUL A.<br>CHRISTIAN; WILLIAM KESSLER;<br>WILLIAM HITCHCOCK; CITY OF<br>BOSTON FIRE DEPARTMENT, and<br>JOHN and/or JANE DOES 1-50,<br><br>                    Defendants.<br>_____ | ) CIVIL NO. 05-10528 RCL<br>)<br>)<br>) AFFIDAVIT OF<br>) THOMAS F. FEENEY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF COUNSEL
## IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Thomas F. Feeney, counsel of record for the Plaintiffs in the above-entitled case, am an

attorney duly licensed in the Commonwealth of Massachusetts and make the following assertions

upon personal knowledge, unless otherwise indicated.

1.     Attached as Exhibit A to the Memorandum in Support of Motion for Class Certification is

        a spreadsheet of the ASFME Positions.

2.     Attached as Exhibit B to the Memorandum in Support of Motion for Class Certification is

        a spreadsheet of the SENA Positions.

3.     Attached as Exhibit C to the Memorandum in Support of Motion for Class Certification is

        a true and correct copy of Plaintiff Denise M. Barry's Answers to Interrogatories.

4.     Attached as Exhibit D to the Memorandum in Support of Motion for Class Certification is

a true and correct copy of Plaintiff Elizabeth H. Golden's Answers to Interrogatories.

5.  Attached as Exhibit E to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Defendant Robert Moran's Deposition Transcript Day 1.

6.  Attached as Exhibit F to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Jane B. Green's Answers to Interrogatories.

7.  Attached as Exhibit G to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Patricia J. McDonough's Answers to Interrogatories.

8.  Attached as Exhibit H to the Memorandum in Support of Motion for Class Certification is a true and correct copy of the Affidavit Catherine Moore.

9.  Attached as Exhibit I to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Elaine Mesiti's Answers to Interrogatories.

10. Attached as Exhibit J to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Lila Brown's Answers to Interrogatories.

11. Attached as Exhibit K to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Mary M. Kane's Answers to Interrogatories.

12. Attached as Exhibit L to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Judith A. Kelley's Answers to Interrogatories.

13. Attached as Exhibit M to the Memorandum is Support of Motion for Class Certification is a true and correct copy of the Affidavit of Maurice J. Mahoney.

14. Attached as Exhibit N to the Memorandum in Support of Motion for Class Certification is a true and correct copy of Plaintiff Denise M. Barry's Deposition Transcript.

15. Attached as Exhibit O to the Memorandum in Support of Motion for Class Certification is

a true and correct copy of Plaintiff Patricia J. McDonough's Deposition Transcript.

16.    Attached as Exhibit P to the Memorandum in Support of Motion for Class Certification is

a true and correct copy of Plaintiff Elizabeth H. Golden's Deposition Transcript.

17.    Attached as Exhibit Q  to the Memorandum in Support of Motion for Class Certification

is a true and correct copy of Defendant Robert Moran's Deposition Transcript. Day 2.

18.    Attached as Exhibit R  to the Memorandum in Support of Motion for Class Certification is

a true and correct copy of Shackman Consent Decree Annual Monitors Report.

19.    Attached as Exhibit S  to the Memorandum in Support of Motion for Class Certification is

a true and correct copy of a Department of Justice Press Release dated 18 July 2005.

20.    Attached as Exhibit T  to the Memorandum in Support of Motion for Class Certification is

a true and correct copy of Deposition Transcript of Peter Laizza.

SIGNED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY

THIS 3rd DAY OF AUGUST 2007:


_____/s/ Thomas F. Feeney_____
Thomas F. Feeney

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) | CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J. ) | |
| McDONOUGH; ELAINE MESITI; LILA ) | |
| BROWN; MARY M. KANE; and          ) | |
| JUDITH A. KELLEY, individually and on ) | |
| behalf of all those similarly situated,     ) | |
|                                                          ) | |
|                     Plaintiffs,                     ) | |
|                                                          ) | |
|          vs.                                           ) | |
|                                                          ) | |
| ROBERT J. MORAN; RONALD         ) | |
| KEATING; PAUL A. CHRISTIAN;       ) | |
| RODERICK FRASER, Jr.; WILLIAM    ) | |
| KESSLER; WILLIAM HITCHCOCK;     ) | |
| CITY OF BOSTON (FIRE                    ) | |
| DEPARTMENT), and JOHN and/or     ) | |
| JANE DOES 1-50,                            ) | |
|                                                          ) | |
|                     Defendants.                   ) | |
| _____ ) | |

<u>AFFIDAVIT OF COUNSEL FOR PLAINTIFF RE: MOTION FOR CLASS CERTIFICSATION</u>

      I, Thomas F. Feeney, am the counsel of record for the Plaintiffs in the above-entitled case

and make the following assertions upon personal knowledge:

1.      I have been an attorney since 1991, have clerked for two state trial court judges

      (designated Civil Motions Judges, Tax Appeal Court Judges, and Land Court Judges), one

      state Supreme Court Justice (Hawai'i), and two Federal Magistrate Judges (D. Haw. and

      D.Mass), and one Federal Court Judge (D.Haw.).  I have been in private practice since

1995 at litigation intensive law firms focusing on civil rights litigation, construction law litigation, and employment discrimination litigation, with a brief hiatus for one of the federal clerkships in 2000.

2.    While practicing for a small firm in Hawai'i and Massachusetts, I successfully prosecuted two civil rights class action matters in civil rights cases in federal court. The first was on behalf of inmates at the Hawai'i State Prison regarding prison conditions, which case was settled. The second was a class action lawsuit, <u>Clark v. State of Hawai'i</u>, Civil No. 99-00885, in which I and three other attorneys represented over 300 mentally disabled class members in prosecuting violations of civil rights. In the <u>Clark</u> matter, we obtained a permanent injunction on summary judgment on 14th and 9th Amendment grounds, <u>see</u> Order attached hereto as Exhibit A, while eventually settling the damages portion of the case after extensive litigation regarding the State's obligation to pay damages.

3.    In Massachusetts, i have worked for two, litigation-oriented law firms in which i was assigned a large caseload of discovery and litigation intensive matters.

4.    I presently manage my own law firm with one associate, and hire contract attorneys as needed.

5.    The Plaintiffs in this matter have covered, and have committed to cover all costs in this matter. The costs covered so far without hesitation have been the costs of twelve deposition transcripts totaling in excess of 6,000.00. The Plaintiffs are well committed to prosecuting the merits of this case. As testified by Plaintiff Denise Barry "

6.    Attorney Paul Anthony is also making an appearance on behalf of Plaintiffs in this case. I an informed of, and experienced with, attorney Anthony's extensive litigation experience with his own 3-person law office. Attorney Anthony and I work on other cases together.

7.    Plaintiffs have been apprised of the potential litigation costs and are committed fully to

prosecute this case to its conclusion. <u>See</u> e.g, Deposition Transcript of Denise Barry,

Exhibit N, p. 127 128.

8.    If necessary, i will seek additional counsel for support litigation services.

SIGNED AND SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 3rd

DAY OF August 2007.


                                        _/s/ Thomas F. Feeney_____

                                        Thomas F. Feeney (BBO# 645605)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

RODNEY W. CLARK, STEVEN H. FIELDS, )
JOHN M. McGINNIS, JOHN BRANCO, )     CV. NO.  99-00885 DAE/BMK
and FRANK SANCHEZ, individually )
and on behalf of all others )
similarly situated, )
)
            Plaintiffs, )                    FILED IN THE
)                 UNITED STATES DISTRICT COURT
      vs. )                    DISTRICT OF HAWAII
)
STATE OF HAWAI`I, TED SAKAI, )                  NOV  8 2001
NOLAN P. ESPINDA, BRUCE ANDERSON, )
WAYNE LAW, LINDA FOX, and JOHN )        at 10 o'clock and ___min. ___a___M.
and/or JANE DOES 1-50, )             WALTER A.Y. H. CHINN, CLERK
)
            Defendants. )
_____)

### ORDER

The court heard Plaintiffs' and Defendants' Motions on

October 22, 2001.  Bruce F. Sherman, Esq., Thomas F. Feeney,

Esq., David J. Minkin, Esq., and Shawn A. Luiz, Esq., appeared on

the briefs or at the hearing on behalf of Plaintiffs; Deputy

Attorneys General Heidi M. Rian, Barbara A. Fabrey, Wendy J.

Utsumi appeared on the briefs or at the hearing on behalf of

Defendants Bruce Anderson, Wayne Law, and Linda Fox in their

Individual Capacities; Deputy Attorneys General Diane Erickson

and John P. Dellera appeared on the briefs or at the hearing on

behalf of Defendants Ted Sakai and Nolan P. Espinda, in their

Individual Capacities; Deputy Attorneys General Deborah Day

Emerson and David A. Webber appeared on the briefs or at the

hearing on behalf of Defendant State of Hawaii and Defendants Ted

Sakai, Nolan P. Espinda, Bruce Anderson, Wayne Law, and Linda Fox, in their respective Official Capacities.

After reviewing the Motions and the Supporting and Opposing Memoranda, the court GRANTS in part and DENIES in part Defendants Bruce Anderson, Wayne Law, and Linda Fox's Motion to Dismiss or In the Alternative for Summary Judgment of Second Amended Complaint; GRANTS in part and DENIES in part Plaintiffs' Motion For Partial Summary Judgment and Permanent Injunction; GRANTS Motion of Defendants Sakai and Espinda in Their Individual Capacities to Dismiss or for Summary Judgment; GRANTS in part and DENIES in part State and Official Capacity Defendants' Motion for Judgment on the Pleadings, as to (1) Statute of Limitations, and (2) Plaintiffs' Fifth and Eighth Causes of Action; DENIES Plaintiffs' Motion for Issuance of an Order to Show Cause Why Defendants Should Not Be Held in Contempt of Preliminary Injunction; and ORDERS Defendants to Comply with the Court's Reporting Requirement.

<u>BACKGROUND</u>

In the instant case, Plaintiffs are a class of people who initially were charged with crimes, but then subsequently were acquitted on grounds of mental disease, disorder, or defect, pursuant to Hawaii Revised Statues ("HRS") § 704-400, et seq.[1]

---

[1]A team of psychologists analyzed each acquittee, and determined that each suffered from a mental disease, defect, or disability of such magnitude that he could not have had the state

Plaintiffs allege that the State of Hawaii, through the

Department of Public Safety ("DPS"), the Department of Health

("DOH"), and other agencies and agents[2] ("the State") for years

have been confining these aquittees to penal institutions rather

than in mental facilities.[3]  Instead of receiving rehabilitative

---

of mind required for a finding of guilty on the crimes charged.
See HRS § 704-401.

[2]Plaintiffs have named as Defendants Ted Sakai, the Director
of DPS, Nolan P. Espinda, the Warden of Oahu Community
Correctional Center ("OCCC") and employee of DPS, Bruce Anderson,
the Director of DOH, Bruce Law, the Administrator of Hawaii State
Hospital ("HSH"), and Linda Fox, the Chief of the Adult Mental
Health Division at DOH, in their official capacities.  Plaintiffs
have also sued these Defendants in their individual capacities
pursuant to Title 42 of the United States Code, Sections 1983 and
1985, as well as under various State laws.

[3]HRS § 704-411, the section of the Hawaii statutes in which
Plaintiffs' acquittals are centered, states, in pertinent part:

(1) When a defendant is acquitted on the ground of
physical or mental disease, disorder, or defect
excluding responsibility, the court shall, on the basis
of the report made pursuant to section 704-404, if
uncontested, or the medical or psychological evidence
given at the trial or at a separate hearing, make an
order as follows:
(a) The court shall order the defendant to be
committed to the custody of the director of
health to be placed in an appropriate institution
for custody, care, and treatment if the court
finds that the defendant presents a risk of
danger to oneself or others and that the
defendant is not a proper subject for conditional
release; provided that the director of health
shall place defendants charged with misdemeanors
or felonies not involving violence or attempted
violence in the least restrictive environment
appropriate in light of the defendant's treatment
needs and the need to prevent harm to the person
confined and others;  or

3

mental health treatment, Plaintiffs allege that each acquitted class member was incarcerated, deprived of appropriate medical treatment without due process, and was subject to unlawful and cruel punishment.

Plaintiffs filed their First Amended Complaint in this case on January 21, 2000, seeking injunctive and declaratory relief based on assertions that Defendants violated Plaintiffs' rights under Federal statutes, including the American with Disabilities Act ("ADA"), the Rehabilitation Act, 42 U.S.C. § 1983 and § 1985, common law, promulgated regulations, and both the United States and Hawaii Constitutions.[4]    In its October 4,

---

(b) The court shall order the defendant to be released on such conditions as the court deems necessary if the court finds that the defendant is affected by physical or mental disease, disorder, or defect and that the defendant presents a danger to oneself or others, but that the defendant can be controlled adequately and given proper care, supervision, and treatment if the defendant is released on condition; or
(c) The court shall order the defendant discharged from custody if the court finds that the defendant is no longer affected by physical or mental disease, disorder, or defect, or, if so affected, that the defendant no longer presents a danger to oneself or others and is not in need of care, supervision, or treatment.

HRS § 704-411(1).

[4]Specifically, the Complaint alleged the following: (1) violation of the American with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA") (Count I); (2) violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504") (Count II); (3) violation of 42 U.S.C. § 1983 ("Section 1983") (Count III); (4) violation of 42 U.S.C. § 1985 ("Section 1985") (Count IV); (5)

4

2000 Order, this court granted Defendants' Motion for Judgment on the Pleadings to the extent it covered Plaintiffs' § 1985 and state law claims against the State and Defendants in their official capacities. State and Official Capacity Defendants filed a notice of appeal on October 12, 2000 for the portion of the order denying their motion for immunity from suit under the Eleventh Amendment to the United States Constitution.

Plaintiffs then filed a Motion for Temporary Restraining Order on October 23, 2000. That Motion urged the court to enjoin Defendants from placing Plaintiffs in penal institutions in three situations: upon acquittal, upon issuance of a bench warrant for alleged violations of conditional release, and upon revocation of conditional release.[5]

---

negligent supervision (Count V); (6) false imprisonment (Count VI); (7) negligence (Count VII); and (8) assault and battery (Count VIII).

[5]Plaintiffs asserted that their urgency in filing the Motion for Temporary Restraining Order was heightened by the fact that the State had placed Plaintiff John Branco into the general prison population at OCCC. Branco, however, is apparently not the only acquittee to be placed in general population at OCCC. Plaintiff Rodney Clark was placed in general population at OCCC on several instances after violating conditional release instead of being returned to HSH. Plaintiff McGinnis also spent time at OCCC, rather than at HSH. He received no mental health treatment while at OCCC. Plaintiff Sanchez was housed at Kauai Community Correctional Center ("KCCC"), rather than at HSH; he received no mental health treatment. Plaintiffs assert that in addition to their being at high risk of being preyed upon by "predators" in the general prison population, they also have increased risk of developing a central nervous system disease called tardive dyskinsia from the injection of anti-psychotic drugs. Part of Plaintiffs' assertions included the allegation that Defendants

On November 16, 2000, this court issued a Preliminary Injunction, which replaced the court's October 30, 2000 Temporary Restraining Order. <u>See</u> Preliminary Injunction, Civil No. 99-885 DAE/BMK, filed November 16, 2000. The court enjoined the State from, inter alia, holding an acquittee who is conditionally released pursuant to HRS §§ 704-411, 704-412, and 704-413, then subsequently arrested for alleged acts or omissions violating the conditions of his or her conditional release, in a facility controlled by the DPS for a period of time longer than necessary to identify the person, determine his legal status, and determine whether the person will be charged with a crime, in no case for a period exceeding 48 hours.[6] The court further ordered that individuals being held in custody by the Department of Corrections or any county police department or any law enforcement agency prior to transfer to the DOH shall be segregated from the general prison or jail population and to the extent practical be provided appropriate mental health

---

continually remove Plaintiffs from HSH and place them into penal institutions in order to avoid the terms of the Federal Consent Decree applicable to HSH.

    [6]The court noted that transfer of custody from facilities on islands other than Oahu may exceed the 48 hour period, as long as transport is made by the first available flight.

6

evaluations.   On January 30, 2001, Plaintiffs filed a Second
Amended Complaint 2001.[7]

Now pending before the court are the following five
motions: (1) Defendants Bruce Anderson, Wayne Law, and Linda
Fox's Motion to Dismiss or in the Alternative for Summary
Judgment of Second Amended Complaint filed on July 3, 2001[8]; (2)
Plaintiffs' Motion for Partial Summary Judgment and Permanent
Injunction filed on April 10, 2001; (3) Defendants Sakai and
Espinda's, in their Individual Capacities, Motion to Dismiss or
for Summary Judgment filed on April 11, 2001; (4) State and
Official Capacity Defendants' Motion for Judgment on the
Pleadings, as to (i) Statute of Limitations, and (ii) Plaintiffs'
Fifth and Eighth Causes of Action filed on June 7, 2001; and (5)
Plaintiffs' Motion for Issuance of an Order to Show Cause Why
Defendants Should not be Held in Contempt of Preliminary
Injunction filed on September 20, 2001.

---

[7]Plaintiffs' Second Amended Complaint is very similar to
their First Amended Complaint; Plaintiffs added John Bronco and
Defendant Linda Fox to the Second Amended Complaint and restated
their conspiracy allegations.

[8]This Motion was accompanied by a Notice of Withdrawing the
same Defendants' October 25, 2000 Motion to Dismiss or in the
Alternative for Summary Judgment.

STANDARD OF REVIEW

I   Motion to Dismiss

A motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). The Ninth Circuit has stated that the court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Terracom v. Valley Nat'l Bank, 49 F.3d 555, 558 (9th Cir. 1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Dismissal for failure to state a claim is a ruling on a question of law. See Parks Sch. of Bus., Inc., v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). That is, "[t]he issue is not whether plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). Review is limited to the contents of the complaint, including any attached exhibits. See Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994)(regarding limited review); Symington, 51 F.3d at 1484 (regarding exhibits). To the extent, however, that "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed. R. Civ. P. 12(b); Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 920 F.2d 1496, 1507 (9th Cir. 1990).

Allegations of fact in the complaint must be taken as true and construed in the light most favorable to the non-moving party. Id. When examining a complaint, a court should be mindful that "conclusory allegations, without more, are insufficient to defeat a motion to dismiss." McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988).

## II    Summary Judgment

The Federal Rules of Civil Procedure provide that summary judgment shall be entered when the following occurs:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In contrast, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citation omitted). A

material fact is one that may affect the decision so that the finding of that fact is relevant and necessary to the proceedings. See Anderson, 477 U.S. at 248.

Once the movant has met its burden, the opposing party has the affirmative burden of showing specific facts that indicate a need for trial. See Fed. R. Civ. P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Fed. R. Civ. P. 56(e). The evidence submitted by the nonmovant in opposition to a motion for summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor." Matsushita, 475 U.S. at 255.

In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. See Matsushita, 475 U.S. at 254. However, the court may not make credibility determinations or weigh conflicting evidence. Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990). When deciding a motion for summary judgment, the court should ask the following question: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law? Id. (citation omitted).

10

DISCUSSION

I    Defendants Anderson, Law, and Fox's Motion to Dismiss or in
     the Alternative for Summary Judgment

        Defendants Anderson, Law, and Fox argue that they are
entitled to judgment for the following reasons: (1) the ADA and
Section 504 do not apply to individually named Defendants; (2)
Plaintiffs' Complaint fails to adequately plead constitutional
violations; (3) Plaintiffs cannot establish facts entitling them
to relief under § 1983; (4) no genuine issue of material fact
exists so Defendants are entitled to summary judgment as a matter
of law; (5) Defendants are entitled to qualified immunity; (6)
there is no respondeat superior liability under § 1983; (7) the
court should decline to exercise supplemental jurisdiction over
Plaintiffs' state law claims; and (8) Plaintiffs cannot establish
malice or improper purpose to state a claim for the state law
claims.

        As a threshold matter, Plaintiffs asked the court to
find Defendants Anderson, Law, and Fox's Concise Statements
ineffectual and then use that finding as the basis for denying
the Defendants' motion.  The court disagrees, noting that the
Concise Statement cites numerous judicial judgments and Orders in
this case, as well as Anderson's, Law's, and Fox's Declarations.

        Having found the Defendants' Concise Statements
satisfactory and in conformity with Rule LR56.1 of the Local

11

Rules, the court now turns to Defendants Anderson, Law and Fox's arguments in support of their Motion.

A.    The ADA and Section 504; Applicability to Individuals

In the first two counts of their Complaint, Plaintiffs allege violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. and violation of § 504 of the Rehabilitation Act of 1973.  In response to these allegations, Defendants Anderson, Law, and Fox argue that the ADA and Section 504 do not provide liability for individual defendants.  They are correct in this assertion.

The ADA provides only for employer, not individual liability.  42 U.S.C. § 12132.  See Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); Silk v. City of Chicago, 194 F.3d 788, 797 n.5 (7th Cir. 1999); Butler v. City of Prarie Village, 172 F.3d 736, 744 (10th Cir. 1999); Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996); Thomas v. Nakatani, 128 F. Supp. 2d 684, 692 (D. Haw. 2000) (noting that Ninth Circuit has not published an opinion with respect to ADA providing individual liability but relying on sister circuits for proposition that it does not).[9]  Similarly, an individual cannot be sued under Section 504 of the Rehabilitation Act.  See 29 U.S.C. § 794(a)

---

[9]Although the court cannot and does not rely on unpublished opinions, the court notes that the Ninth Circuit has at least once upheld the dispute addressing the issue.  See Han v. Brobeck, 2000 WL 1300380, **2 (9th Cir. 2000).

(providing liability for any "program or activity receiving
Federal financial assistance"); see also <u>Zukle v. Regents of the
University of California</u>, 166 F.3d 1041, 1045 n.11 (9th Cir.
1999) (stating that courts apply same analysis to both ADA and
Rehabilitation Act, and that no significant difference in
analysis of rights and obligations from both acts exists).
Plaintiffs do not offer otherwise.  Therefore, the court **GRANTS**
Defendants Anderson, Law, and Fox's, in their respective
Individual Capacities only, Motion to Dismiss Counts I and II of
Plaintiffs' Complaint.

B.    **Liability for Constitutional Claims Under Section 1983**

Defendants Anderson, Law, and Fox argue that (1)
Plaintiffs have failed to meet the heightened pleading burden
imposed by section 1983 for constitutional torts; (2) Plaintiffs
fail to state cognizable claims under the Fourth, Eighth, and
Fourteenth Amendments; (3) they are entitled to qualified
immunity; and (4) Section 1983 does not provide for respondeat
superior liability.

1.    **Heightened Pleading Standards**

Defendants Anderson, Law, and Fox argue that Plaintiffs
did not set forth nonconclusory allegations evidencing an
unlawful intent and that Plaintiffs' Complaint therefore should
be dismissed.  The Ninth Circuit has adopted a "heightened
pleading standard in cases for which subjective intent is an

13

element of a constitutional tort action." <u>Branch v. Tunnell</u>, 937
F.2d 1382, 1386 (9th Cir. 1991) ("Branch I"); <u>see</u> <u>also</u> <u>Lee v.</u>
<u>City of Los Angeles</u>, 250 F.3d 668, 680, n.6 (9th Cir. 2001);
<u>Mendocino Environmental Center v. Mendocino County</u>, 14 F.3d 457,
462 (9th Cir. 1994). At least one of the "constitutional torts"
alleged by Plaintiffs, violation of due process, is subject to a
heightened pleading standard. <u>See</u> <u>F.E. Trotter, Inc. v. Watkins</u>,
869 F.2d 1312, 1316 (9th Cir. 1989) (unlawful motive is a
critical element of due process claim).

 Having established that a heightened pleading
requirement exists, the court finds that Plaintiffs here have met
the required standard. A heightened pleading requires Plaintiffs
to set forth facts "specific and concrete enough to enable the
defendants to prepare a response, and where appropriate, a motion
for summary judgment based on qualified immunity." <u>Branch I</u>, 937
F.2d at 1386. Defendants Anderson, Law, and Fox have prepared
both a response and a very detailed motion for summary judgment.
Moreover, upon a review of the Second Amended Complaint, the
court finds that Plaintiffs do set forth facts particular enough
to notify Defendants against what allegations and for which
actions they must answer. Therefore, the Motion is **DENIED** on
this ground.

14

2.    Cognizable Constitutional Claims

Despite Plaintiffs' allegations that their Fourth,
Eighth, and Fourteenth Amendment rights have been violated,
Defendants Anderson, Law, and Fox argue that Plaintiffs have not
pleaded a cognizable legal theory entitling them to relief under
Section 1983.

a.    Fourth Amendment Seizure

Defendants Anderson, Law, and Fox argue Plaintiffs have
failed to state a claim under Section 1983 against them for
unlawful seizure.  The court agrees.

Although it is debatable where a "seizure" ends for the
purposes of the Fourth Amendment, case law suggests that after a
suspect is arrested and the challenge is limited "solely to
continued incarceration," the Fourth Amendment does not apply.
Brooks v. George County, Mississippi, 84 F.3d 157, 166 (5th Cir.
1996) (relying on several Supreme Court cases); see also Valencia
v. Wiggins, 981 F.2d 1440, 1444 (5th Cir. 1993) (discussing how
"the Fourth Amendment protects against unreasonable 'seizures,'
[but] it seems primarily directed to the initial act of
restraining an individual's liberty"); Austin v. Hamilton, 945
F.2d 1155, 1162 (10th Cir. 1991) (holding that Fourth Amendment's
"objective reasonableness" standard applies until suspect's first
judicial hearing).

15

Here, Plaintiffs do not "contest the method or basis of the arrest" in their Complaint. Brooks, 84 F.3d at 166. They merely contest the fact of their incarceration.[10] This is not sufficient grounds for an allegation of a Fourth Amendment violation. Thus, this Motion is **GRANTED** to the extent that it relates to the portion of Count III relating to unlawful seizure.

   b.   **Eighth Amendment Cruel and Unusual Punishment**

Because Plaintiffs merely allege that they were not provided with adequate mental health treatment between initial incarceration and subsequent court hearings, a period of time over which Defendants Anderson, Law, and Fox had no authority over the named Plaintiffs and representative class, Defendants Anderson, Law, and Fox insist that Plaintiffs do not, and cannot, state a claim that the Defendants violated the Eighth Amendment cruel and unusual punishments clause.

It is well settled that a prisoner may state a cognizable claim for violation of the Eighth Amendment through Section 1983 by showing deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Wood v. Housewright, 900 F.2d 1332, 1337 (9th Cir. 1990). Plaintiffs here have so pled; Plaintiffs have claimed that Defendants

---

[10]Plaintiffs cite only to Youngberg v. Romeo, 457 U.S. 307 (1982), to support the proposition that the Fourth Amendment protects against unlawful imprisonment. Youngberg, however, deals with substantive rights under the Due Process Clause of the Fourteenth Amendment, and not the Fourth Amendment. Id. at 309.

Anderson, Law, and Fox failed to stop others from depriving Plaintiffs of their right to receive rehabilitative mental health treatment. Taking their allegations as true and in a light most favorable to Plaintiffs, Plaintiffs have stated a claim for an Eighth Amendment violation.

As evidence to withstand the alternative Motion for Summary Judgment, Plaintiffs point the court to the Declarations of Defendants Ted Sakai and Nolan Espinda as evidence that the DOH and HSH, and thus Defendants Anderson, Law, and Fox, turned patients away from HSH, and placed them in State penal facilities. The court agrees that the Declarations raise a genuine issue of material fact as to whether Defendants Anderson, Law, and Fox knew that Plaintiffs were incarcerated and that they did not receive the appropriate mental health treatment. Therefore the Motion is **DENIED**.

c.    **Fourteenth Amendment Due Process**

In the instant case, Plaintiffs insist that Defendants have improperly and wrongfully incarcerated them in violation of both their procedural and substantive due process rights.[11]

---

[11]The United States Supreme Court has held that the Fourteenth Amendment's declaration that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," U.S. Const. Amend. 14, § 1, actually guarantees more than just fair process; it also covers a substantive sphere which bars "certain government actions regardless of the fairness of the procedures used to implement them." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 840 (1998) (internal citations omitted).

Defendants Anderson, Law, and Fox, in contrast, maintain that
Plaintiffs cannot establish that their liberty interests were
violated by the Defendants, because the latter neither
participated in decision making about Plaintiffs' cases, nor made
recommendations or decisions as to the individual cases discussed
in any of the 3T (Adult Mental Health Division/OCCC-Public Safety
Collaborative Triage, Treatment and Tracking Team) meetings they
attended.  The court does not agree.

        The quintessential liberty interest arising under the
due process clause is freedom from incarceration.  See Oviatt v.
Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992).  Thus, by alleging
that they were unlawfully incarcerated, Plaintiffs have met the
"threshold requirement to a substantive or procedural due process
claim[, which] is the plaintiff's showing of a liberty or
property interest protected by the Constitution."  Stiesberg v.
California, 80 F.3d 353, 356 (9th Cir. 1990).  Plaintiffs have
successfully pled a violation of both substantive and procedural
due process under Section 1983 which survives this Motion to
Dismiss.

        Further, according to the Plaintiffs, the affidavits of
Defendants Sakai and Espinda establish that the Officials at DOH
and HSH had discretion as to whether Plaintiffs would be held in
the State's prisons, or in HSH.  The court finds that, at the
very least, this evidence is sufficient to raise a genuine issue

of material fact as to whether Defendants Anderson, Law, and Fox
violated Plaintiff's substantive and procedural due process
rights. See White v. Roughton, 530 F.2d 750, 754 (7th Cir. 1976)
(stating that "vesting virtually unfettered discretion in [State
officials] is clearly violative of due process); see also Holmes
v. New York City Housing Authority, 398 F.2d 262, 265 (2d Cir.
1968); Hornsby v. Allen, 326 F.2d 605, 610 (5th Cir. 1964).
Hence, the Motion is **DENIED**.

   3.   **Qualified Immunity for Section 1983 Claims**

      Defendants Anderson, Law, and Fox next argue that they
are entitled to qualified immunity.  Qualified immunity shields
officials from civil liability, but only to the extent that the
conduct in question does not "violate clearly established
statutory or constitutional rights of which a reasonable person
would have known."  Thompson v. Souza, 111 F.3d 694, 698 (9th
Cir. 1997); Somers v. Thurman, 109 F.3d 614, 616-17 (9th Cir.
1997).  A legal right is "'clearly established' if the contours
of that right are sufficiently clear that a reasonable official
would understand that what he is doing violates that right."
Jensen v. City of Oxnard, 145 F.3d 1078, 1085 (9th Cir. 1998).

      Defendants Anderson, Law, and Fox argue that they did
not know, nor could they have known, what constitutes reasonable
detainment prior to transferring acquitted and committed
defendants from prison to mental health facility because the law

was not "clearly established" until this Court's November 16,
2000 Order. Defendants Anderson, Law, and Fox define the issue
too narrowly. Here, the legal rights which Plaintiffs allege
that Defendants Anderson, Law, and Fox have violated arise under
the Eighth and Fourteenth Amendments, which makes them clearly
established legal rights.

            a.   **Qualified Immunity on Eighth Amendment Claims**

            It is sufficiently clear and well-established that
"deliberate indifference to serious medical needs of prisoners
constitutes the unnecessary and wanton infliction of pain
proscribed by the Eighth Amendment and its prohibition against
cruel and unusual punishment." <u>Vaughan v. Ricketts</u>, 859 F.2d
736, 741 (9th Cir. 1988) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97,
104 (1976)). Taking Plaintiffs' allegations as true, which the
court must for purposes of this motion, Defendants' denial of
mental health treatment and rehabilitation to Plaintiffs
constituted an Eighth Amendment violation.

            Despite the fact that the law was clearly established,
Defendants Anderson, Law, and Fox still would be entitled to
qualified immunity if they could nonetheless "have reasonably but
erroneously believed that [their] conduct did not violate the
plaintiff's rights." <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074
(9th Cir. 2001) (citing <u>Saucier v. Katz</u>, 121 S.Ct. 2151 (2001));
<u>see also Thompson</u>, 111 F.3d at 698; <u>Somers</u>, 109 F.3d at 617.

20

This "reasonableness" must be judged objectively (i.e., by using the standard of a reasonable officer in light of the facts and circumstances surrounding him), and not be based upon Defendants' intent or motivation. See Thompson, 111 F.3d at 698; Mendoza v. Block, 27 F.3d 1357, 1361-62 (9th Cir. 1994).

    The Ninth Circuit has commented that a supervisor will only be held liable for the constitutional violations perpetrated by his subordinates if he participated in, directed, or knew of the violations, yet still failed to prevent them. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Although Plaintiffs have not provided evidence that Defendants Anderson, Law, and Fox specifically knew that Plaintiffs were being injected with anti-psychotic drugs, there is evidence to suggest that Defendants Anderson, Law, and Fox knew that Plaintiffs were being improperly incarcerated, rather than placed in the appropriate mental health facility.[12] As a result, the court finds that reasonable officials in Defendant Anderson's, Defendant Law's, and Defendant Fox's positions would have known that they were not meeting the Plaintiffs' serious medical needs and therefore were violating the Plaintiffs' Eighth Amendment rights. Accordingly, Defendants Anderson, Law, and Fox are not protected by qualified immunity in their Individual Capacities and this portion of the Motion is **DENIED**.

_____

[12] See I.B.2.b supra 16-17.

21

b. Qualified Immunity on Fourteenth Amendment Claims

As to the Fourteenth Amendment claims, the court finds that the law of due process is sufficiently clear to qualify as "well-established"--Plaintiffs have liberty interests in safe conditions of confinement and freedom from bodily restraint.[13] Youngberg v. Romeo, 457 U.S. 307, 315 (1982).

Plaintiffs have raised a genuine issue of material fact as to whether Defendants Anderson, Law, and Fox knew that Plaintiffs were improperly incarcerated in penal facilities. To impede a person's liberty interest by incarcerating them when they have been acquitted of the crimes charged against them is undoubtedly a violation of substantive due process; any "reasonable official" would know this. Therefore, Defendants Anderson, Law, and Fox are not protected by qualified immunity as to the Fourteenth Amendment claims arising under Section 1983 against them in their individual capacities. The Motion is **DENIED**.

4. Section 1983 and Respondeat Superior Liability

Defendants Anderson, Law, and Fox next argue that they are entitled to dismissal because Section 1983 does not provide for respondeat superior liability. Plaintiffs concede that this

---

[13]An individual's interest in bodily liberty must be weighed against the State's reasons for the restraint of liberty. Youngberg, 457 U.S. at 320.

22

is correct.  See Rise v. State of Oregon, 59 F.3d 1556, 1563 (9th Cir. 1995); see also Mcnell v. Dept. of Social Services of New York, 436 U.S. 658, 691-94 (1978).

Nonetheless, a plaintiff may sue a state official under section 1983 *if* that official plays "an affirmative part in the alleged deprivation of constitutional rights." Rise, 59 F.3d at 1563; King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987).  For example, an official could effectuate a policy causing the deprivation of constitutional rights.  Monell, 436 U.S. at 692, 698.

Plaintiffs have alleged that Defendants Anderson, Law, and Fox directly participated in Fourteenth Amendment violations by attending meetings at which it was decided that Plaintiffs would be unlawfully incarcerated in penal institutions rather than placed in appropriate mental health facilities.  Taking these allegations in the Complaint as true, Plaintiffs have stated a cause of action for individual liability, not merely for liability under respondeat superior.  Therefore, Defendants are not entitled to dismissal.

Also, Plaintiffs have provided the court with evidence suggesting that Defendants Anderson, Law, and Fox may have played affirmative roles in the deprivation of Plaintiffs' Eighth and Fourteenth Amendment rights, and/or may have effectuated an official policy of ignoring Plaintiffs' serious medical needs and

unlawfully incarcerating acquittees. Defendants Anderson, Law,
and Fox have stated in their affidavits that they had no personal
knowledge of the facts alleged in the Complaint. Because a
genuine issue of material fact exists with regards to Defendants'
participation in Fourteenth Amendment violations, the Motion for
Summary Judgment as to this portion of the Complaint is **DENIED**.

C.    State Law Claims and Supplemental Jurisdiction.

Defendants Anderson, Law, and Fox ask that once the
court dismisses all federal claims, the court also dismiss all
state law claims brought under Supplemental Jurisdiction. The
court has not dismissed all Plaintiffs' federal claims, and the
court still has federal question jurisdiction over the State and
Defendants Anderson, Law, and Fox in their Official Capacities.
See 28 U.S.C. § 1367. Hence, this part of the Motion is **DENIED**.

D.    State Law Claims; Showing of Malice and Improper
      Purpose

Defendants Anderson, Law, and Fox suggest that, if the
court retains supplemental jurisdiction over the state law
claims, the court nonetheless should dismiss them, because
Defendants are entitled to qualified immunity under state law.
The court disagrees.

In order to defeat a claim of privilege asserted by a
government official, a party must prove that the official "had
been motivated by malice and not by an otherwise proper purpose."

24

Towse v. State, 647 P.2d 696, 702 (Haw. 1982); see also Black v.
City and County of Honolulu, 112 F.Supp.2d 1041, 1048-49 (D. Haw.
2000) (referring to and quoting applicable state law).  Hence, in
the instant case, the Plaintiffs bare the burden "of adducing
clear and convincing proof that defendant was motivated by malice
and not by an otherwise proper purpose."  Orso v. City and County
of Honolulu, 534 P.2d 489, 492 (Haw. 1975) (quoting Medeiros v.
Kondo, 522 P.2d 1269, 1272 (Haw. 1974)).  Here, Plaintiffs have
met their burden in coming forward with evidence sufficient to
create a triable issue of material fact.  The courts have held
that maliciousness for the purposes of qualified immunity is to
be judged by a "'reasonable man' test"; in other words,
Defendants Anderson, Law, and Fox were "'required to act as . . .
reasonable [men and women] under the circumstances.'"  Towse, 647
P.2d at 703 (quoting Russell v. Am. Guild of Variety Artists, 497
P.2d 40, 45 (Haw. 1972) (internal citations omitted)).  This
court finds that a reasonable man or woman would not have
improperly incarcerated Plaintiffs without adequate mental health
care and therefore **DENIES** the Motion as to all state claims
alleged against Defendants Anderson, Law, and Fox in their
respective Individual Capacities.

II    Plaintiffs' Motion for Partial Summary Judgment and
      Permanent Injunction

        In their Motion, Plaintiffs ask the court to grant
permanent injunctive relief and partial summary judgment on all

remaining claims, except as to those claims on appeal to the
Ninth Circuit.[14]  These claims include ones for injunctive and
declaratory relief against the State and Official Capacity
Defendants[15] under the ADA and Section 504, injunctive and
declaratory relief against the State and Official Defendants
under Sections 1983 and 1985, and state law claims for, inter
alia, negligence and negligent supervision.

A.    Standard for Issuance of Permanent Injunctive Relief

     The issuance of permanent injunctive relief involves
factual, legal, and discretionary decisions on the part of the
district court.  See Walters v. Reno, 145 F.3d 1032, 1047 (9th
Cir. 1998).  It is appropriate where a party has challenged
government policies resulting in a "pattern of constitutional
violations."  Id. at 1048.

     To establish that it is entitled to permanent
injunctive relief, a party must show that it would sustain
irreparable injury in the absence of the injunction, and that
legal remedies are inadequate.  See id.; Easyriders Freedom
F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1495 (9th Cir. 1996).  To

---

[14]The State Defendants, which includes the State of Hawaii
and Defendants Sakai, Espinda, Anderson, and Law, in their
respective official capacities, are appealing the court's denial
of Eleventh Amendment immunity from Plaintiffs' claims for money
damages under the ADA and Section 504.

[15]Refers to State of Hawai`i, and, in their respective
official capacities, Sakai, Espinda, Anderson, Law, and Fox.

that end, a plaintiff must establish actual success on the merits of the case and that the "balance of equities" tips in favor of an injunction. <u>Walters</u>, 145 F.3d at 1048.  The plaintiff must prove its case by a preponderance of the evidence.  <u>See</u> <u>id.</u>

  Once a constitutional violation has been ascertained by the court, it has broad discretion to fashion a remedy.  <u>See</u> <u>American-Arab Anti-Discrimination Comm. v. Reno</u>, 70 F.3d 1045, 1071 (9th Cir. 1995).  A court should be mindful, however, that when issuing an injunction against a state government, the remedy should protect the "plaintiffs' federal constitutional and statutory rights but [should] not require more of state officials than is necessary to assure their compliance with federal law." <u>Easyriders</u>, 92 F.3d at 1496; <u>Clark v. Coye</u>, 60 F.3d 600, 604 (9th Cir. 1995).

  B. **Success on the Merits of the Claims**

  Based on the standard for permanent injunctive relief, this court must ascertain whether Plaintiffs here are entitled to summary judgment on their claims in order to obtain permanent injunctive relief.

   1. **The Claim under the ADA**

  To establish a violation of Title II of the ADA, Plaintiffs must show that: (1) they are qualified individuals with disabilities; (2) they were excluded from participation in or denied the benefits of a public entity's services, programs,

or activities; and (3) such exclusion or denial of benefits was because of Plaintiffs' disabilities. <u>See</u> <u>Jeffrey v. St. Clair</u>, 933 F. Supp. 963, 970 (D. Haw. 1996). Plaintiffs carry the burden of proof. <u>Id.</u>

The Ninth Circuit has explicitly stated that "mental health services and other activities or services undertaken by law enforcement and provided by correctional facilities to those incarcerated are 'services, programs or activities of a public entity' within the meaning of the ADA." <u>Lee</u>, 250 F.3d at 691 (defining "public entity").

Here, it is clear that Plaintiffs are "qualified individuals with disabilities." Plaintiffs have been diagnosed with mental disabilities and have been determined to be mentally incompetent by a panel of experts assembled by the state court, making them "disabled" for purposes of the ADA. State and Official Capacity Defendants do not argue otherwise.

Second, there is no doubt that Plaintiffs in this case were denied the benefits of the state's services, both by being excluded from the HSH and by being denied treatment during their stays in the various penal institutions. The State of Hawaii has a "program" in place, namely HRS § 704-411, which requires appropriate placement and mental health treatment of these Section 704-411 acquittees. Plaintiffs have provided evidence to show that they were denied these benefits. <u>See</u> <u>Olmstead v.</u>

<u>Zimring</u>, 527 U.S. 581, 598 (1999) (stating that ADA has very comprehensive view of concept of discrimination which does not require identification of comparison class in order to show discrimination).

The remaining question is whether the denial of these benefits was done by reason of Plaintiffs' disabilities. While the court has no doubt that Plaintiffs were "discriminated" against as that word is defined by the ADA, the court is not convinced, however, that it was "by reason of" their disabilities. Plaintiffs have argued to the court that they were placed in penal facilities and denied treatment in order "to avoid the terms of the federal consent decree applicable to the Hawai`i State Hospital and to avoid its obligations under the law." Memo. in Support of Mot. for Partial Summ. Judg., 11. This may be true, and if so, is egregious behavior. It does not, however, allege that Plaintiffs are being mistreated based on their disability. Plaintiffs have provided the court with no evidence as to the basis upon which they were chosen to be denied from the HSH, but it seems unlikely that it was due to their mental disability. If it were, HSH would be turning down each patient that attempted to enter.

Thus, Plaintiffs have not proven the merits of their ADA claim and a genuine issue of material fact remains as to the reason for the denial of benefits to Plaintiffs. <u>Cf</u>. <u>Jeffrey</u>,

933 F. Supp. at 970.  The Motion for Partial Summary Judgment as to Plaintiffs' claims under the ADA is therefore **DENIED**.

### 2.    The Claims under the Rehabilitation Act

Section 504 states, in pertinent part, that

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).  To prevail under Section 504, then, Plaintiffs must allege that: (1) they are individuals with disabilities; (2) they are "otherwise qualified" to receive the benefits of a program; (3) they were denied the benefits by reason of their disabilities; and (4) the program receives federal financial assistance.  See Weinreich v. Los Angeles County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997); Morris v. North Hawaii Community Hosp., 37 F. Supp. 2d 1181, 1186 (D. Haw. 1999).

For the same reason Plaintiffs failed to meet their burden on their ADA claim, they do not succeed on their Section 504 claim; there remains a genuine issue of material fact as to the reason Plaintiffs were denied the benefits of the State's program.  Therefore, the court **DENIES** Plaintiffs' Motion insofar as it applies to partial summary judgment on the claims under the Rehabilitation Act.

3.    The Claims under Section 1983

Plaintiffs seek a permanent injunction to prevent what they refer to as the "repeated violations" of their rights under the Fourth, Eighth, and Fourteenth Amendments.  At the outset, the court would like to note that the Ninth Circuit has commented that "for the ordinary citizen, commitment to a mental hospital produces a massive curtailment of liberty, and in consequence requires due process protection." United States v. Budell, 187 F.3d 1137, 1141 (9th Cir. 1999) (internal citations omitted). Moreover, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."  Id.

With this framework in mind, the court turns to Plaintiffs' claims.  Section 1983 is not a "source of substantive rights"; rather, it provides a "method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994); Graham v. Connor, 490 U.S. 386, 393-94 (1989).  Thus, the first step in any section 1983 action is to determine the constitutional violation alleged.  Albright, 510 U.S. at 271; Graham, 490 U.S. at 394.

a.    Fourth Amendment

For the reasons discussed in part I.B.2.a supra, the court DENIES Plaintiffs' Motion as to section 1983 liability for violations of the Fourth Amendment.

31

### b.    Eighth Amendment

A government official violates an inmate's Eighth Amendment rights when the official is deliberately indifferent to the inmate's medical needs. See Estelle, 429 U.S. at 104; Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000); Johnson v. Meltzer, 134 F.3d 1393, 1398 (9th Cir. 1998); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997)). Officials' actions are considered "deliberately indifferent" when the officials "deny, delay, or intentionally interfere with medical treatment." Lopez, 203 F.3d at 1131; McGuckin, 974 F.2d at 1059. "Serious medical needs" are defined as "an injury that a reasonable doctor ... would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities." Lopez, 203 F.3d at 1131; McGuckin, 974 F.2d at 1059-60.

Here, Plaintiffs have established that the State and Official Capacity Defendants denied Plaintiffs medical treatment. This constitutes deliberate indifference. See Lopez, 203 F.3d at 1131; McGuckin, 974 F.2d at 1059. Furthermore, it is undisputed that doctors would find Plaintiffs' conditions serious or "worthy of treatment"; in fact, a panel of State doctors determined that these Plaintiffs needed mental health rehabilitation. Because

32

State and Official Capacity Defendants have offered no evidence
to the contrary, Plaintiffs' Motion for Partial Summary Judgment,
as it pertains to violations of the Eighth Amendment, is **GRANTED**.

### c.    Fourteenth Amendment

The Fourteenth Amendment bars a state from depriving a
person of liberty.  See Lee, 250 F.3d at 683.  Indeed, the
quintessential liberty interest arising under the due process
clause is freedom from incarceration--a person "has a liberty
interest in being free from incarceration absent a criminal
conviction."  Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir.
1992) (citing Baker v. McCollan, 443 U.S. 137, 144 (1979)); see
also Youngberg, 457 U.S. at 316 (discussing how freedom from
bodily restraint is at heart of liberty interests protected by
due process).  Nonetheless, a state may confine a mentally ill
person if he is dangerous.  Foucha v. Louisiana, 504 U.S. 71, 80
(1992).

Here, Plaintiffs were acquitted of the crimes with
which they were charged.  Although they had been committed to the
HSH, they had not been, and should not have been, incarcerated.
Plaintiffs' liberty interest in freedom from incarceration was
infringed.  The State and Official Capacity Defendants do not
offer a compelling state interest as explanation for why the
Plaintiffs' fundamental liberty interests were infringed.  See
Reno v. Flores, 507 U.S. 292, 301 (1993) (infringement of

33

person's fundamental liberty interest must be narrowly tailored to serve compelling state interest). Thus, the court **GRANTS** Plaintiffs' Motion for Summary Judgment as to section 1983 liability violations of the Fourteenth Amendment.

    4.   **State Law Claims**

Plaintiffs also ask for injunctive relief for violations of state statutes and the State Constitution. Plaintiffs have pled four state causes of action in their Complaint: negligent supervision, false imprisonment, assault and battery, and negligence.

The court finds it unnecessary to discuss these causes of action. First, the injunction will issue based on the aforementioned violation of the federal Constitution. Therefore, there is no need to find another ground upon which to grant the injunction. Second, and more importantly, a federal court cannot enjoin a State official to follow state law. <u>See</u> <u>Pennhurst State School and Hospital v. Halderman</u>, 465 U.S. 89, 105 (1984); <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1087 (9th Cir. 1986). For these reasons, the court cannot enter the injunction sought by Plaintiffs on their proposed State law bases.

Furthermore, the court may not grant monetary relief on these claims against the State and Official Capacity Defendants, nor may it grant injunctive relief based on these claims. Therefore, to issue an order stating that the State and Official

Capacity Defendants have violated these State laws would be, in effect, tantamount to the issue of an advisory opinion. Federal courts may not render advisory opinions. See Golden v. Zwickler, 394 U.S. 103, 108 (1969). For all of the above reasons, the court will not address Plaintiffs' state law claims seeking injunctive relief.

### C.    Balance of Equities

The State and Official Capacity Defendants argue that the court should not grant a permanent injunction because they have thus far complied with the preliminary injunction issued on November 16, 2000. They argue that to issue a permanent injunction would be premature and inappropriate. The court does not agree.

The State and Official Capacity Defendants offer no law to support their argument of prematurity. They simply argue that the preliminary injunction appears to be doing its job. As the court articulated at the November 9, 2000 hearing, however, the court is not only concerned for Plaintiffs now, or in a few weeks from now (i.e., when this case is fresh in everyone's mind); the court is also concerned for Plaintiffs in the future. In light of the recent Lopes incident, it appears this court had, and still has, good cause for such concern. Although Plaintiffs correctly point out that a permanent injunction should issue

following a trial on the merits, a finding of entitlement to summary judgment on the merits is the same for these purposes.

Here, Plaintiffs have prevailed on the merits of the majority of their constitutional claims. Plaintiffs have shown a pattern of Eighth and Fourteenth Amendment violations. The loss of constitutional rights is an irreparable injury. Thus, Plaintiffs have also shown that the "balance of equities" tips in favor of an injunction. The court **GRANTS** the Plaintiffs' Motion for a Permanent Injunction.

The court is mindful that when fashioning a remedy, it should protect "plaintiffs' federal constitutional and statutory rights but [should] not require more of state officials than is necessary to assure their compliance with federal law." Easyriders, 92 F.3d at 1496; Clark, 60 F.3d at 604. For this reason, the court issues a Permanent Injunction, effective immediately, which replaces the Preliminary Injunction issued on November 16, 2000. By the terms of this Permanent Injunction, the State of Hawai`i, its officers and employees, are ordered to comply with the following requirements:

Upon a judgment of acquittal of criminal charges in state court, under HRS § 704-411(1)(a), that includes the requisite finding that an acquitted defendant ("acquitee") presents a risk of danger to oneself or others and that the acquitee is not a proper subject for conditional release, and

36

that thereby orders commitment of the acquitee to the custody of the Director of Health, the acquitee shall be transferred to the physical custody of the Director of Health within seventy-two(72) hours of such judgment of acquittal and commitment.

An acquitee who is conditionally released pursuant to HRS §§ 704-411, 704-412, and 704-413 ("CR Acquitee"), who is subsequently arrested for alleged acts or omissions that violate the conditions of his or her conditional release, shall not be held in a facility controlled by the Hawai`i Department of Public Safety for a period of time longer than the time needed to identify the person, determine his or her legal status, and determine whether the person will be charged with a crime, and in no case for a period that exceeds forty-eight (48) hours, except that transfer of custody from facilities on islands other than Oahu may exceed the forty-eight (48) hour period, so long as transport is made by the first available flight.

Those individuals who are being held in custody by the Department of Corrections or any county police department or any law enforcement agency during the period of time prior to transfer to the custody of the State of Hawaii Department of Health shall be segregated from the general prison or jail population and to the extent practical be provided appropriate mental health evaluations.

37

This Permanent Injunction shall not apply to CR Acquitees who are, in conjunction with an arrest, alleged to have committed acts that constitute misdemeanor offenses involving violence or attempted violence, or felony offenses, as defined by state or federal law.

This order shall remain in effect, *pendente lite*, or until further order of this court.

### III   Defendants Sakai and Espinda in their Individual Capacities' Motion to Dismiss or for Summary Judgment

Defendants Sakai and Espinda, in their respective Individual Capacities, ask the court to dismiss the case against them or to grant summary judgment in favor of them on the grounds of qualified immunity.  For its exposition on the law of qualified immunity, the court hereby incorporates by reference its discussion from part I.B.3 <u>supra</u>.

Defendants Sakai and Espinda concede that the constitutional rights alleged to have been violated in the Complaint are well established, but they argue, inter alia, that a reasonable official in their position would have thought that his conduct was lawful because they acted pursuant to court orders.  The court agrees.

Defendants Sakai and Espinda discharged their duties in accordance with what they were ordered to do by state courts, and what was directed of them through Hawai`i statutes.  Therefore,

it would be reasonable for an officer to believe that following
court orders was not a violation of the law.  Although the court
finds the circumstances surrounding the holding of Plaintiffs
unacceptable, it also determines that to hold these State
officials liable in their individual capacities would be to
contravene the very purpose of the qualified immunity doctrine.
Therefore, the court **GRANTS** the Motion of Defendants Sakai and
Espinda in their Individual Capacities to Dismiss.

IV   Defendants' Motion for Judgment on the Pleadings

As a threshold matter, Plaintiffs argue that the
pleadings in this case are not closed and therefore may not be
ripe for review.  Plaintiffs are correct in their assertion that
Rule 12(c) motions may not be brought until the pleadings are
closed. See Fed R. Civ. P. 12(c).  "Generally, this means a Rule
12(c) motion must await the answers of all defendants." Moran v.
Peralta Community College Dist., 825 F.Supp. 891, 893 (N.D. Cal.
1993).  In the instant case, Defendants have filed their answer
to Plaintiffs' Second Amended Complaint; therefore, the pleadings
are closed and are ripe for review. See Carmen v. San Francisco
Unified School Dist., 982 F.Supp. 1396, 1401 (N.D. Cal. 1997)
(Rule 12(c) motion was timely because Defendants had answered
Plaintiff's Fourth Amended Complaint).

A.   Standard of Review

The Federal Rules of Civil Procedure provide in relevant part as follows:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. . . .

See Fed. R. Civ. P. 12(c). The dismissal on the pleadings is proper only if the moving party is clearly entitled to prevail. See Doleman v. Meiji Mutual Life Insurance Co., 727 F.2d 1480, 1482 (9th Cir. 1984); see also Westlands Water Dist. v. Firebaugh Canal, 10 F.3d 667, 671 (9th Cir. 1993). All allegations of fact of the opposing party are accepted as true. See Doleman, 727 F.2d at 1482. However, to the extent that "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed. R. Civ. P. 12(c).

B.   **Statute of Limitations**

The applicable statute of limitations in the present case is two years. See Oct.4, 2000 Order, 30. Thus, the State and Official Capacity Defendants and the Individual Capacity Defendants[16] insist that the statute of limitations bars all claims for damages for alleged wrongful incarceration *prior* to

---

[16]Refers to Sakai, Espinda, Anderson, Law, and Fox who, in their individual capacities, joined in State and Official Capacity Defendants' Motion, but only as to the Statute of Limitations portion.

40

December 19, 1997. Plaintiffs disagree, claiming that class members may maintain claims for periods of allegedly wrongful incarceration *before* December 19, 1997 when (i) the Plaintiffs also were allegedly wrongfully incarcerated *after* December 19, 1997 and (ii) the Plaintiffs' alleged wrongful incarceration *started before*, but concluded *after* December 19, 1997. Specifically, Plaintiffs make the following two arguments: (1) the continuing tort doctrine tolls the statute of limitations for class members who were allegedly wrongfully incarcerated on after December 19, 1997 and (2) Defendants' practice of unlawfully incarcerating insanity acquittees in state prison constitutes a pattern of unlawful conduct, which, under the continuing violations doctrine, allows Plaintiffs to seek relief outside the limitations period.

Plaintiffs are correct in their assertion that the statute of limitations may be tolled by way of a continuing tortious act. See, e.g., Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472 (9th Cir. 1989); Anderson v. State, 965 P.2d 783 (Haw. App. 1998)(claim for intentional infliction emotional distress was a continuing tort and therefore tolled statute of limitations). A "continuing tort" is defined as "one inflicted over a period of time. . . that occurs so repeatedly that it can be termed 'continuous,'

41

such that one may say that the tortious conduct has not yet ceased." <u>Anderson</u>, 965 P.2d at 789-90.

In the present case, those Defendants who were allegedly wrongfully incarcerated *before* December 19, 1997, acquitted under HRS § 704-411, and then allegedly wrongfully incarcerated a second time *after* December 19, 1997 for violations of their conditional release have not suffered a continuing tort. Two separate incidents of wrongful incarceration occurred. The fact that the second incarceration stemmed from the conditional release associated with the first incarceration, does not constitute a single on-going unlawful act. The violation of the conditional release was a separate action taken by the Plaintiff that resulted in the second alleged unlawful incarceration, it was not caused by the initial alleged wrongful incarceration.

However, as for the Plaintiffs whose alleged wrongful incarceration *started before* but concluded *after* December 19, 1997, the so called "straddle" Plaintiffs,[17] the continuing tort doctrine applies. This is because these Plaintiffs suffered a harm within the eligible period that originated before the eligible period.

---

[17]The court notes Defendants' claim that no such Plaintiffs have yet been identified, but the court takes this opportunity to clarify the matter nonetheless.

42

Although the continuing tort doctrine does not toll the statute of limitations for all the Plaintiffs, Defendants' Statute of Limitations Motion is denied, nonetheless, under the continuing violations theory. In the context of Title VII employment discrimination or sexual harassment claims, the "continuing violations doctrine" applies "when a plaintiff alleges a 'series of related acts, one or more of which falls within the limitations period' and when only a few discriminatory acts took place during the limitations period, but these acts were part of an ongoing unlawful employment practice." Fielder v. UAL Corp., 218 F.3d 973, 983 (9th Cir. 2000) (quoting Green, 883 F.2d at 1480-81); see also, Anderson v. Reno, 190 F.3d 930, 936 (9th Cir. 1999); Williams v. Owens-Illinois, Inc., 665 F.2d 918, 924 (9th Cir. 1982). Plaintiffs must provide evidence showing "a series of related discriminatory acts." Anderson, 190 F.3d at 936.

Plaintiffs argue that prior incidents of incarceration were representative of Defendants' harmful policy and practice and thus invoke the continuing violation doctrine. See Pl.'s Opp., 9. The court agrees. The Anderson court found that the events preceding the limitations period showed a pattern of harassment no different from the events that occurred during the limitations period, and, on those grounds, invoked the continuing violation doctrine. See Anderson, 190 F.3d at 936-37. Likewise,

43

in the present case, the Defendants have failed, in both pre-
limitations and post-limitations periods, to properly place
Plaintiffs in HSH.  Just as the pattern of harassment invoked the
continuing violations doctrine in <u>Anderson</u>, so the Defendants'
unlawful agency-wide policy invokes the continuing violations
doctrine in the instant case.  <u>See</u> <u>Anderson</u>, 190 F.3d at 936-37.
Accordingly, State and Official Capacity Defendants' and
Individual Capacity Defendants' Motion for Judgment on the
Pleadings as to the Statute of Limitations is **DENIED**.

C.    **Plaintiffs Fifth and Eighth Causes of Action**

State and Official Capacity Defendants move this Court
to dismiss with prejudice the state-law tort claims contained in
Plaintiffs' fifth and eighth causes of action.  State and
Official Capacity Defendants correctly point out, and Plaintiffs
concede, that this Court ruled in its October 4, 2000 Order that
the Eleventh Amendment bars state law claims against the State of
Hawai`i and Official Capacity Defendants.  <u>See</u> Order, 23; State
Def.'s Mot., 6; Pl.'s Opp., 14-15.

The Eleventh Amendment bars the federal courts from
exercising supplemental jurisdiction over a state law claim
seeking injunctive relief against a state official acting in his
or her official capacity.  <u>See</u> <u>Pennhurst</u>, 465 U.S. at 106, 117
(holding the Eleventh Amendment "applies ... to state law claims
brought into federal court under pendent jurisdiction").

However, as Plaintiffs correctly argue, the Eleventh Amendment does not bar a suit against state officials in their individual capacity. See Pena v. Gardner, 976 F.2d 469, 472-74 (9th Cir. 1992) (holding Eleventh Amendment does not bar federal or pendent state claims seeking damages against a state official acting personally).

The State and Official Capacity Defendants' motion challenges neither the claims against the Defendants in their individual capacities, nor the court's supplemental jurisdiction over such claims.[18]  Therefore, the court will not address those matters at this time.  In light of this court's previous Order and the relevant case law, the court finds that Plaintiffs' state-law claims, to the extent they are against the State of Hawai`i and Defendants in their *official* capacity, should be dismissed without prejudice. See Freeman v. Oakland Unified Sch. Dist., 179 F.3d 846, 847 (9th Cir. 1999) ("Dismissals for lack of jurisdiction 'should be ... without prejudice so that a plaintiff may reassert his claims in a competent court.'") (quoting Frigard v. United States, 862 F.2d 201, 204 (9th Cir. 1988)).  The court **GRANTS** State and Official Capacity Defendants' Motion for Judgment on the Pleadings as to Plaintiffs' Fifth and Eighth Causes of Action.

---

[18]Plaintiffs unilaterally address these issues in their Opposition.  See Pl.'s Opp. 14-20.

V    Plaintiffs' Motion for Issuance of Order to Show Cause Why Defendants Should Not be Held in Contempt of Preliminary Injunction

Plaintiffs request the court's issuance of an order for the Defendants to show cause why they should not be sanctioned, enjoined or held in contempt of the court's Preliminary Injunction issued November 16, 2001.[19]

On August 22, 2001, CR Acquitee, Jerry A. Lopes, was held at OCCC for approximately 48 hours until his August 24, 2001 court appearance and then for approximately five additional days until his August 29, 2001 transfer to HSH.  See Pl.'s Mot., 4; State and Official Capacity Def.'s Opp., 4, Ex. B, C.  Thus, Mr. Lopes, a CR Acquitee arrested for alleged acts that violated the conditions of conditional release, was held in a DPS Facility for a period that exceeded the 48 hour maximum--an egregious

---

[19]The November 16, 2000 Preliminary Injunction followed the October 30, 2000 Temporary Restraining Order and stated, in significant part, that (1) Acquitees must be transferred to the custody of the Director of Health within 72 hours of judgment of acquittal and commitment, (2) CR Acquitee arrested for alleged acts that violate the conditions of conditional release must not be held in a DPS Facility for longer necessary to identify the person, determine the person's legal status, and determine whether the person will be charged with a crime--in no case for a period that exceeds 48 hours, and (3) individuals who are being held in custody must be segregated from the general prison or jail population and, to the extent practical, be provided appropriate mental health evaluations.

46

occurrence that undeniably violated this court's Preliminary Injunction.

## Standard of Review

A federal court has inherent power to enforce its orders by way of civil contempt. See <u>Spallone v. United States</u>, 493 U.S. 265, 276 (1990). The district court has "wide latitude" in determining whether there has been contemptuous violation of one of its orders. See <u>Stone v. City and County of San Francisco</u>, 968 F.2d 850, 856 (9th Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 1050 (1993) (citing <u>Gifford v. Heckler</u>, 741 F.2d 263, 266 (9th Cir. 1984)). Contempt orders are reviewed for abuse of discretion. <u>Id.</u> The Ninth Circuit's test with regard to contempt has long been whether the defendants have taken "all reasonable steps within their power to insure compliance" with the court's orders. <u>Sekaquaptewa v. MacDonald</u>, 544 F.2d 396, 404 (9th Cir. 1976), <u>cert. denied</u>, 430 U.S. 931 (1977); <u>see also</u> <u>General Signal Corp. v. Donallco, Inc.</u>, 787 F.2d 1376, 1379 (9th Cir. 1986).[20]

_____

[20]The <u>Sekaquaptewa</u> court held that the defendants had failed to take "every reasonable step" to comply because there was "little conscientious effort on the part of the appellants to comply with those orders. . . ." 544 F.2d at 406. More recent cases have held that "technical or inadvertent violations . . . will not support a finding of civil contempt." <u>General Signal Corp.</u>, 787 F.2d at 1379.

The party moving for the contempt order has the burden
of showing by clear and convincing evidence that the defendants
violated a specific and definite order of the court.  See Stone,
968 F.2d at 856 (citing Balla v. Idaho St. Bd. of Corrections,
869 F.2d 461, 466 (9th Cir. 1989)).  The burden then shifts to
the defendants to demonstrate why they were unable to comply
after taking every reasonable step.  Id. (citing Donovan v.
Mazzola, 716 F.2d 1226, 1240 (9th Cir. 1983), cert. denied, 464
U.S. 1040 (1984)).

## Discussion

Here, Plaintiffs have met their burden and shown, by
way of the Lopes incident, that Defendants[21] violated this
court's Preliminary Injunction.  However, the Defendants have
also offered evidence of their efforts to comply with the court's
orders and take reasonable steps to ensure compliance.  Defendant
Law attended meetings with State Circuit Judge Perkins and other
agency staffers to address the problems and develop better
procedures.  See Law Depo., 60-66.  Similarly, Defendants Sakai,
Anderson, and Anita Swanson met the day after the Lopes incident
to address the situation and draft a memorandum of understanding
between DPS and DOH to ensure compliance.  See Pl.'s Mot., Ex. F,
9.  Both Sakai and DPS warden, Clayton Frank, instructed their

---

[21]The Court finds it unnecessary to distinguish between the
Defendants for the purposes of this Motion.

48

staff to comply with the court's order.  See Sakai and Espinda
Def.'s Opp., Ex. B, 25; Sakai and Espinda Def.'s Opp., Ex. A.
Having offered evidence that they (i) were aware of the court's
TRO and preliminary injunction orders, (ii) instructed their
staff to comply with the orders, (iii) organized inter-agency
meetings to try and re-vamp the ailing transfer system, and (iv)
met to address the Lopes violation as soon as it was brought to
their attention, Defendants have shown that they took "reasonable
steps" to implement the preliminary injunction.  Furthermore,
Defendants have explained that the Lopes non-compliance was the
result of inadvertent error, not Defendants' lack of effort.  See
Sakai and Espinda Opp., 6 (Lopes incident caused by the
continuance of Lopes' conditional release order).  The fact that
Plaintiffs do not offer any other evidence of non-compliance
suggests that the Lopes incident was the result of a singular
inadvertant error, not a conscious disregard of the court's
order.[22]

_____

[22]Plaintiffs also offered as evidence of Defendants' non-
compliance with the Preliminary Injunction Robert Riddell's
October 28, 2000 - November 28, 2000 incarceration.  Although the
court finds the Riddell incident unfortunate at best, the court
must concur with Defendants that Riddell's lengthy incarceration
does not violate this court's November 16, 2000 Order.  Riddell's
charges were dismissed under HRS 704-406(2); therefore, Riddell
is not the subject of the court's Preliminary Injunction which
applies (1) to persons acquitted under § 704-411(1)(a) and (2) to
persons conditionally released under HRS §§ 704-411, 704-412, or
704-413 who are "subsequently arrested for alleged acts or
omissions that violate the conditions of his or her conditional

In light of the relevant case law and evidence presented, the court finds that Defendants are not in contempt of court. Accordingly, Plaintiffs' Motion is **DENIED**.

### Additional Remedies Requested

While the court acknowledges that "inadvertant error" caused the non-compliance in Lopes' case, the inescapable, and in this court's opinion very disturbing, fact remains that the Lopes incident did occur. As a result, more must be done to prevent the recurrence of such "errors."

In conjunction with the above and in accordance with Plaintiffs' request, the court **ORDERS** the Defendants to comply with the following reporting requirement: Defendants are to immediately notify Plaintiffs' counsel, the Hawai`i Disability Rights Center, of the date of incarceration of a class member and the date of transfer to HSH. Hopefully this will lessen the animosity and distrust between the parties and ensure that everyone is working together to prevent the recurrence of the unfortunate and inexcusable incident involving Mr. Lopes.

<u>CONCLUSION</u>

For the reasons stated above, the court GRANTS in part and DENIES in part Defendants Bruce Anderson and Wayne Law's

---

release." <u>See</u> Prelim. Injunc., 1-2. Plaintiffs, however, are free to amend the pleadings to include person's in Riddell's specific situation and request the Permanent Injunction include the amended class.

50

Motion to Dismiss or In the Alternative for Summary Judgment; GRANTS in part and DENIES in part Plaintiffs' Motion For Partial Summary Judgment and Permanent Injunction; GRANTS the Motion of Defendants Sakai and Espinda in Their Individual Capacities to Dismiss or for Summary Judgment; GRANTS in part and DENIES in part State and Official Capacity Defendants' Motion for Judgment on the Pleadings, as to (1) Statute of Limitations, and (2) Plaintiffs' Fifth and Eighth Causes of Action; DENIES Plaintiffs' Motion for Issuance of an Order to Show Cause Why Defendants Should Not Be Held in Contempt of Preliminary Injunction; and ORDERS Defendants to Comply with the Court's Reporting Requirement.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, NOV 8 2001

DAVID ALAN EZRA
CHIEF UNITED STATES DISTRICT JUDGE

Rodney W. Clark, et al. v. State of Hawaii, et al., CV. NO. 99-00885 DAE/BMK; ORDER

51

TOTAL P.01