**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO. 05-10528-RCL

DENISE M. BARRY JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA J.
MCDONOUGH; ELAINE MESITI, LILA
BROWN; MARY M. KANE, and JUDITH A.
KELLEY, individually and on behalf of all those
similarly situated,
     Plaintiffs,

v.

ROBERT J. MORAN, PAUL A. CHRISTIAN,
RODERICK FRASER, Jr., WILLIAM KESSLER,
RONALD KEATING, JOSEPH FINN, WILLIAM
HITCHCOCK, CITY OF BOSTON FIRE
DEPARTMENT, and JOHN and/or JANE DOES
1-50.
     Defendants.

<u>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE**</u>
<u>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**</u>

The Defendants, Robert Moran ("Moran"), Paul A. Christian ("Christian"), William Kessler

("Kessler"), Ronald Keating ("Keating"), Joseph Finn ("Finn"), Roderick Fraser ("Fraser"), William

Hitchcock ("Hitchcock") and City of Boston Fire Department ("BFD") file this memorandum of law

in support of their Opposition to the Plaintiffs' Motion for Class Certification.

## I.  <u>INTRODUCTION</u>

The named Plaintiffs in this matter, as well as the people they argue are similarly situated, are

not a class, are not victims of political affiliation discrimination as they would like this Court to

believe and have not been deprived of any rights under any federal or state law. The Plaintiffs are

employees in the civilian side of the BFD, as distinguished from the uniformed firefighters. They are

administrative assistants or the equivalent in this City of Boston department. They are eight women

who present eight different claims against the BFD and various employees of the department based

upon the argument that each woman was denied a different position within the department, a position

they claim entitlement to because of their employment history with the department. Each named

Plaintiff presents a different work history, a distinct educational background, a skill set unique to

each Plaintiff, and a work history within the department that is particular to that Plaintiff.  Any

"similarly situated" potential class member is also a present or former civilian employee of the BFD

who possesses or possessed a different work history, a distinct educational background, a skill set

unique to each plaintiff, and a work history within the department that is particular to that person.

A.    **Background of this Dispute**

> *"Change is difficult, and it will not be without its detractors"*
> Boston Fire Department Review Commission, 2000

In 2000, the Boston Fire Department Commission, also known as the "O'Toole

Commission", issued a report intended to "identify the very real problems and challenges that face

the Boston Fire Department today and to create a dialogue for change within the Department for the

future."  Boston Fire Department Review Commission Report, p. 1:4. Hereinafter "**Commission**

**Report**" attached hereto as **Exhibit A**.  It is no coincidence that the named Plaintiffs in this case

claim the year 2000 as the time frame when their "claims" arose.  It was in the year 2000 that the

City of Boston and the BFD endeavored to remedy past employment practices by addressing

systemic problems within the department that prevented genuine, positive progress in this vital

department. The leaders who undertook this review recognized that "an institution may appear overly

political to an employee involved in a competition for a particular position and not political enough

for the individual who has worked hard developing personal relationships only to be passed over for

a desired promotion."  *Commission Report,* p. 2:9.  It was recognized from the outset that tradition

played a role in an employee's perception of the department; "a positive tradition for some members

may be perceived as non-inclusive to others." *Commission Report,* p. 2:9.  One respondent to a

department wide survey prepared by the Commission summed up the environment within the
department at the time by saying "Our fear of change is killing us." *Commission Report,* p. 2:10.

The comprehensive analysis of the BFD as it existed prior to 2000 revealed that a significant
number of BFD employees complained of the "old boy network in place throughout the department."
*Commission Report,* p. 2:11. In words that could be attributed to the named Plaintiffs in this suit, the
Commission recognized that "there exists a strong perception that if you are not among the 'in'
crowd, you will not succeed." *Commission Report,* p. 2:11.

In direct response to the findings of the Commission, the department began to address culture
and leadership, discipline, supervision and training, department administration and personnel and
human resources. Past policies and procedures determined to be inhibiting the overall function of the
department were addressed immediately, new policies were implemented to bring about needed
change. These changes would extend to both uniformed and civilian employees of the department.
The department would turn to the business world for new methods of management.

The business model as applied to the BFD would bring a civilian commissioner with
significant management and leadership experience in to run the department, not a "political
patronage appointment but a manager with a proven ability to operate a large organization and with a
commitment to provide progressive and dynamic leadership." *Commission Report,* p. 5:23. This
model would call for the hiring of professional management in the area of human resources.
*Commission Report,* p. 6:32. "The Commission recommends that a professional Human Resources
manager be hired outside the collective bargaining unit to address personnel issues with the
organization." *Commission Report,* p. 6:38.

The effort to make the department as an employer open to all residents of the City and drive
the department in the future would demand the implementation of the business principle that has
propelled the private sector of our economy: hiring the best candidate for any position based upon the

applicant's leadership ability, personal ethics, interpersonal skills, education and employment background, and understanding of the duties, necessary skills and responsibilities of the position.

It would be this policy change that would cause the named Plaintiffs, members of the old system, to fight this change by filing this lawsuit. As detractors to the efforts of the department, they subscribed to the failed idea that jobs in the department must go to those who already work in the department. And rather than accept change and grow competitive, they would construct the theory to help justify this suit, namely, if someone is hired from outside the department, that person must be a political patronage appointment. They would paint each new hire with the same brush, even without knowledge of that person's credentials or qualifications.

It is in this context, with the distinct history of the BFD that this Court can begin to understand the claims of the Plaintiffs and consider whether there is a class worthy of certification under Fed. R. Civ. P. 23.

**B.     Facts Relevant to Issues Surrounding Class Certification**

Certain other facts about the named Plaintiffs and potential claimants must also be addressed from the outset so that this Court is equipped with relevant information and better able to make an informed decision[1]:

   **A.** None of the named Plaintiffs and none of the potential class members were discharged from their positions with the BFD as a result of any facts or claims alleged in the Complaint; *See* attached **Exhibit B, Affidavit of Robert J. Moran at ¶3.**

   B. None of the named Plaintiffs and potential class members sustained a loss in pay, a reduction in benefits or a diminution in earnings. *See id.* at ¶ 4.

   C. All of the named Plaintiffs and a substantial number of potential class members remain employed with the BFD and have received collectively bargained increases in pay and benefits over the course of their employment with the BFD. Since 2000, the civilian BFD

---

[1] With regards to what extent this Court may examine the merits of the Plaintiffs' claim and make factual inquiries when deciding a motion to certify a class, the First Circuit "appears to favor a more searching inquiry." *In re Polymedica Corp. Securities Litig.,* 224 F.R.D. 27,34 (D.Mass.2004). The Defendants also assert that inquiry under Rule 23(b)(3) requires a rigorous review of the facts to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

has had a pay increase and benefit increases in accordance with the union contracts of 2% yearly increments. *See id.* at ¶¶5-6.

D. Each of the named Plaintiffs and potential class members has had equal opportunity to apply for any open position within the BFD or other City department or agency. *See id.* at ¶ 7.

E. Their qualifications for any position for which they applied were evenly compared with other applicants. Those named and potential Plaintiffs who possessed the necessary qualifications for the open position were interviewed, and, if the best candidate for the position, hired. *See id.* at ¶8.

F. Each named and potential claimant was a member of a union, either Salaried Employees of America (SENA) or American Federation of State, County and Municipal Employees (AFSCME), and had open access to an accepted union grievance process if they believed that their rights had been violated by the BFD. Each named and potential claimant knew of these rights, rights which included a hearing backed by union representation if the union found sufficient grounds to pursue the grievance. *See id.* at ¶¶ 9-10.

G. The issue of promotion bypass was addressed in 2005 in an arbitration decision between AFSCME and the City of Boston. The arbitrator decided in favor of the City in its choice to hire Michelle Urso over Julie Barton in 2003. In a close examination of the qualifications of both Ms. Urso, an applicant from outside the department, and Julie Barton, an applicant from within the department, the arbitrator concluded that Ms. Urso's qualifications for this position were "significantly greater" than Ms. Barton's. This decision impacted Plaintiff, Denise Barry, who as a less senior applicant for this position, was bound by the decision rendered against Barton, a more senior applicant. *See* **In the Matter of the Arbitration between AFSCME and City of Boston**, attached hereto as **Exhibit C**. Despite this binding decision, the Plaintiffs' raise the department's decision to hire Ms. Urso in their complaint and argue that her hiring was not based upon qualifications but upon political considerations. *See* **Plaintiffs' Third Amended Complaint, attached hereto as Exhibit D**.

H. Of the potential class members comprised of current employees, as defined by counsel for the Plaintiffs, all but Judith Kelley continue to work at the BFD. None have been discharged, reprimanded, suspended or denied benefits or access to the union grievance process; *See* Exhibit B at ¶ 11.

I. Other than named plaintiff, Jane Green, no other current or past employee is asserting a claim of retaliation or fear of retaliation for asserting their rights under the law. *See* Exhibit D, Plaintiffs' Third Amended Complaint.

J. The First Amendment protects non-policymaking public employees from discrimination based on their political beliefs or affiliation. *Branti v. Finkel,* 445 U.S. 507 (1980). The plaintiff is required to show that "a causal connection exists linking defendants' conduct, as manifested in the adverse employment decision, to plaintiff's politics." *Id. See also Aviles-Martinez v. Monroig,* 963 F.2d 2, 5 (1st Cir.1992) (plaintiff-employee must show causal connection between his political affiliation and the adverse treatment). By way of contrast, each named plaintiff uses the same exact language in defining "political affiliation", Answer No. 17 to Defendants' Interrogatories to the Plaintiff: "Political affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of

who they knew, who sponsored them, and who supported them, rather than merit." *See*
**Exhibit E Plaintiffs' Individual Answers to Defendants' Interrogatories No. 17**.

K.  Since 2000, Plaintiff Denise Barry has applied for six positions within the department and
received a promotion with pay increase on 9/18/06 when she was chosen for the position of
Administrative Assistant; Plaintiff, Jane Green, has applied for zero positions within the
department; Plaintiff, Elizabeth Golden, has applied for two positions within the department
and received a pay increase on 10/6/01 when she was upgraded to a Senior Administrative
Assistant position; Plaintiff, Patricia McDonough, has applied for two positions within the
department and is currently a Senior Administrative Assistant; Plaintiff, Elaine Mesiti, has
applied for one position within the department (the Human Resources position currently held
by defendant, Robert Moran) and is currently a Principal Administrative Assistant; Plaintiff,
Lila Brown, has applied for four positions within the department and  received a promotion
with pay increase on 11/13/06 when she was chosen for the position of Fire Prevention
Administrative Assistant; Plaintiff, Mary Kane, has applied for one position within the
department and is currently a Senior Administrative Assistant; Plaintiff, Judith Kelley, has
applied for three positions within the department and  received a lateral transfer at her request
for the position of Senior Administrator in September, 2006 and recently retired from the
department. *See* Exhibit B at ¶¶ 12-19.

L.  Of the BFD employees the Plaintiffs argue are potential class members, nineteen (19) are still
employed with the BFD, seven (7) have retired, six (6) have sought employment elsewhere,
and one (1) lost her job due to excessive absenteeism.  *See* Exhibit B at ¶ 20.

M.  Since 2000, there have been fifteen positions open in the civilian side of the BFD; nine (9) of
those positions were filled by current employees of the BFD. Only six (6) positions were
filled by someone who did not work at the BFD at the time of the filing of their application.
*See* Exhibit B at ¶21.

N.  From 2000 and the end of the Civil Service process of hiring, the BFD has had an
established policy of hiring the most qualified person for any open position. *See* **Affidavit of
Paul A. Christian** attached hereto as **Exhibit F**.

O.  At all times relevant to the Plaintiffs' claims, it is an employment requirement that any
employee of the City of Boston maintain residency in the City itself.  As a result, every
named plaintiff, with the exception of Judith Kelley, who recently retired from the BFD,
currently resides in the City of Boston. Of the potential class members as defined by the
Plaintiffs, all of the employees who still work with the BFD reside in the City of Boston. *See*
**Residency Requirement** attached hereto as **Exhibit G.**

These claims are actually reduced to eight separate claims individual to each person because

of her employment history, training, education and the positions she sought within the department

over the course of her career there. Each employment decision by the BFD was an independent

decision based on the particular need of each position and the unique qualifications of those who

applied. No position is entirely equal to the next; no applicant has the same qualifications, experience or abilities as the next.

## II.    ARGUMENT

**A.    The Potential Class is Not So Numerous that Joinder is Impracticable**

### 1.    The General Requirement

It is incumbent upon the Plaintiffs under Rule 23(a) to demonstrate that the "class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. Rule 23(a). Commentators have used the threshold number of forty (40) class members as a benchmark number for class action consideration. *Sanft v. Winnebago Industries, Inc.,* 214 F.R.D. 514, 521, n.4 (N.D. Iowa 2003). Despite the actual number of possible class members, "joinder is considered more practicable when all members are from the same geographic area."  *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 131-32 (1st Cir. 1985). Courts also examine whether potential class members are easily identifiable. When easily identifiable "joinder is more likely to be practicable." *Id.* at 132.

### 2.    Factors

#### a.    *Size of Class*

The Plaintiffs allege in paragraph 28 of their Third Amended Complaint that "upon information and belief that there are 35-40 potential class members."  *See* Exhibit D.  Although they may argue different numbers in their Motion for Class Certification, the Plaintiffs' Second and Third Amended Complaints both claim the lower number.

Further, an examination of the potential class members included in the Plaintiff, Patricia J. McDonough's Answer to Defendants' Interrogatory No. 14 lists three (3) former employees and twelve (12) current employees "subject to political affiliation discrimination."  *See* Exhibit E, Plaintiff, Patricia J. McDonough's Answer to Defendants' Interrogatory No. 14. This number is significantly less than formerly alleged and reflects the Plaintiff's response under the pains and penalties of perjury during pre-certification class discovery.

Even if the Plaintiffs' larger number of prior employees and current employees is analyzed, the Court will see that many do not fit the definition of potential class members for many different reasons. The list alleged by the Plaintiffs and relevant employment/career information reflects the following pertinent information:

**Former Employees Plaintiffs' Allege were Subject to the Administration's "political affiliation discrimination"[2]:**

*Jessica Ahearn* – Left employment before 2000; *Rosemarie Clinton* – Retired; *Karen Denver* – Resigned; *Mary Doherty* – Left for another job; *Jane Hickey* – Retired; *Marie Howard* – Early Retirement; *Kathryn Kempton* – Left employment before 2000; *Stephanie Long* – Left employment before 2000; *Maria Lopez* – Discharged due to excessive absenteeism; *Sheila Mancuso* – Left for another job; *Claire Miller* – Left for another job (she was a BFD nurse for two days); *Robert Malloy* – Laid off in 2002; *Steve Morash* –Left for another job (Boston U.); *Patricia Mulkern* – Retired after more than 30 years of service with BFD; *Desiree Russo* – Left for another job; *Barbara Ryan* – Retired in 2003; *Gwendolyn Sheppard* – Relocated to South Carolina.

**Present Employees Plaintiffs' Allege were Subject to the Administration's "political affiliation discrimination":**

*JoAnne (Donovan) Allain* –Has not applied for any positions since 2001; *Janice Boyle* – Given Case Manager position, assistant to Commissioner; *Crystal Bradeen* –Has not applied for any positions since 2001; *Irene Debbie Burke* – Promoted recently to Administrative position; *Joanne Callahan* – Promoted several times, now a Shop Steward; *Linda Collins* – Has not applied for any positions since 2001; *Linda Cleary* – Retired; *Carol Connors* – Promoted twice since 2001; *Katy Donovan* – Did not apply for any positions since 2001; *Patricia Fiasconaro* – Retired; *Sharon Green* (listed as Karen Green) – Has not applied for any positions since 2001; *Coretta Henry-Gardiner* – Promoted several times since 2001; *Paula Hamilton* – Has not applied for any positions since 2001; *Maria Hernandez* – Has not applied for any other positions; *Katherine MacMillen* – Has applied for other positions; *Angela Marshall* – Has not applied for any other positions; *Cathy Moore* – Medical Leave of Absence; *Marta Poupart* – Upgraded once since 2000; *Barbara Powers* – Upgraded once since 2000; *Luz Rivera* – Upgraded once since 2000;  *Jennifer Ryan* – Promoted several times since 2001.

In light of the above-named present or former employees, it is clear that a substantial portion have no underlying potential claim against any of the named defendants or the department itself. Former employees who made a career change or retired, present employees who either received a promotion or position upgrade can not assert that their rights have been affected by any adverse employment action or discriminatory intent.

### b.    Geographical Dispersion

All putative class members live in Boston, as residency in the City is a requirement for employment in the BFD or with the City of Boston. *See* Exhibit G. Of former employees, records reveal that their last known address is residency in the City of Boston or Suffolk County. Therefore, all potential class members, with the exception of four past employees and one named plaintiff, live within seven (7) miles of the United States District Court in Boston.

The close proximity of potential claimants and their limited geographical dispersion, makes joinder practicable and reasonable. *Andrews v. Bechtel, et al,* 780 F.2d, 124, 132(1st Cir. 1985); *Universal Calvary Church v. City of New York,* 177 F.R.D. 181, 183 (S.D.N.Y 1998) (Court concludes joinder is not impracticable when putative class members live in one of three counties); *Sanft v. Winnebago Industries, Inc.,* 214 F.R.D. 514, 523 (N.D. Iowa 2003) (most potential class members live in northern Iowa, no finding of geographical dispersion resulting in impracticability of joinder). Joinder of this putative class is practicable and obviates the need to seek the remedies a class action is intended to provide.

### c.    Identification of Class

This factor in the numerosity determination should not stand as an obstacle to the joinder of all putative class members. All possible class members have been identified by the Plaintiffs, as set forth in their Answers to the Defendant's Interrogatory No. 14.  *See* Exhibit E. All information as to name and address are easily obtained from City of Boston/BFD employment records or through the relationships the named Plaintiffs have with the department's former employees.  A putative class in this matter is easily and readily identifiable. Class members here can be easily identified making joinder likely to be practicable. *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980).

---

[2] The content of this section is based upon information in the possession of the Human Resources Department of the Boston Fire Department and is supported by the affidavit of Robert Moran, Human Resources Director, attached hereto as Exhibit B.

The conclusion must be, therefore, that any assertion that the "class represented by Plaintiffs is so numerous that joinder of all is impracticable" is sheer argument and not supported by fact. The number of potential class members is small, well under the benchmark forty used by various Courts, a strong majority of potential class members reside within a short distance from this District Court and the easy identification of potential class members supports a finding that the Plaintiffs have failed satisfy the "numerosity" requirement of Rule 23(a)(1).

**B.   Plaintiffs Allege Individualized Claims Which Do Not Present Common Questions of Law or Fact to Justify Class Action Treatment**

Plaintiffs' allegations that they were not given pay increases or new positions with the Boston Fire Department that were open to the general public are individual in nature, specific as to each separate Plaintiff. The claims "do not relate to general policies and practices, but rather to individualized claims which could not possibly present common questions of law or fact sufficient to justify class action treatment." *Elkins v. American Showa, Inc.* 219 F.R.D. 414, 418 (S.D. Ohio 2002).

The allegation that discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. The Supreme Court stated in *General Telephone Co. of Southwest v. Falcon* that "conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims." 457 U.S. 147, 157 (1982).

The Court stated further that:

[F]or respondent to bridge that gap, he must prove much more than the validity of his own claim. Even though evidence that he was passed over for promotion when several less deserving applicants were advanced may support the conclusion that respondent was denied the promotion because of his

national origin, such evidence would not necessarily justify the additional inferences (1) that this discriminatory treatment is typical of petitioner's promotion practices, (2) that petitioner's promotion practices are motivated by a policy of discrimination that pervades petitioner's Irving division, or (3) that this policy of discrimination is reflected in petitioner's other employment practices, such as hiring, in the same way it is manifested in the promotion practices.

*Id*. at 158.

The Plaintiffs have failed to meet their burden due to the uncommon, individualized nature of their allegations and employment history with the Boston Fire Department. On or about July 3, 1998, the Boston Fire Department upgraded all R-8 positions, one of which was held by Plaintiff Barry. As a result, she was upgraded to the Head Clerk (R-11) position. *See* Exhibit D at ¶ 47. On September 1, 1998, she was again upgraded to the Head Clerk (R-12) position and is now currently at the pay rate of step 5. *Id*. Plaintiff Green started at an R-8 position in 1984 and by 1998 had risen to an MM5 position, receiving seven different pay increases with each new position that she held. *See* **Exhibit H Jane Green Deposition** pp. 11-15. Plaintiff McDonough did not meet the minimum entrance qualifications for the positions she desired according to the specific job postings. *See* Exhibit D at ¶ 117. Plaintiff Golden alleged that William Kessler failed to investigate her claims and instead informed her that her complaint was not covered by the Collective Bargaining Agreement. *See id*. at ¶ 129.

Plaintiff Mesiti made no specific allegations against the Boston Fire Department other than she did not meet the minimum entrance qualifications according to the job posting. *Id*. at ¶ 134. Plaintiff Brown, currently at a pay rate of R-12, was denied an R-14 position after three interviews because she did not meet the minimum entrance qualifications according to the job posting, qualifications which Lois Hart, who was given the job, readily met. *Id*. at ¶ 140. Plaintiff Kane made no specific allegations against the Boston Fire Department other than complaining orally and in writing to have "unlawful practices and policies" corrected. *Id*. at ¶ 149. Plaintiff Kelley went out on

Workers Compensation in November, 1999 and after being out for one year, her responsibilities were given to Mary Ann McHugo, who was able to work immediately. *Id.* at ¶ 155.

Under Rule 23(a)(2), the interests of each prospective class member must arise from a common relationship to a definite wrong. *See M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470 (D.Mass. 1984). To establish commonality, the plaintiffs seeking certification of the class must show that "all the persons whom they profess to represent have a common interest in the subject matter of the suit and a right and interest to ask for the same relief against the defendants." *See Spear v. H.V. Greene Co.,* 246 Mass. 258, 266 (1923).

Each Plaintiff has a different set of facts relating to separate and individual claims against different individuals within the Boston Fire Department. *See* **Exhibit I: Chart Representing Claims of the named Plaintiffs against named Defendants**. This chart, comprised of information obtained from deposition testimony of each Plaintiff, establishes that no Plaintiff's claim is identical even as to the potential liability of any named Defendant. Furthermore, none of the Plaintiffs share a common thread linking them to a general policy and practice that is allegedly discriminatory within the Department. Therefore, the claims alleged by the Plaintiffs are individual in nature and do not present common issues of fact or law that would justify class treatment and thus fail to satisfy Rule 23(a)(2).

## C.    The Claims of the Representative Parties are Not Typical of the Class.

As discussed above in section B, there are no common questions of law or fact present in this matter, and, as discussed below when addressing Rule 23(b)(3) "predominance" issues, the representative parties claims are not typical of the claims of other putative class members. As a general proposition, however, a representative's claim will be deemed typical when its "injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims" and "are based on the same legal theory" as those of the absent class members. *In re Bank of Boston,* 762 F.Supp. 1525, 1532 (D.Mass.1991); *see also  In re Auction Houses,* 193 F.R.D. 162, 164-165 (S.D.N.Y. 2000)(asking "whether other members of the class have the same or similar injury,

whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct").

The claims of any one named plaintiff are atypical because each claim is distinct to that individual.  Whether that plaintiff received a promotion or was denied one will have to be based upon that person's qualifications and skills for that job and an independent fact finding examination will need to be made. In other words, there is no typical claim here, especially in light of the purpose of a class action and the distinct judicial tool this method is meant to provide. The claim of Plaintiff Jane Green, who chose not to apply for any open position, is not typical when compared to the possible claims of Plaintiff, Denise Barry, who has applied for several positions within the department and received a promotion with pay increase on 9/18/06 when she was chosen for a new position within the department. Equally so, can Denise Barry's claim be typical of the possible claims of a former employee who retired after a long, successful career with the department? The Defendants understand that to be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law, but, is it sufficient when the only common fact that binds the Plaintiffs and putative class members who they hope to represent is that they worked for the Boston Fire Department and may not have received a position for which they applied?

**D.     Neither the Plaintiffs Nor Their Counsel Have Established that They Can Fairly or Adequately Protect the Interests of a Class**

The Plaintiffs and their attorney have failed to establish that as representative parties they will fairly and adequately protect the interests of the class in compliance with Rule 23(a)(4). This requirement for fair and adequate representation encompasses both class representatives and class counsel. *See North American Acceptance Corp. v. Arnall, Golden & Gregory,* 593 F.2d 642, 644 n. 4 (5th Cir.1979).

In order to satisfy the 23(a)(4) requirement, the Plaintiffs "must show first that the interests of the representative party will not conflict with the interests of any of the class members, and

second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.,* 780 F.2d 124,130 (1st Cir. 1985); *see In Re Relafen,* 218 F.R.D. 337, 343 (D.Mass 2003)(quoting *Andrews* ); *In Re Bank of Boston,* 762 F.Supp. 1525, 1534 (D.Mass 1991)(describing the relevant adequacy inquiries as "whether any potential conflicts exist between the named plaintiffs and the prospective class members" and "whether the named plaintiffs and their counsel will prosecute their case vigorously.")

There has been lack of evidence of cohesiveness as seen by one named party in the Plaintiffs' Second Amended Complaint, Joanne Callahan, who withdrew her claim. Further, the Plaintiffs have failed to demonstrate that they have the financial resources available to fully and vigorously prosecute a class action, if one is certified.

Question must also be raised as to whether Plaintiffs' attorney, a solo practitioner, has the time or resources to handle a matter of this proposed proportion. Regardless of his prior litigation experience, if chosen as counsel for a class, the responsibilities concomitant with extensive discovery, both financial and time wise, would prove to be extremely burdensome to a solo practitioner. Although he mentions in passing hiring or associating with other counsel, Attorney Feeney has not demonstrated who would be brought in to assist in the litigation, whether that attorney is competent to assist in representing a class action and whether he or she has the financial resources or time to vigorously conduct the proposed litigation.

### E.    Plaintiff's Individual Facts Predominate Over Common Questions of Fact or Law.

None of the Plaintiffs share a common thread linking them to a general policy and practice that is allegedly discriminatory within the Department. The claims alleged by the Plaintiffs are individual in nature and do not present common issues of fact or law that predominate in accordance with Rule 23(b)(3). Although the courts have failed to develop any "ready quantitative or qualitative test," it is clear that "it is not sufficient that common questions merely exist.... the common issues

14

must actually outweigh the individual ones in terms of quantity or quality." *Mattoon v. City of Pittsfield*, 128 F.R.D. 17, 20 (D.Mass 1989). "The 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 624 (1997). The "predominance criterion" is "far more demanding" than the commonality requirement." *Id.* at 623-24.

It is not enough that the claims simply arise out of a common nucleus of operative fact, i.e. common employment with the BFD. Instead, the common questions must be central to all the claims. The resolution of common questions need not dispose of the action, of course. But common issues are predominant only if their resolution would "provide a definite signal of the beginning of the end." *Id.* The Plaintiffs here have solely individualized claims due to their different educational and employment backgrounds, distinct personal qualifications in light of the particular needs or demands of that position, and the particular findings of the department based upon the results of the application process and the interview process for each position.

### 1. Individual facts of educational and employment background will predominate

Each Plaintiff has a different educational and employment background that was taken into consideration when applying for open positions within the BFD. None of the Plaintiffs had credentials equal to those applicants chosen for the specified positions, as in all employment settings, any applicant's educational and employment background is distinct to that particular applicant.

The necessary and individualized analysis that will be required of the Court in this matter is evident in the written opinion of the arbitrator who decided the Julie Barton Promotion Bypass. *See* Exhibit C. The arbitrator was asked in this instance to decide whether a recent hire who came from outside the department was more or less qualified than an applicant with seniority who was working at the department when she applied for the open position. In a critical examination of the two employees' education and employment background, and an in-depth analysis of the demands of the

position, the arbitrator found that Ms. Urso, the recent hire from outside of the department was actually more qualified for the open position than Ms. Barton who had worked for the department for sixteen (16) years. Only after the comparison of the individual background of both these employees was a fair and just result reached.

This comprehensive analysis of individual facts must be applied to the claims of the Plaintiffs, where individual issues will predominate over class issues. For instance, Plaintiff Barry has applied for six positions within the BFD since 2001 and was given an Administrative Assistant position on 9/18/06, a position she held for two days before leaving to go back to her former position within the department. For the five other positions she applied for prior to that time, Plaintiff Barry was less qualified than the individual chosen in each instance. She was not qualified for the lower level Head Clerk position that she applied for on 5/1/01 because she had no accounting experience. Instead, the position was given to Eileen Stille, who had an associate's degree, was trained in the People Soft computer program, and had 18 years of experience in accounting to insure accurate account balances.

Plaintiff McDonough is a high school graduate who applied for the Case Manager Position on 12/4/03. The position was given to Ian Mackenzie, who was continuing his studies towards earning a Master's Degree (MBA) at that time. He had also successfully met the demands of the same position with the BFD from 1996 through 1997. A similar comparison will be necessary for each of the Plaintiffs and possible class member.

> **2.    Distinct, individual facts of personal qualifications for particular positions will predominate.**

Each Plaintiff has distinct, personal qualifications in light of the particular needs or demands of the positions applied for that will predominate over any common issues of fact. None of the Plaintiffs have equal qualifications and work experience and they have either all applied for different position openings within the BFD or not applied for any at all.

Plaintiff Golden applied for the upper level Case Manager Position on 12/4/03 but her limited experience and qualifications prevented her from receiving the job. This position required a highly qualified candidate who was familiar with the medical industry, insurance claims, and had the ability to work with hospitals and perform utilization reviews. The position was awarded to Ian Mackenzie, who had worked in the position as Medical Billing Department director earlier in his career, and returned to assume this complicated, technical, time intensive position that oversees the payment of all work related medical bills incurred by firefighters injured in the line of duty.

Plaintiff Green has never applied for a position within the BFD, while Plaintiff Mesiti stated that she only applied for the position Mr. Moran received as Director of Human Resources. Her credentials will have to be compared to Mr. Moran's before the Court will be able to ask the next logical question as to the appropriateness of the BFD's employment decision. Plaintiff Kane applied for the Principal Administrative Assistant to the Commissioner position while she was working as a Senior Administrative Assistant. Although she met the minimum qualifications, she was less qualified than Mary Kilgallen, who was also a current BFD employee at the time and had Human Resources experience, both with the BFD and at City Hall. Again, individual issues of fact will predominate.

**3.    Individual facts of the application and interview process will predominate over class issues.**

The Plaintiffs who applied for positions within the BFD all had separate and distinct applications and interviews that predominate over class issues. The Plaintiffs applied for different positions at separate times and were considered along with other applicants of diverse backgrounds. As such, each application and interview process is distinct from any other and must be considered individual as to each Plaintiff.

Plaintiff Brown applied for the Head Clerk and Principal Accounting positions on 1/20/04 and 6/10/04, respectively. While she may have met the minimum qualifications necessary to apply

for the Head Clerk position, she had serious attendance issues that prevented her from receiving the job. Plaintiff Brown was also unable to successfully draft a letter in the interview process, a task that is a necessity to perform the duties required of each position. In regards to the Principal Accounting position, she had no prior payroll experience, and the job was given to Julia Barton, who was also from the BFD and had such experience.

Plaintiff Barry was offered an Administrative Assistant position on 8/20/03 but she turned it down initially. When the job was given to Michelle Urso, Plaintiff Barry took the case to arbitration. The arbitrator ruled in favor of Urso, stating that she was the most qualified candidate for the position. Plaintiff Barry was also qualified for and received an Administrative Assistant position on 9/18/06, but left the job after two days to resume her prior duties. The facts stated above indicate that the Plaintiffs here have solely individualized claims due to their different educational and employment backgrounds, distinct personal qualifications in light of the particular needs or demands of that position, and the particular findings of the department based upon the results of the application process and the interview process for each position. Common questions do not predominate over individual ones and therefore, Rule 23(b)(3) is not satisfied.

4. **Individual Facts as to the Liability of Any Particular Named Defendant will Predominate over Common Class Issues of Fact or Law.**

As reflected in Exhibit I, the chart depicting the separation of Plaintiffs claims based upon the named Defendants and their alleged wrongdoing, further evidence of individual claims predominating possible class issues may be seen. One named Plaintiff is seen to have claims against a certain named Defendant and not against another. The next named Plaintiff can be seen to present claims against another defendant, a defendant not named by the first plaintiff.  For instance, Barry alleges a claim against Keating, Golden presents no claim against Keating. Green presents a claim against Finn, McDonough presents no claim against Finn. Barry presents a claim against the current

commissioner, Roderick Fraser, who assumed the position in 2006, when no other plaintiff presents any claim against him.

Consequently, the individual claims of these Plaintiffs will have to be closely examined in light of the disparity of their claims. These issues, like those discussed above, will predominate over any possible class issues. Based upon these facts and issues, the Plaintiffs have failed to satisfy the requirements of Rule 23(b)(3).

### III.  <u>CONCLUSION</u>

For the foregoing reasons in that the Plaintiffs have failed to satisfy the requirements of Fed.R.Civ.P. Rule 23(a) and (b), the Defendants respectfully request that this Honorable Court deny the Plaintiffs' Motion for Class Certification.

Respectfully submitted,

DEFENDANTS,
by their attorneys,

William F. Sinnott
Corporation Counsel

/s/ Scott C. Holmes

_____
Scott C. Holmes BBO# 544545
Senior Assistant Corporation Counsel
Karen A. Glasgow BBO# 648688
Senior Assistant Corporation Counsel
City of Boston Law Department
Room 615, Boston City Hall
Boston, Massachusetts  02201
(617)635-4042 (Holmes)
Date: September 7, 2007          (617)635-3238(Glasgow)

# The Challenge:
## Managing Tradition, Diversity, and Change

Findings and Recommendations
Boston Fire Department
Review Commission
January 2000
City of Boston

The Challenge: Managing Tradition, Diversity, and Change

# Table of Contents

1    INTRODUCTION .............................................................................................. 1:4

    1.1    A PERSONAL NOTE FROM THE BOSTON FIRE DEPARTMENT REVIEW COMMISSION ........ 1:4
    1.2    MEMBERS OF THE BOSTON FIRE DEPARTMENT REVIEW COMMISSION ...................... 1:5
    1.3    BACKGROUND OF THE COMMISSION ................................................................. 1:6
    1.4    HOW THE COMMISSION GATHERED INFORMATION .............................................. 1:6
    1.5    RECOMMENDATIONS ..................................................................................... 1:7
    1.6    ACKNOWLEDGEMENTS ................................................................................... 1:7

2    CULTURE AND LEADERSHIP ....................................................................... 2:9

    2.1    INTRODUCTION ............................................................................................. 2:9
    2.2    ENVIRONMENT ............................................................................................. 2:11
    2.3    COMMUNICATION ........................................................................................ 2:12
    2.4    CONFIDENCE ............................................................................................... 2:13
    2.5    RECOMMENDATIONS ..................................................................................... 2:14

3    DISCIPLINE .................................................................................................. 3:15

    3.1    INTRODUCTION ............................................................................................. 3:15
    3.2    APPLICATION AND ENFORCEMENT .................................................................. 3:15
    3.3    ACCOUNTABILITY ........................................................................................ 3:16
    3.4    TRAINING ................................................................................................... 3:17
    3.5    CULTURE .................................................................................................... 3:17
    3.6    RECOMMENDATIONS ..................................................................................... 3:17

4    SUPERVISION AND TRAINING .................................................................... 4:18

    4.1    INTRODUCTION ............................................................................................. 4:18
    4.2    SUPERVISION ............................................................................................... 4:18
        4.2.1    The "Acting List" and Acting Out of Grade ......................................... 4:19
        4.2.2    Schedule .......................................................................................... 4:19
    4.3    TRAINING ................................................................................................... 4:20
        4.3.1    Senior Management Training .............................................................. 4:21
        4.3.2    Supervisory and Station Level Training ............................................... 4:21
    4.4    RECOMMENDATIONS ..................................................................................... 4:22

5    DEPARTMENT ADMINISTRATION ............................................................... 5:23

    5.1    INTRODUCTION ............................................................................................. 5:23
    5.2    COMMISSIONER AND CHIEF OF DEPARTMENT .................................................. 5:23
    5.3    SENIOR MANAGEMENT .................................................................................. 5:24
    5.4    COMMUNITY FIREFIGHTING ........................................................................... 5:25
    5.5    EQUIPMENT AND TRAINING ........................................................................... 5:25
    5.6    CAPITAL PLANNING ..................................................................................... 5:26
    5.7    FIRE STATION INSPECTION AND MAINTENANCE ............................................... 5:26
    5.8    TECHNOLOGY .............................................................................................. 5:27
    5.9    PHYSICAL FITNESS AND WELLNESS PROGRAMS ............................................... 5:28
    5.10    EQUIPMENT MAINTENANCE .......................................................................... 5:29
    5.11    RECOMMENDATIONS ................................................................................... 5:30

6    PERSONNEL AND HUMAN RESOURCES ..................................................... 6:32

    6.1    INTRODUCTION ............................................................................................. 6:32
    6.2    DISCRIMINATION AND SEXUAL HARASSMENT .................................................. 6:32
    6.3    DEPARTMENT COMPOSITION .......................................................................... 6:34
        6.3.1    Fire Alarm and Construction Division .................................................. 6:35

Final Report of the Boston Fire Department Review Commission

6.3.2    *Recruitment and Gender Representation*..............................................................*6:35*
6.4    PROMOTIONS.......................................................................................................... 6:36
6.5    EDUCATION............................................................................................................. 6:37
6.6    INJURIES AND DISABILITY ..................................................................................... 6:37
6.6.1    *Supervision and Accountability*......................................................................*6:37*
6.6.2    *Modified or Light Duty* ................................................................................... *6:38*
6.6.3    *Disability Retirement*...................................................................................... *6:38*
6.6.4    *Annual Physical Examinations* ....................................................................... *6:38*
6.7    RECOMMENDATIONS .............................................................................................. 6:38

7      **DRUG TESTING** .................................................................................................. **7:41**

7.1    INTRODUCTION........................................................................................................ 7:41
7.2    CURRENT PROCEDURES .......................................................................................... 7:41
7.3    SUBSTANCE ABUSE AND DISCIPLINE ....................................................................... 7:41
7.4    RECOMMENDATION ................................................................................................ 7:42

8      **RESOURCE ALLOCATION** ................................................................................ **8:43**

8.1    INTRODUCTION........................................................................................................ 8:43
8.2    MARINE UNIT.......................................................................................................... 8:43
8.3    EXISTING FIRE BRIGADE AT LONG ISLAND ............................................................. 8:44
8.4    FIRE ALARM CALL BOXES ...................................................................................... 8:44
8.5    RECOMMENDATIONS .............................................................................................. 8:45

9      **IMPLEMENTATION AND PLANNING** ............................................................ **9:46**

9.1    INTRODUCTION........................................................................................................ 9:46
9.2    CHIEF OF PLANNING AND TECHNOLOGY ................................................................. 9:46
9.3    CHIEF OF ADMINISTRATION .................................................................................... 9:47
9.4    CHIEF OF OPERATIONS............................................................................................ 9:47
9.5    ACCREDITATION AND STRATEGIC PLANNING .......................................................... 9:48
9.6    RECOMMENDATIONS .............................................................................................. 9:48

10     **SUMMARY OF RECOMMENDATIONS** ........................................................ **10:49**

10.1    INTRODUCTION...................................................................................................... 10:49
10.2    CULTURE AND LEADERSHIP ................................................................................... 10:49
10.3    DISCIPLINE............................................................................................................ 10:50
10.4    SUPERVISION AND TRAINING ................................................................................. 10:50
10.5    DEPARTMENT ADMINISTRATION ............................................................................ 10:51
10.6    PERSONNEL AND HUMAN RESOURCES .................................................................... 10:52
10.7    DRUG TESTING...................................................................................................... 10:54
10.8    RESOURCE ALLOCATION ....................................................................................... 10:54
10.9    IMPLEMENTATION AND PLANNING ......................................................................... 10:54

11     **APPENDIX AND BIBLIOGRAPHY** .............................................................. **11:56**

11.1    ARTICLES AND PAPERS .......................................................................................... 11:56
11.2    BOOKS .................................................................................................................. 11:56
11.3    REPORTS AND STUDIES .......................................................................................... 11:56
11.4    SURVEYS................................................................................................................ 11:56
11.5    DEPARTMENT STATISTICS...................................................................................... 11:57
11.6    NOTES.................................................................................................................... 11:58

# 1  Introduction

## 1.1  A Personal Note from the Boston Fire Department Review Commission

On Friday, December 3, 1999, a tragic fire in Worcester, Massachusetts took the lives of six dedicated firefighters. Their deaths, occurring as they did during the compilation of this report, served as a grim reminder of the dangers faced by firefighters each day. As we undertake the publication of this report, we are mindful of the dedication, courage and commitment to duty on the part of firefighters throughout the country, the Commonwealth and particularly within the Boston Fire Department.

As with any organization of its size, the Department has its share of problems and challenges, many of the same problems and challenges confronted by fire departments nationwide. When faced with the mandate to report honestly and fairly about problems within an organization, it is easy to lose sight of the enormous good that exists within the organization. The Boston Fire Department is a strong, well-trained and fiercely proud group of men and women. In fact, the many difficult issues addressed in this report were brought to the attention of the Commission by a significant cross-section of these same men and women, all of whom share a common desire to improve the Department. The issues and problems raised are prevalent in many areas within the Department, and the concerns expressed are genuine and widespread. Yet, for every criticism contained in this report, there exist examples of the opposite. Thus, it is unfair to the many hardworking people in the Department to suggest that the problems cited in this report reflect an attitude or culture shared by all its members.

Nevertheless, it is the intent of this report to identify the very real problems and challenges that face the Boston Fire Department today and to create a dialogue for change within the Department for the future. It is the sincere hope of this Commission that the problems discussed within this report are viewed as opportunities and not as hurdles, and that the issues raised are viewed as challenges for building a stronger Department and not foundations for divisiveness or alienation. Change is difficult, and it will not be without its detractors. Yet, as we all know, change will occur with or without action on our part. An organization that directs change can define and plan its own future. Conversely, an organization that resists change will remain stagnant, unable to deal with a future it did not help create. The true challenge presented to the Department is to direct this process of change for the good of the Department rather than react to change that has been thrust upon it. If the Department, the Union and the City accept this challenge, the Department has the opportunity to become the model for fire

Final Report of the Boston Fire Department Review Commission

departments nationwide that face similar challenges, problems, and concerns.

We believe that the Boston Fire Department is well poised to confront the difficult challenges that are identified in this report. We conclude our responsibilities confident in our belief that the Department will institute the recommendations and reforms necessary to achieve these important goals and take responsibility for its future. Above all else, however, the Commission members wish to recognize the sacrifices made each day by members of the Boston Fire Department.

## 1.2 Members of the Boston Fire Department Review Commission

Kathleen M. O'Toole, Chair
Former Secretary of Public Safety
Commonwealth of Massachusetts

Mark D. Bolling
Director, State Office of Affirmative Action
Commonwealth of Massachusetts

William J. Good, III
Chief, Bureau of Administrative Services
Boston Police Department
City of Boston

Vivian Leonard
Director, Office of Human Resources
City of Boston

Kevin P. MacCurtain
Deputy Fire Chief/Chief of Operations
Boston Fire Department
City of Boston

Francis X. Hartmann[1]
Executive Director and Senior Research Fellow
Program in Criminal Justice
John F. Kennedy School of Government
Harvard University

---

[1] Due to an increase in responsibilities at Harvard University, Mr. Hartmann was unable to fully participate in Commission meetings but remained a Commission member in an advisory capacity.

The Challenge: Managing Tradition, Diversity, and Change

## 1.3  Background of the Commission

Mayor Thomas M. Menino appointed the Boston Fire Department Review Commission on February 24, 1999, to address the specific issues identified in this report. The Commission met on thirty separate occasions since its inception and members of the Commission interviewed over one hundred people, including Boston firefighters, officers and senior management, civilian personnel, Union officials, and City officials. In addition, Commission members and staff traveled to Kansas City, Missouri, Milwaukee, Wisconsin, San Francisco, California, and Phoenix, Arizona, to discuss fire department management and met with fire department personnel and senior officials from throughout the United States. The Commission also met with a number of experts in public safety management, personnel and testing procedures, technology, and fire safety, and reviewed thousands of pages of materials from journals, newspapers and treatises relative to the issues discussed in this report. In addition, the Commission collected and reviewed over two hundred personnel surveys. A collection of the cited materials is available in the Appendix. After a thorough review of the above materials, the Commission incorporated the most important findings, recommendations, and conclusions in this report.

## 1.4  How the Commission Gathered Information

In order to conduct a review of this kind, it was necessary for the Commission to utilize a number of different techniques to gather information. Commission members were encouraged to be accessible to and to engage in dialogue with members of the Department at all levels. A number of people within the Department expressed reluctance to appear before the Commission, or to have their comments recorded for publication, for a variety of reasons. Anonymity is respected throughout this report, and anecdotal references are made without attribution where requested by the party. In addition to informal discussions, the Commission invited several individuals and organizations to meet with the entire Commission to discuss Department issues and concerns. These individuals and organizations are acknowledged in Section 1.6. Further, the Commission traveled to various cities to discuss general firefighting issues with leaders in the field, and spoke with experts in management and operation of fire departments. The Commission also utilized an informational survey of both uniformed and civilian Department personnel to elicit further comments and suggestions.[2] Although the numbers of survey responses were disappointing, the

---

[2] The survey results lack statistical validity; therefore, no percentages are quoted in this report. Further, Local 718 requested that union members not respond to the informational survey. This action had a chilling effect, limiting the number of responses to the survey. Nevertheless, over 160 uniformed members and over 50 civilian personnel responded and their comments were instructive and helpful to the Commission.

Final Report of the Boston Fire Department Review Commission

Commission believes that it has gathered significant information that was used to supplement its findings. The Commission is pleased with the overall cooperation and encouragement it received from many members of the Department, civilian and uniformed, as well as the management of the Department at all levels. We express our thanks to all who responded to the survey or spoke with Commission members over the past several months.

## 1.5 Recommendations

This report contains sixty-six recommendations for the Department as part of a process for implementation. They are summarized in Section 10 and at the end of each section. The Commission acknowledges that a significant number of the recommendations made in this report are subject to negotiation in collective bargaining. However, the Commission did not and could not limit its review to management issues outside of collective bargaining, as so many of the challenges faced by the Department must be discussed and debated within the confines of that process. The Commission hopes that both the Union and management will commit to address these issues during current collective bargaining sessions and that they will work to resolve the details of the policies with an eye toward the future of the Department and its members. In addition, the Commission was charged to address certain major issues confronting the Department. As such, this document is not intended to be a comprehensive management study of the operations of the Department. Prior reports and studies of the Boston Fire Department have been conducted that address additional concerns, and the Commission recommends that the Department revisit these reports as it begins the process of developing a strategic plan for implementation of our recommendations as well as planning for the future. In particular, the Department would be well served to review both of the following reports: *An Analysis of the Boston Fire Department*, City of Boston Finance Commission (July 28, 1994), and *Review of the Boston Fire Protection and Rescue Delivery System*, MMA Consulting Group, Inc. (1995).

## 1.6 Acknowledgements

The Boston Fire Department Review Commission acknowledges the assistance and cooperation of the following agencies and individuals:

Mayor Thomas M. Menino and his staff
Gloria A. Aluise, Esq., Spectra Publishing Company, Silverthorn, Colorado
Walter S. Booth, Ph.D., Booth Research Group, Inc., Parker, Colorado
Chief Dennis Budd, Worcester Fire Department, Worcester, Massachusetts
Ruthie Burton, Director of Labor Relations, Bell Atlantic New England
Crest Associates, Boston, Massachusetts
Chief Gary Cassanelli, Springfield Fire Department, Springfield, Massachusetts

The Challenge: Managing Tradition, Diversity, and Change

Jeffrey Conley, Executive Director, Boston Finance Commission
Sean Curran, Senior Director, GPC/O'Neill & Associates, Boston, Massachusetts
Betty Dennis, Human Resources Division, Commonwealth of Massachusetts
Chief Daniel Gardiner (Ret.), Fairfield Department of Fire-Rescue Services, Fairfield, Connecticut
James G. Gilbert, Esq., Law Offices of James G. Gilbert, Salem, Massachusetts
James Hartnett, Personnel Administrator, Commonwealth of Massachusetts
William Killen, Member, Commission on Fire Accreditation International and Director of Fire Emergency Services, United States Department of the Navy
Robert McCarthy, President, Professional Firefighters of Massachusetts
James McDonagh, General Counsel, Human Resources Division, Commonwealth of Massachusetts
Captain John J. McKenna, Boston Fire Department, Boston, Massachusetts and President, Boston Fire Fighters Local No. 718, International Association of Firefighters, AFL-CIO
Michael Mullane, Third Vice President, International Association of Firefighters, AFL-CIO
GPC/O'Neill & Associates, Boston, Massachusetts
Fire Commissioner Martin Pierce, Boston Fire Department, Boston, Massachusetts
Captain Walter Porter, Boston Fire Department, Boston, Massachusetts
Robert Powler (Ret.), Boston Fire Department, Boston, Massachusetts and First Vice President, Boston Society of Vulcans of Massachusetts, Inc.
Neil Santangelo, Boston Fire Department, Boston, Massachusetts and past President, Boston Fire Fighters Local No. 718, International Association of Firefighters, AFL-CIO
Richard St. Louis, Principal, Crest Associates, Boston, Massachusetts
State Office of Affirmative Action, Commonwealth of Massachusetts
Samuel Tyler, Executive Director, Boston Municipal Research Bureau
Linda Weaver, Human Resources Division, Commonwealth of Massachusetts
Toni G. Wolfman, Esq., Foley, Hoag & Eliot LLP, Boston, Massachusetts
Phillip Wornum, Boston Fire Department, Boston, Massachusetts and President, Boston Society of Vulcans of Massachusetts, Inc.

The Commission also thanks the officers and members of the following fire departments for their assistance and hospitality:

Kansas City Fire Department, Kansas City, Missouri
Milwaukee Fire Department, Milwaukee, Wisconsin
Phoenix Fire Department, Phoenix, Arizona
San Francisco Fire Department, San Francisco, California

Final Report of the Boston Fire Department Review Commission

## 2   Culture and Leadership

### 2.1   Introduction

Culture can be difficult to define in any large and diverse organization. Many times the culture of an organization depends on an individual's status within the organization. An institution may appear overly political to an employee involved in a competition for a particular position and not political enough for the individual who has worked hard developing personal relationships only to be passed over for a desired promotion. It is clear, however, that an organization's culture takes its cues from the values emphasized by its leadership team.[3]

> "Leadership only occurs when others willingly adopt, for a period of time, the goals of the group as their own."
> *What we Know About Leadership, Robert Hogan, Gordon J. Curphy, and Joyce Hogan, American Psychologist, June 1994*

In the case of the Boston Fire Department, strong emphasis on tradition has been the premiere value stressed by the leadership of the Department. As a result, this emphasis on tradition plays an important role in members' perceptions about their place in the Department. Traditions such as bravery, courage, and commitment to duty deserve recognition and can be shared among all the members. In many cases, emphasis on a particular tradition strengthens an individual's association with the organization, such as the member whose family shares a commitment of service to the

> "Successful leaders communicate a clear mission or sense of purpose, identify available resources and talent, develop the talent, plan and organize, coordinate work activities, and acquire needed resources. "
> *What we Know About Leadership, Robert Hogan, Gordon J. Curphy, and Joyce Hogan, American Psychologist, June 1994*

Department, for example, a father, grandfather, uncle or cousin. In other cases, an overemphasis of the same tradition of service may alienate newer members of the organization who do not share similar family experiences. As such, a positive tradition for some members may be perceived as non-inclusive to others. The difficulty lies in balancing the seemingly variant views of this core value of the Department. How does a department change with the times while maintaining a sense of its past? The answer is to appreciate the history of the organization without allowing the past to govern the future. Creating new traditions begins by recognizing the desire of all members to feel an

---

[3] See, Wallace, Mark, *Fire Department Strategic Planning, Creating Future Excellence*, p. 38 (1998).

The Challenge: Managing Tradition, Diversity, and Change

important part of the larger organization. The challenge to the Department is to evaluate the shared values of the members of the organization as a whole, and to incorporate those shared values into an overall philosophy of change. In order to do so, the Department must also identify those values that are necessary to achieve its goals as an organization. As Boulder, Colorado Fire Chief Mark Wallace describes in his book, *Fire Department Strategic Planning: Creating Future Excellence*, for a department to achieve success it "must recognize and articulate the values that drive the

> "Change the culture and mindset of the department. The focus is on the past. Tradition should be respected as the teacher but not revered as a god. Tradition is an anchor around our necks. The BFD (and many other fire departments) have too many historians and not enough visionaries. Our fear of change is killing us."
> *Respondent to Boston Fire Department Firefighter/Fire Officer Survey*

decision making within the organization. The individual members of the department must be empowered to make decisions, applying their values to everyday operations . . . Without this congruency, some members will feel the articulated values [or traditions] are a fraud, and the likely result will be alienation rather than empowerment."[4]

The Commission believes that the Department has failed to capitalize on the shared values of its members. For example, almost without exception, the Commission found that members expressed great pride in being firefighters. Yet, despite this common sense of pride, many members expressed a degree of alienation from the traditions and attitudes that govern the Department. This disconnect suggests that the leadership's emphasis on tradition and history is out of balance with the desire of the Department to move into the future. Thus, in order for the Department to address alienation within its ranks, the Department must redefine its values, identify its goals, and review its existing management practices. This process will require a fundamental shift in the traditional "power-oriented" approach currently exercised by the Department's management team.[5] That is, the Department must consider a new approach to its operation that decentralizes decision-making, and opens avenues of communication between management and the field.

There are three main challenges that face the Department in its process of creating new traditions through shared values. The first challenge is to create an environment that is inclusive, welcoming and respectful for all its members. The second challenge is to improve communication between field personnel and officers by creating a management structure that invites participation throughout the ranks. The third challenge is to increase the

---

[4] Id.
[5] Id.

Final Report of the Boston Fire Department Review Commission

confidence of the members in the future and direction of the Department by
providing dynamic and progressive leadership. We will address each in
turn.

## 2.2   *Environment*

Any large organization in a culturally diverse city should reflect and
celebrate the diversity of the community. In the last decade, the Department
has moved to increasing representation of minorities on the force as a direct
result of the consent decrees handed down from the courts.[6]  *See Section 6,
Personnel and Human Resources.* While 30% of the uniformed members of
the Department represent minority populations, only twelve women, and one
Asian American currently serve in the uniformed ranks. Clearly, more
remains to be done to insure that the Department reflects the City it serves.

However, according to some
minorities and women in certain
areas within the organization,
with the increasing
diversification of the Department
has come a level of polarization.
Many allege that this polarization
is reflected in the application of
discipline, promotions,

> "It's a good old boy workplace. It
> is in many cases a hostile
> workplace for someone that is
> different or that is out of the loop."
> *Respondent to Boston Fire
> Department Firefighter/Fire
> Officer Survey*

assignments and recruitment. A significant number of survey respondents
complained of the "old boy network" in place throughout the Department.
There exists a strong perception that if you are not among the "in" crowd,
you will not succeed, you will not receive the better assignments, you will
not be encouraged to take a leadership role and you will not be taken
seriously regarding suggestions for improvement. This perception
undermines morale and reinforces negative attitudes. Only effective
supervision and strong leadership will change pervasive attitudes relative to
race and gender. The appearance of favoritism, whether real or imagined, is
as destructive as the existence of favoritism. The current system does little
to address these perceptions, and many of the members expressing concerns
are branded "complainers" or "troublemakers." Efforts to address these
points have not been effective, and the Department lacks a cohesive strategy
on the difficult issue of cultural diversity.

The Commission finds that major changes are necessary in the overall
structure of the management team and that greater accountability at all
levels of management must be instituted to insure that policies are
implemented consistently and effectively. Change of attitudes and culture
take time and effort. However, there is no substitute for strong leadership

---

[6] It should be noted that women were not covered by the consent decree. *See Boston Chapter,
NAACP v. Beecher*, Civil Action No. 72-3060, 371 F.Supp. 507 (D.Mass. 1974) and *United States
v. Beecher*, Civil Action No. 73-269, 365 F.Supp. 655 (D.Mass. 1973)

The Challenge: Managing Tradition, Diversity, and Change

on issues of diversity from the top of the Department and throughout every level of management. The Department must adopt a "zero tolerance" policy for inappropriate behavior, and must undertake a serious effort to rid itself of the existing perception that the Department remains a non-inclusive organization. Only when the message is clear from the highest levels of the Department can the rank and file members be expected to conform to a gender and race neutral environment. This message is a vital part of the communication necessary to bring fundamental change to the Department.

## 2.3   Communication

The ability of members of an organization to communicate effectively with management at all levels is critical to the success of the organization. Two-way communication encourages the flow of ideas and allows for management to make decisions that will enhance and improve conditions in the field, not hinder or complicate operations. Many firefighters and officers responding to the survey and speaking directly with Commission members expressed frustration at the lack of communication within the Department. This frustration crossed gender and racial lines, and seems to be pervasive throughout the organization. The perception that decisions by senior management are made in a vacuum contributes to the level of frustration of field personnel and mid-level management. Many respondents to the survey requested the opportunity to work on committees, and the overall response indicated willingness on behalf of the members of the Department to work with management toward the improvement of communications and conditions in the field. Based on interviews conducted by the Commission, this desire to communicate more effectively is shared by many members of the management team.

> "We lack basic communication skills at all levels. Creativity is stifled and any thinking 'outside the box' is ignored. We avoid any self-criticism as an unfounded attack on our character. We consider ourselves a Sacred Cow."
> *Respondent to Boston Fire Department Firefighter/Fire Officer Survey*

Therefore, the Commission finds that much of the foundation is present to implement immediately more formal and informal communication between firefighters and management. The Department must utilize members more frequently on working groups to address a variety of technical, cultural and operational issues. Bringing more members "on the team" and into the decision-making process will enable the Department to address the concerns regarding environment expressed above. The more an individual is asked for his or her opinion relative to the operation of the department, and the more an individual witnesses his or her suggestions in action, the more the individual will feel invested in the organization and its goals. Morale will

Final Report of the Boston Fire Department Review Commission

improve if members' opinions are more frequently sought and valued. Likewise, the more that management can do to effectuate better communication, the less isolated many who perceive themselves to be "out of the loop" will feel.

The Commission recommends the establishment of working groups within each division that consist of senior management, mid-level management and field personnel to address the issues raised in this report.

## 2.4  Confidence

There exists "a causal and definitional link between leadership and team performance."[7] Leadership requires the confidence of those individuals expected to follow. Without confidence in management, organizations are bound to be fraught with dissention, indifference, and eventually decline. Organizations that choose to derive their leadership from a strong sense of tradition have an overriding obligation to insure that the tradition and the environment it creates include all members of the organization. As discussed, tradition is important, and can be a unifying force for good. However, when tradition is exclusive rather than inclusive, its inherent value in an organization is weakened and can prove to be divisive. Leadership needs to emphasize the need for loyalty and respect for one another not just at the fire scene but in every location throughout the Department. In addition, any organization must remain focused on its future to succeed. In order to do so, the organization must

> "The only constant is change . . . If an organization doesn't undertake this process, change will still occur. The difference will be how well the organization is equipped to deal with a future that it doesn't help create."
> *Mark Wallace, Fire Department Strategic Planning: Creating Future Excellence*

communicate with its members who are closest to the field. This is particularly true in rapidly changing fields such as public safety. An organization that lacks direction cannot move forward. Therefore, strong leadership exercised at all levels, a tradition of pride that includes all members, loyalty and respect for one another, and clear direction for the future of the organization as expressed by its members are the foundation on which confidence in an organization is built.

The Commission finds that the Department now suffers from a crisis of confidence. Throughout the interviews and evident in the survey responses are a significant number of firefighters, officers, and civilians who express a lack of confidence in the Department and its direction. This lack of

---

[7] Hogan, Robert, Gordon J. Curphy and Joyce Hogan, "What we Know About Leadership," *American Psychologist*, June 1994, p. 493

confidence is pervasive and presents a challenge to the organization. This challenge can be addressed in many ways, including structural reorganization, which is discussed in detail in *Section 5, Department Administration.*

## 2.5 Recommendations

- *The Commission recommends the Department redefine its values, identify its goals, and review its existing management practices.*

- *The Commission recommends that the Department create an environment that is inclusive, welcoming and respectful for all its members.*

- *The Commission recommends that the Department create a management structure that invites participation throughout the ranks.*

- *The Commission recommends that the Department increase confidence of its members by providing dynamic and progressive leadership.*

- *The Commission recommends that the Department adopt a "zero tolerance" policy for inappropriate behavior, and undertake a serious effort to rid itself of the existing perception that it remains a non-inclusive organization.*

- *The Commission recommends the establishment of a permanent strategic planning committee with representatives from all levels of the Department.*

- *The Commission recommends that division-based working groups, under the direction of senior management, reporting to the strategic planning committee, be established to address specific issues raised in this report.*

Final Report of the Boston Fire Department Review Commission

## 3   Discipline

### 3.1   Introduction

Throughout the meetings and interviews conducted by the Commission the
issue of discipline, in particular, perceptions that discipline is meted out
unfairly, remained a constant theme. Prior to the early 1980's, discipline
lacked formality within the Department. Today, there exist two forms of
discipline. They are progressive discipline, often referred to as "formal"
discipline, and undocumented discipline, referred to as "informal"
discipline. Undocumented discipline is the informal system by which
supervisors impose punishment on firefighters who violate the rules. It is
often referred to by members as "informal" discipline because it does not
fall within the Department's progressive discipline policy. An example of
informal discipline for a firefighter who arrived late for a shift might involve
cleaning the station bathroom. Most members of the Department who spoke
to the Commission, including Union representatives and minority
firefighters, agree that overall conditions relative to the imposition of
discipline have improved since the implementation of progressive discipline
in the late 1980's. However, many acknowledge that difficulties with the
application of discipline occur most frequently at the local station level.
More concerns and questions were raised relative to the imposition of
undocumented discipline than with the application of the progressive
discipline policy. Nevertheless, concerns were raised regarding uneven
application of all discipline and many expressed frustration at the lack of
consistent enforcement of rules and regulations throughout the Department.
Discipline requires trust and accountability. Without those elements,
discipline can rupture an organization, increase hostility among members,
and ultimately divide the organization to the detriment of the public safety.

The Commission finds that the perception that the Department imposes
discipline in an uneven manner raises serious concerns that the important
factors of trust and accountability are lacking within the existing structure
for discipline. As a result, without immediate action to reverse the trend, the
Department is well on its way to serious and disruptive rifts within the
ranks. Among the many concerns raised by critics within the Department,
the issue of fairness in discipline is critical.

### 3.2   Application and Enforcement

The results of the survey conducted by the Commission and numerous
conversations with members suggest that the application of discipline, or
decisions not to apply discipline, are perceived by some members to be
based on factors of race, gender, personalities, and friendships of the
individuals involved. For example, although one firefighter may be

punished for a late arrival, another may not receive even a verbal warning for the same behavior. While there may be many explanations for the appearance of such inequities, the perception exists that factors beyond job performance affect disciplinary decisions. Once fundamental trust and basic accountability are gone, morale is fast to follow. Immediate and effective change must occur at the station level to stem the tide of rising distrust among the members and to restore a discipline system that increases trust through proper accountability. The Department's past efforts in this regard, particularly with respect to the 18.41 Committee, were ineffective. Members of the 18.41 Committee complained that their roles were never defined and committee members were never trained to review disciplinary procedures.

The Commission finds that any reconstitution of the 18.41 Committee is not advisable. In addition to existing procedures under civil service and the collective bargaining agreement, the Department can explore internal processes that will restore trust in the disciplinary system. Among the possible avenues for restoring trust is to provide procedures for review of disciplinary decisions, and to offer members an opportunity to bring concerns regarding uneven enforcement to a trained professional and neutral party. An ombudsman, working with an audit and review unit within human resources, might provide members with an avenue to resolve not only allegations of uneven enforcement, but also disputes among and between members. The ability to mediate disputes within the organization will assist the Department in its efforts to recognize and solve problems before they become ubiquitous and divisive.

## 3.3  Accountability

There exists no process by which the application of undocumented discipline can be reviewed. Without some form of accountability, and a method to insure consistency between the offense and the punishment from station to station and member to member, the system of undocumented discipline in place at the Department is doomed to failure. Proper training in the application of discipline must be instituted immediately. The Commission looked at a number of possible measures that would require supervisors to track all discipline, ranging from the maintenance of a station discipline log to a centralized database of disciplinary sanctions. In the end, the Commission prefers to leave the specific methods for review to the new management team. Nevertheless, regardless of what method the Department chooses to address the issue of accountability, it must immediately accept the responsibility that the imposition of informal discipline must be monitored carefully to insure fairness and uniformity throughout the Department.

Final Report of the Boston Fire Department Review Commission

## 3.4  Training

As discussed in Section 4, the lack of proper training of members in supervisory positions results in uneven and faulty application of both progressive and undocumented discipline.

## 3.5  Culture

As part of a review of the imposition of discipline in the Department, there must be a comprehensive review of the effects of the culture of the organization on the application of discipline. It is impossible to escape the conclusion that a significant number of the problems associated with discipline in the Department stem from the larger issues of culture and attitude pervasive from the highest levels of senior management to the members in the field. Discipline must be based on trust. The Department, through its process of review of culture and leadership, must build this trust. Until the Department accepts the necessity of striving to change the fundamental culture of the organization as addressed in Section 2, all efforts to improve its disciplinary system will remain cosmetic.

## 3.6  Recommendations

- *The Commission recommends a complete review of the disciplinary procedures currently in place, and further recommends a comprehensive program of training at each level of the Department on the proper use of progressive and undocumented discipline in the organization.*

- *The Commission recommends the creation of an audit and review unit that serves a monitoring and management function over disciplinary procedures.*

- *The Commission recommends appointment of an ombudsman for accountability and review of unfair and uneven disciplinary actions and to mediate internal disputes.*

- *The Commission recommends that senior management work with human resource professionals to devise a proper method for monitoring and control of the imposition of informal discipline.*

- *The Commission recommends that all Department members be trained in the application of discipline prior to or immediately upon being placed in a supervisory position.*

The Challenge: Managing Tradition, Diversity, and Change

## 4    Supervision and Training

### 4.1    Introduction

The Commission finds that the Boston Fire Department is among the finest technically trained firefighting operations in the country. Almost without exception, critics and supporters agree that the quality of the Boston Fire Department as a firefighting organization sets the pace for technical ability, and its excellent record in the field is a source of pride among its members. However, the Commission also finds that management and supervisory level training within the Department does not support the excellent training displayed in the field. In fact, management training at all supervisory levels of the Department is virtually nonexistent. The Commission finds that the Boston Fire Department Fire College is a credible program; however, a one-day annual management training initiative is insufficient for a 1,600 person, $115 million dollar budget organization. Exacerbating the lack of management training are a number of practices and customs -- many of which are governed by the existing collective bargaining agreement -- that interfere with the efficient operation and management of the Department. One of the best examples of such customs is the Department's current practice utilizing the "acting list." This practice of "on the job training" invites inexperienced and untrained members to assume supervisory and management roles in the Department on a rotating basis. Without adequate training, this awkward and expensive process invites neglect and abuse of Department procedures and the Department suffers from cultural and professional inconsistencies that can have a negative impact on its primary functions: fire prevention and public safety. Similarly, long-standing past practices such as "swapping" of shifts by members affect the continuity of the Department and its effectiveness in the field. Combined with the acting list, swapping leaves the Department with little control over the proper allocation and distribution of personnel in the most efficient manner possible, and aggravates the lack of continuity complained of by many members of the Department. Each should be addressed immediately within the confines of the collective bargaining process.

### 4.2    Supervision

To properly supervise an operation such as the Department, it is necessary for supervisors and managers to establish continuity. The lack of continuity in the Department can be corrected by addressing at collective bargaining the issues raised relative to certain long-standing past practices.

Final Report of the Boston Fire Department Review Commission

### 4.2.1 The "Acting List" and Acting Out of Grade

The Department's current practice for replacement for vacancies and absences among the supervisory levels is a convoluted structure known as the "acting list," also referred to as acting out of grade. The acting list consists of individuals eligible to fill Department vacancies by virtue of their place on the promotional list or by seniority. Each Department vacancy must be filled by a member from the level of the Department immediately below that of the absent member.[8] This bumping procedure continues for every vacancy at every level on any given day on every shift. *See Figure 4.1.* As a result, according to senior Department sources, as many as 30% or more of the Department on any shift may be in "acting" capacities in their positions. In all but the very few highest levels, the acting officer has had no supervisory training in the role he assumes for the shift. For example, an acting officer may be expected to administer discipline without any knowledge or training in the process of progressive discipline. Further, with so many positions in an acting capacity at any one time, there exists little in the way of continuity. The process breaks continuity for the firefighters when one of their company must fill the acting role at the station level, and the problem is multiplied throughout the various levels of the Department. In addition, the resulting increase in differential pay at the various levels, including the overtime for the firefighter who must fill the vacancy at the station level, makes an ineffective management practice an unnecessarily costly one as well.

> **The "Acting List" with a Vacancy or Absence in the Position of Deputy Chief**
>
> - Firefighter #1 becomes Acting Lieutenant
> - Lieutenant becomes Acting Captain
> - Captain becomes Acting District Chief
> - District Chief becomes Acting Deputy Chief
> - Firefighter #2 hired on OT to replace Firefighter #1
> - Firefighter #1 has no training in role of Lieutenant
> - Lieutenant has no training in role of Captain
> - Captain has no training in role of District Chief
> - District Chief has no training in role of Deputy Chief
> - All parties receive increase pay differential for their "new position"
>
> Figure 4.1

### 4.2.2 Schedule

In addition to the confusion and lack of continuity that results from the "acting list," there is a widespread practice among firefighters of swapping shifts. In fact, the practice has become so common that it is not at all unusual to have an entirely different group of members of the same

---

[8] This procedure does not apply in certain cases relative to the Senior Firefighter.

The Challenge: Managing Tradition, Diversity, and Change

company from the group scheduled to be present on the shift. The station commanders may not be aware of who will be on their team for a particular shift, and as a result, they cannot properly assess the strengths and weaknesses of their team prior to the shift. This practice is in direct conflict with management's emphasis on the need for cohesive teams. For example, the week of December 5, 1999, there were approximately 7,200 personnel hours of "swaps," the majority of which did not reflect one-time changing of shifts, but were the result of "permanent" swaps between members. That is, members have established permanent arrangements of swapping scheduled shifts with other members that allow them to establish their own schedules independent of the structured schedule of the Department. The consequence of this long-standing management practice is that there now exists virtually no supervision over swapping of shifts, and the Department schedule is of little value. (*See* Rule 18.51, Rules and Regulations of the Boston Fire Department). Without adequate procedures in place and enforced regarding this practice, the lack of continuity complained of by many in the field can be expected to continue indefinitely. While there may be occasions when managerial flexibility is necessary, the current practice is neither appropriate nor beneficial to the Department as a cohesive organization. Due to the prolonged practice of management approval of swapping, the Department must now address this issue within the collective bargaining process.

## 4.3  Training

The Commission finds that there exists little in the way of formal management and supervisory training within the Department. The Commission also finds that the above-described practices directly impact the ability of the Department to institute effective management and supervisory training for its personnel. Due to the use of the "acting list," members who are pulled from a shift to attend training must be backfilled from the next lowest level. Rather than replace a single member off a shift, the bumping procedure results in the absurd "structure" illustrated in Figure 4.1. As such, the expense of removing a member from the field has been a deterrent for the Department to institute widespread training for its supervisory personnel. The Commission finds that this deterrent is insufficient justification to forego proper management training. The effect of a lack of proper management training is reflected in the complaints of members that such critical management processes as discipline are mishandled. Proper training of supervisors at all levels in the procedures for discipline, as well as methods for accountability, would assist in addressing this ongoing concern. (This subject is discussed in more detail in Section 3.) The Department needs to identify existing resources within the organization to address its current training needs, as well as to project for future training as part of an annual fiscal review. Adequate resources dedicated to training must be made a priority of the Department.

Final Report of the Boston Fire Department Review Commission

### 4.3.1 Senior Management Training

The Commission's review of management practices in the Department suggests that senior level members of the Department would benefit from more intensive and effective management training in a variety of capacities. Such training is offered by many universities and private companies in the Boston area, and by the City of Boston, and is readily available to senior managers in the Department. In addition, National Fire Academy programs, training with the Massachusetts Department of Fire Services, executive training programs such as Senior Managers in State and Local Government at Harvard's Kennedy School, and the City of Boston's Leadership 2000 management training program are examples of existing programs currently underutilized by the Department. Further, in addition to regular technical training, officers and supervisors should receive in-service training focused on management and leadership issues.

### 4.3.2 Supervisory and Station Level Training

Specific training regarding management practices is necessary to develop and maintain a good sense of order and fairness among members in the field. Toward that end, the Department must assume responsibility that all members of the Department who will exercise any form of supervisory authority are properly trained as to their roles and responsibilities. In addition, successful organizations must identify future leaders from within their ranks. These future leaders will need to be more than just excellent firefighters; they will be required to address complicated issues in a changing organization. Station Commanders must recognize potential leaders from within their ranks and assist in the formal and informal training of future supervisors. They can be supported by the establishment of a future leaders program within the Department that will promote mentoring and focus on the skills necessary for a successful new generation of leaders. The Department should assist the station level supervisors in developing proper supervisory habits and practices that are consistent from station to station. Proper training and centralized oversight of station practices will assist the Department in assuring that all members have an equal opportunity at career success and future advancement. Based on our review, the Commission finds that the initial promotion from firefighter to lieutenant involves the greatest degree of change in responsibilities, and recommends that increased efforts be concentrated on proper training at that level. However, all members of the Department, particularly those who will be the leaders of the future, would benefit from early and continuous management and leadership training.

The Challenge: Managing Tradition, Diversity, and Change

## 4.4 Recommendations

- *The Commission recommends that the "acting list" be abolished in favor of vacancy replacements within grade.*

- *The Commission recommends that one schedule be negotiated, adopted, and enforced for the entire Department.*

- *The Commission recommends that the practice of "swapping" be addressed immediately within the collective bargaining process.*

- *The Commission recommends that a formal level of management training be instituted at each level of management within the Department prior to or immediately after promotion of any individual into a supervisory level position.*

- *The Commission recommends that the Department take advantage of all federal, state and local management training opportunities, including private sector training and executive programs at local universities.*

- *The Commission recommends that current in-service training be expanded to include management and leadership issues.*

- *The Commission recommends that the promotion from firefighter to lieutenant be identified with intensive training on all facets of management, leadership, and supervision issues and concerns, including formal and informal discipline.*

- *The Commission recommends that the Department develop a program for identifying and training future leaders within its ranks.*

Final Report of the Boston Fire Department Review Commission

# 5   Department Administration

## 5.1   Introduction

One senior Department official noted that "there is a lack of attention to detail permeating the organization." The Commission's personal experiences confirm this observation. The Commission acknowledges the challenges of managing and operating a 1,600-person organization with an annual operating budget of $115,000,000. Such an operation requires skilled managers and technical knowledge on a wide range of issues and individuals with appropriate experience and education. As such, it is in the interest of the Department to identify the best available individuals to oversee the

> "The traditional [fire] department looks to its peers and its history to determine how to operate in the future. This has led to a great deal of information inbreeding and stagnation of ideas. Over the past few years, leading departments have been changing this cycle by turning to the business world for new methods of management."
> Mark Wallace, *Fire Department Strategic Planning, Creating Future Excellence,* (p. 205).

management and operations of the Department and to allow the professional firefighters to focus on their mission of public safety. Therefore, the management structure of the Department should recognize the strengths and experience necessary to perform specific functions within the organization. The Commission finds that in order to achieve these goals, the existing structure for management of Department operations and administration should be reorganized for efficiency and accountability.

## 5.2   Commissioner and Chief of Department

For many years, a civilian commissioner appointed by the Mayor headed the Boston Fire Department. In recent years, a single uniformed member of the Department has held the dual role of Commissioner and Chief of Department. The Commission prefers the organizational model currently utilized by the Boston Police Department and many public safety organizations throughout the country. A civilian commissioner with significant management and leadership experience will bring greater accountability to the Department and professional management expertise to the operations of the organization. This civilian commissioner should not be a political patronage appointment, but a manager with proven ability to operate a large organization and with a commitment to provide progressive and dynamic leadership. While it would be advantageous for the individual to have prior firefighting experience, it is not viewed by the Commission as

The Challenge: Managing Tradition, Diversity, and Change

a necessary qualification for the post. Appointed by and reporting directly to the new civilian Fire Commissioner should be a uniformed member of the Department in the role of Chief of Department with responsibility for the day to day operations of the Department and a similar commitment to progressive leadership. *See Section 10 Planning and Implementation.*

## 5.3   Senior Management

The Commission also believes that a more effective organizational structure would allow for greater accountability and experience in the areas of administration, operations and planning and technology. The Commission recommends the creation of three positions appointed by the Commissioner and reporting directly to the Chief of Department. The three positions are Chief of Administration (civilian), Chief of Operations (uniformed) and Chief of Planning and Technology (uniformed or civilian). This system will allow for increased civilianization in the areas of Department management that require strong organizational skills, and will allow for professional firefighters to oversee the critical and complex technical aspects of firefighting operations. The Commission further recommends that these three positions be created outside of the existing collective bargaining unit.[9] *For further discussion and explanation see Section 10 Planning and Implementation.*

### Figure 5.1

Proposed Reorganization of Senior Management
Boston Fire Department



---

[9]  The Commission recognizes that the proposed reorganization raises issues that may require review of and/or changes in local ordinances, state law, and existing labor agreements. The proposed reorganization reflects the Commission's strong belief that the existing management structure is insufficient to properly administer the department in modern times.

Final Report of the Boston Fire Department Review Commission

### 5.4  Community Firefighting

Decentralized decision-making and increased responsibility at the station house provides greater accountability as well as a sense of community. Although the dangers faced by firefighters have not diminished, the numbers of fires have decreased in recent years due to

> "Today, fire departments must be sensitive to their communities. This is because the services provided are so much more than they were in the past. Also, there is no such thing as a universal fire department. The fire service is community based and no longer generic. One size does not fit all."
> *Mark Wallace, Fire Department Strategic Planning, Creating Future Excellence.*

technological advances and rigorous inspections. As the Department moves into the new millenium, the focus of the Department will shift from firefighting to fire prevention and technology. This shift will require more community interaction and prevention education. Community firefighting and prevention are the future of fire departments nationwide and the Commission believes that with the appropriate commitment the Department can become a national leader in this effort.

### 5.5  Equipment and Training

The Department has made efforts to properly equip and train the firefighting staff. The Department now has over 600 emergency medical technicians, eight paramedics and four nurses, and each company is equipped with a defibrillator. In addition, eighty firefighters are HAZMAT certified. The technical ability of the Department is excellent. In general, equipment and maintenance are at acceptable levels throughout the Department; however, there are areas that require attention. Many firefighters raised concerns about existing firefighting apparatus and its sufficiency for a growing population. For example, there exists just one aerial tower in the Department. Several firefighters noted the substantial increase in development within the City, particularly in downtown Boston and Back Bay, and the plans for increase usage of the South Boston Waterfront, as evidence of the need to bolster existing capability. The respondents emphasized the need for the Department to keep pace with appropriate equipment.

The Commission recommends that a complete review of existing equipment be commenced as soon as possible with a goal of updating equipment to meet the City's changing needs. In addition, although existing bunker gear is effective, many firefighters maintain that their gear is too hot for summer

The Challenge: Managing Tradition, Diversity, and Change

use. There have been reports of sickness and fatigue in extreme weather conditions. The Commission recommends that a study by the Department be commenced as soon as possible to review all available alternatives to existing bunker gear during warmer weather months. The Commission does not recommend replacement of existing bunker gear until the Department is satisfied that there are appropriate alternatives that meet or exceed existing safety standards. The Commission believes that a comprehensive fitness and training program will lead to a reduction of heat-related injuries, and therefore recommends that the Department institute such a program. Placing aerobic machines in station houses is a good beginning, but it cannot address the concerns of the Commission unless such equipment is part of an overall plan for fitness improvement Department-wide.

## 5.6   Capital Planning

The existing physical facilities throughout the Department are generally inadequate. Many of the fire stations and firehouses are in various stages of disrepair. The Department must institute a capital plan that includes a comprehensive review of all existing fire stations and fire hydrants for repair, rehabilitation or replacement. In addition, the conditions at Boston Fire Department headquarters are unacceptable. Recently, one worker was injured as the result of problems with outdated electrical outlets. In the aging facility, problems will only increase over time. As part of its overall capital plan, the Boston Fire Department must review options for the construction of a new, state of the art Fire Department headquarters. In addition, a five-year and a ten-year capital plan for the repair, rehabilitation or replacement of existing fire stations should be prepared with the assistance of the City planners.

## 5.7   Fire Station Inspection and Maintenance

A Department that is at once proud of its distinguished history currently operates in predominately unkempt fire stations that lack any physical evidence of the pride so often mentioned by the members. While many of the problems associated with the existing facilities can be blamed on the age of the facilities, age is not the only problem. The Commission visited other comparable cities that maintain many fire stations of approximately the same age as Boston's, such as Milwaukee, Wisconsin and San Francisco, California. In those cities the station houses were meticulous, the firefighters uniformed and well mannered and the sense of pride in their work clearly evident in their appearance. To the contrary, Commission visits to Boston fire stations confirmed complaints from many firefighters of indifference to station maintenance, firefighters appearing out of uniform, and firefighting equipment in need of attention. Indifference to appearance was repeated throughout the City with some notable exceptions. In addition, numerous complaints from firefighters regarding cigarette smoking in

Final Report of the Boston Fire Department Review Commission

station houses, and more than one source alleging occasional alcohol use at certain stations, further emphasize what appears to be a lack of order and pride in many station houses. There appears to be no concern for reprisal resulting from the poor conditions and unprofessional appearance. Regular fire station inspections by the deputy chiefs have not been conducted for nearly a decade. Although many of the existing firehouses are in need of major repair or replacement, an issue addressed in this report, physical conditions are not an excuse to forego simple cleaning, regular maintenance, and proper personal appearance. Station supervisors must be held accountable for the physical conditions of their stations, and supervisors must hold firefighters accountable for regular maintenance and personal professional appearance. These conditions can be improved immediately and Department management should institute a series of regular inspections with appropriate discipline for failure of a station to pass inspection. The pride of the members should be reflected in every station throughout the City.

## 5.8   Technology

The Department has made efforts to remain abreast of changes in technology and the Commission applauds their efforts to date. Pass devices, thermal imaging cameras and other fire safety technology are now available to firefighters in most Department companies. In addition, the Commission understands that plans are in place for an upgrade of the existing radio system. However, as one of the nation's oldest firefighting organizations, the Department continues to conduct some operations in an antiquated fashion. As many governmental entities turn to the use of new technologies to support decision-making, improve citizen service and assist in administrative activities, the Department should embark upon a thorough research and planning process to leverage appropriate technologies into its service model. The Commission recommends that the pace of technological implementation increase over the next several months and years. The Department will be well served by a standing committee of firefighters, officers, civilians, and technology professionals whose function it is to review emerging technology and make recommendations for further review and purchase. Among the technology initiatives that should be explored are mapping systems, and ways to create new opportunities utilizing fiber-optic technology. Mapping systems are being successfully deployed in public safety agencies throughout the world. As these technologies have evolved, the levels of integration and the "real time" speed of mission-critical information have increased exponentially. The City of Boston has taken a lead role in technology deployment in its schools and in the Boston Police Department, and the Boston Fire Department should become a part of this vision. Pilot projects with mobile data terminals (MDT's) have been performed and should be fully implemented. Among the functions the Department should consider in a technology strategy are the following:

The Challenge: Managing Tradition, Diversity, and Change

- Fully integrated links to Global Information Systems (GIS) and Global Positioning Systems (GPS)
- "Real-time" access to building information, footprints, and floor plans in cooperation with other City departments
- The ability to tour buildings virtually to minimize the need for fire personnel to go in during an incident
- Road closures and traffic pattern changes linked directly into a central system so that vehicles can be re-routed (especially important in downtown Boston during the completion of the Central Artery Project)
- "Real-time" information at the incident site concerning the location of fire hydrants, power and gas lines, water pipes, and the location of any hazardous materials
- E-911 address verification and plotting at dispatch and in the vehicle
- The ability to transfer events to other agencies automatically
- Web-based solutions that will allow decision-makers to access the system from remote locations through a password-protected session

The Department should immediately equip the remaining four companies that lack thermal imaging cameras with this technology. PASS device reliability must be constantly assessed for safety and improvements. In addition, the Department should upgrade existing computer systems to keep pace with technological advances. The Commission recognizes that the suggestions contained herein are ambitious and expensive. They should be viewed as part of a long-term strategy on technology, and the Department must work with other City departments to insure that efforts are not duplicated. Further, there may exist state and federal funding opportunities, public/private partnerships and other grant opportunities for the Department to explore. The Chief of Planning and Technology will have direct responsibility to seek out and identify such opportunities for the Department.

## 5.9   Physical Fitness and Wellness Programs

The Department has begun efforts to improve the health and well being of the firefighting force. The Commission finds that a firefighting team in peak physical condition must be a priority of the Department. A significant number of injuries and deaths can be attributed to physical fitness issues. Such injuries contribute to problems associated with the number of injured on duty and disability retirements currently in force in the Department. (See Section 6.4) In an effort to address these issues and with the goal of a healthy, physically fit Department a top priority, the Commission

Final Report of the Boston Fire Department Review Commission

recommends that the Department work with the Union to institute physical
fitness programs for all members.  In addition, a number of members have
commented that prohibitions against smoking in fire stations are unevenly
enforced.  Smoking prohibitions should be addressed, and smoking
cessation programs encouraged and offered by the Department.  Also, the
Commission recommends relative to the study conducted relative to the concerns
raised by excessive exhaust fumes in station houses be made a priority.
Finally, the Commission believes that a wellness program, including
nutrition and stress reduction, should be made available to all members of
the Department and that participation in the program be encouraged
throughout the Department.

## 5.10  Equipment Maintenance

The responsibility for maintaining the Department's motor vehicle, electric
and firefighting equipment lies with the Motor Squad.  This unit is staffed
with fourteen uniformed firefighters on group schedules and eighteen
civilians on five day, Monday to Friday schedules.  This unit does a
significant amount of work in the firehouses, as well as in its base at the rear
of the Southampton Street headquarters building.  All of the work on the
trucks is handled by firefighters; there are no civilian mechanics.
Firefighters are responsible for repair of engines and vehicle equipment,
preventive maintenance and, when necessary, provision of replacement
vehicles while repairs are made.  The unit is also responsible for keeping
hydrants operational when fires are fought in sub-freezing temperatures.
While the unit appears to function effectively, it is not clear that it must be
staffed exclusively by firefighters.  There may be certain circumstances in
which work must be performed at fire scenes, in which case there exists a
benefit to having uniformed mechanics.  However, civilian diesel mechanics
could fill a number of these positions.  The civilian personnel deal with the
maintenance and testing of equipment and repairs to systems at the stations.
Seven of the personnel are electricians who do work on generators, switches
and other systems.  The remaining personnel deal with equipment and
supplies for use on the trucks.  While recognizing that this is subject to
collective bargaining, the Commission sees an opportunity for increased
civilianization of this unit.  In addition, the Commission believes that as part
of the Department reorganization, there may be a benefit to consolidate all
maintenance tasks within a centralized unit that could include mechanics,
electricians and the maintenance functions of the Fire Alarm Unit.  Such a
consolidation may offer the Department significant savings and is worthy of
further review.

The Challenge: Managing Tradition, Diversity, and Change

## 5.11 Recommendations

- The Commission recommends the appointment of a civilian Fire Commissioner with significant management experience to oversee the Department.

- The Commission recommends a reorganization of senior management as set forth in Figure 5.1.

- The Commission recommends that as part of its strategic plan for the future, the Department explore avenues to implement community firefighting citywide.

- The Commission recommends that a complete review of existing equipment be commenced as soon as possible with a goal of updating equipment to meet the City's changing needs.

- The Commission recommends that a study by the Department be commenced as soon as possible to review all available alternatives to existing bunker gear that meet or exceed current safety standards.

- The Commission recommends the institution of a five-year and ten-year capital plan for the Department that will include the construction of a new, state of the artFire Department headquarters and the repair, rehabilitation or replacement of fire stations throughout the City.

- The Commission recommends the reinstatement of regular inspections at station houses.

- The Commission recommends that a permanent technology committee consisting of field personnel, supervisors, technological experts, and civilian members of the Department, reporting to the Chief of Planning and Technology, be established to address ongoing technological needs.

- The Commission recommends that the remaining four companies without thermal imaging cameras be so equipped.

- The Commission recommends that PASS device reliability be constantly assessed for safety and improvements in technology.

- The Commission recommends that the Department work with Union representatives to develop physical fitness programs for all members.

Final Report of the Boston Fire Department Review Commission

- *The Commission recommends that smoking prohibitions should be addressed, and smoking cessation programs encouraged and offered by the Department.*

- *The Commission recommends that the study conducted relative to the concerns raised by excessive exhaust fumes in station houses be made a priority, and that appropriate remedies be instituted as soon as possible.*

- *The Commission recommends that a wellness program, including nutrition education and stress reduction should be made available to all members of the Department and that participation in the program be encouraged across the City.*

- *The Commission recommends that the Department explore opportunities for civilianization of vehicle maintenance tasks and that it explore the restructuring of all maintenance functions in one unit.*

The Challenge: Managing Tradition, Diversity, and Change

## 6   Personnel and Human Resources

### 6.1   Introduction

While it does not appear so in the organizational chart, for all practical purposes there exist within the Department two separate personnel divisions for uniform and civilian personnel respectively. This unnecessary duplication must be addressed as part of the Department reorganization. The area of human resources is in need of extensive review. Some practices have evolved for the better. For example, in the recent past, the Department utilized uniformed members to conduct background investigations on personnel, a task for which they were not trained. The Commission is pleased that investigations of new hires are no longer conducted by the Department but have been forwarded to the Boston Municipal Police Department. This recent change is an important move; however, significant changes in the area of human resources are necessary. In general, the Commission finds that the Department would benefit from experienced professional management in the area of human resources. As part of an overall reorganization of the management of the Department, special attention must be paid to existing systems in place for human resources. Under the proposed reorganization, the Chief of Administration would be responsible for oversight of all personnel related issues. The main challenges facing the area of human resources and personnel are discrimination and sexual harassment, minority representation in the Department, gender parity, promotions, education of the workforce, injured on duty, disability retirement procedures, and civilianization.

### 6.2   Discrimination and Sexual Harassment

The Department has made efforts in recent years to increase its training on issues of sexual harassment and diversity. However, the Commission finds that the success of such training has been limited. The 18.41 Committee was a failure, and training sessions have been ineffective. In fact, there have been instances in which supervisors mocked

> "All workers want to succeed on the job and to be accepted by the organization, but they also want to maintain their own senses of identity and have their special perspectives and assets acknowledged and appreciated. It's important not simply to tolerate different perspectives but to see them as definite assets."
> *Renee Blank and Sandra Slipp, Voices of Diversity, American Management Association (1994)*

Final Report of the Boston Fire Department Review Commission

the training, setting a tone of indifference among the firefighters regarding the importance of such instruction. This limited success is evident in the survey results obtained by the Commission.

Training and education are the key elements in addressing the larger issues of culture and diversity. According to members who spoke with the Commission, many of the issues that divide members of the Department have a history rooted in actions taken in the late 1970's and early 1980's relative to hiring practices and Proposition 2½. The resentment that resulted from these actions gave rise to a culture and attitude within the Department that minorities have received "special treatment." Unfortunately, although nearly twenty-five years have passed since that time, these attitudes remain among some firefighters and supervisors. However, many other organizations that faced the same problems have moved beyond the decades old issues, and it is long past time for the Boston Fire Department to do the same. This failure by the Department to address properly such important issues as race and diversity cannot be allowed to continue. The President of Local 718 expressed to the Commission a desire to address issues of diversity within the ranks. Representatives of Boston Society of Vulcans of Massachusetts, Inc., an organization representing minority firefighters, also expressed the desire to work with the Union and management on this issue. Department leadership must facilitate this discussion, and there exists no excuse to further postpone the dialogue.

However, the future does hold the promise of change. One Commission member had a chance encounter with a very credible young member of the Department who recently joined the organization after leaving the military. He stated that for him, and many of his young colleagues, race was a non-issue. While this bodes well for the future, it does not address present concerns that the organization is insensitive to issues of cultural diversity. Sensitivity to issues of diversity must become a priority for the new management team. We can celebrate our diversity without diversity becoming a focal point of division and exclusion. The workplace is not the arena to emphasize cultural differences, but to accept differences as part of the mosaic of the organization. Diversity is more than a "necessary evil" or the fashionable buzzword of the day. It is the reality of the society in which we live and work. Understanding that, the Department should reflect the City, and to the extent it does not, the Department must commit itself to become an organization that welcomes diversity.

The Challenge: Managing Tradition, Diversity, and Change

## 6.3  Department Composition

In general, minority representation throughout the Department has improved in the last few decades. However, many of the attitudes remain that divided the Department in the past. Part of the problem lies in the under-representation of minorities and women in the senior Department ranks. Personnel and human resources must work closely with management and supervisors to identify potential officers from existing firefighters, and offer additional pre-promotional training necessary to insure that all firefighters have equal opportunities for advancement. (See Section 4.3.2) The Commission is convinced that there are extremely well-qualified individuals representing all segments of our population who can be groomed for future leadership positions. The Commission recognizes that all perceptions of favoritism in the current distribution of work assignments, promotions and other benefits must be addressed from within the organization. The Commission believes that the use of working groups can assist to identify the problems and provide an atmosphere for frank and open dialogue without fear of retribution. Such discussions are not easy, and the Department might benefit from expert

> "If you need more resources, additional training, more or less feedback, or an opportunity for advancement, tell your boss. Don't expect that your boss will automatically know what you want and that she or he will take care of it. Take responsibility for making your needs known."
> *Renee Blank and Sandra Slipp, Voices of Diversity, American Management Association (1994)*

assistance in the facilitation of these deliberations. However, the Department must address the perceptions among many minority and female firefighters that they are excluded from the team. Likewise, minority and female firefighters must use the opportunities presented to them to speak out about their perceptions of sexism, racism or homophobia without fear of retribution. The success of any effort to address race, gender or sexual orientation issues in the Department largely falls on the members themselves; however, addressing this issue head-on must be an immediate priority and strong commitment of the Department management team.

Final Report of the Boston Fire Department Review Commission

### 6.3.1  Fire Alarm and Construction Division

Currently, this civilian unit has no minority members. Once again, the perception of many people is that this division is representative of the indifference of the Department to minority hiring. As this division is not subject to the consent decrees,[10] the lack of minority representation in this area is perceived by some as evidence that the Department does not maintain minority-hiring practices as a priority when left to its own devices. The Commission believes that this oversight must be corrected and recommends that the Department concentrate its efforts on hiring a variety of diverse candidates for positions in this unit as they become available.

### 6.3.2  Recruitment and Gender Representation

Several issues were brought to the Commission's attention relative to gender parity. The Commission notes that despite an existing Memorandum of Understanding to the contrary, bathroom facilities for female firefighters still do not meet required standards. Further, according to the state Personnel Administrator and the Department, the biggest hurdle for female applicants is the physical standards test. The Commission does not endorse changing those standards, but more effective recruitment might include Department sponsored training to encourage all applicants to "get in shape" to meet the Department standards. Similar efforts have worked in other public safety agencies. In addition, the Commission finds that the Department's commitment to recruitment of female firefighters must be more aggressive. For example, when the Commission inquired whether the Department had actively recruited from groups or agencies requiring fitness of their members, such as the Massachusetts National Guard, it learned the Department had made no such efforts. We note that several departments visited by the Commission boasted a higher number of female firefighters, and we have found no evidence that Boston is less desirable for female firefighters than the cities we visited while preparing this report. The Department must work with such groups as the Massachusetts National Guard, local high schools and colleges, active military personnel and others to advertise for, promote, and seek qualified females who may desire careers in firefighting. The Department must commit itself to a more comprehensive effort to reach out in all communities including Spanish-speaking, Asian, and gay and lesbian communities. Each community could be better reached simply through more strategic placement of advertising in community-based newspapers, and by firefighters on the force who are willing to work in their communities to increase interest in firefighting

---

[10] *Boston Chapter, NAACP v. Beecher*, Civil Action No. 72-3060, 371 F.Supp. 507 (D.Mass. 1974) and *United States v. Beecher*, Civil Action No. 73-269, 365 F.Supp. 655 (D.Mass. 1973)

careers. Recruitment by the Department has been traditionally handled
during the months prior to an exam. This is not an effective strategy for
recruitment. Recruiting quality personnel should be a full time, year-
round effort. The Department must commit itself to a comprehensive plan
for recruitment and must execute that plan throughout the year in order to
accomplish the goal of a diverse Department that reflects the City it
serves.

## 6.4  Promotions

The Commission found it was very difficult to engage in constructive
dialogue with many Department members about the promotional system.
No doubt, it was among the most difficult and sensitive issues that the
Commission addressed. One senior fire official, when asked for his opinion
on the promotional system, quickly replied, "If you change the promotional
system to accommodate minorities, it won't be fair." Similar statements
were made throughout our process. The difficult issue relative to the "fair"
method to identify qualified persons for promotion is not easily resolved,
but this issue is under review in many public safety agencies nationwide,
including the Boston Police Department. The Commission discussed this
issue with many firefighters, Union officials and experts in the field.
Although there appears to be significant reluctance within the Department to
making any changes to the current process of written examinations, the
Commission does not believe the existing system should remain in place.
Statisticians will tell you that all written examinations contain a standard
deviation in which all candidates are "qualified." Currently, the Department
carries out the scores of its written examinations for promotion to the $1/100^{th}$
of a point. Such an infinitesimal score is far below the standard deviation
and is inherently and statistically flawed. The ability to score well on a test,
while important in school, is not the method by which we choose our
political, industrial or military leaders. As one state human resource expert
noted to the Commission, "[w]ritten tests are not the fairest and best
predictors of management or administrative skills." The Commission
concludes that the existing written examination alone is not the best
indicator of a person's ability to lead or supervise within the Boston Fire
Department. We believe the existing promotional system lacks the tools to
evaluate candidates for such basic qualities as leadership ability, ethics,
interpersonal skills, and understanding of management processes. The
Department, the Union, and the state should work to replace the existing
promotional system with a more progressive process and look to the
business world, the military and other public safety agencies to devise a
system that can be a model for the nation. The Commission reiterates its
strong position that any political interference in the promotional system is
unacceptable. The new system will be "fair" if it identifies the most capable
managers and leaders and promotes them accordingly. In addition, it has
come to the attention of the Commission that job task analyses for

Final Report of the Boston Fire Department Review Commission

uniformed positions within the Department are long overdue. The
Commission believes that such analyses should be conducted as soon as
possible, perhaps as part of a review of the promotional system.

## 6.5  Education

As the role of firefighter increasingly requires the use of technology and the
ability to maintain currency on changes in the field, the role of proper
formal education cannot be overstated. The Commission believes that a
minimum entrance requirement for the Department should be a high school
diploma or GED. In addition, the Department should encourage its
members to seek further education. Incentives should be made available to
the members of the Department who wish to further their education beyond
high school.

## 6.6  Injuries and Disability

According to many who spoke with Commission members, the increasing
numbers of disability occurrences are alarming. Under state law,
firefighters injured on duty receive 100% of their salary tax-free for the time
they are off the job. Although the Commission recognizes the importance
of this benefit for public safety personnel, the Department must be diligent
in its efforts to control potential abuses. For example, according to statistics
provided by the City, in FY '97, the Department reported 429
occurrences.[11] By the end of FY '98, the Department recorded 971
occurrences, an increase of over 100% over the prior fiscal year. The trend
continued. Figures available through the end of the first quarter of FY '99
indicated that 764 occurrences had been filed. Although final FY '99
figures were not available to the Commission, the Department appeared
well on its way to doubling the FY '98 figures. In the past, Department
management has not exercised its right to involuntarily retire firefighters
where it has been determined that they can no longer perform the essential
functions of the job. It is difficult to assess the possible impact of
involuntary retirements on the above-cited figures; however, it could
substantially reduce the number of occurrences and length of leave if
actively utilized by the Department.

### 6.6.1  Supervision and Accountability

The Utilization Review Unit (URU) is charged with the task of managing
firefighters back to work. However, they have not been supported in this
role. In order to successfully accomplish this task, the URU must be given
the support its needs from management. A working plan must be
formulated as a means of accomplishing this goal. The Commission

---

[11]  An "occurrence" reflects the filing of an injured on duty report. The number of occurrences
may include multiple filings by the same individual.

recommends that a working group utilize existing information as a basis to formulate a plan to manage the ballooning caseload.

## 6.6.2  Modified or Light Duty

Currently, modified or light duty is available for persons injured off duty but not for personnel injured on duty. The Commission recommends that the Department work within the confines of collective bargaining to address the issue of light or modified duty for injured on duty personnel.

## 6.6.3  Disability Retirement

It takes eighteen months to twenty-four months from the time of filing to process a disability retirement at the Department. By contrast, under the same system, the Boston Police Department processes disability retirements in eight to eighteen months with the average being one year. The Commission could not find any reasonable explanation for this discrepancy other than the Commissioner of the Boston Police Department exercises his right to voluntarily retire injured officers. The Department must review its current processes to bring its system in line with more appropriate processing timeframes.

## 6.6.4  Annual Physical Examinations

Many of the issues addressed in the preceding sections are related to the overall fitness of the Department. Although the Department has many members who are older, it is necessary that the Department formalize fitness and wellness programs for all its members. Annual physical examinations could assist in identifying firefighters at risk for heart disease and other job-related illnesses, and would allow those personnel to seek appropriate dietary and fitness programs to insure future health. Nutrition, exercise, and education programs are necessary for the Department to achieve the goals of physical and mental well being for its members.

## 6.7  Recommendations

- *The Commission recommends that the personnel divisions for uniformed and civilian human resources be combined.*

- *The Commission recommends that a professional human resources manager be hired outside of the collective bargaining unit to address personnel issues within the organization.*

- *The Commission recommends that the new Director of Human Resources review existing diversity and sensitivity training as part of the organization's overall strategic planning review and begin a more comprehensive program designed to educate existing personnel on the benefits of diversity.*

- *The Commission recommends that Department working groups specifically address issues relative to race relations, gender and sexual orientation in an open atmosphere without fear of retribution.*

- *The Commission recommends that the Department concentrate its efforts on hiring a variety of diverse candidates for positions in the Fire Alarm and Construction unit, as they become available.*

- *The Commission recommends that the Department increase its efforts to recruit qualified female firefighters and candidates.*

- *The Commission recommends that the Department meet the conditions of the Memorandum of Understanding regarding female employees.*

- *The Commission recommends that the Department develop a strategic and comprehensive year-round recruitment plan.*

- *The Commission recommends that the Department work with the Office of the Personnel Administrator for the Commonwealth to update the existing promotional system.*

- *The Commission recommends that job task analyses be conducted for each uniformed position within the Department.*

- *The Commission recommends that the Department develop incentives for members wishing to further their education.*

- *The Commission recommends that the Department institute a minimum educational requirement for new hires of at least a high school diploma or GED with a three-year phase in period to allow for potential applicants to meet this requirement.*

- *The Commission recommends that a working group, including representatives from the City, formulate a plan to better manage injured on duty cases.*

- *The Commission recommends the Department involuntarily retire injured firefighters when appropriate.*

The Challenge: Managing Tradition, Diversity, and Change

- *The Commission recommends that the Department work within the confines of collective bargaining to address the issue of light or modified duty for injured on duty personnel.*

- *The Commission recommends that the Department review existing disability retirement procedures to bring their system in line with more appropriate processing timeframes.*

- *The Commission recommends that the Department work with the Union to develop a system to provide for annual physicals for all uniformed members.*

- *The Commission recommends that the Department work with the Union to institute a comprehensive wellness program for all uniformed and civilian personnel.*

Final Report of the Boston Fire Department Review Commission

# 7    Drug Testing

## 7.1    Introduction

One senior Department official noted that "the concept of an impaired driver operating a ladder truck through the City at great speeds is frightening." This statement summarizes the fear of many that firefighters are not properly tested for drug and alcohol use. To its credit and foresight, the Boston Firefighters Local No. 718, International Association of Firefighters, AFL-CIO was among the first such unions in the country to agree to drug testing among its ranks. This continued leadership and support is critical as the Department continues to tackle this difficult issue. The Commission finds that a number of the legitimate disciplinary cases involving members of the Department are related to substance abuse. As such, an expanded system of drug testing of all members of the Department would serve a two-fold benefit to the Department and the citizens. First, detection of substance abuse can lead to appropriate treatment and enable the Department to retain otherwise qualified individuals in need of substance abuse treatment. Second, the abuse of controlled substances by any member of the Department is inconsistent with the duties and obligations of a firefighter. The danger to fellow officers and to citizens far outweighs the individual privacy rights of the individual firefighter.

## 7.2    Current Procedures

The Department may currently test for drugs only in the matter of reasonable suspicion. The testing that does occur is by urine sample. Such a limited scope for testing of public safety personnel is insufficient to prevent dangerous or deadly situations for members of the Department and citizens of the City. The Department should consider methods currently in place elsewhere, such as the Boston Police Department.[12] Simply stated, substance abuse is incompatible with membership in the Boston Fire Department. The role of firefighter is too critical to allow an impaired member of the Department to continue to serve in the field. Procedures must be in place to insure that substance abuse is identified in advance of problems in the field.

## 7.3    Substance Abuse and Discipline

The Commission finds that there exists a direct correlation between disciplinary problems and substance abuse. Without expanded drug testing, supervisors are hampered in their efforts to remove suspected

---

[12] See Boston Police Department Rules and Procedures, Rule 111, Appendix D

The Challenge: Managing Tradition, Diversity, and Change

substance abusers from the field before unfortunate situations occur. Further, firefighters with substance abuse issues cannot be helped if they cannot be identified. Reasonable suspicion for a drug test is raised usually because something went wrong. For example, for the three-year period between September 1996 and September 1999, there were twenty-five substance related formal departmental charges filed. Violations of the Department's rule prohibiting substance use while on duty was the most frequent offense reported. Such figures suggest that expanded drug testing may reveal higher numbers of substance abuse within the Department. The Commission recognizes the difficult privacy issues raised by drug testing but finds that these issues pale in comparison to the dangers to fellow firefighters and to citizens when a substance abuser is permitted to continue to serve in the field. Management and Union should prioritize this issue in the context of collective bargaining.

## 7.4   Recommendation

- *The Commission endorses an expanded system of drug testing of all uniformed Boston Fire Department personnel and suggests that this important issue be addressed in collective bargaining.*

## 8   Resource Allocation

### 8.1   Introduction

There have been a number of criticisms relative to the Department's
allocation of resources. Some of the allegations of abuse of Department
resources and inappropriate use of personnel are best left for a new
management team to explore as part of a comprehensive review of the
Department's operations. However, other criticisms as they relate to the
operation of the Department are appropriately addressed in this forum. In
particular, there have been calls for the abolition of the existing fire alarm
call boxes, and the extensive network needed to maintain the system.
Further, complaints surfaced relative to a manned operation on Long Island,
and questions have been raised regarding the necessity and operation of a
Marine Unit. The Commission questioned Department officials at length
regarding these topics, and we have concluded that further review is
necessary before the Commission could recommend that certain operations
be eliminated. However, in advance of such a review, there are issues that
should be addressed relative to these operations.

### 8.2   Marine Unit

The Commission agrees with several Department officials who argued that
increased development on the waterfront justifies the presence of a marine
unit. However, the Commission finds that a marine unit would be better
served if it had both a land-based and water-based presence. As part of the
development of the South Boston waterfront, the Department should review
the possibility of establishing a marine unit in a new station house that will
serve both the extensive land development planned in the area, along with
the necessary presence of firefighting apparatus in the harbor. In this plan,
one team could perform both land and water based roles. This would
increase the efficiency of such a unit, and justify the expense of
maintenance of a water-based firefighting presence on the harbor. This is
also an area that may provide the Department with possibilities for
public/private partnerships or state or federal grants. The Department
should explore these avenues wherever possible. Finally, it was suggested
to the Commission that the current location for the marine unit would be
attractive to private development. The Department and the City should
explore how the proceeds of this property might benefit the relocation of the
marine unit.

## 8.3    Existing Fire Brigade at Long Island

The Commission reviewed concerns raised relative to the continued
existence of a manned fire station on Long Island. Currently, Long Island
houses several City agencies, and its tenancy has increased in recent years.
Many of the buildings are not equipped with sprinklers. As of November
1999, there were 1,035 clients and staff who work or live at the Long
Island Campus of the Boston Public Health Commission. In addition, an
ongoing renovation project in the administration building is scheduled to
be completed shortly. The renovated space will house two new programs,
an adolescent service and an adult detoxification program. It is anticipated
that these programs will increase daily usage to approximately 1,125
people, not including the 75-100 visitors each day. The Public Health
Commission has expressed concerns to the Commission relative to the
closing of this facility. Among the concerns expressed are that due to
weight restrictions on the Long Island Bridge, there exists a 20 MPH
speed restriction that slows response time. In addition, due to the same
weight restrictions, the bridge cannot sustain several pieces of firefighting
equipment at once. Further, in the best case scenario, fire department
response time from the nearest City station is eleven minutes. Response
time from the closest Quincy station is seven minutes. The Commission
believes that the increased usage of Long Island by both public and private
entities, combined with the inadequate response times from the nearest
manned facilities and the lack of effective fire suppression within the
buildings, does not justify closing the Long Island Brigade facility.
However, the Commission believes that if a continued presence is
necessary on Long Island, the station should be treated appropriately for
staffing purposes, and it should not be viewed as a "special assignment,"
and should be subject to the same bidding requirements as any other fire
station in the City o Boston.

## 8.4    Fire Alarm Call Boxes

According to the Boston Finance Commission report, *An Analysis of the
Boston Fire Department*, fire alarm call boxes accounted for 46.9% of all
false alarms in 1993 and only 5.7% of all actual reported incidents.
According to Department sources, fire alarm call boxes remain one of the
main sources for a high rate of false alarms and they are rarely the sole
source of an incident call. Extensive use of enhanced 911 and the
proliferation of cellular technology suggest that fire alarm call boxes will
be of decreasing value in the years to come. These factors raise serious
questions regarding the value of maintaining the existing system. The
Commission acknowledges the strong arguments against continuing to
operate a fire alarm call box network in the City, and we agree that the
system as currently in existence is outdated. Nevertheless, after

Final Report of the Boston Fire Department Review Commission

consideration, the Commission defers to the Department's stated desire to maintain the existing call box network at this time. Many Department officials argue that the existing system, which is in good repair, would remain the only communication for neighborhoods in the event of a major catastrophe, such as hurricane or earthquake. This might be some justification to maintain the system, but in order to justify its expense, the City should leverage this network to insure that it is utilized for the most effective purposes. For example, a project to tie City Hall to the central alarm office in the Fenway is underway which will upgrade the existing copper wire network to fiber-optic cable. Some have proposed a citywide fibre optic network that utilizes the existing fire alarm call box system supporting many City departments. It would be premature to dismantle the system before we understand the possible uses of an upgraded network, and explore the potential for private partnerships that would help to defray the cost of maintenance of the system.

## 8.5 Recommendations

- *The Commission recommends the maintenance of a station on Long Island staffed according to the same bidding requirements as any other fire station in the City of Boston.*

- *The Commission recommends a review of a possible land and water facility on the South Boston waterfront to service significant planned development in that area.*

- *The Commission recommends that the City MIS department assume control of the evaluation maintenance and future development of the fire alarm call box network and evaluate all possible technological uses, both public and private.*

# 9    Implementation and Planning

## 9.1    introduction

Several officers and field personnel have reported to the Commission that prior reports contained recommendations that were never implemented by the Department. It is the desire of the Commission that the recommendations in this report serve as a basis for a far-reaching plan for the future of the Department. The Commission believes that the Department would benefit from a comprehensive effort of strategic planning and a specific course for implementation of the recommendations contained in this report. In addition, the Commission emphasizes the need for a Department reorganization that will include the following key positions to be appointed by the Commissioner reporting directly to the Chief of Department.

## 9.2    Chief of Planning and Technology

The creation of this new position outside of the collective bargaining unit is necessary to centralize the focus and forward planning for the Department. By consolidating the efforts of capital planning, strategic planning and technology under a single manager, the Department is well served for the future. Specific duties can be addressed as the result of a management review for the reorganization of the Department, but will include an individual involved in policy making and collective bargaining. The Commission believes that the creation of this confidential position, along with the position of Chief of Administration, is absolutely critical to insure that current management practices are subject to review by career management professionals with authority to make necessary changes.

Proposed Senior Management
Boston Fire Department

```
                    ┌──────────────────────────────────┐
                    │  Chief of Planning and Technology  │
                    └──────────────────────────────────┘
              ┌───────────────────────┐   ┌──────────────────────────────┐
              │  Director of Technology │   │ Strategic Planning Committee │
              └───────────────────────┘   └──────────────────────────────┘
```

Final Report of the Boston Fire Department Review Commission

## 9.3 Chief of Administration

This position will perform the critical day to day oversight of the administration of the Department, including policy-making decisions. All Human Resources, Accounting and Budget personnel should report to this position. This confidential position will also take the lead for the Department in Union negotiations and all personnel matters including application of progressive discipline and oversight of informal discipline procedures. The Commission also believes that the creation of specific positions to address Budget, Human Resources and Labor Relations are necessary to support the Chief of Administration. Working with the Chief of Planning and Technology, and the Chief of Operations, the Chief of Administration can be part of the overall management team necessary to implement the recommendations in this report.



Proposed Senior Management
Boston Fire Department

Chief of Administration (Civilian)

Director of Human Resources — Budget Director — Director of Labor Relations

## 9.4 Chief of Operations

This professional firefighting position will be responsible for the development of all firefighting policy and will also assume the technical duties currently held by the Deputy Fire Chief/Chief of Operations. This confidential position should be outside of a collective bargaining unit and will be responsible for the day to day technical operations of the Department. Working with the Chief of Administration and the Chief of Planning and Technology, the Chief of Operations will bring collective knowledge and experience in firefighting to the planning and implementation process. Significant responsibilities will include oversight of all Deputy Fire Chiefs, daily technical operations of the Department, as well as assuming the role of Acting Chief of Department in the absence or disability of the Chief of Department, thereby assuring a direct chain of command through this position to the Chief of Department for all uniformed personnel.

## 9.5  Accreditation and Strategic Planning

As a part of its strategic planning effort and process of implementing the recommendations contained in this report, the Commission recommends that the Boston Fire Department explore the benefits and opportunities offered by pursuing national accreditation through the Commission on Fire Accreditation International (CFAI). The level of sophistication and detail contained in the accreditation process and its Self-Assessment program impressed the Commission. The Commission believes that the CFAI process, materials, and assistance will be of value to the Department's leadership and managers, particularly in the early stages of initiating a formal planning process when some of the most difficult obstacles to successful implementation are experienced. The process of defining the Department's values and goals, developing a strategic plan and implementing the plan will be complicated and challenging. The Department might benefit from outside professional assistance as it prepares to meet the challenges contained in this report.

## 9.6  Recommendations

- *The Commission recommends that an implementation strategy be prepared immediately following the release of this report with significant input from City, management, and Union officials, officers, firefighters and civilian personnel, as well organizational experts.*

- *The Commission recommends the creation of the position of Chief of Planning and Technology outside of the collective bargaining unit.*

- *The Commission recommends the creation of the civilian position of Chief of Administration outside of the collective bargaining unit.*

- *The Commission recommends the reclassification of the uniformed position of Chief of Operations.*

- *The Commission recommends a management reorganization that will include the creation of certain key civilian management positions.*

- *The Commission recommends that the Department seek accreditation with The Commission of Fire Accreditation International.*

# 10 Summary of Recommendations

## 10.1 Introduction

Below is a summary of the recommendations contained in this report. The Commission believes that a comprehensive effort for change instituted by senior management will address many of the issues and concerns raised in this report. The recommendations made by the Commission create a framework for change. It is the desire of the Commission that these recommendations serve as a focal point for discussion, planning and implementation.

## 10.2 Culture and Leadership

- *The Commission recommends the Department redefine its values, identify its goals, and review its existing management practices.*

- *The Commission recommends that the Department create an environment that is inclusive, welcoming and respectful for all its members.*

- *The Commission recommends that the Department create a management structure that invites participation throughout the ranks.*

- *The Commission recommends that the Department increase confidence of its members by providing dynamic and progressive leadership.*

- *The Commission recommends that the Department adopt a "zero tolerance" policy for inappropriate behavior, and undertake a serious effort to rid itself of the existing perception that it remains a non-inclusive organization.*

- *The Commission recommends the establishment of a permanent strategic planning committee with representatives from all levels of the Department.*

- *The Commission recommends that division-based working groups, under the direction of senior management, reporting to the strategic planning committee, be established to address specific issues raised in this report.*

### 10.3  Discipline

- *The Commission recommends a complete review of the disciplinary procedures currently in place, and further recommends a comprehensive program of training at each level of the Department on the proper use of progressive and undocumented discipline in the organization.*

- *The Commission recommends the creation of an audit and review unit that serves a monitoring and management function over disciplinary procedures.*

- *The Commission recommends appointment of an ombudsman for accountability and review of unfair and uneven disciplinary actions and to mediate internal disputes.*

- *The Commission recommends that senior management work with human resource professionals to devise a proper method for monitoring and control of the imposition of informal discipline.*

- *The Commission recommends that all Department members be trained in the application of discipline prior to or immediately upon being placed in a supervisory position.*

### 10.4  Supervision and Training

- *The Commission recommends that the "acting list" be abolished in favor of vacancy replacements within grade.*

- *The Commission recommends that one schedule be negotiated, adopted, and enforced for the entire Department.*

- *The Commission recommends that the practice of "swapping" be addressed immediately within the collective bargaining process.*

- *The Commission recommends that a formal level of management training be instituted at each level of management within the Department prior to or immediately after promotion of any individual into a supervisory level position.*

- *The Commission recommends that the Department take advantage of all federal, state and local management training opportunities, including private sector training and executive programs at local universities.*

- *The Commission recommends that current in-service training be expanded to include management and leadership issues.*

- *The Commission recommends that the promotion from firefighter to lieutenant be identified with intensive training on all facets of management, leadership, and supervision issues and concerns, including formal and informal discipline.*

- *The Commission recommends that the Department develop a program for identifying and training future leaders within its ranks.*

## 10.5 Department Administration

- *The Commission recommends the appointment of a civilian Fire Commissioner with significant management experience to oversee the Department.*

- *The Commission recommends a reorganization of senior management as set forth in Figure 5.1.*

- *The Commission recommends that as part of its strategic plan for the future, the Department explore avenues to implement community firefighting citywide.*

- *The Commission recommends that a complete review of existing equipment be commenced as soon as possible with a goal of updating equipment to meet the City's changing needs.*

- *The Commission recommends that a study by the Department be commenced as soon as possible to review all available alternatives to existing bunker gear that meet or exceed current safety standards.*

- *The Commission recommends the institution of a five-year and ten-year capital plan for the Department that will include the construction of a new, state of the art Fire Department headquarters and the repair, rehabilitation or replacement of fire stations throughout the City.*

- *The Commission recommends the reinstatement of regular inspections at station houses.*

- *The Commission recommends that a permanent technology committee consisting of field personnel, supervisors, technological experts, and civilian members of the Department, reporting to the*

*Chief of Planning and Technology, be established to address
ongoing technological needs.*

- *The Commission recommends that the remaining four companies
without thermal imaging cameras be so equipped.*

- *The Commission recommends that PASS device reliability be
constantly assessed for safety and improvements in technology.*

- *The Commission recommends that the Department work with Union
representatives to develop physical fitness programs for all members.*

- *The Commission recommends that smoking prohibitions should be
addressed, and smoking cessation programs encouraged and offered
by the Department.*

- *The Commission recommends that the study conducted relative to
the concerns raised by excessive exhaust fumes in station houses be
made a priority, and that appropriate remedies be instituted as soon
as possible.*

- *The Commission recommends that a wellness program, including
nutrition education and stress reduction should be made available to
all members of the Department and that participation in the program
be encouraged across the City.*

- *The Commission recommends that the Department explore
opportunities for civilianization of vehicle maintenance tasks and
that it explore the restructuring of all maintenance functions in one
unit.*

## 10.6 Personnel and Human Resources

- *The Commission recommends that the personnel divisions for
uniformed and civilian human resources be combined.*

- *The Commission recommends that a professional human resources
manager be hired outside of the collective bargaining unit to address
personnel issues within the organization.*

- *The Commission recommends that the new Director of Human
Resources review existing diversity and sensitivity training as part of
the organization's overall strategic planning review and begin a
more comprehensive program designed to educate existing personnel
on the benefits of diversity.*

Final Report of the Boston Fire Department Review Commission

- *The Commission recommends that Department working groups specifically address issues relative to race relations, gender and sexual orientation in an open atmosphere without fear of retribution.*

- *The Commission recommends that the Department concentrate its efforts on hiring a variety of diverse candidates for positions in the Fire Alarm and Construction unit, as they become available.*

- *The Commission recommends that the Department increase its efforts to recruit qualified female firefighters and candidates.*

- *The Commission recommends that the Department meet the conditions of the Memorandum of Understanding regarding female employees.*

- *The Commission recommends that the Department develop a strategic and comprehensive year-round recruitment plan.*

- *The Commission recommends that the Department work with the Office of the Personnel Administrator for the Commonwealth to update the existing promotional system.*

- *The Commission recommends that job task analyses be conducted for each uniformed position within the Department.*

- *The Commission recommends that the Department develop incentives for members wishing to further their education.*

- *The Commission recommends that the Department institute a minimum educational requirement for new hires of at least a high school diploma or GED with a three-year phase in period to allow for potential applicants to meet this requirement.*

- *The Commission recommends that a working group, including representatives from the City, formulate a plan to better manage injured on duty cases.*

- *The Commission recommends the Department involuntarily retire injured firefighters when appropriate.*

- *The Commission recommends that the Department work within the confines of collective bargaining to address the issue of light or modified duty for injured on duty personnel.*

- *The Commission recommends that the Department review existing disability retirement procedures to bring their system in line with more appropriate processing timeframes.*

- *The Commission recommends that the Department work with the Union to develop a system to provide for annual physicals for all uniformed members.*

- *The Commission recommends that the Department work with the Union to institute a comprehensive wellness program for all uniformed and civilian personnel.*

## 10.7 Drug Testing

- *The Commission endorses an expanded system of drug testing of all uniformed Boston Fire Department personnel and suggests that this important issue be addressed in collective bargaining.*

## 10.8 Resource Allocation

- *The Commission recommends the maintenance of a station on Long Island staffed according to the same bidding requirements as any other fire station in the City of Boston.*

- *The Commission recommends a review of a possible land and water facility on the South Boston waterfront to service significant planned development in that area.*

- *The Commission recommends that the City MIS department assume control of the evaluation maintenance and future development of the fire alarm call box network and evaluate all possible technological uses, both public and private.*

## 10.9 Implementation and Planning

- *The Commission recommends that an implementation strategy be prepared immediately following the release of this report with significant input from City, management, and Union officials, officers, firefighters and civilian personnel, as well organizational experts.*

- *The Commission recommends the creation of the position of Chief of Planning and Technology outside of the collective bargaining unit.*

- *The Commission recommends the creation of the civilian position of Chief of Administration outside of the collective bargaining unit.*

- *The Commission recommends the reclassification of the uniformed position of Chief of Operations.*

- *The Commission recommends a management reorganization that will include the creation of certain key civilian management positions.*

- *The Commission recommends that the Department seek accreditation with The Commission of Fire Accreditation International.*

# 11 Appendix and Bibliography

## 11.1 Articles and Papers

Armstrong, David, *A Department Under Fire*, Boston Globe, Spotlight Series, February 7-9, 1999

Booth, Walter S., Ph.D., *Ten Complaints About Assessment Centers and How To Overcome Them*, Law and Order (October 1997)

Hogan, Robert, Gordon J. Curphy, and Joyce Hogan, *What We Know About Leadership*, American Psychologist (June 1994)

Wolfman, Toni G., *Background Paper on Police and Firefighter Consent Decrees*, submitted to Boston City Council (October 8, 1997)

## 11.2 Books

Blank, Renee and Sandra Slipp, *Voices of Diversity*, American Management Association (1994)

Wallace, Mark, *Fire Department Strategic Planning: Creating Future Excellence*, Fire Engineering Books and Videos (1998)

## 11.3 Reports and Studies

*An Analysis of the Boston Fire Department*, City of Boston Finance Commission (July 28, 1994)

*Review of the Boston Fire Protection and Rescue Delivery System*, MMA Consulting Group, Inc. (1995)

## 11.4 Surveys

*Boston Fire Department Review Commission Firefighter/Officer Survey*, October 1999

*Boston Fire Department Review Commission Civilian Employee/Manager Survey*, November 1999

Final Report of the Boston Fire Department Review Commission

## 11.5 Department Statistics

| | |
|---|---|
| Area Served (square miles) | 47.3 |
| Population Served | 574,283 |
| Density (per square mile) | 12,141 |
| | |
| Uniformed Personnel | 1,602 |
| Deputy Fire Chiefs | 15 |
| District Fire Chiefs | 58 |
| Fire Captains | 78 |
| Fire Lieutenants | 214 |
| Fire Fighters | 1237 |
| Fire Alarm Personnel | 73 |
| Civilian Personnel | 82 |
| | |
| **Total FD Personnel** | **1,684** |
| | |
| Fire Academy | 1 |
| | |
| Fire Stations | 35 |
| | |
| **Fire Companies & Units** | **70** |
| Engine Companies | 33 |
| Ladder Companies | 21 |
| Rescue Companies | 2 |
| Tower Company | 1 |
| Marine Unit | 1 |
| Fire Brigade | 1 |
| Tunnel Units | 2 |
| Brush Fire Units | 2 |
| Hazardous Material Unit | 1 |
| Trench Collapse Unit | 1 |
| Special Unit | 1 |
| Air Supply Unit | 1 |
| Rehabilitation Unit | 1 |
| Mobile Command Unit | 1 |
| Hydrant Thawing Unit | 1 |

Source:  Boston Fire Department Web Site

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-10528-RCL

DENISE M. BARRY; JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA J.
MCDONOUGH; ELAINE MESITI, LILA
BROWN; MARY M. KANE, and JUDITH A.
KELLEY, individually and on behalf of all those
similarly situated,
      Plaintiffs,

v.

ROBERT J. MORAN, PAUL A. CHRISTIAN,
WILLIAM KESSLER, RONALD KEATING,
JOSEPH FINN, WILLIAM HITCHCOCK,
CITY OF BOSTON FIRE DEPARTMENT, and
JOHN and/or JANE DOES 1-50.
      Defendants.

### AFFIDAVIT OF ROBERT MORAN

I, ROBERT MORAN, hereby state and depose as follows:

1.     I am the Human Resources Director of the Boston Fire Department (BFD) and have held such position since July, 2001.

2.     I have personal knowledge of each Plaintiff's employment history with the BFD.

3.     None of the named plaintiffs and none of the potential class members were discharged from their positions with the BFD as a result of any facts or claims alleged in the Third Amended Complaint.

4.     None of the named plaintiffs and potential class members sustained a loss in pay, a reduction in benefits or a diminution in earnings.

5.     All of the named plaintiffs and a substantial number of potential class members remain employed with the BFD and have received collectively bargained increases in pay and benefits over the course of their employment with the BFD.

6.     Since 2000, the civilian BFD has had a pay increase and benefit increases in accordance with the union contracts of approximately 2% yearly increments.

7.    Each of the named plaintiffs and potential class members has had equal opportunity to apply for any open position within the BFD or other City department or agency.

8.    Those named and potential plaintiffs who possessed the necessary qualifications for the open position were interviewed, and, if the best candidate for the position, hired; their qualifications for any position for which they applied were evenly compared with other applicants. The policy in effect as expressed to me upon the commencement of my employment with the BFD has been to hire the best qualified candidate for the position based upon the particular requirements of the position.

9.    Each named and potential claimant was a member of a union, either SENA or AFSCME, and had open access to an accepted union grievance process if they believed that their rights had been violated by the BFD.

10.    Each named and potential claimant knew of these rights, rights which included a hearing backed by union representation if the union found sufficient grounds to pursue the grievance

11.    Of the potential class members as defined by counsel for the plaintiffs, all but Judith Kelley continue to work at the BFD. None have been discharged, reprimanded, suspended or denied benefits or access to the union grievance process.

12.    Since 2000, Plaintiff Denise Barry has applied for several positions within the department and received a promotion with pay increase on 9/18/06 when she was chosen for the position of Administrative Assistant.

13.    Since 2000, Plaintiff Jane Green has applied for zero positions within the department.

14.    Since 2000, Plaintiff Elizabeth Golden has applied for two positions within the department and received a pay increase on 10/6/01 when she was upgraded to a Senior Administrative Assistant position.

15.    Since 2000, Plaintiff Patricia McDonough has applied for two positions within the department and is currently a Senior Administrative Assistant.

16.    Since 2000, Plaintiff Elaine Mesiti has applied for one position within the department (the Human Resources position I currently hold) and is now a Principal Administrative Assistant.

17.    Since 2000, Plaintiff Lila Brown has applied for four positions within the department and received a promotion with pay increase on 11/13/06 when she was chosen for the position of Fire Prevention Administrative Assistant.

18.    Since 2000, Plaintiff Mary Kane has applied for one position within the department and is currently a Senior Administrative Assistant.

19.    Since 2000, Plaintiff Judith Kelley has applied for three positions within the department and received a lateral transfer at her request for the position of Senior Administrator in September, 2006 and recently retired from the department.

20.    Of the BFD employees the plaintiffs argue are potential class members, 19 are still employed with the BFD, 7 have retired, 6 have sought employment elsewhere, and 1 lost their job due to excessive absenteeism.

21.    Since 2000, there have been fifteen positions open in the civilian side of the BFD; nine of those positions were filled by current employees of the BFD. Only six positions were filled by someone who did not work at the BFD at the time of the filing of their application.

22.    With respect to former civilian employees of the BFD, my review of records in the possession of the BFD reflected the following information:

  a. Jessica Ahearn left employment with the BFD in 2001.

  b. Rosemarie Clinton retired from the BFD in 2002.

  c. Karen Danvers (listed as Denver) resigned from the BFD in 2005.

  d. Mary Doherty left the BFD for employment elsewhere.

  e. Jane Hickey retired from the BFD in 2004.

  f. Marie Howard retired from the BFD in 2002.

  g. Kathryn Kempton left employment with the BFD in 2000.

  h. Stephanie Long left employment with the BFD before 2000.

  i. Maria Lopez was discharged due to excessive absenteeism.

  j. Sheila Mancuso left the BFD for employment elsewhere.

  k. Claire Miller left for another job after she was a BFD nurse for two days.

  l. Robert Malloy was laid off in 2002.

  m. Steve Morash left the BFD for employment with Boston University.

n.    Patricia Mulkern retired from the BFD in 2003 after more than 30 years of service.

o.    Desiree Russo left the BFD for employment elsewhere.

p.    Barbara Ryan retired from the BFD in 2003.

q.    Gwendolyn Sheppard relocated to South Carolina.

r.    Linda Cleary retired from the BFD in 2006.

s.    Patricia Fiasconaro retired from the BFD in 2006.

23.    With respect to current civilian employees of the BFD, my review of records in possession of the BFD reflected the following information:

a.    JoAnne (Donovan) Allain has not applied for any positions since 2001.

b.    Janice Boyle applied for the Case Manager position and the Assistant to the Commissioner position.

c.    Crystal Bradeen has not applied for any positions since 2001.

d.    Irene Debbie Burke was recently promoted to an Administrative position

e.    Joanne Callahan has been promoted several times, and is now a Shop Steward.

f.    Linda Collins has not applied for any positions since 2001.

g.    Carol Connors has been promoted twice since 2001.

h.    Katy Donovan has not applied for any positions since 2001.

i.    Sharon Green (listed as Karen) has not applied for any positions since 2001.

j.    Coretta Henry-Gardiner has been promoted several times since 2001.

k.    Paula Hamilton has not applied for any positions since 2001.

l.    Maria Hernandez applied for and received a lateral transfer in 2007.

m.    Katherine MacMillen has applied for other positions with the BFD.

n.    Angela Marshall has applied for other positions with the BFD.

o.    Cathy Moore is currently on a Medical Leave of Absence.

p.    Marta Poupart has been upgraded once since 2000.

q.    Barbara Powers has been upgraded once since 2000.

r.    Luz Rivera has been upgraded once since 2000.

s.    Jennifer Ryan has been promoted several times since 2001.

*Signed under the pains and penalties of perjury this* __5th__ *day of September, 2007.*

Robert Moran,
City of Boston Fire Department
Human Resources Department

*EXTRA COPY*

```
************************************
                                   *
In the Matter of the Arbitration  *              3-161
                                   *
                                   *
          between                  *
                                   *  Case No.  2003-329/3-161
                                   *
AFSCME, COUNCIL 93, AFL-CIO        *
                                   *  Grievance: Julie Barton
                                   *             Promotion Bypass
                                   *
            and                    *
                                   *
      CITY OF BOSTON               *
                                   *
                                   *
************************************
```

2005 DEC -1  A 9: 35

OFFICE OF LABOR RELATIONS

BEFORE:   John B. Cochran, Esq.

APPEARANCES:

    For the Union:    Daniel A. Cocuzzo, Esq.

    For the Employer:   Paul Curran, Esq.

HEARING DETAILS:

    Place of Hearing:   Boston City Hall

    Date of Hearing:    June 3, 2005

ISSUE:

    The parties stipulated to the following issue:

    Did the City of Boston violate the collective
    bargaining agreement when it selected Michelle Urso
    instead of Julie Barton for the position of
    Administrative Assistant in the Boston Fire Department
    in October 2003?  If so, what should the remedy be?

1

PERTINENT CONTRACT LANGUAGE:

### ARTICLE 5 - MANAGEMENT RIGHTS

**Section 1.** Subject to the express provisions of this Agreement, the Municipal Employer shall not be deemed to be limited in any way by this Agreement in the performance of the regular and customary functions of municipal management, and reserves and retains all powers, authority and prerogatives including without limitation, the exclusive right of the Appointing Authority to issue reasonable rules and regulations governing the conduct of his/her Department.

### ARTICLE 11 - TEMPORARY SERVICE IN A HIGHER OR LOWER CLASSIFICATION AND PROMOTIONS

**Section 5.** When there is no existing Civil Service list for a bargaining unit position and it is to be filled by a provisional appointment or provisional promotion, the following procedure shall apply:

D. Selection shall be made on the basis of qualifications and ability; and where, qualifications and ability are substantially equal, seniority as defined under Civil Service law and rules shall be the determining factor. . .

E. The Appointing Authority's selection shall not be made arbitrarily, capriciously, or unreasonably.

F. In the event a more senior applicant is not selected, the Appointing Authority shall, upon written request by the Union, provide in writing reasons for the non-selection for up to three (3) of the most senior applicants who were not selected to fill the position. The Department shall endeavor to be as detailed as reasonably possible when providing said reasons. . .

### FACTS:

On August 20, 2003, the City of Boston (City) posted the vacant position of Administrative Assistant R-15 in the City's Fire Department (Department). The essential function of the position was to serve as the Administrative Assistant to the Director of Emergency Management, the Assistant Director of Emergency Management, and the LEPC Coordinator. The posted duties included

2

insuring that the Department and the business community comply with Federal law and the State Emergency Response Commission; maintaining a database of facilities storing hazardous chemicals; organizing Local Emergency Planning Committee meetings; and acting as the Document Unit Leader in the Emergency Operations Center. The minimum entry requirements of the position included knowledge of Department rules and regulations, experience with Microsoft Office software; and four years of experience.   The posting also notes that knowledge of Peoplesoft software was preferred and that appropriate education could be substituted for the listed requirements.   According to Robert Moran (Moran), the Department's Director of Human Resources, and Deputy Chief Robert Calobrisi (Calobrisi) it is a highly visible, high pressure job that requires the incumbent to communicate regularly with the Police Department and various state and federal emergency management agencies and to report to work whenever there is an emergency.   In Calobrisi's view, the position needed someone with good managerial experience, who could coordinate personnel, have good interpersonal skills, could work flexible hours, and could be available in emergencies as needed.

Twenty-seven people applied for the position, and Moran reviewed them to determine if the applicants met the minimum qualifications.   Moran determined ten of the applicants, including Julia Barton (Barton) and Michelle Urso (Urso) met those

3

qualifications, and he interviewed those ten candidates.[1]

Barton has worked in the City's Fire Department since 1987, and, since approximately 2000, she has been a grade 14 Administrative Accountant, working on detail billings and payroll for the Department. In that postion, she regularly used Peoplesoft and Microsoft Excel software. Barton usually worked independently, but her supervisor would help her if she had a problem. Previously, she spent thirteen years at the City's Building Department, working on certificates of occupancy and quarterly inspections, and she used Microsoft Access software in that position. Prior to 1987, Barton worked for several local companies doing bookkeeping and accounts receivable work. Barton has no experience planning meetings, communicating with high level City officials or supervising other employees in her prior positions.

At the time she applied for the Administrative Assistant position, Urso has been an office manager for a private sector company for approximately a year. Prior to that she spent three years as a corporate human resources client representative, and had worked as a Senior Executive Assistant for the Polaroid Corporation for eight years. Her duties in human resources included preparing sales meetings and presentations, and, at Polaroaid, she was

---

[1] Moran acknowledged that he used the mimimum qualifications in the position posting as a guideline and did not preclude candidates from being interviewed if they lacked one of the listed minimum entrance requirements. For example, he interviewed Barton even though her application did not indicate she had experience with Microsoft or Peoplesoft software, and Urso had not worked in a position where she had to know all of the specific Department rules.

4

responsible for communicating with state and federal customers
about sensitive contract information,

Moran asked each candidate the same questions during the
interviews and went through their applications or resumes with
them, and he prepared an interview report for each candidate. His
overall evaluation of Urso was that she was an excellent candidate,
and his overall evaluation of Barton was that she was acceptable.
Following the interviews, Moran rejected two of the candidates who
he believed did not meet the minimum qualifications and forwarded
the names of the eight remaining applicants, including Barton and
Urso, to a three-person interview panel that conducted second
interviews.

The three members of the interview panel were Joseph McMahon,
the BEMA District Fire Chief, Calobrisi, who would supervise the
successful applicant, and Jennifer Ryan, the former incumbent of
the Administrative Assistant position. Using a standard interview
report form, the panel ranked each of the candidates on ten
criteria, including experience, communication skills, and job
knowledge[2]. All three of the interviewers ranked Urso slightly
higher than Barton.

Following the second round of interviews, Moran and Calobrisi
jointly reviewed the results of the interviews and determined that
Urso was substantially superior to the other candidates. According

---

[2] Barton believed that the questions the interview panel asked
were relevant to the Administrative Assistant position.

to Moran, he reached that conclusion because Urso had excellent experience with meeting planning and coordination because she had set up meetings with high level executives, worked with various state agencies, had been an office manager for, and had relevant human resources experience, including knowledge of human resources rules. Similarly, Calobrisi believed that Urso had strong experience as an office manager and senior executive assistant and strong experience bringing high level executives together.

Moran and Calobrisi agreed that Urso was the best qualified for the Administrative Assistant position, and the Department subsequently selected her for it. By letter dated October 2, 2003, Moran notified Barton that she would not be promoted to the position, and he provided Union shop steward Cathy Moore with an explanation of why the Department selected Urso for the position.

## POSITIONS OF THE PARTIES:

### Union

The Union's position is that the City violated Article 11.5 of the parties' agreement by selecting Urso for the position of Administrative Assistant in the Emergency Management Division of the Fire Department, instead of Barton. At the outset, the Union argues that the City should not have hired Urso, who had never worked for the City, instead of Barton because the posting for the position stated explicitly that "Only qualified applicants from the stated department may be considered for this vacancy." In the Union's view, this language restricted the City from considering

6

external candidates, like Urso.

Next, the Union asserts that the standard I must apply is whether Barton was substantially equal to Urso in ability and qualifications.    Under this standard, the Union argues, Barton's prior experience with the City of Boston and with the Department was clearly equal to Urso's unrelated experience.    In support of its position, the Union points to the interview reports prepared by Moran, and it contends the overall evaluation of acceptable that Barton received showed that she was not unsatisfactory or unqualified, but rather was substantially equal to Urso.    Further, the Union points to the interview reports prepared by each member of the panel that interviewed Urso and Barton, which reflect that two of the interviewers rated Urso only two points above Barton and the third rated Urso only one point higher.    In the Union's view, these interview summaries demonstrate that each of the interviewers believed the two candidates were substantially equal.    Therefore, the City should have applied the contractual tiebreaker – seniority – and selected her for the position based on her years of experience with the City.    Accordingly, the Union asks that I order the City to award the position of Administrative Assistant in the Emergency Management Division to Barton and make her whole for any lost wages and contract benefits because it did not do so initially.

City

The City contends that, because Urso and Barton did not have

7

substantially equivalent ability and qualifications, the seniority language in Article 11.4 was not triggered here and it was not required to appoint Barton to the Administrative Assistant position. According to the City, seniority is only the determining factor if it concludes that the two candidates for a position had substantially equal qualifications. In the City's view, it is not my role to re-evaluate the candidates and to substitute my judgment about their relative qualifications. Rather, my role is to determine whether the City's decision had a reasonable basis in fact and was not arbitrary or capricious.

Here, the City argues, the Union failed to show that Barton's abilities and qualifications were substantially equal to those of Urso. Rather, the City argues that the evidence demonstrates that Urso's abilities and qualifications were substantially greater. The City emphasizes that Calobrisi identified the three most important qualifications for the position, other than those listed in the posting, as prior managerial experience, excellent communication skills, and excellent attendance. Unlike Barton, Urso had relevant managerial experience, including working as an office manager serving as a human resource client representative, and being a senior executive assistant. Further, Urso possessed superior communication skills based on her prior job experience, but Barton did not have similar skills. The City also contends that, based on a fair and reasonable interview process, the City properly determined that Urso was an outstanding candidate, whereas Barton was only acceptable.

8

In sum, the City argues that I should deny the grievance because the Union has failed to demonstrate that Barton's qualifications and abilities were substantially equal to those of Urso. Even if I were to find that Urso and Barton were substantially equal, however, the only remedy I could award would be an order that the City reconsider the two candidates and make a new selection.

## DISCUSSION:

At the outset, I must address the Union's argument that the City should not have hired Urso for the Administrative Assistant position because the language of the posting provided that "only qualified applicants from the stated department may be considered for this vacancy." First, Article 11.C of the parties' agreement provides that promotion selections shall be made from among the eligible bidders, without limiting bidders to particular departments or even City employment. Indeed, if the Union's argument were followed to its logical conclusion, the City would not be able to consider or to select qualified unit members from any department other than the one in which a vacancy exists. Therefore, I do not find that the boilerplate language on the City's job postings restricts the City from considering applicants from outside the department where the posted vacancy exists. Rather, to be consistent with the parties' agreement, the posting language can only be read to mean than any applicants from the department where a vacancy exists must meet the minimum

9

qualifications to be considered for that vacancy.

This dispute is governed by the language of 11.5.D, which provides that, if qualifications and ability are substantially equal, the more senior applicant must receive the position. Therefore, the Union's burden here is to demonstrate that Barton and Urso were substantially equal or that Urso did not have significantly greater qualifications and experience than Barton.[3] There is no doubt in my mind that Barton is an excellent employee with a strong employment record with the City. However, I am convinced that Urso's ability and experience made her significantly more qualified than Barton for the Administrative Assistant position in the Department's Bureau of Emergency Management.

The major duties of the Administrative Assistant position include ensuring compliance with state and federal mandates, acting as a liaison with various city, state, and federal agencies, and organizing emergency planning meetings with officials from those agencies. According to Calobrisi and Moran, these duties require a candidate with strong management, organizational, and communication skills. It is undisputed that Barton was a strong candidate for the position, she had excellent attendance, knowledge of the Department and its procedures, and experience using peoplesoft. Despite her strong credentials in these areas, however, Barton worked independently on financial matters and had never had occasion to supervise or manage a program, to communicate with high

---

[3] The Union does not challenge the process the City used to select Urso, and Barton herself testified that she believed it

level City officials, or to organize or coordinate meetings. In contrast, Urso had worked as an office manager, had extensive experience managing an office, doing event and meeting planning, and communicating with corporate executives and government officials. Further, even though Urso had never worked for the City and had limited experience with the Department's rules, Calobrisi and Moran concluded that her prior human resources experience provided her with working knowledge of the Department's human resources rules. Even though Barton was a strong candidate, Urso had a unique set of abilities and experience that was more directly related to the duties of the position. Therefore, I find that Barton and Urso's qualifications were not substantially equal, and that Urso's qualifications for this particular position were significantly greater than Barton's. Accordingly, the City was not required to award the position to Barton as the senior candidate and did not violate Article 11.5 by selecting Urso over Barton.

was a fair and reasonable process.

AWARD:

The City of Boston did not violate the collective
bargaining agreement when it selected Michelle Urso
instead of Julie Barton for the position of Administrative
Assistant in the Boston Fire Department in October 2003.
Therefore, the grievance is denied.

John B. Cochran, Arbitrator

November 29, 2005
Newton, MA

12

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) <br> ELIZABETH H. GOLDEN; PATRICIA J.) <br> McDONOUGH; ELAINE MESITI; LILA ) <br> BROWN; MARY M. KANE; and        ) <br> JUDITH A. KELLEY, individually and on) <br> behalf of all those similarly situated,   ) <br> ) <br> Plaintiffs,        ) <br> ) <br> vs.        ) <br> ) <br> ROBERT J. MORAN; RONALD        ) <br> KEATING; PAUL A. CHRISTIAN;        ) <br> RODERICK FRASER, Jr.; WILLIAM        ) <br> KESSLER; WILLIAM HITCHCOCK;        ) <br> CITY OF BOSTON (FIRE        ) <br> DEPARTMENT), and JOHN and/or        ) <br> JANE DOES 1-50.        ) <br> ) <br> Defendants.        ) <br> ) | CIVIL NO. 05-10528 RCL |

### THIRD AMENDED COMPLAINT FOR
### INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES
### ON BEHALF OF PLAINTIFFS INDIVIDUALLY,
### AND ON BEHALF OF A CLASS OF PERSONS SIMILARLY SITUATED

Plaintiffs Denise M. Barry, Jane B. Green, Elizabeth H. Golden, Patricia J. McDonough,

Elaine Mesiti, Lyla Brown, Mary M. Kane, and Judith A. Kelley, individually and on behalf of all

those similarly situated [hereinafter collectively referred to as "Plaintiffs"], by and through their

undersigned counsel, hereby assert the following facts and claims against Defendants Robert J.

Moran, Ronald Keating, Paul A. Christian, William Kessler, William Hitchcock [collectively

referred to as the "Individual Defendants"] in their individual and official capacities, and against

Defendant City of Boston and its Fire Department [hereinafter "BFD"].

## I. INTRODUCTION

1)    This is a class action to redress the deprivation under color of statutes, ordinances,

regulations, customs, policies, practices, and/or usages of rights, privileges, and

immunities secured to Plaintiffs by the First, Fifth, Ninth, and Fourteenth Amendments to

the Constitution of the United States, Articles I, VI, XI, and XII, and Amendment XVI of

the Massachusetts Constitution, Declaration of Rights, and 42 U.S.C. §§ 1983 and 1988,

et seq., M.G.L. c. 12, §§ 11H, 11I, and 11J, M.G.L. c. 25, §17, and M.G.L. c. 149, §

185b, the City of Boston October 2000 Executive Order, and state common law, inter

alia. Plaintiffs, on behalf of themselves and all others similarly situated, seek declaratory

and injunctive relief pursuant to M.G.L. c. 214, § 1, M.G.L. c. 231A, and 42 U.S.C. §§

1983, inter alia, and damages. Plaintiffs allege further that Defendant BFD and its

supervisors negligently failed to train and supervise its employees, including but not

limited to Defendant Moran, thereby causing the violations of Plaintiffs' constitutional,

statutory, and other legal rights, and seek damages accordingly.

## PARTIES

1.    Plaintiff Denise M. Barry is an individual residing at 4 Essex Street, Charlestown, Suffolk

County, Massachusetts 02129.

2.    Plaintiff Jane B. Green is an individual residing at 60 LaGrange Street, West Roxbury,

Suffolk County, Massachusetts 02132.

3.    Plaintiff Patricia J. McDonough is an individual residing at 31 Woodcliff Road, Holbrook,

Norfolk County, Massachusetts 02343.

4.    Plaintiff Elizabeth H. Golden is an individual residing at 74 Tremont Street, Charlestown,

Suffolk County, Massachusetts 02129.

5.    Plaintiff Elaine Mesiti is an individual residing at 12 Waterman Road, Roslindale,  Suffolk

County, Massachusetts 02131.

6.    Plaintiff Lila Brown is an individual residing at 99 Lawrence Avenue, Dorchester,  Suffolk

County, Massachusetts 02121.

7.    Plaintiff Mary M. Kane is an individual residing at 619 East 5th  Street, South Boston,

Suffolk County, Massachusetts 02127.

8.    Plaintiff Judith A. Kelley is an individual residing at 290 Turner Road, Rockland,

Plymouth County, Massachusetts 02370.

9.    Defendant Robert Moran is employed as the Personnel Manager in the Boston Fire

Department.  Upon information and belief, Defendant Moran resides at 86 Minot Street,

Dorchester, Boston, Massachusetts 02122. Defendant Moran is sued in his official and

individual capacities.

10.   Defendant Joseph Finn was employed as the Deputy Fire Chief of Personnel Department

in the Boston Fire Department from 8 December 2001 to 2 July 2005.  Upon information

and belief, Defendant Finn resides at Quincy, Norfolk County, Massachusetts 02269.

Defendant Finn is sued in his official and individual capacities.

11.   Defendant Ronald Keating is employed as the Deputy Fire Chief of Personnel Department

in the Boston Fire Department since 15 June 2005.  Upon information and belief,

Defendant Keating resides at 8163 Bayside Road, Squantum, Norfolk County,

Massachusetts 02171. Defendant Keating is sued in his official and individual capacities.

12.   Defendant Paul A. Christian was, at relevant times herein, employed as the Fire

Commissioner for the City of Boston Fire Department, with his place of business located

3

at 115 Southhampton Street, Boston, Massachusetts, and who resides at 1682 Columbia

Road, South Boston, Massachusetts 02127. Defendant Christian is sued in his official and

individual capacities.

13. Defendant Roderick Fraser, Jr., is, at relevant times herein, employed as the Fire

Commissioner for the City of Boston Fire Department, with his place of business located

at 115 Southhampton Street, Boston, Massachusetts, and who resides at 2 Maple Leaf

Drive, Hyde Park, Massachusetts 02136. Defendant Fraser is sued in his official and

individual capacities.

14. Defendant William Kessler is employed by the City of Boston as the Director of

Employment and Recruitment, with his place of business located at Boston City Hall,

Room 612, Boston, Massachusetts 02201. Defendant Kessler is sued in his official and

individual capacities.

15. Defendant William Hitchcock was employed, at relevant times herein, as the Director of

Operations for the City of Boston Fire Department, and resides at 15 Hatch Avenue,

Braintree, Massachusetts 02184. Defendant Hitchcock is sued in his official and individual

capacities.

16. Defendant City of Boston, inclusive of its Fire Department ["BFD"], is an incorporated

governmental municipality of the Commonwealth of Massachusetts, with the BFD's

principal office located at 115 Southhampton Street, Boston, Suffolk County,

Massachusetts.

17. Defendants John and/or Jane Does 1-50 [hereinafter "Doe Defendants"] are

administrators, supervisors, and/or other employees and/or staff of the BFD and/or of

related municipal entities, and/or government and/or non-government persons and/or

entities employed, hired, and/or otherwise engaged by the City of Boston, whose true

names and capacities are as yet unknown to Plaintiffs and their counsel despite inquiry and

due diligence, who acted and/or failed to act herein as more particularly alleged below.

The Doe Defendants are sued herein in both their official and their individual capacities.

The true names and capacities of the Doe Defendants will be substituted through a Motion

to Amend the Complaint as they become known.

## JURISDICTION

18.    The original Complaint in ths matter was filed in the Superior Court of Commonwealth of

Massachusetts which had jurisdiction over this action for damages and equitable relief

pursuant to M.G.L. c. 212, § 4 and M.G.L. c. 214, §1, respectively, *inter alia.*

19.    The civil rights claims asserted herein present questions of federal law thereby conferring

jurisdiction upon this Court under 42 U.S.C. §§ 1983, <u>inter alia</u>.  Any and all state law

claims contained herein form part of the same case or controversy and therefore fall within

the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## CLASS ACTION ALLEGATIONS

20.    Plaintiffs Barry, Green, McDonough, Golden, Mesiti, Brown, Kane, and Kelley bring this

action in their own behalf and, pursuant to Rules 23(a) and 23(b)(1)(2) and (3) of the

Federal Rules of Civil Procedure, in behalf of all others who were or are similarly situated.

21.    Plaintiffs Barry, Green, McDonough, Golden, Mesiti, Brown, Kane, and Kelley seek to

represent that class of present and former administrative employees of the Boston Fire

Department who have been and/or are being subjected to unlawful political affiliation

discrimination, or retaliation based upon their objection to, or reporting of, said political

affiliation discrimination, that has been practiced and/or is now being practiced within the

Boston Fire Department, as set forth below.

22. Plaintiffs fairly and adequately will represent the interests of the class because Plaintiffs' claims that Defendants' policies, practices, regulations, and/or actions deprive them of constitutionally protected rights, <u>inter alia</u>, are typical of the claims of the class as a whole.

23. Plaintiffs know of no conflicts of interest among members of the class and are represented by an attorney with over 15 years of state and federal court litigation experience and who has litigated several class actions in federal court and adequately will represent the interests of the entire class.

24. Plaintiffs allege that the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class.

25. Plaintiffs allege further that adjudications with respect to individual class representatives would, as a practical matter, be dispositive of the interests of certain other class members who are not parties to this action, or substantially impair or impede the class members' ability to protect their interests without class certification.

26. Defendants have acted and/or refused to act on grounds generally applicable to the class thereby making appropriate final injunctive, declaratory, and monetary relief with respect to the class as a whole.

27. Plaintiffs assert that there are questions of law and fact that predominate over any questions affecting only individual members, and a class action is superior to individual lawsuits or other methods of formal dispute resolution.

28. To the best of Plaintiffs' knowledge and belief, there are approximately thirty-five to forty potential class members.

6

## FACTS COMMON TO ALL COUNTS

29.     On or about October 2000, City of Boston Mayor Thomas M. Menino issued an

Executive Order which "ordered and directed" that "[a]ll departments within the City of

Boston shall adhere to this policy" and setting forth the policy, *inter alia*, that

"discrimination, retaliation and harassment are contrary to City policy and are also illegal.

Such conduct is defined as follows: . . . Conduct that conditions a person's hiring,

compensation, terms and conditions of employment or access to services provided by the

City on that person's . . . political affiliation[.]"

30.     Plaintiffs are informed and believe, and thereupon allege, that the October 2000 Executive

Order was issued to address a historical pattern and practice of political affiliation

discrimination, a.k.a. "patronage" or "cronyism", within Boston City departments,

including but not limited to Defendant Boston Fire Department.

31.     On or about July 2001, Defendant Moran was hired by the BFD.  Plaintiffs are informed

and believe, and thereupon allege, that Defendant Moran was not qualified, and certainly

not as well qualified as other applicants as set forth below, or otherwise suited for the

position of personnel manager, was suspended and/or terminated from his previous human

resources position for cause, and obtained the position with the BFD primarily as a

political favor.

32.     Plaintiffs are informed and believe, and thereupon allege, that regular meetings were held

between and among Defendants Moran, Hitchcock, and Christian, and Fraser as

Christian's successor, in which meetings it was determined who would be hired or

promoted such that the primary and/or substantial factor was not the person's

qualifications, but was the applicant's political affiliation or other association with those

7

maintaining power and influence as to the BFD.

33.    Since Defendant Fraser was hired as Fire Commissioner, the pattern and practice of

political affiliation discrimination has continued, and Plaintiffs allege that Defendant Fraser

knew or should have known of such discrimination and acquiesced in such unlawful

34.    For more than the past five years, Plaintiffs have been passed over for, denied, or

otherwise dissuaded from applying for, promotions, step increases, and upgrades because

they are not politically affiliated or otherwise advantageously associated with those in

power in the Fire Department, or those in City Government who have influence in the Fire

Department, including but not limited to the following

a.    On 3 Aprll 2006, Jacqueline McGrath,  primarily and/or substantially because of

her political affiliations with one or more of the Defendants or their political

affiliations, was not qualified but placed in a position over a qualified

candidate/class member without the necessary political affiliations, as an R-9,

despite testing positive for drugs. On 28 April 2006, McGrath's employment

terminated after she was found consistently sleeping at her desk.

b.    On or about 6 February 2006, Anthony Renzi, primarily and/or substantially

because of his political affiliations with one or more of the Defendants or their

political affiliations, was provided a position as Civil Service Linesman on a

Construction Crew, which position never was posted for any of the Plaintiffs or

Class Members to apply; Plaintiff Golden, among other Class Members, would

have applied for this position if it had been offered.  In addition to the procedurally

and substantively unlawful appointment, as an exclamation of his political

connections, Mr. Renzi was escorted personally into the office by Defendant

8

Moran upon his first day of work, which was special treatment from Defendant Moran inconsistent with treatment afforded those with no political affiliation.

c.  On or about 22 April 2005, Priscilla Richardson, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was provided a position as an R-10 Principal Clerk, which position never was posted for any of the Plaintiffs or Class Members to apply; certain members of the Class would have applied for this position if it had been offered.

d.  On or about 13 December 2004, Lois Hart, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an R-14 Principal Clerk, thereby depriving the position to Plaintiffs Barry and Brown, who had applied, and certain other Class Members who had applied for the position, or who, such as certain Class Members were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position; More specifically, the job was first posted months prior to Hart obtaining the position, at which Barry and Brown applied, then it was posted again, at which only Brown applied, then, after once again not properly considering Brown's application, the BFD posted the job city-wide, and Lois Hart was installed as a political favor.

e.  Kerin Cunningham was hired on 25 August 2004 as an R-9 as a political favor and immediately negotiated a Step 3 pay raise, where the class members need to start at a Step 1 (Ian McKenzie negotiated a Step 7 upon hire). Moreover, Cunningham was promised by Moran and certain other persons with political influence that she

9

would get an R-14 position. On 30 June 2006, Cunningham successfully applied for a compensation grade appeal, with no further real increase in duties, and she was granted a 3-level upgrade (R-9 to R-12) in October with the direct help and intervention of Defendant Ronald Keating, retroactive to 30 June 2006. All Plaintiffs and class members all have been seeking upgrades for their position but have been denied such upgrades, or have been dissuaded from applying for such upgrades because it would be futile, because of their lack of proper political affiliations.

f.    On or about 11 August 2004, Ian McKenzie, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an MM-5 Case Manager/ Utilization Review, later changed and upgraded to MM-7 Director of Utilization Review prior to the hiring of McKenzie, thereby depriving the position to Plaintiffs Barry, Golden, McDonough, and Kelley, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying, such as Plaintiff Green, because they were informed that a person with favorable political connections already had been promised the position;

g.    On or about 20 January 2004, Erica Boylan, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position an R-12 Administrative Assistant, thereby depriving the position to one or more Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a

10

person with favorable political connections already had been promised the position;

h.    On or about 13 October 2003, Michelle Urso, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an R-15 Head Clerk, thereby depriving the position to Plaintiff Barry, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position;

i.    On or about 12 December 2002, Kerry Manning, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of an R-15 Stationary Clerk, thereby depriving the position to Plaintiff Barry, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position;

j.    On or about 21 July 2001, Mary Kilgallen, primarily and/or substantially because of her political affiliations with one or more of the Defendants or their political affiliations, was hired for the position of a MM-8 Principal Administrative Clerk, thereby depriving the position to Plaintiffs McDonough, Kane, and Kelley, who had applied, and certain other Class Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position, such as Plaintiff Golden;

11

i.    Furthermore, Mary Kilgallen was provided with another MM-8 position on

or about August 2003, and her prior position, rather than being reposted,

was abolished, thereby denying the opportunity for promotion to Plaintiffs

Barry, Green, Kane, Brown, and Kelley who would have applied, and

certain other Class Members who would have applied;

(1)    The new position that eventually was provided to Kilgallen

originally was posted as a MM-6, and Kilgallen, a MM-8, was the

interviewer for the position along with Defendant Moran, to

interview Plaintiffs Barry, McDonough, Kane, Brown, and Kelley.

Then when the position was raised to a MM-8, only Plaintiff

Golden was interviewed, the other Plaintiffs being told that their

prior interviews [with Kilgallen] would suffice.

(2)    Plaintiffs are informed and believe, and thereupon allege, that

Kilgallen is further granted additional benefits, unavailable to

Plaintiffs or the Class Members, in the form of paid time off and

free tuition to attend higher education classes on Monday,

Wednesdays, and Friday from 9 am to 12 pm, and is allowed to sign

in, as though working in the building when she is not, from 8 to 5.

(3)    Plaintiffs Barry, McDonough, Golden, Kane, Brown, and Kelley all

protested the manner and substance of Kilgallen's appointment.

k.    On or about 21 July 2001, Defendant Robert Moran, primarily and/or substantially

because of his political affiliations with one or more of the Defendants or their

political affiliations, was hired for the position of Executive Assistant Director of

12

Human Services MM-12, thereby depriving the position to Plaintiff Mesiti, who

had applied, and certain other Class Members who had applied for the position, or

who were dissuaded from applying because they were informed that a person with

favorable political connections already had been promised the position;

l.      On or about 9 July 2001, Eileen Stille, primarily and/or substantially because of her

political affiliations with one or more of the Defendants or their political

affiliations, was hired for the position of an R-10 [or 12] Head Clerk, thereby

depriving the position to Plaintiffs Barry, who had applied, and certain other Class

Members who had applied for the position, or who were dissuaded from applying

because they were informed that a person with favorable political connections

already had been promised the position;

m.      On or about 19 June 2001, Carol Petta, primarily and/or substantially because of

her political affiliations with one or more of the Defendants or their political

affiliations, was hired for the position of an MM-8 Principal Administrative

Assistant, thereby depriving the position to Plaintiff McDonough, who had applied,

and certain other Class Members who had applied for the position, or who were

dissuaded from applying because they were informed that a person with favorable

political connections already had been promised the position; and

n.      On or about 18 September 2000, Mary Ann McHugo (nee Creedan), primarily

and/or substantially because of her political affiliations with one or more of the

Defendants or their political affiliations, was hired for the position of a MM-8

Principal Administrative Assistant, thereby depriving the position to Plaintiffs

McDonough, Golden and Kelley, who had applied, and certain other Class

13

Members who had applied for the position, or who were dissuaded from applying because they were informed that a person with favorable political connections already had been promised the position.

  i.  Plaintiffs are informed and believe, and thereupon allege, that Mary Ann McHugo receives additional benefits and privileges, unavailable to Plaintiffs or Class Members, in the form of free tuition to attend higher education.

35. For each of the above positions denied to one of the Plaintiffs and/or Class Members as set forth above, *inter alia*, the position filled unlawfully by a political appointee then did not become available for another Plaintiff or Class Member, thus, perpetuating the discriminatory effect down the line to others of lesser or equal grades who would have qualified, applied, and been accepted for the denied Plaintiff's position had it become available.

36. Defendants BFD, Moran, Christian, and Hitchcock, and certain of the Doe Defendants have established a pattern and practice of hiring and/or promoting, with little or no regard to actual or comparative qualifications, almost exclusively those persons who are politically affiliated, associated, or otherwise connected to those with power and influence over the BFD and those persons in charge, including but not limited to Defendants Moran, Christian, and Hitchcock.

37. Defendants BFD, Moran, Christian, and Hitchcock, and certain of the Doe Defendants would, as part of their unlawful practice of political affiliation discrimination, tailor the position's requirements to the politically affiliated candidate such as to exclude the equally or more qualified Plaintiff or Class Member, by adding in, on an arbitrary and capricious manner, certain requirements that never were required for the same or similar positions,

14

and were not required for the substance of the position. In addition, Defendants would apply position requirements only to the non-politically affiliated Plaintiffs and/or Class Members of the BFD and not to the installed politically affiliated person.

38.    Defendants BFD, Moran, Christian, and Hitchcock, and certain of the Doe Defendants would, as part of their unlawful practice of political affiliation discrimination, deny or otherwise impede the provision of training to Plaintiffs, such as Plaintiffs Barry, Golden, and McDonough, and other class members so that they could not match the qualifications set forth in the job postings.

39.    Defendants BFD, Moran, Finn, Keating, Christian, Fraser, and Hitchcock, and certain of the Doe Defendants would, as part of their unlawful practice of political affiliation discrimination, would misrepresent or otherwise fabricate reasons for the denial of promotions to certain Plaintiffs and Class members, such as Defendant Moran representing to potential class member Joanne Callahan (a formal post office worker lifting large sacks of mail) that she was not hired for the job given to Kerry Manning (a former bakery worker lifting sacks of flour) because the BFD needed someone who occasionally could lift large containers of stationary, and Ms. Manning purportedly had the sole ability.

40.    Defendants knew of the unlawful political affiliation discrimination because of complaints reasonably timely submitted to Defendants in writing and orally, and Defendants failed and refused to correct said unlawful discrimination.

41.    Defendants Moran, Keating, Finn, Christian, Fraser, Hitchcock, and Kessler, and certain Doe Defendants acted, and otherwise purposely failed to act, in concert with each other to affect adversely the terms and conditions of Plaintiffs' respective employment as set forth herein.

15

42.  As set forth in more detail below, complaints were made to Defendant Kessler about the political affiliation and retaliatory conduct of Defendants Moran, Christian, and Hitchcock.

43.  Defendant Kessler never conducted a reasonable investigation, and never issued a written opinion regarding Plaintiffs' complaints, despite receiving a written request to conduct an investigation, and despite receiving complaints about Defendant Moran from other individuals, in addition to Plaintiffs, during the meeting on 7 September 2004, and otherwise.

44.  Instead, Plaintiffs are informed and believe, and thereupon allege, that Defendant Kessler's refusal and deliberate failure to consider and otherwise investigate the Plaintiff's allegations of wrongdoing by Moran and the BFD was motivated by Plaintiffs lack of political affiliation or other advantageous association with those having influence over the BFD.

45.  As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiffs have been deprived of wages and benefits, and continue to suffer such losses in amounts to be shown at trial, which are the differences between each Plaintiff's then or present wages and the higher wages of the person installed into the position for which each Plaintiff was well qualified, or the difference between comparable step nnd grade increases, as provided, for example, to Kerin Cunningham.

**PLAINTIFF DENISE M. BARRY**

46.  On or about 21 August 1996, Plaintiff Barry commenced employment with the BFD in the Training Division as a Principal Clerk, with an R-8 civil service employment rating.

16

47.    On or about 3 July 1998 after a budget review, the BFD upgraded all R-8 positions. As a

result, Plaintiff Barry and another employee were upgraded to Head Clerk (R-11)

positions. Then, on 1 September 1998, a Memorandum went out from AFSCME Council

93 regarding the Joint Clerical Upgrade Committee Meeting such that whoever held a R-

11 Head Clerk position was upgraded to Head Clerk (R12) position, Step 1 (Plaintiff

Barry is now at the current pay rate of a step 5, pursuant to regular Union step increases,

at approximately $666.00 per week). This has been the only time that Plaintiff Barry has

been upgraded.

48.    On or about 14 July 2003, Plaintiff Barry asked Defendant Moran why she was not getting

raises or upgrades, whereupon Defendant Moran told Plaintiff Barry that there was not

enough money and that no one is getting a raise. Coincidentally, despite the purported

lack of money, Plaintiff Barry discovered that Defendant Moran was trying, at this time, to

create an R-15 Administrative Assistant position for a Sheila Mancuso, who just recently

was employed at the BFD on 12 October 2002 as a form of patronage and political favor.

49.    On or about 14 August 2003, Plaintiff Barry submitted a 12-page letter consisting of

recommendations from various fire and civilian personnel from different offices that

Plaintiff Barry had assisted during her BFD career.

50.    On or about 20 August 2003, Plaintiff Barry applied for an R-15 Administrative Assistant

position in the BFD, for which she was well-qualified. Plaintiff Barry went on two

interviews; first with Defendant Moran; and second with Chief Robert Calobrisi. On her

way to the second interview, Plaintiff Barry was told by other employees not to waste her

time because they - Defendant Moran and Defendant Christian - already had someone

picked for the job from outside the department, and that she purportedly did not meet the

17

minimum entrance qualifications according to the job posting.  Plaintiff Barry is informed and believes, and thereupon alleges that an outsider, Michelle Urso, who did not meet the minimum qualifications but was politically affiliated and otherwise associated with those with power and influence in the BFD, was hired for the position on or about 1 October 2003.

51.    On or about 28 August 2003, during a conversation with Defendant Moran, Plaintiff Barry asked Defendant Moran if he had received a reply from City Hall about her pay raise. Defendant's  response was, despite the recent hiring as set forth above,  "No, I didn't tell you the City is out of money, there is a freeze on raises and hiring?"  "No,"Plaintiff said, "you didn't tell me."

52.    For the past 2 years, Defendant Chief William F. Hitchcock and Chief David R. Granara have requested step increases on several occasions for Plaintiff Barry, which repeatedly were denied by Defendants Moran and Christian.

53.    For each position for which Plaintiff Barry applied, she was well qualified for the position, more so than 90% of the persons who received the jobs.

54.    On or about 1 October 2003, a BFD nurse, knowing of Plaintiff's competence, asked Plaintiff if she would be willing to assist in organizing the medical bills for payment in a job classified as "Case Manager - Indemnification.".  Plaintiff agreed to help and Defendant Moran agreed to appoint Plaintiff Barry as an Acting .position of MM-5.

55.    In order to prepare for her new responsibilities, Plaintiff requested of Defendant Moran if she could attend Peoplesoft Training at City Hall because the software had been updated. Defendant Moran's reply was "Yes, I will work on it immediately."

56.    On or about 1 October 2003, Plaintiff Barry asked Defendant Moran what Acting Position

18

grade and step that she was doing as a Case Manager. Defendant Moran responded that the position was an "MM-5, and that he would work out what step it was and respond to Plaintiff Barry at a later time.

57.   On or about 3 October 2003, after only one day at the new position, Plaintiff Barry sent $43,996.48 worth of payrun claims to City Hall to be processed; there was a significant backlog of such payrun claims when Plaintiff Barry entered the position.

58.   On or about 3 October 2003, Nurse Barbara Ryan sent an electronic mail message to Carol Connors and Plaintiff Barry,  thanking them for their extra effort during the backlog process.

59.   On or about 6 October 2003, Department Nurse Barbara Ryan sent an electronic mail message to Chief Granara saying that she wanted to thank him for allowing Plaintiff Barry to assist in the claims payment process and that Plaintiff Barry is a pleasure to work with and performs her duties exceptionally well.

60.   Plaintiff Barry was doing both her regular position's responsibilities as well as the Case Manager's responsibilities during the time that she had the temporary upgrade.

61.   On or about 6 October 2003, Plaintiff Barry requested again of Defendant Moran about the step rate, because she was only receiving the pay for a step 1 while she should be receiving at least a Step 3 or 4.

62.   On or about 7 October  2003, Plaintiff Barry requested again of Defendant Moran if he had a chance to ask City Hall about the step rate; Defendant Moran responded that he would check into it.

63.   On or about 7 October 2003, Plaintiff Barry sent $25,753.28 worth of payrun claims to City Hall for processing in order to assist in clearing the Case Manager backlog.

19

64.    On or about 8 October 2003, Plaintiff Barry went to the Fire Marshall's Office of

Maryanne McHugo in order to get trained in People Soft, but Ms. McHugo had informed

Defendant Moran earlier that she could not train Plaintiff Barry, and Defendant Moran had

failed to inform Plaintiff Barry about this situation, thereby causing unnecessary dissension

among BFD employees, and embarrassing Plaintiff Barry.

65.    On or about 9 October 2003, Plaintiff Barry had a meeting with the Fire Department

Human Resources Manager, Defendant Robert Moran. This meeting was called because

Plaintiff Barry wanted to inquire if she would be getting the Case Manager position and

because Plaintiff Barry had complaints that she was not receiving promotions and pay

increases when due.


66.    At the 9 October 2003 meeting, in response to Plaintiff Barry's request for the position

and complaints, Defendant Moran said that Plaintiff Barry would not be getting the

position, that City Hall had someone else in mind and said, rather blatantly, "Well, if

you're not into politics little girl, then you're not into a position here."

67.    At the 9 October 2003 meeting, at which Plaintiff Jane Green was present as Plaintiff

Barry's Union Shop Steward, Plaintiff Green promptly stood up upon Defendant Moran's

statement above, and said to Defendant Moran "I can't believe you are saying this to her,

not to mention in front of me." Defendant Moran replied "that's the way it is around

here." Whereupon Plaintiff Barry said "so, I am going to be punished because I am not

into politics?" Defendant Moran shrugged his shoulders and said "that's politics for you."

68.    Later on 9 October 2003, Plaintiff Barry was informed that Defendant Moran was going

to retaliate against Plaintiff Barry for her complaints and request for pay raises, such that

he never would approve any pay increases for Plaintiff Barry. That has been the case since that time, such that Plaintiff Barry has continued to be denied promotions and wage increases.

69.   The person who received the Case Manager position was a former BFD employee who was politically affiliated with those with power and influence over the BFD, Ian McKenzie, who, Plaintiffs are informed and believe, did not even live within the City of Boston at the time he was hired, as is a requirement for such positions; Mr. McKenzie lived in Maryland at the time, while using a Boston property that he owned as his residence address for the purposes of applying for the position. Moreover, Mr. McKenzie received the position as an MM-8, Step 7, paying approximately $1,350.00 per week, rather than the MM-5, Step 1 pay at approximately $720.00 per week that Plaintiff Barry was receiving for doing the same job.

70.   After Plaintiff Barry's above-mentioned meeting with Defendant Moran, Plaintiff Barry complained in writing and in a meeting to Defendant Kessler, the Director of Employment and Recruitment for the City of Boston, who told her that what Defendant Moran said was not unlawful discrimination and that he could not help Plaintiff Barry.

71.   Plaintiff Barry had subsequent meetings with Defendant Kessler and at each meeting, Defendant Kessler refused to acknowledge that discrimination on the basis of political affiliation was unlawful and failed and otherwise refused do an independent investigation of Plaintiff Barry's allegations.

72.   On or about 3 September 2004, Plaintiff Barry submitted to her supervisor Chief Granara a written complaint against Defendant Moran and the BFD's unlawful practices and policies that he was effectuating.

21

73.    Shortly about or after 3 September 2004, Chief Granara then informed Defendant

Hitchcock and then proceeded to inform the Fire Commissioner Defendant Christian of

Plaintiff's complaint against Defendant Moran and the alleged policies of discrimination.

74.    On or about 3 September 2004, Plaintiff Barry again submitted to, *inter alia*, Defendant

Kessler, formal complaints about Defendant Moran's actions against her, including her

lack of promotions and retaliation for her complaints, and as to Plaintiff Green for the

retaliation being perpetrated upon her as her witness. The Mayor of the City of Boston

was notified also of Plaintiffs' complaints against Defendant Moran. In response, on 21

October 2004, legal counsel for the City of Boston's Office of Labor Relations drafted a

letter warning Plaintiffs' counsel not to speak with any employees of the City of Boston

regarding this matter.

75.    On or about 7 September 2004, a meeting was held with Defendant Kessler to review the

complaints regarding Defendant Moran's, and others', discrimination, mistreatment, and

retaliation against Plaintiffs Barry and Green.

76.    More than six months elapsed and Plaintiffs are informed and believe, and thereupon

allege, that Defendant Kessler never conducted an investigation, and never issued a

written opinion regarding Plaintiff Barry and Green's complaints, despite receiving a

written request to conduct an investigation, and despite receiving complaints about

Defendant Moran from other individuals, in addition to Plaintiffs, during the meeting on 7

September 2004.

77.    Defendant Kessler, instead of investigating the significant complaints about Defendant

Moran's unlawful employment practices from Plaintiff Barry and others, placed an

unreasonable and unnecessary burden upon Plaintiff Barry to produce more

22

documentation, when, in fact, Defendant Kessler had more than enough information to commence and otherwise complete a good faith investigation.

78. On or about 15 October 2004, Plaintiff Barry was denied a step increase by Defendants.

79. On or about 20 October 2004, Chief Joseph Finn requested a step increase for Kathy Frechette for an R-17. Kathy Frechette resides in South Boston and is politically affiliated with those presently having political influence over the Boston Fire Department.

80. On or about 9 December 2004, Plaintiff Barry had two hearings scheduled at Labor Relations before Analyst Alice Kessler, the wife of Defendant William Kessler, that were held with regards to her complaints that she was being discriminated against.

81. Eight days after the hearings on 9 December 2004, Plaintiff Green was informed that the Commissioner wants her out of the building immediately for no apparent reason.

82. On or about this time in Mid-December 2004, Defendants Moran, Christian, and Hitchock, *inter alia*, had a meeting in which it was decided to retaliate against Plaintiff Barry through harassing her witness, and Union Shop Steward Plaintiff Green, by moving Plaintiff Green away from her files and making Plaintiff Green's terms and conditions of employment more onerous. At this meeting, in response to concerns that their behavior was retaliatory, Defendant Hitchcock stated "F–k Jane Green."

83. Plaintiff Barry was offered only once an out-of-grade positions when such position were made available to less senior civil service and non-civil-service employees who were politically affiliated to influential persons, including but not limited to Defendants Christian and Moran, for which she would have been qualified. On or about 15 November 2004, Plaintiff Barry reported and complained about this unlawful practice to Defendants, but her reports and complaint were ignored.

23

84.    On or about 4 April 2005, Plaintiff Barry arrived at work, after having taken the last few business days off because of the stress induced by Defendants' retaliatory conduct, and discovered that a surveillance camera installed to monitor the entrance has been re-trained, at the direction of the Fire Commissioner - Defendant Christian's office, to monitor her work station, instead of the entrance way.

85.    Since approximately January of 2006, Plaintiff Barry has been compelled to cover the responsibilities of a Fire Lieutenant (Thomas Dinan), who had been getting acting Captain's pay, who passed away, without Plaintiff Barry being offered an out-of grade promotion for doing the extra work.

86.    As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Barry has been deprived of approximately $90,000 in wages and benefits, and continues to suffer such losses at the rate of approximately $1,092 per week, which is the difference between her present wages and the wages of the person who was doing her present job responsibilities before her, for which Plaintiff Barry was well qualified.

87.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Barry has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF JANE B. GREEN**

88.    Plaintiff Green is employed by the Boston Fire Department as a civil service employee, and a member of, and shop steward in, SENA, Local 9158.

24

89. Plaintiff Green's responsibilities include reviewing fire reports of the on-scene firemen, providing documentation and confirmation to victims of fires so that the victims, many of whom are poor and destitute as a result of the fire, can receive recoveries from their insurance companies and aid from welfare agencies, including temporary housing and housing assistance payments. The victims of house and car fires are directed to seek assistance through Plaintiff Green.

90. On or about 9 October 2003, Plaintiff Green was present as the Union Shop Steward for Union Member Plaintiff Barry for a meeting between Plaintiff Barry and Boston Fire Department Human Resources Manager Defendant Robert Moran. This meeting was called as a result of complaints by Plaintiff Barry that she was not receiving promotions and pay increases when due. In response to Plaintiff Barry's complaints, Defendant Moran said, rather blatantly, "Well, if you're not into politics little girl, then you're not into a position here." Plaintiff Green promptly stood up and said to Defendant Moran "I can't believe you are saying this to her, not to mention in front of me." Mr. Moran replied "that's the way it is around here." Whereupon Plaintiff Barry said "so, I am going to be punished because I am not into politics?" Defendant Moran shrugged his shoulders and said "that's politics for you."

91. On or about this time in Mid-December 2004, Defendants Moran, Finn, Christian, and Hitchock, *inter alia*, had one or more meetings in which it was decided to retaliate against Plaintiffs by moving Plaintiff Green away from her files and make Plaintiff Greens terms and conditions of employment more onerous. At this meeting, in response to concerns that their behavior was retaliatory, Defendant Hitchcock stated "F–k Jane Green."

92. On and before 27 December 2004, Plaintiff Green was based at 115 Southampton Street,

25

Boston, Massachusetts; all of the records that she needs are there, as well as the computer files vital to the efficient operation of her position.

93. In addition, the Fire Investigation Unit, a necessary stop for the victims of car fires, is located just behind 115 Southhampton Street, on 920 Massachusetts Avenue. Fortunately for the victims of house fires, there is ample free parking near 115 Southampton Street.

94. On Thursday, 23 December 2004, Defendant Moran handed Plaintiff Green a paper stating "this is your official transfer paper," signed, Peter Liazza, Fire Marshal, Boston Fire Department. Plaintiff Green is informed and believes and thereupon alleges that Liazza only signed the document under duress and at the insistence of Defendant Finn. The transfer stated that management has decided that the Fire Reports section (Plaintiff Green's section) of the Fire Prevention Division will be relocated to 1010 Massachusetts Avenue, 4th floor, starting Monday, 27 December 2004. The only explanation provided was that "this is not a transfer but a relocation."

95. When Plaintiff Green was moved, she was told that the equipment and files needed for her position would be moved with her. This did not happen for more than 8 months after she moved, forcing her to travel back and forth between buildings for almost the entire winter..

96. The relocation is arbitrary, capricious, and malicious because Plaintiff Green's records remained located at 115 Southampton Street, requiring her to make two or three trips a week to look up information for customers.

97. Plaintiff Green's move to 1010 Massachusetts Avenue also has an adverse impact upon the public.

98. Plaintiff Green's move causes an unnecessary, malicious, arbitrary, and capricious burden

to the public to access the Fire Investigation Unit, there is no free parking (often a vital

consideration for the newly destitute); and Plaintiff Green was practically unreachable

because her old telephone number had been disconnected, without being re-established at

her new location until Tuesday, 8 March 2005. Plaintiff Green remained separated from

key files and records located at 115 Southhampton Street for more than eight months,

posing an undue and malicious burden upon the terms and conditions of her employment

because of her exercise of her First Amendment Rights to speak on behalf of Plaintiff

Barry.

99.     Up until 8 March 2005, Plaintiff Green's current location did not provide her with a

telephone such that she was cut off from answering vital customer and work-related

inquiries and helping customers in need of emergency services, such that she was forced to

locate an available desk, and stand over the person whose desk it is, to answer and return

calls at least 15 to 20 times a day for three months.

100.    The Boston Fire Department is in the business of not only putting out fires, but are to

provide fire victims with the essential services they need to help them.

101.    The emotional pain of people experiencing the devastating effects of fire is traumatic, and

then not to provide the emergency services they so desperately need creates further

trauma and burden. With the loss of a home, belongings and sometimes family members,

people are emotionally distraught and angry, and are in need of emergency services.

Plaintiff Green's present location prevents her from meeting the needs of the public

effectively.

102.    Plaintiff Green's responsibilities as Senior Administrative Assistant - Incident Reports

requires her to be in constant contact with people to provide information on fire or

27

incident reports, and to do research in order to get emergency services when needed either through Boston Housing, Salvation Army, Red Cross or insurance companies. This process further requires the public to come to 1010 Mass Ave., to pick up a fire report or information, where parking is a problem or paying a parking fee of five-dollars (which they often do not have); such problems did not exist at her former location.

103. Because of information that Plaintiff Green has provided and offered to provide as a witness to the violations of law being perpetrated by Defendants, the actions of the Defendants are in violation of the terms and conditions of her employment and of law.

104. The transfer or job relocation to 1010 Mass Ave., serves no other purpose than retaliation, discrimination, and harassment because of Plaintiff Green's exercise of her First Amendment Rights to freedom of speech in her union activity in an official capacity as shop steward, and in her role as a witness to and reporter of the violations of law perpetrated upon Plaintiff Barry.

105. The transfer or job relocation has been difficult and frustrating for Plaintiff Green in trying to do Plaintiff Green's job for at least eight full months after her purported "transfer", and has caused, and continues to cause, severe emotional and physical distress and suffering, such that she has been compelled to seek medical treatment for the same.

106. Plaintiff Green filed a grievance regarding her retaliatory, forced relocation, which was heard on 27 January 2005 by Labor Relations Analyst Alice Kessler.

107. Labor Relations Analyst Alice Kessler is the wife of Defendant Kessler.

108. By decision dated 1 March 2005, Labor Relations Analyst Kessler found that there was no violation of the collective bargaining agreement, and thereby denied Plaintiff Green's grievance.

28

109.    Plaintiffs are informed and believe, and thereupon allege, that such grievances that address
the discrimination based upon political affiliation, and any related grievances, are
arbitrarily, capriciously, and uniformly denied by the Office of Labor Relations, and
specifically by Ms. Kessler.

110.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,
Plaintiff Green discovered from her physician on Saturday, 12 March 2005, that her blood
pressure suddenly has become threateningly high, such that her physician has considered
pulling Plaintiff Green from her position for health reasons.

111.    On 1 April 2004, Defendant Moran continued his retaliatory conduct against Plaintiffs by
calling Plaintiff Green at her home and denying her bereavement leave for the death of her
husband's brother the day before.   It has been the long standing practice in the BFD to
grant five days of bereavement leave under such and similar circumstances.   Thus, Plaintiff
Green has been forced to use her vacation pay instead of the bereavement leave ordinarily
granted, and has suffered the loss of those vacation days in the amount of approximately
$669.00, accordingly.

112.    As a direct and proximate result of the discrimination and other violations of the law
perpetrated by Defendants, Plaintiff Green has been deprived of approximately $45,000 in
wages and benefits, and continues to suffer such losses at the rate of approximately $400
per week, which is the difference between her present wages and the wages of the person
installed into the Case Manager position, for which Plaintiff Barry was well qualified.

113.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,
Plaintiff Green has suffered, and will continue to suffer, severe emotional distress in
amounts to be proven at trial, but no less than $100.000.00.

114.    Defendants, in concert with each other, acted, and otherwise purposefully failed to act, to

affect adversely the terms and conditions of Plaintiff Green's employment as set forth.

**PLAINTIFF PATRICA McDONOUGH**

115.    On or about 6 November 1974, Plaintiff McDonough commenced employment with the

BFD in an administrative position.

116.    Plaintiff McDonough is now, and has been for approximately the last five years, at the

current pay rate of an MM-6.

117.    For the positions to which she applied, Plaintiff McDonough often was told not to waste

her time because they - Defendants Moran and Defendant Christian, among others in

power - already had someone picked for the job from outside the department, and that

she purportedly did not meet the minimum entrance qualifications according to the job

posting.

118.    In or about September 2000, when Plaintiff McDonough applied for the position given to

Mary Ann McHugo, Defendants decided to not even provide Plaintiff McDonough an

interview for the posted position.

119.    For each position for which Plaintiff McDonough applied, she was well qualified for the

position, more so than the politically affiliated persons who received the jobs.

120.    Plaintiff McDonough, timely after her denials of the above-mentioned positions, submitted

written complaints and/or grievances to her supervisors and Defendants, including

Defendant Kessler, describing and seeking a correction of the unlawful practices and

policies that were being effectuated by the Defendants; Plaintiff McDonough continues to

assert her complaints in writing and orally..

121. As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff McDonough has been deprived of approximately $70,000.00 in wages and benefits, and continues to suffer such losses at the rate of approximately $251.22 per week.

122. As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff McDonough has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

### PLAINTIFF ELIZABETH H. GOLDEN

123. On or about 15 July 1985, Plaintiff Golden commenced employment with the BFD in an administrative position.

124. Plaintiff Golden is now, and has been for approximately the last five years, at the current pay rate of an MM-6.

125. For the positions to which she applied, and for some that she did not, Plaintiff Golden often was told, many times by Defendant Moran, not to waste her time because they - Defendants Moran and Defendant Christian, among others in power - already had someone picked for the job from outside the department, and that she purportedly did not meet the minimum entrance qualifications according to the job posting.

126. For each position for which Plaintiff Golden applied, she was well qualified for the position, more so than the politically affiliated persons who received the jobs.

127. Plaintiff Golden submitted written complaints and grievances to her supervisors and Defendants, including Defendant Kessler, describing and seeking a correction of the

unlawful practices and policies that were being effectuated by the Defendants.

128. On or about Spring 2005, Plaintiff Golden met, after submitting a written complaint and demand for investigation, with Labor Relations with Defendant William Kessler, that was held to discuss her complaints that she was being discriminated against.

129. Defendant Kessler promised to investigate Plaintiff's Golden's allegations but, Plaintiff Golden is informed and believes and thereupon alleges, that Defendant Kessler did not perform an investigation in good faith or otherwise, and simply informed Plaintiff Golden that her complaint was not covered by the Collective Bargaining Agreement. When asked to point specifically to what provision[s] of the CBA did not no apply, Defendant Kessler failed and refused to answer such of Plaintiff Golden's inquiried.

130. As a direct and proximate result of the discrimination and other violations of the law perpetrated by Defendants, Plaintiff Golden has been deprived of approximately $68,000.00 in wages and benefits, and continues to suffer such losses at the rate of approximately $220.00 per week.

131. As a direct and proximate cause of the foregoing actions and omissions of the Defendants, Plaintiff Golden has suffered, and will continue to suffer, severe emotional distress in amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF ELAINE MESITI**

132. On or about 11 July 1966, Plaintiff Mesitit commenced employment with the BFD in an administrative position.

133. Plaintiff Mesiti is now, and has been for approximately the last five years, at the current pay rate of an MM-8.

134. For the positions to which she applied, Plaintiff Mesiti often was told not to waste her

32

time because they - Defendants Moran and Defendant Christian, among others in power -
already had someone picked for the job from outside the department, and that she
purportedly did not meet the minimum entrance qualifications according to the job
posting. .

135.   For each position for which Plaintiff Mesiti applied, she was well qualified for the position,
more so than the politically affiliated persons who received the jobs.

136.   As a direct and proximate result of the discrimination and other violations of the law
perpetrated by Defendants, Plaintiff Mesiti has been deprived of approximately
$123,900.00 in wages and benefits through 2005, and continues to suffer such losses at
the rate of approximately $390.00 per week.

137.   As a direct and proximate cause of the foregoing actions and omissions of the Defendants,
Plaintiff McDonough has suffered, and will continue to suffer, severe emotional distress in
amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF LILA BROWN**

138.   On or about 26 November 1997, Plaintiff Brown commenced employment with the BFD
in an administrative position.

139.   Plaintiff Brown is now, and has been for approximately the last five years, at the current
pay rate of an R-12. ·

140.   For the positions to which she applied, Lois Hart's R-14, Plaintiff Brown applied the first
time that the position was offered interdepartmentally.   Plaintiff was interviewed, along
with Plaintiff Green, but both were informed that the position was going to be reposted
interdepartmentally.   The second time that it was posted, Plaintiff Brown was the only
applicant, and, though qualified, still she did not get the position.   The position was posted

a third time, city wide, to which Plaintiff Brown applied again, interviewed again and once
again was not picked. The third time around, Lois Hart, substantially on the basis of her
political connections.

141.    Plaintiff Brown often was told not to waste her time because they - Defendants Moran and
Defendant Christian, among others in power - already had someone picked for the job
from outside the department, and that she purportedly did not meet the minimum entrance
qualifications according to the job posting.

142.    For each position for which Plaintiff Brown applied, she was well qualified for the
position, more so than the politically affiliated persons who received the jobs.

143.    As a direct and proximate result of the discrimination and other violations of the law
perpetrated by Defendants, Plaintiff Brown has been deprived of approximately $4,000 in
wages and benefits through 2005, and continues to suffer such losses at the rate of
approximately $89.00 per week.

144.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,
Plaintiff Brown has suffered, and will continue to suffer, severe emotional distress in
amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF MARY KANE**

145.    On or about 26 October 1987, Plaintiff Kane commenced employment with the BFD in an
administrative position.

146.    Plaintiff Kane is now, and has been for approximately the last five years, at the current pay
rate of an MM-8.

147.    For the positions to which she applied, Plaintiff Kane often was told not to waste her time
because they - Defendants Moran and Defendant Christian, among others in power -

already had someone picked for the job from outside the department, and that she

purportedly did not meet the minimum entrance qualifications according to the job

posting.

148.    For each position for which Plaintiff Kane applied, she was well qualified for the position,

more so than the politically affiliated persons who received the jobs.

149.    Plaintiff Kane complained orally and submitted written complaints and grievances to her

supervisors and Defendants, including Defendant Kessler, describing and seeking a

correction of the unlawful practices and policies that were being effectuated by the

Defendants.

150.    As a direct and proximate result of the discrimination and other violations of the law

perpetrated by Defendants, Plaintiff Kane has been deprived of approximately $ 78,000.00

in wages and benefits, and continues to suffer such losses at the rate of approximately

$344.00 per week.

151.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,

Plaintiff Kane has suffered, and will continue to suffer, severe emotional distress in

amounts to be proven at trial, but no less than $100,000.00.

**PLAINTIFF JUDITH A. KELLEY**

152.    On or about 6 June 1980, Plaintiff Kelley commenced employment with the BFD as an R-

2 Clerk Typist.

153.    Plaintiff Kelley is now a senior administrative assistant, and has been for approximately the

last thirteen years, at the current pay rate of a MM-5.

154.    Plaintiff Kelley has continued to complain and object to the unlawful treatment as set forth

herein.

35

155.    When Plaintiff went out on Workers Compensation in November 1999, she had the

responsibility of manager of Fire Prevention at MM-5 level.  After she had been out on

year, she discovered that her responsibilities were going to be given to Mary Ann McHugo

at the MM-8 level, and Plaintiff Kelley applied for the position given to Mary Ann

McHugo, but was told that she could only apply if she were able to come back

immediately.

156.    Plaintiff Kelley, and the other Plaintiffs, constantly sought, inquired after, or applied for

step and grade increases for her responsibilities, but was denied in an arbitrary and

capricious manner when other politically affiliated persons received such step and grade

increases undeservedly.

157.    For each position for which Plaintiff Kelley applied, she was well qualified for the position,

more so than the politically affiliated persons who received the jobs.

158.    As a direct and proximate result of the discrimination and other violations of the law

perpetrated by Defendants, Plaintiff Kelley has been deprived of approximately $20,000.00

in wages and benefits, and continues to suffer such losses at the rate of approximately

$60.00 per week.

159.    As a direct and proximate cause of the foregoing actions and omissions of the Defendants,

Plaintiff Kelley has suffered, and will continue to suffer, severe emotional distress in

amounts to be proven at trial, but no less than $100,000.00.


## CLAIMS

### First Cause of Action - Massachusetts Civil Rights Act M.G.L. c. 12, 11H and 11I

160.    Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

161.  Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

162.  Defendants Christian, Fraser, Finn, Hitchcock, Keating, Kessler, Moran, and certain Doe Defendants perpetrated, and continue to perpetrate a scheme of harassment and retaliation against Plaintiffs in order to deny Plaintiffs rights secured to them by the Constitution and laws of the Commonwealth of Massachusetts and of the United States.

163.  Defendants Christian, Fraser, Hitchcock, Kessler, Moran, Finn, Keating and certain Doe Defendants, in their individual capacities, interfered, or attempted to interfere, by threats, intimidation, and/or coercion, with Plaintiffs' exercise of their rights of freedom of speech and association, and to due process of law, *inter alia.*

164.  As a direct and proximate cause of these Defendants' violation of laws as set forth herein, Plaintiffs have suffered, and continue to suffer, adverse and hostile employment actions, and severe emotional distress, in amounts as set forth herein and to be proven at trial.


**Second Cause of Action - Whistleblower Protection Act - Violation of M.G.L. c 149, § 185**

165.  Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

166.  Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

167.  Plaintiffs have suffered retaliation in the form of adverse and hostile terms and conditions of employment  because of Plaintiffs' reports regarding the unlawful political affiliation discrimination and patronage practices being perpetrated by Defendant BFD (Defendants Christian, Fraser, Finn, Keating, Hitchcock, and Moran in their official capacities).

168.  As a direct and proximate result of said violations of public policy, Plaintiffs have suffered,

and will continue to suffer, adverse and hostile employment conditions and severe emotional distress in amounts as set forth herein and to be shown at trial.

## Third Cause of Action - 42 U.S.C. § 1983

169.    Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

170.    Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

171.    This claim for relief is brought against Defendants Moran, Christian, Fraser, Finn, Keating, Kessler, and Hitchcock, and certain of the Doe Defendants, in their individual capacities for monetary damages, against Defendant BFD for monetary damages because of the pattern and practice of such unlawful conduct, and against all Defendants in their official capacities, including the BFD, for declaratory and injunctive relief.

172.    Plaintiffs are informed and believe, and thereupon allege, that the individual Defendants Moran, Christian, Fraser, Finn, Keating, Hitchcock, Kessler, and certain of the Doe Defendants acted and/or purported to act herein under color of statutes, regulations, customs, practices, and/or usages of the Municipality of the City of Boston and the Commonwealth of Massachusetts.

173.    Plaintiffs are informed and believe, and thereupon allege, that by the aforementioned acts and/or omissions of Defendants Moran, Hitchcock, Kessler, and Christian and certain of the Doe Defendants, Plaintiffs have been unlawfully denied their First Amendment Rights to Freedom of Speech and Association, due process of law, and their rights to be free from unlawful discrimination, including discrimination on the basis of political affiliation and patronage, whether created by federal, state, or local law, inter alia, in violation of

38

rights guaranteed to them by the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and the Constitution and laws of the Commonwealth of Massachusetts, including but not limited to M.G.L., c. 12, §§ 11H, 11I, and 11J, Articles I, VI, XI, XII, and Amendment XVI of the Massachusetts Constitution, the Massachusetts Declaration of Rights, M.G.L. c. 127, § 32, M.G.L., c. 149, § 185b; and the City of Boston October 2000 Executive Order, inter alia.

174.    Plaintiffs are informed and believe, and thereupon allege, that Defendants Moran, Christian, Fraser, Finn, Keating, Hitchcock, Kessler, and certain of the Doe Defendants, acted herein knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference for the rights and/or interests and/or well being of Plaintiffs, thereby directly and proximately causing injuries in amounts as set forth herein and to be proven at trial.

### Fourth Cause of Action - NEGLIGENT SUPERVISION

175.    Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

176.    Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all those similarly situated.

177.    This claim for relief is brought against Defendants Christian, Fraser, and Hitchcock in their individual an official capacities, and Defendant BFD.

178.    Plaintiffs are informed and believe, and thereupon allege, that Defendants Christian, Fraser, and the BFD, and certain of the Doe Defendants, and/or their predecessors and successors in their respective employment offices, failed and refused to properly train, supervise, and/or discipline Defendants Moran and Hitchcock, and certain other of the Doe Defendants, including but not limited to the supervisory staff of the BFD, thereby proximately causing the aforementioned injuries to Plaintiffs.

179.  Plaintiffs are informed and believe, and thereupon allege, that Defendants BFD and

Defendants Moran, Christian, Fraser, Kessler, Hitchcock, and certain of the Doe

Defendants acted herein with negligence and/or deliberate indifference to the rights,

interests, and well being of Plaintiffs, thereby directly and proximately causing injuries in

amounts as set forth herein and to be proven at trial.

180.  Plaintiffs have brought to the attention, in writing and otherwise the discriminatory

practices, retaliatory actions, and general negligence of the Defendants as set forth herein,

to their supervisors and the City of Boston, or have been informed, or otherwise have

experienced, that it would be futile to complain about such discriminatory practices.

### Sixth Cause of Action - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

181.  Plaintiffs hereby incorporate all allegations contained in the preceding paragraphs.

182.  This cause of action is brought against Defendant Moran, Christian, Hitchcock, Kessler,

and certain of the Doe Defendants in their individual capacities only.

183.  Plaintiffs recognize that this Sixth Cause of Action for Intentional Infliction of Emotional

Distress was dismissed by order of this court as to Plaintiff Green and include the claim as

for Plaintiff Barry, and all others similarly situated, and merely preserve the issue for

possible appeal by Plaintiff Green, rather than to assert it anew.

184.  Defendants knew or should have known that their conduct would cause severe emotional

distress to Plaintiffs.

185.  Defendants' conduct was and continues to be outrageous and beyond the bounds of

decency.

186.  Plaintiffs are informed and believe, and thereupon allege, that Defendant Moran, Christian,

Hitchcock, Kessler, and certain of the Doe Defendants malevolently wrongfully and

intentionally caused emotional distress upon Plaintiffs.

187.    Plaintiffs are informed and believe, and thereupon allege, that Defendant Moran, Christian,

Hitchcock, Kessler, and certain of the Doe Defendants acted herein knowingly,

intentionally, willfully, and deliberately without regard for Plaintiffs' rights, interests, or

well being, thereby directly and proximately causing injuries in amounts as set forth herein

and to be proven at trial.

### Seventh Cause of Action - NEGLIGENCE

188.    Plaintiffs hereby incorporate all of the allegations contained in the preceding paragraphs.

189.    Plaintiffs bring this cause of action on behalf of themselves individually and on behalf all

those similarly situated.

190.    This cause of action is brought against all Defendants.

191.    Plaintiffs are informed and believe, and thereupon allege, that Defendants acted herein

negligently, including but not limited to Defendants' failure to appropriately train and/or

supervise Defendant Moran and other Fire Department employees in the appropriate

standards of conduct regarding the prohibitions of political affiliation discrimination and

retaliation for exercises of rights to freedom of speech constitutes negligence under state

tort law and M.G.L. c. 258, *inter alia,* thereby proximately and directly causing the

injuries of which Plaintiffs complain.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For a determination that the named Plaintiffs qualify as class representatives for

those persons similarly situated;

(B)    For a Declaration that the actions and/or omissions of Defendants in failing and

refusing to promote and/or upgrade Plaintiffs on the basis of their political affiliation, or lack

thereof, *inter alia,* with the attendant deprivations, as set forth herein violate Plaintiffs' rights

under the First, Fifth, and Fourteenth Amendments to the United States Constitution; Articles 1,

10, 11, 12, and 16 of the Massachusetts Declaration of Rights; 42 U.S.C. §§ 1983; G.L. c. 127, §

32; and state tort law; and for a further Declaration that the actions and/or omissions of

Defendants in retaliating against Plaintiff Green because of her status as a witness to the aforesaid

violations and for her support of Plaintiff Barry's report of violations of law violate Plaintiff

Green's rights under the Fifth and Fourteenth Amendments to the United States Constitution,

Articles 1, 10, 11,12, and 16 of the Massachusetts Declaration of Rights, 42 U.S.C. § 1983;

M.G.L. c. 12, §§ 11H, 11I, and 11J; M.G.L. c. 127, § 32; and state tort law;

      (C)     For and injunction preventing Defendants from interfering with the terms and

conditions of Plaintiff Green's position's responsibilities such that she be relocated at 115

Southampton Road, Boston with all of the facilities necessary for her to fulfill her employment

responsibilities without harassment or intimidation.

      (D)     For general damages in the amount of no less than $2,000.000 against Defendant

Moran, Christian, Kessler, Hitchcock, and certain of the Doe Defendants, in their individual

capacities, according to the proof thereof at trial;

      (E)     For special damages against Defendants Moran, Christian, Finn, Keating, Kessler,

and Hitchcock, and certain of the Doe Defendants, in their individual capacities, according to the

proof thereof at trial, in amount in excess of $600,000.00 for the class representatives and an

additional amount of approximately $40 - 75,000 for each class member, plus medical expenses

for Plaintiff Green, and other Class Members similarly situated;

      (E)     For pre-judgment interest and triple damages pursuant to the Whistleblower

Protection Act, M.G.L., c. 149, § 185.

    (F)    For punitive damages against Defendant BFD, and Defendants Moran, Christian, Kessler, and Hitchcock, and certain of the Doe Defendants, in their individual capacities, in an amount sufficient to deter such practices in the future, which amount is alleged to be $500,000;

    (G)    For reimbursement of Plaintiffs' costs and expenses herein, including reasonable provision for their attorneys' fees and costs pursuant to 42 U.S.C. § 1988, M.G.L. c. 12, § 11H, 11I, and 11J, and the Massachusetts Declaration of Rights, *inter alia*; and

    (H)    For such further and additional relief as the Court deems appropriate and just.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

Respectfully submitted,
Plaintiffs Denise M. Barry and Jane B.Green
By their attorney,


_____ /s/ Thomas F.Feeney _____
Thomas F. Feeney, BBO # 645605
THOMAS F FEENEY, COUNSELLOR AT LAW
39 Sheafe Street, Suite 1
Chestnut Hill, Massachusetts 02467
Tel.: (617) 277-5750
DATED: 8 December 2006    Fax: (617) 277-5751


Certificate of Service
I, Thomas F. Feeney, hereby certify that the foregoing document was served upon counsel for the

named Defendants in this matter on the 8th day of December 2006 by Electronic Filing Notification and U.S. Mail, First Class Postage, Prepaid..

/s/ Thomas F. Feeney

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) <br> ELIZABETH H. GOLDEN; PATRICIA J.) <br> McDONOUGH; ELAINE MESITI; LILA ) <br> BROWN; MARY M. KANE; and        ) <br> JUDITH A. KELLEY, individually and on) <br> behalf of all those similarly situated, ) <br>                                      ) <br>             Plaintiffs,               ) <br>                                      ) <br>                                      ) <br>      vs.                             ) <br>                                      ) <br> ROBERT J. MORAN; RONALD              ) <br> KEATING; PAUL A. CHRISTIAN;          ) <br> RODERICK FRASER, Jr.; WILLIAM        ) <br> KESSLER; WILLIAM HITCHCOCK;          ) <br> CITY OF BOSTON (FIRE                 ) <br> DEPARTMENT), and JOHN and/or         ) <br> JANE DOES 1-50,                      ) <br>                                      ) <br>             Defendants.              ) <br> | CIVIL NO. 05-10528 RCL |

PLAINTIFF PATRICIA J. McDONOUGH ANSWERS TO
DEFENDANTS' INTERROGATORIES TO THE
PLAINTIFF, PATRICIA J. McDONOUGH

Plaintiff Patricia J. McDonough [hereinafter "Plaintiff"] hereby responds to Defendants'

First Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.     Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.     Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.     Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.     Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.     Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.     Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

       Answer:       Patricia Jean McDonough,
                     31 Woodcliff Road
                     Holbrook, Massachusetts  02343-1129

                     D.O.B. 13 September 1953

                     Senior Administrative Assistant (MM6 -- Step 9)
                     Fire Marshal's Office, Fire Prevention Division

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:    Hyde Park High School – Business Course 1968-1971

Computer Courses:
Excel 97 Intro, Excel 97 Intermediate
Word 97 Intermediate

PeopleSoft Training in Spring/Summer of 2000
Leadership 2000 in Fall of 2000

State Department of Mental Health,
Jr. Clerk & Typist, June to September of 1970.

Division of Personnel Administration (Civil Service),
One Ashburton Place
Clerk & Typist from May 24, 1971 to November of 1973
Senior Clerk & Typist from November 1973 to November 5, 1974

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answers:    Senior Clerk & Typist from November 6, 1974 to March 15, 1978
Payroll Office: Answered phones, filed, entered payroll in ledger, assisted
members at counter, distributed checks. Also, filled in as Telephone
Operator on the switchboard.
Personnel Office: Handled all inquiries, did the paperwork and all matters
dealing with Indemnification Forms (injury forms) for all Uniform Fire
Department members. I dealt with doctors, clinics and hospitals in these
matters. Also, filled in as Telephone Operator on the switchboard.

Principal Account Clerk from March 15, 1978 to April 21, 1982
Accounting Office: I handled all inquiries, bids, correspondence,
proposals, forms and paperwork pertaining to all outside vendor contracts
for the Fire Department. Also, filled in as Telephone Operator on the
switchboard.

3

Executive Secretary Office: I processed all forms, letters and inquiries pertaining to members for Status Change, Promotion, also appointment forms for new hires. Also, I filled in as Telephone Operator on the switchboard.

Head Clerk & Secretary from April 21, 1982 to July 4, 1984
Fire Marshal's Office: Secretary to the Fire Marshal and Asst. Fire Marshal. I answered all inquiries on the Fire Prevention Code, handled the Fire Prevention Budget, entered all information for the Fire Marshal and Asst. Fire Marshal into the computer. I performed all secretarial duties pertaining to the Fire Prevention Division. I maintained all blasting, pyrotechnics and fireworks records. I performed any related work as required.

Administrative Secretary from July 4, 1984 to December 17, 1986
Fire Marshal's Office: Secretary to the Fire Marshal and Asst. Fire Marshal. I answered all inquiries on the Fire Prevention Code, handled the Fire Prevention Budget, used the Dictaphone and transcribed onto the computer all letters and drafts from the Fire Marshal. I handled all secretarial duties for the Fire Prevention Division. I maintained all blasting, pyrotechnics and fireworks records. I performed any related work as required.

Administrative Assistant from December 17, 1986 to September 9, 1988
Fire Marshal's Office: Secretary to the Fire Marshal and Asst. Fire Marshal, I answered all inquiries on the Boston Fire Prevention Code, inquiries on fire hazard complaints. I entered all letters, drafts, documents into the computer for Fire Marshal and Asst. Fire Marshal. I handled the Fire Prevention Budget. Maintained all blasting, pyrotechnic and fireworks records. Maintained the records and made appointments for Smoke Detector Certificate inspections on the sale of property under the Smoke Detector Law. Related work as required.

Senior Administrative Assistant from September 9, 1988 to October 4, 1995
Fire Marshal's Office: Secretary to the Fire Marshal and Asst. Fire Marshal, I kept all records for the Needless Alarm Program, coordinated and sat in on monthly hearings for the Needless Alarm Citation Appeals. Coordinated, maintained all records on the newly instituted Sprinkler Retrofit Law (MGL Chapter 148, Section 26). Maintained blasting, pyrotechnic and fireworks records. Related work as required.

Senior Administrative Assistant /Fire from October 4, 1995 – To Present
Fire Marshal's Office: See Attached in Request for Production of Documents – City of Boston Position Description Questionnaire and letter from Joseph M. Fleming, Fire Marshal dated October 14, 1997.

4

Senior Administrative Assistant/Fire
Fire Marshal's Office: Secretary to the Fire Marshal and Asst. Fire
Marshal. I handle all subpoenas, freedom of information requests, and
record searches that are sent to the Keeper of Records. Maintain the
blasting records and related material for the West Roxbury Crushed Stone
blasting operations. I assisted the Fire Commissioner, Chief of
Department, Chiefs of Operation and all other Fire Dept. I assisted
personnel that call looking for information on Fire Prevention issues, laws,
codes, projects etc., that the Fire Prevention Division and the Fire Marshal
oversees. I assisted the Asst. Fire Marshal in all aspects of the new
Sprinkler law that Massachusetts put into effect this year requiring
sprinkler systems in nightclubs, bars etc., with a place of assembly permit
of 100 persons or more. I maintain the morning reports for all the units in
Fire Prevention daily. I do the record keeping of all correspondence in the
Fire Marshal's Office and any related work as required.

4.    For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:    Director of Utilization Review MM-8   In Personnel
I was not interviewed for this position.
I was informed by letter on February 26, 1999 that I did not meet minimum
requirements.
I believe they had someone already in mind who had political patronage,
support, and affiliation, which I did not.

Principal Administrative Assistant MM-8  In Fire Prevention
I was not interviewed for this position.
I was informed by letter on August 23, 2000 that they felt my qualifications
and experience did not match the needs for the position in the Fire
Prevention Division.
A memorandum was sent announcing Mary Ann Creedon (now McHugo)
got the position.
I know they had someone already in mind for the position who had political
patronage, support, and affiliation because I was told this before the
posting for the job opening was even posted.

Principal Administrative Assistant MM-8  In Payroll
I was sent a letter of rejection on June 7, 2001, they did not feel that my
qualifications and experience matched the needs of the position.

5

I was interviewed by Lt. Leo Stapleton, MaryAnn Creedon (McHugo), Andy Warren.
A memorandum was sent announcing that Carol Petta got the position.
I believe that Carol Petta received this position primarily or substantially because of her political patronage, support, and affiliation.

Principal Administrative Assistant MM-8  In Human Resources
I was sent a letter of rejection on June 14, 2001, they did not feel that my qualifications and experience matched the needs of the position.
I was interviewed by Andy Warren only.
A memorandum was sent announcing Mary Kilgallen got the position.
I believe that Mary Kilgallen received this position primarily or substantially because of her political patronage, support, and affiliation.

Senior Administrative Assistant  MM-6  Commissioner's Office
Job posted June 11, 2003
I was interviewed by Robert Moran and Mary Kilgallen
I was never informed of any results after interview.
No one appointed to this as MM-6
All of a sudden the position was posted again on August 5, 2003 as
Principal Administrative Assistant MM-8  Commissioner's Office

Principal Administrative Assistant MM-8  Commissioner's Office
I was never interviewed for this position.
I was not sent any letter of rejection or acceptance.
A memorandum was posted announcing that Mary Kilgallen got the position.
Mary Kilgallen ended up getting the position (for which she had been the interviewer of the applicants when it was posted as an MM-6.).
I believe that Mary Kilgallen received this position primarily or substantially because of her political patronage, support, and affiliation.

Case Manager  MM-8
I was sent a letter of rejection on July 24, 2004, that stated that my background and experience, while impressive, are not matched with this position.
Ian McKenzie obtained this position, even though he was an out of state resident at the time, because of his political affiliation, patronage, and support, and I was at least equally, if not more, qualified for the position.
I believe that I did not receive this position primarily or substantially because of my lack of proper political patronage, support, and affiliation.

5.  Please state each and every fact upon which you rely in Your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:     See the facts as alleged in the Complaint filed herein, the Answer to
            Interrogatory No. 5 specifically, and generally to all interrogatories herein.
            I know that I, and many others, have been victims of Political Affiliation
            Discrimination in regard to promotional advancement within the Boston
            Fire Department.

            I, and many others, was also denied pay upgrades because of the lack of
            political affiliation, patronage, and support. People who have been
            advanced soley because of their political affiliation, patronage, and support
            include Carol Petta, Mary Any McHugo, and Mary Kilgallen..

6.  Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:     See the facts as alleged in the Complaint filed herein, the Answer to
            Interrogatory No. 5 specifically, and generally to all interrogatories herein.
            Other class representatives and potential class members applied also for the
            jobs listed above, and for pay upgrades, and were denied fair consideration
            because of political affiliation discrimination in regards to promotional
            advancement within the Boston Fire Department.

7.  Please set forth in detail the factual basis for any and all claims that you have Filed against

the defendant, Robert J. Moran.

Answer:     See the facts as alleged in the Complaint filed herein, the Answer to
            Interrogatory No. 5 specifically, and generally to all interrogatories herein.
            Since Robert J. Moran has been with the Boston Fire Department, any
            promotional positions that have been applied for by me, he has either not
            interviewed me because he feels, without any good cause, that I lack the
            qualifications and or experience to do the job. Or has interviewed me and
            still states that I lack the qualifications and or experience to do the job.

            Robert Moran's behavior towards my thirty three years of experience in
            numerous positions with the Boston Fire Department has been a character
            and career assassination towards my reputation with the City of Boston and
            Boston Fire Department.

7

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

Answer:    Not applicable to me.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

Answer:    Not applicable to me.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:    Paul A. Christian, was the Appointing Authority during the time frame of
some of the appointments for promotion that are in question for me.  As
such, Robert Moran follows and implements the preferences and policies of
Paul Christian, and thus all of the actions of Robert Moran are taken under
the direct or implicit supervision of Paul A. Christian.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:    Not applicable to me.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against

the City of Boston Fire Department.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.
The Boston Fire Department and several of its members have instituted a
character and career assassination towards me in the way that they have
conducted themselves when it comes to interviewing and appointing people
to promotional positions within the Fire Department.

The Boston Fire Department has no policy on Interviewing.

The Boston Fire Department and representatives of the Fire Department
have appointed people solely or substantially because of their political
affiliation, patronage, or support.

I was told by Andrew Warren, Executive Assistant, that "if you are

unhappy with the way promotions are handled in the Fire Department, you should apply elsewhere".

My direct superiors in the Fire Marshal's Office (Fire Prevention Division) did not sign me up to take Peoplesoft Training classes in the Spring of 2000. Knowing that Fire Prevention was going to change to Peoplesoft by the fall, they sent just about everyone else but me. They knew at that time that the position of Principal Administrative Assistant MM-8 in Fire Prevention that would be posted in the near future would need that qualification and still denied me the chance to attend. The only way I got to go was when I insisted that I be able to attend the classes that Paul Dateo was signed up for and could not attend because of his serious illness. (see Peoplesoft Training Schedule in Response for Reproduction).

13.  Are you aware of other employees of the Boston Fire Department not already named in

the above-captioned matter that you claim or understand to be, in your opinion, subject to

the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:      Yes.

14.  If your answer to the preceding interrogatory Is In 'the affirmative, please Identify (a) the

number of those individuals; and/or (b) identify those individuals by name, residence

address and office within the Boston Fire Department. If you are unable to provide the

name and address of these individuals, please set forth the number of those individuals.

Answer:      Former Employees who were subject to political affiliation discrimination
             Patricia Fiasconaro
             Maria Lopez
             Steve Morash

             Present Employees who were victims of the administrations' political
             affiliation discrimination
             Janice Boyle
             Irene Debbie Burke
             Joanne Callahan
             Linda Collins
             Carol Connors
             Katy Donovan
             Paula Hamilton
             Maria Hernandez
             Katherine MacMillen

9

Angela Marshall
Cathy Moore
Marta Poupart

Majority of B.F.D. civilian employees.

15.    If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:    Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases. Some Plaintiff were retaliated against because of their
vocal opposition to this system. That type of retaliation may have a part of
why id did not receive fair consideration, but my claims are more directly
political discrimination claims.. But the individual circumstances are not
exactly the same.

I was employed by the Division of Civil Service in 1971 then transferred to
the Boston Fire Department in 1974; for many years I advanced my career
through promotions by taking Civil Service promotional exams and placing
very well on test scores. Since approximately 1988, the Boston Fire
Department has not had any Civil Service Promotional Exams for the
civilian employees.

Promotions for me have been non existent since the competitive aspect of
taking Civil Service exams stopped and Political Affiliation took over.
Thirty three years experience in numerous positions and in several
departments within the Boston Fire Department means nothing to the
appointing authorities of the Boston Fire Department.

Since 2000, I have applied for five MM-8 positions in the Boston Fire
Department and have been denied all of them.

I had prior knowledge, of the person selected for the position, before the
position was posted. Also, shortly after she was appointed she was
upgraded to a Step 9 in the grade of MM-8. Step 9 is only automatically
given in a promotional situation to an employee with twenty (20) years or
more of City service. Not employees with only seven (7) years of City
service. The norm is to work your way up to Step 9 by yearly union
contract step raises, each year gaining another Step, until you max out at
Step 9.

16.     How long do you believe you have been denied advancement in the Boston Fire

        Department because, as you assert in Plaintiffs' Complaint, you were of the correct

        political affiliation, including in your answer the date when you first believe you were

        denied advancement due to political affiliation.

        Answer:     As set forth herein, I have been subject to adverse employment decisions
                    such as the denial of pay raises, upgrades, and denials of promotion, solely
                    because of my lack of political affiliation, sponsorship, support, and/or
                    connection to the then current City and BFD administration, I never have
                    alleged that I was of the "correct political
                    affiliation."

17.     Please define "political affiliation" as applied in your particular case and set forth in the

        plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

        "political affiliation".

        Answer:     See Answers to Interrogatories, above.   Political affiliation is the
                    sponsorship from, support from, and/or close affiliation with a member of
                    the then existing administration in power and influence in the City of
                    Boston Administration and Boston Fire Department executive officers,
                    including the group of individuals known as the "Hyde Park Group" and
                    "South Boston Group" who constantly vie for power against any other
                    political group, including other parties (e.g., Republicans and other groups
                    within the Democratic party).

                    Political Affiliation as applied in my particular case is that persons were
                    appointed to positions in the Boston Fire Department because of who they
                    knew, who sponsored them, and who supported them, rather than merit.. I
                    was aware, as well as others were aware, of who was being appointed to a
                    position before the position was posted and interviews conducted.

                    This practice has occurred time and time again, but very blatant since the
                    year 2000.

18.     As set forth in the Plaintiffs' Complaint, to what organization. political group, place or

        person do you believe YOU Must be affiliated in order to advance in the Boston Fire

        Department.

        Answers:    Mayor Thomas M. Menino

                                        11

"The Menino Administration,"
"Hyde Park Group. Including Menino, Dennis DeMazio, Andy Warren, McHugo, Petta
"South Boston Group – including Joe "Do Do" Nee, Hitchcock, Christian.

19. Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answers:  Objection, overbroad, vague and ambiguous, subject to and without waiver
of said objection, Plaintiff responds that political affiliation discrimination is
widespread throughout the agencies controlled by the Menino
administration. This is not part of the claims as set forth in the complaint,
and therefore irrelevant to the Class Certification issues.

20. For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

a. the dates of each request for promotion or transfer;

b. the position desired;

c. the date you received a response to each request; and

d. the reason you received for the denial of the request.

Answer:  See answers to Interrogatory Nos. 3 and 4.

21. Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

Answer:  See answer to Interrogatory No. 14.

I, PATRICIA J. McDONOUGH, HEREBY SWEAR AND AFFIRM UNDER THE
PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO
INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT
INFORMATION AND BELIEF:

_____
Patricia J. McDonough

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

12

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) | CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J.) | |
| McDONOUGH; ELAINE MESITI; LILA ) | |
| BROWN; MARY M. KANE; and ) | |
| JUDITH A. KELLEY, individually and on ) | |
| behalf of all those similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| ROBERT J. MORAN; RONALD ) | |
| KEATING; PAUL A. CHRISTIAN; ) | |
| RODERICK FRASER, Jr.; WILLIAM ) | |
| KESSLER; WILLIAM HITCHCOCK; ) | |
| CITY OF BOSTON (FIRE ) | |
| DEPARTMENT), and JOHN and/or ) | |
| JANE DOES 1-50, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFF JANE B. GREEN'S ANSWERS TO DEFENDANTS' INTERROGATORIES
TO THE PLAINTIFF, JANE B. GREEN**

Plaintiff Jane B. Green [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope, and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests seek information which is protected by the attorney/client privilege,

constitutes attorney work product, constitutes material prepared in anticipation of litigation or for

trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for

Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and

requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and

33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for

Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of

information protected by the attorney/client privilege, the attorney work product doctrine,

material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent

said Requests seek information beyond a relevant time period. Notwithstanding said objections,

Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all

responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment

        position with the Boston Fire Department.

        Answer:      Jane Bernadette Green
                     181 Belmont Street
                     Everett, Massachusetts 02149

                     Date of birth: 11 December 1944

                     Position: Senior Administrative Assistant, Fire Prevention Division- MM-5,
                     Step 9

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

   Answer:    Objection, overbroad. Subject to and without waiver of said objection,

Defendant answers as follows:

1984 - G.E.D. - Condon School
1997 (approximately) - Computer class - Northeastern University
2000 - April - Access 97, Computer Software Use class - Fire Dept. offer
2000 - Excel 97 - Intermediate - Computer Software Use Class - Fire Dept.
offer
2000 - Peoplesoft - Computer Software Use Class - Fire Dept. offer
2001 - May - Leadership 2000 - City of Boston offer

Boston Fire Department
1964, 18 March - 11/01/65 - Civil Service - Statistical Machine Operator
(key punch)
1984, 25 July - Principal Clerk - R-8
1986, 28 February - Senior Cashier - R-10
1987, 29 July - Head Clerk - R-11
1994 - 25 November - Head Clerk - R-12
1995 - 26 April - Adminstrative Secretary - R-14 (Temporary)
1996 - 10 July - Administrative Assistant - R-15
1997 - 22 January - Administrative Assistant - MM-4 (acting out of grade)
1997 - 19 March - Senior Administrative Assistant - MM-5
Supervisor of Special Hazards and Permit Department;
Supervising 6 people doing permits. Processed public's applications for
permits to store flammable materials. Processed and maintained all licenses
and permits for the storage, transportation, and use of flammable materials.
Knowledge of Title 527, C.M.R. and Fire Prevention Code. Act as liaison
on Fire Reports to assist public, and coordinate with outside assistance
agencies (e.g., Red Cross and Salvation Army. Research property history
for Realtors upon application.

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

   Answer:    See Answer to Interrogatory No. 2.

4.    For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:    There were approximately three position for which I applied after 1997,
but I do not recall at this time what they were. There were a number of
positions subsequent for which I was discouraged from applying because I
already knew which political appointee was slated to receive the position.

5.    Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:    In addition to the facts as set forth in the Complaint, consider that the
Mayor issued Executive Order 2000 prohibiting political affiliation
discrimination for city jobs. For each of the positions to which I applied
after 1997, I was not chosen because I was not politically affiliated or
otherwise in support of the then current City and Boston Fire Department
administrations, in addition to the positions for which I was discouraged
from applying because of the known political appointment process. As set
forth in more detail in the Complaint and herein, I was retaliated against for
my opposition to the practice and policy of political affiliation
discrimination.

6.  ,    Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:    I also was the object of retaliation by the Defendants for opposition to the
political affiliation discrimination that was occurring in the BFD. There are
others who are currently class representatives who have also been
retaliated against because of their opposition to the discriminatory way that
people are treated at Boston Fire Department.

7.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

Answer:    In general, Robert Moran effectuated the political agenda of the policy
makers with in the current City of Boston Fire Department administration.

I believe that Bob Moran is retaliating against me because I was a witness to statements that Bob Moran made to Denise Barry in her formal written complaint against Bob Moran.

October 9, 2003
9:30am, I and Denise Barry went to Bob Moran's office and asked if we could have a meeting to discuss Denise's chances of receiving the position in which she was acting temporarily, when it is posted. Moran told Denise Barry that "there are no guarantees". Moran was asked about Mary Anne McHugo refusing to train Barry for the position and denied knowing anything about what took place at the Fire Marshall's Office with Chief Laizza. Denise said to Bob "are you calling Chief Laizza a liar?" and "Do we have to call him and verify what took place?"

Moran completely ignored Barry and changed the subject. Moran said "I don't know if I mentioned this to you but, we have nothing but problems in the Indemnification Office". So people from City Hall are coming to revamp the entire office. Barry said, "are you saying you want me to do all of this work, get you up to date and then someone from City Hall is going to replace me?" "Yes ," he said. Barry said, that's not fair, we have no chance for promotions or advancements here. Moran said, "well if you're not into politics little girl then you are not into a position here." I stood up and said, "I can't believe you are saying this to her, not to mention in front of me." I said also, "Is that so Bob?" Moran said, "that's the way it is around here, yes." Barry said, "so I am going to be punished because I am not into politics." Moran shrugged his shoulders and said "that's politics for you." Then Moran said, "listen kiddo, there are other job opportunities out there you know". With that remark I and Barry walked out of his office.

September 7, 2004
Chief Laizza called Denise Barry and told her that he thinks Bob Moran is retaliating against her already. Barry asked, "what are you talking about?" He said, "Bob just called over here and asked all kinds of questions about Jane Green and Carol Connors' positions." Barry said, "well Bob did tell Chief Hitchcock that he thinks Jane Green is a bad influence on me and that he thinks she influences me with some decisions that I have made around here." Denise Barry came to tell me about this conversation she had just had with Chief Laizza. I said, "how ironic that was just Chief Burke (per order of the Commissioner he said) on the phone asking me all kinds of questions regarding my position." They want to have a meeting regarding our positions.

December 21, 2004
Chief Laizza came into the Training Division's back door at around 9:00 as always. He came over to my desk and apologized to me for what was going on and said, "I don't want to be in the middle of this Jane". I said, "I understand Peter".

Peter Laizza went into the Commissioner's office, the Commissioner, Chief
Hitchcock, and Bob Moran were all sitting there. They asked Peter if he
told Jane to report to 1010 Mass. Ave., he said, "Yes, I did." Chief Laizza
stated "to all of them that not only does Jane's Union want it in writing, but
her lawyer too, before she moves." Peter said, "that he let them know that
this is pure retaliation and he will not be a part of it." Peter said "the
Commissioner said, "I want Jane Green out of this building, no ifs, and, or
buts about it". Peter said he stated to all of them that he was not putting it
in writing and if they want her moved that they should write it themselves".
Peter said he stated that this looks like retaliation to me. The
Commissioner responded "you're not a fucking lawyer". Peter said he told
the Commissioner "I didn't say that I was a fucking lawyer, I am just telling
you that I know the laws from working in Personnel, and retaliation is
serious".

Peter said that he mentioned when subpoenas go out that he is not going
under the bus." He said the Commissioner said, "what are you talking
about?" Peter said that he stated, "you're doing this because Denise has a
case against Bob and Jane is one of her witnesses". He said, the
Commissioner said, "what case are you talking about?" Peter said
"Denise's case!" He said the Commissioner looked around at Chief
Hitchcock and Bob Moran and they both stated that they didn't know
anything about a case". Peter said, Denise I know that they know and they
are playing dumb, but I just wanted to get out of there." Peter said "on his
way out of the Commissioner's office Bob Moran said "hey Peter what do
you think?" This is the start of getting rid of Jane Green". Peter said that
he was appalled that Bob would make a statement like that.

### December 23, 2004

At around 12:30, Chief Laizza was sitting in Bob Moran's office. At
around 1:00 Bob Moran came into the office and was looking for me.
When I came back to my desk Bob Moran was waiting for me at my desk
with a piece of paper in his hand. When I got there, Bob handed me the
paper and said "your official transfer paper." Then he walked out the
office.

Peter said, when he got to Bob's office Chief Finn and Bob Moran assured
him that the law department helped them construct and write the letter.
Peter said, when he read it he felt better because it was not derogatory.
Peter said "If I get called as a witness I am going to make sure to state that
I was ordered by Chief Finn and the Commissioner to sign the paper.

Moran and Finn, along with the labor relations law department (Kessler)
assisted in drafting the Transfer papers that forced me out of the
Southhampton office which contains all of the records that I need, as well
as the computer files that are vital to the efficient operation of my job.

When I was moved, I was told that the equipment and files that I would need to do my job, would be moved too. This has never has happened, and I believe that it never will happen. For over two months I was practically unreachable because my old telephone number had been disconnected, without it being re-established at my new location.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

    Answer:    No claims of direct discrimination

9.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

    Answer:    See Answer to Interrogatory No. 7. By way of emphasis, is was Finn who compelled Peter Laizza to sign the transfer paper for my move.

10.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

    Answer:    Paul A. Christian implements and perpetuates a policy of political affiliation discrimination, including having knowledge of and otherwise acquiescing in all of the activities set forth in these answers. By way of emphasis, Paul Christian ordered me out of the building immediately because of my support of Denise Barry and because of my opposition to Christian's policies and practices of political affiliation discrimination.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

    Answer:    See Answer to Interrogatory No. 7. Once Kessler was informed of my support of the claims of Denise Barry, his department was instrumental in getting me transferred unlawfully with the intent to harass and cause me stress.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

    Answer:    See Answers to Interrogatories Nos. 7, 9, 10, and 11. As additional facts, Carol Petta is politically affiliated with, supported by, and otherwise sponsored by Mayor Menino, through her association with both the Mayor and his wife, Angela. For example, Carol Petta is the only person who is entitled to almost $20,000.00 per year in overtime pay (gets 15 minutes

overtime in the morning to do part of Mary Kilgallen's job (because Kilgallen is incapable of doing it), and then is allowed to stay late at night on a regular basis to get overtime (in the same amount as her regular check) for her regular job, that was done without overtime prior to her taking the position). Other employees would prefer to work overtime, but are denied.

13.   Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:   Yes.

14.   If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

Answer:   Former Employees who were subject to political affiliation discrimination
Jessica Ahearn
Rosemarie Clinton
Karen Denver
Mary Doherty
Jane Hickey
Marie Howard
Kathryn Kempton
Stephanie Long
Maria Lopez
Sheila Mancuso
Claire Miller
Robert Molloy
Steve Morash
Patricia Mulkern
Desiree Russo
Barbara Ryan
Gwendolyn Sheppard

Present Employees who remain whe were victims of the administrations' political affiliation discrimination
JoAnne (Donovan) Allain
Janice Boyle0
Crystal Bradeen
Irene Debbie Burke

> Joanne Callahan
> Linda Collins
> Linda Cleary
> Carol Connors
> Katy Donovan
> Patricia Fiasconaro
> Karen Green
> Coretta Henry-Gardiner
> Paula Hamilton
> Maria Hernandez
> Maria Lopez
> Katherine MacMillen
> Angela Marshall
> Cathy Moore
> Marta Poupart
> Barbara Powers
> Luz Rivera
> Jennifer Ryan
>
> Majority of B.F.D. civilian employees

15.     If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

> Answer:     All class members have had adverse employment decisions as a result of
> direct political affiliation discrimination. My claims arise mostly as a result
> of retaliation for my support of persons who suffered from such
> discrimination. I am informed and believe that not all of the class members
> have suffered retaliation as I have.

16.     How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

> Answer:     I have not asserted that I am of the "correct political affiliation."

17.     Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above. Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Botson Group" who constantly vie for power against the Republicans, and within the Democratic party.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

Answer:    The "Hyde Park Group" including Mayor Menino, Dennis DeMazio, Carol Petta, Andy Warren, and Mary Ann McHugo, and the "South Boston Group", including Mayor Menino, Joe "Do Do" Nee and Paul Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver of said objection, Plaintiff responds that political affiliation discrimination is widespread throughout the agencies controlled by the Menino administration. This is not part of the claims as set forth in the complaint, and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

     a. the dates of each request for promotion or transfer;

     b. the position desired;

     c. the date you received a response to each request; and

     d. the reason you received for the denial of the request.

Answer:    I cannot recall at this time, which positions I applied to after 1997.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

      Answer:     See Answer to Interrogatory No. 14.

     I, JANE GREEN, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

                                      Jane Green

AS TO OBJECTIONS:

Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) ELIZABETH H. GOLDEN; PATRICIA J.) McDONOUGH; ELAINE MESITI; LILA ) BROWN; and MARY M. KANE; and JUDITH A. KELLEY, individually and on ) behalf of all those similarly situated, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>ROBERT J. MORAN; RONALD ) KEATING; PAUL A. CHRISTIAN; ) RODERICK FRASER, Jr.; WILLIAM ) KESSLER; WILLIAM HITCHCOCK; ) CITY OF BOSTON (FIRE ) DEPARTMENT), and JOHN and/or ) JANE DOES 1-50, )<br><br>Defendants. ) | CIVIL NO. 05-10528 RCL |

## PLAINTIFF ELIZABETH H GOLDEN'S ANSWERS TO DEFENDANTS' INTERROGATORIES TO THE PLAINTIFF, ELIZABETH H. GOLDEN

Plaintiff Elizabeth H. Golden [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

## GENERAL OBJECTIONS

1.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.    Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.    Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.    Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.    Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

> Answer:    Elizabeth H. Golden
> 74 Tremont Street
> Charlestown, Massachusetts 02129
>
> Date of Birth: 15 November 1950
>
> Position: Senior Administrative Assistant (Fire) MM6

2

2.   Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:      See Appendix A.

3.   Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:      See Appendices B and C.

4.   For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:      Lineman (multiple)
             Cablesplicer (multiple)
             Lineman/Cablesplicer (multiple)
             Radio Repairman (multiple)
             Batteryman/Battery Operator (multiple)
             Principal Administrative Assistant MM8 (multiple)
             Case Manager
             Leather and Canvas Worker
             Electrical Equipment Repairman
             Each clerical or administrative position which I have held were also applied
             for on multiple occasions.  See Appendix D for additional information.

5.   Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:      See the facts as alleged in the Complaint filed herein, the Answer to
             Interrogatory No. 5 specifically, and generally to all interrogatories herein.

3

I know that I, and many others, have been victims of Political Affiliation Discrimination in regard to promotional advancement within the Boston Fire Department.

I, and many others, was also denied pay upgrades because of the lack of political affiliation, patronage, and support. People who have been advanced solely because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, and Mary Kilgallen.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and were denied fair consideration because of political affiliation discrimination in regards to promotional advancement within the Boston Fire Department. Also, as a result ot inserting political appointments at the highest levels, all persons below who would have had a chance to move up into a position vacated by a person who obtained the higher position were denied the opportunity to move up.

All job vacancies and newly created positions have not been filled following any established procedures or policies within the Boston Fire Department.

7.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

Answer:    See Appendices C, D, E, F, H, and I.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

Answer:    Not applicable to me.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

Answer:    See Appendix E.

4

10.   Please set forth in detail the factual basis for any and all claims that you have filed against

      the defendant, Paul A. Christian.

      Answer:      See Appendices C, D, E, H, and I.

11.   Please set forth in detail the factual basis for any and all claims that you have filed against

      the defendant, William Kessler.

      Answer:      See Appendices E, F, H, and I.

12.   Please set forth in detail the factual basis for any and all claims that you have filed against

      the City of Boston Fire Department.

      Answer:      See the facts as alleged in the Complaint filed herein, the Answer to
                   Interrogatory No. 5 specifically, and generally to all interrogatories herein.
                   See also Appendices A through K, attached hereto.

                   The Boston Fire Department and representatives of the Fire Department
                   have appointed people solely or substantially because of their political
                   affiliation, patronage, or support.

13.   Are you aware of other employees of the Boston Fire Department not already named in

      the above-captioned matter that you claim or understand to be, in your opinion, subject to

      the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

      Answer:      Yes.

14.   If you answer to the preceding interrogatory is in the affirmative, please identify (a) the

      number of those individuals; and/or (b) identify those individuals by name, residence

      address and office within the Boston Fire Department. If you are unable to provide the

      name and address of these individuals, please set forth the number of those individuals.

      Answer:      Former Employees who were subject to political affiliation discrimination
                   Jessica Ahearn
                   Herbert Ceruvales
                   Linda Cleary
                   Rosemarie Clinton
                   Karen Denver

5

Mary Doherty
Jane Hickey
Marie Howard
Stephanie Long
Maria Lopez
Robert Molloy
Steve Morash
Jeanne Pijanowske
Desiree Russo
Gwendolyn Sheppard

Present Employees who remain whe were victims of the administrations'
political affiliation discrimination
Janice Boyle0
Irene Debbie Burke
Joanne Callahan
William Chisolm
Carol Connors
Katy Donovan
Denise Evers
Patricia Fiasconaro
Sharon Green
Paula Hamilton
Maureen Hartnett
Maria Hernandez
Katherine MacMillen
Cathy Moore
Michael O'Reilly
Marta Poupart
Luz Rivera
Jennifer Ryan
Linda Short
Mary Ann Quilty

Majority of B.F.D. civilian employees because of non-advancement

15. If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer: Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,

and step increases. Some Plaintiff were retaliated against because of their vocal opposition to this system. That type of retaliation may have a part of why I did not receive fair consideration, but my claims are more directly political discrimination claims. But the individual circumstances are not exactly the same.

16.  How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions such as the denial of pay raises, upgrades, and denials of promotion, solely because of my lack of political affiliation, sponsorship, support, and/or connection to the then current City and BFD administration, I never have alleged that I have suffered because I was of the "correct political affiliation."

17.  Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above. Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly vie for power against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

Political Affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit.. I was aware, as well as others were aware, of who was being appointed to a position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the year 2000.

18.  As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

7

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

    Answer:        Former Mayor Raymond Flynn
                    Mayor Thomas M. Menino
                    "The Menino Administration,"
                    "Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
                    "South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

    Answer:        Objection, overbroad, vague and ambiguous, subject to and without waiver
                    of said objection, Plaintiff responds that political affiliation discrimination is
                    widespread throughout the agencies controlled by the Menino
                    administration. This is not part of the claims as set forth in the complaint,
                    and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

          a. the dates of each request for promotion or transfer;

          b. the position desired;

          c. the date you received a response to each request; and

          d. the reason you received for the denial of the request.

    Answer:        See Answer to Interrogatory Nos. 3 and 4.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

    Answer:        See Answer to Interrogatory No. 14. The addresses of the individuals

identified are more readily available to the Defendants than the Plaintiff.

8

I, ELIZABETH H. GOLDEN, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

_____/s/_____

Elizabeth H. Golden

AS TO OBJECTIONS:

_____

Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

9

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) <br> ELIZABETH H. GOLDEN; PATRICIA J.) <br> McDONOUGH; ELAINE MESITI; LILA ) <br> BROWN; MARY M. KANE; and        ) <br> JUDITH A. KELLEY, individually and on ) <br> behalf of all those similarly situated, ) <br> ) <br>           Plaintiffs,        ) <br> ) <br>    vs.        ) <br> ) <br> ROBERT J. MORAN; RONALD        ) <br> KEATING; PAUL A. CHRISTIAN;        ) <br> RODERICK FRASER, Jr.; WILLIAM        ) <br> KESSLER; WILLIAM HITCHCOCK;        ) <br> CITY OF BOSTON (FIRE        ) <br> DEPARTMENT), and JOHN and/or        ) <br> JANE DOES 1-50,        ) <br> ) <br>           Defendants.        ) <br>           ) | CIVIL NO. 05-10528 RCL |

## PLAINTIFF LILA BROWN'S ANSWERS TO
## DEFENDANTS' INTERROGATORIES TO THE
## PLAINTIFF, LILA BROWN

Plaintiff Lila Brown [hereinafter "Plaintiff"] hereby responds to Defendants' First Request

for Answers to Interrogatories as follows:

## GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

          Answer:     Lila Brown
                      99 Lawrence Avenue, Apt. 2
                      Dorchester, Massachusetts 02121

Date of Birth: 7/31/72

Position: Administrative Assistant - R-15

2.   Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:

Dorchester High School  - 1991

Quincy Junior College - Associates Degree in Progress

B.F.D.

November 1997 - Principal Clerk in Medical Office - R-9

Manage entire medical office, including scheduling of appointments, paying
bills, preparing and sending reports out each day on each firefighter who
came in.  While I was in the medical office for five years, I repeatedly asked
to be upgraded because the job entailed more than entry level
responsibilities, but was told that it could not be done.  I discovered that
the secretary hired to replace me wanted an upgrade, and when they
eventually told her she could not have it (after telling her that it could
happen), she quit.  The second secretary was given the upgrade supposedly
because she had a child and needed more money.  At the time I was in the
medical office, I was a single mother with three children.  I believe that she
has political patronage that I do not.

June 2002 - Transferred to Fire Prevention - Head Clerk - R-12

Counter work, Sprinkler applications and fire alarm application processing;
work with engineers on applications; prepared Certificate of Occupancies
upon orders of Mary Ann McHugo until I discovered that that should not
have been part of the job.  BFD hired summer help to do COs after it was
discovered that it should not have been part of job; even then, McHugo
tried to order me to train the summer help.  I also asked McHugo if I could
have the CO job, to which she replied that position was not being filled,
except by floating staff.  However, after the summer help left, they
transferred Desiree Russo from the medial office for the position, who quit
because of the stress of the way that she was treated.
When Angela Marshall went out for three months, McHugo ordered

Brown to do Marshall's job without being paid extra in violation of rules. Joseph Finn and Barbara Ryan, after complaining to Dr. Hamrock about the disrespectful behavior of Barbara Ryan towards me. For example, Barbara Ryan would say that if I took a coffee break that I could not take my 15 minute wash-up time at the end of the day to leave early. When I called Pat Mulkearn in the Commisioner's office, I was told that every employee was allowed that time, regardless of coffee breaks. The Doctor told me that he had noted her inappropriate behavior, but explained that perhaps she was going through a difficult time, but may improve once she returned from vacation. Dr. Hamrock suggested that I report Ryan's behavior to Bob Moran. I thus set up a meeting with Bob Moran to include Dr. Hamrock, Ryan, and myself for 30 May 2002. On that day, Ryan, Moran, and Dr. Hamrock met by themselves for aboug 30 minutes without me. Then they came out of the meeting and told me that they thought I was not going to be in that day. Then my union steward (Cathy Moore) arrived for a meeting that included Moran, Mary Kilgallen (Moran's secretary), and myself. At that meeting, Moran told me that I was being transferred because my work record was "shot;" which it was not, because my record was completely absent of any complaints about my work. Whereupon Shop Steward Moore informed Moran that because of the pending complaint, I could not be transferred. Moran said that he did not care and was going to transfer me anyway. Mary Kilgallen said that I probably would be happier in Fire Prevention. I grieved that decision, but was still made to go on 27 June 2002, and the grievance was denied. I went to talk to Joe Finn, who was in charge of Personnel at that time, and he said that my transfer was in the best interest of the department. On 12 June 2002, when I received by transfer notice, I asked Moran if he would put that I am being ordered transferred against my will. Moran said to get an attorney and have my attorney to tell him to put it in writing.

November 2006 - Administrative Assistant - R-15

Prepare Welding, Dumpster, Asbestos, Construction Permits. Job Description includes acting supervisor if my supervisor is absent, but when my supervisor is absent, I never have received such respect.

3.    Please set forth your employment history within the Boston Fire Department, if any, including in your answer each position held, the dates for which you held the position, and a description of the responsibilities of the position and each position for which you applied.

Answer:    See answer to Interrogatory No. 2, above.

4.    For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:

> 1999 - Applied for a R-14 Administrative Secretary position. I received an
> interview. Cathy Moore received the position because she was more qualified
> than me.
> 2000 - Applied for position in Payroll, received an interview. When I went to the
> interview at the appointed time, I was told by Bob Moran and Carol Petta to come
> back a few minutes later because they were not ready for me. I returned about 10
> minutes later and had the interview. I was informed afterwards by Bob Moran
> orally that I did get the position because I had shown up late for the interview. I
> did not receive the position because I had not political connections. Luz Rivera
> received the position.
> 2000 - Applied for a R-14 position in the Chemist's office. I received an interview
> with Bob Moran, Janice Boyle, and Joseph Murphy, but the position was given to
> someone else. Joseph Murphy informed me that my supervisor at the time,
> Barbara Ryan, was unwilling to fill out a performance review sheet. Barbara Ryan
> is politically affiliated with Joseph Finn.
> 11 December 2001 - Applied for an O-1 position in the Accounting Department. I
> did not receive an interview because Rosilind Coppin said that I needed Peoplesoft
> skills. They gave the position ti Tans "Doe" and Ilene Stilley, who was from the
> outside who did not have PeopleSoft skills. Tans was fired because it was
> discovered that she had a criminal record from her work at the Registry.
> 2002 - When Tans' position came open in about 2002, I applied again, but did not
> obtain an interview and did not hear anything about my application.
> 27 August 2003 - Applied for an Administrative Assistant - R-15. I received an
> interview with Bob Morn and Mary Kilgallen. Jennifer Ryan received the position
> because she had political patronage. Recently, about three months ago 2007, the
> BFD created for Jennifer Ryan an MM-5 position. When the MM-5 position was
> posted, everyone knew that the position was reserved for Jennifer Ryan.
> 2003 - Applied for a position Human Resources. I received an interview, but was
> not given the position because Erica Boylan, an outsider with connections to Do
> Do Nee, was put in the position.
> 2004 - I applied a Detail position in Fire Prevention. The position was posted for
> the usual week's time. The first time that I applied, I was the only applicant, but I
> then was told that it had to be reposted because there supposedly was not enough
> time for everyone to see the posting.
>
> The job was reposted, and I was told by Mary Ann McHugo that I did not

need to re-apply because they still had my application. Upon the second posting, I was still the only one who had applied. Instead of giving me the job or informing me that I would not get the job, they reposted it a third time, this time city wide.

For the third posting, I was given an interview with Mary Ann McHugo and Bob Moran. At the interview, McHugo said to me that she did not know why I wanted the job. After explaining that the job would help me, and that I was qualified for the job. At that point, they hired Lois Hart, someone with political patronage that I did not have. Lois Hart, who sits right in front of McHugo, is allowed to leave whenever she wants, without reprimand. After the first time in three years that Hart was told that she could not leave early (because of short staffing) Hart complained to McHugo that if I was allowed to go during work to my doctor's appointment because I am pregnant, then she should be allowed to leave to go to the gym 3 times a week. Instead of McHugo tilling Hart to mind her own business, she continues to allow Hart to monitor what I do on my job. 2005 - Applied for a R-14 Administrative Secretary position. I received an interview with Bob Morn and Mary Ann McHugo. Although I knew the job better, they gave it to a more senior person, without regard to political patronage.

5.    Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatories Nos. 2 and 4 specifically, and generally to all interrogatories herein. I know that I, and many others, have been victims of Political Affiliation Discrimination in regard to pay upgrades and promotional advancement within the Boston Fire Department.

I, and many others, also was denied pay upgrades because of the lack of political affiliation, patronage, and support. People who have been advanced solely because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, Erica Boylan, and Mary Kilgallen.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatories Nos. 2, 4, and 5 specifically, and generally to all interrogatories herein. Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and

were denied fair consideration because of political affiliation discrimination in regards to pay upgrades and promotional advancement within the Boston Fire Department.

7.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Robert J. Moran.

Answer: See Answers Interrogatories Nos. 2, 4, and 5.

8.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

Answer: Not applicable.

9.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

Answer: Joseph Finn helped to push my transfer through because I was out favor with those persons with political patronage, including Bob Moran and Barbara Ryan.

10.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

Answer: Paul Christian supported and acquiesced in my transfer, and told me he did not want to hear about it.

11.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

Answer: In 2001, I complained to the office in which Bill Kessler worked about the hostile environment in the medical office, thinking that I would get fairer treatment in City Hall. Bill Kessler along with someone else, took down my complaint, and did nothing. The next year I was transferred. I believe that Bill Kessler supported the poeple with the authority in the Fire Department against those who were not politically connected.

12.  Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

Answer:   See the facts as alleged in the Complaint filed herein, the Answer to Interrogatories Nos. 2, 4, and 5 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

The Boston Fire Department has no policy on Interviewing considering that we almost always know who the position is going to before interviewing

The Boston Fire Department and representatives of the Fire Department have appointed people or given pay upgrades and other benefits solely or substantially because of their political affiliation, patronage, or support.

13.   Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:   Yes.

14.   If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

Answer:   Former Employees who were subject to political affiliation discrimination
Jessica Ahearn
Rosemarie Clinton
Patricia Fiasconaro
Jane Hickey
Stephanie Long
Maria Lopez
Robert Molloy
Desiree Russo

Present Employees who were victims of the administrations' political affiliation discrimination
Linda Collins

Carol Connors
Katy Donovan
Sharon Green
Maria Hernandez
Angela Marshall

Majority of B.F.D. civilian employees

15.    If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:    Each of Plaintiffs' claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases. Some Plaintiffs were retaliated against because of their
vocal opposition to this system, I am one of those also. That type of
retaliation is a part of why I did not receive fair consideration.

16.    How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered  because I was of the "correct political
affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above. Political affiliation is the
sponsorship from, support from, and/or close affiliation with a member of

the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly go against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

Political Affiliation as applied in my particular case is that persons were appointed to positions in the Boston Fire Department because of who they knew, who sponsored them, and who supported them, rather than merit. I also was transferred solely because I lacked political patronage. I was denied positions solely because of my lack of political connections. I was aware, as well as others were aware, of who was being appointed to a position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the year 2000.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

Answer:    Mayor Thomas M. Menino
"The Menino Administration,"
"Hyde Park Group". Including Menino, Andy Warren, McHugo, Petta
"South Boston Group" - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver

of said objection, Plaintiff responds that political affiliation discrimination is

widespread throughout the agencies controlled by the Menino

administration. This is not part of the claims as set forth in the complaint,

and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

      a. the dates of each request for promotion or transfer;

      b. the position desired;

      c. the date you received a response to each request; and

      d. the reason you received for the denial of the request.

    Answer:    See Answer to Interrogatory Nos. 2, 3, and 4.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

    Answer:    See Answer to Interrogatory No. 14.

    I, LILA BROWN, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

_____
Lila Brown

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; )<br>ELIZABETH H. GOLDEN; PATRICIA J.)<br>McDONOUGH; ELAINE MESITI; LILA )<br>BROWN; MARY M. KANE; and )<br>JUDITH A. KELLEY, individually and on )<br>behalf of all those similarly situated, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>ROBERT J. MORAN; RONALD )<br>KEATING; PAUL A. CHRISTIAN; )<br>RODERICK FRASER, Jr.; WILLIAM )<br>KESSLER; WILLIAM HITCHCOCK; )<br>CITY OF BOSTON (FIRE )<br>DEPARTMENT), and JOHN and/or )<br>JANE DOES 1-50, )<br>)<br>Defendants. )<br>) | CIVIL NO. 05-10528 RCL |

**PLAINTIFF DENISE M. BARRY'S ANSWERS TO
DEFENDANTS' INTERROGATORIES TO THE
PLAINTIFF, DENISE M. BARRY**

Plaintiff Denise M. Barry [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court

that these Interrogatories be limited to Class Certification issues.

2.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests seek information which is protected by the attorney/client privilege,

constitutes attorney work product, constitutes material prepared in anticipation of litigation or for

trial, or is otherwise immune from discovery.

3.    Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for

Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and

requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and

33.

4.    Plaintiff objects to Defendants' Definitions and Instructions contained in Request for

Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of

information protected by the attorney/client privilege, the attorney work product doctrine,

material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.    Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent

said Requests seek information beyond a relevant time period. Notwithstanding said objections,

Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all

responses to the following requests if and when he receives any additional documentation.

1.    Please state your full name, residence address, date of birth, and current employment

position with the Boston Fire Department.

    Answer:    Denise Marie Barry
               4 Essex Street
               Charlestown, MA 02129

               Date of Birth: April 3, 1973

               Position: Head Clerk R12, Step 9

2

2.     Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:     Objection, overbroad. Subject to and without waiver of said objection,

Defendant answers as follows:

| | |
|---|---|
| St. Catherine's of Siena School<br>9 Vine Street<br>Charlestown, MA 02129 | 1979-1987 |
| Matignon High School<br>One Matignon Road<br>Cambridge, MA | 1991 |
| Harborside Business Skills Training Program<br>Harborside Drive, Logan Airport<br>East Boston, MA | 1996 |
| Bunker Hill Community College<br>250 Rutherford Avenue<br>Charlestown, MA 02129 | 2005 |
| Quincy College<br>34 Coddington Street<br>Quincy, MA | 2005 |

Boston Fire Department Headquarters, Boston, MA     **Sept. 2003 to Oct. 2003**

CASE MANAGER/UTILIZATION REVIEW ACTING MM-5:

I assured that medical providers including primary care physicians, hospitals and specialists are providing high quality care to members. I conferred with department physicians and nurses to determine potential lengths of absence of members. I developed treatment pathway for injuries to insure that care is reasonable, necessary, and related to the injury. I also conducted a weekly meeting with staff, submitted monthly reports detailing indemnification costs and advising trends of injury, downloaded and submitted pay runs to City hall to insure payment in a timely manner, and mailed, signed non-order workers compensation expenditures piles, to auditing and budget located at City hall for review.

Boston Fire Department Headquarters, Boston, MA      **August, 1996 to present**
<u>HEAD CLERK:</u>
I assist the Deputy Fire Chief, District Fire Chief and Fire Captain with all incoming and
outgoing business correspondence. I communicate with outside federal, state, and city
agencies on a daily basis. I am responsible for all general office duties, faxing,
switchboard, xeroxing, etc. I am responsible for submitting requisitions to purchasing for
items requested by the Training Division. I am responsible for transcribing scheduled
monthly meetings into report form, designing spreadsheets ranging from special
equipment, fiscal budget, FFOP reports, etc., and I maintaining and updating Training
Division Annual Fiscal Year Budget. I presently hold certificates in Advanced MS Word
(7.0), Excel (7.0), Access (7.0), and Intro. PowerPoint (7.0).

Warren Tavern/Tavern on the Water, Charlestown, MA      **May 1998 to June 1999**
<u>WAITRESS/HOSTESS</u>
I assisted customers, greeted and seat customers, handled cash and credit card
transactions, and was responsible for maintaining a clean work environment.

Fleet Bank, Malden, MA      **Feb. 1993 to March 1994**
<u>COMPLIANCE CLERK</u>
I was responsible for activating all new incoming accounts, reconciling accounts for final
month ending reports, and I maintained and updated accounts from spreadsheets.
\*Controlled accounts for out-of-state clients
\*Owner of IOLTA accounts, Reg. CC accounts and Political Campaign accounts

3.    Please set forth your employment history within the Boston Fire Department, if any,

      including in your answer each position held, the dates for which you held the position, and

      a description of the responsibilities of the position and each position for which you

      applied.

      Answer:    See answer to Interrogatory No. 2, above.

|  |  |  |  |
|---|---|---|---|
| Principal Clerk | - | R8 | August 21, 1996 |
| Head Clerk | - | R11 (Budget) | July 3, 1998 |
| Head Clerk | - | R12 (Union) | Sept. 1, 1998 |

4.    For each position within the Boston Fire Department for which you have applied and did

      not receive the position, please set forth the position for which you applied, how you were

      informed of the Fire Department's decision and the reasons for which you believe you did

      not receive the position.

4

Answer:    Administrative Secretary                    R-14       April 2000
           I never got an interview or an explanation. I was denied a position because
           I was not politically affiliated or otherwise supported or sponsored by
           those with influence in the City of Boston or the Boston Fire Department.

           Administrative Analyst                      R-14       June 2000
           I never got an interview or an explanation. I was denied a position because
           I was not politically affiliated or otherwise supported or sponsored by
           those with influence in the City of Boston or the Boston Fire Department.

           Head Clerk and Secretary                    R-13       May 2001
           This was a temporary position for the duration of the vacancy. Eileen Stile
           was appointed who was part of the same affiliation with Carol Petta and
           Mary Kilgallen and their sponsors. I never got an interview or an
           explanation. I was denied a position because I was not politically affiliated
           or otherwise supported or sponsored by those with influence in the City of
           Boston or the Boston Fire Department.

           Administrative Assistant                    R-15       August 2003
           I never got an interview or an explanation. I was denied a position because
           I was not politically affiliated or otherwise supported or sponsored by
           those with influence in the City of Boston or the Boston Fire Department.
           More over, I received a letter from Bob Moran. Michelle Urso from
           Polaroid, and was sponsored by Joe "Do Do" Nee (and therefore by the
           Mayor) was hired through her political affiliation with, and sponsorship
           from, the current City of Boston Fire Department administrator and others.

           Case Manager/Utilization Review             MM6        Dec. 2003
           I never got an interview or an explanation. I was denied a position because
           I was not politically affiliated or otherwise supported or sponsored by
           those with influence in the City of Boston or the Boston Fire Department.
           Moreover, I got an email from Bob Moran on April 7, 2004 stating, "the
           position is still open, no decisions have been made". Ian MacKenzie was
           politically affiliated with, supported by, and sponsored by the then current
           City and BFD administration. In addition, he lived in Maryland at the time
           of application and hiring, which is illegal.

           Principal Accountant                        R-16       June 2004
           I received a letter from Bob Moran telling me that I did not get the
           position.

           Assistant Principal Accountant              R-14       July 2004
           I received a letter from Bob Moran telling me that I did not get the position

           Administrative Secretary                    R-14       Sept. 2004
           I received a letter from Bob Moran telling me that I did not get the
           position. Lois Hart, a person politically affiliated with and/or supported or

sponsored by persons within the then current City and/or BFD administration, was hired. I was denied a position because I was not politically affiliated or otherwise supported or sponsored by those with influence in the City of Boston or the Boston Fire Department.

Temp. Senior Legal Assistant          R-15          August 2006
I inquired about the position to Bob Moran but never received an answer. I never got an interview or an explanation. I was denied the position because I was not politically affiliated or otherwise supported or sponsored by those with influence in the City of Boston or the Boston Fire Department.

Senior Admin. Asst.                    MM5          August 2006
I received a letter from Bob Moran telling me that I did not get the position. I was denied a position because I was not politically affiliated or otherwise supported or sponsored by those with influence in the City of Boston or the Boston Fire Department.

Administrative Assistant          R-15 down from MM-6 August 2006
At first I received an offer for the position, but then they changed the job responsibilities, without an increase in pay, so the job I had applied for was constructively taken away, and so I did not accept the revised position.

5.    Please state each and every fact upon which you rely in your assertion that your claims against the Defendants in this matter are equal to or the same as the other Plaintiffs in this civil action.

Answer:    In addition to the facts as set forth in the Complaint, consider that the Mayor issued Executive Order 2000 prohibiting political affiliation discrimination for city jobs. Almost all of the persons who were hired instead of me were less qualified but more affiliated with, supported by, or sponsored by the then current City and Boston Fire Department administrations. It was clear from my lack of active and/or obvious support and affiliations with the political power holders that I was not going to be given equal treatment.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims asserted by you and the other plaintiffs against the named defendants in the above-referenced matter.

Answer:    I was bypassed for promotion, pay upgrades (3 to 5), and step increases (at least 5 times) based on my lack of political affiliation with the current administration. Other class representatives experienced similarly adverse

6

Case 1:05-cv-10528-RCL    Document 79-6    Filed 09/07/2007    Page 50 of 62
Case 1:05-cv-10528-RCL    Document 76-4    Filed 08/03/2007    Page 7 of 19

employment decisions in their applications for promotions, pay upgrades, and step increase. I also was the object of retaliation by the Defendants because of my assertion of my rights to be free from political affiliation discrimination, as were others, e'g, Jane Green..

7.   Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

Answer:   In addition to the facts as alleged in the Complaint, which are hereby incorporated herein, in general, Robert Moran effectuated the political agenda of the policy makers with in the current City of Boston Fire Department administration. More specifically, Moran's unlawful activities include, but are not limited to, the following:

October 9, 2003
9:30am, Jane Green, my shop steward, and I went to Bob Moran's office and asked if we could have a meeting to discuss what my chances are of receiving the position in which i had been acting in temporarily, in which it is posted. Moran told me "there are no guarantees". I asked him about Mary Anne McHugo (a political appointee) refusing to train me for the position and Moran denied knowing anything about what took place at the Fire Marshall's Office with Chief Laizza. I said to Moran "are you calling Chief Laizza a liar?" "Do we have to call him and verify what took place?"

Moran completely ignored me and changed the subject. Moran said "I don't know if I mentioned this to you but, we have nothing but problems in the Indemnification Office. So people from City Hall are coming to revamp the entire office." I said, "are you saying you want me to do all of this work, get you up to date and then someone from City Hall is going to replace me?" "Yes ," Moran said. I said, that's not fair, we have no chance for promotions or advancements here. He said, "Well, if you're not into politics little girl then you are not into a position here." Whereupon Jane Green stood up and said, "I can't believe you are saying this to her, not to mention in front of me." Jane continued and asked for confirmation from Moran by asking: "Is that so Bob?" Moran said, "that's the way it is around here, yes." I said, "so I am going to be punished because I am not into politics." Bob shrugged his shoulders and said "that's politics for you." Then he said, "listen kiddo there are other job opportunities out there you know". With that remark Jane Green and I walked out of his office.

October 9, 2003
I spoke with the Boston Fire Department Nurse Barbara Ryan about a conversation with Bob Moran about the Acting MM-5 I was performing. Barbara Ryan told Moran that she would give me $50.00 out of her own pocket, that's how desperate she was for help. Barbara said, "Bob's

7

response was "that little girl is not going to hold me hostage, I'll just remember when promotions come around." Barbara said, "You're going to be spiteful towards her?" He said, "I'll just remember who gave me headaches".

October 10, 2003
I spoke with Chief Hitchcock and he asked me what happened between Bob Moran and myself. I told him what took place. Chief Hitchcock told me that Bob Moran went to him and told him he thinks Jane Green influenced me to stop the acting position. I told Chief Hitchcock, Jane Green had nothing to do with my decision. I stopped because Bob Moran told me that someone from City Hall was coming to take over the position and the reason I am not in the position flat out is I am not into politics. My reason for not acting was simple; I didn't think that it was fair to process six months of backlog, get the office up to date and then replace me with someone with City Hall patronage.

Bob Moran has engaged in almost every conceivable workplace harassment tactics, which have interfered with my work performance and has affected me physically, emotionally, financially, and psychologically by intimidation and retaliation tactics. He misuses his authority as the Human Resource Director, with the full approval and acquiescence of the BFD and City adminstration.

September 3, 2004
I submitted my formal written complaint against Robert Moran to my supervisor Chief Granara. Chief Granara informed Chief Hitchcock and then proceeded to inform the Fire Commissioner. On my way home I stopped into the post office where I certified all the carbon copy letters to the proper authorities.

September 7, 2004
Chief Laizza called me and told me that he thinks Bob Moran is retaliating against me already. I said, "what are you talking about?" He said, "Bob just called over here and asked all kinds of questions about Jane Green and Carol Connors' positions." I said, "well Bob did tell Chief Hitchcock that he thinks Jane Green is a bad influence on me and that he thinks she influences me with some decisions that I have made around here." I walked over to Jane Green personally and she was on the phone so I walked away. As soon as she was off of the phone, I went back over to her desk and told her what Chief Laizza just said to me about Bob Moran retaliation toward Jane and myself. Jane said, "how ironic that was just Chief Burke (per order of the Commissioner he said) on the phone asking me all kinds of questions regarding my position." They want to have a meeting regarding our positions.

For the record, I personally believe that Bob Moran is retaliating against Jane Green because she is against political affiliation discrimination as practiced by the then current administration and represented me well as Union Shop Steward for SENA when I was acting MM-5 not to mention she is a witness to statements that Bob Moran made to me in my formal written complaint against Bob Moran.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

Answer:    Ronald Keating has perpetrated and perpetuated the pattern and practice of political affiliation discrimination, and harassment against me and other class members. For example, Keating obtained an upgrade for Karen Cunningham (a South Boston Group affiliated person) while he was the chief of personnel, and bragged about it to me and Kay McMillan because he knew that we had been trying to get the same upgrade. Keating also allowed Cunningham to change her job description without going through proper channels.

9.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

Answer:    Generally, Chief Finn sponsors or otherwise is a patron of political appointees in the BFD, and otherwise carries out the politically discriminatory policies and practices of the then current City and BFD administrations. In addition, Chief Finn's unlawful activities include, but are not limited to, the following:

October 20, 2004

Jane Green and I went to the post office so I could certify my letters to Bill Kessler & Winnie Yam. When Jane Green and I returned we went into the conference room where Kay was eating lunch. She looked up from reading the paper and said, "no more raise Denise". I said, "what does that mean?" She said "Chief Finn told Chief Shea to stop bothering Bob [Moran] about getting Kay a raise." So Jane stated, "that doesn't mean that you can't get a raise." Kay in a stern voice said Jane, Chief Finn had a meeting with Chief Shea and Bob Moran where again he told Bart (Chief Shea) to stop asking Bob Moran for a raise for Kay." Chief Finn said, "that it is a dead issue." Chief Finn said, "it took him 18 months to get Kathy Frechette an upgrade."

I spoke with Chief Shea after I said "so you were told not to ask Bob Moran anymore for a raise for Kay." He said "yes." When Bob Moran told me that Cityhall denied the raise I emailed Bob and asked him the

9

names of the people from Cityhall that denied the raise." Because of this
email, Chief Finn told Chief Shea "stop listening to them (meaning me and
Kay) they don't know what they are talking about". Chief Shea then stated
"that Chief Finn read him the riot act to leave Bob alone." Chief Shea
stated "that Bob denied ever going to Cityhall for a raise for Kay 2 years
ago. Bob also denied stating "that he needed documentation and or Chief
Shea himself to go down to Cityhall and present his case in order to get
Kay an upgrade. Chief Shea stated to Bob "I have heard a lot of stories
about you Bob, but I wanted to give you the benefit of doubt, but it is true
you are a liar." Bob replied, "I am offended by that statement Bart." Chief
Shea said he turned to Chief Finn and asked him if he was finished with him
because he wanted away from Bob because he is unprofessional.

Later on that afternoon, Chief Finn approached Chief Shea and stated, "it is
not about their qualifications, it's about politics & connections!" "Who do
they know?" "Do they know anyone?"

December 9, 2004
I went to City Hall to have 2 grievances heard by Labor Relations. At this
meeting was Jen Springer (AFSCME Council), Dan Moriarty - Union
President, Robert Moran, Alice Kessler, and myself. During the meeting,
we went over the first grievance, which was regarding Kerin Cunnunigham.
I mentioned that she just started here in August and was able to negotiate
her starting step when Mary Kilgallen and Bob Moran told me that you
could not negotiate steps. Instead of coming in as an R9 step 1 she is at a
step 3. Bob stated "nobody is going to come and work for $20,000". I
said, "well we all had to". He stated, "that's not true." Alice Kessler
seemed to agree with him where I disagree.

We proceeded on to the second grievance regarding Kathy Frechette
upgrade from and R15 to an R17. Moran said, "we have been working on
this upgrade for about 18 months". I said, "well so hasn't Chief Hitchcock
and Chief Granara". I asked Moran to justify how Kathy was able to get
her upgrade and I was denied. Moran simply had no answer. I asked
Moran to state what documentation he presented on Kathy's behalf in
comparison to me. Moran still did not have an answer. Alice Kessler
asked Moran "who he asked about the upgrades?" Morn answered "Carol
Connors, Tony Repucci and Richie Driscoll." Moran stated, "they didn't
see any reason for my [Denise Barry's] position being upgraded and denied
the request". Moran stated that they (budget) said it is an R12 position and
that if I wanted an upgrade that I should have applied for the R14 over at
1010 Mass Ave.

I asked Moran "why should I have to move for an upgrade if Kathy doesn't
have to?" I stated to Moran "is the reason just like Chief Finn stated to
Chief Shea that it is not about your qualifications but about politics, I said
just like you told me on Oct. 9, 2003 in your office Bob?" Moran wouldn't

10

answer me. Moran stated "that he has tried to post positions in house to give people opportunities for promotions". I said, 'well since you are on the subject, that R14 that was posted for 1010 Mass Ave., Lila Brown was the only one that applied for it. You didn't even give her an interview before you posted it again, then you post it for a second time where again she is the only one that applied again without interviewing her you re-posted the position Citywide. How would you call that 'opportunity'?" Alice Kessler asked, "did you put in for that position?" I said "no". Mary Ann McHugo told me that Bob Moran called her and told her that if Kay MacMillan or I put it for the position to hire whichever one applied". I stated, "this is what I am fighting against, people being hand picked for positions, it is not fair." Also, I mentioned to Alice Kessler that I have applied for about 5-6 positions whereupon someone from the outside with political affiliations always is hired. I mentioned that I always am bypassed for acting position when it becomes available.

I told Alice Kessler that Chief Hitchcock is the one that initiated me being upgraded about 2 years ago maybe even longer. Chief Hitchcock called me on the phone and told me that he sat with Bob Moran and for me to go and sit with Bob. Chief Granara did everything that Bob requested. Bob said, "I just can't go down to City Hall and tell them to upgrade you, I need ammunition." I said, "what kind of ammunition?" He said "basically sell yourself on paper that you're worth an upgrade." On August 11, 2003, Chief Granara handed a letter to Bob along with 12 other letters of recommendation the reasons why I should be upgraded". Moran said, "this should be more than enough."

During the hearing Moran stated "that he never discussed getting me an upgrade with Chief Granara." I said, "you're going to sit here and say that you never sat with Chief Granara about getting me an upgrade". Moran stated "no". I said, "then why would you email him that you 'presented Denis's case to City Hall' and denied the request if you didn't discuss this with him." At that time, I put the email on the table that Bob Moran sent to Chief Granara. Moran said, "oh", on October 15th I sat with Chief Granara and discussed your position where Chief Granara agreed that your position is not worth an upgrade." I said "I thought that you never had a discussion this with Chief Granara, you just said it yourself." Moran didn't reply.

Alice Kessler said, "may I have a copy of this email?" I said "sure." Alice Kessler said, "you have documentation too?" I said, "not with me, it is at my desk and as soon as I get back to my desk I will forward it to your attention." She said "great".

Later that afternoon, as soon as I got back from City Hall, Chief Finn came into the Training Division area. Chief Shea, Kay, and I were in the conference room talking while they were eating lunch. Chief Finn looked

11

into the room and said "Bart, when you have a chance I want to see you."
I got scared for him because of what I mentioned down at Labor Relations.
Chief Granara walked in I mentioned to him what had just happened and he
said that he would go to Chief Finn's office with Chief Shea. Chief
Granara came back to the office I said, "Chief Shea didn't get in trouble
because of me did he?" Chief Granara said "no". About 30 minutes later I
saw Chief Shea and looked up at him from my desk he made a gesture to
me (locking his lips) and shrugged his shoulders. I said, "I feel terrible, I
just don't want you getting in trouble because of me." He said, "Chief Finn
was nice about it and said that considering that he is a District Chief he
really shouldn't be getting involved in civilian issues. Chief Finn told Chief
Shea that he is not a team player and not trustworthy.

December 20, 2004
Monday, 3:30 Chief Finn walked them the back door of the Training
Division. No sooner did he walk out Jane Green's phone was ringing. It
was Bob Moran he said "that he wanted to see Jane Green down at his
office". Jane hung up and said, "Bob wants to see me will you watch my
phones?" When Jane came back to the office her face was so withdrawn I
asked "Jane if she was okay, because she looked like she was going to have
either a heart attack or a stroke". She said, "Bob just screamed and yelled
at me that I was to transfer to 1010 Mass Ave."

I stayed with her until it was time to leave but at 5:00 she opened the back
door located at the Training Division, she opened the back door where she
noticed Chief Laizza going to his car she said "Peter do you have a
minute?" He said, "no Jane, I got to go". Jane said, "no problem Chief,
thanks anyhow".

10.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:    Paul A. Christian implements and perpetuates a policy of political affiliation
discrimination, including having knowledge of and otherwise acquiescing in
all of the activities set forth in these answers. His activities include, but are
not limited to, the following unlawful activities:

December 21, 2004
Chief Laizza came into the Training Division's back door at around 9:00 as
always. He was over at Jane's desk and he apologized to her for what was
going on and stated, "I don't want to be in the middle of this Jane". She
said, "I understand Peter".

He walked over to my desk and said "Chief Hitchcock called him and

12

asked him why Jane Green wasn't over at 1010 Mass Ave this morning?"
Peter said, "her lawyer wants it in writing." Peter said Chief Hitchcock's
response was "fuck Jane Green and her lawyer."

Chief Laizza and Chief Granara went up to the Deputy's meeting. Peter
came back to me and said how crazy is this. At the end of the meeting
Chief Hitchcock stated, "there are rumors going around about Bob Moran,
so if anyone has any comments or complaints regarding Bob please feel
free to speak". Peter said, "no one said anything".

He said that Chief Hitchcock called him back later in the day and told him
that the Commissioner wanted to speak to him. Peter said, "that he turned
back in traffic". Peter said, "when I was entering the Commissioner's
office, Joe Finn was coming out". He went into the Commissioner's office,
the Commissioner, Chief Hitchcock, and Bob Moran were all sitting there.
They asked Peter if he told Jane to report to 1010 Mass. Ave., he said,
"Yes, I did." Chief Laizza stated "to all of them that not only does Jane's
Union want it in writing, but her lawyer too, before she moves." Peter
said, "that he let them know that this is pure retaliation and he will not be a
part of it." Peter said "the Commissioner said, "I want Jane Green out of
this building, no ifs, and, or buts about it". Peter said he stated to all of
them that he was not putting it in writing and if they want her moved that
they should write it themselves". Peter said he stated that this looks like
retaliation to me. The Commissioner responded "you're not a fucking
lawyer". Peter said he told the Commissioner "I didn't say that I was a
fucking lawyer, I am just telling you that I know the laws from working in
Personnel, and retaliation is serious".

Peter said that he mentioned when subpoenas go out that he is not going
under the bus." He said the Commissioner said, "what are you talking
about?" Peter said that he stated, "you're doing this because Denise has a
case against Bob and Jane is one of her witnesses". He said, the
Commissioner, said, "what case are you talking about?" Peter said
"Denise's case!" He said the Commissioner looked around at Chief
Hitchcock and Bob Moran and they both stated that they didn't know
anything about a case." Peter said, "Denise, I know that they know, and
they are playing dumb, but I just wanted to get out of there." Peter said
"on his way out of the Commissioner's office Bob Moran said "hey Peter
what do you think? This is the start of getting rid of Jane Green". Peter
said that he was appalled that Moran would make a statement like that.

<u>December 23, 2004</u>
At around 12:30, Chief Laizza was sitting in Bob Moran's office. At
around 1:00 Bob came into the office and was looking around. I was
standing talking to someone. He said "Denise, Jane around?" I said "yes,
she is here, she was just at her desk." He waited over at her desk until she
returned. He had a piece of paper in his hand. Jane came up from the

13

garage area, Moran was standing at her desk and handed her the paper and said "your official transfer paper." Then he walked out the office.

3:30 I was talking to Chief Laizza wishing him a Merry Christmas. I said "Bob couldn't come down here quick enough after you left his office to give Jane the paper. Peter said, "yeah, Chief Finn called me to come over and sign something." Peter said, "Joe if it has anything to do with Jane I am not signing it." Peter said, Chief Finn said, "well then you are going to have to answer to the Commissioner then." Peter said, "Joe I am not getting into it".

Peter said, when he got to Bob's office Chief Finn and Bob Moran assured him that the law department helped them construct and write the letter. Peter said, when he read it he felt better because it was not derogatory." Peter said "If I get called as a witness I am going to make sure to state that I was ordered by Chief Finn and the Commissioner to sign the paper.

11. Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:   Generally, William Kessler implements, enforces, and otherwise acquiesces in the political affiliation discrimination set forth in the Complaint and these answers. Kessler's involvement in said unlawful activities includes, but is not limited to, the following:

September 7, 2004
At around 11:00 am Bill Kessler from City Hall called to speak with Chief Granara. Later in the day Winnie Yam called from Human Resources located at City Hall to speak with me. She said, "I would like to sit and talk with you regarding some of the statements that you have written in your complaint." I responded "fine let me consult with my Union Shop Steward and I will get right back to you." So I called Winnie back and asked her if Thursday at 9:00 was convenient with her, she said, "that is perfect." So we are going to meet down City Hall in room 612 at 9:00.

September 9, 2004
Went to City Hall for a meeting with Bill Kessler, Winnie Yam, Cathy Moore, Jen Springer, Dan Moriarty and myself.

September 20, 2004
Bill Kessler from City Hall called requesting my paper regarding Bob Moran. I told him that I consulted with my attorney and was advised not to submit any of my paper work and that my attorney will be in touch with Mr. Kessler.

December 9, 2004

I went to City Hall to have two grievances heard by Labor Relations. At this meeting was Jen Springer (AFSCME Council), Dan Moriarty, Union President, Robert Moran, Alice Kessler, and myself. During the meeting, we went over the 1st grievance, which was regarding Kerin Cunnunigham. I mentioned that she just started here in August and was able to negotiate her starting step when Mary Kilgallen and Bob Moran told me that there is no negotiating steps. Instead of coming in as an R9 step 1 she is at a step 3. Bob stated "nobody is going to come and work for $20,000". I said, "well we all had to". He stated, "that's not true." Alice Kessler seemed to agree with him where I disagree.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against the

       City of Boston Fire Department.

       Answer:    See Answers to Interrogatories Nos. 4, 7, 8, 9, 10, and 11. As additional facts, Carol Petta is politically affiliated with, supported by, and otherwise sponsored by Mayor Menino, through her association with both the Mayor and his wife, Angela. For example, Carol Petta is the only person who is entitled to almost $20,000.00 per year in overtime pay (gets 15 minutes overtime in the morning to do part of Mary Kilgallen's job (because Kilgallen is incapable of doing it), and then is allowed to stay late at night on a regular basis to get overtime (in the same amount as her regular check) for her regular job, that was done without overtime prior to her taking the position). Other employees would prefer to work overtime, but are denied..

13.    Are you aware of other employees of the Boston Fire Department not already named in the

       above-captioned matter that you claim or understand to be, in your opinion, subject to the

       same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

       Answer: Yes.

14.    If you answer to the preceding interrogatory is in the affirmative, please identify (a) the

       number of those individuals; and/or (b) identify those individuals by name, residence address

       and office within the Boston Fire Department. If you are unable to provide the name and

       address of these individuals, please set forth the number of those individuals.

15

Answer:    Former Employees who were subject to political affilation discrimination
          Jessica Ahearn
          Rosemarie Clinton
          Karen Denver
          Mary Doherty
          Jane Hickey
          Marie Howard
          Kathryn Kempton
          Stephanie Long
          Maria Lopez
          Sheila Mancuso
          Claire Miller
          Robert Molloy
          Steve Morash
          Patricia Mulkern
          Desiree Russo
          Barbara Ryan
          Gwendolyn Sheppard

          Present Employees who remain whe were victims of the administrtion'
          political affiliation discrimination
          JoAnne (Donovan) Allain
          Janice Boyle0
          Crystal Bradeen
          Irene Debbie Burke
          Joanne Callahan
          Linda Collins
          Linda Cleary
          Carol Connors
          Katy Donovan
          Patricia Fiasconaro
          Karen Green
          Coretta Henry-Gardiner
          Paula Hamilton
          Maria Hernandez
          Maria Lopez
          Katherine MacMillen
          Angela Marshall
          Cathy Moore
          Marta Poupart
          Barbara Powers
          Luz Rivera
          Jennifer Ryan

          Majority of B.F.D. civilian employees

16

15. If you believe the facts or nature of your claims against the Defendants is different in anyway than the facts and nature of the claims of the other plaintiffs named in the above-captioned matter, please set forth each and every fact which you believe distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:    I have been subject to adverse employment decisions based on lack of political support for and or affiliation with the City of Boston ans /or the Boston Fire Department administration. I have been subject also to adverse employment decisions and harassment in retaliation for the assertion of my rights to be free from political affiliation discrimination. I am informed and believe that not all of the class members have suffered retaliation as I have..

16. How long do you believe you have been denied advancement in the Boston Fire Department because, as you assert in Plaintiffs' Complaint, you were of the correct political affiliation, including in your answer the date when you first believe you were denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions such as the denial of pay raises, upgrades, and denials of promotion, solely because of my lack of political affiliation, sponsorship, support, and/or connection to the then current City and BFD administration, I never have alleged that I have suffered because I was of the "correct political affliation."

17. Please define "political affiliation" as applied in your particular case and set forth in the Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of "political affiliation".

Answer: See Answers to Interrogatories, above. Political affiliation is the sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Botson Group" who constantly vie for power against the Republicans, and within the Democratic party.

17

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or person

do you believe you must be affiliated in order to advance in the Boston Fire Department.

Answer:        Mayor Thomas M. Menino
               "The Menino Administration,"
               "Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
               "South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely in

this assertion and describe the extent of the alleged discrimination.

Answer:        Objection, overbroad, vague and ambiguous, subject to and without waiver
               of said objection, Plaintiff responds that political affiliation discrimination is
               widespread throughout the agencies controlled by the Menino administration.
               This is not part of the claims as set forth in the complaint, and therefore
               irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire Department,

please state the following:

        a. the dates of each request for promotion or transfer;

        b. the position desired;

        c. the date you received a response to each request; and

        d. the reason you received for the denial of the request.

Answer:        See Answer to Interrogatory No. 4.

21.    Please identify by name and address everyone known to you to have been subjected to the
       same conduct from the Defendant(s) as you allege in the Plaintiffs' Complaint.

Answer:        See Answer to Interrogatory No. 14.

18

I, DENISE BARRY, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

_Denise Barry_
Denise Barry

AS TO OBJECTIONS:

_Thomas F. Feeney [BBO# 645605]_
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) <br> ELIZABETH H. GOLDEN; PATRICIA J.) <br> McDONOUGH; ELAINE MESITI; LILA ) <br> BROWN; MARY M. KANE; and       ) <br> JUDITH A. KELLEY, individually and on) <br> behalf of all those similarly situated, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> ROBERT J. MORAN; RONALD ) <br> KEATING; PAUL A. CHRISTIAN; ) <br> RODERICK FRASER, Jr.; WILLIAM ) <br> KESSLER; WILLIAM HITCHCOCK; ) <br> CITY OF BOSTON (FIRE ) <br> DEPARTMENT), and JOHN and/or ) <br> JANE DOES 1-50. ) <br> ) <br> Defendants. ) <br> ) | CIVIL NO. 05-10528 RCL |

## PLAINTIFF ELAINE MESITI'S ANSWERS TO DEFENDANTS' INTERROGATORIES TO THE PLAINTIFF, ELAINE MESITI

Plaintiff Elaine Mesiti [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

### GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

        Answer:     Elaine F. Mesiti
                    12 Waterman Road
                    Roslindale, MA 02131

Date of Birth: October 14, 1946

Position: Principal Administrative Assistant

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:    See Resume and Employment personnel card

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:    See Resume, Employment personnel card & Job Postings

4.    For each position within the Boston Fire Department for which you have applied and did

not receive the position, please set forth the position for which you applied, how you were

informed of the Fire Department's decision and the reasons for which you believe you did

not receive the position.

Answer:    Human Resources Director.
I was never informed by the B.F.D. in writing or verbally about
department's decision or reason I did not receive the job.

5.    Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.
I know that I, and many others, have been victims of Political Affiliation
Discrimination in regard to promotional advancement within the Boston
Fire Department.

I, and many others, were also denied positions because of the lack of
political affiliation, patronage, and support. People who have been
advanced primarily because of their political affiliation, patronage, and
support include Carol Petta, Mary Any McHugo, and Mary Kilgallen.

6.  Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

   Answer:    See the facts as alleged in the Complaint filed herein, the Answer to
              Interrogatory No. 5 specifically, and generally to all interrogatories herein.
              Other class representatives and potential class members applied also for the
              job listed above and were denied fair consideration because of political
              affiliation discrimination in regards to promotional advancement within the
              Boston Fire Department.

7.  Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

   Answer:    I applied for the position and the position was given to someone outside
              the department that I feel, is not as qualified as I am. I believe that am
              more qualified because I was encouraged by the Boston Fire Department to
              go back to school with the preface in mind that we would be able to further
              our careers. I have done just that but it has failed to advance my career
              due to my lack of political affiliation.

8.  Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

   Answer:    Not applicable to me.

9.  Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

   Answer:    Not applicable to me.

10. Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:    He was the Chief of the department at the time, and I believe that he has the final say in who is appointed to the position.

11.    Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

Answer:    Not applicable to me.

12.    Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory Nos. 5 and 9 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

The Boston Fire Department has no policy on Interviewing.

The Boston Fire Department and representatives of the Fire Department have appointed people solely or substantially because of their political affiliation, patronage, or support.

13.    Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:    Yes.

14.    If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

Answer:    Former Employees who were subject to political affiliation discrimination
Stephanie Long
Maria Lopez

Desiree Russo
Linda Cleary
Patricia Fiasconaro

Present Employees who remain were victims of the administrations'
political affiliation discrimination
JoAnne (Donovan) Allain
Janice Boyle
Irene Debbie Burke
Joanne Callahan
Linda Collins
Carol Connors
Katy Donovan
Sharon Green
Coretta Henry-Gardiner
Paula Hamilton
Maria Hernandez
Katherine MacMillen
Angela Marshall
Cathy Moore
Marta Poupart
Barbara Powers

Majority of B.F.D. civilian employees

15.  If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:     Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases. The individual circumstances are similar the major
difference is that I did not repeatedly suffer the political discrimination in
that there was only one position that I applied for that was given to an
outsider that was less qualified.

16.  How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered because I was of the "correct political
affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.  Political affiliation is the
sponsorship from, support from, and/or close affiliation with a member of
the then existing administration in power and influence in the City of
Boston Administration and Boston Fire Department executive officers,
including the group of individuals known as the "Hyde Park Group" and
"South Boston Group" who constantly vie for power against any other
political group, including other parties (e.g., Republicans and other groups
within the Democratic party).

Political Affiliation as applied in my particular case is that persons were
appointed to positions in the Boston Fire Department because of who they
knew, who sponsored them, and who supported them, rather than merit.  I
was aware, as well as others were aware, of who was being appointed to a
position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the
year 2000.
Political Affiliation Discrimination - Defendants policies, practices,
regulations, and/or actions have deprived me of my Constitutionally
Protected Rights to advance on the basis of merit, qualifications,
experience, background and education.

Discrimination however you look at it is a violation of the City of Boston
policy and is Illegal, when dealing with hiring, compensation, promotions
and term and conditions of employment, not to even mention civil service.

I feel there's an ongoing pattern & practice in the Boston Fire Department
for hiring and promoting with little or no regard to those actually or
comparatively qualified to those who have political connections or are
politically affiliated, associated or otherwise connected to those with power

and influence.  Positions are further tailored to those politically affiliated of
which I find all to be in violation of the City's  policy and therefore illegal.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

Answer:    Mayor Thomas M. Menino
"The Menino Administration,"
"Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
"South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver
of said objection, Plaintiff responds that political affiliation discrimination is
widespread throughout the agencies controlled by the Menino
administration.  This is not part of the claims as set forth in the complaint,
and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

a. the dates of each request for promotion or transfer;

b. the position desired;

c. the date you received a response to each request; and

d. the reason you received for the denial of the request.

Answer:    See Answer to Interrogatory Nos. 3 and 4.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

Answer:    See answer to Interrogatory No. 14.

I, ELAINE MESITI, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

_____
Elaine Mesiti

AS TO OBJECTIONS:


_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) | CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J.) | |
| McDONOUGH; ELAINE MESITI; LILA ) | |
| BROWN; MARY M. KANE; and         ) | |
| JUDITH A. KELLEY, individually and on ) | |
| behalf of all those similarly situated,    ) | |
| ) | |
| Plaintiffs,              ) | |
| ) | |
| vs.                    ) | |
| ) | |
| ROBERT J. MORAN; RONALD      ) | |
| KEATING; PAUL A. CHRISTIAN;    ) | |
| RODERICK FRASER, Jr.; WILLIAM   ) | |
| KESSLER; WILLIAM HITCHCOCK;    ) | |
| CITY OF BOSTON (FIRE            ) | |
| DEPARTMENT), and JOHN and/or    ) | |
| JANE DOES 1-50,              ) | |
| ) | |
| Defendants.              ) | |
| ) | |

## PLAINTIFF JUDITH A. KELLEY ANSWERS TO
## DEFENDANTS' INTERROGATORIES TO THE
## PLAINTIFF, JUDITH A. KELLEY

Plaintiff Judith A. Kelley [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

## GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.    Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.    Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.    Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

_____Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.    Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

        Answer:        Judith A. Kelley
                       20 Turner Road
                       Rockland, Massachusetts 02370

Date of Birth: 2/18/60

Position: Senior Administrative Assistant MM-5

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:    Objection, overbroad.  Subject to and without waiver of said objection,
Plaintiff answers as follows:
**Education**
South Boston High School - 1977

Quincy Jr. College -            Word Processing, 9/83-11/83

Boston Business School -        Business Math 2/5/88-4/29/88
                                Business Law June, 1988
                                Psychology 9/15/88-12/15/88
                                Word Perfect I (Multi Mate) 9/89-12/89
                                Word Perfect II

**Employment**
Boston Fire Department -                        4/1979 - Present
MM-5 Sr. Administrative Assistant (Fire Prevention) - 7/7/1997 - present
MM-5 Senior Administrative Assistant(Accounting)-11/22/1991- 7/7/1997
MM-6 Senior Administrative Assistant(Fire) - 5/8/1991 - 11/22/1991
R-14 Administrative Secretary - 12/28/1988 - 5/8/1991
R-13 Head Administrative Clerk - 10/30/1985 - 12/28/1988
R-11 Head Clerk - 5/22/1985 - 10/30/1985
R-8 Principal Clerk 8/17/1983 - 5/22/1985
Emergency R-12 Head Clerk & Secretary - 4/4/1983 - 4/10/1983
R-5 Senior Clerk & Typist - 3/23/1983 - 8/17/1983
Reinstated as an R-2 Clerk & Typist - 10/25/1982 - 3/23/1983
I Resigned - 8/21/1981 - 10/25/1982
R-5 Senior Clerk & Typist - 12/18/1980 - 8/21/1981
R-2 Clerk & Typist - 4/11/1979 to 12/18/1980

UNA Corporation -                               4/1978-4/1979
Secretary to Executive Manager
My duties were typing, filing, answer phone, use adding machine,
calculator, helped out in various other departments, including sales &
purchasing, used telex machine, filled in for the secretary to the President
of the company, was right-hand for receptionist.

Johnson Bros. Florist in Woburn, MA -          5/1977-4/1978
Grader
My duties were to cut & wrap roses. I also helped out in the front office. I
filed, answered the phone, typed payroll checks.

3.    Please set forth your employment history within the Boston Fire Department, if any,

including in your answer each position held, the dates for which you held the position, and

a description of the responsibilities of the position and each position for which you

applied.

Answer:    See answer to Interrogatory No. 2, above.

In addition Plaintiff answers, for the above positions I had taken Civil
Service Tests and was made permanent, off a list, for each one. All my
positions I held were in the Accounting Office except my present position
which I also hold the same title in the Fire Prevention Division.

My job duties were as follows:
Clerk & Typist - Answer phone, file, use adding machine, calculator, type
requisitions, record information in journals, fasten various forms of material
together.

Senior Clerk & typist - same as above plus processing payments, receives
requests, basic math computations, addresses and mails correspondence.

Principal Clerk - same as above plus maintains files, types forms and
letters, investigates records, checks for accuracy.

Head Clerk - same as above plus gives information to vendors and other
departments over the phone, takes care of balances for accounts.

Head Administrative Clerk - same as above plus uses IBM computer,
checks purchase orders for accuracy, takes care of all heating fuel and
gasoline for headquarters and fire houses across the city, handles all the
problems the fire houses might have with same.

Administrative Secretary - same as above plus takes care of problems with
materials on purchase orders being delivered or ordered, receives all
requests for materials to be purchased, processes purchase orders, oversees
work of Head Administrative Clerk and takes care of problems he/she
might have.

Senior Administrative Assistant - provides instructions as required and procedural and policy guidance, assigns work and reviews performance through conferences and report for effectiveness. Directly supervises several personnel, oversees and coordinates the activities of subordinates in connection with the preparation and maintenance of reports, records and documents.

Senior Administrative Assistant - When I first went to Fire Prevention I still have the same title but did different things but never had a new job description written out. I overseen the floor, which consisted of the cashier, permits, special hazards, 21E reports, lawyers assistant. I had roughly 10 or more people under me. I also did the quarterly/annual inspections.

Senior Administrative Assistant - assigns work and reviews performance through conferences and reports for effectiveness and compliance with laws, rules and regulations, directly supervises clerical personnel including the planning and assigning of work according to the nature of the job to be accomplished, reviews, analyzes and prepares reports concerning assigned unit activities in order to improve work methods, determine progress, revise established procedures and/or to provide information to superiors, oversees and coordinates the activities of subordinates in connection with the preparation and maintenance of reports, records and documents, performs related work as required. As supervisor of Permitting my specific duties also include supervision of the permit application unit, cashier and paid detail office, responsible for scheduling adequate staffing and training to service the public, serves as back-up when needed for any member of the unit, supervises a staff of 10.

I transferred down the back to do places of assembly. It was a lateral transfer, there was no difference in pay. My duties have changed a bit. I still fill in up front when needed with the duties of above plus I am responsible for scheduling adequate staffing and training to cover the administrative functions of special occupancies, special hazards, planned fire education, fire marshal's office, do the place of assembly permits, type abatements, lab registrations. I was not politically connected.

4.    For each position within the Boston Fire Department for which you have applied and did not receive the position, please set forth the position for which you applied, how you were informed of the Fire Department's decision and the reasons for which you believe you did not receive the position.

Answer:    The following are positions I applied for and didn't get. You were usually
           notified when the selection came out with whoever's name was on it. You
           also heard thru the coworkers who was getting the job before you even put
           it in for it. As soon as the posting went up it was known who would be
           getting the position.

           Head Administrative Clerk - R-13  6/83
           Head Clerk & Secretary - R-12   8/83
           Head Clerk - R-11  6/84
           Head Clerk - R-11  7/84
           Head Clerk & Secretary - R-12  7/84
           Head Clerk & Secretary - R-12  10/85
           Administrative Assistant - R-15  6/87
           Administrative Secretary - MM-3 (changed to MM-4)  9/87
           Administrative Assistant - R-15  10/88
           Administrative Secretary - MM-3  12/88
           Administrative Assistant (Fire) - MM-4 (changed to MM-6)  6/03
           Principal Administrative Assistant - MM-8  8/03
           Case Manager/Utilization Review - MM-6 (changed to MM-8)  12/03

5.    Please state each and every fact upon which you rely in your assertion that your claims

      against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

      civil action.

      Answer:    See the facts as alleged in the Complaint filed herein, the Answer to
                 Interrogatory No. 5 specifically, and generally to all interrogatories herein.
                 I know that I, and many others, have been victims of Political Affiliation
                 Discrimination in regard to promotional advancement within the Boston
                 Fire Department.

                 I, and many others, was also denied pay upgrades because of the lack of
                 political affiliation, patronage, and support. People who have been
                 advanced solely because of their political affiliation, patronage, and support
                 include Mary Any McHugo, and Mary Kilgallen.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims

      asserted by you and the other plaintiffs against the named defendants in the

      above-referenced matter.

      Answer:    See the facts as alleged in the Complaint filed herein, the Answer to
                 Interrogatory No. 5 specifically, and generally to all interrogatories herein.

Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and were denied fair consideration because of political affiliation discrimination in regards to promotional advancement within the Boston Fire Department.

7.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Robert J. Moran.

    Answer:    I interviewed for an MM-6 position. Robert Moran and Mary Killgalen both interviewed me for the position. Mary Killgalen ended up getting the MM-6 position after having been a part of the interviews with the candidates.

8.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Ronald Keating.

    Answer:    Not applicable to me.

9.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Joseph Finn.

    Answer:    Not applicable to me.

10.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, Paul A. Christian.

    Answer:    Not applicable to me.

11.  Please set forth in detail the factual basis for any and all claims that you have filed against the defendant, William Kessler.

    Answer:    Not applicable to me.

12.  Please set forth in detail the factual basis for any and all claims that you have filed against the City of Boston Fire Department.

    Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. The Boston Fire Department and several of its members have instituted a

character and career assassination towards me in the way that they have conducted themselves when it comes to interviewing and appointing people to promotional positions within the Fire Department.

The Boston Fire Department has no policy on interviewing as can be seen from the fact that Mary Killgalen interviewed me for th MM-8 position and ended up being the one who was given the position.

The Boston Fire Department and representatives of the Fire Department have appointed people solely or substantially because of their political affiliation, patronage, or support.

13. Are you aware of other employees of the Boston Fire Department not already named in the above-captioned matter that you claim or understand to be, in your opinion, subject to the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

    Answer:    No.

14. If you answer to the preceding interrogatory is in the affirmative, please identify (a) the number of those individuals; and/or (b) identify those individuals by name, residence address and office within the Boston Fire Department. If you are unable to provide the name and address of these individuals, please set forth the number of those individuals.

    Answer:

15. If you believe the facts or nature of your claims against the defendants is different in anyway than the facts and nature of the claims of the other plaintiffs named in the above-captioned matter, please set forth each and every fact which you believe distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

    Answer:    Each of Plaintiff's claims are similar in that we all were discriminated against in similar ways in our efforts to obtain promotions, pay upgrades, and step increases. Some Plaintiff were retaliated against because of their vocal opposition to this system. That type of retaliation may have a part of why I did not receive fair consideration, but my claims are more directly political discrimination claims. But the individual circumstances are not exactly the same.

16. How long do you believe you have been denied advancement in the Boston Fire

    Department because, as you assert in Plaintiffs' Complaint, you were of the correct

    political affiliation, including in your answer the date when you first believe you were

    denied advancement due to political affiliation.

    Answer:        As set forth herein, I have been subject to adverse employment decisions
                   such as the denial of pay raises, upgrades, and denials of promotion, solely
                   because of my lack of political affiliation, sponsorship, support, and/or
                   connection to the then current City and BFD administration, I never have
                   alleged that I have suffered because I was of the "correct political
                   affiliation."

17. Please define "political affiliation" as applied in your particular case and set forth in the

    Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

    "political affiliation".

    Answer:        See Answers to Interrogatories, above. Political affiliation is the
                   sponsorship from, support from, and/or close affiliation with a member of
                   the then existing administration in power and influence in the City of
                   Boston Administration and Boston Fire Department executive officers,
                   including the group of individuals known as the "Hyde Park Group" and
                   "South Boston Group" who constantly vie for power against any other
                   political group, including other parties (e.g., Republicans and other groups
                   within the Democratic party).

                   Political Affiliation as applied in my particular case is that persons were
                   appointed to positions in the Boston Fire Department because of who they
                   knew, who sponsored them, and who supported them, rather than merit. I
                   was aware, as well as others were aware, of who was being appointed to a
                   position before the position was posted and interviews conducted.

                   This practice has occurred time and time again, but very blatant since the
                   year 2000.

18. As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

    person do you believe you must be affiliated in order to advance in the Boston Fire

    Department.

Answer:    Mayor Thomas M. Menino
"The Menino Administration,"
"Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
"South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19. Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver
of said objection, Plaintiff responds that political affiliation discrimination is
widespread throughout the agencies controlled by the Menino
administration. This is not part of the claims as set forth in the complaint,
and therefore irrelevant to the Class Certification issues.

20. For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

    a. the dates of each request for promotion or transfer;

    b. the position desired;

    c. the date you received a response to each request; and

    d. the reason you received for the denial of the request.

Answer:    See Answer to Interrogatory Nos. 3 and 4.

21. Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint.

Answer:    See Answer to Interrogatory No. 14.

I, JUDITH A. KELLEY, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND
PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES
ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND
BELIEF:

Judith A. Kelley

AS TO OBJECTIONS:

_____

Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DENISE M. BARRY; JANE B. GREEN; ) | CIVIL NO. 05-10528 RCL |
| ELIZABETH H. GOLDEN; PATRICIA J.) | |
| McDONOUGH; ELAINE MESITI; LILA ) | |
| BROWN; MARY M. KANE; and        ) | |
| JUDITH A. KELLEY, individually and on ) | |
| behalf of all those similarly situated,   ) | |
| ) | |
| Plaintiffs,        ) | |
| ) | |
| vs.        ) | |
| ) | |
| ROBERT J. MORAN; RONALD        ) | |
| KEATING; PAUL A. CHRISTIAN;    ) | |
| RODERICK FRASER, Jr.; WILLIAM  ) | |
| KESSLER; WILLIAM HITCHCOCK;    ) | |
| CITY OF BOSTON (FIRE            ) | |
| DEPARTMENT), and JOHN and/or    ) | |
| JANE DOES 1-50,        ) | |
| ) | |
| Defendants.        ) | |
| ) | |

## PLAINTIFF MARY M. KANEANSWERS TO
## DEFENDANTS' INTERROGATORIES TO THE
## PLAINTIFF, MARY M. KANE

Plaintiff Mary M. Kane [hereinafter "Plaintiff"] hereby responds to Defendants' First

Request for Answers to Interrogatories as follows:

### GENERAL OBJECTIONS

1.    Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the

extent the Requests exceed the scope and requirements of the Massachusetts Rules of Civil

Procedure, including but not limited to Rules 26 and 33, and the limitations imposed by the Court that these Interrogatories be limited to Class Certification issues.

2.      Plaintiff objects generally to Defendants' Request for Answers to Interrogatories to the extent the Requests seek information which is protected by the attorney/client privilege, constitutes attorney work product, constitutes material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

3.      Plaintiff objects to Defendants' Definitions and Instructions contained in the Request for Answers to Interrogatories to the extent the Definitions and Instructions exceed the scope and requirements of Massachusetts Rules of Civil Procedure, including but not limited to Rules 26 and 33.

4.      Plaintiff objects to Defendants' Definitions and Instructions contained in Request for Answers to Interrogatories to the extent the Definitions and Instructions seek the revelation of information protected by the attorney/client privilege, the attorney work product doctrine, material prepared in anticipation of litigation or for trial, or is otherwise immune from discovery.

5.      Plaintiff objects to the Defendants' Request for Answers to Interrogatories to the extent said Requests seek information beyond a relevant time period. Notwithstanding said objections, Plaintiff states and answers as follows:

        Plaintiff hereby acknowledges his continuing obligation to supplement any and all responses to the following requests if and when he receives any additional documentation.

1.      Please state your full name, residence address, date of birth, and current employment position with the Boston Fire Department.

              Answer:      Mary M. Kane
                           619 East Fifth Street
                           South Boston, Massachusetts 02127

Date of Birth: January 25, 1960

Position: Senior Administrative Assistant MM-5

2.    Please set forth in detail your complete educational background and employment history

to date, including in your answer the dates and schools where you received an education

and the dates, places of your employment and positions held with each employer.

Answer:

**EDUCATION:**                    Boston Business School
Boston, MA
1978- 1980
Bookkeeping

Cardinal Cushing High School
South Boston, MA
1973- 1977

Saint Augustine's Grammar School
South Boston, MA
1966 - 1973

**WORK EXPERIENCE:**

BOSTON FIRE DEPARTMENT
MAINTENANCE DIVISION
OCTOBER 26, 1987 – PRESENT
VARIOUS TITLES

November 2, 2002 - Present
**HELD WHILE WORKING        SENIOR ADMINISTRATIVE
ASSISTANT
IN THE MAINTENANCE  MM5
DIVISION:**

July 10, 1996 – November 1, 2002
**ADMINISTRATIVE ASSISTANT-MM4**

June 10, 1993 – July 9, 1996
**PROV. PROM. HEAD ADMINISTRATIVE
CLERK-R13**

June 9, 1993 – June 9, 1993
**PERM. HEAD CLERK -- From Civil Service
List-R11**

December 23, 1992 – June 9, 1993
**APPT. PROV. HEAD ADMINISTRATIVE
CLERK-R13**

December 28, 1988 – December 22, 1992
**PROV. APPT. ADMINISTRATIVE
SECRETARY-R14**

June 18, 1988 – December 28, 1988
**PROV. HEAD CLERK**

October 26, 1987 – June 15, 1988
PROV. PRINCIPAL CLERK TYPIST-R8

THORTON & EARLY (LAW FIRM)
BOSTON, MA
OCTOBER 1985 – JANUARY 1987
Computer Programmer – designed and implemented
programs to assist in the distribution of clients'
checks and mailings and other computer printouts
REASON FOR LEAVING – Had my son


CARDOOS
FANUEIL HALL – BOSTON, MA
1985 – 1986
Part-Time Sales Clerk – which included stocking,
cashing out and closing the store
REASON FOR LEAVING – Pregnant

EDWARDS FOOD WAREHOUSE
WATERTOWN, MA
1979 – 1982
Cashier
Deli Clerk
Produce Clerk
Part-Time Front End Manager
REASON FOR LEAVING – Decided not to work
two jobs any longer

AFSA PROJECT

BOSTON CITY HALL
NOVEMBER 3, 1982 – JUNE 29, 1984
Secretary and Data Entry Clerk – which included training others
REASON FOR LEAVE – Administration transferred the entire department to Boston Fire Department

PROPERTY EQUALIZATION
CITY OF BOSTON – MILK STREET
NOVEMBER 12, 1980 – NOVEMBER 2, 1982
Secretary for the Commercial Property Assessment Division
REASON FOR LEAVING – Applied and received the position at AFSA Project

FIRST NATIONAL SUPERMARKET
SOUTH BOSTON, MA
1976 – 1979
Cashier
Deli Clerk
REASON FOR LEAVING – Store burnt down and transferred to Watertown Store, which eventually changed names to Edwards Food Warehouse

LABOURE CENTER/ABCD
SOUTH BOSTON, MA
1984 - 1986
Teacher's Aid
REASON FOR LEAVING – applied and received cashier's position at the First National Supermarket

3.    Please set forth your employment history within the Boston Fire Department, if any, including in your answer each position held, the dates for which you held the position, and a description of the responsibilities of the position and each position for which you applied.

Answer: See answer to Interrogatory No 2.

**Duties and Responsibilities for Positions Held in Maintenance:**
I first started at the Maintenance Division on October 26, 1987. My title was Principal Clerk Typist but I was actually the secretary for the Maintenance and Motor Squad Division. My duties included but were not limited to, civilian

personnel paperwork such as recording daily attendance, sick leave and return for sick leave forms, injury/workers' compensation forms, etc.; answering and routing telephone calls; all typing and word processing; petty cash funds and filing.

When Tom Kelly transferred to Fire Headquarters I received all his duties in addition to my own. Those duties include and are not limited to, filing of all paperwork for fire houses requesting and ordering supplies; keeping a log of purchase order requests and received by Maintenance/Motor Squad Division; keeping running totals of all open requisition accounts so they will balance with the Accounting Office and to keep Maintenance/Motor Squad from overspending in the accounts; logging and filing of monthly fuel reports; filing Out of Service reports for apparatus out of service over 24 hours and filing of 5 OC Forms – Outside Contractors Forms – received from the fire houses.

When Connie Quinlan retired I assumed the following responsibilities along with the above duties I already was performing. These duties include but are not limited to, filling out the firefighters daily morning reports; assigning overtime for firefighters for personal tours, injured leave, death leave and unscheduled overtime; recording of firefighters personal tour schedule; all sick and injury reports for firefighters and other related paperwork until Bob Sances came to the Maintenance Division. I received all these duties back when Bob went out on injured/medical leave. Bob never came back and officially retired in August of 1995.

Since the retirement of Louis Amichetti, Sr. I now do the ordering of all household and janitorial supplies for the Boston Fire Department. I also oversee all the paperwork when other personnel from Maintenance/Motor Squad requests parts and supplies for their areas. This includes overseeing the requests to make sure they properly filled out, all essential information was obtained and the prices and totals were correct. I also do requests for service orders for the Maintenance/Motor Squad this includes getting phone quotes when necessary and forwarding them to the Accounting Division in Headquarters.

Around Fiscal Year 1989, I assumed the responsibilities of the Repetitive Contracts from Elaine Mesiti. Duties include but are not limited to, handling advertising for contract applications, preparing and processing contracts that include approving contracts, assigning contract numbers and dollar amounts to each contract, writing the mayor's letters, etc. for the approval process for various city departments for the Maintenance/Motor Squad Divisions as well as the Fire Alarm Division; Accounts Payable of all Repetitive Contract vendors for all building and automotive/equipment repairs and services; copy all automotive/equipment invoices for vehicles repairs to keep in folders for future reference. I Assign contract numbers and written quote numbers when requested from personnel in fire headquarters because the Fire Department were only issued so many contracts numbers and written quote numbers and I was designated as the

person to keep track of all the contracts numbers and written quote numbers for the Department.

When the department electricians were assigned to the Maintenance Division (approximately 1995), I took on the responsibilities for all their repetitive contracts, correspondence and paperwork. This includes but is not limited to, accounts payable for their repetitive contracts, paperwork for requisitions, purchase orders and service orders as well as keeping running tallies for all the open requisition accounts and payments of all goods and services.

In the spring of 1999 the City of Boston acquired a new computer system. As of July of 1999 my duties now included all accounting responsibilities for the Maintenance and Motor Squad Division. Since that time an abundance of work has been taken off the Headquarters Accounting Office. Approximately 50% of each of the three employees in the Headquarters Accounting office has had their workload reduced due to my taking the responsibility of all the Accounting responsibilities for the Maintenance/Motor Squad Division. This is because the majority of open requisitions and purchase requisitions and some service orders for the Fire Department belonged to the Maintenance/Motor Squad Division. I now handle all the open requisitions, purchase requisitions/orders and service orders along with the Requirement (formerly repetitive) Contracts, Advertised Contracts, Emergency Contracts and Sole Source in addition to ordering all household and janitorial supplies and automotive parts and supplies as requested/needed. This involves entering requisitions and purchase orders into the Peoplesoft program for all goods and services for the Maintenance and Motor Squad Division along with all invoices and payments for all goods and services.

I've also created Account Payable workbooks on the computer for all vendors that have a Requirement Contract, Open Purchase Orders and Open Service Orders. Each vendor has their own worksheet where payments are entered which records date of invoices, invoice numbers and dates of payments. Running totals of each account automatically kept whenever an entry is made. Balance sheets are printed regularly and distributed to the appropriate Maintenance/Motor Squad personnel for spending purposes. These worksheets keep running totals of each vendor's accounts. Balance sheets are printed regularly and are distributed to the appropriate Maintenance/Motor Squad personnel for spending purposes. I also have workbooks for all non-open requisitions keeping which list parts/supplies ordered, when goods were received and when the payments were processed.

All Fire Department vehicles are on the computer and listings are updated regularly. These lists include all cars, small truck and vans and the divisions and personnel they are assigned to; what their registrations and vehicle identification numbers are and where they are housed at night. All fire apparatus are also on the computer with the registrations and vehicle identification numbers. Listings are

distributed to various fire personal including the Fire Commissioner, Chief of the Department and Chief of Operations. It is also used as a quick reference.

Cleaning supplies requests are also on the computer. When a firehouse calls for supplies I can look up the last time supplies were requested and what supplies were issued. The request for supplies form is then printed and I assign a member of the Maintenance Division to fill the order and deliver the supplies to the appropriate firehouse. All requests are signed by members of the firehouses receiving supplies and returned to me and I file them in the firehouse's file.

I am also authorized to contact vendors to assign building repairs and services for various Fire Department locations. This first started when then Assistant Superintendent of Maintenance Joseph Nee was out of the office e.g. department business, vacation or other type of leaves. When Assistant Superintendent Nee retired James Pyke was made the Assistant Superintendent and the procedure continued. This responsibility has been in effect since July of 1999.

I also copy automotive work repairs/invoices for specific vehicles when requested by Fire Headquarters and/or the City of Boston Law Department. The requests from the Law Department are for when Boston Fire Department vehicles/apparatus are involved in automobile accidents and the attorneys need back up for lawsuits.

When Maintenance was assigned Critical Funding the responsibility of the majority of contracts and payments that are through the Critical Funding. This includes advertised, emergency and sole source contracts as well as purchase orders for service. I oversee the majority of the spending the Maintenance Division handles and have on the computer worksheets for year fiscal year with the work done, by whom, cost and payment as well as a continuous balance for each fiscal year. These contracts can run up to up $200,000.00 or more.

I'm also responsible for assisting with the Fiscal Year budgets for Maintenance/Motor Squad Division. This includes requests for items the division/department may need in the coming year and giving a breakdown of all costs by various building, automotive and equipment categories.

4.  For each position within the Boston Fire Department for which you have applied and did not receive the position, please set forth the position for which you applied, how you were informed of the Fire Department's decision and the reasons for which you believe you did not receive the position.

Answer:  **August 5, 2003**    Principal Administrative Assistant – MM8
Told by Bob Moran I didn't have to be re-interviewed since he and Mary Kilgallen interviewed me for the same position when it was posted as Sr. Administrative Assistant MM6
Notified on August 22, 2003 that Mary Kilgallen was offered and accepted

the MM8 position via email from Bob Moran.

**June 18, 2003**        Sr. Administrative Assistant – MM6
Interviewed by Bob Moran and Mary Kilgallen. Position changed to
Principal Administrative Assistant MM8 and Mary Kilgallen received the
MM8 position.
Notified via MM8 job posting about this position no longer being an MM6
title.

**June 18, 2003**        Administrative Assistant – MM4
Told by Andrew Warren that this title was the same title that I held – I
withdrew application even though I didn't realize and I was never told I
could have done a lateral promotion.

**October 29, 2001**        Sr. Administrative Assistant – MM5
Interview by Rosalyn Coppin
Never notified why I was denied the position and I don't believe the title
was even awarded to anyone.

**May 20, 1996** Sr. Administrative Assistant – MM5 (2 positions available)
Interviewed by Jerry Horgan
Never notified who received the positions until posting selection is
forwarded and/or posted or why I was denied the positions.

**July 3, 1995** Administrative Assistant – R15
Application was submitted – not sure who interviewed back then
Never notified who received the positions until posting selection is
forwarded and/or posted or why I was denied the positions.

**December 20, 1988** Administrative Assistant – MM3
Application was submitted – not sure who interviewed back then
Never notified who received the positions until posting selection is
forwarded and/or posted or why I was denied the positions.

5.    Please state each and every fact upon which you rely in your assertion that your claims

against the Defendants in this matter are equal to or the same as the other Plaintiffs in this

civil action.

Answer:        See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.
I know that I, and many others, have been victims of Political Affiliation
Discrimination in regard to promotional advancement within the Boston
Fire Department.

I, and many others, were also denied pay upgrades because of the lack of political affiliation, patronage, and support. People who have been advanced solely because of their political affiliation, patronage, and support include Carol Petta, Mary Any McHugo, and Mary Kilgallen.

6.    Please state every fact common to you and the other plaintiffs with respect to the claims

asserted by you and the other plaintiffs against the named defendants in the

above-referenced matter.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to Interrogatory No. 5 specifically, and generally to all interrogatories herein. Other class representatives and potential class members applied also for the jobs listed above, and for pay upgrades, and were denied fair consideration because of political affiliation discrimination in regards to promotional advancement within the Boston Fire Department. The Defendants failed to follow proper procedure when job positions became available.

7.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Robert J. Moran.

Answer:    A.  Giving Mary Kilgallen the MM8 position after she interviewed candidates for MM6 title and second interviews for MM8 position were never given.

### INTERVIEW FOR MM6 – PAT MULKERN'S POSITION

Mary Kilgallen and Bob Moran interviewed me for the MM6 position. During the interview I was asked a question that deal with negative issues with the Fire Department. My response had something to do about current employees and longevity and not being able to advance because people from outside the department with much less time were receiving the higher titles. At that time Mary Kilgallen snapped at me saying how she was tired of everyone saying that. I felt she took it personally because she then told me how she had six or seven years of service with the City. I, in turn, told her how I had 20.

This position was bumped back to the original MM8 it was supposed to be and I applied again. I was told by Bob Moran that I didn't have to be re-interview because I was just interview for the same job when it was the MM6 title by him and Mary Kilgallen.

Mary Kilgallen received the position. I find this to be a conflict of interest

due to the fact that she interviewed all the applicants for the original job and as a far as I know, nobody was re-interviewed

B. Telling me that I could have an MM6 title in payroll of a person who he stated was going to retire, she was on medical leave at the time...she never retired.

### BOB MORAN & THE MM6 POSITION

On October 2, 2002, Dennis Flynn told me that Bob Moran wanted to see the both of us in his office. When I asked Dennis what it was about he said it was about me working in Payroll.

We arrived in Bob's office and Bob asked me if I would be interested in Paula Hamilton's position (MM6) in Payroll (Paula at the time was on, I believe, medical leave). Bob said that Paula was retiring and I could have her position if I wanted it. He felt it would be a good opportunity for me because I could then apply to other City departments to run their payrolls.

I felt that statement was insulting. It was as if Bob Moran wanted me out of the Fire Department. I also felt that someone thought that I had a good thing working in Maintenance and wanted me out so they could have my position. I told Bob first of all that I had a great relationship with not only my co-workers but with my vendors and members of the Fire Department. Secondly, I asked Bob what they pay would be and he said he wasn't sure but would get back to me. I told Bob nobody would do the work I do for the money I make and I felt that if I left Maintenance then my position would be filled with a higher title/pay.

I then asked Dennis Flynn if he had anything to say and he said how he thought I had to look out for myself because I had a son that would soon be attending college.

I told Bob I didn't want to leave the Maintenance and that was the end of the meeting. I did ask Bob via email for a description of the job because I wanted to compare the work done there with all the work I do for less money. Paula Hamilton never retired.

8.    Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Ronald Keating.

Answer:    Not applicable to me.

9.   Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Joseph Finn.

Answer:    Not applicable to me.

10.   Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, Paul A. Christian.

Answer:    **REQUESTING MM6 TITLE**

In the fall/winter of 2001 I requested and received a meeting with then
Chief of Department Christian. In that meeting I explained how both Betty
and I perform the same duties and how I believed my duties, especially the
contracts duties were considerable more than Betty (approximately 20
compared to 80-100). The Chief actually had a payroll printout and
compared our two salaries and said how Betty made quite a bit more
money than I did at that time (I was an MM4 and Betty was an MM6). I
believe he told me he would see what he could do and when I didn't hear
anything I went to Chief William Hitchcock. I explained what Chief
Christian and I discussed and he asked me to put it in writing explaining
what I was looking for, what Betty received, etc. (see email dated
1/31/02).

When Chief Christian became Commissioner Chief Hitchcock spoke to him
about getting me a high title. I meet with Commissioner Christian again I
believe in the Spring/Summer of 2002 and again, I explained the situation
of being upgraded to an MM6. He told me that City hall would only give
me an MM5 and asked if I could take it to hold me over for a while. I did
receive the MM5 in November 2002 and nothing has ever been done on
upgrading me to an MM6.

11.   Please set forth in detail the factual basis for any and all claims that you have filed against

the defendant, William Kessler.

Answer:    Not applicable to me.

12.   Please set forth in detail the factual basis for any and all claims that you have filed against

the City of Boston Fire Department.

Answer:    See the facts as alleged in the Complaint filed herein, the Answer to
Interrogatory No. 5 specifically, and generally to all interrogatories herein.

The Boston Fire Department and several of its members have instituted a
character and career assassination towards me in the way that they have
conducted themselves when it comes to interviewing and appointing people
to promotional positions within the Fire Department.

The Boston Fire Department has no policy on Interviewing.

The Boston Fire Department and representatives of the Fire Department
have appointed people solely or substantially because of their political
affiliation, patronage, or support.

**No Pay Acting and Upgrade**
More specifically, on June 11, 1998, I wrote a letter to the Fire
Commissioner, Martin E. Pierce requesting Acting pay while Joseph (Joe)
Nee was out on injured leave and a promotion. (See copy). I also
mentioned in that letter that I was requesting to be compensated on my
own due to the fact that whenever I mentioned a pay raise to Joe Nee, my
supervisor, it was always taken in a joking manner and I would receive
comments about how I make enough money or how I shouldn't complain
or I'll be sent over to work at the main building of Fire Headquarters.

The Commissioner requested a meeting with Dennis Flynn, Superintendent
of Maintenance and myself (I don't remember the exact date) a short time
later. The letter was addressed first and I was told how I didn't go through
the proper procedure when I sent my letter to him. Thus, I believe the
reason Dennis Flynn was requested to attend the meeting was to make sure
that he knew that I went over Dennis' head.

I was told I wouldn't be compensated for acting money nor get a pay raise.
The acting money was because Joe Nee was a firefighter and I was a
civilian and acting money goes to firefighters. When he addressed a pay
raise I mentioned how I am constantly being told by Fire Department
personnel on what a great job I was doing in Maintenance and how I
appreciated the compliments but "pats on the back doesn't pay my bills".
The Commissioner told me if I wanted a raise I would have to apply for a
job title when one was posted. When I mentioned how I liked my current
job and how I didn't want to leave it I was told if this was Edison and a job
came up on say the third floor you would have to move. I then asked
why/how Pat Mulkern and Susan Gailunas received higher titles and they
didn't have to apply for other titles and move into other offices.
Commissioner Pierce never answered the question. I also asked Dennis
Flynn if he wanted me to leave the Maintenance Division and he said no
because I am such an asset to the Maintenance Division.

The meeting ended and I left it without being compensated for acting out

of grade or with a pay raise.

**Requesting MM6 title**

On January 19, 2006 I attended a Fiscal Year 2007 budget meeting with
Dennis Flynn, Andy Warren, Mike Grigalunas and Kathleen Kirleis. At the
end of the meeting I addressed two issues with Kathleen. The first was
about getting my title upgraded to an MM6 the same as Betty Golden. I
said how we both do the same work and I felt how we should be
compensated the same. She jotted my request down in her notes

The second was the new job posting for an MM5 Manager Analyst. I
asked Kathleen if all the MM5 titles (which is Senior Administrative
Assistant) are going to be change to Manager Analyst because I thought
the Civil Service title for an MM5 was Senior Administrative Assistant.
Kathleen said that the MM5 Manager Analyst title was a Civil Service title
and the Richie Driscoll from the Office of Human Resources gave them the
job description and she would check with him on it. She also said that this
is a new title that doesn't exist in the Fire Department. I then said that
many of the responsibilities and duties sound like I do. She then said to me
how that title doesn't do accounts payable.

When I started to leave the meeting I told Kathleen the difference between
Betty and my pay is around $5,000 - $8,000. I gave Kathleen an estimate
because I was not sure exactly because I did not have the figures in front of
me.

13.   Are you aware of other employees of the Boston Fire Department not already named in

the above-captioned matter that you claim or understand to be, in your opinion, subject to

the same alleged discrimination or rights violations as alleged in the Plaintiffs' Complaint.

Answer:      Yes.

14.   If you answer to the preceding interrogatory is in the affirmative, please identify (a) the

number of those individuals; and/or (b) identify those individuals by name, residence

address and office within the Boston Fire Department. If you are unable to provide the

name and address of these individuals, please set forth the number of those individuals.

Answer:      Former Employees who were subject to political affiliation discrimination
             Rosemarie Clinton
             Steve Morash
             Barbara Ryan

       Present Employees who were victims of the administrations' political
       affiliation discrimination
       Linda Collins- trained pay role director
       Katy Donovan
       Paula Hamilton- trained pay role director
       Marta Poupart

       Majority of B.F.D. civilian employees

15.    If you believe the facts or nature of your claims against the defendants is different in

anyway than the facts and nature of the claims of the other plaintiffs named in the

above-captioned matter, please set forth each and every fact which you believe

distinguishes or differentiates your claim or claims from the claims of the other plaintiffs.

Answer:    Each of Plaintiff's claims are similar in that we all were discriminated
against in similar ways in our efforts to obtain promotions, pay upgrades,
and step increases. Some Plaintiff were retaliated against because of their
vocal opposition to this system. That type of retaliation may have a part of
why I did not receive fair consideration, but my claims are more directly
political discrimination claims. But the individual circumstances are not
exactly the same.

16.    How long do you believe you have been denied advancement in the Boston Fire

Department because, as you assert in Plaintiffs' Complaint, you were of the correct

political affiliation, including in your answer the date when you first believe you were

denied advancement due to political affiliation.

Answer:    As set forth herein, I have been subject to adverse employment decisions
such as the denial of pay raises, upgrades, and denials of promotion, solely
because of my lack of political affiliation, sponsorship, support, and/or
connection to the then current City and BFD administration, I never have
alleged that I have suffered  because I was of the "correct political
affiliation."

17.    Please define "political affiliation" as applied in your particular case and set forth in the

Plaintiffs' Complaint, and describe how you have been discriminated against on the basis of

"political affiliation".

Answer:    See Answers to Interrogatories, above.  Political affiliation is the
sponsorship from, support from, and/or close affiliation with a member of
the then existing administration in power and influence in the City of
Boston Administration and Boston Fire Department executive officers,
including the group of individuals known as the "Hyde Park Group" and
"South Boston Group" who constantly vie for power against any other
political group, including other parties (e.g., Republicans and other groups
within the Democratic party).

Political Affiliation as applied in my particular case is that persons were
appointed to positions in the Boston Fire Department because of who they
knew, who sponsored them, and who supported them, rather than merit.  I
was aware, as well as others were aware, of who was being appointed to a
position before the position was posted and interviews conducted.

This practice has occurred time and time again, but very blatant since the
year 2000.

18.    As set forth in the Plaintiffs' Complaint, to what organization, political group, place or

person do you believe you must be affiliated in order to advance in the Boston Fire

Department.

Answer:    Mayor Thomas M. Menino
"The Menino Administration,"
"Hyde Park Group. Including Menino, Andy Warren, McHugo, Petta
"South Boston Group - including Joe "Do Do" Nee, Hitchcock, Christian.

19.    Do you believe "political affiliation" discrimination within the Boston Fire Department

extends beyond your department and, if so, state each and every fact upon which you rely

in this assertion and describe the extent of the alleged discrimination.

Answer:    Objection, overbroad, vague and ambiguous, subject to and without waiver
of said objection, Plaintiff responds that political affiliation discrimination is
widespread throughout the agencies controlled by the Menino
administration.  This is not part of the claims as set forth in the complaint,
and therefore irrelevant to the Class Certification issues.

20.    For each promotion or transfer you requested or received within the Boston Fire

Department, please state the following:

a. the dates of each request for promotion or transfer;

b. the position desired;

c. the date you received a response to each request; and

d. the reason you received for the denial of the request.

Answer:     See Answer to Interrogatory Nos. 3, 4, 7, 10, and 12.

21.    Please identify by name and address everyone known to you to have been subjected to the

same conduct from the Defendants as you allege in the Plaintiffs' Complaint. Answer: See

Answer to Interrogatory No. 14.

I, MARY M. KANE, HEREBY SWEAR AND AFFIRM UNDER THE PAINS AND PENALTIES OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY PRESENT INFORMATION AND BELIEF:

_____
Mary M. Kane

AS TO OBJECTIONS:

_____
Thomas F. Feeney [BBO# 645605]
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05-10528-RCL

DENISE M. BARRY; JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA J.
MCDONOUGH; ELAINE MESITI, LILA
BROWN; MARY M. KANE, and JUDITH A.
KELLEY, individually and on behalf of all those
similarly situated,
        Plaintiffs,

v.

ROBERT J. MORAN, PAUL A. CHRISTIAN,
WILLIAM KESSLER, RONALD KEATING,
JOSEPH FINN, WILLIAM HITCHCOCK,
CITY OF BOSTON FIRE DEPARTMENT, and
JOHN and/or JANE DOES 1-50.
        Defendants.

## AFFIDAVIT OF PAUL A. CHRISTIAN

I, Paul A. Christian, do hereby swear and depose the following:

1.  I was the Commissioner of Boston Fire Department from November 9, 2001 until February 15, 2006 and held the position of Chief of Department from March 25, 2000 until February 15, 2006.

2.  My career with the Boston Fire Department began in January of 1968 when I started as a firefighter. I advanced from Firefighter to Lieutenant to Captain and then went from District Chief to Deputy Chief until I assumed the position of Chief of Department in 2000.

3.  As Chief of Department, I was the executive head of the uniformed firefighting force for the City.

4.  As Commissioner, I was the head of the Boston Fire Department, the appointing authority who possessed the right to hire, fire, or promote within the department and was statutorily responsible for the protection of life and property from fire or any other hazardous condition, natural or man made, within the City of Boston. I had the authority to take all measures I deemed appropriate to protect life and property and to guarantee the effective operation of the Boston Fire Department.

5. While Commissioner of the Boston Fire Department, qualified applicants for an open civilian position would be forwarded to Robert Moran who would do the preliminary screening to make sure that they met the basic requirements of the position. Mr. Moran would conduct the initial interviews and oversee the satisfaction of the other employment pre-requisites, such as drug testing. Job descriptions, pay rate, employment and educational requirements as well as other relevant position details were developed at City Hall.

6. After Mr. Moran concluded the initial assessment, he would advise me as to whom were the top candidates for the position, which could be one or more people depending of the level of the position within the department at the time.

7. At all times during my tenure as Commissioner, consistent with the employment policies of the City of Boston, we would hire or attempt to hire the person who we believed was the best qualified candidate for the position considering the position and the field of applicants.

8. This policy was in effect during the time of my position as Commissioner of the Boston Fire Department and I believe this policy is still in effect today as an adopted policy of the department.

*Signed under the pains and penalties of perjury this*  **6**  *day of September, 2007.*

Paul A. Christian
Commissioner of the Boston Fire Department, Retired
Chief of Department, Retired

# City of Boston
# Employee Handbook



 ## Thomas M. Menino, Mayor

## An Equal Opportunity Employer

## E. Workplace Problems/Complaints

### a. Overview

It is the desire of the City of Boston to promote a positive work environment. Thus, it is the policy of the City of Boston that all employees have an opportunity to inform the City of situations employees perceive as problems in the workplace.

We recognize the meaningful value and importance of full discussion in resolving possible misunderstandings and preserving good relations between management and City employees. Accordingly, we believe that the following procedure will ensure that employee concerns receive full consideration. In the absence of an applicable collective bargaining grievance procedure, the following procedure should be utilized. This section does **not** create a formal or informal grievance procedure and employees are not granted any contractual or legal rights as a result of the City's use of this procedure.

### b. Procedure

Should a condition exist which you feel is unsatisfactory, it is important that you bring it to the attention of the appropriate person. Normally, that person would be your immediate supervisor. However, if your supervisor is the source of the complaint, you should contact the next level of management.

It is of utmost importance that your supervisor notify you of the action to be taken to correct the situation that is the source of your complaint. If your supervisor believes no action is warranted, you should receive an explanation as to the reasoning of such decision. Generally, your supervisor should reply to you within three (3) working days of your complaint.

In the event that you feel that the problem remains unresolved following discussions with your supervisor, you may submit the complaint in writing to the appropriate Appointing Authority/Department Head for reconsideration. Upon reviewing the complaint, your Department Head will normally render a decision in writing within three (3) days after receipt of your written complaint.

In certain cases, your Department Head and your supervisor may wish to meet personally with you in order to provide a more extensive explanation of the action taken. Unionized employees should consult their respective collective bargaining agreements concerning the specifics of their grievance and/or complaint procedure.

## F. Residency Policy

All newly hired City of Boston employees must be residents of the City prior to their actual start date with the City. Said employees must remain residents during their entire employment with the City of Boston. Newly hired employees are governed by the City of Boston Ordinance 5-5.3 as amended on July 21, 1994.

Upon date of hire, and annually on February 1st, all employees subject to the City of Boston ordinance must file a certificate of residency and two (2) utility bills with their respective department heads. Failure to file an annual residency certificate and two (2) utility bills will result in a voluntary termination of your employment.

Certain unionized members hired before a specific date referred to in their collective bargaining agreement are exempt from the residency ordinance as amended on July 21, 1994.

## G. E-Mail and Internet Policy

The City of Boston recognizes the importance of modern technology and access to information to the City's efforts to provide its citizens the best and most efficient services. Therefore, many employees of the City of Boston are provided with e-mail as well as limited access to the internet. The City encourages its employees to utilize these tools, however, it should be understood that the City's e-mail system and internet access should only be used for the City's business purposes. E-mail and the internet should not be used for an employee's personal benefit.

Information sent or received via e-mail and/or the internet is the exclusive property of the City of Boston. Employees should be aware that all e-mail messages are automatically stored on the City's computer back-up system. The City also keeps records of internet sites visited by City employees. All e-mail messages and internet sites are subject to review by the City from time to time or at any time at the City's discretion. An employee's use of the City's e-mail system and/or the internet constitutes their consent to the City's recording of the employee's e-mail messages as well as the web sites visited by that employee. Any improper use of these vital tools will not be tolerated and will subject the employee to discipline, up to and including termination.

## H. Employee Attendance Policy

### a. Hours of Work

Hours of work shall be determined in accordance with the needs of the City and the convenience of the public. Unless otherwise specified by your department head or your collective bargaining agreement, the work week shall ordinarily consist of seven (7) hours during each of five (5) consecutive twenty-four (24) hour periods. Also, unless otherwise specified, the work week will be from Monday to Friday, 9:00 a.m. to 5:00 p.m. Employees scheduled to work thirty-five (35) hours per week will be considered full-time employees (See Section V for more detail regarding employee status definitions). An employee's lunch period shall not be included as part of their normal thirty-five (35) hour work week. Unionized employees should consult their respective collective bargaining agreements regarding hours of work.

Case 1:05-cv-10528-RCL    Document 79-10    Filed 09/07/2007    Page 1 of 6

ORIGINAL

VOLUME: 1
PAGES: 1-111
EXHIBITS: 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 05-10528-RCL

DENISE M. BARRY; JANE B. GREEN;
ELIZABETH H. GOLDEN; PATRICIA
J. MCDONOUGH; ELAINE MESITI;
LILA BROWN; MARY M. KANE; and
JUDITH KELLY, individually and
on behalf of those similarly situated
          Plaintiffs

v.

ROBERT J. MORAN; RONALD KEATING;
PAUL CHRISTIAN; RODERICK J. FRASER, JR;
WILLIAM KESSLER; WILLIAM HITCHCOCK;
CITY OF BOSTON (Fire Department) and
JOHN and/or JANE DOES 1-50

          Defendants.


          DEPOSITION OF JANE B. GREEN, Plaintiff, called

on behalf of the Defendant, pursuant to the provisions

of the Massachusetts Rules of Civil Procedure, before

Mary Jo Boxer, Professional Court Reporter and Notary

Public, in and for the Commonwealth of Massachusetts, at

the City of Boston Law Department, One City Hall Plaza,

Boston, Massachusetts, on Friday, April 13, 2007,

commencing at 2:20 p.m.

1    A.    No, I believe I left in 1965.

2    Q.    For how long?

3    A.    About eighteen years; I had four children.

4    Q.    Okay.  So when did you return to your

5    employment?

6    A.    I returned July 25, 1984.

7    Q.    And what position did you take there then?

8    A.    It was an R-8.  I believe it was a

9    principal clerk.

10    Q.    And what did that job title require you to

11    do?

12    A.    Basically, I did the flammable licenses,

13    which would be every building that had highly flammable

14    material.

15    Q.    Did you get some kind of increase in the

16    position after working in that position, R-8 position?

17    A.    I believe I became an R-10 in that

18    position and backing up the cashier.

19    Q.    Did that result in an increase in pay?

20    A.    Yes.

21    Q.    Did you have to apply for that position?

22    A.    Yes.

23    Q.    Did you get that position based on your

24    application?

1          A.      Yes, I believe.

2          Q.      And then did you get another grade up

3    increase at some point in time?

4          A.      Uh-huh.  I believe it was an R-11.

5          Q.      Did you apply for that position?

6          A.      Yes.

7          Q.      Were you interviewed?

8          A.      Yes.

9          Q.      And you got it?

10         A.      Yes.

11         Q.      And that was an R-11?

12         A.      Yes.

13         Q.      Did that result in an increase in pay?

14         A.      Yes.

15         Q.      At some point in time thereafter, did you

16   get an increase in your position or a promotion, so to

17   speak?

18         A.      It would be an R-12.

19         Q.      What were you doing in an R-12 position?

20         A.      In the R-12, I believe at that time I was

21   in Special Hazards, which covered every flammable from

22   five gallons of gasoline up until 100,000, all flammable

23   materials throughout the city, transportation permits,

24   garages --

1      Q.    And --

2      A.    Tanks removal.

3      Q.    I'm sorry for interrupting.  Did that

4  result in a pay increase as well?

5      A.    Yes.

6      Q.    Did you then get another position after

7  the R-12 position?

8      A.    It was an R-14.

9      Q.    What were your job responsibilities there?

10     A.    Special Hazards just kept growing and

11  growing; it's a massive office.

12     Q.    And did that result in a pay increase as

13  well?

14     A.    Yes.

15     Q.    Did you get an increase or a promotion

16  after that?

17     A.    R-15, I believe.

18     Q.    Okay, what were the responsibilities of

19  that job?

20     A.    Special Hazards, you know, supervising

21  another girl, one girl at that time.

22     Q.    Same department though?

23     A.    Absolutely.

24     Q.    And did that result in a pay increase?

1        A.        Yes.

2        Q.        Did you have a position upgrade or

3    promotion after the R-15?

4        A.        I believe I was an acting MM4.

5        Q.        Okay.

6        A.        And at that time, I believe I supervised

7    my end of the floor.

8        Q.        How many people was that?

9        A.        I helped out -- I'd probably say about

10   six.

11       Q.        Six people you supervised?

12       A.        Yes.

13       Q.        Did that increase the pay that you

14   received?

15       A.        Yes, temporarily.

16       Q.        And did you have another promotion or

17   upgrade?

18       A.        That was the MM5.

19       Q.        Do you recall when that was?

20       A.        I believe it was 1998, 1997.

21       Q.        What were your responsibilities in the MM5

22   position?

23       A.        I got that due to the fact that I did a

24   good job supervising and they wanted to keep me on.

```
 1          Q.     Did that result in a pay increase as well?

 2          A.     Yes.

 3          Q.     After 1997, have you ever applied for

 4   another position?

 5          A.     I believe I have, but I can't remember to

 6   be honest.

 7          Q.     Okay.  Do you know the department even

 8   that you applied?

 9          A.     Everything changes so fast.  I can't.

10          Q.     Do you recall having filed an application

11   for those positions?

12          A.     I can't; I can't remember.

13          Q.     Is your current MM5 position in flammables

14   also, same department?

15          A.     No.

16          Q.     Okay.

17          A.     Well, the reason why I say that -- I'll

18   explain that -- is I'm doing -- I was moved to the Fire

19   Reports to work with the public, deal with the Salvation

20   Army, deal with the American Red Cross.

21          Q.     When were you moved to Fire Reports?

22          A.     2001.

23          Q.     Had you ever done fire reports before

24   this?
```

**Breakdown of Claims Alleged by Named Plaintiffs against Named Defendants as set forth in Plaintiffs Third Amended Complaint**

**Exhibit "I"**

|  | Moran | Keating | Finn | Christian | Kessler | Hitchcock | Fraser |
|---|---|---|---|---|---|---|---|
| **Barry** | Claim | Claim | Claim | Claim | Claim | No claim | Claim |
| **Golden** | Claim | No claim | No claim | Claim | Claim | No claim | No claim |
| **Green** | Claim | No claim | Claim | No claim | Claim | No claim | No claim |
| **Mc Donough** | Claim | No claim | No claim | Claim | No claim | No claim | No claim |
| **Mesiti** | Claim[1] | No claim | No claim | Claim | No claim | No claim | No claim |
| **Brown** | Claim | No claim | Claim | Claim | Claim | No claim | No claim |
| **Kane** | Claim | No claim | No claim | Claim | No claim | No claim | No claim |
| **Kelley** | Claim | No claim | No claim | No claim | No claim | No claim | No claim |

[1] Plaintiff Mesiti's claim against Bob Moran is based solely on the fact that he received the position for which she applied.