UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE M. BARRY, et al.,    )
                             )
         Plaintiffs,   )
   v.                   )        CIVIL ACTION
                             )        NO. 05-10528-RCL
ROBERT J. MORAN, et al.,   )
                             )
        Defendants.  )

**REPORT AND RECOMMENDATION ON
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

April 7, 2008

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiffs, eight civilian employees of the Boston Fire Department ("BFD" or "Department"), have brought this action against the BFD and seven of its current or former officials and supervisors, alleging that the defendants established a pattern and practice of hiring and promotion at the BFD based on political patronage and favoritism. The individual defendants include Robert J. Moran ("Moran"), Paul A. Christian ("Christian"), Roderick Fraser, Jr. ("Fraser"), William Kessler ("Kessler"), Ronald Keating ("Keating"), Joseph Finn ("Finn") and William Hitchcock ("Hitchcock"). Each of the defendants has been named in both his official and individual capacity.

The plaintiffs claim that the defendants' conduct in hiring and promoting BFD employees on the basis of their political affiliation or other association with those in

power at the BFD, and the defendants' actions in retaliating against individuals who complained about such discrimination, deprived the plaintiffs and others similarly situated of their civil rights and violated state statutory and common law.  By their Third Amended Complaint, the plaintiffs have asserted claims against all of the defendants for civil rights violations under 42 U.S.C. § 1983 and for negligence, and against certain of the defendants for violations of the Massachusetts Civil Rights Act, violations of the Massachusetts Whistleblower Protection Act, negligent supervision and intentional infliction of emotional distress.

Presently before the court is the "Plaintiffs' Motion for Class Certification" (Docket No. 76), by which the named plaintiffs, Denise M. Barry, Jane B. Green, Elizabeth H. Golden, Patricia J. McDonough, Elaine Mesiti, Lila Brown, Mary M. Kane and Judith A. Kelley, are requesting certification of a class and two subclasses.  The proposed class would consist of "all persons who have been and/or are being subjected to unlawful political affiliation discrimination, or retaliation based upon their objection to, or reporting of, said political affiliation discrimination, that has been practiced and/or is now being practiced within the Boston Fire Department."[1]  (Mot. at 1-2).  According to the plaintiffs, this class would include "employees who have applied for positions, promotions, pay upgrades, and/or step increases," as well "individuals who were

---

[1]  At oral argument, plaintiff's counsel stated that the proposed class would include only individuals who have been subjected to the alleged discriminatory employment practices since 2000.

denied the opportunity to apply for a position that would have been open had a more qualified, non-affiliated BFD applicant obtained a promotion given to a (usually non-BFD) political appointee." (Pl. Mem. (attached to Docket No. 76) at 7). The first proposed subclass would consist of "[p]laintiffs seeking injunctive relief who have been discriminated against because of their lack of political affiliation," and the second proposed subclass would consist of "[p]laintiffs who may have monetary claims for injuries suffered due to Defendants' denial of advancement or pay increases while employed by the Boston Fire Department." (Mot. at 2).

As detailed below, this court finds that the plaintiffs have failed to demonstrate that their claims and the class claims share common questions of law or fact and that the individual plaintiffs' claims are typical of the class claims. In particular, the plaintiffs have not sufficiently alleged that they were subjected to standardized conduct by the defendants or that a political patronage system adversely affected all members of the putative class. Instead, the record reveals an assortment of highly individualized employment decisions involving individual plaintiffs having different backgrounds and employment experience and seeking a diverse array of employment positions. Under these circumstances, a case-by-case analysis of the plaintiffs' legal claims is necessary and class treatment would be inappropriate. Accordingly, and for all the reasons set forth below, this court recommends to the District Judge to whom this case is assigned that the plaintiffs' motion for class certification be DENIED.

## II.  <u>STATEMENT OF FACTS</u>[2]

The following facts are relevant to the plaintiffs' motion for class certification.

### <u>The Parties</u>

Each of the named plaintiffs is currently a civilian employee of the BFD and is a member of either the union of Salaried Employees of America ("SENA") or the American Federation of State, County and Municipal Employees ("AFSCME").  (Def. Ex. B ¶¶ 5, 9).  Most of the plaintiffs claim that they have been passed over, denied or otherwise dissuaded from applying for, promotions, step increases and upgrades in their employment positions because they are not politically affiliated or otherwise advantageously associated with those in power at the BFD.  (Compl. ¶ 34).  They further claim that these employment actions were part of a pattern and practice of hiring and promotion at the BFD that placed little or no emphasis on individuals' qualifications and was based almost

---

[2]  The facts are derived from the Third Amended Complaint (Docket No. 54) ("Compl. ¶ __"), exhibits attached to the plaintiffs' "Memorandum in Support of Motion for Class Certification" (Docket No. 76) ("Pl. Ex.__") and exhibits attached to the "Defendants' Memorandum of Law in Opposition to the Plaintiffs' Motion for Class Certification" (Docket No. 79) ("Def. Ex. __").

exclusively on applicants' political affiliation[3] or connection to various persons in charge at the Department.  (Id. ¶ 36).  The plaintiffs contend that these practices have been ongoing since 2000.[4]  (Pl. Mem. at 18).

At any given time, there are approximately 77 SENA and AFSCME civilian employees working for the BFD in a variety of positions and grade levels.  (See Pl. Exs. A & B).  The plaintiffs contend that since 2000, most of these civilian employees have likely been victims of political affiliation, patronage and influence discrimination, as have others who applied for but were not hired into these positions.  (Pl. Mem. at 7-8).  The class that they are seeking to represent consists of both current and former civilian employees, each of whom has had a different employment experience at the BFD.  (See

---

[3]  The plaintiffs define "political affiliation" as:

> The sponsorship from, support from, and/or close affiliation with a member of the then existing administration in power and influence in the City of Boston Administration and Boston Fire Department executive officers, including the group of individuals known as the "Hyde Park Group" and "South Boston Group" who constantly vie for power against any other political group, including other parties (e.g., Republicans and other groups within the Democratic party).

(E.g., Pl. Ex. D at Int. No. 17; Pl. Ex. F at Int. No. 17).

[4]  The defendants have submitted evidence by which they dispute the substance of certain of the plaintiffs' factual allegations, including their allegations that decisions regarding hiring and promotion were based on applicants' political or other affiliations with those in power at the BFD. Although this court has considered the materials submitted by the defendants to the extent they are relevant to the present motion, at this stage, the court does not consider the merits of the claims and defenses.  See Markarian v. Conn. Mut. Life Ins. Co., 202 F.R.D. 60, 63 (D. Mass. 2001) (Court should not decide merits of case at the certification stage, even though motions to certify generally involve considerations "enmeshed in the factual and legal issues comprising a plaintiff's cause of action") (internal punctuation and citation omitted).

Def. Ex. B ¶¶ 22-23).  For example, employment records of individuals currently employed in civilian positions at the BFD show that some of the individuals have applied for one or more promotions since 2000 while others have not applied for any, some but not all have received promotions or upgrades, and one individual is currently on a medical leave of absence.  (Id. ¶ 23).  Similarly, of the former civilian employees who have left the Department since 2000, some retired after a long period of service, while others left for alternative employment opportunities or were terminated.  (Id. ¶ 22).

Defendant  Moran has been the Human Resources Director of the BFD since 2001. (Def. Ex. B ¶ 1).  During most if not all of the time period from 2000 to the present, Moran was responsible for conducting the preliminary screening of applicants for civilian positions within the BFD, for selecting the top candidates for those positions, and for advising the BFD Commissioner regarding those candidates.  (Def. Ex. F ¶¶ 5-6).  Defendant Paul A. Christian was the Chief of the BFD and executive head of the uniformed firefighting force for the City of Boston from March 2000 until February 2006.  (Id. ¶¶ 1, 3).   He also served as the Commissioner of the BFD from November 2001 to February 2006.  (Id. ¶ 1).  In that capacity, Christian headed the Department and had ultimate authority to make decisions regarding the hiring, firing and promotion of employees, and to take all measures appropriate to protect life and property and to guarantee the effective operation of the BFD.  (Id. ¶ 4).  Defendant Fraser succeeded Christian as Commissioner of the BFD.  (Compl. ¶¶ 13, 32).

Defendant Finn was employed as the Deputy Fire Chief of Personnel Department of the BFD from December 2001 to July 2005. (Id. ¶ 10). Defendant Keating has served as the Deputy Fire Chief of Personnel Department since June 15, 2005. (Id. ¶ 11). Defendant Hitchcock was employed as the Director of Operations for the BFD during the relevant time period, and defendant Kessler works as the Department's Director of Employment and Recruitment. (Id. ¶¶ 14-15). The plaintiffs allege that Hitchcock attended regular meetings with Moran, Christian and, after Christian was no longer Commissioner, Fraser, at which the defendants determined who would be hired or promoted based primarily on the applicant's political affiliation or other association with those having power and influence over the BFD. (Id. ¶ 32).

## Background of Employment Practices at the BFD

In January 2000, the Boston Fire Department Review Commission ("Commission") issued a report intended "to identify the very real problems and challenges that face the Boston Fire Department today and to create a dialogue for change within the Department for the future." (Def. Ex. A at 1:4). In its report, the Commission noted, in relevant part, that a significant number of employees had complained of the existence of an "old boy network" throughout the Department, and a "perception" that you had to be among the "in crowd" to succeed. (Id. at 2:11). The Commission made sixty-six different recommendations as a result of its review. (Id. at 1:7). Among them were the recommendations that a professional human resources manager be hired outside of the collective bargaining unit to address personnel issues within the organization, and that the

BFD work with the Office of Personnel Administrator for the Commonwealth to update the existing promotional system.  (Id. at 6:38-39).

In October 2000, Boston Mayor Thomas Menino issued an Executive Order directing all departments within the City to adhere to a policy which provided, inter alia, that "discrimination, retaliation and harassment are contrary to City policy and are also illegal.  Such conduct is defined as follows: . . . Conduct that conditions a person's hiring, compensation, terms and conditions of employment or access to services provided by the City on that person's . . . political affiliation[.]"  (Compl. ¶ 29).  The plaintiffs claim that this Executive Order was issued for the purpose of addressing "a historical pattern and practice of political affiliation discrimination, a/k/a 'patronage' or 'cronyism' within Boston City Departments, including, but not limited to" the BFD.  (Id. ¶ 30).  Notwithstanding the Executive Order and the efforts of the Commission, the plaintiffs claim that since 2000, decisions regarding hiring and promotion at the BFD have continued to be based primarily upon "the applicant's political affiliation or other association with those maintaining power and influence as to the BFD."  (Compl. ¶ 32).

## Alleged Discrimination Against Denise Barry

Plaintiffs Barry and Green have alleged detailed facts regarding instances in which they claim to have suffered adverse employment practices at the BFD.  The plaintiffs contend that these facts, and the more generalized allegations of the remaining named plaintiffs, establish that their claims are essentially the same as those of the putative class members in that they were discriminated against on the basis of political affiliation.  (See

Pl. Mem. at 12-15). However, a review of the allegations establishes the individualized nature of the plaintiffs' claims.

Plaintiff Barry began working as a Principal Clerk in the Training Division of the BFD in August 1996. (Compl. ¶ 46). At that time, she had a civil service employment rating of R-8. (Id.). She claims that throughout her employment, she has received only two upgrades, and that all of these upgrades occurred as a result of a decision to elevate everyone working in the particular employment position. (Id. ¶ 47). Barry alleges that in July 2003, she approached Moran to inquire as to why she was not receiving raises or upgrades. (Id.¶ 48). Moran allegedly told Barry that there was not enough money and that no one was receiving a raise. (Id.). However, Barry later learned that Moran was attempting to create an R-15 Administrative Assistant position, a position superior to Barry's position, for Sheila Mancuso. (Id.). Barry claims that Moran was attempting to assist Ms. Mancuso as a political favor, even as he continued to represent to Barry that there was a freeze on raises and hiring. (Id. ¶¶ 48, 51).

Barry alleges further that in August 2003, she applied for an R-15 Administrative Assistant position, that she was well qualified for the job, and that she was interviewed for the position by both Moran and Chief Robert Calobrisi. (Id. ¶ 50). According to Barry, during the course of the interview process, other BFD employees informed her that defendants Moran and Christian had already selected someone for the job from outside the Department who did not meet the minimum qualifications for the position. (Id.). Barry further claims that the individual selected by the defendants was ultimately hired

for the position based on her political affiliation and association with those in power at the BFD.  (Id.).[5]

According to Barry, in October 2003, Moran refused to increase her pay to appropriately compensate her for higher level and additional work that he had assigned her to do.  (See id. ¶¶ 54-62).  Eventually, on October 9, 2003, Barry met with Moran in order to ask whether she would be receiving the Case Manager position she had been performing on a temporary basis, and to complain about the fact that she was not receiving promotions and pay increases when due.  (Id. ¶ 65).  Plaintiff Green also attended the meeting in her capacity as Barry's union shop steward.  (Id. ¶ 67).  During the meeting, Moran allegedly told Barry that she would not be getting the Case Manager position because City Hall had someone else in mind for the job.  (Id. ¶ 66).  According to the plaintiffs, Moran stated, "[w]ell, if you're not into politics little girl, then you're not into a position here."  (Id. ¶ 90).  Green told Moran that she could not believe he had made that statement, and Moran allegedly replied, "that's the way it is around here." (Id.).  The plaintiffs further claim that when Barry asked Moran if she was going to be punished because she was not into politics, Moran shrugged his shoulders and said, "that's politics for you."  (Id.).

---

[5]  As further evidence of the fact-intensive nature of the claims herein, the defendants point to the fact that the hiring of this individual was addressed in an arbitration between AFSCME (on behalf of another applicant for the position) and the City of Boston where the arbitrator found the new hire to be appropriate and that the new hire's qualifications were "significantly greater" than the other applicant (who, in turn, was more senior than Barry).  (Def. Mem. ¶¶ F, G; Def. Ex. C).

Barry claims that following the meeting with Moran, she was informed that Moran would never approve any pay increases for her due to her complaints and requests for pay raises. (Id. ¶ 68). Thereafter, according to Barry, she continued to be denied promotions and wage increases. (Id.).[6] The Case Manager position for which Barry had applied was given to Ian McKenzie, a former BFD employee who, according to Barry, was politically affiliated with individuals who had power and influence over the BFD. (Id. ¶ 69).

Barry maintains that she made various complaints about Moran's treatment of her, but that no investigation was ever conducted. In particular, Barry alleges that she complained both in writing and in meetings to defendant Kessler, the Director of Employment and Recruitment, but that Kessler refused to conduct an independent investigation and denied that anything Moran had said constituted unlawful discrimination. (Id. ¶¶ 70-71, 74-76). She also alleges that she submitted a written complaint to her supervisor, Chief Granara, regarding Moran's behavior and what she asserted were the BFD's unlawful policies and practices. (Id. ¶ 72). Barry contends that no investigation was performed even after Chief Granara informed defendants Hitchcock and Christian about Barry's complaints, and notice of her complaints was given to the Mayor of Boston. (Id. ¶¶ 73-77).

---

[6] The defendants have introduced evidence indicating that Barry received a promotion and pay increase in September 2006, which was about a year and a half after Barry commenced the present litigation. (See Def. Ex. B ¶ 12; Docket No. 1).

Barry claims that the defendants denied her a step increase on about October 15, 2004, but that several days later, on October 20, 2004, defendant Finn requested a step increase for another employee, Kathy Frechette.  (Id. ¶¶ 78-79).  According to Barry, Ms. Frechette is politically affiliated with those having political influence over the BFD.  (Id. ¶ 79).  Subsequently, on about November 15, 2004, Barry complained that she was not receiving offers for out-of-grade positions for which she would have been qualified, even though such opportunities were made available to less senior civil service and non-civil service employees who were politically affiliated with influential individuals.  (Id. ¶ 83).  According to Barry, the defendants ignored these complaints.  (Id.).

On December 9, 2004, Barry attended two labor relations hearings, which were held before Analyst Alice Kessler, the spouse of defendant William Kessler, in connection with Barry's complaints of discrimination.  (Id. ¶ 80).  The plaintiffs claim that shortly thereafter, defendants Moran, Christian, Finn and Hitchcock decided to retaliate against Barry by harassing her witness, plaintiff Green.  (Id. ¶¶ 82, 91).  The details of the alleged conduct against Green is described below.

Barry contends that the defendants continued to discriminate and retaliate against her during 2005 and 2006.  (See id. ¶¶ 84-85).  In particular, she claims that in April 2005, she discovered that at defendant Christian's direction, a surveillance camera used to monitor the entrance to the building had been redirected in order to monitor her work station.  (Id. ¶ 84).  Additionally, she claims that beginning in about January 2006, she was required to perform the responsibilities of a Fire Lieutenant who had passed away,

without receiving an out-of-grade promotion for completing the additional work. (Id. ¶ 85). Barry alleges that as a result of discrimination and other unlawful conduct by the defendants, she has been deprived of about $90,000 in past wages and benefits, continues to suffer losses in wages and benefits, and has suffered and will continue to suffer severe emotional distress. (Id. ¶¶ 86-87).

### Alleged Retaliation Against Jane B. Green

Plaintiff Green is a civil service employee in the Fire Reports section of the Fire Prevention Division of the BFD. (See id. ¶¶ 88, 94). She is also a member of and a shop steward for SENA, Local 9158. (Id. ¶ 88). Since 2000, Green has not applied for any positions within the BFD and, in contrast to the other named plaintiffs, she does not claim that she has been discriminated against in connection with any hiring decisions or opportunities for promotion. (See id. ¶¶ 88-114; Def. Ex. B ¶ 13). Rather, she claims that the defendants have unlawfully retaliated against her for supporting Barry's complaints of discrimination. (See Compl. ¶¶ 98, 103-04). Green also claims that she has suffered monetary damages, as well as severe emotional distress as a result of the defendants' actions. (Id. ¶¶ 105, 112-13). Again, a review of the complaint shows the personal nature of this plaintiff's complaints.

Green contends that on April 1, 2004, Moran denied her request for bereavement leave for the death of a family member even though the BFD has had a long standing practice of granting five days of bereavement leave under such circumstances. (Id.

¶ 111).  As a result, Green was forced to take vacation, and suffered damages.  (Id.).

Green maintains that Moran's conduct was retaliatory.  (Id.).

The plaintiff also alleges that in mid-December 2004, defendants Moran, Finn,

Christian and Hitchcock met with each other and decided to punish Green for supporting

Barry.  (See id. ¶¶ 90-91).  In furtherance of this plan, Green's section was moved at the

behest of defendant Finn from 115 Southampton Street in Boston to 1010 Massachusetts

Avenue in Boston beginning on December 27, 2004.  (Id. ¶ 94).  According to Green, the

equipment and files that she needed to perform her job remained at the Southampton

Street location for months, forcing her to make two or three trips back to her former

office each week throughout the winter in order to obtain needed information.  (Id. ¶¶ 95-

96).  She further claims that she had no telephone until March 8, 2005, and was unable to

assist customers in need of emergency services or to respond adequately to other work-

related inquiries.  (Id. ¶ 99).  Green contends that the defendants' conduct in relocating

her under such circumstances imposed an undue burden upon her, prevented her from

meeting the needs of the public effectively, and served no other purpose than to retaliate

against her for acting in her capacity as union shop steward and for serving as a witness

to and reporting unlawful conduct against Barry.  (See id. ¶¶ 98, 101, 104).

Green filed a grievance concerning her relocation, which was heard on January 27,

2005 by defendant Kessler's spouse, Labor Relations Analyst, Alice Kessler.  (Id. ¶¶ 106-

07).  Analyst Kessler rendered a decision dated March 1, 2005 in which she found that

there had been no violation of the collective bargaining agreement and denied Green's

grievance.  (Id. ¶ 108).  The plaintiffs claim that grievances such as Green's, relating to discrimination based on political affiliation, are arbitrarily and uniformly denied by Ms. Kessler and the Office of Labor Relations.  (Id. ¶ 109).

### Alleged Discrimination Against the Remaining Plaintiffs

The remaining named plaintiffs, Patricia McDonough, Elizabeth H. Golden, Elaine Mesiti, Lila Brown, Mary Kane and Judith A. Kelley, also have alleged acts of discrimination against them by one or more of the defendants, but they have not provided the level of detail alleged by Barry and Green.  Because their factual allegations are more generalized than the allegations of Barry and Green, they will be discussed collectively. Nevertheless, even the generalized allegations establish the need for a fact intensive analysis of each plaintiff's claims.

All of the remaining plaintiffs have been employed at the BFD in administrative positions.  (See id. ¶¶ 115, 123, 132, 138, 145, 152).  However, the dates on which they were first hired varies.  For example, Mesiti began her employment with the Department in July 1966, while Brown began working at the BFD in November 1997.  (Id. ¶¶ 132, 138).  The remaining plaintiffs were hired at different times between 1974 and 1987. (See id. ¶¶ 115, 123, 145, 152).  The positions held by the plaintiffs within the Department and their rates of pay also vary.  Both McDonough and Golden hold positions as Senior Administrative Assistants and have each remained at an MM-6 pay rate for about the last five years.  (Id. ¶¶ 116, 124; Def. Ex. B ¶¶ 14-15).  Brown worked at an R-12 pay rate for approximately five years, but apparently received a pay increase when she was

promoted to the position of Fire Prevention Administrative Assistant on November 13,

2006.  (Compl. ¶ 139; Def. Ex. B ¶ 17).  Mesiti is a Principal Administrative Assistant,

and Kane holds the position of Senior Administrative Assistant.  (Def. Ex. B ¶¶ 16, 18).

Each claims that she has worked at an MM-8 pay rate for the last five years. (Compl.

¶¶ 133, 146).  Kelley worked as a Senior Administrative Assistant with a pay rate of an

MM-5 for approximately 13 years.  (Id. ¶ 153).  The record indicates that Kelley has

retired from the Department.  (Def. Ex. B ¶ 19).

Since 2000, each of the plaintiffs has applied for one or more positions within the

BFD.  (Id. ¶¶ 14-19).  All of the plaintiffs claim that when they applied for new positions,

they were told not to waste their time because they purportedly did not meet the qualifi-

cations set forth in the job posting and because defendants Moran and Christian, among

others in power, had already picked someone for the job from outside the Department.

(Id. ¶¶ 117, 125, 134, 141, 147).  In each case, a different applicant was hired whom, the

plaintiffs allege, was less qualified and politically affiliated.  (Id. ¶¶ 119, 126, 135, 142,

148, 157).  In addition, the plaintiffs allege that they sought, inquired after or applied for

step and grade increases on a number of occasions, but that they were denied those

opportunities while other, politically affiliated individuals received increases undeser-

vedly.  (Id. ¶ 156).

In addition to these more general allegations, Brown has alleged that on one

occasion she applied for a new position the first time it was offered, but was told after she

had been interviewed that the position was going to be reposted interdepartmentally.  (Id.

¶ 140).  After it had been posted a second time, Brown allegedly applied again and was the only applicant for the position.  (Id.).  Although she claims to have been qualified, she was not given the position.  (Id.).  Instead, according to Brown, the position was posted a third time, this time city wide, and ultimately given to Lois Hart, allegedly on the basis of Ms. Hart's political connections.  (Id.).

The plaintiffs allege that they have submitted written complaints and grievances to their supervisors, including defendant Kessler, regarding the defendants' allegedly unlawful policies and practices.  (See id. ¶¶ 120, 127, 149, 154).  Golden claims that she met with Kessler in the Spring of 2005 to discuss her claims of discrimination.  (Id. ¶ 128). She asserts that Kessler promised to perform an investigation, but that he failed to do so, and that he simply informed her that her complaint was not covered by the collective bargaining agreement.  (Id. ¶ 129).

Each of these plaintiffs claims that the defendants' conduct has caused her to lose wages and benefits.  (Id. ¶¶ 121, 130, 136, 143, 150, 158).  Additionally, each of these plaintiffs claims that she has suffered and continues to suffer severe emotional distress as a result of the defendants' actions.  (Id. ¶¶ 122, 131, 137, 144, 151, 159).

## Alleged Preferential Treatment at the BFD

The plaintiffs have identified 14 individuals, including defendant Moran, who allegedly received a variety of different employment positions at the BFD due primarily to their political affiliations with one or more of the defendants or others with whom the defendants were affiliated.  (See id. ¶ 34a-n).  The plaintiffs claim that these individuals

were selected for employment positions over more qualified plaintiffs or proposed class members, and that in some instances the positions given to these individuals were never even posted.  (Id.).  They also claim that certain of the individuals received higher pay rates or benefits that were not available to the plaintiffs or potential class members.  (Id.).

The plaintiffs further maintain that in some instances the BFD, and specifically defendants Moran, Christian and Hitchcock, prevented the plaintiffs and members of the proposed class from obtaining the training necessary to qualify for the available employment positions, and would arbitrarily tailor the requirements of the jobs in order to match the qualifications of their selected candidates and exclude the plaintiffs from consideration.  (Id. ¶¶ 37-38).  By way of example only, the plaintiffs have submitted affidavit testimony from BFD employees, Catherine Moore and Maurice Mahoney, describing the hiring of Mary Ann McHugo to the position of Principal Administrative Assistant in the Fire Prevention Division of the BFD.  According to the plaintiffs, Ms. McHugo obtained this job with the assistance of Deputy Chief Joseph Fleming only because of her friendship with Andy Warren who was a member of a political group within the BFD known as the "Hyde Park Group."  (See Pl. Exs. H, M; note 3, supra).

The defendants have indicated that they are disputing all of the allegations of wrongdoing and intend to challenge all the plaintiffs' claims, including, inter alia, that lesser qualified applicants were hired or promoted.  To the extent necessary, additional facts relevant to this court's analysis are provided below.

### III.  ANALYSIS

A.    <u>Standard of Review</u>

1.    <u>Class Actions</u>

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 155, 102 S. Ct. 2364, 2369, 72 L. Ed. 2d 740 (1982) (quoting <u>Califano v. Yamasaki,</u> 442 U.S. 682, 700-01, 99 S. Ct. 2545, 2557-58, 61 L. Ed. 2d 176 (1979)).  "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" <u>Id.</u> (quoting <u>Califano</u>, 442 U.S. at 701, 99 S. Ct. at 2557).  In such circumstances, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion . . . ." <u>Id.</u> (internal quotations and citation omitted; alteration in original).

Class certification is governed by Fed. R. Civ. P. 23.  "To obtain class certification, the plaintiff must establish the four elements of Rule 23(a) and one of several elements of Rule 23(b)."  <u>Smilow v. Sw. Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 38 (1st Cir. 2003).  Pursuant to Rule 23(a), the plaintiffs must demonstrate:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  If the plaintiffs are able to meet these prerequisites to class

certification, they still must satisfy one of the requirements of Rule 23(b).  Here, the

plaintiffs are seeking class action status pursuant to either Rule 23(b)(2) or Rule 23(b)(3).

Under Rule 23(b)(2), the plaintiffs must show that "the party opposing the class has acted

or refused to act on grounds generally applicable to the class, thereby making appropriate

final injunctive relief or corresponding declaratory relief with respect to the class as a

whole[.]"  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) requires "that the questions of law or

fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the

fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

 Although the district court's decision on certification is discretionary, the "court

must conduct a rigorous analysis of the prerequisites established by Rule 23 before

certifying a class."  <u>Smilow</u>, 323 F.3d at 38.  In doing so, it may be "necessary for the

court to probe behind the pleadings before coming to rest on the certification question."

<u>Falcon</u>, 457 U.S. at 160, 102 S. Ct. at 2372.  Thus, in evaluating the plaintiffs' motion to

allow the case to proceed as a class action, the court may assess "the allegations in the

complaint in light of the entire record presented . . . on the motion for class certification."

<u>Swack v. Credit Suisse First Boston</u>, 230 F.R.D. 250, 257 (D. Mass. 2005).  When this

standard is applied to the record in the instant case, this court concludes that the plaintiffs

have not satisfied the prerequisites for class certification set forth in Rule 23.

## 2.    **Political Discrimination**

The crux of the plaintiffs' Complaint in this action is that the defendants' politi-

cally motivated process for making employment decisions within the BFD has deprived

the plaintiffs and others similarly situated of their constitutional rights.  "It is now well

established that political patronage restrains freedom of belief and association, core

activities protected by the First Amendment."  Padilla-Garcia v. Guillermo Rodriguez,

212 F.3d 69, 74 (1st Cir. 2000).  "In a trilogy of cases, the Supreme Court addressed the

constitutionality of political patronage and collectively held that non-policymaking public

employees are protected from adverse employment decisions based on their political

affiliation."  Id. (internal citations omitted).  In the instant case, the plaintiffs assert that

none of the employment positions at issue involve policymaking and that applicants for

these positions were therefore protected under the Constitution.  (See Pl. Mem. at 5).

To make out a claim for political discrimination, "the plaintiff must show that she

engaged in constitutionally protected conduct, and that this conduct was a substantial or

motivating factor for the adverse employment decision."  Padilla-Garcia, 212 F.3d at 74.

Accordingly, the plaintiff must demonstrate that "the challenged personnel action

occurred and stemmed from a politically based discriminatory animus."  Id.  Thus, the

plaintiffs must establish that affiliation with another was a motivating factor for the job

action and that the affiliation was political.  Id.  A personal affiliation is insufficient to

establish a constitutional violation.  See id. at 76.  If the plaintiff is able to establish a

prima facie case of political discrimination, the defendant may defeat the claim by

establishing "that it would have taken the same action regardless of the plaintiff's political beliefs . . . ." Id. at 74.

**B.    Application of Rule 23 to the Record**

The defendants have challenged the plaintiffs' ability to meet any of the necessary elements of Rule 23(a) or any one of the requirements of Rule 23(b).  This court finds that even assuming the plaintiffs are able to satisfy the remaining elements of Rule 23, their failure to demonstrate commonality or typicality under Rule 23(a) is fatal to their motion.[7]

"Rule 23 by its terms requires a commonality of fact and law and a typicality of claims between the plaintiffs in order that a case qualify for class treatment.  Courts have recognized that the commonality and typicality requirements of Rule 23(a) tend to merge."  Stott v. Haworth, 916 F.2d 134, 143 (4th Cir. 1990).  "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  Falcon, 457 U.S. at 157 n.13, 102 S. Ct. at 2371 n.13.  Accordingly, it is appropriate to address these elements collectively.

"There need only be a single issue common to all members of the class to satisfy the commonality requirement" and "the mere fact that questions peculiar to each

---

[7] In light of this conclusion, this court will not address the other elements of Rules 23(a) or (b).

-22-

individual member of the class remain after common questions as to defendant's liability have been resolved does not dictate the conclusion that the class action is impermissible." Elkins v. Am. Showa, Inc., 219 F.R.D. 414, 418 (S.D. Ohio 2002).  However, "[n]ot every common question will suffice . . . to establish commonality.  The common issue must be such that its resolution will advance the litigation."  Id.  See also Falcon, 457 U.S. at 159, 102 S. Ct. at 2371 (principal purpose of class action is to "advance the efficiency and economy of litigation") (quotations and citation omitted).

"The central inquiry in determining whether a proposed class has 'typicality' is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class."  McLaughlin v. Liberty Mut. Ins. Co., 224 F.R.D. 304, 310 (D. Mass. 2004).  "While factual differences between the claims do not alone preclude certification, the representative's claim must arise from the same event, practice or conduct, and be based on the same legal theory as those of the other class members."  Collazo v. Calderon, 212 F.R.D. 437, 442-43 (D.P.R. 2002).  "Typicality may be defeated, however, if factual differences predominate to the extent where the court must make highly fact-specific or individualized determinations in order to establish a defendant's liability to each class member."  Id. at 443.

In Stott, the Fourth Circuit Court of Appeals questioned the appropriateness of class treatment in cases alleging political patronage discrimination.  See Stott, 916 F.2d at 145 (describing the need for individual determination of political patronage claims).  The plaintiffs in that case sought to represent a class of government employees who allegedly

had been deprived of their constitutional rights due to a pattern and practice of patronage

dismissals.  See id. at 139-40.  The court found that the plaintiffs held "an array of jobs"

and that their "[j]ob descriptions, responsibilities and expectations quite naturally were

varied."  Id. at 143.  The court also concluded in relevant part as follows:

> We can find no commonality or typicality between the claims of
> each plaintiff that would propel this case through class treatment
> when the positions held by each plaintiff were so divergent.  The
> only question common to each member of the class is whether or not
> his or her position was one that was subject to patronage dismissal.
> This question is in no way dispositive and simply propels the action
> into a posture where judicial scrutiny is necessary for just adjudica-
> tion; scrutiny that requires a district court to do a case by case, posi-
> tion by position, activity by activity analysis of the First Amendment
> questions raised by the pleadings.

Id.

That is the situation in the instant case.  The record establishes that the named

plaintiffs and the putative class members held a variety of administrative positions within

different areas of the BFD, and that they had differing employment histories and

experience.  The record further indicates that the number of upgrades and promotions for

which they applied, and the nature of the positions sought by those who applied for

promotions, were similarly varied.  Each position required different qualifications and the

competition for each position varied.  Moreover, the plaintiffs have alleged that they were

subjected to different types of adverse employment actions (i.e., retaliation vs. direct

discrimination), and that the alleged unlawful actions were performed by different

defendants.  Furthermore, the successful applicants for the various positions were

allegedly hired as a result of different relationships with different people, all of which the plaintiffs challenge. Where, as here, "the facts described by the various class representatives portray individualized claims of discrimination which do not seem to share a common core of allegations with the class at large, aside from the imputation that all were the result of political discrimination[,]" an individualized showing of political discrimination will be required. Collazo, 212 F.R.D. at 443 (no typicality where plaintiffs alleged diverse employment actions occurring at different locations that would require independent consideration of individuals' qualifications, work performance and duties in light of particular employment conditions). Compare Vickery v. Jones, 856 F. Supp. 1313, 1328-29 (S.D. Ill. 1994) (class treatment appropriate in light of fact that each putative class member sought or held same employment position, claims did not seek monetary relief, and no individualized consideration of reasons for adverse job actions would be necessary because putative classes consisted of individuals who possessed basic job qualifications and would have been considered for employment but for political affiliation).

The plaintiffs argue that commonality is present because "[t]he politically motivated procedure and decision making related to individuals less qualified, constitutes a recurring and common practice applicable to all, even though certain factual situations may be case specific." (Pl. Mem. at 11). However, as the Supreme Court has observed in the context of a case involving claims of discrimination under Title VII:

-25-

> Conceptually, there is a wide gap between (a) an individual's claim
> that he has been denied a promotion on discriminatory grounds, and
> his otherwise unsupported allegation that the company has a policy
> of discrimination, and (b) the existence of a class of persons who
> have suffered the same injury as that individual, such that the
> individual's claim and the class claims will share common questions
> of law or fact and that the individual's claim will be typical of the
> class claims.  For [the individual] to bridge that gap, he must prove
> much more than the validity of his own claim.

Falcon, 457 U.S. at 157-58, 102 S. Ct. at 2370-71.  The plaintiffs have not alleged

sufficient facts to bridge that gap.  Rather, plaintiffs have put forth anecdotal evidence of

"an assortment of separate claims based on differing legal theories," which arose out of

"assorted and unrelated . . . actions, over a long period, in various locations, and in an

uncoordinated manner."  Morgan v. Metro. Dist. Comm'n, 222 F.R.D. 220, 231-32 (D.

Conn. 2004) (declining to certify class in Title VII case brought by current and former

employees where record established "essentially individual claims of employment

discrimination.").  In contrast to Jensen v. Eveleth Taconite Co., 139 F.R.D. 657 (D.

Minn. 1991), a Title VII sex discrimination class action on which the plaintiffs rely, there

is no statistical evidence supporting a claim that adverse job actions were taken based on

an unconstitutional consideration.  Id. at 660 (in support of class certification, plaintiffs

submitted statistical evidence that women were not hired due to gender).  There is not

even evidence in the instant case that the plaintiffs were subjected to the same wrongful

conduct.  See id. at 663 (hostile work environment claim can be considered on class-wide

basis where sexually explicit materials were found on the walls throughout common areas

of workplace and in women's vehicles, restrooms and other public areas). The fact-based inquiries required by plaintiffs' claims are not appropriate for class-wide resolution.

Finally, the plaintiffs' allegations raise questions as to whether a class of persons subjected to unlawful political affiliation discrimination can be sustained. Throughout their complaint, the plaintiffs have alleged that decisions regarding upgrades, pay raises and promotions at the BFD were determined by the applicant's political affiliation or other association with individuals having power or influence over the BFD. (See, e.g., Compl. ¶¶ 32, 34, 36, 44). However, "[t]o succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.'" Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336, 97 S. Ct. 1843, 1855, 52 L. Ed. 2d 396 (1977)). By their own allegations, the plaintiffs have established that some decisions regarding hiring and promotion at the BFD were based on the applicant's political ties, but that other decisions were made on the basis of personal relationships, which while unfair, would not have been unconstitutional. See Padilla-Garcia, 212 F.3d at 74 (to prevail on claim of political discrimination, plaintiff must establish both that affiliation with another was a motivating factor for adverse employment action and that the affiliation was political). Therefore, this court concludes that the plaintiffs have not adequately alleged an institutionalized pattern and practice of political discrimination, as

opposed to individual instances of discrimination, which was applied to civilian employees at the BFD.

The plaintiffs' allegations of fact based grievances have set forth what are essentially individual claims of constitutional violations. The record presented by the parties reveals that "[i]f the Court were to certify the Plaintiffs' . . . claims, the Court 'would be grouping together many unrelated employment decisions made by [various individuals] against many individual plaintiffs. An analysis of these unrelated decisions would raise numerous individualized questions that are not amenable to generalized proof.' Class certification is not appropriate in such circumstances." Morgan, 222 F.R.D. at 233-34 (quoting Reap v. Cont'l Cas. Co., 199 F.R.D. 536, 545 (D.N.J. 2001)). Because the plaintiffs have not met their burden of establishing commonality and typicality under Rule 23(a), this court recommends that their motion for class certification be denied.

## IV.  CONCLUSION

For all the reasons detailed above, this court finds that the plaintiffs have failed to demonstrate that their claims and the class claims share common questions of law or fact and that the individual plaintiffs' claims are typical of the class claims, as required for class certification under Fed. R. Civ. P. 23. Accordingly, this court recommends that the "Plaintiffs' Motion for Class Certification" (Docket No. 76) be DENIED.[8]

_____

[8]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a

-28-

___/ s / Judith Gail Dein_____

Judith Gail Dein
United States Magistrate Judge

written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).